# United States Court of Appeals

*for the*

# First Circuit

---

Case No. 25-1360

EDERVALDO RODRIGUES DA SILVA,

*Petitioner-Appellee,*

v.

JESSICA SILVEIRA DA SILVA,

*Respondent-Appellant,*

GILBERTO LUCAS,

*Respondent.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON, IN CASE NO. 1:24-cv-11280-ADB

## JOINT APPENDIX
## VOLUME 1 OF 2, Pages A1-A538

ELIZABETH G. CROWLEY
CHARLES R. HUNSINGER
BOWDITCH & DEWEY LLP
*Counsel for Petitioner-Appellee*
75 Federal Street, Suite 1000
Boston, Massachusetts 02110
(617) 757-6500

BETH I.Z. BOLAND
LEA GULOTTA JAMES
AMANI KMEID
RUBEN J. RODRIGUES
FOLEY & LARDNER LLP
*Counsel for Respondent-Appellant*
111 Huntington Ave, Suite 2500
Boston, Massachusetts 02199
(617) 342-4000

CP COUNSEL PRESS   (800) 4-APPEAL • (381440)

# TABLE OF CONTENTS

| Docket No. | Description | Pages |
|---|---|---|
| | Docket Sheet – Civil Action No. 1:24-cv-11280-ADB | A1 |
| 28 | Joint Pretrial Memorandum, dated October 4, 2024 | A10 |
| 29 | Petitioner's Trial Brief, dated October 7, 2024 | A26 |
| 30 | Respondents' Pre-Trial Brief, dated October 7, 2024 | A35 |
| 30-1 | Exhibit A – Respondents' Proposed Findings of Fact | A79 |
| 30-2 | Exhibit B – Respondents' Proposed Conclusion of Law | A88 |
| 30-3 | Exhibit C – Automated Case Information for EOIR | A103 |
| 30-4 | Exhibit D - Automated Case Information for EOIR | A106 |
| 30-5 | Exhibit E – Deposition Transcript of Jessica Silveira data Silva, dated September 13, 2024 | A109 |
| 30-8 | Exhibit H – Excerpts from Deposition Transcript of Edervaldo Rodrigues da Silva, dated September 13, 2024 | A121 |
| 30-9 | Exhibit I – Decision Communication from INSS – National Social Security Institute, dated May 18, 2022 | A130 |
| 30-12 | Exhibit L – Department of Homeland Security Notice re Application For Asylum and For Withholding of Removal, dated October 4, 2023 | A139 |
| 30-13 | Exhibit M – Social Security card and United States Employment Authorization cards for Jessica Silveira Da Silva | A141 |
| 30-17 | Exhibit T – Explanation Report by Elisa Perez-Vera | A143 |

| Docket No. | Description | Pages |
|---|---|---|
| 30-18 | Exhibit U – National Social Security Institute Decision Communication, dated October 1, 2024 | A195 |
| 30-19 | Exhibit V – Report Card for minor child, Series 3 2023-2024 | A199 |
| 30-20 | Exhibit W - National Social Security Institute Decision Communication, dated October 1, 2024 | A209 |
| 30-21 | Exhibit X - National Social Security Institute Decision Communication, dated October 1, 2024 | A213 |
| 30-22 | Exhibit Y - National Social Security Institute Decision Communication, dated October 1, 2024 | A217 |
| 36 | Trial Transcript Day 1, October 15, 2024 | A221 |
| 37 | Trial Transcript Day 2, October 16, 2024 | A335 |
| 38 | Trial Transcript Day 3, October 17, 2024 | A426 |
| 44 | Motion For a Stay of Order For Return of Child Pending Appeal, dated March 11, 2025 | A483 |
| 45 | Judgment, dated March 13, 2025 | A494 |
| 46 | Opposition To Respondent's Motion For Stay Pending Appeal, dated March 24, 2025 | A496 |
| 47 | Jessica Silveira Da Silva's Motion For Leave To File Reply Memorandum In Support of Motion For A Stay of Order, dated March 25, 2025 | A507 |
| 49 | Notice of Appeal, dated March 31, 2025 | A511 |
| 50 | Reply In Support of Motion For A Stay of Order For Return of Child Pending Appeal, dated April 2, 2025 | A513 |
| 53 | Order, dated April 18, 2025 | A520 |
| | Respondent da Silva and Child's Master Calendar Hearing (Trial Ex. JX-50) | A522 |
| | Brazilian Civil Code (Trial Ex. JX-51) | A536 |

| Docket No. | Description | Pages |
|---|---|---|
| | **SEALED VOLUME** | |
| 1 | Complaint, dated May 14, 2024 | A539 |
| 18-1 | Defendants' Answer and Affirmative Defenses (Under Seal), dated August 7, 2024 | A582 |
| 30-23 | Exhibit F – Respondent's Responses To Petitioner's First Set of Interrogatories, dated September 6, 2024 | A599 |
| 30-24 | Exhibit G – Hearing Transcript from Divorce Proceedings, dated December 10, 2021 | A619 |
| 30-25 | Exhibit J – Form for issuance of minor's passport, dated May 4, 2014 | A631 |
| 30-26 | Exhibit K – 5th Family Court Judgment | A635 |
| 30-27 | Exhibit N - Report Card for minor child for Series 2 2022-2023 | A643 |
| 30-28 | Exhibit R - National Social Security Institute Decision Communication, dated October 1, 2024 | A653 |
| 30-29 | Exhibit S - National Social Security Institute Decision Communication, dated October 1, 2024 | A657 |
| 41 | Findings of Fact and Conclusions of Law, dated February 28, 2025 | A661 |
| | Respondent Silveira da Silva's work identification card (Trial Ex. JX-1) | A691 |
| | Respondent Silveira da Silva and Child's pending asylum application (Trial Ex. JX-2) | A692 |
| | Documents concerning receipt of asylum application (Trial Ex. JX-3) | A720 |
| | Medical records from Oak Pediatrics (Trial Ex. JX-4) | A727 |
| | Soccer enrollment receipt  (Trial Ex. JX-5) | A741 |
| | Authorization form for Child's Brazilian passport (Trial Ex. JX-6) | A742 |

| Docket No. | Description | Pages |
|---|---|---|
| | Child's Brazilian Passport (Trial Ex. JX-7) | A745 |
| | Petitioner's National Social Security Institute Decisions (Trial Ex. JX-8) | A746 |
| | Child's social security card and employment authorization card (Trial Ex. JX-9) | A766 |
| | Respondent Silveira da Silva's social security card and employment authorization card (Trial Ex. JX-10) | A767 |
| | Divorce hearing minutes (Trial Ex. JX-11) | A768 |
| | Hearing minutes, dated June 5, 2024 (Trial Ex. JX-12) | A779 |
| | Photographs of Child at church (Trial Ex. JX-13) | A786 |
| | Photograph of Child with classmates (Trial Ex. JX-14) | A787 |
| | Photograph of Child with classmates (Trial Ex. JX-15) | A788 |
| | Photographs of Child with cousin (Trial Ex. JX-16) | A789 |
| | Photographs of Child with family (Trial Ex. JX-17) | A790 |
| | Photographs of Child with family (Trial Ex. JX-18) | A791 |
| | Photographs of Child with family (Trial Ex. JX-19) | A792 |
| | Photographs of Child with teacher (Trial Ex. JX-20) | A793 |
| | Photographs of Child and Respondent Lucas (Trial Ex. JX-21) | A794 |
| | Photographs of Child and Respondent Lucas (Trial Ex. JX-22) | A795 |
| | Photographs of Child and Respondent Lucas (Trial Ex. JX-23) | A796 |
| | Photographs of Child and Respondent Lucas (Trial Ex. JX-24) | A797 |

| Docket No. | Description | Pages |
|---|---|---|
| | Photographs of Child and Respondent Lucas (Trial Ex. JX-25) | A798 |
| | Photographs of Child and Respondent Lucas (Trial Ex. JX-26) | A799 |
| | Photographs of Child, Respondent(s), and family members (Trial Ex. JX-27) | A800 |
| | Photographs of Child, Respondent(s), and family members (Trial Ex. JX-28) | A801 |
| | Photographs of Child, Respondent(s), and family members (Trial Ex. JX-29) | A802 |
| | Photograph of Child at soccer practice (Trial Ex. JX-30) | A803 |
| | Photographs of Respondents (Trial Ex. JX-31) | A804 |
| | Passport cancellation document and Communications of Migratory Movements (Trial Ex. JX-32) | A805 |
| | Certificate of Petitioner's negative criminal history (Trial Ex. JX-33) | A810 |
| | Photograph of the Minor Child and the Petitioner (Trial Ex. JX-35) | A813 |
| | Photograph of the Minor Child and the Petitioner (Trial Ex. JX-36) | A814 |
| | Photograph of the Minor Child and the Petitioner (Trial Ex. JX-37) | A815 |
| | Photograph of the Minor Child and the Petitioner (Trial Ex. JX-38) | A816 |
| | School Documents (Trial Ex. JX-39) | A817 |
| | Child's 2022-2023 report card (Trial Ex. JX-40) | A845 |
| | Child's 2023-2024 report card (Trial Ex. JX-41) | A854 |
| | Hague Application (Trial Ex. JX-42) | A863 |
| | Police Report 03/30/2022 (Trial Ex. JX-43) | A870 |
| | Messages with Brendan Casey (Trial Ex. JX-44) | A877 |

| Docket No. | Description | Pages |
|---|---|---|
| | Messages with Miss Couser  (Trial Ex. JX-45) | A878 |
| | Messages with Ms. Emerick (Trial Ex. JX-46) | A879 |
| |  Combined Messages with Ms. Marshall (Trial Ex. JX-47) | A880 |
| | Messages with Dr. Scarpati (Trial Ex. JX-48) | A883 |
| | Combine Messages with Ms. Woodcox (Trial Ex. JX-49) | A884 |

APPEAL

# United States District Court
## District of Massachusetts (Boston)
### CIVIL DOCKET FOR CASE #: 1:24-cv-11280-ADB

| | |
|---|---|
| Rodrigues Da Silva v. Silveira Da Silva et al | Date Filed: 05/14/2024 |
| Assigned to: Judge Allison D. Burroughs | Date Terminated: 03/13/2025 |
| Case in other court:  USCA - First Circuit, 25-01360 | Jury Demand: None |
| Cause: 46:1156 Administrative Procedure Act | Nature of Suit: 890 Other Statutory Actions |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Edervaldo Rodrigues Da Silva**
Rua Paris, 69 casa 02, Bairro Copacabana,
Belo Horizonte-
Minas Gerais
CEP: 31.550-150
Brasil

represented by **Charles R. Hunsinger**
Bowditch & Dewey
Massachusetts
101 Federal Street
Suite 1405
Boston, MA 02110
617-757-6557
*ATTORNEY TO BE NOTICED*

**Elizabeth G. Crowley**
Bowditch & Dewey
101 Federal Street
Boston, MA 02110
617-757-6555
Email: ecrowley@bowditch.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Jessica Silveira Da Silva**

represented by **James W. Matthews**
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA 02199
617-226-3131
Email: jmatthews@foley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ruben J. Rodrigues**
Foley & Lardner LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199
617-342-4000
Fax: 617-342-4001

A1

Email: rrodrigues@foley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amani Kmeid**
Foley & Lardner LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199
617-342-4069
Email: akmeid@foley.com
*ATTORNEY TO BE NOTICED*

**Jamie Steven**
Foley & Lardner LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199
207-890-9361
Email: jsteven@foley.com
*ATTORNEY TO BE NOTICED*

**John W. Custer**
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
617-646-8000
Email: jcuster@wolfgreenfield.com
*ATTORNEY TO BE NOTICED*

**Lea Gulotta James**
Foley & Lardner LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199
617-226-3163
Email: ljames@foley.com
*ATTORNEY TO BE NOTICED*

**Olivia Rae King Benjamin**
DOJ-USAO
1 Courthouse Way
Ste 9200
Boston, MA 02210
617-748-3100
Email: olivia.benjamin@usdoj.gov
*TERMINATED: 01/13/2025*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gilberto Lucas**
*TERMINATED: 10/17/2024*

represented by **James W. Matthews**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ruben J. Rodrigues**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amani Kmeid**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie Steven**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John W. Custer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lea Gulotta James**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Olivia Rae King Benjamin**
(See above for address)
*TERMINATED: 01/13/2025*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/14/2024 | 1 | COMPLAINT against Gilberto Lucas, Jessica Silveira Da Silva, filed by Edervaldo Rodrigues Da Silva. (Attachments: # 1 Envelopes, # 2 Exhibit)(Phillips, Sophie) (Entered: 05/14/2024) |
| 05/14/2024 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge Allison D. Burroughs assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jennifer C. Boal. (Cowan, Nicole) (Entered: 05/14/2024) |
| 06/20/2024 | 3 | Judge Allison D. Burroughs: ORDER entered regarding filing fee. The Court ORDERS da Silva to resolve the filing fee within thirty-five (35) days either by (1) paying the fee; or (2) submitting an Application to Proceed in District Court Without Prepaying Fees or Costs. (McManus, Caetlin) (Entered: 06/20/2024) |
| 06/20/2024 | 4 | Judge Allison D. Burroughs: ORDER to Appear and for Service entered.  IT IS HEREBY ORDERED that Petitioner and Respondents appear at an initial hearing on July 11, 2024, at 1:00 PM EST. The hearing will take place by video conference. The parties shall contact Courtroom Deputy Clerk Karen Folan no later than July 8, 2024, to receive instructions for participating by video conference. See full order attached.  (McManus, Caetlin) (Entered: 06/20/2024) |
| 06/20/2024 | 5 | Copy re 4 Order,, Set Deadlines/Hearings, 3 Order, mailed to Edervaldo Rodrigues Da Silva Rua Paris, 69 casa 02, Bairro Copacabana, Belo Horizonte-Minas Gerais CEP: |

| | | 31.550-150 Brasil on 6/20/2024, emailed to edervaldo.silva85@gmail.com. (McManus, Caetlin) (Entered: 06/20/2024) |
|---|---|---|
| 07/11/2024 | 6 | NOTICE of Appearance by Elizabeth G. Crowley on behalf of Edervaldo Rodrigues Da Silva (Crowley, Elizabeth) (Entered: 07/11/2024) |
| 07/11/2024 | 7 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Status Conference held on 7/11/2024. Parties will confer and get back to the court regarding trial dates. (Court Reporter: Kelly Mortellite at mortellite@gmail.com.)(Attorneys present: Crowley, Rodriguez) (Folan, Karen) (Entered: 07/11/2024) |
| 07/26/2024 | 8 | Judge Allison D. Burroughs: PRETRIAL ORDER entered. Final Pretrial Conference set for 10/10/2024 09:00 AM in Courtroom 17 (In person only) before Judge Allison D. Burroughs. Bench Trial set for 10/15/2024 09:00 AM in Courtroom 17 (In person only) before Judge Allison D. Burroughs. (McManus, Caetlin) (Entered: 07/26/2024) |
| 07/26/2024 | 9 | NOTICE of Appearance by Ruben J. Rodrigues on behalf of Gilberto Lucas, Jessica Silveira Da Silva (Rodrigues, Ruben) (Entered: 07/26/2024) |
| 07/26/2024 | 10 | NOTICE of Appearance by John Custer on behalf of Gilberto Lucas, Jessica Silveira Da Silva (Custer, John) (Entered: 07/26/2024) |
| 07/26/2024 | 11 | NOTICE of Appearance by Amani Kmeid on behalf of Gilberto Lucas, Jessica Silveira Da Silva (Kmeid, Amani) (Entered: 07/26/2024) |
| 07/26/2024 | 12 | NOTICE of Appearance by Lea Gulotta James on behalf of Gilberto Lucas, Jessica Silveira Da Silva (James, Lea) (Entered: 07/26/2024) |
| 07/26/2024 | 13 | NOTICE of Appearance by Olivia Rae King Benjamin on behalf of Gilberto Lucas, Jessica Silveira Da Silva (Benjamin, Olivia) (Entered: 07/26/2024) |
| 07/31/2024 | 14 | MOTION for Leave to Proceed in forma pauperis by Edervaldo Rodrigues Da Silva. (Crowley, Elizabeth) (Entered: 07/31/2024) |
| 07/31/2024 | 15 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 14 Motion for Leave to Proceed in forma pauperis. (McManus, Caetlin) (Entered: 07/31/2024) |
| 08/02/2024 | 16 | Proposed Document(s) submitted by Gilberto Lucas, Jessica Silveira Da Silva. Document received: Joint Proposed Scheduling Order. (Kmeid, Amani) (Entered: 08/02/2024) |
| 08/02/2024 | 17 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered APPROVING 16 Joint Proposed Scheduling Order. (McManus, Caetlin) (Entered: 08/02/2024) |
| 08/07/2024 | 18 | ANSWER to 1 Complaint *and Affirmative Defenses (Redacted)* by Gilberto Lucas, Jessica Silveira Da Silva.(Rodrigues, Ruben) (Additional attachment(s) added on 8/7/2024: # 1 Unredacted Answer, Sealed) (McManus, Caetlin). (Entered: 08/07/2024) |
| 08/14/2024 | 19 | MOTION to Seal Document by Edervaldo Rodrigues Da Silva.(Crowley, Elizabeth) (Entered: 08/14/2024) |
| 08/15/2024 | 20 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 19 Motion to Seal 1 Complaint. (McManus, Caetlin) (Entered: 08/15/2024) |
| 08/27/2024 | 21 | NOTICE of Withdrawal of Appearance by John Custer (Custer, John) (Entered: 08/27/2024) |

| | | |
|---|---|---|
| 08/29/2024 | 22 | US Marshal Process Receipt and Return for Complaint and Orders. Gilberto Lucas served. Delivered on 7/1/2024. (Cook, Savannah) (Entered: 08/29/2024) |
| 08/29/2024 | 23 | US Marshal Process Receipt and Return for Complaint and Orders. Jessica Silveira Da Silva served. Delivered on 7/1/2024. (Cook, Savannah) (Entered: 08/29/2024) |
| 09/10/2024 | 24 | NOTICE of Appearance by Elizabeth G. Crowley on behalf of Edervaldo Rodrigues Da Silva (Crowley, Elizabeth) (Entered: 09/10/2024) |
| 09/12/2024 | 25 | NOTICE of Appearance by Jamie Steven on behalf of Gilberto Lucas, Jessica Silveira Da Silva (Steven, Jamie) (Entered: 09/12/2024) |
| 09/17/2024 | 26 | Disclosure pursuant to Rule 26 by Gilberto Lucas, Jessica Silveira Da Silva.(James, Lea) (Entered: 09/17/2024) |
| 09/30/2024 | 27 | NOTICE of Appearance by James W. Matthews on behalf of Gilberto Lucas, Jessica Silveira Da Silva (Matthews, James) (Entered: 09/30/2024) |
| 10/04/2024 | 28 | PRETRIAL MEMORANDUM by Edervaldo Rodrigues Da Silva. (Crowley, Elizabeth) (Entered: 10/04/2024) |
| 10/07/2024 | 29 | TRIAL BRIEF by Edervaldo Rodrigues Da Silva. (Crowley, Elizabeth) (Entered: 10/07/2024) |
| 10/07/2024 | 30 | PRETRIAL MEMORANDUM by Gilberto Lucas, Jessica Silveira Da Silva. (Attachments: # 1 Exhibit A - Proposed Findings of Fact, # 2 Exhibit B - Proposed Conclusion of Law, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit R, # 16 Exhibit S, # 17 Exhibit T, # 18 Exhibit U, # 19 Exhibit V, # 20 Exhibit W, # 21 Exhibit X, # 22 Exhibit Y)(Rodrigues, Ruben) (Additional attachment(s) added on 10/8/2024: # 23 Unredacted Exhibit F - SEALED, # 24 Unredacted Exhibit G - SEALED, # 25 Unredacted Exhibit J - SEALED, # 26 Unredacted Exhibit K - SEALED, # 27 Unredacted Exhibit N - SEALED, # 28 Unredacted Exhibit R - SEALED, # 29 Unredacted Exhibit S - SEALED) (McManus, Caetlin). (Entered: 10/07/2024) |
| 10/09/2024 | 31 | NOTICE of Appearance by Charles R. Hunsinger on behalf of Edervaldo Rodrigues Da Silva (Hunsinger, Charles) (Entered: 10/09/2024) |
| 10/10/2024 | 32 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Final Pretrial Conference held on 10/10/2024. Colloquy re: trial schedule and trial logistics. (Court Reporter: Kelly Mortellite at mortellite@gmail.com.)(Attorneys present: Hunsinger, Matthews, Benjamin, James) (Folan, Karen) (Entered: 10/10/2024) |
| 10/15/2024 | 33 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 1 held on 10/15/2024. Opening statements by the parties. Edervaldo Rodrigues DaSilva sworn and testifies. Jessica Silveira DaSilva sworn and testifies. (Court Reporter: Kelly Mortellite at mortellite@gmail.com.)(Attorneys present: Hunsinger, Crowley, Matthews, Benjamin, James) (Folan, Karen) (Entered: 10/15/2024) |
| 10/16/2024 | 34 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 2 held on 10/16/2024. Testimony of Jessica Silveira DaSilva resumes. Petitioner rests. Respondent conducts direct of Jessica Silveira DaSilva. Brenda Countinho sworn and testifies. Gilmar Junior Torres dos Santos sworn and testifies. (Court Reporter: Kelly Mortellite at mortellite@gmail.com.) (Folan, Karen) (Entered: 10/17/2024) |
| 10/17/2024 | 35 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 3 completed on 10/17/2024. Oral motion to dismiss respondent Gilberto Lucas is allowed. Testimony of Jessica Silveira DaSilva resumes. Sara Hoey sworn and testifies. No further witnesses. Closing statements by the parties. Court takes matter under advisement. |

| | | (Court Reporter: Kelly Mortellite at mortellite@gmail.com.) (Folan, Karen) (Entered: 10/17/2024) |
|---|---|---|
| 11/04/2024 | 36 | Transcript of Bench Trial Day One held on October 15, 2024, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 11/25/2024. Redacted Transcript Deadline set for 12/5/2024. Release of Transcript Restriction set for 2/3/2025. (Kelly, Danielle) (Entered: 11/04/2024) |
| 11/04/2024 | 37 | Transcript of Bench Trial Day Two held on October 16, 2024, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 11/25/2024. Redacted Transcript Deadline set for 12/5/2024. Release of Transcript Restriction set for 2/3/2025. (Kelly, Danielle) (Entered: 11/04/2024) |
| 11/04/2024 | 38 | Transcript of Bench Trial Day Three held on October 17, 2024, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 11/25/2024. Redacted Transcript Deadline set for 12/5/2024. Release of Transcript Restriction set for 2/3/2025. (Kelly, Danielle) (Entered: 11/04/2024) |
| 11/04/2024 | 39 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Kelly, Danielle) (Entered: 11/04/2024) |
| 01/09/2025 | 40 | NOTICE of Withdrawal of Appearance by Olivia Rae King Benjamin (Benjamin, Olivia) (Entered: 01/09/2025) |
| 02/28/2025 | 41 | Judge Allison D. Burroughs: Order entered. Findings of Fact and Conclusions of Law.<br><br>...Accordingly, Edervaldo da Silva's Petition for Return of Child Under the Hague Convention is <u>GRANTED</u>.<br><br>IT IS HEREBY ORDERED that A.R. shall be returned to Brazil, his country of habitual residence, at Respondent's expense at a reasonable date and time mutually agreed upon by the parties.<br><br>IT IS FURTHER ORDERED that Respondent shall make all necessary arrangements associated with returning A.R. to Brazil.<br><br>IT IS FURTHER ORDERED that Respondent shall not, absent leave of this Court, remove A.R. from the District of Massachusetts pending his return to Brazil.<br><br>IT IS FURTHER ORDERED that counsel for Respondent shall file a notice with the Clerk of Court immediately upon A.R.'s arrival in Brazil, indicating that Respondent has fully complied with the terms of this Order.<br><br>**SO ORDERED.**<br><br>(CAM) Replaced with redacted version on 3/13/2025 (CAM). (Additional attachment(s) added on 3/13/2025: # 1 Unredacted Findings of Fact - SEALED) (CAM). (Entered: 02/28/2025) |

| 02/28/2025 | 42 | Judge Allison D. Burroughs: ELECTRONIC ORDER ENTERED. The Court has filed its Findings of Fact and Conclusions of Law under seal because they contain references to materials that have been filed under seal. The parties shall confer and, no later than March 12, 2025, propose any redactions to the Court so that an unredacted or partially redacted version may be placed on the public docket. (CAM) (Entered: 02/28/2025) |
|---|---|---|
| 03/07/2025 | 43 | NOTICE of Change of Address or Firm Name by Elizabeth G. Crowley (Crowley, Elizabeth) (Entered: 03/07/2025) |
| 03/11/2025 | 44 | MOTION to Stay re 41 Order, by Jessica Silveira Da Silva.(James, Lea) Modified on 3/13/2025 to link to correct docket entry (CAM). (Entered: 03/11/2025) |
| 03/13/2025 | 45 | Judge Allison D. Burroughs: ORDER entered. JUDGMENT entered on behalf of Petitioner, Edervaldo da Silva. (CAM) (Entered: 03/13/2025) |
| 03/24/2025 | 46 | Opposition re 44 MOTION to Stay re 42 Order, filed by Edervaldo Rodrigues Da Silva. (Crowley, Elizabeth) (Entered: 03/24/2025) |
| 03/25/2025 | 47 | MOTION for Leave to File *Reply in Support of Motion for Stay* by Jessica Silveira Da Silva.(James, Lea) (Entered: 03/25/2025) |
| 03/26/2025 | 48 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 47 Motion for Leave to File Reply to Response to 44 Motion to Stay ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 03/26/2025) |
| 03/31/2025 | 49 | NOTICE OF APPEAL as to 42 Order, by Jessica Silveira Da Silva. Filing fee: $ 605, receipt number AMADC-10923187 Fee Status: Not Exempt.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 4/21/2025. (James, Lea) (Entered: 03/31/2025)** |
| 04/02/2025 | 50 | REPLY to Response to 44 MOTION to Stay re 42 Order, filed by Jessica Silveira Da Silva. (James, Lea) (Entered: 04/02/2025) |
| 04/14/2025 | 51 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 49 Notice of Appeal. (MAP) (Entered: 04/14/2025) |
| 04/14/2025 | 52 | USCA Case Number 25-1360 for 49 Notice of Appeal, filed by Jessica Silveira Da Silva. (MAP) (Entered: 04/14/2025) |
| 04/18/2025 | 53 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Presently before the Court is Jéssica Silveira da Silva's ("Respondent") Motion for Stay of Order for Return of the Child Pending Appeal. [ECF No. 44 ]. In evaluating a motion to stay return, the Court must assess "(1) whether the stay applicant has made a strong showing that [she] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Chafin v. Chafin, 568 U.S. 165, 179 (2013) (quoting Nken v. Holder, 556 U.S. 418, 434 (2009)). The Supreme Court has cautioned against granting stays "as a matter of course," as "routine stays... would conflict |

with the Convention's mandate of prompt return to a child's country of habitual residence." Id. at 178. For the reasons set forth below, the motion is **DENIED**.

In relation to the first factor, Respondent argues that she is likely to succeed on appeal because the Court improperly considered certain factors in determining that A.R. is not well-settled in the United States. [ECF No. 44 at 7–9]. The Court, however, carefully considered the parties' evidence and engaged in a thorough analysis of the pertinent facts. See [ECF No. 41 at 20–26]. Not one factor was dispositive in the Court's ultimate conclusion, and it instead, as it was required to, weighed the relevant factors, in light of the evidence presented, under a totality of the circumstances analysis. [Id.]. As to the second factor—irreparable injury to the Respondent—the Court cannot agree with Respondent's reasoning that A.R.'s return to Brazil presupposes that her appeal will fail or that any relief would be automatically rendered ineffective. [ECF No. 44 at 5–6]; [ECF No. 50 at 1]; see Chafin, 568 U.S. at 171–76 (concluding that a district court's return order and subsequent removal of a child outside of the United States does not render an appeal of that order moot); id. at 175 ("No law of physics [would] prevent[] [A.R.'s] return from [Brazil]," and Petitioner "might... decide to comply with an order against [him] and return [A.R.] to the United States."); Lukic v. Elezovic, No. 20-cv-3110, 2021 WL 804384, at *3 (E.D.N.Y. Mar. 3, 2021) ("While respondent claims that effectuating a re-return order after a favorable appeal would be nearly impossible, she provides no evidence for this assertion." (internal quotation and citation omitted)). Nor is the Court persuaded that Respondent's apprehension about the status of her asylum application in the United States should she temporarily leave the country offers a sufficient basis for the Court to find irreparable harm, and Respondent offers no authority that it is. [ECF No. 44 at 5–6]; [ECF No. 50 at 1–3]. The second factor thus disfavors Respondent. The third factor, the balance of harms, similarly weighs against Respondent. A stay pending appeal would substantially injure Edervaldo Rodrigues da Silva ("Petitioner"), who has not seen A.R. in person for nearly three years. A.R. "would [similarly] lose precious months [he] could have [spent] readjusting to life" in Brazil. Chafin, 568 U.S. at 178. The Court acknowledges that A.R. will be returned while his asylum application is still pending, with possible implications to the international law principle of non-refoulement. Nonetheless, the Court, even understanding that the interplay between that principle and the Hague Convention has not yet been resolved, is not persuaded that this sufficiently tips the scale. Cf., Salame v. Tescari, 29 F.4th 763, 772–73 (6th Cir. 2022) ("[T]he district court has the authority to order the return of wrongfully removed children, regardless of whether the children were previously granted asylum."). The fourth factor, which considers the public interest, favors denial of the motion. Mendoza v. Silva, 987 F. Supp. 2d 883, 909 (N.D. Iowa 2013) ("[T]he Convention and [International Child Abduction Remedies Act] demonstrate a public interest in expeditious resolution of petitions for return of children, 'for the sake of the children who find themselves in such an unfortunate situation.'" (quoting Chafin, 568 U.S. at 179)). In balancing the stay factors, therefore, the Court finds that they favor denial of Respondent's motion.

That said, the Court is nonetheless mindful of A.R.'s best interests and would like to see his return conducted in a manner that is minimally disruptive to his life. Thus, in order to facilitate A.R.'s transition to Brazil, the Court hereby stays the Order of Return until **July 1, 2025**, which will allow him to finish the school year here.

(CAM) (Entered: 04/18/2025)

| 04/18/2025 | 54 | Supplemental Record on Appeal transmitted to US Court of Appeals re 49 Notice of Appeal, Documents included: ECF No. 53 (MAP) (Entered: 04/18/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/09/2025 13:14:15 | | | |
| **PACER Login:** | fl2759shine | **Client Code:** | 999400-9068 |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-11280-ADB |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

A9

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EDERVALDO RODRIGUES DA SILVA, ) | |
| ) | |
|     Plaintiff/Petitioner, ) | |
| ) | |
| v. ) | C.A. No. 1:24-cv-11280-ADB |
| ) | |
| JESSICA SILVEIRA DA SILVA and ) | |
| GILBERTO LUCAS, ) | |
| ) | |
|     Defendants/Respondents. ) | |
| ) | |

## JOINT PRE-TRIAL MEMORANDUM

Pursuant to Local Rule 16.5(d), Petitioner Edervaldo Rodrigues da Silva ("Petitioner" or

"Father") and Respondents Jessica Silveira da Silva ("Mother") and Gilberto Lucas ("Mr. Lucas"

or "Stepfather") (collectively, "Respondents") (together with Petitioner, the "Parties")

respectfully submit the following Joint Pretrial Memorandum.

A.    **Names, Addresses, and Telephone Numbers of Trial Counsel**

*Petitioner's Counsel*

Elizabeth G. Crowley, Esq.
Charles R. Hunsinger, Esq.
BOWDITCH & DEWEY LLP
101 Federal Street #1405
Boston, MA 02110
(617) 757-6500
ecrowley@bowditch.com
chunsinger@bowditch.com

*Respondent's Counsel*

Ruben J. Rodrigues, Esq.
Lea Gulotta James, Esq.
Olivia Rae King Benjamin, Esq.
Jamie Steven, Esq.
Amani Kmeid, Esq.
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
(617) 342-4000
rrodrigues@foley.com
ljames@foley.com
obenjamin@foley.com
jsteven@foley.com
akmeid@foley.com

A10

B.   **Concise Summary of the Evidence**

    a.    **Petitioner's Concise Summary of the Evidence**

The evidence to be presented at trial will show that Petitioner had rights of custody as defined in the Hague Convention. The Petitioner and the Respondent were married in Brazil on May 13, 2011, in Brazil. A. R. S. da S. (hereinafter "the minor child") was born on May 4, 2014. The parties were both involved in care for the minor child during their marriage.

The parties were divorced in Brazil on or about December 10, 2021. The divorce judgment provided that they would have "joint custody of the minor." Petitioner was granted custody of the minor child on alternate weekends, from Friday at 5:00 PM to Monday at 9:00 AM; half of school vacations; and half of school holidays. Petitioner was also ordered to pay child support for the benefit of the minor child. Petitioner paid child support and exercised his custody rights regularly between December 10, 2021, and the date Respondent removed the minor child from Brazil.

The evidence will show that the Petitioner did not agree to the minor child being removed from Brazil. In February of 2022, Respondent obtained a passport for the minor child. Respondent represented to Petitioner that the passport was only for identification purposes and not for travel. Petitioner did not agree that the minor child would be able to leave Brazil, but the Respondent left Brazil with the minor child in or about March 2022. Respondent represented to Petitioner that she would leave the minor child in Brazil when she went abroad. Instead, Petitioner kidnapped the minor child, fled to Mexico, and then crossed the border into the United States on foot and without the proper documentation. Respondent and the minor child were detained by American immigration officials and ultimately moved to Lowell, Massachusetts. The evidence will also show that she did not tell the Petitioner of her intent to retain the minor child

2

in the United States permanently and that she told Petitioner that she would return to Brazil after five years.

The evidence will also show that the minor child is not well settled in the United States. The minor child has behavioral problems in school, has missed significant amounts of school time, and had to be reclassified to the second grade despite being age-eligible for third grade. The minor child's family lacks sufficient financial resources to make his life in the United States stable, with no foreseeable resolution, given the length of time the asylum process will take to be resolved. The evidence will show that the minor child misses Brazil and his family there. The evidence will also show that the minor child is not integrated into the community.

Lastly, the evidence will show that the minor child is not at grave risk of harm if he is returned to Brazil. The Respondent's asylum application for the minor child is based on harm to her, rather than to the minor child. Any evidence that the Respondent attempts to present that the minor child is at grave risk of harm will be insufficient to meet her burden of proof.

Petitioner reserves the right to offer such further and additional evidence as develops during the trial, and to offer such further evidence in rebuttal as the need therefore becomes known.

b.    **Respondents' Concise Summary of the Evidence**

Respondents expect the evidence at trial to show the following:

Mother and Father married in 2011; had a child, A.R., in 2014; and separated in 2016. After the separation, Father moved out of their shared apartment.  Before Mother and Father reached a formal custody agreement, A.R. primarily lived with Mother. During this time, Father was an inconsistent presence in the Child's life, and Mother primarily provided for A.R.'s physical and mental wellbeing.

3

A12

Mother and Father reached a formal agreement as to custody and child support of A.R. on December 10, 2021 (the "Divorce Agreement"), the same date on which their divorce was finalized.  The Divorce Agreement did not confer custody rights to Petitioner. Mother received custody of A.R.  Father's parental rights were limited to visitation on alternate weekends, half of vacations and school breaks amounting to 30 cumulative days annually, and alternate holidays. Father did not consistently exercise his rights of visitation, including missing several weekends, vacations, and holidays.  Mother never denied a request from Father to visit A.R.  Mother met and began dating Mr. Lucas in early 2021; he then relocated to, and settled in, the United States in July 2021.  Mother and Stepfather married in September 2024 in Lowell, Massachusetts.

Mother informed Father she intended to take A.R. to live abroad.  Knowing of her plans, on or about February 3, 2022, Father appeared at the Brazilian Immigration Police's passport division and signed an application for A.R. to obtain a passport with International Travel Authorization, which authorized one parent to travel with the Child abroad. The application states: "Standard form for authorizing the issuance of a minor's passport with the inclusion of an international travel authorization on the common passport, to travel with one of the parents[.]" Father did not ever effectively cancel A.R.'s passport.  Specifically, the evidence will show that Mother did not know or believe that A.R.'s passport had been cancelled.  A.R.'s passport was accepted by the airport when Mother and A.R. used the passport to travel from Brazil. Moreover, based on the terms of the application for cancellation, Father was aware that completing the application did not guarantee protection from the minor's travel from the country and "additional measures are recommended."

Mother and A.R. relocated to, and settled in, the United States in April of 2022 when A.R. was eight years old.  Mother and A.R. traveled to the United States with Stepfather's

4

A13

brother, Gilmar Torres dos Santos, and his now-wife, Bruna Coutinho.  After arriving in the United States, Mother and A.R. settled in Massachusetts with Stepfather.  Since then, Father has been able to have full communication with Mother and a now ten-year-old A.R.   In fact, Mother sought a court order from a Brazilian court to require Father to contact A.R. more frequently. Father now speaks with A.R. by video call several times per week, and Mother is always willing to facilitate her son's communications with Father.

Nonetheless, Father waited more than two years after Mother and A.R. moved to and settled in the United States, and then filed this Hague Convention action on May 14, 2024.

A.R. is now well-settled in the United States.  A.R. currently resides in Lowell, Massachusetts with his Mother and Stepfather.  A.R. is very close with his Stepfather, who thinks of A.R. like his own son.  Stepfather is an active participant in A.R.'s care, including caring for him after school, taking him to medical appointments, and teaching him how to ride a bike.

A.R. has many family connections in Massachusetts.  Stepfather's brother (and A.R.'s uncle), Mr. Torres dos Santos and his wife live in Gloucester, Massachusetts; they lived with A.R. [and Stepfather and Mother] for approximately one year after coming to the United States, during which time they were actively involved in A.R.'s care and upbringing.  Even now, A.R. sees his aunt and uncle on nearly a biweekly basis, and they do activities like going to the beach, riding bikes, or playing games and sports.  Several of Stepfather's cousins also live in Massachusetts, some with young children of their own, and A.R. sees many of them on at least a monthly basis to celebrate birthdays, holidays, and special events.  A.R. is particularly close with one of his cousins who is approximately eight years old.

5

A14

Mother is enrolled in beauty school, and also works part-time as a house cleaner. Stepfather works as a carpenter.  Together, they are able to provide a safe and financially secure life for A.R.  Per the Divorce Agreement, Father agreed to pay 20% of his net income into Mother's U.S. bank account on a monthly basis.  Even when Father has made those payments— which amount to approximately less than $45 per month—Mother and Stepfather have saved that money for A.R.'s use when he turns 18 and have instead fully provided for all of A.R.'s needs without dipping into those savings.

A.R. has lived in the United States for two and a half years, and he has a happy, stable life in Massachusetts.  Lowell has a large Brazilian community, allowing A.R. access to essential educational resources, community support, and connection to his culture.  A.R. currently attends fourth grade at Greenhalge Elementary School in Lowell.  He has attended the same school since September 2022, when he was in second grade.  The school provides a teacher aide in A.R.'s classroom to assist A.R. and other students with English learning, which allows A.R. to learn in both English and Portuguese.  A.R. has made friends at school and has quickly learned English.  Outside of school, A.R. is actively engaged in the community.  He has periodically attended church services with Mother.  He plays with his friends from both school and from the neighborhood where he lives.  He attends soccer lessons through a local organization, and also enjoys playing soccer in his free time.

The evidence will show that Father has engaged in a pattern of inappropriate and anti-social behavior that creates a grave risk of physical and psychological harm to A.R.

- On at least one occasion, after the Mother and Father separated but prior to divorce, Father grabbed and pulled Mother's arm, injuring her.  Father's physical violence toward Mother occurred because she requested to use Father's work

bonus to buy food for A.R.  Father never allowed Mother to use this bonus for A.R's benefit.

- Father is a habitual user of pornography. Father often verbally sexualized Mother. Mother was not the only victim of Father's sexual propensities. At least once, when A.R. was roughly five years old, A.R viewed pornography on Father's cellphone. A.R. later questioned Mother about what he had seen.

- Father regularly exposed A.R. to content rated far beyond his age, spending his visitation time with A.R. playing video games that would expose A.R. to drugs, violence, sexually explicit activity, and bad language.  This occurred on multiple occasions despite Mother's objections. A.R. was seven years old at the time.

- Father has also demonstrated a pattern of reckless behavior, including committing illegal acts such as breaking into neighbors' homes and stealing their belongings. One such incident occurred when Father skipped work, broke into a neighbor's home, and stole her cellphone. Another time, Father broke into another neighbor's home and stole a soccer jersey.

- Father has a history of mental illness. Father applied for temporary disability assistance, and subsequent extensions, several times between February 2022 and February 2023. This benefit was granted on the basis of anxiety. Father's anxiety was so severe, he has been unable to hold a job. Father has alerted Mother in the past that he hears voices telling him to kill himself.

Respondents reserve the right to offer such further and additional evidence as develops during the trial, and to offer such further evidence in rebuttal as the need becomes known.

C.      **Facts Established by Stipulation or Admission of Counsel**

1.      Mother and Father were married on May 13, 2011 in Brazil.

2.      Mother and Father had one (1) child, A R S da S ("Child" or "A.R."), born in 2014.  The child is presently ten (10) years old.

3.      Mother, Father, and Child are Brazilian citizens.

4.      Father, Mother, and Child resided together in the state of Minas Gerais, Brazil from the date of the Child's birth until the parties separated in or about 2018.

5.      Father filed for divorce in early 2021.

6.      On or about December 10, 2021, a Brazilian court entered a divorce judgment finalizing and setting the terms of Father and Mother's divorce.

7.      Father and Mother's divorce agreement provides, in pertinent part:

   a.  "[T]he custody of the minor [child] will be shared, and he will reside with his mother . . ."

   b.  "[T]he father will live with the child and have him in his company on alternate weekends, picking him up on Friday at the mother's residence at 5:00 p.m. and returning him on Monday, also at the mother's residence, at 9:00 a.m., starting on December 17, 2021 . . ."

   c.  "[E]ach parent will have the child with them for half of the January and July vacations and school breaks, with the first half going to the parent who is with the child on New Year's Eve . . ."

   d.  "[E]ach parent will have their child with them on alternate holidays . . . holidays that fall on the weekend will be the responsibility of the parent who is with the child on that weekend . . ."

   e.  "[I]n odd-numbered years, the mother will be with the child at Christmas, while the father will have the child with him on New Year's Eve, the situation being reversed in even-numbered years . . ."

   f.  "[O]n Father's Day, Father's Birthday, Mother's Day and Mother's Birthday, the child will stay with the party being feted . . ."

   g.  "[T]hese regulations may be waived by the parties, provided there is prior agreement and communication."

8.      Father and Mother's divorce agreement also provides that "the father will pay child support to [the child], from January 2022 onwards, the amount corresponding to 20% of his net income, by the 10th of each month . . ."

A17

9.      On or about February 3, 2022, Mother applied for a Brazilian passport on behalf of the Child.

10.     Father signed the passport application.

11.     On or about February 3, 2022, the Child was issued a Brazilian passport.

12.     On or about March 2, 2022, Petitioner applied for temporary disability assistance with the Brazilian National Social Security Institute.  This benefit was granted.

13.     In April 2022, Mother and the Child traveled to the United States.

14.     Mother and the Child ultimately traveled to Lowell in Middlesex County in the Commonwealth of Massachusetts.

15.     Mother, Gilberto Lucas, and the Child have resided together in Lowell since April 2022.

16.     Mr. Lucas is a Brazilian citizen.

17.     On or about April 3, 2023, through counsel, Mother filed on behalf of herself and the Child an I-589 Application for Asylum and for Withholding of Removal with the United States Department of Homeland Security, United States Citizenship and Immigration Services ("USCIS").

18.     The master calendar hearing in Mother's proceeding with USCIS is scheduled for November 3, 2025.  The Court has not yet set a final hearing date.

19.     Mother, Mr. Lucas, and the minor child resided with Mr. Lucas's brother-in-law and his wife from approximately April 2022 until April 2023.

20.     The child began attending Greenhalge Elementary School in Lowell, Massachusetts in September 2022.

21.     The child is currently enrolled in fourth grade at Greenhalge Elementary School.

22.     On or about November 16, 2023, Mother and the child were issued social security numbers by the United States Social Security Administration.

23.     On or about January 22, 2024, Mother was issued an employment authorization card by USCIS, which is valid until January 21, 2029.

24.     On or about September 18, 2024, the Respondents were married in Lowell, Massachusetts.

25.     The child and the Petitioner speak on the phone at least three times per week.

26.     On May 14, 2024, Petitioner initiated proceedings in the United States under the Hague Convention by filing a Complaint and Petition for Return of the Minor Child in the United States District Court for the District of Massachusetts.

27.     The pending action is filed pursuant to the Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11,670 1332 U.N.T.S. 49 (reprinted at 51 Fed. Reg. 10494 (Mar. 26, 1986), and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 – 11610 (2011).  The United States and Brazil are both Contracting States pursuant to the Hague Convention.

28.     The pending action is brought pursuant to the original jurisdiction conferred on this Court under 42 U.S.C. § 11603(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

29.     Venue is proper as the child and the Respondents reside in Middlesex County, Massachusetts.

D.   **Contested Issues of Fact**

    **a.**   **Petitioner's Contested Issues of Fact:**

        1.   Whether Father knew that Mother intended to remove the minor child from Brazil.

    **b.**   **Respondents' Contested Issues of Fact:**

        1.   Whether Father signed A.R.'s passport application with the understanding that Mother would move abroad with the Child.

        2.   Whether Father was verbally and physically abusive to Mother.

        3.   Whether Father has engaged in illegal behaviors such as breaking into neighbors' homes.

        4.   Whether Father is mentally fit to provide safe care for A.R.

        5.   Whether Father made every child support payment as required by the divorce agreement.

        6.   How often and for how long Father visited A.R. after his divorce from Mother.

E.   **Jurisdictional Questions**

There are no jurisdictional questions.

F.   **Issues of Law, Including Evidentiary Questions**

    a.   **Petitioner's Issues of Law**

      1.       Whether Mother has met her burden of proof that the minor child will be at grave risk of harm if he is returned to Brazil.

      2.       Whether Mother has met her burden of proof to show that the minor child is well-settled in Massachusetts

  b.    **Respondent's Issues of Law**

      1.       Whether Father had custody rights immediately prior to A.R.'s removal from Brazil.

      2.       If Father had custody rights, whether he was exercising any custody rights.

      3.       Whether Father assented, consented, or acquiesced to Mother's removal of A.R. from Brazil.

      4.       Whether A.R. is well-settled in Massachusetts, and thus should not be ordered to return to Brazil.

      5.       Whether A.R. would be placed at grave risk of physical and psychological harm if returned to Brazil, and thus should not be ordered to return to Brazil.

G.    **<u>Requested Amendments to the Pleadings</u>**

The parties do not request any amendments to their respective pleadings.

H.    **<u>Additional Matters</u>**

There are no additional matters.

I.    **<u>Probable Length of Trial</u>**

The parties estimate that trial in this matter will last approximately three days.

J.    **<u>Expert Qualifications</u>**

The parties do not intend to call any expert witnesses.

K.    **<u>Witnesses</u>**

  a.    **Petitioner's Witnesses**

      1.       Jessica Silveira da Silva, c/o Lea James, Foley & Lardner LLP, 111, Huntington Avenue, Boston, MA 02199

      2.       Edervaldo da Silva, c/o Charles R. Hunsinger, Bowditch & Dewey LLP 101 Federal Street, Suite 1405 Boston, MA 02110

Petitioners intend to seek the Court's permission to present Mr. da Silva's testimony via contemporaneous video conference.

      b.    **Respondent's Witnesses**

1. Edervaldo da Silva, c/o Charles R. Hunsinger, Bowditch & Dewey LLP 101 Federal Street, Suite 1405 Boston, MA 02110

2. Jessica Silveira da Silva, c/o Lea James, Foley & Lardner LLP, 111, Huntington Avenue, Boston, MA 02199

3. Gilberto Lucas, c/o Lea James, Foley & Lardner LLP, 111, Huntington Avenue, Boston, MA 02199

4. Gilmar Junior Torres dos Santos, c/o Lea James, Foley & Lardner LLP, 111, Huntington Avenue, Boston, MA 02199

5. Bruna Coutinho, c/o Lea James, Foley & Lardner LLP, 111, Huntington Avenue, Boston, MA 02199

6. Sarah Hoey, Frederic T. Greenhalge Elementary School, 149 Ennell Street, Lowell, MA 01850, c/o Jane Mosher-Canty, Lowell Public Schools

Respondents intend to seek the Court's permission to present the testimony of Ms. Hoey via contemporaneous videoconference.  Ms. Hoey will be available to testify during a free period at school starting at 10AM., and Respondents intend to seek the Court's permission to present Ms. Hoey's testimony at that specific time.

Respondents reserve the right to supplement this list through and including the time of trial, and to call such witnesses in rebuttal as necessary to meet the presentation of the Petitioner's case.

A21

L.     **Proposed Exhibits**

a.     **Proposed Joint Exhibits**

| EXHIBIT NUMBER | DESCRIPTION | LIMITATION |
|---|---|---|
| | Deposition transcript of Jessica Silveira da Silva - joint | |
| | Deposition transcript of Edervaldo Rodrigues Silveira da Silva | |
| | Answer | |
| | Respondent da Silva's work identification card | |
| | Respondent da Silva and child's pending asylum application | |
| | Documents concerning receipt of asylum application | |
| | Medical records from Oak Pediatrics | |
| | Soccer enrollment receipt | |
| | Authorization form for child's Brazilian passport | |
| | Child's Brazilian Passport | |
| | Petitioner's National Social Security Institute Decisions | |
| | Child's social security card and employment authorization card | |
| | Respondent da Silva's social security card and employment authorization card | |
| | Divorce hearing minutes | |
| | Child's 2022-2023 report card | |
| | Child's 2023-2024 report card | |
| | 2024.06.05 Hearing minutes | |
| | Photographs of the Minor Child and the Petitioner | |
| | Photographs of child at church | |
| | Photographs of child with classmates | |
| | Photographs of child with cousin | |
| | Photographs of child with family | |
| | Photographs of child with teacher | |
| | Photographs of child and Respondent Lucas | |
| | Photographs of child, Respondent(s), and family members | |
| | Photograph of child at soccer practice | |
| | Videos of child and Respondent Lucas | |
| | Video of child speaking English | |
| | Photographs of Respondents | |

A22

| | | |
|---|---|---|
| | Brazilian Civil Code Provisions from the Brazilian Central Authority | |
| | Hague Application to Brazilian Ministry of Justice | Not admissible for the truth of the matters asserted therein |

 

 

   b.    **Petitioner's Proposed Exhibits**

| EXHIBIT NUMBER | DESCRIPTION | LIMITATION |
|---|---|---|
| | Communications between Respondent da Silva and child's school | |
| | Child Support Payment Receipts | |
| | Certificate of Criminal History for Edervaldo da Silva | |
| | Voluntary Return Letter | |
| | Communications between the parties | |
| | Proof of Payment for Passport | |
| | Police reports | Not submitted for the truth of the statements therein |
| | Complaint with all exhibits including request for cancellation of passport | |

 

   c.    **Respondent's Proposed Exhibits**

| EX. NO. | DESCRIPTION |
|---|---|
| DX-1 | Confirmation of Respondent da Silva's enrollment in Flavia Leal Beauty School |
| DX-2 | Respondents' residential leases |
| DX-3 | Child's Perfect Attendance award |
| DX-4 | Petitioner's discovery responses |
| DX-5 | Communications between Respondent da Silva and child's school |
| DX-6 | Communications between Respondent da Silva and Petitioner |
| DX-7 | Respondents' marriage certificate |

A23

Dated: October 4, 2024                              Respectfully submitted,


EDERVALDO RODRIGUES DA SILVA
By his attorneys,

*/s/ Elizabeth G. Crowley*
Elizabeth G. Crowley (BBO #663470)
Charles R. Hunsinger (BBO #703519)
BOWDITCH & DEWEY LLP
101 Federal Street #1405
Boston, MA 021110
Phone: (617) 757-6500
ecrowley@bowditch.com
chunsinger@bowditch.com


JESSICA SILVEIRA DA SILVA and
GILBERTO LUCAS
By their attorneys,

*/s/ Jamie Steven (with permission)*
Ruben J. Rodrigues (BBO #676573)
Lea Gulotta James (BBO #705421)
Olivia Benjamin (BBO #705525)
Jamie Steven (BBO # 705904)
Amani Kmeid (BBO #711302)
FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199-7610
Phone: (617) 342-4000
Fax: (617) 342-4001
rrodrigues@foley.com
ljames@foley.com
obenjamin@foley.com
jsteven@foley.com
akmeid@foley.com

15

A24

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on October 4, 2024, a copy of the foregoing document was electronically filed through the CM/ECF system, which will send notification of such filing to all counsel of record.

<div align="right">

*/s/ Elizabeth G. Crowley*

Elizabeth G. Crowley

</div>

16

A25

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EDERVALDO RODRIGUES DA SILVA,　　　)<br><br>　　　　Plaintiff/Petitioner,　　　　　)<br><br>v.　　　　　　　　　　　　　　　　)<br><br>JESSICA SILVEIRA DA SILVA and　　)<br>GILBERTO LUCAS,　　　　　　　　　)<br><br>　　　　Defendants/Respondents.　　　)<br><br>　　　　　　　　　　　　　　　　　　) | C.A. No. 1:24-cv-11280-ADB |

**PETITIONER'S TRIAL BRIEF**

NOW COMES Petitioner Edervaldo Rodrigues da Silva ("Petitioner" or "Father") and submits the within trial brief including proposed findings of fact and requested rulings of law. This matter is scheduled for trial commencing on October 15, 2024, before the Honorable Allison D. Burroughs.

**Proposed Findings of Fact**

1. Petitioner and Respondent Jessica Silveira da Silva ("Respondent" or "Mother") were married on May 13, 2011.

2. Petitioner and Respondent have one child together; A. R. S. da S. (hereinafter "the minor child"). The child is presently ten (10) years old.

3. Petitioner, Respondent, and the minor child are Brazilian citizens.

4. Petitioner and Respondent divorced on December 13, 2021.

5. The divorce judgment granted the parties "joint custody of the minor [child]."

6. The divorce judgment provided for Petitioner to have physical custody of the minor child on alternate weekends, from Friday at 5:00 PM to Monday at 9:00 AM; half of school holidays and vacations; half of holidays; New Year's Eve in odd years and Christmas in even years; and Father's Day and father's birthday.

7. On or about February 3, 2022, Petitioner signed a passport application for the minor child based on Respondent's representations that the passport would not be used for travel.

8. On or about February 3, 2022, the minor child was issued a Brazilian passport.

1

A26

9. Upon learning that Respondent may flee Brazil with the minor child, Petitioner canceled the minor child's passport on or about March 17, 2022.

10. Respondent and the minor child left Brazil on or about March 28, 2022.

11. Father filed a Hague Application in Brazil dated March 20, 2022, but which was filed after Respondent and the minor child left Brazil on March 28, 2022.

12. Father filed the instant Hague Petition on or about May 13, 2024.

13. Respondent removed the minor child from Brazil without Petitioner's knowledge or consent.

14. Mother's knowledge of whether Father canceled the minor child's passport is immaterial to the fact that her removal of the child was wrongful at the time it was perpetrated.

15. Brazil is the minor child's habitual residence.

16. Father had rights of custody over the minor child at the time Mother removed him from Brazil.

17. Father was exercising his rights of custody to the minor child at the time Mother removed him from Brazil.

18. Respondent has not met her burden to show that the minor child is at grave risk of harm upon his return to Brazil.

19. Respondent has not met her burden to show that the minor child is well settled in the United States of America.

20. Petitioner has no criminal history in Brazil.

21. Respondent's allegations of domestic violence against Father are not credible.

22. The minor child had to be reclassified to the second grade based on gaps in his knowledge and English skills. He has missed significant amounts of school since 2022.

23. Petitioner and the minor child speak on the phone at least three times per week.

**Requested Rulings of Law**

This Petition is governed by the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49 (reprinted at 51 Fed. Reg. 10494 (Mar. 26, 1986), and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 – 11610 (2011). The Hague Convention addresses "the problem of international child abductions during domestic disputes." Abbott v.

2

A27

Abbott, 560 U.S. 1, 8 (2010). Its "core premise [is] that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." Monasky v. Taglieri, 140 S. Ct. 719, 723 (2020) (internal quotation marks and ellipsis omitted). To that end, its "central operating feature is the return remedy." Abbott, 560 U.S. at 9. That is, the Convention sets forth a statutory framework "to secure the prompt return of children" under the age of sixteen who are "wrongfully removed to or retained in any Contracting State" unless an exception applies. Hague Convention, arts. 1(a), 4, 13. The United States has implemented the Convention through the International Child Abduction Act, which extends jurisdiction to federal courts over Hague Convention disputes, 22 U.S.C. § 9003(a), and provides that courts "shall decide [each] case in accordance with the Convention," id. § 9003(d).

The Hague Convention establishes a strong presumption favoring return of a wrongfully removed child. Charalambous v. Charalambous, 627 F.3d 462, 466 (1st Cir. 2010). "The Hague Convention is generally intended to restore the status quo before removal and to prevent a parent from engaging in international forum shopping." Id., citing Kufner v. Kufner, 519 F.3d 33, 38 (1st Cir. 2008). If the petitioner can show that a child has been "wrongfully retained," then a court "shall order the return of the child forthwith," unless the respondent can establish that an enumerated exception applies. Sanchez-Londono v. Gonzalez, 752 F.3d 533, 540 (1st Cir. 2014); see also, 22 U.S.C. § 9001(a)(4) ("[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.").

In "adjudicating a dispute under the Convention," the Court "must make two inquiries." Moura v. Cunha, 67 F. Supp. 3d 493, 497 (D. Mass. 2014). First, the Court undertakes "a threshold inquiry as to whether the child was wrongfully removed from the jurisdiction in which he or she was habitually resident." Id. An answer in the affirmative "creates a presumption in favor of return." Id. Second, the Court "evaluates whether any exceptions apply that serve to rebut this presumption." Id. The habitual residence is determined at the point in time "immediately before the removal or retention." Hague Convention, Art. 3(a). The determination of habitual residence is a fact-specific analysis, and the First Circuit has adopted an approach that focuses on "the parents' shared intent or settled purpose regarding their child's residence." Nicolson v. Pappalardo, 605 F.3d 100, 104 (1st Cir. 2010); see also, Zuker v. Andrews, 181 F.3d 81, No. 98-

3

A28

1622, 1999 WL 525936, at *1  (1st Cir. Apr. 9, 1999).  "One parent's wishes are not sufficient, by themselves, to effect a change in a child's habitual residence."  <u>Darin</u>, 746 F.3d at 11.

At the first step, a petitioner seeking the return of a child must "establish by a preponderance of the evidence . . . that the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(a). Article 3 of the Convention provides that a child's removal is wrongful if:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3 (emphasis added). Thus, to establish wrongful removal, a "petitioner must show that he or she (1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights." <u>Mendez v. May</u>, 778 F.3d 337, 343 (1st Cir. 2015).

Here, the minor child was born in Brazil. The child resided with the parties in Brazil within the meaning of Article 3 of the Hague Convention from the time of his birth until approximately March of 2022.  The minor child is a Brazilian citizen and lived in Brazil until his removal. The minor child's habitual residence is Brazil. Respondent removed the minor child from Brazil without Petitioner's knowledge or consent and after he withdrew his consent to the minor child's passport, contrary to Brazilian law. Accordingly, the Court finds that as a matter of law, the minor child's place of habitual residence is Brazil.

To establish wrongful removal, Petitioner must show that the minor child was removed "in breach of rights of custody attributed to [Petitioner] under the law of the State in which the child was a habitual resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." For purposes of the Hague Convention, rights of custody include "rights relating to the care of the person of the child" and "the right to determine the child's place of residence" and rights of access include "the right to take a child for a limited period of time to a place other than the child's habitual residence."

4

A29

Petitioner had rights of custody under the divorce judgment and under Brazilian law and was exercising those rights of custody at the time of the wrongful removal. Brazilian law provides that shared custody means "that the mother and father have joint responsibility for family authority over their common children and exercise the rights and duties of mother and father." Brazilian Civil Code Article 1.583, paragraph 1. When divorced parties have shared custody, both parents have the right "to grant or to deny [their children] consent to travel abroad." Brazilian Civil Code Article 1.634(IV). See *Filho v. Albuquerque*, No. 20-cv-01421, 2020 WL 9455201, at *8-9 (D. Colo. Aug. 21, 2020) ("[T]he Brazilian Civil Code, Chapter V, Section II, article 1.634, grants each parent the right to participate in the determination of their child's permanent residence").

At the time of the child's retention in the United States, Petitioner was exercising his rights of custody within the meaning of Articles 3 and 5 of the Hague Convention.  By the terms of the judgment of divorce, Petitioner had custody of the minor child overnight every other weekend, for holidays, and for school vacations. Under Brazilian law, Petitioner also had the right to prevent the minor child from leaving the country, a right he tried to exercise by canceling the minor child's passport. But for the Respondent's removal of the minor child from Brazil, Petitioner would have continued to exercise his rights of custody as defined by the Hague Convention. Respondent's retention of the minor child is in violation of Petitioner's rights as joint custodian of the minor child.

Respondent raised affirmative defenses to the petition. The affirmative defenses specified in the Hague Convention are to be construed narrowly.  See, e.g., McManus v. McManus, 354 F. Supp. 2d 62, 68 (D. Mass. 2005), quoting Danaipour v. McLarey, 286 F.3d 1, 13-14 (1st Cir. 2002) ("'The Convention establishes a strong presumption favoring return of a wrongfully removed child,' and '[e]xceptions to the general rule of expedient return . . . are to be construed narrowly.'"). ICARA explicitly states that "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."  22 U.S.C. § 9001(a)(4).

The "well-settled" defense can be raised only where (1) more than one year has elapsed between the "date of the wrongful removal or retention" and the "commencement of proceedings in the Contracting State where the child is" located, and (2) "the child is now settled in its new environment." Hague Convention, Art. 12. The respondent must prove such settlement by a

5

A30

preponderance of the evidence, and the court has discretionary power to determine whether the defense justifies denial of return. See 22 U.S.C. § 9003(e)(2)(B). The State Department's Public Notice 957, supra, states that "nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof" for an Article 12 defense.   The courts look beyond the mere passage of time to determine the degree to which the children are "in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effect."  See Zuker v. Andrews, 2 F. Supp. 2d 134, 141 (D. Mass. 1998).   One of the primary considerations under the "well-settled" defense is the degree of stability in the country where the children are wrongfully retained. See Cabrera v. Lozano, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004) (requiring child to return to habitual residence where mother's immigration status and job stability were uncertain, there had been multiple residence changes and a school change, and there was a lack of family support system beyond mother and aunt in the United States, notwithstanding child's fluency in English, maintenance of friends, and participation in extracurricular activities).

Here, the minor child has been in the United States for slightly over two years, almost exactly two years as of the time of filing the petition. The minor child began school in Massachusetts in the fall of 2022, when he was age-eligible for third grade and was placed there, before being reclassified into second grade based on his limited English and general lack of knowledge base. His school attendance has been poor and his behavior at times has been equally poor. The minor child did not participate in extracurricular activities prior to the filing of the petition. He does not speak English fluently, and his long-term immigration status in the United States is uncertain due to Respondent's pending asylum application. Even if the minor child has friends and is learning English, such evidence is not substantial evidence of significant connections. The minor child is not well settled.

Further, even assuming, *arguendo*, that the Court finds Respondent is able to satisfy her burden of proving the "well-settled" defense, the Hague Convention does not prevent the court from ordering the return of wrongfully removed or retained children, even if such children were "now settled" within meaning of the Convention.  Yaman v. Yaman, 730 F.3d 1, 16 (1st Cir. 2013); 42 U.S.C.A. § 11603(e)(2)(B).  Father filed a Hague Application in Brazil on March 20, 2022. He has clearly been seeking the return of his child since almost the very moment Mother wrongfully removed the minor child. The delays in the Brazilian government and the United

States Department of State in processing the application, connecting him to local counsel, finding the minor child in the United States, and all the other administrative tasks are not chargeable to the Petitioner. The United States Department of State sent Mother a letter on April 10, 2023, seeking the voluntary return of the minor child and informing her that Father had filed a Hague Application in Brazil. Thus, Mother was on notice of Father's intent to seek the minor child's return almost exactly a year after the wrongful removal. Thus, even if the child is deemed to be well-settled, a discretionary order of return is appropriate given Father's diligent attempts to use the legal system to return his child, the delays attendant in such attempts, the minor child's difficult adjustment to life in the United States, and Mother's conduct in wrongfully removing the child.

Respondent also raises the affirmative defense that the minor child would be subjected to a grave risk of harm upon returning to Brazil. To succeed on a "grave risk" defense, the respondent must prove by *clear and convincing evidence* that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b); 22 U.S.C. § 9003(e)(2)(A). The Supreme Court has instructed that the clear and convincing standard is met only when a party can "place in the ultimate factfinder an abiding conviction that the trust of its factual contentions are 'highly probable.'" Colorado v. New Mexico, 467 U.S. 310, 316 (1984). This Court has held that this standard is satisfied only when the material offered by one party "instantly tilted the evidentiary scales in [its favor] when weighed against the evidence [the other party] offered in opposition." United States v. Smith, 964 F. Supp. 2d 167, 172 (D. Mass. 2013).

The risk under Article 13(b) must be "more than serious," though it need not be "immediate." Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000). The harm involved "must be a great deal more than minimal." Id.; see Moura v. Cunha, 67 F. Supp. 3d 493, 500 (D. Mass. 2014) ("in the absence of clear abuse, courts are unlikely to block removal under [Article 13(b)]"). "[W]hen determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention." Id. The grave risk defense "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests." Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002).

Here, Respondent's allegations that the minor child would be subject to a grave risk of harm are not credible and are not sufficient to meet her burden. The Respondent's story about the

grave risk of harm the minor child would face is inconsistent with other documents that she signed under penalties of perjury and submitted to the federal government. Furthermore, even if true, none of the Respondent's allegations involve more than minimal harm and the level of risk is insufficiently high to support this defense. The Court therefore finds that there is no grave risk of harm to the minor child if he returns to Brazil.

Finally, in a further effort to defend her actions, Respondent contends that Petitioner consented to her removal of the minor child to the United States. Under Article 13(a) of the Hague Convention, the Court *may* choose not to order the return of a child if a party establishes by a preponderance of the evidence that the other party consented to, or subsequently acquiesced in a child's removal or retention.  In Friedrich v. Friedrich, the Court held that acquiescence to removal and retention requires, "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation or rights; or a consistent attitude of acquiescence over a significant period of time." 78 F.3d 1060 (6th Cir. 1996). When an abducting parent has removed a child secretively, *as is the case here*, the Court is unlikely to find that the other parent consented or acquiesced to the child's removal. In Friedrich, the Sixth Circuit found that "[the] deliberately secretive nature of [the mother's] actions is extremely strong evidence that [the father] would not have consented to the removal of [the child]. Id. at 1069.  Moreover, also in Friedrich, the Court has found that "[e]ach of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." Id. at 1070. Here, the Petitioner canceled the minor child's passport prior to the minor child leaving Brazil. While the Respondent contends the Petitioner should have done more to prevent the removal, this reverses the burden: it is the Respondent's burden to show that Petitioner affirmatively agreed, not the Petitioner's burden to show that he took every step necessary to stop the minor child from being removed. As discussed above, Petitioner filed police reports in Brazil, canceled the minor child's passport, and began Hague proceedings as soon as he could.

## Conclusion

Respondent has wrongfully retained the child in the United States, over the Petitioner's objection, and in violation of the laws of Brazil. Petitioner is able to provide care for the child in Brazil. The minor child is not well settled in the United States of America. Petitioner has not acquiesced or consented to Respondent's permanent retention of the child in the United States.

The minor child is not at grave risk of physical or psychological harm or being returned to an intolerable situation. The petition should be allowed and the minor child ordered returned to Brazil forthwith.

Dated: October 7, 2024                           Respectfully submitted,

                                                 EDERVALDO RODRIGUES DA SILVA
                                                 By his attorneys,

                                                 */s/ Elizabeth G. Crowley*
                                                 Elizabeth G. Crowley, BBO #663470
                                                 Charles R. Hunsinger, BBO #703519
                                                 BOWDITCH & DEWEY LLP
                                                 101 Federal Street #1405
                                                 Boston, MA 021110
                                                 Phone: (617) 757-6500
                                                 ecrowley@bowditch.com
                                                 chunsinger@bowditch.com

## CERTIFICATE OF SERVICE

I hereby certify that, on October 7, 2024, a copy of the foregoing document was electronically filed through the CM/ECF system, which will send notification of such filing to all counsel of record.

                                                 */s/ Elizabeth G. Crowley*
                                                 Elizabeth G. Crowley

A34

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EDERVALDO RODRIGUES DA SILVA, | ) |
| | ) |
| Plaintiff/Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| JESSICA SILVEIRA DA SILVA and | ) |
| GILBERTO LUCAS, | ) |
| | ) |
| Defendants/Respondents. | ) |

C.A. No. 1:24-cv-11280-ADB

**RESPONDENTS' PRE-TRIAL MEMORANDUM OF LAW**

Dated: October 7, 2024

Respectfully submitted,

 _/s/ Ruben J. Rodrigues_
Ruben J. Rodrigues (BBO #676573)
James W. Matthews (BBO #560560)
Lea Gulotta James (BBO #705421)
Olivia Rae King Benjamin (BBO #705525)
Jamie A. Steven (BBO #705904)
Amani Kmeid (BBO #711302)
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199
Tel: (617) 342-4000
Fax: (617) 342-4001
rrodrigues@foley.com
jmatthews@foley.com
ljames@foley.com
obenjamin@foley.com
jsteven@foley.com
akmeid@foley.com

*Counsel for Defendants/Respondents Jessica*
*Silveira da Silva and Gilberto Lucas*

A35

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BRIEF OVERVIEW OF HAGUE CONVENTION PROCEDURES AND LAW ..................... 4

I.      The Petitioner's Burden ............................................................................................ 5

II.     Exceptions To The Hague Convention ..................................................................... 6

RELEVANT FACTUAL BACKGROUND ............................................................................. 8

I.      The Parties And Their Relationship......................................................................... 8

II.     The Move To The United States In April 2022 ..................................................... 10

III.    Procedural History ................................................................................................. 15

ARGUMENT .......................................................................................................................... 16

I.      The Petition Should Be Denied Because The Petitioner Has Not Established All Of The Elements Of His *Prima Facie* Case. ...................................................... 16

II.     Petitioner Consented To The Child's Relocation ................................................. 19

III.    The Child Should Not Be Removed Because He Is Well-Settled And Petitioner Did Not File This Action Until More Than One Year After The Alleged Wrongful Taking. .................... 22
         A.    Legal Standard ................................................................................. 22
         B.    Respondents are Entitled To Assert The "Settled" Defense ............ 23
         C.    The Child Is Well-Settled In Massachusetts. .................................. 25

IV.    The Child Would Be Exposed To A Grave Risk Of Harm If Forced To Return To Brazil .......... 32
         A.    Legal Standard ................................................................................. 33
         B.    The "Grave Risk Of Harm" Defense Applies, And The Court Should Deny The Petition ............................................................................. 33

V.     Post-Petition Evidence Should Be Admitted. ....................................................... 36

CONCLUSION........................................................................................................................ 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Abbott*,
    560 U.S. 1 (2010) ................................................................................................ 18

*Acosta v. Acosta*,
    725 F.3d 868 (8th Cir. 2013) ......................................................................... 6, 8

*Alcala v. Hernandez*,
    826 F.3d 161 (4th Cir. 2016) ........................................................... 8, 26, 31, 32

*Alcala v. Hernandez*,
    No. 4:14-cv-04176-RBH, 2015 WL 4429425 (D.S.C. July 20, 2015) .................... 23

*Anderson v. Acree*,
    250 F. Supp. 2d 876 (S.D. Ohio 2002) ................................................................ 5

*Application of Ponath*,
    829 F. Supp. 363 (D. Utah 1993) ...................................................................... 20

*Bader v. Kramer*,
    484 F.3d 666 (4th Cir. 2007) ............................................................................ 17

*Bejarno v. Jimenez*,
    837 Fed. App'x 936 ........................................................................................... 32

*Cascio v. Pace*,
    992 F. Supp. 2d 856 (N.D. Ill. 2014) ........................................................... 20, 22

*Castellanos Monzón v. De La Roca*,
    No. 16-0058 (FLW) (LHG), 2016 WL 1337261 (D.N.J. Apr. 5, 2016) ............ 24, 28

*Chafin v. Chafin*,
    133 S. Ct. 1017 (2013) ....................................................................................... 4

*Currier v. Currier*,
    845 F. Supp. 916 (D.N.H. 1994) ......................................................................... 5

*da Costa v. da Lima*,
    No. 22-cv-10543, 2023 WL 4049378 (D. Mass. Jun. 6, 2023) .................... passim

*da Costa v. de Lima*,
    94 F.4th 174 (1st Cir. 2024) .............................................................................. 37

iii

A37

*Danaipour v. McLarey*,
    286 F.3d 1 (1st Cir. 2002) ................................................................. 33

*Darin v. Olivero-Huffman*,
    746 F.3d 1 (1st Cir. 2014) ......................................................... 7, 19, 20

*De Aguiar Dias v. De Souza*,
    212 F. Supp. 3d 259 (D. Mass. 2016) ........................................ 6, 23, 33

*De Carvalho v. Pereira*,
    308 So. 3d 1078 (Fla. Dist. Ct. App. 2020) ........................................ 4

*Edoho v. Edoho*,
    No. H-10-1881, 2010 WL 3257480 (S.D. Tex. Aug. 17, 2010) ........................ 28, 36

*Garza-Castillo v. Guajardo-Ochoa*,
    No. 2:10-CV-00359-LDG, 2012 WL 523696 (D. Nev. Feb. 15, 2012) .................. 28

*German v. Lopez*,
    146 F. Supp. 3d 392 (D. Mass. 2015) .................................................. 5

*Giles v. Bravo*
    2:11-CV-01600-PMP, 2012 WL 704910 (D. Nev. Jan. 27, 2012) .................... 21, 24

*Gonzalez-Caballero v. Mena*,
    251 F.3d 789 (9th Cir. 2001) ......................................................... 21

*Gwiazdowski v. Gwiazdowska*,
    No. 14-cv-1482 (FB)(RER), 2015 WL 1514436 (E.D.N.Y. Apr. 3, 2015) ............. 26

*Holmes v. Holmes*,
    887 F. Supp. 2d 755 (E.D. Mich. 2012) ............................................... 6

*In re B. Del C.S.B.*,
    559 F.3d 999 (9th Cir. 2009) ......................................................... 26

*In re D.T.J.*,
    956 F. Supp. 2d 523 (S.D.N.Y. 2013) ................................................. 26

*In re Krishna v. Krishna*,
    97-0021 SC,1997 WL 195439 (N.D. Cal. Apr. 11, 1997) ............................ 21

*In re Lozano*,
    809 F. Supp. 2d 197 (S.D.N.Y. 2011) ................................................. 28

*In re R.V.B.*,
    29 F. Supp. 3d 243 (E.D.N.Y. 2014) .................................................. 24

A38

*In re Robinson*,
 983 F. Supp. 1339 (D. Colo. 1997) ........................................................................ 26

*Krefter v. Wills*,
 623 F. Supp. 2d 125 (D. Mass. 2009) ............................................................ 7, 17, 26

*Kufner v. Kufner*,
 519 F.3d 33 (1st Cir. 2008) ................................................................................ 17, 18

*Lozano v. Alvarez*,
 134 S. Ct. 1224 (2014) .................................................................................... passim

*Lozano v. Alvarez*,
 697 F.3d 41 (2d Cir. 2012) .............................................................................. passim

*Margain v. Ruiz-Bours*,
 592 F. App'x 619 (9th Cir. 2015) ............................................................................ 28

*Matovski v. Matovski*,
 No. 06 Civ. 4259 (PKC), 2007 WL 2600862 (S.D.N.Y. Aug. 31, 2007) ................. 23

*Matute-Castro v. Jimenez-Ortiz*,
 No. 15-cv-04568 (DLI)(JO), 2016 WL 8711076 (E.D.N.Y. Aug. 26, 2016) ..... 31, 36

*Mendez v. May*,
 778 F.3d 337 (1st Cir. 2015) ........................................................................... passim

*Moura v. Cunha*,
 67 F.Supp.3d 493 (D. Mass. 2014) ............................................................ 7, 25, 26

*Moura*,
 67 F. Supp. 3d ........................................................................................... 31, 32

*Muhlenkamp v. Blizzard*,
 521 F. Supp. 2d 1140 (E.D. Wash. Oct. 23, 2007) .................................................. 24

*Nicolson v. Pappalardo*,
 605 F.3d 100 (1st Cir. 2010) ..................................................................................... 7

*Padilla v. Troxell*,
 850 F.3d 168 (4th Cir. 2017) .................................................................................... 20

*Sánchez-Londoño v. Gonzalez*,
 752 F.3d 533 (1st Cir. 2014) ........................................................................... passim

*Walsh v. Walsh*,
 221 F.3d 204 (1st Cir. 2000) ..................................................................... 7, 26, 33

v

*Whallon v. Lynn*,
  230 F.3d 450 (1st Cir. 2000) ............................................................... 17, 33

*Wojcik v. Wojcik*,
  959 F. Supp. 413 (E.D. Mich. 1997) ........................................................ 24

*Yaman v. Yaman*,
  730 F.3d 1 (1st Cir. 2013) .................................................................. 5, 32

*Yaman*,
  919 F. Supp. 2d ........................................................................... 22

**Statutes**

22 U.S.C. § 9001 ................................................................................ 1

22 U.S.C. § 9001(a)(4) ......................................................................... 22

22 U.S.C. § 9003(b), (f)(3) .................................................................... 23

22 U.S.C. § 9003(e)(1)(A) ................................................................. 1, 5, 16

22 U.S.C. § 9003(e)(2)(A) ..................................................................... 33

22 U.S.C. § 9003(e)(2)(B) ................................................................... 7, 23

§ 9003(b) ..................................................................................... 23

**Rules**

Fed. R. Civ. P. 5.2 ............................................................................ 1

**Regulations**

25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted*,
  51 Fed. Reg. 10,494 (Mar. 26, 1986) ...................................................... 1, 25

A40

**PRELIMINARY STATEMENT**

This is a proceeding filed under the Hague Convention on the Civil Aspects of International

Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted* 51 Fed. Reg.

10,494 (Mar. 26, 1986) (the "Convention"), and its implementing legislation, the International

Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.* Petitioner Edervaldo

Rodrigues da Silva ("Father") seeks repatriation to Brazil of ten-year-old A.R. (the "Child" or

"A.R.").[1] As set out in Respondents' Proposed Findings of Fact (Ex. A) and Respondents'

Proposed Conclusions of Law (Ex. B), not only has Father failed to establish the required elements

of his prima facie case, but even if this honorable Court finds that he has, Respondent Jessica

Silveira da Silva ("Mother") and Respondent Gilberto Lucas ("Mr. Lucas" or "Stepfather")

(collectively "Respondents") assert the defenses that the Father consented to the Child's removal,

the Child is so well-settled that he should not be sent to Brazil, and that returning the Child to

Brazil would put him at grave risk of both physical and psychological harm. The Court should

deny this Petition for each of the four meritorious reasons set forth below.

First, Father has not established a prima facie case under the Convention. A petitioner

seeking the return of a child under the Convention must establish the child's wrongful removal by

a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A); *Mendez v. May*, 778 F.3d 337, 343

(1st Cir. 2015); *Sánchez-Londoño v. Gonzalez*, 752 F.3d 533, 539 (1st Cir. 2014). The Petitioner

must show that he or she (1) seeks to return the child to the child's country of habitual residence,

_____

[1] The names of minors and full birth dates are not disclosed in these motion papers and have been
redacted from exhibits in compliance with Fed. R. Civ. P. 5.2.

(2) had custody rights immediately prior to the child's removal, and (3) was exercising those custody rights. Hague Convention, art. 3; *Mendez*, 778 F.3d at 343; *Sánchez-Londoño*, 752 F.3d at 540. If these three elements are met, *and* the petitioner has commenced judicial or administrative proceedings within one year of the date of wrongful removal, the Convention commands the court reviewing the petition "shall order the return of the child forthwith." Hague Convention, art. 12. Although Respondents do not dispute that Brazil was A.R.'s country of habitual residence, Father still must prove that he had custody rights immediately prior to A.R.'s removal, and that he was exercising those custody rights, which Father has failed to do:  Father has failed to prove that as a matter of Brazilian law, the custody agreement conferred rights of custody as defined in the Convention and, even if this Court finds Father had a right of custody of A.R., Father failed to exercise any custody rights he may have had, frequently missing visits with the Child as allowed by the terms of the custody agreement.

Second, under Article 13(a) of the Convention, a return order is not required when the petitioner has consented to the child's relocation. *Id.* at 13(a).  Consent to relocation need not be formal, but may be inferred from the petitioner's actions, conduct, and communications leading up to the child's relocation. Here, the evidence will unequivocally demonstrate that Father— through his conversations with Mother and his actions beginning in December 2021 into at least February 2022, including his authorization of a passport for A.R. with an international travel authorization —clearly and objectively gave his consent for the Child to move abroad with Respondent.

Third, the Child is well-settled in the United States and the Court should not order the Child's return, which would cause disruption and harm to the Child. Mother and the Child have been living in Massachusetts since April 2022. However, Father did not file the Petition herein

seeking the return of the Child until May 14, 2024, more than two years after the Child's arrival in the United States. Where the petition is not filed in the jurisdiction where the child now resides (*i.e.,* the United States in this case) until more than one year after the alleged wrongful retention, and the respondent is able to demonstrate, by a preponderance of the evidence, that the Child is "now settled in its new environment," the Court should not order the Child be removed from that well-settled environment. *Id.* at 12. The evidence will show that since 2022, the Child has lived in Massachusetts in a stable and loving home; he is enrolled in fourth grade here, in the same school he has attended since second grade. A.R. is learning English and has friends; he is actively involved in soccer lessons; attends church; and he is surrounded by extended family. *See infra* Argument Section III. The purposes of the Convention would not be served by returning the Child to Brazil in this case, and a traumatic disruption of his now-settled life in Massachusetts should be denied.

Fourth, this Court should deny the Petition because "there is a grave risk of harm that [A.R.'s] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Id.* at 13(b). The evidence will show that the Father is an unfit father who has exhibited disturbing behavior in a number of ways which pose a grave risk of harm to A.R. should he return to Brazil: Father has exhibited violence toward Mother when angry; he has a history of engaging in illegal conduct, such as breaking and entering into and stealing property from neighbor's homes for no apparent reason; he has exposed A.R. to pornography and violent and sexual, age-inappropriate video games; and he has repeatedly failed to prioritize A.R.'s education. *See infra* Argument Section IV.

**BRIEF OVERVIEW OF HAGUE CONVENTION PROCEDURES AND LAW[2]**

The Hague Conference on Private International Law adopted the Hague Convention on the Civil Aspects of International Child Abduction in 1980. The Convention seeks to secure "the prompt return of children wrongfully removed to or retained in any Contracting State" and to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention, art. 1. Brazil and the United States are both signatories to the Hague Convention. *See De Carvalho v. Pereira*, 308 So. 3d 1078, 1081 (Fla. Dist. Ct. App. 2020). The passage of ICARA implemented the Convention in the United States, granting federal and state courts concurrent jurisdiction over Convention actions and directing those courts to decide cases in accordance with the Convention. *Chafin v. Chafin*, 133 S. Ct. 1017, 1019 (2013). Article 3 of the Convention provides that the "removal or the retention of a child is to be considered wrongful" when "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Id.* at 1021*;* Hague Convention, art. 3.

The charge of a court presented with a petition seeking the return of a minor pursuant to the Convention is to determine the jurisdiction where the custody adjudication ultimately should take place. *See, e.g.*, *da Costa v. da Lima,* No. 22-cv-10543, 2023 WL 4049378, at *2 (D. Mass. Jun. 6, 2023) ("The Court is tasked solely with determining whether that custody decision should be made here in the United States or by [the child's] country of habitual residence."), (Burroughs,

---

[2] Respondents have included this "Brief Overview of Hague Convention Procedures and Law" to provide the Court with a general roadmap with respect to the Hague Convention on the Civil Aspects of International Child Abduction. A more complete discussion of the Hague Convention and relevant case law appears further below, in Respondents' Argument section.

J. ruling), *aff'd*, 94 F.4th 174 (1st Cir. 2024); *Currier v. Currier*, 845 F. Supp. 916, 920 (D.N.H. 1994) ("[T]his court may properly determine which Contracting State has jurisdiction to determine the custody rights . . . ."). In addition, the court must determine where the minor will reside, in the interim, while the eventual determination of custody is adjudicated. *See, e.g.*, *Anderson v. Acree*, 250 F. Supp. 2d 876, 884 (S.D. Ohio 2002) (declining to order the child's return and noting that this was not a decision on who should have the child, or where she should ultimately live, "but merely a holding that the custody decision should be made in the United States"). The merits of the underlying custody determination, however, are not at issue during consideration of the petition. *da Costa,* 2023 WL 4049378, at *2 ("The Convention does not empower the Court to make any determinations regarding child custody."); Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."); *Yaman v. Yaman*, 730 F.3d 1, 22 (1st Cir. 2013) ("We stress that this case does not involve a determination of custody.").

## I. The Petitioner's Burden

A petitioner seeking the return of a child under the Convention must establish the child's wrongful removal by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A); *Mendez*, 778 F.3d at 343; *Sánchez-Londoño*, 752 F.3d at 539. The petitioner must show that he or she (1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those custody rights. Hague Convention, art. 3; *Mendez*, 778 F.3d at 343; *Sánchez-Londoño*, 752 F.3d at 540; *German v. Lopez*, 146 F. Supp. 3d 392, 396 (D. Mass. 2015). Where the conditions of Article 3 are met, and where a "period of less than one year has elapsed from the date of the wrongful removal or retention" to the "date of commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is" (*i.e.*, the filing of an action in the U.S. District Court), then

that judicial authority shall order the return of the child to the country of habitual residence, unless one of the established exceptions to the Hague Convention is met. Hague Convention, art. 12; *De Aguiar Dias v. De Souza*, 212 F. Supp. 3d 259 (D. Mass. 2016) (where petition was filed in the District of Massachusetts 11 months after the wrongful retention and the child was located in Worcester, Massachusetts at the time of filing). A failure to plead any one of these elements will undermine a Hague Convention action. *Holmes v. Holmes*, 887 F. Supp. 2d 755 (E.D. Mich. 2012) (finding, in part, the petitioner failed to prove elements of wrongful removal where petitioner could not show an exercise of custody of the child at the time of removal).

## II.   Exceptions To The Hague Convention

Several exceptions block an otherwise appropriate application of the Hague Convention. Three are particularly relevant in these proceedings before this Court.[3] First, a court is not required to order the return of a child where petitioner consented to the child's removal. Hague Convention, art. 13(a). Second, a child should not be returned where the petition was filed in the jurisdiction where the child resides (*i.e.,* the United States, in this case) more than one year after the alleged wrongful retention and the child is "now settled in its new environment." Hague Convention, art. 12; *Lozano v. Alvarez*, 134 S. Ct. 1224, 1229 (2014) ("Thus, at least in some cases, failure to file a petition for return within one year renders the return remedy unavailable."). Third, a child should not be returned where there is a grave risk that his return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Hague Convention, art. 13(b); *Acosta v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013).

---

[3] There are additional exceptions not squarely before this Court. Exceptions include, but are not limited to, where petitioner acquiesced to the child's removal or retention, and where return would conflict with fundamental freedom and human rights in the state from which return is requested. Hague Convention, arts. 13(a), 20.

Pursuant to the "consent" defense, a court is not bound to order the return of a child where respondent establishes by a preponderance of the evidence that petitioner had "consented to or subsequently acquiesced" to the child's removal. Hague Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B). The court must consider the petitioner's conduct in time prior to the child's removal when evaluating whether petitioner consented. *See Darin v. Olivero-Huffman*, 746 F.3d 1, 14 (1st Cir. 2014). "Consent may be evinced by the petitioner's statements or conduct, which can be rather informal," and a court should consider what "the petitioner actually contemplated and agreed to, as well as the nature and scope of the petitioner's consent—including any conditions or limitations." *Id.* (internal citations omitted); *see also Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010); *Moura v. Cunha*, 67 F.Supp.3d 493, 501 (D. Mass. 2014).

The "settled" defense "permits courts to consider the interests of a child who has been in a new environment for more than a year before ordering that child to be returned to her country of habitual residency." *Lozano v. Alvarez*, 697 F.3d 41, 52 (2d Cir. 2012), *aff'd on other grounds*, 134 S. Ct. 1224 (2014); Hague Convention, art. 12. Equitable tolling is not available. *Lozano*, 134 S. Ct. at 1231 (holding that the one-year calculation was not tolled even where the mother hid the child from the father). The respondent bears the burden of establishing that the child is settled by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). The rationale behind the "settled" defense is that after a child has become settled in a new environment, a forced return will only cause disruption and further harm to the child. *Krefter v. Wills*, 623 F. Supp. 2d 125, 136 (D. Mass. 2009) (citing *Walsh v. Walsh*, 221 F.3d 204, 220 n.14 (1st Cir. 2000) (characterizing such disruption as "an inevitable consequence of removal")). While a court may exercise its discretion to order the return of the child despite establishment of a "settled" defense, such discretion should only be exercised in limited circumstances. *Lozano*, 134 S. Ct. at 1237 (discussing various

equitable factors, including the need to discourage inequitable conduct). So long as respondent has proved by a preponderance of the evidence that the child is well-settled, and the balance of equities do not fall against that respondent, then the court should decline to send the child back. *Alcala v. Hernandez*, 826 F.3d 161, 168 (4th Cir. 2016).

The "grave risk of harm" defense permits a court to consider whether a child should not be ordered to return based on the likelihood that such an order would put the child at risk. Article 13 of the Hague Convention states that a court "is not bound to order the return of the child" if a respondent establishes that "there is a grave risk that his return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Courts have held that it is proper to decline to return a child in situations where it was "highly probable that [the petitioner] will react with violence, threats, or other verbal abuse towards the children," even where there was no history of violence toward the child himself. *Acosta*, 725 F.3d at 875.

## RELEVANT FACTUAL BACKGROUND

### I.    The Parties And Their Relationship

Mother and Father married on May 1, 2021, and the Child was born in 2014. Mother and Father lived with the Child in the marital home in Ibirité, Minas Gerais, Brazil, until 2016. Mother and Father's relationship soured due to Father's disrespect of Mother, and the couple separated in 2016 when the Child was two years old. After the couple separated, A.R. primarily lived with Mother. Father left and Mother and the Child stayed in the marital home.[4] Mother and the Child later moved to a nearby city, Belo Horizonte, Minas Gerais, Brazil.[5]

---

[4] Ex. E, Silveira da Silva Dep. at 17:9-17:14.
[5] Ex. E, Silveira da Silva Dep. at 9:10-9:11.

8

A48

After the separation, Mother encouraged and facilitated Father's visits with A.R. However, Father was an inconsistent presence in the Child's life, only seeing A.R. intermittently.[6] In fact, Mother would beg Father to visit with his son and to assist in providing for A.R.'s needs, but Father only took interest in the Child when convenient for him. Father did not support A.R. financially during this time. Throughout the Child's life, Mother has provided for his physical, emotional, and financial needs.

Mother and Father divorced on December 10, 2021, and reached an agreement as to custody of A.R. at that time (the "Custody Agreement").[7] By the terms of the Custody Agreement, Mother received custody of A.R. and Father was permitted visitation with A.R. on alternative weekends, half of vacation, and school breaks, accounting to 30 cumulative days annually, and alternate holidays.[8]

Despite the terms of the Custody Agreement, Father did not consistently exercise his visitation rights. Father infrequently visited the Child. Father missed several of his allowed weekend visits with the Child and rarely, if ever, exercised his right to have the Child on holidays and half of the Child's January and June school vacations.[9] When Father did visit with the Child, he would rely on his mother to pick A.R. up and drop him off.[10] Mother always permitted and

---

[6] Ex. E, Silveira da Silva Dep. at 17:22-18:1 ("**Q** And did he continue in every other week seeing [A.R.] until you left Brazil with [A.R.]? **A** It wasn't frequent, but sometimes he wouldn't go see the boy."); Ex. F, Silveira da Silva Interrogatory Response No. 14.

[7] Ex. G.

[8] *Id.*

[9] Ex. F, Silveira da Silva Interrogatory Response No. 14.

[10] Ex. H, Rodrigues da Silva Dep. at 27:10-27:23 ("**Q** About how long did you spend with [A.R.] during your visits? **A** When I got home from work, I was with him. **Q** Mr. da Silva, did you rely on anyone else to pick up [A.R.] for your visits? **A** Yes. **Q** Who picked -- who did you have pick up [A.R.] for your visits? **A** My mother. **Q** Mr. da Silva, during the period in which you were separated from Ms. da Silva, did you work on weekends? **A** From Monday to Saturday. From Monday to Saturday, until noon on Saturday."); Ex. E, Silveira da Silva Dep. at 56:9-56:14 ("**Q** During Edervaldo's regular weekend visits, who picked him up from your house? **A** It was the

encouraged Father to visit with the Child, and requested Father engage in A.R.'s care and education. Despite this, Father inconsistently visited with A.R.

## II.   Father's History of Disturbing Behavior

Father has a troubling history of disturbing behavior, physical abuse towards Mother, and exposing young A.R. to age-inappropriate content. On at least one occasion after Mother and Father separated, but prior to the divorce, Father twisted and pulled Mother's arm, injuring her.[11] This altercation occurred because Mother requested Father allow her to use his work bonus, which was provided in the form of a VISA gift card, to purchase food for the Child. Father refused and became physically violent when Mother attempted to reach for the card. Mother called the Brazilian police but Father had fled before they arrived.

Father has also verbally sexualized Mother in a way that caused her to feel disrespected and uncomfortable.[12] Father is a habitual user of pornography and has exposed the minor Child to such content. Specifically, on at least one occasion, the Child viewed pornographic material on the Father's phone. Mother learned about this matter when the young Child questioned her about what he saw. Father further threatened A.R.'s healthy development by exposing him to age-inappropriate video games. When A.R. would visit Father, Father would play Grand Theft Auto while the Child was watching. Father also allowed the Child to play the game during these visits. Grand Theft Auto is a video game which contains sexual and violent content, explicit material,

---

grandmother. **Q** And who dropped [A.R.] off at your house at the end of the weekend? **A** The -- the grandmother.").

[11] Ex. F, Silveira da Silva Interrogatory Response No. 16.

[12] Ex. E, Silveira da Silva Dep. at 13:2-13:18 ("**Q** After [A.R.] was born, did anything about our relationship with Edervaldo change? **A** Yes. **Q** What changed? **A** The good relationship between him and myself changed due to some of the attitudes that he had. **Q** What attitudes? **A** Disrespect and porn. That's it. (The court reporter asked for clarification.) **A** Disrespect and porn. That's it. **Q** Disrespect to whom? **A** Disrespect of me, towards me. **Q** Can you provide any examples? **A** Things he would say about other women. He would talk about other women. And also, he would look at other women.").

A50

and drug use. Mother repeatedly requested Father stop exposing A.R. to such material and did what she could to stop A.R.'s exposure. However, Father allowed A.R. to engage with such content repeatedly.

Father has also exhibited reckless and illegal behavior. One more than one occasion, Father broke into neighbors' homes and stole their belongings, including a cell phone and soccer jersey.[13] Father has a history of mental illness – anxiety. Father's anxiety caused him to lose his job and apply for temporary disability assistance from the Brazilian National Social Security Institute ("INSS") on the basis of his anxiety.[14] In fact, over the course of approximately one year from March 2022 to February 2023, Father applied for INSS benefits seven times. The INSS denied five of Father's requests and granted benefits on two occasions.[15] Clearly Father believed that he was unable to maintain employment for this extended period of time due to the severity of his anxiety. This mental illness was apparent to Mother, and on at least one occasion Father told Mother that he hears voices telling him to kill himself. Father's mental instability caused Mother to fear leaving the Child alone with Father.[16]

### III. The Move To The United States In April 2022

Mother met and began dating Mr. Lucas in 2021. Mr. Lucas moved to the United States in July of 2021, and settled in Massachusetts.

---

[13] Ex. F, Silveira da Silva Interrogatory Response No. 16.
[14] Ex. I; Ex. H, Rodrigues da Silva Dep. at 44:19-44:23 ("Q This documents shows that you requested assistance due to illness. Is that correct? A Yes. Q What was your illness? A Anxiety.") and 44:15-44:18 ("Q Did you apply for this benefit from the government? A Yeah. I lost my job, so I had to ask for
this benefit from the INSS.").
[15] Ex. I, Ex. R [4/25/22]; Ex. S [5/16/2022 app]; Ex. U [7/9/2022]; Ex. W [10/5/22]; Ex. X [12/23/22]; Ex. Y [2/23/23].
[16] Ex. F, Silveira da Silva Interrogatory Response No. 16.

In December 2021, Mother repeatedly told Father that she wished to move with the Child abroad and asked Father to authorize the issuance of a passport with travel authorization for A.R.[17] Father agreed with Mother's plans and on February 3, 2022, with knowledge of her plans, Father appeared in person at the passport division of the Brazilian Immigration Police and signed a passport and travel authorization document that allowed the Child to travel internationally with one parent.[18] The application states: "Standard form for authoring the issuance of a minor's passport with the inclusion of an international travel authorization on the common passport, to travel with one of the parents".[19] The Child was issued a Brazilian passport as a result. Prior to her departure from Brazil, Mother did not know nor believe that Father had cancelled A.R.'s passport. Indeed, the passport was accepted at the airport when Mother and A.R. used the passport to travel from Brazil.

Mother and the Child traveled to the United States with Mr. Lucas's brother and sister-in-law, Gilmar Junior Torres dos Santos ("Mr. Junior Torres dos Santos") and Bruna Coutinho ("Ms. Coutinho"). Mother and the Child arrived in the United States in April 2022 and settled with Mr. Lucas, Mr. Junior Torres dos Santo, and Ms. Coutinho in Lowell, Massachusetts.[20] Mother, Mr. Lucas, and the Child moved to a different home in Lowell approximately one year later, at which time Mr. Junior Torres dos Santos and Ms. Coutinho moved to Gloucester, Massachusetts, which

---

[17] Ex. E, Silveira da Silva Dep. at 49:21-49:24 ("**Q** When Edervaldo signed for the passport, did -- had you told him that you were planning to take [A.R.] to the U.S.? **A** Yes.") and 49:11-49:16 ("**Q** What did you do to get Edervaldo to sign for the passport? **A** I had already spoken to him about the possibility of traveling. And that, therefore, [A.R.] would need a passport and he would need to sign for it, sign permission."); Ex. E, Silveira da Silva Dep. at 49:17-20 ("**Q** When Edervaldo signed for the passport, did he give permission for [A.R.] to travel? **A** Yes.").

[18] Ex. H, Rodrigues da Silva Dep. at 11:11-11:18 ("**Q** Mr. da Silva, in your complaint at paragraph 9 you state that Ms. da Silva asked you to agree to making a passport, so that the minor, [A.R.], could travel to the United States; is that correct? **A** Yes.").

[19] Ex. J.

[20] Ex. F, Silveira da Silva Interrogatory Response Nos. 5 & 7.

is approximately one-hour from Lowell.[21] The Child has lived in Lowell, Massachusetts for the two and a half years since his arrival to the United States.

Mother has always permitted and encouraged Father to speak with the Child since the Child's arrival in the U.S. However, until Mother sought a judicial remedy, Father only sporadically called to speak with A.R.[22] In fact, because Father was not picking up A.R.'s calls, Mother was forced to seek a court order from a Brazilian court to *require* Father to speak with the Child more frequently.[23] Since the Brazilian court granted this order, Father now regularly speaks with A.R. over the phone using video calling capabilities. Mother has never denied Father the opportunity to speak with the Child, nor has Mother ever prevented Father from speaking with the Child.[24]

Father filed his petition under the Convention on May 14, 2024, more than two-years after the Child left Brazil.[25] By that time, A.R. had a stable and secure life in the United States. A.R. has an extremely close relationship with his Mother and now Stepfather. Mother and Stepfather married in September 2024, and Stepfather thinks of A.R. as his own son. Mother and Stepfather provide for A.R.'s physical, emotional, and financial needs. Mother has applied for asylum for

---

[21] Ex. F, Silveira da Silva Interrogatory Response No. 5). Since their arrival in the United States, Mother has never prevented Father from knowing the Child's location. (Ex. H, Rodrigues da Silva Dep. at 33:2-34:4.

[22] Ex. E, Silveira da Silva Dep. at 56:18-56:21 ("**Q** You stated that when you first moved to the United States, Edervaldo and [A.R.] did not speak three times a week; is that correct? **A** Yes.").

[23] Ex. K ; Ex. E, Silveira da Silva Dep. at 56:22-57:14 ("**Q** Why did they start speaking three times a week? **A** Because of a final court appearance that I had in Brazil - had in Brazil -- the last court appearance that I had in Brazil, where the lady Judge said that the visit -- the visit would be three times. There had to be three times a week -- speaking, sorry. **Q** Was that something you had asked for? **A** So, I spoke to the Judge about this, and the problem was is that he was not returning my phone calls. So, she then made this agreement between us as a result of all this, bringing this to her attention. **Q** Had [A.R.] ever told you that he wanted to talk to his dad, but his father wouldn't answer the phone? **A** Yes.").

[24] Ex. E, Silveira da Silva Dep. at 23:4-23:5.

[25] Compl. Dkt. 1.

13

A53

herself and derivative asylum for A.R.[26] Mother has work authorization and works part-time as a house-cleaner and is studying to be an aesthetician.[27] Stepfather works in construction. Together, Respondents earn enough money to provide for A.R.'s financial needs and do not rely on Father to provide financial support for the Child. Moreover, the Child's uncle and aunt, Mr. Junior Torres dos Santos and Ms. Coutinho, are willing to support the Child financially if needed, though it has not been needed to date.

The Child enjoys spending time with his Mother and Stepfather, visiting the beach and the park, playing games, cooking, and riding bikes. The Child also has a strong relationship with his uncle and aunt, Mr. Junior Torres dos Santos and Ms. Coutinho. When living with the Child, Mr. Junior Torres dos Santos and Ms. Coutinho would play games with A.R., take him for bike rides or to the mall, and share meals with him. Mr. Junior Torres dos Santos and Ms. Coutinho remain engaged in A.R.'s life today. Mother, Stepfather, the Child, Mr. Junior Torres dos Santos, and Ms. Coutinho spend time together approximately biweekly, and on holidays, birthdays, and celebrations. The Child also maintains close connections with his extended family who live nearby in Massachusetts, including Stepfather's cousins and their children, who are close in age to A.R. The Child sees these extended family members approximately once per month and to celebrate holidays, birthdays, and celebrations.

Lowell has a large Brazilian community, which allows A.R. to maintain a connection to his culture. A.R. attends Frederic T. Greenhalge Elementary School.[28] He is currently enrolled in the fourth grade and has attended Greenhalge Elementary School since the second grade.[29] A.R. is progressing in his English learning and becoming more confident in the classroom due, in part, to

---

[26] Ex. L .
[27] Ex. M; Ex. F, Silveira da Silva Interrogatory Response No. 18.
[28] Ex. F, Silveira da Silva Interrogatory Response No. 10.
[29] *Id*.

the classroom resources provided to assist English language learners.[30] Mother helps the Child with his schoolwork and is committed to advancing his education.[31] A.R. is beloved by his teachers and classmates and has friends from his neighborhood and extracurricular activities. The Child participates in soccer lessons twice a week and periodically attends church with his Mother.[32]

Mother and Stepfather provide A.R. with a stable and secure home, which allows A.R. to maintain relationships with extended family in the area, and flourish in school and activities. The Child's removal to Brazil would uproot him from his home and the strong connections he has made in the United States.

## IV.   Procedural History

The Petition, filed on May 14, 2024, alleges that A.R. was wrongfully removed from Brazil and retained in Massachusetts, and requests a judgment returning A.R. to Brazil.[33] On June 20, 2024, the Court ordered Father to resolve the filing fee.[34] Also on June 20, 2024, the Court ordered the parties to appear at an initial hearing on July 11, 2024, and ordered the United States Marshals Service to serve Respondents no later than July 2, 2024.[35]

---

[30] Ex. N (Teacher L. O'Donnel stated in A.R.'s report card: "His English language development has grown over the course of the school year.").

[31] Ex. E, Silveira da Silva Dep. at 30:10-30:20 ("**Q** Has [A.R.] ever taken a class from any place other than the Lowell Public Schools? **A** No. Only at home when I study with him. **Q** What do you study with him? **A** I like to practice his reading. **Q** Do you practice in English or in Portuguese? **A** Both. **Q** Do you teach [A.R.] any other lessons? **A** Some in Portuguese, yes; some written activities in Portuguese.").

[32] Ex. F, Silveira da Silva, Interrogatory Response No. 12.

[33] *See* Verified Complaint and Petition for Return of the Minor Child (Dkt. No. 1) at ¶ 1 and Requests for Relief.

[34] *See* Order entered regarding filing fee (Dkt. 3).

[35] *See* Order (Dkt. 4); *see also* Receipt and Return for Complaint and Orders (Dkt. Nos. 22 and 23).

On July 11, 2024, the parties appeared for an initial hearing, at which time the Court offered parties a choice of trial dates.[36] Parties conferred and, on July 26, 2024, the Court scheduled a final pretrial conference for October 10, 2024 and a bench trial to begin on October 15, 2024.[37]

On July 31, 2024, Father sought Leave to Proceed in forma pauperis, asserting unemployment.[38] This Motion was granted July 31, 2024. The Parties filed, and this Court approved, a Joint Proposed Scheduling Order on August 2, 2024.[39]

On August 7, 2024, Respondents filed an Answer to the Complaint and Affirmative Defenses.[40] Respondents filed their Pretrial Disclosures on September 17, 2024.[41]

The parties have engaged in written discovery and have produced documents. Father and Mother were each deposed via videoconference on September 13, 2024.

The parties submitted a Joint Pretrial Memorandum to the Court on October 4, 2024.[42] The final pretrial conference is set for October 10, 2024.[43]

## ARGUMENT

### I.   The Petition Should Be Denied Because Father Has Not Established All Of The Elements Of His *Prima Facie* Case.

A petitioner seeking the return of a child under the Convention must establish the child's wrongful removal by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A); *Mendez*, 778 F.3d at 343; *Sánchez-Londoño*, 752 F.3d at 539. The petitioner must show that he or she (1) seeks

---

[36] *See* Clerk's Note (Dkt. No. 7).
[37] *See* Order (Dkt. No. 8).
[38] *See* Motion for Leave to Proceed in forma pauperis (Dkt. No. 14).
[39] *See* Dkt. Nos. 16 and 17.
[40] *See* Dkt. 18.
[41] *See* Dkt. No. 26.
[42] *See* Joint Pretrial Memorandum (Dkt. No. 28).
[43] *See* Order (Dkt. No. 8).

to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights. Hague Convention, art. 3; *Mendez*, 778 F.3d at 343; *Sánchez-Londoño*, 752 F.3d at 540.

The burden of establishing both (i) rights of custody and (ii) exercise of custody is on the Father. *See, e.g., Kufner v. Kufner*, 519 F.3d 33, 39 (1st Cir. 2008) ("[T]he petitioner must establish by a preponderance of the evidence that the child was wrongfully removed or retained …. A removal or retention is wrongful when (a) it is in breach of rights of custody . . . and (b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."); *Whallon v. Lynn*, 230 F.3d 450, 454 (1st Cir. 2000) ("The petitioner bears the burden of proving 'wrongful removal' by a preponderance of the evidence.").

While a showing of "actual exercise" of custody rights is necessary under the Convention, "the Convention itself does not define the term." *Krefter*, 623 F. Supp. 2d at 133; *see generally* Hague Convention, art. 5 ("'[R]ights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."). Instead, the courts must determine "what conduct by a parent possessing custody rights is sufficient to show that he actually exercised *those rights*." *Krefter*, 623 F. Supp. 2d at 133-34 (quoting *Bader v. Kramer*, 484 F.3d 666, 670 (4th Cir. 2007)).

    A.  <u>The Divorce Agreement Does Not Confer Custody Rights to Father Per The Hague Convention.</u>

To prove wrongful removal, Father must prove he had rights of custody in the child's country of habitual residence. *See Mendez*, 778 F.3d at 343. Mere rights of "access" to the child, however, are not sufficient to confer custody rights under the Hague Convention. *See da Costa*, 2023 WL 4049378, at *6 ("Rights of custody are distinguished from 'rights of access[.]'") (internal

17

A57

citations omitted); *Abbott v. Abbott*, 560 U.S. 1, 13 (2010); *Kufner*, 519 F.3d at 39; Hague Convention, art. 5. Sources of rights of custody arise "(1) by operation of law; (2) by reason of judicial or administrative decision; or (3) by reason of an agreement having legal effect under the law of that State." Hague Convention, art. 3.

Per Father and Mother's Custody Agreement, Father had a right to *visitation* with the Child at specific times: every other weekend, certain holidays, and half of the January and June vacation periods.[44] According to Article 5 of the Hague Convention, rights of access include "the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention, art. 5. As such, visitation rights constitute a right of access, not a right of custody. Hague Convention, art. 5. Father has failed to prove he had a right of *custody* to the Child. *See da Costa*, 2023 WL 4049378, at *6-7 (finding that by merely providing the Court with a copy of the divorce agreement, and not providing a thorough presentation on Brazilian law and the petitioner's rights thereunder, the petitioner failed to prove he had custody of the child).

B.   Father Did Not Exercise Any Custody Rights He May Have Had.

Even if this Court determines Father had custody rights under the Convention, Father was not exercising those rights immediately prior to the Child's removal. Between when Father and Mother separated in 2016 and the divorce agreement was finalized in December 2021, Father was an infrequent and inconsistent presence in young A.R's life. The divorce agreement obligated Father to see the Child every other weekend, from Friday evening until Monday morning.[45] However, according to Father, the Child was picked up on the respective Friday afternoons by Father's mother, and Father did not spend time with Child until after 12:00 in the afternoon on Saturdays when Father returned from work. It was also Father's mother who would return the

---

[44] Ex. G.
[45] Ex. Q.

Child back home to Mother. Father's interactions with the Child during these visits was quite limited. On some of Father's assigned weekends, he would not take the Child at all.

Additionally, according to the divorce agreement, "each parent will have the child with them for half of the January and July vacations and school breaks."[46] This allowed the Child to spend 15 days at home with Mother and 15 days with Father each January and July. However, Father rarely, if ever, exercised his rights to have the Child on holiday, or for half of vacations and school breaks. As such, the Child would spend roughly one weekend during each of Child's 30-day vacations with Father, spending the remaining twelve days of Father's vacation time, as well as the entire 15 days of Mother's vacation time at home with Mother. In addition, the Child rarely, if ever, spent holidays with Father, despite the divorce agreement's stipulation that "in odd-numbered years, the mother will be with the child at Christmas, while the father will have the child with him on New Year's Eve, the situation being reversed in even-numbered years."[47] This lack of action by Father to see the Child clearly demonstrates that Father has failed to exercise any right of custody he may have had, and therefore has failed to make a *prima facie* showing of wrongful removal of Child.

## II.    Father Consented To The Child's Relocation

Even if Father has established a prima facie case under the Hague Convention, the right to a child's return secured by the Convention is extinguished if "the person . . . having the care of the person of the child ... had consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13(a). An inquiry into whether a petitioner consented to removal focuses on the petitioner's conduct prior to the contested removal. *See Darin*, 746 F.3d at 14. Determining whether the evidence supports a finding of consent to removal is a fact-sensitive inquiry and can

---

[46] Ex. Q.
[47] Ex. Q.

rely on factual and credibility determinations. *See*, *e.g.*, *Padilla v. Troxell*, 850 F.3d 168, 176 (4th Cir. 2017); *Cascio v. Pace*, 992 F. Supp. 2d 856, 866 (N.D. Ill. 2014); *Application of Ponath*, 829 F. Supp. 363, 368 (D. Utah 1993). Critically, "[c]onsent may be evinced by the petitioner's statements or conduct, which can be rather informal."  *Darin*, 746 F.3d at 15 (citations omitted).

Here, the evidence will show that (1) in the several months preceding Mother's move to the United States, Mother and Father had several conversations (both in person and via other forms of communication) that collectively evince that Father ultimately consented to Mother relocating abroad with the Child. As a result of these conversations, Father opted to take voluntary action thereafter that was crucial to the Child's removal from Brazil and thus was consistent with and further demonstrative of his consent to the Child's move: he authorized the issuance of a passport for the Child, "with the inclusion of an international travel authorization".[48]

Beginning in or around December 2021, over the span of several months, Mother repeatedly informed Petitioner that she wished to move abroad for an uncertain period of time, and that she wished for the Child to move with her. Mother further repeatedly informed Father that his consent was expressly required to facilitate this move, as his signature was required to allow the Child to obtain a passport with travel authorization—documentation that was essential for the discussed international travel. In the months leading up to Mother's move to the United States with the Child, Father did not object to Mother's plan to relocate abroad with the Child; rather, he expressed agreement both with Mother's underlying motivation for the relocation and the plan itself, and thereafter he elected to take action that he understood to be necessary for the Child's move abroad to occur. Specifically, on or about February 3, 2022, Mother applied for a Brazilian passport on behalf of the Child. The ordinary passport application included an express request to

---

[48] Ex. J.

include a travel authorization for the Child. Critically, on this date, Father appeared in person at the passport division of the Brazilian Immigration Police and signed the paperwork for the Child's passport application and travel authorization.[49] The application states: "Standard form for authorizing the issuance of a minor's passport with the inclusion of an international travel authorization on the common passport, to travel with one of the parents[.]"[50]

Courts have found that signing travel documents in circumstances where the parent knows the child will be relocated is compelling evidence of consent. *See, e.g., Gonzalez-Caballero v. Mena*, 251 F.3d 789 (9th Cir. 2001) (signing travel documents was evidence of consent); *Giles v. Bravo*, 2:11-CV-01600-PMP, 2012 WL 704910 (D. Nev. Jan. 27, 2012), *report and recommendation approved*, 2:11-CV-01600-PMP, 2012 WL 704745 at *6 (D. Nev. Mar. 5, 2012) (relevant that mother placed no restrictions on the right to travel at the time she filled out a travel authorization and obtained a passport for the child)*; In re Krishna v. Krishna,* C 97-0021 SC, 1997 WL 195439 at *4 (N.D. Cal. Apr. 11, 1997) (relevant that petitioner father provided the mother with the child's passport after he had been informed of the mother's intention to move to the United States). Here, Father's deliberate acts of signing the passport application specifically including a travel authorization, understood in the context that he did so as a direct result of several conversations he'd had with Mother over the span of many months regarding her intent to relocate abroad with the Child, should be viewed as clear evidence of Father's consent to the Child's removal from Brazil.

It may be that Father wants to ex ante revoke his consent. Such desire, however, is irrelevant to the at-issue inquiry of whether Father consented to the removal in the first instance, "as the Hague Convention does not provide a mechanism for the revocation of consent once

---

[49] Ex. J.
[50] *Id.*

given." *See Cascio*, 992 F. Supp. 2d at 866 (denying petition and finding that petitioner's behavior was "consistent with an individual who changed his mind after consenting and then rushed to correct what he thereafter decided had been an error").

### III.   The Child Should Not Be Removed Because He Is Well-Settled And Father Did Not File This Action Until More Than One Year After The Alleged Wrongful Taking.

Even assuming that Father has established a prima facie case under the Convention, Respondents are able to show that A.R. is now well settled in the United States and should not be returned to Brazil.

### A.   Legal Standard

The "settled" defense is grounded in the perspective of the child. The signatory states of the Convention were "firmly convinced that the interests of children are of paramount importance in matters relating to their custody." (Ex. T, Elisa Pérez-Vera, Explanatory Report ¶ 23, *available at* https://assets.hcch.net/upload/expl28.pdf).[51]  As a result, "the interests of the child are stated to be the guiding criterion on this area." *Id.* at ¶ 25.

The return remedy "is not absolute." *Lozano*, 134 S. Ct. at 1229; 22 U.S.C. § 9001(a)(4). "Children who are wrongfully removed. . . are to be promptly returned **unless** one of the narrow exceptions set forth in the Convention applies." *Lozano*, 134 S. Ct. at 1229 (emphasis added). Article 12 of the Convention provides that a court is not bound to order the child's return if the petition was filed more than one year after the alleged wrongful retention and the child is "now

---

[51] The Pérez-Vera Explanatory Report was prepared by the Convention's official reporter. Although the Pérez-Vera Report is not part of the official drafting history of the Convention, the Department of State and a number of federal courts have characterized it as an authoritative text for interpreting the Convention. *See, e.g.*, *Yaman*, 919 F. Supp. 2d at 193, 193 n.2.

A62

settled in its new environment." Hague Convention, art. 12; *Lozano*, 134 S. Ct. at 1229 ("[I]n some cases, failure to file a petition for return within one year renders the return remedy unavailable."). The "settled" defense "permits courts to consider the interests of a child who has been in a new environment for more than a year before ordering that child to be returned to her country of habitual residency." *Lozano*, 697 F.3d at 52. The respondent bears the burden of establishing that the child is settled by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

As set forth below, because the undisputed facts establish that the "settled" defense is available to Respondents, the Child is well-settled in Massachusetts, and the equitable considerations all weigh against returning the Child to Brazil, the Court should deny and dismiss the Petition in this case.

B.   Respondents are Entitled To Assert The "Settled" Defense

The "settled" defense is available where, "at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is," a period of more than one year "has elapsed from the date of the wrongful removal or retention." Hague Convention, art. 12. Under ICARA, the "commencement of proceedings" is defined as the filing of an action pursuant to § 9003(b), which means filing a petition in a court "authorized to exercise its jurisdiction in the place *where the child is located* at the time the petition is filed." 22 U.S.C. § 9003(b), (f)(3) (emphasis added); *De Aguiar Dias*, 212 F. Supp. 3d at 273 (Petition was filed in the District of Massachusetts 11 months after the wrongful retention and the child was located in Worcester, Massachusetts at the time of filing); *Matovski v. Matovski*, No. 06 Civ. 4259 (PKC), 2007 WL 2600862, at *10 (S.D.N.Y. Aug. 31, 2007) (holding "commencement of proceedings" refers to filing of petition in a civil action for the return of the child in the jurisdiction where the child resides); *Alcala v. Hernandez*, No. 4:14-cv-04176-RBH, 2015 WL

4429425, at *10 (D.S.C. July 20, 2015) ("Under ICARA, the commencement of proceedings begins with the filing of a judicial petition."), *aff'd in part, appeal dismissed in part*, 826 F.3d 161 (4th Cir. 2016); *Wojcik v. Wojcik*, 959 F. Supp. 413, 418 (E.D. Mich. 1997) (same). Both parties stipulated in the Joint Pretrial Memorandum that the Child resides in Massachusetts. *See* Joint Pretrial Memorandum at §§ C.19, C.27. Consequently, the filing of Father's action in the U.S. District Court on May 14, 2024, marked the commencement of proceedings for the purposes of the case at hand.

Neither the commencement of proceedings in the petitioner's home country, nor an application to the central authority responsible for discharging a contracting state's duties under the Convention—*e.g.*, the U.S. Department of State or Brazilian equivalent—is sufficient. *Castellanos Monzón v. De La Roca*, No. 16-0058 (FLW) (LHG), 2016 WL 1337261, at *11 (D.N.J. Apr. 5, 2016) (holding application filed with Guatemalan central authority "was neither a substitute, nor a prerequisite" for filing petition in court); *In re R.V.B.*, 29 F. Supp. 3d 243, 255 (E.D.N.Y. 2014) (holding "any requests or filings made in the home country to have the child returned" are not sufficient); *Giles*, 2012 WL 704910, at *5, n.13  (holding petitioner had not commenced proceeding by contacting the Mexican Central Authority); *Muhlenkamp v. Blizzard*, 521 F. Supp. 2d 1140, 1152 (E.D. Wash. Oct. 23, 2007) (holding petition "must be filed with the court of record, not the Central Authority" to meet the one-year limitation). Therefore, any legal or other actions taken by Father prior to the filing of the action in this Court have no relevance to the settled analysis.

Furthermore, equitable tolling is not available. *Lozano*, 134 S. Ct. at 1231 (holding that the one-year calculation was not tolled even where the mother hid the child from the father). To the extent that Father alleges that Mother took measures to prevent him from learning the Child's

<div style="text-align:center">24</div>

<div style="text-align:center">A64</div>

whereabouts, such allegations would not extend the timeline during which Father was required to file his Hague Convention Petition. *da costa,* 2023 WL 4049378, at *8 (this Court considered whether "T.F." was "settled" in the United States where "the petition was thus filed more than one year after any of the potentially controlling dates."). Mother and the Child entered the United States on April 3, 2022 and have been living in Lowell, Massachusetts ever since.[52] The Petition was filed more than two years later in the District of Massachusetts on May 14, 2024.

C. The Child Is Well-Settled In Massachusetts.

The Convention does not define what it means for a child to be "settled." The natural meaning of the term "suggests a stable and permanent relocation of the child." *Lozano,* 697 F.3d at 56. The Department of State has interpreted "settled" to require "substantial evidence of the child's significant connections to the new country." *Id.* (quoting U.S. Dep't of State, Hague Int'l Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986)). Thus, "settled" in this context means "that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." *Id.*

Factors relevant to a determination of whether a child is settled include: (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church or participates in other community or extracurricular school activities regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent. *Lozano,* 697 F.3d at 57; *Moura,* 67 F. Supp. 3d at 499-500. "Courts also consider the amount of time a child has spent in the country, as well as

_____

[52] Ex. E, Silveira da Silva Dep. at 19:19-20:17.

25

A65

their academic performance, social networks and relationships, and, under some circumstances, country of citizenship." *Moura*, 67 F. Supp. 3d at 500.

The rationale behind the "settled" defense is that after a child has become settled in a new environment, a forced return will only cause disruption and further harm to the child. *Krefter*, 623 F. Supp. 2d at 136 (citing *Walsh*, 221 F.3d at 220 n.14 (characterizing such disruption as "an inevitable consequence of *removal*")); *Alcala*, 826 F.3d at 170, n.6 ("Ordering a child's return will generally sever whatever immediate connections a child has to his or her new environment. If those connections are significant enough that the child's life is secure, stable, and permanent, a return order is likely to be harmfully disruptive."); *In re Robinson*, 983 F. Supp. 1339, 1345 (D. Colo. 1997) ("It would seem that, just as it is harmful to wrongfully remove the children from their habitual residence, it may also be harmful to remove them again if they have become connected to or 'settled' in the new environment.").

### i. The Child is well-cared for in a supportive, stable home.

The length and stability of a child's residence is a significant factor in determining whether the child is settled. *Gwiazdowski v. Gwiazdowska*, No. 14-cv-1482 (FB)(RER), 2015 WL 1514436, at *4 (E.D.N.Y. Apr. 3, 2015); *In re D.T.J.*, 956 F. Supp. 2d 523, 535 (S.D.N.Y. 2013); *In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir. 2009) ("[O]rdinarily the most important [factor] is the length and stability of the child's residence in the new environment").

A.R. has resided in the same area for the two and a half years since he arrived in the United States. Upon arrival to the United States, A.R. lived with his Mother and Stepfather, and his uncle, Mr. Junior Torres dos Santos and aunt, Ms. Coutinho, in Lowell, Massachusetts. Respondents later secured a different apartment in Lowell in which the Child and Respondents reside. Respondents and the Child live near extended family, including Mr. Junior Torres dos Santos and Ms. Coutinho, and Stepfather's cousins, some of whom have children around A.R.'s age. *See da Costa*, 2023 WL

26

A66

4049378, at *9 (finding the child was well settled, in part, where all of the moves were within the same town and with or close to family, because "the Court does not find that [living in several homes] necessarily required a finding of instability").

A.R. has an extremely close relationship with his mother and stepfather, who provide him with a stable and loving home. A.R. enjoys spending time with his mother and stepfather, including going to the beach and the park together. Indeed, Father believes that Mother is a good mother to, and has a good relationship with, A.R.[53] Mother is engaged in A.R.'s educational activities, aware of his interests, and Mother ensures the Child receives medical care when needed, including preventative care visits. Mother helps her son with his homework and is engaged in his pursuit of education.[54] In contrast, Father does not know the school A.R. attends, who his teachers and friends are, and from whom A.R. receives medical care.[55] It is clear Father and A.R.'s relationship is surface level at best.[56] In fact, Father did not regularly speak with the Child after Mother and the Child left Brazil. Upon Mother's request, a Brazilian Court ordered Father to engage in regularly

---

[53] Ex. H, Rodrigues da Silva Dep. at 59:1-59:9 ("**Q** Do you believe that Jessica has a good relationship with [A.R.]? **A** Yes. **Q** Has [A.R.] ever complained about his mom on the phone with you? **A** No. **Q** Do you believe that Jessica is a good mother to [A.R.]? **A** Yes.").

[54] Ex. E, Silveira da Silva Dep. at 30:13-30:20 ("**Q** What do you study with him? **A** I like to practice his reading. **Q** Do you practice in English or in Portuguese? **A** Both. **Q** Do you teach [A.R.] any other lessons? **A** Some in Portuguese, yes; some written activities in Portuguese.").

[55] Ex. H, Rodrigues da Silva Dep. at 35:6-19 ("**Q** Mr. da Silva, do you know what school [A.R.] attends? **A** No. **Q** Do you know the name of his current teacher? **A** I also don't know that. **Q** Do you know the name of his prior teachers in the United States? **A** No. **Q** Do you know the name of his friends in the United States? **A** No. I only know about the friends that he had here when I would take -- little friends when I would take him and pick him up from school.").

[56] Ex. H, Rodrigues da Silva Dep. at 35:1-5 ("**Q** Does [A.R] tell you that he is happy living in the United States? **A** He talks to me about football and how he plays football/soccer. He doesn't talk to me about -- about living in the States.") and 36:3-11 ("**Q** Does [A.R.] tell you how he's doing in school? **A** He doesn't talk about the kinds of grades he makes at school, or things like that. He talks about football/soccer. **Q** Do you know what activities [A.R.] participates in? **A** All I know is the soccer, that he talks about with me.").

A67

scheduled calls with the Child.[57] Only after this court order did Father begin regularly communicating with the Child. Today, the Child and Father communicate over the phone using video calling capabilities, and Mother has never denied Father the opportunity to speak with the Child. And, despite his allegation in the Petition, Mother has never prevented Father from learning A.R.'s whereabouts. Rather, Father failed to explicitly ask Mother for the address of A.R.'s residence in the U.S.

The evidence confirms the Child lives in a supportive and stable home.

     ii.     *The Child is Old Enough to Form Meaningful Attachments to his New Home.*

A.R. arrived in the United States when he was eight years old. He has spent the majority of his school years in the United States and, at ten years of age, A.R. is undoubtedly old enough to form meaningful connections in the U.S. *See In re Lozano*, 809 F. Supp. 2d 197, 232 (S.D.N.Y. 2011) (holding five-year-old child "is old enough to form attachments"), *aff'd sub nom. Lozano v. Alvarez*, 697 F.3d 41 (2d Cir. 2012), *aff'd on other grounds*, 134 S. Ct. 1224 (2014); *Castellanos Monzón*, 2016 WL 1337261 at *13 (holding five-year old child capable of forming "memories of the United States and more ties to the country"); *Garza-Castillo v. Guajardo-Ochoa*, No. 2:10-CV-00359-LDG, 2012 WL 523696, *5-6 (D. Nev. Feb. 15, 2012) (finding five-and-a-half year old child to be settled); *Edoho v. Edoho*, No. H-10-1881, 2010 WL 3257480, at *6 (S.D. Tex. Aug. 17, 2010) (finding children aged four and six to be settled); *Margain v. Ruiz-Bours*, 592 F. App'x 619, 620-21 (9th Cir. 2015) (affirming finding that five-year old child was "settled").

In *da Costa* (J. Burroughs), this Court found a six-year-old child, was "clearly old enough to allow meaningful connections to the new environment to evolve." *da Costa,* 2023 WL 4049378,

---

[57] Ex. K; Ex. E, Silveira da Silva Dep. at 57:6-10 ("**A** So, I spoke to the Judge about this, and the problem was is that he was not returning my phone calls. So, she then made this agreement between us as a result of all this, bringing this to her attention.").

at *8 (internal citations omitted).  In that case, this Court found that the child had "strong relationships and significant contact with [] family members in the United States[,]" was engaged in school and learning English, had formed connections with teachers and classmates, and was engaged in extracurricular activities with other children. *Id.* at *9. The same facts exist here. A.R. has strong and meaningful relationships with his family in the United States, he is progressing in school and learning English, he has connected with his elementary school teachers and classmates, and he is engaged in extracurricular activities with other children, including soccer and church. Requiring A.R.'s return to Brazil would sever these strong connections that he has formed.

      *iii.*    *The Child is surrounded by extended family and friends in Massachusetts.*

Here, in addition to the close, loving relationships A.R. has with Respondents, A.R. has extremely close relationships with his uncle, Mr. Junior Torres dos Santo, and aunt, Ms. Coutinho. A.R. sees his uncle and aunt approximately bi-weekly and for birthdays, holidays, and other celebrations. Coutinho and Junior Torres dos Santos enjoy sharing meals with A.R. and Respondents, taking A.R. on bike rides or to the mall, and playing games with A.R. The Child has other extended family members living in Massachusetts, who he sees regularly at family gatherings and celebrations, including young cousins close to his age. The Child is also very friendly with his classmates and neighborhood friends and can often be found playing cards with friends at school and soccer with kids in his neighborhood. A.R. also participates in extracurricular activities, including soccer twice a week.

The evidence confirms that the Child has, in fact, formed meaningful connections to his extended family, friends and community in Massachusetts.

      *iv.*    *The Child is doing well in school and learning English rapidly.*

The Child has enrolled in fourth grade at Greenhalge Elementary School, which he has attended since second grade. The Child is doing well in the classroom, due in part to the school's

significant resources and familiarity with Portuguese-speaking children. In the time A.R. has been in school, his English language development has improved.[58] His teachers report that he "has a kind heart and is sweet. He is full of life and has a contagious smile!"[59] Moreover, A.R. is comfortable sharing his ideas with the class, and "likes to try out new strategies and learn mathematical games."[60] Overall, A.R. is known at school to be positive, hardworking, and kind.[61] His third-grade teacher left the following comments in A.R.'s report card:

> My dear [A.R.], I have loved being your teacher this year. [A.R.] has grown in many ways during the school year. He has worked hard to maintain consistency and meet expectations, both socially and academically. I am very proud of his achievements. He works very hard every day. Keep being you, [A.R.]! You are a positive light![62]

In *da Costa* (J. Burroughs), this Court emphasized that, though a child "is still learning English, which likely makes it more difficult to communicate with his schoolmates and teachers," having a strong community that speaks the native language of the child can show "that he is already settled in his new environment and will only become more so as he continues to get comfortable with English." 2023 WL 4049378, at *9. As in *da Costa*, A.R. lives in an area with a rich Brazilian community, which allows him to interact with Portuguese speakers, including family members, some classmates, and many neighborhood friends.

The evidence will show that A.R. is progressing with his English learning and has formed meaningful connections with his teachers and others in his Portuguese-speaking community. *See id.* (finding child to be well settled in part because he was engaged in school, had connections with his teachers and classmates, and was making progress with his English learning).

---

[58] Ex. N (Teacher L. O'Donnel stated in A.R.'s report card: "His English language development has grown over the course of the school year.").
[59] Ex. V.
[60] *Id.*
[61] *Id.*
[62] *Id.*

     *v.*   *Respondents are financially stable.*

Mother has work authorization and works part-time as a house cleaner. Stepfather works in construction. Together, they earn enough money to pay rent and for all of the Child's needs. Mother has not relied upon any financial assistance from Father since coming to the United States. Further, the Child's uncle and aunt, Mr. Junior Torres dos Santos and Ms. Coutinho, are employed, provide gifts to the Child, and are willing to support the Child and Respondents if needed, though it has not been needed to date. *See Matute-Castro v. Jimenez-Ortiz*, No. 15-cv-04568 (DLI)(JO), 2016 WL 8711076, at \*29-30 (E.D.N.Y. Aug. 26, 2016) (finding that because the respondent and child were receiving stable and substantial support from other sources, respondent's inability to work did not support the conclusion that this factor weighed against finding that the child was settled).

     *v.*   *Mother is seeking asylum in the United States for herself and the Child.*

Courts have made clear that "immigration status should only be one of many factors courts take into account when deciding if a child is settled within the meaning of Article 12," and "in any given case, the weight to be ascribed to a child's immigration status will necessarily vary." *Lozano*, 697 F.3d at 56 (finding child settled despite lack of legal immigration status); *accord Alcala*, 826 F.3d at 173-74 (same); *Moura*, 67 F. Supp. 3d at 409 ("[T]his consideration will be relevant only if there is an immediate, concrete threat of deportation."). Mother is seeking asylum for herself and derivative asylum for the Child in the United States and has obtained Work Authorization through U.S. Citizenship and Immigration Services ("USCIS").[63] USCIS has acknowledged her asylum request and her master hearing with USCIS has been scheduled for November 3, 2025.[64]

---

[63] Ex. M .
[64] Ex. C [Jessica Silveira da Silva master calendar hearing] & Ex. D [Arthur Rodrigues da Silva master calendar hearing].

Accordingly, Mother and the Child are pursuing legal status in the United States, and because that process is now in the purview of the appropriate agency to review their case, this Court need not examine the merits of that application now. In any event, given the numerous other factors weighing in favor of finding that A.R. is well settled, the family's immigration status should not be a factor in this proceeding.[65] *See, e.g.*, *da Costa*, 2023 WL 4049378, at *9 (finding the child was well settled because, in part, mother was authorized to work, held a job, and had applied for asylum for herself and the child); *Moura*, 67 F. Supp. 3d at 409; *Bejarno v. Jimenez*, 837 Fed. App'x 936, 937-38 (holding that immigration status should not be dispositive in determining whether a child is well-settled); *Lozano*, 697 F.3d at 56 (holding that immigration status is one of many factors taken into account when deciding if a child is well-settled, and that the weight ascribed to this factor varies).

## IV.   The Child Would Be Exposed To A Grave Risk Of Harm If Forced To Return To Brazil

Even if the Father is determined to have established a prima facie case under the Hague Convention, the Respondent is entitled to the grave risk of harm defense.

---

[65] This Court's discretionary power to order the return of the Child despite the existence of the "settled" defense is narrow and should only be exercised in limited circumstances. *See Lozano*, 134 S. Ct. at 1237 (articulating factors that narrow the scope of a district court's discretionary review). While the Hague Convention itself indicates that its provisions "do not limit the power of a judicial or administrative authority to order the return of the child at any time," the courts of the United States have generally cabined such power to limited inequitable circumstances. *See, e.g.*, *Alcala*, 826 F.3d at 175 (declining to order child's return pursuant to rule that the exercise of "[d]iscretion to order return is grounded in principles of equity"). If a wrongful removal alone was sufficient to warrant ordering return, the "settled" determination would be meaningless. The Convention's signatories did not intend the exceptions to be dead letters. *Id.* Rather, they intended that while a court must have "due regard" to the needs of the Convention, "the importance of the child's welfare" remains central to its analysis, and the exceptions should be considered in that context. *See Yaman*, 730 F.3d at 22-23 (internal citations omitted).

A. <u>Legal Standard</u>

The "grave risk of harm" defense is similarly grounded in the perspective of the child. This defense provides that a court is not bound to order the child's return if it is established that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). The respondent bears the burden of establishing that the child would be at grave risk of harm by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

A "grave" risk of harm means "more than serious risk." *Danaipour v. McLarey*, 286 F.3d 1, 14 (1st Cir. 2002). The potential harm to the child "must be something greater than would normally be expected on taking a child away from one parent and passing him to another." *Whallon*, 230 F.3d at 459. The risk to the child need not be immediate, it only needs to be "grave" as construed by the courts. *See Walsh*, 221 F.3d at 218. It should also be assessed on a forward-looking basis, considering the living situation the child would actually be facing if returned to their home country. *See De Aguiar Dias*, 212 F. Supp. 3d at 270-71.

As set forth below, the facts establish that there is a grave risk that A.R's return to Brazil would expose him to physical or psychological harm, and the Court may therefore appropriately deny and dismiss the Petition in this case.

B. <u>The "Grave Risk Of Harm" Defense Applies, And The Court Should Deny The Petition</u>

A.R. would be at grave risk of physical or psychological harm should he be forced to return to Brazil due to Father's pattern of physical abuse toward Mother, as well as a pattern of disturbing behavior, including exposing the Child to pornography and other age-inappropriate content, and committing illegal acts such as breaking into neighbors' homes and stealing their belongings.

33

A73

Father has exhibited a pattern of physical abuse directed toward Mother. On at least one occasion, Father grabbed and pulled Mother's arm, hurting her.[66] Father had received a prepaid VISA card as a bonus from his employer, which could be used to buy groceries. Mother, wanting to purchase food for A.R. with the money, asked Father to give her the card. When Father refused, Mother reached to take the card from him. In a fit of rage, Father resorted to physical violence, grabbing and pulling Mother's arm, hurting her. Mother called the police, but Father left before they arrived. This instance occurred prior to the custody agreement delineating Father's required child support payments. Mother never received the VISA card from Father, leaving Mother to provide for the Child on her own.

Father often verbally sexualized Mother in ways that made her feel disrespected and frequently uncomfortable.[67] Unfortunately, Mother was not the only victim of Father's sexual propensities. Father is a habitual user of pornography, and on at least one occasion, a young A.R., roughly five years old at the time, viewed pornography on Father's phone. *See* Michael Flood, *The Harms of Pornography Exposure Among Children and Young People*, 18 Child Abuse Rev. 384 (2009) (review finding young children's exposure to pornography sustains sexist and unhealthy notions of sex and relationships, and exposure intensifies support of sexual coercion and increases likelihood of perpetrating assault). It was not until the Child questioned Mother about what he had seen that Mother became aware of what had occurred. This was not the only time A.R. was exposed to content rated far beyond his age. When A.R. was seven years old, Father would spend his bi-weekly weekend visitation time playing Grand Theft Auto, a video game rated for 17 years of age or above, with A.R. The Child would both watch his father play and play the game himself. This occurred on multiple occasions, despite Mother's objections to exposing the Child to drugs,

---

[66] Ex. F, Silveira da Silva Interrogatory Response No. 16.
[67] Ex. E, Silveira da Silva Dep. at 13:2-13:18.

violence, sexually explicit activity, and bad language via the game. *See* Mingchen Wei, Yanling Liu, & Shuai Chen, *Violent Video Game Exposure and Problem Behaviors among Children and Adolescents: The Mediating Role of Deviant Peer Affiliation for Gender and Grade Differences*, 19 Int.'l J. Env't Rsch. Pub. Health 15400 (2022) (study of 2,118 children and adolescents found exposure to violent video games significantly positively predicted problem behaviors).

Father also has a pattern of disturbing behavior, including committing illegal acts such as breaking into neighbors' homes and stealing their belongings for no apparent reason. One such incident occurred when Father skipped work and broke into a neighbor's home, stealing her cell phone.[68] On a separate occasion, Father broke into another neighbor's home and stole a soccer jersey. These are not items Father, Mother, or even A.R. needed. Father broke into his neighbors' homes and stole their belongings for no other reason than he wanted to.

Father also has a history of mental illness. On February 2, 2022, almost two months before A.R. moved to the United States, Father submitted a request to INSS.[69] Father applied for, and was granted, Temporary Disability Assistance on the basis of anxiety.[70] This anxiety was so severe that Father could not hold a job.[71] Indeed, over the course of approximately one year, Father applied for INSS benefits seven times. The INSS denied five of Father's requests and granted benefits on two occasions.[72] Clearly Father believed that his anxiety was sufficiently severe that he could not maintain employment and required government assistance. Father has alerted Mother in the past

---

[68] Ex. F, Silveira da Silva Interrogatory Response No. 16.
[69] Ex. I.
[70] Ex E, Rodrigues da Silva Dep. at 44:19-23.
[71] *Id*. at 44:15-18.
[72] Ex. I, Ex. R [4/25/22]; Ex. S [5/16/2022 app]; Ex. U [7/9/2022]; Ex. W [10/5/22]; Ex. X [12/23/22]; Ex. Y [2/23/23].

that he hears voices telling him to kill himself, leaving Mother scared to leave A.R. alone with Father.[73]

Father's behavior demonstrates a pattern of (1) physical abuse, (2) exposing the Child to age-inappropriate content, (3) recklessly breaking into neighbors' homes and stealing their belongings, and (4) concerning mental health issues, such that return of the Child to Brazil would expose the Child a grave risk of harm sufficient for the "grave risk of harm" defense to apply, and for the Court to deny and dismiss the Petition.

## V.   Post-Petition Evidence Should Be Admitted.

The relevant portion of Article 12 of the Hague Convention indicates that post-petition evidence should be considered. It reads: "The judicial or administrative authority, <u>even where the proceedings have been commenced after the expiration of the period of one year</u> [following the child's wrongful removal], shall also order the return of the child, unless…the child is <u>now settled</u> in [his] new environment." Hague Convention, art. 12 (emphases added). Significantly, the phrase "now settled" is introduced in the context of post-petition circumstances without reference to pre-petition circumstances. This phrase implies that the defense focuses on the present, not the past.

Indeed, courts routinely analyze post-petition evidence when determining if a child is well-settled as "[a] court should examine the child's present circumstances and assess whether a child is 'now settled' as of the date of either an evidentiary hearing or when a motion for summary judgment is filed." *Matute-Castro*, 2016 WL 8711076, at *8 (gathering cases); *see also e.g., Lozano*, 697 F.3d at 46-47 (considering child's enrollment in kindergarten "at the time of the proceedings before the district court" as well as therapist notes that were post-petition); *Edoho*,

---

[73] Ex. F, Silveira da Silva Interrogatory Response No. 16.

2010 WL 3257480, at *4 & 6 (considering employment status of mother and step-father at time of hearing).

Thus, it is proper to include post-petition evidence when determining whether the child is well-settled. *See da Costa v. de Lima,* 94 F.4th 174, 182-83 (1st Cir. 2024) (affirming the District Court's finding and rejecting appellant's argument that the District Court erroneously relied on post-petition evidence).

**CONCLUSION**

For the foregoing reasons, repatriation of the Child should be denied and the Petition should be dismissed.

A77

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: October 7, 2024

/s/*Ruben J. Rodrigues*
Ruben J. Rodrigues

A78

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EDERVALDO RODRIGUES DA SILVA,<br><br>     Plaintiff/Petitioner,<br><br>v.<br><br>JESSICA SILVEIRA DA SILVA and<br>GILBERTO LUCAS,<br><br>     Defendants/Respondents. | C.A. No. 1:24-cv-11280-ADB |

## RESPONDENTS' PROPOSED FINDINGS OF FACT

**The Parties and Their Relationship**

1.　　Jessica Silveira da Silva ("Mother") was born in Brazil on September 23, 1992.

2.　　Mother and Edervaldo Rodrigues da Silva ("Father") married on May 13, 2011.

3.　　Mother and Father have one child, A. R. (the "Child"), who is now ten years old.

4.　　Mother, Father, and the Child lived together in Ibirité, Minas Gerais, Brazil after the Child was born.

5.　　Mother and Father separated in 2016.

6.　　Father left the marital home and moved in with his mother nearby, whereas Mother and the Child remained in the marital home.

7.　　Mother and the Child later moved to a nearby city, Belo Horizonte, Minas Gerais, Brazil.

8.　　Father was an inconsistent presence in the Child's life at this time, seeing him only intermittently and disappearing for unknown periods of time.

9.　　Mother would request Father visit the Child, which he agreed to only when convenient.

10.　　Father would purchase food for the Child, but it was never enough for the month.

4882-5006-3329.2

A80

11.     Father did not make any child support payments to Mother between their separation in 2016 and December 2021, when the custody agreement mandated he do so.

12.     Mother and Gilberto Lucas ("Mr. Lucas" or "Stepfather") met in 2021 and began dating.

13.     Mother and Father reached a formal agreement as to custody of the Child on December 10, 2021, where Mother received custody of the Child, and Father's parental rights were limited to visitation on alternate weekends, half of vacations and school breaks amounting to 30 cumulative days annually, and alternate holidays.

14.     Mother and Father's divorce was finalized on December 10, 2021.

15.     Father did not consistently exercise his rights of visitation, including missing several weekends, vacations, and holidays with the Child.

16.     Mother always permitted, and even encouraged, Father to have his visitation time with the Child.

**Father's Disturbing and Unstable Behavior While Child Is in Brazil**

17.     Father has demonstrated a pattern of inappropriate behavior and physical abuse toward Mother.

18.     On at least one occasion, after separation but prior to divorce, Father was physically violent towards Mother.

19.     Father had received a prepaid VISA card as a bonus from his employer, which could be used to buy groceries. Mother requested the card from Father so she could buy food for the Child.

20.     Father refused to allow Mother to use his bonus to purchase food for the Child.

21.     When Mother reached to take the card from Father, Father grabbed and pulled Mother's arm, injuring her.

2

22.     Mother called the Brazilian Police, but Father left before they arrived.

23.     Mother was never able to use the work bonus to purchase food for the Child. Mother

        provided for the Child on her own.

24.     Father often verbally sexualized Mother in a way that made Mother feel uncomfortable

        and disrespected.

25.     Father is a habitual user of pornography.

26.     On at least one occasion, the Child, roughly five years old at the time, viewed

        pornography on Father's phone. It was not until the Child questioned Mother about what

        he had seen that Mother became aware of what had occurred.

27.     Father regularly exposed the Child to content rated far beyond his age.

28.     Father would spend his bi-weekly weekend visitation time playing Grand Theft Auto, a

        video game rated for 17 years of age or above, with the Child. The Child would both

        watch his father play and play the game himself. The video game features violent and

        sexual content, and features drug use. The Child was seven years old at the time. This

        occurred on multiple occasions, despite Mother's objections to exposing the Child to

        drugs, violence, sexually explicit activity, and bad language via the game.

29.     Father has also demonstrated a pattern of reckless behavior, including committing illegal

        acts such as breaking into neighbors' homes and stealing their belongings.

30.     One such incident occurred when Father skipped work, broke into a neighbor's home,

        and stole her cellphone.

31.     Another incident involved Father breaking into a different neighbor's home and stealing a

        soccer jersey.

32.     Father has a history of mental illness.

3

33.     On or about March 2, 2022, after Father lost his job due to anxiety, Father applied for temporary disability assistance with the Brazilian National Social Security Institute ("INSS") on the basis of anxiety. This benefit was granted.

34.     Father applied for INSS benefits five more times between April and December 2022. INSS denied these requests.

35.     Father applied again on February 23, 2022. INSS approved these requests

36.     Father's anxiety was so severe that he was unable to maintain employment.

37.     Father has alerted Mother in the past that he hears voices telling him to kill himself.

**The Respondents' Move to the United States**

38.     In or around July of 2021, Mr. Lucas relocated to, and settled in, the United States.

39.     In or around December 2021, Mother told Father she wished to move with the Child abroad and would need Father's signature to obtain the Child's passport.

40.     On or about February 3, 2022, Mother and Father applied for a Brazilian Passport with International Travel Authorization on behalf of the Child.

41.     Father appeared at the passport division of the Brazilian Immigration Police and signed the passport application.

42.     On or about February 3, 2022, the Child was issued a Brazilian passport with International Travel Authorization, which authorized one parent to travel with the Child abroad.

43.     Mother did not know or believe that Father cancelled the Child's passport.

44.     The Child's passport was accepted by the airport when Mother and the Child used the passport to travel from Brazil.

A83

45. Mother and the Child relocated to, and settled in, the United States in April of 2022, when the Child was seven years old.

46. Mr. Lucas's brother, Gilmar Torres dos Santos, and sister-in-law, Bruna Coutinho, traveled to the United States with Mother and the Child, and settled in Massachusetts.

47. Since that date, Father has been able to have full communication with Mother and a now ten-year-old Child.

48. Mother sought a court order from a Brazilian court to require Father to contact the Child more frequently.

49. Father now speaks with the Child by video call several times per week, and Mother is always willing to facilitate her son's communication with Father.

50. Mother is seeking asylum for herself and derivative asylum for the Child in the United States and has obtained Work Authorization through U.S. Citizenship and Immigration Services ("USCIS"). USCIS has acknowledged her asylum request and her master hearing with USCIS has been scheduled for November 3, 2025. Accordingly, Mother and the Child are pursuing legal status in the United States, and that process is now in the purview of the appropriate agency to her review their case.

51. Mr. Lucas was detained at the border and released on his own recognizance. He does not currently have any date set to appear for further immigration proceedings. Regardless, Mr. Lucas's immigration status is known to the United States government, and that process is now in the purview of the appropriate agency to review his case.

52. Father did not file this petition under the Hague Convention in Massachusetts until May 14, 2024, more than two years following Mother and the Child's entrance into and settlement in the United States.

**The Child's Life in Massachusetts**

53.   The Child lives with Mother and Stepfather (collectively, the "Respondents") in Lowell.

54.   The Respondents were married on September 18, 2024.

55.   The Child has resided in the same area since his arrival in the United States two and a half years ago. Upon arrival, he lived with his Mother and Stepfather, uncle Mr. Torres dos Santos, and aunt Ms. Coutinho in Lowell, Massachusetts for approximately a year. During this time, Mr. Torres dos Santos and Ms. Coutinho regularly participated in the Child's care and upbringing.

56.   Respondents, together with the Child, obtained a new apartment in Lowell in April 2023. Mr. Torres dos Santos and Ms. Coutinho moved around the same time to Gloucester, Massachusetts, roughly an hour from Lowell.

57.   Pursuant to the Custody Agreement, Father is to pay 20% of his net income into Mother's account on a monthly basis.

58.   These payments amount to approximately less than $45 per month.

59.   Mother and Stepfather have saved these payments for the Child's use when he turns 18 and have instead fully provided for all of the Child's needs independently.

60.   Mother and the Child have familial connections in Massachusetts who the Child sees on a regular basis.

61.   The Child has a very close relationship with his Stepfather, who thinks of the Child as his own son. Stepfather is an active participant in the Child's care, including cooking with him, caring for him after school, taking him to medical appointments, and teaching him how to ride a bike.

62.     The Child also has close relationships with his uncle and aunt, Mr. Torres dos Santos and Ms. Coutinho. They see each other approximately biweekly and do activities like going to the park and the beach.

63.     The Child has other familiar connections in the area, including younger cousins that he sees regularly.

64.     Mother is employed part-time as a house cleaner.

65.     Mother also attends beauty school to become an esthetician.

66.     Stepfather has been employed in construction since his arrival in the United States in 2021.

67.     Together, Respondents provide a safe and financially secure life for the Child.

68.     Respondents earn enough money to pay rent and for all of the Child's needs without any financial assistance from Father.

69.     Lowell has a large Brazilian community, allowing the Child access to essential educational resources, community support, and maintain a connection to his culture.

70.     The Child has an established routine in Massachusetts.

71.     The Child has attended Frederic T. Greenhalge Elementary School in Lowell since September 2022, when he was in second grade. The Child is currently in fourth grade at Greenhalge Elementary School.

72.     The school staffs a teacher aid in the Child's classroom to support students with English learning, which allows the Child to learn in both English and Portuguese.

73.     The Child's English has improved significantly since coming to the United States  and he has made friends in his classes.

74.     The Child loves his teachers and enjoys learning.

75. The Child has been a patient of Oak Pediatrics in Westford, Massachusetts since September 2022.

76. The Child is actively engaged in the community.

77. The Child periodically attends church services in Wilmington, MA.

78. The Child participates in soccer lessons in Lowell.

79. The Child has playdates with friends from school, soccer, and his neighborhood, and has spent time at their homes.

80. The Child has lived in the United States for two and a half years. He has spent the majority of his school years in the United States.

81. The Child has a happy, stable life in Massachusetts.


Dated: October 7, 2024                    Respectfully submitted,

                                          JESSICA SILVEIRA DA SILVA and
                                          GILBERTO LUCAS
                                          By their attorneys,

                                          */s/ DRAFT*_____
                                          Ruben J. Rodrigues (BBO #676573)
                                          James W. Matthews (BBO #560560)
                                          Lea Gulotta James (BBO #705421)
                                          Olivia Benjamin (BBO #705525)
                                          Jamie Steven (BBO #)
                                          Amani Kmeid (BBO #711302)
                                          FOLEY & LARDNER LLP
                                          111 Huntington Avenue
                                          Suite 2500
                                          Boston, MA 02199-7610
                                          Phone: (617) 342-4000
                                          Fax: (617) 342-4001
                                          rrodrigues@foley.com
                                          ljames@foley.com
                                          obenjamin@foley.com
                                          jsteven@foley.com
                                          akmeid@foley.com

8

A87

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EDERVALDO RODRIGUES DA SILVA,<br><br>    Plaintiff/Petitioner,<br><br>v.<br><br>JESSICA SILVEIRA DA SILVA and<br>GILBERTO LUCAS,<br><br>    Defendants/Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

           C.A. No. 1:24-cv-11280-ADB

## RESPONDENTS' PROPOSED CONCLUSIONS OF LAW

**A.**     **Legal Standard**

    1.     A petitioner seeking the return of a child under the Convention must establish the child's wrongful removal by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A); *Mendez v. May*, 778 F.3d 337, 343 (1st Cir. 2015); *Sánchez-Londoño v. Gonzalez*, 752 F.3d 533, 539 (1st Cir. 2014).

    2.     The petitioner must show that he or she (1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those custody rights. Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986), art. 3; *Mendez*, 778 F.3d at 343; *Sánchez-Londoño*, 752 F.3d at 540.

**B.**     **Rights of Custody**

    3.     The burden of establishing both (i) rights of custody and (ii) exercise of custody is on the petitioner. *See, e.g., Kufner v. Kufner*, 519 F.3d 33, 39 (1st Cir. 2008) ("The petitioner must establish by a preponderance of the evidence that the child was 'wrongfully removed or retained' . . . when (a) it is in breach of rights of custody . . . and (b) at the time of the removal or retention

4893-8973-4369.3

those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."); *Whallon v. Lynn*, 230 F.3d 450, 454 (1st Cir. 2000) ("The petitioner bears the burden of proving 'wrongful removal' by a preponderance of the evidence.").

4.      Sources of rights of custody arise "(1) by operation of law; (2) by reason of judicial or administrative decision; or (3) by reason of an agreement having legal effect under the law of that State."  Hague Convention, art. 3.

5.      The Hague Convention defines "rights of custody" in the context of wrongful removal analysis as including rights relating to the care of the child, and in particular the right to determine the child's place of residence. *See, e.g.*, *Abbott v. Abbott*, 560 U.S. 1, 9 (2010) (citing Hague Convention, arts. 5(a), 7).

6.      Rights of custody are distinguished from rights of access, with the latter only granting the parent the "right to take the child for a limited period of time to a place other than the Child's habitual residence." *Kufner*, 519 F.3d at 39 (quoting Hague Convention, art. 5); *da Costa v. da Lima,* 22-CV-10543-ADB, 2023 WL 4049378, at *6 (D. Mass. Jun. 6, 2023) ("Rights of custody are distinguished from 'rights of access[.]'") (internal citations omitted) (Burroughs, J. ruling), *aff'd* 94 F.4th 174 (1st Cir. 2024). Rights of access have been found to include where a party only had rights to visit their child biweekly. *See De Vasconcelos v. Batista*, No. 4:10-cv-00628, 2011 WL 806096, at *3-4 (E.D. Tex. Mar. 1, 2011). There is no evidence that overnight visits alone constitute rights of custody.

7.      Mere rights of access to a child are not sufficient to confer custody rights under the Hague Convention. *See id.*; *see also Abbott*, 560 U.S. at 13. "Having rights of custody is necessary to petition for return of a child, while only having rights of access does not entitle a party to petition for the return of a child . . ." *Kufner*, 519 F.3d at 39.

8.      The parties' divorce agreement specifies that Edervaldo Rodrigues da Silva ("Father" or "Petitioner") may have the Child for overnight visits every other weekend and alternate holidays.  This is insufficient to constitute rights of custody under the Hague Convention.

9.      Father has failed to establish a prima facie case under the Hague Convention because he has not proven that he had rights of custody over the child.

**C.      Failure to Exercise Custody Rights**

10.      While a showing of "actual exercise" of custody rights is necessary under the Hague Convention, "the Convention itself does not define the term." *Krefter v. Wills*, 623 F. Supp. 2d 125, 133 (D. Mass. 2009); *see generally* Hague Convention, art. 5 ("'[R]ights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.").

11.      Courts must determine "what conduct by a parent possessing custody rights is sufficient to show that he actually exercised *those rights*." *Id.* at 133-34 (quoting *Bader v. Kramer*, 484 F.3d 666, 670 (4th Cir. 2007)).

12.      The Father has failed to establish a prima facie case under the Hague Convention because he has not proven that "at the time of removal or retention," the custody rights he had, if any, "were actually exercised." Hague Convention, art. 3.

**D.      The Consent Defense**

13.      Even where a petitioner has established a prima facie case under the Hague Convention, the right to a child's return secured by the Convention is extinguished if "the person . . . having the care of the person of the child ... had consented to or subsequently acquiesced in the removal or retention."  Hague Convention, art. 13(a).

3

A91

14.     An inquiry into whether a petitioner consented to removal focuses on the petitioner's conduct prior to the contested removal.  *See Darin v. Olivero-Huffman*, 746 F.3d 1, 14 (1st. Cir. 2014).

15.     Determining whether the evidence supports a finding of consent to removal is a fact-sensitive inquiry and can rely on factual and credibility determinations. *See*, *e.g.*, *Padilla v. Troxell*, 850 F.3d 168, 176 (4th Cir. 2017); *Cascio v. Pace*, 992 F. Supp. 2d 856, 866 (N.D. Ill. 2014); *Application of Ponath*, 829 F. Supp. 363, 368 (D. Utah 1993).

16.     "Consent may be evinced by the petitioner's statements or conduct, which can be rather informal."  *Darin*, 746 F.3d at 15 (citations omitted).

17.     Signing travel documents in circumstances where the parent knows the child will be relocated is compelling evidence of consent.  *See, e.g., Gonzalez-Caballero v. Mena*, 251 F.3d 789 (9th Cir. 2001); *Giles v. Bravo*, 2:11-CV-01600-PMP, 2012 WL 704910 (D. Nev. Jan. 27, 2012), *report and recommendation approved*, 2:11-CV-01600-PMP, 2012 WL 704745 (D. Nev. Mar. 5, 2012); *In re Krishna v. Krishna*, 1997 WL 195439 (N.D. Cal. 1997).

18.     An ex-ante desire to revoke consent is irrelevant to the inquiry of whether a petitioner consented to a child's removal in the first instance, "as the Hague Convention does not provide a mechanism for the revocation of consent once given."  *See Cascio*, 992 F. Supp. 2d at 866.

**E.     The Settled Defense**

<u>Respondents are Entitled to Assert the Settled Defense</u>

19.      The return remedy "is not absolute."  22 U.S.C. § 9001(a)(4); *Lozano v. Alvarez*, 134 S. Ct. 1224, 1229 (2014).

20.   "Children who are wrongfully removed. . . are to be promptly returned **unless** one of the narrow exceptions set forth in the Convention applies." *Id.* (emphasis added).

21.   The signatory states of the Hague Convention were "firmly convinced that the interests of children are of paramount importance in matters relating to their custody." (Ex. H, Elisa Pérez-Vera, *Explanatory Report* ¶ 23, *available at* https://assets.hcch.net/upload/expl28.pdf).

22.   Even where the conditions of Article 3 of the Convention are met, which they are not here, Article 12 provides that a court is not bound to order the child's return if the petition was filed more than one year after the alleged wrongful retention and the child is "now settled in its new environment." Hague Convention, art. 12.

23.   The "settled" defense "permits courts to . . . consider the interests of a child who has been in a new environment for more than a year before ordering that child to be returned to her country of habitual residency." *Lozano v. Alvarez*, 697 F.3d 41, 52 (2d Cir. 2012), *aff'd on other grounds*, 134 S. Ct. 1224 (2014); Hague Convention, art. 12.

24.   The respondent bears the burden of establishing that the child is settled by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

25.   The rationale behind the "settled" defense is that after a child has become settled in a new environment, a forced return will only cause disruption and further harm to the child. *Krefter*, 623 F. Supp. 2d at 136 (citing *Walsh v. Walsh*, 221 F.3d 204, 220 n.14 (1st Cir. 2000) (characterizing such disruption as "an inevitable consequence of removal")).

26.   Under the International Child Abduction Remedies Act ("ICARA"), the "commencement of proceedings" is defined as the filing of an action pursuant to § 9003(b), which means filing a petition in a court "authorized to exercise its jurisdiction in the place *where the child is located* at the time the petition is filed." 22 U.S.C. § 9003(b), (f)(3) (emphasis added); *De*

*Aguiar Dias v. De Souza*, 212 F. Supp. 3d 259, 273 (D. Mass. 2016) (petition was filed in the District of Massachusetts 11 months after the wrongful retention and the child was located in Worcester, Massachusetts at the time of filing); *Matovski v. Matovski*, No. 06 Civ. 4259 (PKC), 2007 WL 2600862, at *10 (S.D.N.Y. Aug. 31, 2007) (holding "commencement of proceedings" refers to filing of petition in a civil action for the return of the child in the jurisdiction where the child resides); *Alcala v. Hernandez*, No. 4:14-cv-04176-RBH, 2015 WL 4429425, at *10 (D.S.C. July 20, 2015) ("Under ICARA, the commencement of proceedings begins with the filing of a judicial petition"), *aff'd in part, appeal dismissed in part*, 826 F.3d 161 (4th Cir. 2016); *Wojcik v. Wojcik*, 959 F. Supp. 413, 418 (E.D. Mich. 1997) (same).

27.     Neither the commencement of proceedings in the petitioner's home country, nor an application to the central authority responsible for discharging a contracting state's duties under the Convention—*e.g.*, the U.S. Department of State or Brazilian equivalent—is sufficient. *Castellanos Monzón v. De La Roca*, No. 16-0058 (FLW) (LHG), 2016 WL 1337261, at *11 (D.N.J. Apr. 5, 2016) (holding application filed with Guatemalan central authority "was neither a substitute, nor a prerequisite" for filing petition in court); *In re R.V.B.*, 29 F. Supp. 3d 243, 255 (E.D.N.Y. 2014) (holding "any requests or filings made in the home country to have the child returned" are not sufficient); *Giles*, 2012 WL 704910, at *5, n.13 (holding the petitioner had not commenced proceeding by contacting the Mexican Central Authority); *Muhlenkamp v. Blizzard*, 521 F. Supp. 2d 1140, 1152 (E.D. Wash. Oct. 23, 2007) (holding petition "must be filed with the court of record, not the Central Authority" to meet the one-year limitation).

28.     Both parties stipulated in the Joint Pretrial Memorandum that the Child resides in Massachusetts. *See* Joint Pretrial Memorandum at §§ C.14, C.15 (Dkt. No. 28).

29. The one-year calculation began from the date of the wrongful taking or retention to the date that Father filed his petition in this court, since the District of Massachusetts is a court "authorized to exercise its jurisdiction in the place *where the child is located* at the time the petition is filed." 22 U.S.C. § 9003(b).

30. The alleged wrongful taking occurred in April 2022.

31. Equitable tolling is not available. *Lozano*, 134 S. Ct. at 1231 (holding that the one year calculation was not tolled even where the mother hid the child from the father).

32. This Petition was filed in the U.S. District Court for the District of Massachusetts on May 14, 2022.

33. More than one year has elapsed from the date of the alleged wrongful taking to the filing of the Petition.

34. Jessica Silveira da Silva ("Mother") and Gilberto Lucas ("Mr. Lucas" or "Stepfather") (together, "Respondents") are entitled to assert the "settled" defense.

<u>Admissibility of Post-Petition Evidence</u>

35. Courts routinely analyze post-petition evidence when determining if a child is now settled, as "[a] court should examine the child's present circumstances and assess whether a child is 'now settled' as of the date of either an evidentiary hearing or when a motion for summary judgment is filed." *Matute-Castro v. Jimenez-Ortiz*, 15CV04568DLIJO, 2016 WL 8711076, at *8 (E.D.N.Y. Aug. 26, 2016); *see also Lozano*, 697 F.3d at 46-47 (considering child's post-petition enrollment in kindergarten and post-petition notes from child's therapist); *da Costa v. de Lima,* 94 F.4th 174, 182-83 (1st Cir. 2024) (affirming the District Court's finding and rejecting appellant's argument that the District Court erroneously relied on post-petition evidence); *Edoho v. Edoho*,

A95

CIV.A. H-10-1881, 2010 WL 3257480, at *4-6 (S.D. Tex. Aug. 17, 2010) (considering employment status of mother and stepfather at the time of hearing).

36.     Consideration of post-petition evidence is consistent with the Hague Convention's intentions in providing the now-settled defense, which requires consideration of whether the child is "now settled in its new environment." Hague Convention, art. 12.

<u>The Child is Well Settled in Massachusetts</u>

37.     The "settled" defense "permits courts to . . . consider the interests of a child who has been in a new environment for more than a year before ordering that child to be returned to her country of habitual residency." *Lozano*, 697 F.3d at 52; Hague Convention, art. 12.

38.     The Convention does not define what it means for a child to be "settled."

39.     The natural meaning of the term "suggest[s] a stable and permanent relocation of the child." *Id.*

40.     "Settled" in the context of the Hague Convention means "that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." *Id.*

41.     Factors relevant to a determination of whether a child is settled include: (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church or participates in other community or extracurricular school activities regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent. *Lozano*, 697 F.3d. at 57; *Moura v. Cunha*, 67 F. Supp. 3d 493, 499-500 (D. Mass. 2014).

42.     "Courts also consider the amount of time a child has spent in the country, as well as their academic performance, social networks and relationships, and, under some circumstances, country of citizenship." *Moura*, 67 F. Supp. 3d at 500.

43.     While a court may exercise its discretion to order the return of the child despite establishment of a "settled" defense, such discretion should only be exercised in limited circumstances. *Lozano*, 134 S. Ct. at 1237 (discussing various equitable factors, including the need to discourage inequitable conduct); Hague Convention, art. 18 ("The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time.").

44.     So long as respondent has proved by a preponderance of the evidence that the child is well-settled, and the balance of equities do not fall against that respondent, then the court should decline to send the child back. *Alcala v. Hernandez*, 826 F.3d 161, 168 (4th Cir. 2016).

45.     The length and stability of a child's residence is a significant factor in determining whether the child is settled. *Gwiazdowski v. Gwiazdowska*, 14-CV-1482 FB RER, 2015 WL 1514436, at *4 (E.D.N.Y. Apr. 3, 2015).

46.     Given that the Child has resided in Lowell for two and half years and is surrounded by family and friends whom he sees often, this factor weighs in favor of finding that the Child is settled.

47.     At ten years of age, the Child is old enough to form meaningful attachments to his new home. *See da Costa,* 2023 WL 4049378, at *8 (finding a six-year-old child, was "clearly old enough to allow meaningful connections to the new environment to evolve."); *In re Lozano*, 809 F. Supp. 2d 197, 232 (S.D.N.Y. 2011) (holding five-year-old child "is old enough to form attachments"), *aff'd sub nom. Lozano v. Alvarez*, 697 F.3d 41 (2d Cir. 2012), *aff'd on other*

*grounds*, 134 S. Ct. 1224 (2014); *Castellanos Monzón*, 2016 WL 1337261, at *13 (holding five-year old child capable of forming "memories of the United States and more ties to the country"); *Garza-Castillo v. Guajardo-Ochoa,* No. 2:10-CV-00359-LDG, 2012 WL 523696, *5-6 (D. Nev. Feb. 15, 2012) (finding five-and-a-half year old child to be settled); *Edoho*, 2010 WL 3257480, at *6 (finding children aged four and six to be settled); *Margain v. Ruiz-Bours*, 592 F. App'x 619, 620-21 (9th Cir. 2015) (affirming finding that five-year old child was "settled"). The evidence confirms that the Child has, in fact, formed meaningful connections to his extended family, friends and community in Massachusetts.

48.     The evidence confirms that the Child has formed meaningful connections to his family, friends, and community in Massachusetts. He has close relationships with his stepfather who he lives with, as well as his aunt and uncle who live nearby and who he sees most weeks. Lowell also has a large Brazilian community, and the Child has connected with the community through involvement in church, school, and soccer lessons. This factor weighs in favor of finding the Child is settled in Massachusetts.

49.     The evidence confirms that the Child is doing well in school. His teachers report that his English has shown improvement since he started second grade in September 2022, and he has access to classroom resources provided to assist English language learners. *See da Costa,* 2023 WL 4049378, at *9 (finding that a thought a child "is still learning English, which likely makes it more difficult to communicate with his schoolmates and teachers," having a strong community that speaks the native language of the child can show "that he is already settled in his new environment and will only become more so as he continues to get comfortable with English."). He has made friends with others in his class and is known as a kind-hearted child. This factor weighs in favor of finding that the Child is settled in Massachusetts.

50.     Mother is employed as a house cleaner. She is also enrolled in esthetician school. Stepfather has been consistently employed in construction since his arrival in Massachusetts in July 2021. Together, the Respondents provide a safe and financially secure life for the Child and are able to support the household without assistance from the Father. *See Matute-Castro*,  2016 WL 8711076, at *8-9 (finding that because the respondent and child were receiving stable and substantial support from other sources, respondent's inability to work did not support the conclusion that this factor weighed against finding that the child was settled). This factor weighs in favor of finding the Child is settled in Massachusetts.

51.     Courts have made clear that "immigration status should only be one of many factors courts take into account when deciding if a child is settled within the meaning of Article 12," and "in any given case, the weight to be ascribed to a child's immigration status will necessarily vary." *Lozano*, 697 F.3d at 56 (finding child settled despite lack of legal immigration status); *accord Alcala*, 826 F.3d at 173-74 (same); *da Costa*, 2023 WL 4049378, at *9 (finding the child was well settled because, in part, mother was authorized to work, held a job, and had applied for asylum for herself and the child); *Moura*, 67 F. Supp. 3d at 499 ("[T]his consideration will be relevant only if there is an immediate, concrete threat of deportation.").

52.     Mother and the Child are pursuing legal status in the United States, and because that process is now in the purview of the appropriate agency to review their case, this Court need not examine the merits of that application now. Additionally, Mother and the Child do not have even a master calendar hearing until November 2025. Mr. Lucas was detained at the border and released on his own recognizance and does not have any scheduled immigration proceedings. In any event, given the numerous other factors weighing in favor of finding that the Child is well settled, the family's immigration status should not be a factor in this proceeding. *See, e.g.*, *Moura*,

67 F. Supp. 3d at 499; *Bejarno v. Jimenez*, 837 Fed. App'x 936, 937-38 (3d Cir. 2021) (holding that immigration status should not be dispositive in determining whether a child is well-settled); *Lozano*, 697 F.3d at 56 (holding that immigration status is one of many factors taken into account when deciding if a child is well-settled, and that the weight ascribed to this factor varies).

53.     There is substantial evidence of the Child's significant connections to conclude that he is in fact settled in or connected to his new environment so that return would be disruptive with likely harmful effects. *Anderson v. Acree*, 250 F. Supp. 2d 876, 881 (S.D. Ohio 2002).

54.     It would be particularly disruptive to return the Child to Brazil because it would potentially separate the Child from his Mother and Stepfather, and sever the strong connections the Child has with his extended family, friends, classmates, and teachers in the U.S.

55.     Because the Child is settled in the United States and sending him back to Brazil would be harmfully disruptive, this Court should decline to exercise its discretion to return the Child and the Child should remain in the United States.

**F.     The Child Would be Exposed to Grave Risk of Harm if Returned to Brazil**

56.     Return is not required if there is a "grave risk of harm that his return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b); *Acosta v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013).

57.     A "grave" risk of harm means "more than serious risk." *Danaipour v. McLarey*, 286 F.3d 1, 14 (1st Cir. 2002).

58.     The potential harm to the child "must be something greater than would normally be expected on taking a child away from one parent and passing him to another." *Whallon*, 230 F.3d at 459.

A100

59.     The risk to the child need not be immediate, it only needs to be "grave" as construed by the courts. *See Walsh*, 221 F.3d at 218. It should also be assessed on a forward-looking basis, considering the living situation the child would actually be facing if returned to their home country. *See De Aguiar Dias*, 212 F. Supp. 3d at 270-71.

60.     Courts have found there was a grave risk of harm to a child when there was a sustained pattern of abuse or a propensity for violence. *See, e.g.*, *Walsh*, 221 F.3d at 219-20 (finding a grave risk of harm where petitioner father exhibited a "generalized pattern of violence, including violence directed at his own children").

61.     Courts have held that it is proper to decline to return a child in situations where it was "highly probable that [the petitioner] will react with violence, threats, or other verbal abuse towards the children," even though where there was no history of violence toward the children. *Acosta*, 725 F.3d at 875.

62.     The respondent bears the burden of establishing that the child would be at grave risk of harm by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

63.     The Father has demonstrated a pattern of verbal and physical abuse toward Mother.

64.     The Father has also demonstrated a pattern of disturbing and reckless behavior, including exposing the Child to pornography and other age-inappropriate content, committing illegal acts such as breaking into neighbors' homes, and stealing from neighbors' homes. These actions put the Child at grave risk of harm arising from Father's illegal actions.

65.     Because there is clear and convincing evidence that returning the Child to Brazil would expose the Child to physical or psychological harm, or otherwise place him in an intolerable situation, this Court declines to exercise its discretion to return the Child and the Child shall remain in the United States.

A101

Dated: October 7, 2024

Respectfully submitted,

JESSICA SILVEIRA DA SILVA and
GILBERTO LUCAS
By their attorneys,

*/s/ DRAFT*
Ruben J. Rodrigues (BBO #676573)
James W. Matthews (BBO #560560)
Lea Gulotta James (BBO #705421)
Olivia Benjamin (BBO #705525)
Jamie Steven (BBO #)
Amani Kmeid (BBO #711302)
FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199-7610
Phone: (617) 342-4000
Fax: (617) 342-4001
rrodrigues@foley.com
ljames@foley.com
obenjamin@foley.com
jsteven@foley.com
akmeid@foley.com

14

A102



An official website of the United States government
Here's how you know ⌄

## EOIR | Automated Case Information

---

**Court Closures Today**  October 7, 2024

Please check https://www.justice.gov/eoir-operational-status for up to date closures.

Home  >  **SILVEIRA DA SILVA, JESSICA (240-603-427)**



# Automated Case Information

## Name: SILVEIRA DA SILVA, JESSICA │ A-Number: 240-603-427 │ Docket Date: 4/21/2022

### 📅 Next Hearing Information

Your upcoming **MASTER** hearing is **IN PERSON** on **November 3, 2025** at **8:30 AM**

**JUDGE**
Visiting Judge 3

**COURT ADDRESS**
JFK BLDG, 15 NEW SUDBURY, #320
BOSTON, MA 02203

DASILVA0000271

A103

Automated Case Information

 ## Decision and Motion Information



*This case is pending.*

 ## BIA Case Information

No appeal was received for this case.

 ## Court Contact Information

If you require further information regarding your case, or wish to file additional documents, please contact the immigration court.

**COURT ADDRESS**
JFK FEDERAL BLDG., ROOM 320
BOSTON, MA 02203

**PHONE NUMBER**
(617) 565-3080

Archive

Accessibility

Information Quality

Privacy Policy

DASILVA0000272

A104

Legal Policies & Disclaimers

Social Media

Budget & Performance

Office of the Inspector General

No FEAR Act

For Employees
EOIR Freedom of Information Act (FOIA)

USA.gov

Contact EOIR

EOIR Home

Justice.gov
Immigration Court Online Resource

Contact Technical Support

---

Department of Justice | Executive Office for Immigration Review

*5107 Leesburg Pike, Suite 2600, Falls Church, VA 22041*

 EOIR    Automated Case Information

DASILVA0000273

A105



An official website of the United States government
Here's how you know ⌄

**EOIR** | Automated Case Information

**Court Closures Today**  October 7, 2024

Please check https://www.justice.gov/eoir-operational-status for up to date closures.

Home  >  **RODRIGUEZ SILVEIRA DA SILVA, ARTHUR (240-485-147)**



# Automated Case Information

## Name: RODRIGUEZ SILVEIRA DA SILVA, ▮▮▮▮▮  |  A–Number: 240–485–147  |  Docket Date: 4/21/2022



### Next Hearing Information

Your upcoming **MASTER** hearing is **IN PERSON** on **November 3, 2025** at **8:30 AM**

**JUDGE**

Visiting Judge 3

**COURT ADDRESS**

JFK BLDG, 15 NEW SUDBURY, #320

BOSTON, MA 02203

DASILVA0000274

A106

 **Decision and Motion Information**



*This case is pending.*

 **BIA Case Information**

No appeal was received for this case.

 **Court Contact Information**

If you require further information regarding your case, or wish to file
additional documents, please contact the immigration court.

**COURT ADDRESS**
JFK FEDERAL BLDG., ROOM 320
BOSTON, MA 02203

**PHONE NUMBER**
(617) 565-3080

Archive

Accessibility

Information Quality

Privacy Policy

DASILVA0000275

A107

Legal Policies & Disclaimers

Social Media

Budget & Performance

Office of the Inspector General

No FEAR Act

For Employees

EOIR Freedom of Information Act (FOIA)

USA.gov

Contact EOIR

EOIR Home

Justice.gov

Immigration Court Online Resource

Contact Technical Support

---

Department of Justice | Executive Office for Immigration Review

*5107 Leesburg Pike, Suite 2600, Falls Church, VA 22041*

 **EOIR**   Automated Case Information

A108

# EXHIBIT E



# Transcript of Jessica Silveira da Silva

**Date:** September 13, 2024
**Case:** Rodrigues da Silva -v- Silveira da Silva

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

A110

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MASSACHUSETTS
3
4    - - - - - - - - - - - - x
5    EDERVALDO RODRIGUES      :
6    DA SILVA,                :
7          Plaintiff,        :
8       v.                   :  CA No. 1:24-cv-11280-ADB
9    JESSICA SILVEIRA DA      :
10   SILVA, et al.,          :
11         Defendants.       :
12   - - - - - - - - - - - - x
13        Deposition of JESSICA SILVEIRA DA SILVA
14             Conducted Virtually
15         Friday, September 13, 2025
16              2:05 p.m. EST
17
18
19   Job No.:  553226
20   Pages: 1 - 58
21   Reported By: Karen Klerekoper, CSR-4250, RPR
22
23
24
```

**Page 2**

```
1        Deposition of JESSICA SILVEIRA DA SILVA,
2    conducted virtually:
3
4
5
6
7
8
9        Pursuant to Notice, before Karen Klerekoper,
10   Notary Public in and for the State of Michigan.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1              A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFFS:
4        CHARLES R. HUNSINGER, ESQUIRE
5        BOWDITCH & DEWEY LLP
6        101 Federal Street, Suite 1405
7        Boston, Massachusetts  02110
8        617.757.6500
9
10   ON BEHALF OF THE DEFENDANTS:
11       AMANI KMEID, ESQUIRE
12       FOLEY & LARDNER LLP
13       111 Huntington Avenue, Suite 2500
14       Boston, Massachusetts  02119
15       617.342.4000
16
17   ALSO PRESENT:
18   ZOOM TECHNICIAN MICHELLE MEJIA, PLANET DEPOS
19   JANE LAMB RUIZ, PORTUGUESE INTERPRETER
20   SIDHI GOSAIN, ESQUIRE, FOLEY & LARDNER
21
22
23
24
```

**Page 4**

```
1                    INDEX
2
3    WITNESS:                           PAGE:
4
5
6        EXAMINATION BY MR. HUNSINGER:      5
7        EXAMINATION BY MS. KMEID:         54
8
9              *****
10   EXHIBIT:                           PAGE:
11   (Exhibits not marked.)
12
13
14
15             *****
16
17
18
19
20
21
22
23
24
```

A111

5

```
 1        P R O C E E D I N G S
 2     (Oath stipulation read and agreed by counsel
 3  and witness.)
 4      JANE LAMB RUIZ, having been duly sworn to
 5  interpret English to Portuguese and Portuguese to
 6  English testified as follows:
 7      JESSICA SILVEIRA DA SILVA, having been duly
 8  sworn testified as follows:
 9        MR. HUNSINGER:  Counsel, we will reserve
10  all objections except as to the form of the
11  question, if that's okay with you.
12        MS. KMEID:  Yeah, that's fine.
13        MR. HUNSINGER:  And we will waive the
14  notary requirement on the transcript, but we do
15  still want the signature.
16        MS. KMEID:  Correct.
17        MR. HUNSINGER:  Thank you.  Before we get
18  started, may I ask if there is anyone else in the
19  room with you, Sidhi?
20        MS. GOSAIN:  There is not, it's just me.
21            EXAMINATION
22  BY MR. HUNSINGER:
23     Q  Ms. Silva, please state your name for the
24  record?
```

6

```
 1     A  Jessica Silveira da Silva.
 2     Q  Do you mind if I call you Jessica?
 3     A  Yes.
 4     Q  Thank you.
 5        Jessica, is there a reason that would you
 6  not be able to answer my questions truthfully
 7  today?
 8     A  No.
 9     Q  What is your current address?
10        THE INTERPRETER:  Excuse me, I have to --
11  I don't know the name of street because of the
12  pronunciation.
13     A  80 Goran Street in Lowell, Massachusetts.
14     Q  How long have you lived at that address?
15     A  A little more than a year.
16     Q  With whom do you live?
17     A  I live with Arthur, my son, and Gilberto,
18  my husband.
19     Q  Anyone else?
20     A  No.
21     Q  When did you marry Gilberto?
22     A  We actually haven't gotten married yet,
23  but we're going to be married very shortly.
24     Q  Do you have a date for the wedding yet?
```

7

```
 1     A  Yes, we do.  We're going to get married on
 2  the 18th.
 3     Q  Of September?
 4     A  Yes.
 5     Q  Congratulations.
 6     A  Thank you.  (By the deponent).
 7     Q  Do you have any other children other than
 8  Arthur?
 9     A  No.
10     Q  Other than Gilberto and Arthur, do you
11  have other family here in the U.S.?
12     A  No.
13     Q  Did your -- when -- withdrawn -- or strike
14  that.
15        When you first came to the U.S., did you
16  used to live with your brother?
17     A  No, not me.
18     Q  Did you live with any other family
19  members?
20     A  Not with my family, but with Gilberto's
21  family.
22     Q  And who was that?
23     A  Gilberto's brother and wife.
24     Q  And when did you live with them?
```

8

```
 1     A  At the beginning when I first got here.
 2     Q  What year was that?
 3     A  2022.
 4     Q  When did you stop living with them?
 5     A  They live with us some months, only a few
 6  months.
 7     Q  So, is it fair to say that they stopped
 8  living with you in 2023?
 9     A  No.  It was in 2022.
10     Q  Is Gilberto's brother and his wife, do
11  they still live in the U.S.?
12     A  Yes.
13     Q  Do they still live in Lowell?
14     A  No.
15     Q  Do they still live anywhere in
16  Massachusetts?
17     A  Yes.
18     Q  Where?
19     A  In Gloucester.
20     Q  When did you meet Edervaldo da Silva?
21     A  I don't remember exactly the year.
22     Q  Was it before 2010?
23     A  I think it was.  It could be.  I don't
24  remember.
```

A112

9

1    Q  Was it before 2005?

2    **A  No, it was after 2005.**

3    Q  So, you met Edervaldo da Silva sometime

4  between 2005 and 2010; is that correct?

5    **A  I think it was between 2010 and 2011.**

6    Q  Where did you meet him?

7    **A  I met him in the neighborhood where I**

8  **lived.  He moved on to the street where -- where I**

9  **lived.**

10    Q  And what city or town was that in?

11    **A  In the city of Belo Horizonte.**

12    Q  When did you begin a relationship with

13  him?

14    **A  Shortly after we met, we started dating.**

15    Q  And please describe your relationship in

16  the early days of dating Edervaldo?

17    **A  At the beginning, it was very calm, very**

18  **nice, or good.**

19    Q  And you got married on May 13th, 2011,

20  correct?

21    **A  Yes.**

22    Q  How would you describe your relationship

23  prior to your marriage?

24    **A  As I said before, at the beginning, it was**

10

1  **calm, easygoing, maybe.**

2    MR. HUNSINGER:  I'm sorry, I didn't catch

3  that.

4    THE INTERPRETER:  Easygoing.

5    MR. HUNSINGER:  Easygoing.  Thank you.

6    Q  Anything else?

7    **A  No.**

8    Q  Between the day you got married and

9  Arthur's birth, would you say your relationship

10  was still calm and easygoing?

11    **A  Yes, I would.**

12    Q  And Arthur was born on May 4th, 2014,

13  correct?

14    **A  Yes.**

15    Q  Did you plan to have a child?

16    **A  No, it wasn't -- it wasn't planned.**

17    Q  How did you feel when you learned you were

18  pregnant?

19    **A  It was a surprise.**

20    Q  A good surprise or a bad surprise?

21    **A  A good surprise.**

22    Q  Were you excited?  Were you looking

23  forward to being a mother?

24    **A  Yes, I was looking forward to it.**

11

1    Q  How did Edervaldo feel?

2    **A  He was happy.**

3    Q  Did knowing that you were going to have a

4  child change your marriage in any way?

5    **A  No.  That wasn't what changed it.**

6    Q  After Arthur was born, please describe for

7  me what Edervaldo did to care for him.

8    **A  He would change his diapers, and he also**

9  **would help with his bath, things like that.**

10    Q  Were there times that Edervaldo was the

11  only parent at home with Arthur?

12    THE INTERPRETER:  She didn't understand.

13  Shall I say it again?

14    MR. HUNSINGER:  Yes, please.

15    MS. KMEID:  Can you rephrase the question?

16    Q  Did you ever leave Edervaldo and Arthur

17  alone together?

18    **A  Yes.**

19    Q  How often?

20    **A  Like once you a week.**

21    Q  For how many hours, typically?

22    **A  I don't remember.**

23    Q  Would you say that they were typically

24  alone together for more or less than two hours a

12

1  week?

2    **A  Yes, about two hours, yes.**

3    Q  How many hours a week were you alone with

4  Arthur?

5    **A  Most of the time, I was with him, the**

6  **majority of the time.  Most of the time.**

7    Q  Did you work after Arthur was born?

8    **A  Not while I was married.**

9    Q  So, you stopped working at or before the

10  time of your marriage on May 13th, 2011?

11    **A  2013.**

12    Q  2011.

13    THE INTERPRETER:  You know, sometimes his

14  mic is going in and out.  I'm not hearing the

15  initial --

16    MS. KMEID:  If that's the case, we can ask

17  the reporter to repeat the question.

18    THE INTERPRETER:  Okay.  Ask her to repeat

19  it, please.

20    MS. KMEID:  Can you please repeat the

21  question or read it back?

22    (The court reporter asked for clarification.)

23    (The requested portion of the record was

24  read by the reporter at 2:24 p.m.)

A113

---

13

1    A  While I was married I did not work.
2    Q  After Arthur was born, did anything about
3  your relationship with Edervaldo change?
4    A  Yes.
5    Q  What changed?
6    A  The good relationship between him and
7  myself changed due to some of the attitudes that
8  he had.
9    Q  What attitudes?
10   A  Disrespect and porn.  That's it.
11  (The court reporter asked for clarification.)
12   A  Disrespect and porn.  That's it.
13   Q  Disrespect to whom?
14   A  Disrespect of me, towards me.
15   Q  Can you provide any examples?
16   A  Things he would say about other women.  He
17  would talk about other women.  And also, he would
18  look at other women.
19   Q  Did he disrespect you in any other way?
20   A  Those were -- those were the main -- those
21  were the -- those were the disrespect.
22   Q  Did anyone live with you and Edervaldo
23  during your marriage, other than Arthur after he
24  was born?

---

14

1    A  No.
2    Q  Did Edervaldo work during your marriage?
3    A  It was difficult.  He would end up losing
4  his job.  He wasn't able to work steadily.
5    Q  So, Ms. da Silva, I'm going to ask you to
6  answer the question I'm asking.
7       And the question I'm asking is, did he
8  work during the marriage?
9    A  He worked.
10   Q  What was his job during the marriage?
11   A  He worked at the (speaking in Portuguese),
12  which is a political level of organization for the
13  Brazilian government.  That was the place where he
14  spent the most time in a job -- the most time in a
15  job.
16   Q  What other jobs did he have during the
17  marriage?
18   A  He also worked as a stone mason's
19  assistant several times.
20   Q  Did Edervaldo earn enough to support you
21  and Arthur during your marriage?
22   A  Yes.
23   Q  Please tell me three strengths of
24  Edervaldo as a parent.

---

15

1    A  So, attentiveness, he's attentive, he's
2  willing to do things for the child, and he -- he's
3  affectionate with the child.
4    Q  Please tell me three strengths of yours as
5  a parent.
6    A  So, I'm attentive, and I'm affectionate,
7  and I'm also willing to do things for the -- for
8  the child.
9    Q  Why did you and Edervaldo divorce?
10   A  Because of everything that happened in the
11  relationship, the relationship dried up, went
12  away.  There was no more relationship, so the best
13  solution was to get a divorce.
14   Q  And when you and Edervaldo divorced, you
15  reached an agreement about some things, correct?
16   A  Yes.
17   Q  And one of the things you agreed to was
18  that you would have shared legal custody of
19  Arthur, correct?
20   A  Yes.
21   MS. KMEID:  I've just want to make sure
22  we're leaving a bit of space amongst us so I can
23  object between when you're asking your question
24  and when you're translating.

---

16

1       Go ahead.
2    Q  What did shared legal custody mean to you?
3    A  That the two parents have the same rights.
4    Q  Anything else?
5    A  No, I believe that's what -- what it
6  means.
7    Q  Did you have an attorney for your divorce?
8    A  No, I didn't.
9    Q  When you got divorced, did you go in front
10  of a judge?
11   A  As far as I recall, I did not have to
12  appear before a judge.
13   Q  When was the last time you and Edervaldo
14  lived together?
15   A  I don't remember.
16  (The court reporter asked for clarification.)
17   Q  Did you last live together before or after
18  2017?
19   A  I don't remember.
20   Q  What town or city did you and Edervaldo
21  last live together in?
22   A  Belo Horizonte.
23   Q  And who moved out of the house or
24  apartment that you shared together?

17

1    A   Who left the apartment, it was him.
2    Q   Did you live in any other apartment before
3  you left Brazil?
4    A   Before I left Brazil, I was living with my
5  mother.
6    Q   What city or town does your mother live
7  in?
8    A   Belo Horizonte, also.
9    Q   Where did Edervaldo move to after he moved
10 out of the house you shared when you were married?
11   A   He went to live with his mother.
12   Q   Where did his mother live?
13   A   I think it's -- I think it was a town very
14 close to Belo Horizonte.
15   Q   Between the last time you lived together
16 and when you left Brazil, did Edervaldo see
17 Arthur?
18   A   Yes, he did.
19   Q   How often?
20   A   One week, he would see him, another week
21 he wouldn't.
22   Q   And did he continue in every other week
23 seeing Arthur until you left Brazil with Arthur?
24   A   It wasn't frequent, but sometimes he

18

1  wouldn't go see the boy.
2    Q   Did Edervaldo ever ask you to see Arthur
3  and you said no?
4        MS. KMEID: Objection.
5    A   Please repeat.
6        MS. KMEID: One second.  I just want to
7  make sure that when Jessica's confused, it's not
8  your job to clarify the question for her.  I
9  understand that.  But I would appreciate it if we
10 could repeat the question instead of you trying to
11 re-explain it.
12       THE INTERPRETER: All right.
13   Q   Did Edervaldo ever ask you to see Arthur
14 and you said no?
15   A   No, that never happened.
16   Q   So, every time Edervaldo wanted to see
17 Arthur, he saw him, correct?
18   A   Yes.
19   Q   Did Arthur ever stay with Edervaldo
20 overnight?
21   A   Yes, he spent the overnight, because when
22 the father pick -- would pick him up, it was for
23 weekends, so...
24   Q   What date did you leave Brazil?

19

1    A   I don't remember the exact date, but it
2  was toward the end of March, close to the end of
3  March in 2022.
4    Q   So, between the date you divorced and the
5  date you left Brazil, is it fair to say that
6  Edervaldo saw Arthur every other weekend?
7    A   Yes.
8    Q   Why did you leave Brazil?
9    A   First because I wanted to give Arthur a
10 better life.
11   Q   Any other reason?
12   A   No.
13   Q   Who was with you when you left Brazil?
14   A   Gilberto's brother and his wife, and a
15 couple, like a couple that lived together, of
16 cousins.
17   Q   And Arthur, correct?
18   A   Yes.
19   Q   When did you arrive in the United States?
20   A   In April of 2022.
21   Q   Where in the United States did you cross
22 the border?
23   A   Mexico to Arizona.
24   Q   Did you walk across the border?

20

1    A   Yes.
2    Q   Had you ever been to the U.S. before?
3    A   No.
4    Q   Before you left Brazil, where did you plan
5  to go?
6    A   Before I left Brazil?
7    Q   Yes.  When you left Brazil, were you
8  planning to come to the United States?
9    A   Yes.
10   Q   Was it your plan to come to Massachusetts,
11 in particular?
12   A   Yes.
13   Q   Why Massachusetts?
14   A   Because it's where Gilberto lived.
15   Q   When did you meet Gilberto?
16   A   I met him in Brazil.
17   Q   I'm sorry, I said when, not where.
18   A   I met him in 2021.
19   Q   Is Gilberto a Brazilian citizen?
20   A   Yes.
21   Q   Does he also have American citizenship?
22       MS. KMEID: Objection.
23   Q   You can answer.
24   A   No.

A115

---

**21**

1    Q  What is his immigration status in the
2  U.S.?
3        MS. KMEID:  Objection.
4    Q  Please answer.
5    **A  What does that mean, "status"?**
6    Q  If he's not a citizen, does he have a
7  Green card?
8        MS. KMEID:  Objection.
9    **A  No, he doesn't have the Green card.**
10   Q  Does he have a work Visa?
11       MS. KMEID:  Objection.
12   **A  No.**
13   Q  Has he applied for asylum?
14       MS. KMEID:  Objection.
15   **A  No.**
16   Q  Did he immigrate into the U.S. legally?
17       MS. KMEID:  Objection.
18   **A  No.**
19   Q  When you entered the U.S., was it your
20  plan to stay here permanently?
21   **A  I don't know.**
22   Q  As you sit here today, is it your plan to
23  stay in the United States permanently?
24       MS. KMEID:  Objection.

---

**22**

1    **A  Right now, yes, but in the future, I don't**
2  **know.**
3    Q  Before you left Brazil, did you tell
4  Edervaldo that you were planning to bring Arthur
5  to the United States?
6    **A  Yes.**
7    Q  How long did you tell Edervaldo that you
8  would be in the U.S.?
9    **A  I said to him something, like, about five**
10  **years.**
11   Q  And what would happen after those five
12  years?
13       MS. KMEID:  Objection.
14   **A  We would go back.**
15   Q  Back to Brazil?
16   **A  Yes.**
17   Q  Did you attempt to get a Visa to enter the
18  United States?
19       MS. KMEID:  Objection.
20   **A  No, I didn't.**
21   Q  Why not?
22       MS. KMEID:  Objection.
23   **A  I don't know, I just didn't.**
24   Q  Between April of 2022 when you entered the

---

**23**

1  United States and the present day, has Arthur seen
2  Edervaldo in person?
3    **A  Only video calls.**
4    Q  How often do they have video calls?
5    **A  Three times a week.**
6    Q  Has that been consistent since you left
7  Brazil?
8        THE INTERPRETER:  I didn't understand the
9  first part of the question, sorry.
10       MS. BENJAMIN:  Has Edervaldo had those
11  calls three times a week since Jessica and Arthur
12  left Brazil?
13   **A  No.**
14   Q  Was there a time period when Arthur and
15  Edervaldo talked less frequently?
16   **A  Yes, there was.**
17   Q  When was that?
18   **A  It was for a few months.**
19   Q  And why did they only -- why did they
20  speak less than three times a week?
21   **A  Because his father didn't want to talk to**
22  **him.**
23   Q  During the time when they were speaking
24  less frequently, they still did speak, though,

---

**24**

1  correct?
2    **A  Yes.**
3    Q  How frequently would they speak when they
4  spoke during the time they spoke less than three
5  times a week?
6    **A  Once a week, sometimes three or four times**
7  **per month.**
8        MR. HUNSINGER:  Off the record for a
9  second.
10       (Off the record.)
11  BY MR. HUNSINGER:
12   Q  Jessica, when did you apply for asylum?
13       MS. KMEID:  Objection.
14   **A  I don't know the exact date.  It was in**
15  **2023.**
16   Q  And you previously testified that you
17  entered the United States in April of 2022.  So,
18  why did you not apply for asylum in 2022?
19       MS. KMEID:  Objection, form.
20   **A  I don't know.**
21   Q  When did you learn that Edervaldo had
22  filed this complaint?
23       MS. KMEID:  Objection, form.
24   **A  Which form?**

A116

29

1    A  I don't know exactly.  I don't know if it
2  was because he didn't know much when he started.
3  He didn't know enough to go into third grade.
4    Q  What grade is he in now?
5    A  He's in fourth grade now.
6    Q  So, he has -- after being placed in second
7  grade in 2022, he has progressed from second grade
8  to third grade to fourth grade, correct?
9        MS. KMEID:  Objection.
10   A  Yes.
11   Q  Does he receive any lessons in Portuguese?
12   A  He -- it's -- the classes are in English,
13 but when he needs help in Portuguese, he can get
14 it.
15   Q  Does he receive English language learner
16 services?
17   A  At school?
18   Q  Yes.
19   A  You mean like to strengthen his English,
20 for example?
21   Q  Yes.
22   A  Yes.
23   Q  How often does he receive these lessons?
24   A  It's once a week, I think.

30

1    Q  Does he receive any special education?
2    A  No.
3    Q  Has the school ever referred you to any
4  outside providers to assist with Arthur's
5  education?
6    A  No.
7    Q  Has Arthur ever taken English classes
8  outside of the school district?
9    A  No.
10   Q  Has Arthur ever taken a class from any
11 place other than the Lowell Public Schools?
12   A  No.  Only at home when I study with him.
13   Q  What do you study with him?
14   A  I like to practice his reading.
15   Q  Do you practice in English or in
16 Portuguese?
17   A  Both.
18   Q  Do you teach Arthur any other lessons?
19   A  Some in Portuguese, yes; some written
20 activities in Portuguese.
21   Q  Has Arthur had any difficulties in school?
22   A  No.
23   Q  Does he attend school regularly?
24   A  Yes.

31

1    Q  Have you ever received a warning from
2  Lowell about how many -- from the Lowell Public
3  Schools about how many days of schools he is
4  missing?
5        MS. KMEID:  Objection.
6    A  Yes.
7    Q  When did you receive such a warning?
8    A  When he was in the third grade.
9    Q  Have you ever received a warning from
10 Lowell Public Schools about Arthur not behaving in
11 class?
12       MS. KMEID:  Objection.
13   A  Yes.
14   Q  When?
15       MS. KMEID:  Objection.
16   A  It was at the beginning when he began
17 going to school.  It was more frequent.
18   Q  Have you received any such warnings this
19 school year?
20   A  Yes, this year, I got one warning.
21   Q  And what was that warning about?
22   A  They called me and they told me that, you
23 know, there was a fight among the kids.
24   Q  Did Arthur instigate the fight?

32

1    A  Well, I spoke to him and he told me that
2  he did not start the fight.
3    Q  Did the school say that Arthur started the
4  fight?
5        MS. KMEID:  Objection.
6    A  Yes, they did.
7    Q  What was the fight about?
8        MS. KMEID:  Objection.
9    A  So, his little friend dropped something on
10 the floor, or something fell on the floor, and
11 Arthur started laughing.  And then a result of
12 that, they got into a squabble, I mean, a, you
13 know...
14   Q  How was Arthur disciplined for this fight?
15   A  By me?
16   Q  By the school.
17   A  No.  I think that that was all.  They
18 called both the parents of the two kids, and
19 that's all that happened.
20   Q  What discipline did you impose for the
21 fight?
22   A  So, I told him what the school said, and I
23 told him that it's not a good idea to fight in
24 school.  And that the school had said that, you

A117

49

1    MR. HUNSINGER: All right. Back on the
2 record.
3 BY MR. HUNSINGER:
4    Q Jessica, when did you obtain a passport
5 for Arthur?
6    A The beginning of 2022.
7    Q And you needed Edervaldo to cosign for the
8 passport, correct?
9    MS. KMEID: Objection.
10   A Yes.
11   Q What did you do to get Edervaldo to sign
12 for the passport?
13   A I had already spoken to him about the
14 possibility of traveling. And that, therefore,
15 Arthur would need a passport and he would need to
16 sign for it, sign permission.
17   Q When Edervaldo signed for the passport,
18 did he give permission for Arthur to travel?
19   MS. KMEID: Objection.
20   A Yes.
21   Q When Edervaldo signed for the passport,
22 did -- had you told him that you were planning to
23 take Arthur to the U.S.?
24   A Yes.

50

1    Q Did you ever tell Edervaldo that you
2 wanted to go to Portugal?
3    MS. KMEID: Objection.
4    A Yes, at one point there was a possibility
5 of going to Portugal rather than going to the --
6 coming to the States.
7    Q Did you plan to take Arthur with you to
8 Portugal?
9    A Yes.
10   Q Did you tell Edervaldo that Arthur would
11 stay in Portugal permanently?
12   MS. KMEID: Objection.
13   A No.
14   Q Why did you tell Edervaldo that you wanted
15 to take Arthur to Portugal?
16   A I don't have a why for that. I would go
17 and then he would accompany me. He would go with
18 me.
19   Q And was your plan to return to Brazil from
20 Portugal if you did go there?
21   A Yes.
22   Q Who did you tell that you were planning to
23 come to the United States before you left Brazil?
24   A I -- I told my family members, and I also

51

1 told Arthur's father. I talked to him about it.
2    Q And at the time you left Brazil, you told
3 Edervaldo that you would be gone with Arthur for
4 five years, correct?
5    MS. KMEID: Objection.
6    A Yes.
7    Q Did Edervaldo give his permission for you
8 to take Arthur to the U.S. for five years?
9    MS. KMEID: Objection.
10   A He gave permission for him to leave.
11   Q Are you aware that Edervaldo canceled
12 Arthur's passport?
13   MS. KMEID: Objection.
14   A Yes, um-hmm.
15   Q When did you learn that?
16   MS. KMEID: Objection.
17   A When he told me that he canceled it, I
18 didn't believe it. I didn't believe it at first.
19 But then when I saw all the documentation and what
20 had happened in the Court in Brazil, then I did
21 believe it.
22   Q When Edervaldo canceled the passport, what
23 did you understand that action to mean?
24   MS. KMEID: Objection.

52

1    A Yes, it meant that the passport would have
2 no validity.
3    Q What do you do with Arthur on the
4 weekends?
5    A It depends. On Sundays, for example, we
6 have some leisure activity, and we go to the mall,
7 we eat out. We go to the parks. That kind of
8 thing. It depends on the -- on the weekend.
9    Q What language do you speak with Arthur at
10 home?
11   A Portuguese.
12   Q What language does Arthur speak with his
13 friends outside of school?
14   A He speaks English or Portuguese, but he
15 also speaks -- because he does have some friends
16 that are Brazilians.
17   Q Was Arthur happy to move to the United
18 States?
19   MS. KMEID: Objection.
20   A Yes, he was.
21   Q How do you know?
22   A Yes, he was.
23   Q How do you know?
24   MS. KMEID: Objection.

A118

53

1    A   By his manner that he manifested about
2  learning about a new country.  He was happy.
3    Q   Has he been happy every day he has been in
4  the U.S.?
5        MS. KMEID:  Objection.
6    A   Yes.
7    Q   So, he's never cried in the U.S.?
8        MS. KMEID:  Objection.
9    A   For the fact of being here in the States,
10  no.
11    Q   He's never said to you that he would
12  rather be back in Brazil?
13        MS. KMEID:  Objection.
14    A   Well, you know, he does miss Brazil and he
15  misses the family members, but he's never said
16  that to me.
17        MR. HUNSINGER:  I'm going to suspend here
18  for the day, Amani.  If you have any questions,
19  please go ahead.
20        MS. KMEID:  Yeah, I have a couple
21  questions.
22        Could you let Jessica know that Charlie
23  has finished asking, and I'm going to ask her some
24  questions.

54

1        THE INTERPRETER:  She should tell him
2  she's finished?
3        MS. KMEID:  No, tell her that Charlie is
4  finished asking questions.
5        THE INTERPRETER:  Oh, sorry.
6        MS. KMEID:  And I'm going to ask some
7  questions.
8              EXAMINATION
9  BY MS. KMEID:
10    Q   Does Gilberto have any family members in
11  the U.S.?
12    A   Yes.
13    Q   Can you list for me his family members?
14    A   Names?
15    Q   Relationships.
16    A   He has an aunt, cousins, a brother, and a
17  brother-in-law.
18    Q   Does his aunt have any children?
19    A   Yes.
20    Q   Does his cousins have any children?
21    A   Yes, one couple, as in couple that lives
22  together, of the cousins have children.
23    Q   Are any of them close to Arthur's age?
24    A   Only Sophia, who is seven years old.

55

1        (Indiscernible crosstalk.)
2        (The court reporter asked for clarification.)
3        (The requested portion of the record was
4  read by the reporter at 4:25 p.m.)
5    A   Only Sophia, who is seven years old.
6  There is a difference, a little difference in age.
7    Q   Does Arthur ever see Sophia?
8    A   Yeah, he does, but it's not frequent.
9    Q   But they attend family activities
10  together, correct?
11    A   Yes.
12    Q   Can you explain to me what your
13  understanding is regarding the rights that
14  Edervaldo got from the custody agreement?
15    A   What I understand it to be is that he
16  would get some weekends with his father, and then
17  eh would get some holidays and holiday times with
18  his father.
19    Q   Did Arthur ever spend holidays with his
20  father?
21    A   Well, the father picked him up for
22  holidays, but he ended up only being there for a
23  week -- a weekend.
24    Q   How long was the holiday supposed to be?

56

1    A   Oh, these weren't -- these were holidays
2  because of the father's work, which in Brazil,
3  work holidays is 30 days out of the year.  So, it
4  would have been 15 days.  The holidays would have
5  been 15 days.
6    Q   But Edervaldo did not spend 15 days with
7  Arthur, correct?
8    A   Only one weekend.
9    Q   During Edervaldo's regular weekend visits,
10  who picked him up from your house?
11    A   It was the grandmother.
12    Q   And who dropped Arthur off at your house
13  at the end of the weekend?
14    A   The -- the grandmother.
15    Q   Did Edervaldo ever pick up Arthur?
16    A   Yes, but very rarely.  Mostly, it was the
17  grandmother.
18    Q   You stated that when you first moved to
19  the United States, Edervaldo and Arthur did not
20  speak three times a week; is that correct?
21    A   Yes.
22    Q   Why did they start speaking three times a
23  week?
24    A   Because of a final court appearance that I

A119

57

1  had in Brazil -- the last court appearance that I
2  had in Brazil, where the lady Judge said that the
3  visit -- the visit would be three times.  There
4  had to be three times a week -- speaking, sorry.
5      Q  Was that something you had asked for?
6      A  So, I spoke to the Judge about this, and
7  the problem was is that he was not returning my
8  phone calls.  So, she then made this agreement
9  between us as a result of all this, bringing this
10  to her attention.
11      Q  Had Arthur ever told you that he wanted to
12  talk to his dad, but his father wouldn't answer
13  the phone?
14      A  Yes.
15      MS. KMEID:  That's all I have, Charlie.
16      MR. HUNSINGER:  We can go off the record.
17      (Deposition concluded at 4:32 p.m. EST
18       Signature of the witness was requested.)
19
20
21
22
23
24

58

1      CERTIFICATE OF SHORTHAND REPORTER NOTARY PUBLIC
2          I, Karen Klerekoper, the officer before
3  whom the foregoing proceedings were taken, do
4  hereby certify that the foregoing transcript is a
5  true and correct record of the proceedings; that
6  said proceedings were taken by me stenographically
7  and thereafter reduced to typewriting under my
8  supervision; that review was NOT requested; and
9  that I am neither counsel for, related to, nor
10  employed by any of the parties to this case and
11  have no interest, financial or otherwise, in its
12  outcome.
13      IN WITNESS WHEREOF, I have hereunto set my hand
14  and affixed my notarial seal this 16th day of
15  September, 2024.
16
17
18  MY COMMISSION EXPIRES:
19  OCTOBER 7, 2024
20
21  _Karen Klerekoper_
22  NOTARY PUBLIC IN AND FOR THE STATE OF MICHIGAN
23
24

A120

# EXHIBIT H



# Transcript of Edervaldo Rodrigues da Silva

**Date:** September 13, 2024
**Case:** Rodrigues da Silva -v- Silveira da Silva

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

A122

1

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF MASSACHUSETTS
3
4    - - - - - - - - - - - - x
5    EDERVALDO RODRIGUES     :
6    DA SILVA,              :
7         Plaintiff,       :
8       v.                 :   CA No. 1:24-cv-11280-ADB
9    JESSICA SILVEIRA DA     :
10   SILVA, et al.,         :
11        Defendants.       :
12   - - - - - - - - - - - - x
13       Deposition of EDERVALDO RODRIGUES DA SILVA
14            Conducted Virtually
15        Friday, September 13, 2025
16             9:15 a.m. EST
17
18
19   Job No.: 553046
20   Pages: 1 - 64
21   Reported By: Karen Klerekoper, CSR-4250, RPR
22
23
24
```

2

```
1        Deposition of EDERVALDO RODRIGUES DA SILVA,
2    conducted virtually:
3
4
5
6
7
8
9        Pursuant to Notice, before Karen Klerekoper,
10   Notary Public in and for the State of Michigan.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

3

```
1             A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4        CHARLES R. HUNSINGER, ESQUIRE
5        BOWDITCH & DEWEY LLP
6        101 Federal Street, Suite 1405
7        Boston, Massachusetts  02110
8        617.757.6500
9
10   ON BEHALF OF THE DEFENDANTS:
11       OLIVIA RAE KING BENJAMIN, ESQUIRE
12       FOLEY & LARDNER LLP
13       111 Huntington Avenue, Suite 2500
14       Boston, Massachusetts  02119
15       617.342.4000
16
17   ALSO PRESENT:
18   ZOOM TECHNICIAN MICHELLE MEJIA, PLANET DEPOS
19   JANE LAMB RUIZ, PORTUGUESE INTERPRETER
20
21
22
23
24
```

4

```
1                   INDEX
2
3    WITNESS:                          PAGE:
4
5    EDERVALDO RODRIGUES DA SILVA
6          EXAMINATION BY MS. BENJAMIN:     5
7
8               *****
9    EXHIBIT:                          PAGE:
10
11   (Exhibits attached to transcript.)
12   Exhibit 1, complaint                    10
13   Exhibit 2, email attachment to complaint   18
14   Exhibit 3, divorce hearing minutes      23
15   Exhibit 4, application for fees or costs  41
16   Exhibit 5, INSS benefit                 44
17   Exhibit 6, psychological evaluation     53
18
19               *****
20
21
22
23
24
```

A123

**5**

1  P R O C E E D I N G S
2  (Oath stipulation read and agreed by counsel
3  and witness.)
4  JANE LAMB RUIZ, having been duly sworn to
5  interpret Portuguese to English and English to
6  Portuguese testified as follows:
7  RODRIGUES DA SILVA, having been duly sworn
8  testified as follows:
9  EXAMINATION
10 BY MS. BENJAMIN:
11  Q  Mr. Rodrigues da Silva, thank you for
12 being here today.
13  **A  Thank you.**
14  Q  Mr. da Silva, have you been deposed
15 before?
16  **A  No.**
17  MR. HUNSINGER:  Olivia -- may I call you
18 Olivia?
19  MS. BENJAMIN:  Yes.
20  MR. HUNSINGER:  Sorry to interrupt.  Can
21 we get the stipulations on the record, please?
22  MS. BENJAMIN:  Yes.  One second, sorry, I
23 just need to pause for a moment.
24  Yeah, so, we'll have no form objections,

**6**

1  or we won't object to form.
2  MR. HUNSINGER:  Those will be the only
3  objections, actually, that we will have.
4  That's -- we usually --
5  MS. BENJAMIN:  Yes.  Sorry.
6  MR. HUNSINGER:  Only objections as to
7  form.  All other objections reserved to the time
8  of trial.
9  MS. BENJAMIN:  Right.
10  MR. HUNSINGER:  We're also willing to
11 waive the notary requirement Eldervaldo's
12 signature on the transcript, if that's all right.
13  MS. BENJAMIN:  Okay.  Yeah, that's
14 permissible.
15  MR. HUNSINGER:  Thank you.
16  Q  All right.  Okay.  So, Mr. da Silva, I'm
17 going to go over some ground rules for our
18 deposition.
19  **A  Okay.**
20  Q  So, the first rule to remember is that we
21 have a court reporter, Karen, with us today.  And
22 she's taking down everything we say, so we don't
23 want to talk over one another.
24  Please also give verbal answers so that

**7**

1  Karen can keep a record of our deposition.
2  **A  Okay.**
3  Q  Mr. da Silva, if you need a break at any
4  time, please just let us know and we can take a
5  break.  I just ask that you answer my current
6  question before we take a break.
7  **A  Okay.**
8  Q  Mr. da Silva, is there any reason that
9  your deposition should not proceed today?
10  **A  No.**
11  Q  Mr. da Silva, is Arthur Silveira da Silva
12 your son?
13  THE INTERPRETER:  I'm sorry, Arthur --
14 what is his second name?
15  MS. BENJAMIN:  Arthur Silveira.
16  THE INTERPRETER:  I can't understand the
17 second one.  Sorry.
18  MS. BENJAMIN:  Silveira.
19  **A  Arthur Rodrigues da Silva, yes.**
20  Q  Okay.  When was Arthur born?
21  **A  May 5th.  No, May 4th.**
22  Q  Okay.  What year was Arthur born?
23  **A  2014.**
24  Q  Mr. da Silva, you are married to Jessica

**8**

1  da Silva, correct?
2  **A  No.**
3  Q  You were never married to Jessica da
4  Silva?
5  **A  Yes, I was married to her.  But I'm**
6  **divorced from her.**
7  Q  You were married and separated in 2016,
8  correct?
9  **A  Yes.**
10  Q  And then you divorced in December of 2021
11 from Jessica da Silva, correct?
12  **A  Yes.**
13  Q  Thank you.
14  All right.  Mr. da Silva, in March of
15 2022, did you and Ms. Silveira da Silva discuss
16 your authorization of a passport for Arthur?
17  **A  Yes, we discussed having -- doing the**
18 **passport.  We only discussed the document.**
19  Q  What did you discuss about the document?
20  THE INTERPRETER:  I'm asking him to speak
21 more slowly.
22  **A  She told me it was to do document, so I**
23 **went and had the passport made for her.**
24  Q  Did Ms. da Silva tell you why she wanted

A124

**9**

1 Arthur's passport?

2    **A She said she was going to Portugal. She**
3 **never said she was going where she is now. She**
4 **was going to go to Portugal for a year and then**
5 **return to Brazil.**

6    Q Mr. da Silva, did you discuss getting a
7 passport for Arthur with Jessica on more than one
8 occasion?

9    **A Yes.**

10    Q During those conversations, did Jessica
11 tell you that she would travel with Arthur using
12 that passport?

13    **A No.**

14    Q Why did Jessica want a passport for Arthur
15 if she did not intend to travel with Arthur?

16    **A For him to have a document. At no point**
17 **did she say it was for going on a trip.**

18    Q Did Jessica ever discuss her own travel
19 away from Brazil during those conversations
20 without Arthur?

21    **A Yes.**

22    Q What did -- where did Jessica say she
23 would travel Jessica?

24    **A To Portugal.**

**10**

1    Q Did Jessica state that she might travel to
2 the United States?

3    **A Yes.**

4    Q So Jessica did tell you that she might
5 travel to the United States, correct?

6    **A Okay. Yes.**

7    Q Mr. da Silva, did Jessica tell you that
8 Arthur would travel to the United States with her?

9    **A No.**

10    Q I want to introduce an exhibit.

11    MS. BENJAMIN: This is tab number 7,
12 Morgan.

13    For you, Charles, this is the complaint
14 filed by Mr. da Silva. Morgan is going to share
15 the document on her screen. But I know this is an
16 English document, so it may be that Mr. da Silva
17 is unable to read it.

18    Q Mr. da Silva, I've put on the screen the
19 complaint that was filed in the United States
20 District Court of Massachusetts.

21    (Marked for identification Exhibit 1,
22 complaint.)

23    Q Mr. da Silva, did you file a case in the
24 United States District Court of Massachusetts

**11**

1 regarding Arthur's residence in the United States
2 and your desire for him to return to Brazil?

3    THE INTERPRETER: I'm sorry, asking that
4 what? I can't...

5    MS. BENJAMIN: Regarding Arthur's return
6 to Brazil.

7    **A Yes.**

8    Q Mr. da Silva, did you authorize the filing
9 of a complaint with a lawyer for that case?

10    **A Yes.**

11    Q Mr. da Silva, in your complaint at
12 paragraph 9 you state that Ms. da Silva asked you
13 to agree to making a passport, so that the minor,
14 Arthur, could travel to the United States; is that
15 correct?

16    THE INTERPRETER: Can you -- can you stop
17 it? Okay.

18    **A Yes.**

19    Q So, Mr. da Silva, is it correct that Ms.
20 da Silva asked you to authorize the passport in
21 order for Arthur to travel to the United States at
22 some point?

23    **A Only to travel, not to live.**

24    Q Mr. da Silva, did you ever discuss how

**12**

1 long Ms. da Silva or Jessica da Silva would travel
2 with Arthur in the United States?

3    **A No. We were still going to discuss the**
4 **trip, you understand?**

5    Q Mr. da Silva, did Jessica ever tell you
6 that she intended to take Arthur to the United
7 States with her to live?

8    **A No.**

9    Q Mr. da Silva, in March of 2022, you
10 authorized a passport for Arthur; is that correct?

11    **A Right.**

12    Q What did you understand you were agreeing
13 to when authorizing that passport?

14    **A Only to have a document, that's what she**
15 **had told me.**

16    Q Did you understand that the authorization
17 of the passport would allow Arthur to travel
18 outside of Brazil?

19    **A No.**

20    Q Mr. da Silva, is there anyone else in the
21 room with you today?

22    **A No.**

23    Q Mr. da Silva, you said that you thought
24 the authorization of your passport would simply

A125

25

1  must pick up Arthur from Ms. Da Silva's home on
2  Fridays and return him on Mondays on alternate
3  weekends, correct?
4      THE INTERPRETER:  Excuse me, I have to
5  read it.
6      MS. BENJAMIN:  Yeah.  Please interpret my
7  question, not the document.
8      THE INTERPRETER:  Okay.
9  **A Yes, that's right, pick up on Friday and**
10 **take back on Sunday.**
11     Q  And section 2.1 states that each parent
12 will have Arthur for half of the July and January
13 vacations, correct?
14 **A Yes.**
15     Q  And section 2.2 states that each parent
16 will have Arthur on alternate holidays; is that
17 correct?
18 **A Yes.**
19     Q  Mr. da Silva, between the time of your
20 divorce proceedings in December of 2021, and the
21 time that Arthur left Brazil, about how often did
22 you engage in visitation with Arthur?
23 **A Every 15 days.**
24     Q  Did you ever miss a visitation with Arthur

26

1  every 15 days?
2  **A Yes.**
3      Q  How often did you miss a visitation with
4  Arthur?
5  **A Never.  As I recall, I never missed one.**
6      Q  Mr. da Silva, did you take Arthur for half
7  of his January vacation in 2022?
8  **A I was -- I was unable to -- to be with him**
9  **then.**
10     Q  Mr. da Silva, did you take Arthur for any
11 holidays during the time between your divorce and
12 Arthur's departure from Brazil?
13 **A Yes.**
14     Q  Did you take him for all of the holidays
15 for which you were allowed to take him?
16 **A All of the holidays?**
17     Q  Well, you were allowed to take Arthur for
18 alternate holidays, correct?
19 **A Yes.**
20     Q  Did you do that, did you take Arthur for
21 those alternate holidays?
22 **A Yes.**
23     Q  Prior to your divorce but after your
24 separation, how often did you see Arthur?

27

1  **A Every 15 days I would get him.**
2      Q  Did you ever miss visits with Arthur?
3  **A No.**
4      Q  Did you take Arthur for overnight visits
5  during that period?
6  **A Yes.**
7      Q  Did you take Arthur for half of his July
8  and January vacations during that period?
9  **A Yes.**
10     Q  About how long did you spend with Arthur
11 during your visits?
12 **A When I got home from work, I was with him.**
13     Q  Mr. da Silva, did you rely on anyone else
14 to pick up Arthur for your visits?
15 **A Yes.**
16     Q  Who picked -- who did you have pick up
17 Arthur for your visits?
18 **A My mother.**
19     Q  Mr. da Silva, during the period in which
20 you were separated from Ms. da Silva, did you work
21 on weekends?
22 **A From Monday to Saturday.  From Monday to**
23 **Saturday, until noon on Saturday.**
24     Q  What kind of things would you do with

28

1  Arthur during your visits with him?
2  **A I'd go with him, we'd go to the shopping**
3  **center.  We'd play ball.  We'd push a little cart**
4  **around.**
5      Q  Mr. da Silva, you earlier testified that
6  you were not able to take Arthur for his January
7  2022 vacation.  Do you recall that?
8  **A Yes.**
9      Q  Why did you not take Arthur for that
10 vacation?
11 **A Because, to tell you the truth, she**
12 **wouldn't let me take him for those -- for that**
13 **vacation.**
14     Q  Did you ask Jessica whether you could pick
15 up Arthur for that vacation?
16 **A Yes.  She had certain dates in mind.  She**
17 **said Christmas was with her and...**
18     MS. BENJAMIN:  Did -- was there more that
19 he said?
20 **A For these holidays that we're talking**
21 **about in June, she said she was going to go out**
22 **with him.**
23     Q  I'm specifically asking you about the
24 January holiday.  Why did you not take Arthur for

A126

33

1 about that.
2     Q  Did Jessica ever refuse to tell you where
3 Arthur was living?
4     A  Yes.
5     Q  Describe that circumstance.
6     A  So, he -- I still have the shirt that I
7 bought for him when he left.  Because at the
8 beginning, she wouldn't give me the address of
9 where they were.  And I had bought this Flamengo
10 football shirt to send him, and I wasn't able to
11 send it to him.  Because he had asked me to buy
12 this shirt for him.
13     Q  Did you ask --
14     A  So, it's still here.
15     Q  Did you ask Ms. da Silva for the address?
16     A  I asked my son.  He said he asked -- he
17 asked her.  And she said that you -- so, she said
18 that I already had the address, but the fact is
19 that I didn't -- I don't have the address.
20     Q  Did you ask Ms. da Silva at that time to
21 give you the address again?
22     A  No, when I asked, she didn't want to give
23 it to me, so I didn't ask her again.
24     Q  Did you ever ask Ms. da Silva for the

34

1 address and she refused to give it to you?
2     A  Yes, because it's her idea that I do have
3 the address.  But the fact is, I don't have the
4 address.
5     Q  When you speak with Arthur on the phone,
6 what kind of things do you talk about?
7     A  So, I talk to him about his school.  I
8 talk to him about his soccer school.  We have a
9 lot in common with soccer.  He like it and I do,
10 too.  And I ask him about that.  We talk about
11 that.
12     Q  Does he tell you that he misses Brazil?
13     A  Yes, yes, he misses Brazil.
14     Q  Mr. da Silva, do you talk about Arthur's
15 friends?
16     A  Yes.
17     Q  Do you talk about the activities he's
18 engaged in?
19     A  He says he misses -- he talks about -- his
20 little friends here in Brazil talk about him.
21 They miss him.  He misses them.
22     Q  Does Arthur say that he's happy in the
23 United States?
24     A  I didn't understand that correctly.

35

1     Q  Does Arthur tell you that he is happy
2 living in the United States?
3     A  He talks to me about football and how he
4 plays football/soccer.  He doesn't talk to me
5 about -- about living in the States.
6     Q  Mr. da Silva, do you know what school
7 Arthur attends?
8     A  No.
9     Q  Do you know the name of his current
10 teacher?
11     A  I also don't know that.
12     Q  Do you know the name of his prior teachers
13 in the United States?
14     A  No.
15     Q  Do you know the name of his friends in the
16 United States?
17     A  No.  I only know about the friends that he
18 had here when I would take -- little friends when
19 I would take him and pick him up from school.
20     Q  Has Arthur ever talked about having
21 friends in the United States?
22     A  No, he never mentioned that to me.
23     Q  Do you know how Arthur is doing in school?
24     A  She does not talk to me about anything she

36

1 does with him there.  She does not give me
2 information about how he's doing in school.
3     Q  Does Arthur tell you how he's doing in
4 school?
5     A  He doesn't talk about the kinds of grades
6 he makes at school, or things like that.  He talks
7 about football/soccer.
8     Q  Do you know what activities Arthur
9 participates in?
10     A  All I know is the soccer, that he talks
11 about with me.
12     Q  Do you know whether Arthur attends church?
13     A  I don't know.
14     Q  Do you know the name of Arthur's doctor?
15     A  No.
16     Q  Do you know the name of Arthur's doctor
17 when he was in Brazil?
18     A  No, because he was in Brazil, I would take
19 him to the local clinic, local -- local clinic.
20     Q  Do you know the name of Arthur's last
21 school when he was in Brazil?
22         THE INTERPRETER:  Sorry, the last what?
23         MS. BENJAMIN:  School.
24     A  Yes.  Yes.  The school is called Utan

A127

**41**

1    A  There are two.
2    Q  Do you live with your father-in-law?
3    A  No, it's a separate house.
4    Q  Who lives in the house with you?
5    A  Only myself and my wife.
6    Q  Do you have any children other than
7  Arthur?
8    A  No, just Arthur.
9        MS. BENJAMIN:  Morgan, can you bring up
10  tab 15.  This is going to be Exhibit 4.
11       And Charlie, for your benefit, this is
12  filing at number 14 in the docket.
13       (Marked for identification Exhibit 4,
14  application for fees or costs.)
15       MS. MCDONALD:  Yes, one moment.  Sorry.
16       MS. BENJAMIN:  That's okay.
17       MS. MCDONALD:  Tab 15, you said, right?
18       MS. BENJAMIN:  Correct.
19       MS. MCDONALD:  Okay.
20       MS. BENJAMIN:  Which will be marked as
21  Exhibit 4.
22    Q  Mr. da Silva, you filed an application in
23  this case to proceed without preparing or --
24  preparing fees or costs; is that correct?

**42**

1    A  Yes.
2    Q  In this filing, you indicated that you
3  were unemployed, correct?
4    A  That's correct.
5    Q  In this filing, you indicated you have no
6  money in gross wages and you make no money in
7  take-home pay; is that correct?
8    A  Yes.
9    Q  As of today, do you have a job?
10    A  No.
11    Q  Do you have an income now?
12    A  Yes.
13    Q  How do you have an income if you do not
14  have a job?
15    A  There's my -- my wife's income.
16    Q  Are you currently looking for a job for
17  yourself?
18    A  Yes.
19    Q  Do you have any prospects for a future
20  job?
21    A  Yes.
22    Q  What are those prospects?
23    A  I'm doing a lot of interviews.
24    Q  When do you anticipate you will get a job?

**43**

1    A  As quickly as possible.
2    Q  If Arthur were to be returned to Brazil,
3  how would you support him financially?
4    A  Through my work.
5    Q  Mr. da Silva, if you do not obtain a job
6  by the time Arthur returns to Brazil, how would
7  you support him financially?
8    A  Because right now, there's my wife's
9  income.
10    Q  Would you rely on your wife's income to
11  support Arthur financially if he were to return to
12  the United States -- or to Brazil?
13    A  Yes.
14    Q  Have you ever applied for welfare
15  benefits?
16    A  I don't understand.
17    Q  Have you ever applied for government
18  financial support?
19    A  No.
20    Q  Have you ever applied for Social Security
21  support?
22    A  I don't know what Social Security is.
23       MS. BENJAMIN:  Morgan can you pull up tab
24  number 18.  We'll mark that as Exhibit 5.

**44**

1        (Marked for identification Exhibit 5, INSS
2  benefit.)
3        MS. BENJAMIN:  Charlie, this a Portuguese
4  version, but we've produced the English version.
5  I can give you the Bates, if that's helpful.
6        MR. HUNSINGER:  Sure.
7        I can't see that.
8    Q  Mr. da Silva, do you recognize this
9  document?
10    A  Yes.
11    Q  What is this document?
12    A  It's from the INSS.
13    Q  What is it?
14    A  It's a benefit from the government.
15    Q  Did you apply for this benefit from the
16  government?
17    A  Yeah.  I lost my job, so I had to ask for
18  this benefit from the INSS.
19    Q  This documents shows that you requested
20  assistance due to illness.  Is that correct?
21    A  Yes.
22    Q  What was your illness?
23    A  Anxiety.
24    Q  Do you still receive benefits through the

A128

57

1    A  I don't think so.
2    Q  Have you asked Arthur what he wants?
3    A  He says he wants to.
4    Q  He says he wants to return to Brazil?
5    A  Yes.
6    Q  Has Arthur ever said he would like to stay
7  in the United States?
8    A  No.
9    Q  Do you think Arthur would miss the school
10 he attends in the United States if he returned to
11 Brazil?
12   A  I don't think so.
13   Q  Do you think Arthur would be harmed by
14 leaving the United States?
15   A  No.
16   Q  Do you think being returned to Brazil is
17 best for Arthur?
18   A  Certainly do.
19   Q  Why do you believe it is best for Arthur
20 to return to Brazil?
21   A  Because all of his family is here in
22 (speaking Portuguese), all of it.  He doesn't have
23 any family in the United States.
24   Q  You said that you asked Arthur what he

58

1  wanted in terms of returning to Brazil; is that
2  correct?
3    A  Correct.
4    Q  How many times has Arthur said he wants to
5  return to Brazil?
6    A  Most of the times when I speak to him, he
7  shows an interest in coming back to Brazil.
8    Q  How many times has Arthur explicitly said
9  he would like to return to Brazil?
10   A  That I can recall, sort of, something like
11 four times.
12   Q  When you speak with Arthur on the phone,
13 do you talk about his relationship with his
14 mother?
15   A  No.
16   Q  When you talk to Arthur on the phone, do
17 you talk about his relationship with Gilberto?
18   A  No, we also don't discuss that.
19   Q  Has Arthur ever shared anything about his
20 relationship with Gilberto with you?
21   A  No.
22   Q  Do you know anything about Arthur's
23 relationship with Gilberto?
24   A  No.

59

1    Q  Do you believe that Jessica has a good
2  relationship with Arthur?
3    A  Yes.
4    Q  Has Arthur ever complained about his mom
5  on the phone with you?
6    A  No.
7    Q  Do you believe that Jessica is a good
8  mother to Arthur?
9    A  Yes.
10   Q  Do you believe that Jessica makes
11 decisions that are in the best interest for
12 Arthur?
13   A  No.
14   Q  What that decisions do you believe Jessica
15 makes that are not in the best interest of Arthur?
16   A  For me, for example, taking Arthur to the
17 United States is an example.  She said she's going
18 to go there, she's going to get rich.  But for me,
19 that's not a -- that's not a -- it's not a good
20 decision.
21   Q  Other than Jessica's decision to take
22 Arthur to the United States, do you believe she's
23 made other decisions that are not in Arthur's best
24 interest?

60

1    A  Yeah, yeah, for example, going into the
2  United States illegally and crossing the frontier,
3  crossing the border using a coyote.
4    Q  Have you asked Jessica to return to Brazil
5  with Arthur?
6    A  Yes.
7    Q  What has been Jessica's response?
8    A  That she would not come back.
9    Q  What was your motivation in bringing this
10 lawsuit against Jessica?
11   A  To exercise my rights as a father, my
12 right as a father.
13   Q  Did you file this suit because you want
14 Arthur to return to Brazil?
15   A  Yes.
16   Q  Are you angry at Jessica for taking Arthur
17 to the United States?
18   A  No.
19   Q  Do you know why Jessica wanted to move to
20 the United States?
21   A  Well, she told me it was because she was
22 going to work there.
23   Q  Do you believe there is a better
24 opportunity to make money in the United States

A129

# EXHIBIT I



**INSS - INSTITUTO NACIONAL DO SEGURO SOCIAL**

**Comunicação de Decisão**

18/05/2022 11:52:33

NIT: 129.06538.13-4

Número do Benefício: 638.288.289-9          Espécie: 31

Número do Requerimento: 213368847

Ao Sr. (a): EDERVALDO RODRIGUES DA SILVA

Endereço: RUA PARIS, 69, CASA A, COPACABANA

CEP: 31.550-150     Município: BELO HORIZONTE          UF: MG

Assunto: Pedido de Auxílio - Doença

Decisão: Deferimento do Pedido

Motivo: Constatação de Incapacidade Laborativa

Fundamentação Legal: Art. 59 da Lei Nº8.213, de 24/07/1991; Artigos 71, 77 e 78 do Decreto Nº3.048, de 06/05/1999; Portaria Ministerial 359 de 31/08/2006, Artigo 207, da IN 20 INSS/PRES. de 10/10/2007.

Em atenção ao seu pedido de Auxílio por Incapacidade Temporária, apresentado no dia 02/03/2022, informamos que foi reconhecido o direito ao benefício, tendo em vista que foi constatada incapacidade para o trabalho. O benefício foi concedido até 17/05/2022. Informamos que o pagamento do seu benefício será mantido até 06/06/2022. A partir de 06/06/2022 (data da cessação do benefício) e pelo prazo de 30 (trinta) dias, V. Sa. poderá interpor Recurso à Junta de Recursos da Previdência Social. O requerimento de Solicitação de Prorrogação poderá ser feito ligando para o número 135 da Central de Atendimento do INSS; ou pela Internet no endereço meu.inss.gov.br ou uma Agência da Previdência Social - APS. A Previdência Social informa que o(a) segurado(a) em Auxílio por Incapacidade Temporária que retornar voluntariamente à mesma atividade, poderá ter seu Auxílio cancelado a partir da data do retorno, de acordo com os §§ 6º e 7º do art. 60 da Lei nº 8213/91, com redação dada pela Lei nº 13135/15.



_____

INSTITUTO NACIONAL DO SEGURO SOCIAL - INSS

Agência da Previdência Social: BELO HORIZONTE   OESTE

Endereço: RUA ESPIRITO SANTO , 54 , CENTRO

CEP: 30.160-030     Município: BELO HORIZONTE          UF: MG

Termo de Responsabilidade: Responsabilizo-me, sob as penas do Artigo 171 do Código Penal, pela veracidade da documentação apresentada para a solicitação do benefício acima descrito.
Ciente, 16 de Maio de 2022

_____

Assinatura do Requerente / Representante Legal

Você pode conferir a autenticidade do documento em https://meu.inss.gov.br/central/#/aberto/autenticidade/ com o código 220518XAQ8MU08



Número do documento: 22070608594565000009539274239
https://pje.tjmg.jus.br:443/pje/Processo/ConsultaDocumento/listView.seam?x=22070608594565000009539274239
Assinado eletronicamente por: ALEXANDRE ALVES DE MAGALHAES - 06/07/2022 08:59:45

Num. 9543182470 - Pág. 1

CONFIDENTIAL

DASILVA0000015

**A131**

Página 1 de 1

**INSS - INSTITUTO NACIONAL DO SEGURO SOCIAL**
**Histórico de Créditos**

01/06/2022 20:46:17

### Identificação do Filiado

**NIT:** 129.06538.13-4   **CPF:** 087.707.046-60   **Data de Nascimento:** 17/09/1985

**Nome:** EDERVALDO RODRIGUES DA SILVA

**Nome da mãe:** NELCY RODRIGUES DA SILVA

**Compet. Inicial:** 03/2022   **Compet. Final:** 04/2022

### Créditos do Benefício

**NB:** 6382882899

**Espécie:** 31 - AUXILIO-DOENCA PREVIDENCIARIO

**APS:** 11001030 - AGÊNCIA DA PREVIDÊNCIA SOCIAL BELO HORIZONTE - OESTE

**Data de Início do Benefício (DIB):** 28/02/2022   **Data de Cessação do Benefício (DCB):** 06/06/2022

**Data de Início do Pagamento (DIP):** 28/02/2022   **MR:** R$ 1.281,16

| Competência | Período | Valor Líquido | Meio de Pagamento | Status | Previsão de Pagamento | Data de Pagamento | Crédito Invalidado | Isento IR |
|---|---|---|---|---|---|---|---|---|
| 03/2022 | 01/03/2022 a 25/03/2022 | R$ 1.230,87 | | Pago | 19/04/2022 | 19/04/2022 | Não | Sim |

Banco: 389 - BANCO MERCANTIL  OP: 828544 - POSTO DE ATENDIMENTO AV. SANTOS DUMONT  Ocorrência: Pagamento efetivado

Data Cálculo: 02/04/2022  Origem: Concessão  Validade Início: 19/04/2022  Fim: 30/06/2022

| Código | Descrição Rubrica | Valor |
|---|---|---|
| 101 | VALOR TOTAL DE MR DO PERIODO | R$ 1.067,63 |
| 104 | VALOR DO DECIMO-TERCEIRO SALARIO | R$ 106,76 |
| 105 | SALARIO FAMILIA | R$ 56,48 |



Você pode conferir a autenticidade do documento em
https://meu.inss.gov.br/central/#/aberto/autenticidade/
com o código 220601MY64PT77

O INSS poderá rever a qualquer tempo as informações constantes deste extrato, conforme art. 19, § 3° do Decreto 3.048/99.



Número do documento: 220706085945799000009539264058
https://pje.tjmg.jus.br:443/pje/Processo/ConsultaDocumento/listView.seam?x=220706085945799000009539264058
Assinado eletronicamente por: ALEXANDRE ALVES DE MAGALHAES - 06/07/2022 08:59:45

Num. 9543172289 - Pág. 1

CONFIDENTIAL

DASILVA0000016

A132



**INSS - INSTITUTO NACIONAL DO SEGURO SOCIAL**
**Histórico de Créditos**

05/07/2022 15:31:59

### Identificação do Filiado

**NIT:** 129.06538.13-4   **CPF:** 087.707.046-60   **Data de Nascimento:** 17/09/1985

**Nome:** EDERVALDO RODRIGUES DA SILVA

**Nome da mãe:** NELCY RODRIGUES DA SILVA

**Compet. Inicial:** 05/2022                    **Compet. Final:** 07/2022

### Créditos do Benefício

**NB:** 638.288.289-9

**Espécie:** 31 - AUXILIO-DOENCA PREVIDENCIARIO

**APS:** 11001060 - AGÊNCIA DA PREVIDÊNCIA SOCIAL BELO HORIZONTE - SANTA EFIGÊNIA

**Data de Início do Benefício (DIB):** 28/02/2022   **Data de Cessação do Benefício (DCB):** 06/06/2022

**Data de Início do Pagamento (DIP):** 28/02/2022                    **MR:** R$ 1.281,16

| Competência | Período | Valor Líquido | Meio de Pagamento | Status | Previsão de Pagamento | Data do Pagamento | Crédito Invalidado | Isento IR |
|---|---|---|---|---|---|---|---|---|
| 06/2022 | 01/06/2022 a 06/06/2022 | R$ 526,24 | | | 06/07/2022 | | Não | Sim |

Banco: 389 - BANCO MERCANTIL   OP: 16637 - MATRIZ - MG   Ocorrência: Crédito não retornado

Data Cálculo: 10/06/2022   Origem: Maciça   Validade Início: 06/07/2022   Fim: 31/08/2022

| Código | Descrição Rubrica | Valor |
|---|---|---|
| 101 | VALOR TOTAL DE MR DO PERIODO | R$ 256,23 |
| 104 | VALOR DO DECIMO-TERCEIRO SALARIO | R$ 320,29 |
| 105 | SALARIO FAMILIA | R$ 56,48 |
| 218 | 13. SALARIO PAGO COMPETENCIAS ANTERIORES | R$ 106,76 |



Você pode conferir a autenticidade do documento em
https://meu.inss.gov.br/central/#/autenticidade
com o código 220705CENTRAL-Y1JML888

O INSS poderá rever a qualquer tempo as informações constantes deste extrato, conforme art. 19, § 3° do Decreto 3.048/99.



Número do documento: 2207060859459580000953927200
https://pje.tjmg.jus.br:443/pje/Processo/ConsultaDocumento/listView.seam?x=22070608594595800009539272000
Assinado eletronicamente por: ALEXANDRE ALVES DE MAGALHAES - 06/07/2022 08:59:46

Num. 9543180231 - Pág. 1

DASILVA0000017

CONFIDENTIAL

A133



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**INSTITUTO NACIONAL DO SEGURO SOCIAL**" is, to the best of my knowledge and belief, a true and accurate translation from Portuguese into English.

_____
Jacqueline Yorke

Sworn to before me this
September 5, 2024

_____
Signature, Notary Public

> **WENDY POON**
> Notary Public - State of New York
> No. 01PO0000184
> Qualified in Queens County
> My Commission Expires February 02, 20 27

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.400.8840  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

CONFIDENTIAL

DASILVA0000018

A134



**INSS - NATIONAL SOCIAL SECURITY INSTITUTE**

**Decision Communication**

05/18/2022 11:52:33

**NIT:** 129.06538.13-4

**Benefit Number:** 638.288.289-9                    **Type:** 31

**Application Number:** 213368847

**To Mr./Mrs.:** EDERVALDO RODRIGUES DA SILVA

**Address:** RUA PARIS, 69, CASA A, COPACABANA

**CEP:** 31.550-150        **Municipality:** BELO HORIZONTE                **UF:** MG

**Subject:** Request for Assistance - Illness

**Decision:** Approval of the Order

**Reason:** Finding of Work Disability

**Legal Rationale:** Art. 59 of Law Number 8.213, of 07/24/1991; Articles 71, 77 and 78 of Decree Number 3.048, of 05/06/1999; Ministerial Ordinance 359 of 08/31/2006, Article 207, of IN 20 INSS/PRES. of 10/10/2007.

In response to your request for Temporary Disability Assistance, submitted on 03/02/2022, we hereby inform you that the right to the benefit has been recognized, considering that inability to work was found. The benefit was granted until 05/17/2022. Please be advised that your benefit payment will continue until 06/06/2022. From 06/06/2022 (date of termination of the benefit) and for a period of 30 (thirty) days, you may file an Appeal with the Social Security Resource Board. The Extension Request application may be made by calling the INSS Service Center at 135; or by accessing the Internet at meu.inss.gov.br or by visiting a Social Security Agency - APS. The Social Security states that the insured person(s) in Temporary Disability Assistance who voluntarily returns to the same activity may have his/her Assistance cancelled from the date of return, in accordance with §§ 6 and 7 of Art. 60 of Law Number 8213/91, as amended by Law Number 13135/15.

[signature]

---

NATIONAL SOCIAL SECURITY INSTITUTE - INSS

**Social Security Agency:** BELO HORIZONTE WEST

**Address:** RUA ESPIRITO SANTO, 54 , CENTRO

**CEP:** 30.160-030                **Municipality:** BELO HORIZONTE                **UF:** MG

Disclaimer: I am responsible, under the penalties of Article 171 of the Criminal Code, for the truthfulness of the documentation presented for the request for the benefit described above.
Acknowledge, May 16, 2022

---

Signature of Requestor / Legal Representative



You can verify the authenticity of the document at https://meu.inss.gov.br/central/#/aberto/autenticidade/com code 220518XAQ8MU08

---



Document number: 22070608594565000009539274239
https://pje.tjmg.jus.br:443/pje/Processo/ConsultaDocumento/listView.seam?x=22070608594565000009539274239
Electronically signed by: ALEXANDRE ALVES DE MAGALHAES - 07/06/2022 8:59:45 A.M.

No. 9543182470 - Page 1

DASILVA0000019

CONFIDENTIAL

A135



Page 1 of 1

**INSS - NATIONAL SOCIAL SECURITY INSTITUTE**
**Credit History**

06/01/2022 20:46:17

**Identification of the Affiliate**

| | | |
|---|---|---|
| **NIT:** 129.06538.13-4 | **CPF:** 087.707.046-60 | **Date of Birth:** 09/17/1985 |

**Name:** EDERVALDO RODRIGUES DA SILVA

**Mother's name:** NELCY RODRIGUES DA SILVA

**Compet. Initial:** 03/2022                    **Compet. Final:** 04/2022

**Benefit Credits**

**NB:** 6382882899

**Type:** 31 - SOCIAL SECURITY DISEASE-ASSISTANCE

**APS:** 11001030 - BELO HORIZONTE SOCIAL SECURITY AGENCY - WEST

**Benefit Start Date (BID):**          02/28/2022          **Benefit Termination Date (DCB):** 06/06/2022

**Payment Start Date (DIP):**          02/28/2022                              **MR:** R$ 1,281.16

| Competence | Period | Net value | Means of Payment | Status | Payment Forecast | Payment Date | Invalidated Credit | IR exempt |
|---|---|---|---|---|---|---|---|---|
| 03/2022 | 03/01/2022 to 03/25/2022 | R$ 1,230.87 | | Paid | 19/04/2022 | 19/04/2022 | No | Yes |

Bank: 389 - BANCO MERCANTIL OP: 828544 - SERVICE STATION AV. SANTOS DUMONT Occurrence: Payment Made

Calculation Date: 04/02/2022 Origin: Grant Expiration Start: 04/19/2022 End: 06/30/2022

| Code | Description Initials | Amount |
|---|---|---|
| 101 | TOTAL MR AMOUNT OF PERIOD | R$ 1,067.63 |
| 104 | VALUE OF THE THIRTEENTH SALARY | R$ 106.76 |
| 105 | FAMILY SALARY | R$ 56.48 |



You can check the authenticity of the document at
https://meu.inss.gov.br/central/#/aberto/autenticidade/com
code 220601MY64PT77

The INSS may review the information contained in this statement at any time, pursuant to Art. 19, § 3 of Decree 3.048/99.



Document number: 22070608594579900009539264058
https://pje.tjmg.jus.br:443/pje/Processo/ConsultaDocumento/listView.seam?x=22070608594579900009539264058
Electronically signed by: ALEXANDRE ALVES DE MAGALHAES - 07/06/2022 8:59:45 A.M.

No. 9543172289 - Page 1

DASILVA0000020

CONFIDENTIAL

A136



Page 1 of 1

**INSS – NATIONAL SOCIAL SECURITY INSTITUTE**
**Credit History**

07/05/2022 15:31:59

**Identification of the Affiliate**

**NIT:** 129.06538.13–4 **CPF:** 087.707.046–60 **Date of Birth:** 09/17/1985

**Name:** EDERVALDO RODRIGUES DA SILVA

**Mother's name:** NELCY RODRIGUES DA SILVA

**Compet. Initial:** 05/2022 **Compet. Final:** 07/2022

**Benefit Credits**

**NB:** 638.288.289–9

**Species:** 31 – SOCIAL SECURITY ILLNESS–ASSISTANCE

**APS:** 11001060 – BELO HORIZONTE SOCIAL SECURITY AGENCY – SANTA EFIGÊNIA

**Benefit Start Date (BID):** 02/28/2022 **Benefit Termination Date (DCB):** 06/06/2022

**Payment Start Date (DIP):** 02/28/2022 **MR:** R$ 1,281.16

| Competence | Period | Net value | Means of Payment | Status | Payment Forecast | Payment Date | Invalidated Credit | IR exempt |
|---|---|---|---|---|---|---|---|---|
| 06/2022 | 06/01/2022 to 06/06/2022 | R$ 526.24 | | | 06/07/2022 | | No | Yes |

Bank: 389 – BANCO MERCANTIL OP: 16637 – HEADOFFICE - MG Occurrence: Credit not returned Calculation Date:

06/10/2022 Origin: Solid Validity Start: 07/06/2022 End: 08/31/2022

| Code | Description Initials | Amount |
|---|---|---|
| 101 | TOTAL MR AMOUNT OF PERIOD | R$ 256.23 |
| 104 | VALUE OF THE THIRTEENTH SALARY | R$ 320.29 |
| 105 | FAMILY SALARY | R$ 56.48 |
| 218 | 13. SALARY PAID FOR PREVIOUS PERIODS | R$ 106.76 |



You can verify the authenticity of the document at https://meu.inss.gov.br/central/#/autenticidade with the code 220705CENTRAL–Y1JML888

The INSS may review the information contained in this statement at any time, pursuant to Art. 19, § 3 of Decree 3.048/99.



Document number: 22070608594595800009539272000
https://pje.tjmg.jus.br:443/pje/Processo/ConsultaDocumento/listView.seam?x=22070608594595800009539272000
Electronically signed by: ALEXANDRE ALVES DE MAGALHAES - 07/06/2022 8:59:46 A.M.

No. 9543180231 - Page 1

DASILVA0000021

CONFIDENTIAL

A137

_____



Document number: 24060611340831400010236500379
https://pje.tjmg.jus.br:443/pje/Processo/ConsultaDocumento/listView.seam?x=24060611340831400010236500379
Electronically signed by: PAULA MURCA MACHADO ROCHA MOURA - 06/06/2024 11:34:08

No. 10240433610 - Page 1

DASILVA0000022

CONFIDENTIAL

A138

# EXHIBIT L

Department of Homeland Security
U.S. Citizenship and Immigration Services

Z3-0874A

**Form I-797C, Notice of Action**

<div style="border:2px solid black">

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

</div>



| Receipt Number<br>ZDF2466420530 | | | Case Type<br>I589 - APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL |
|---|---|---|---|
| Received Date<br>10/04/2023 | Priority Date | | Applicant  A240 603 427<br>SILVEIRA DA SILVA, JESSICA |
| Notice Date<br>10/04/2023 | Page<br>1 of 1 | | |

JESSICA SILVEIRA DA SILVA
c/o LUDOVINO PEREZ GARDINI
PEREZ GARDINI LLC
296 NEWTON STREET
STE 250
WALTHAM MA  02453

**Notice Type:** Defensive Receipt Notice

We have mailed an official notice about this case (and any relevant documentation) according to the mailing preferences you chose on Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative. **This is a courtesy copy, not the official notice.**

**What the Official Notice Said**

*** ACKNOWLEDGEMENT OF RECEIPT ***

USCIS has received a copy of your I-589 (application for Asylum and Withholding of Removal) filed in defense of removal from the US in Immigration Court. Pursuant to S.265 of the Immigration and Nationality Act, you are required to notify USCIS, in writing, of any address changes, within 10 days of such change using Form AR11. Since you were placed in removal proceedings before an Immigration Judge, you are also required to notify the Immigration Court having jurisdiction over your case of any change of address within 5 days of such change, on Form EOIR-33. If you changed your address, please mail each completed change of address form (AR11 and EOIR-33) to the location specified on the respective form.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

Nebraska Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 82521
Lincoln NE 68501-2521



USCIS Contact Center: www.uscis.gov/contactcenter

If this is an interview or biometrics appointment notice, please see the back of this notice for important information.     Form I-797C   10/13/21

CONFIDENTIAL

DASILVA0000002

A140

# EXHIBIT M



CONFIDENTIAL

DASILVA0000036

A142

# EXHIBIT T

A143

Rapport explicatif de
Mlle Elisa Pérez-Vera

Explanatory Report by
Elisa Pérez-Vera

TRANSLATION OF THE PERMANENT BUREAU

## Introduction

*1   Conclusions des travaux de la Conférence de La Haye de droit international privé*

1 ˝ La Convention sur les aspects civils de l'enlèvement international d'enfants a été adoptée en séance plénière le 24 octobre 1980 par la Quatorzième session de la Conférence de La Haye de droit international privé, à l'unanimité des Etats présents.[1] Le 25 octobre 1980, les délégués signèrent l'Acte final de la Quatorzième session contenant le texte de la Convention et une Recommandation qui contient la formule modèle à utiliser pour les demandes de retour des enfants déplacés ou retenus illicitement.

A cette occasion, la Conférence de La Haye s'est écartée de sa pratique, les projets de Conventions adoptés au cours de la Quatorzième session ayant été ouverts à la signature des Etats immédiatement après la séance de clôture. Quatre Etats ont signé la Convention à cette occasion (le Canada, la France, la Grèce et la Suisse), de sorte qu'elle porte la date du 25 octobre 1980.

2   En ce qui concerne le point de départ des travaux qui ont abouti à l'adoption de la Convention, ainsi que les conventions existantes en la matière ou ayant un rapport direct avec elle, nous renvoyons à l'introduction du Rapport de la Commission spéciale.[2]

3   La Quatorzième session de la Conférence, qui a siégé du 6 au 25 octobre 1980, a confié l'élaboration de la Convention à sa Première commission, dont le Président était le professeur A. E. Anton (Royaume-Uni) et le Vice-président le doyen Leal (Canada); l'un et l'autre avaient déjà été respectivement Président et Vice-président de la Commission spéciale. D'autre part, le professeur Elisa Pérez-Vera a été confirmé dans ses fonctions de Rapporteur. M. Adair Dyer, Premier secrétaire au Bureau Permanent, qui avait élaboré d'importants documents pour les travaux de la Conférence, a été chargé de la direction scientifique du secrétariat.

4   Au cours de treize séances, la Première commission a procédé à une première lecture de l'avant-projet élaboré par la Commission spéciale. Simultanément, elle a nommé un Comité de rédaction qui, au fur et à mesure de la pro-

## Introduction

*1   Results of the work of the Hague Conference on private international law*

1   The Convention on the Civil Aspects of International Child Abduction was adopted on 24 October 1980 by the Fourteenth Session of the Hague Conference on private international law in Plenary Session, and by unanimous vote of the States which were present.[1] On 25 October 1980, the delegates signed the Final Act of the Fourteenth Session which contained the text of the Convention and a Recommendation containing the model form which is to be used in applications for the return of children who have been wrongfully abducted or retained.

On this occasion, the Hague Conference departed from its usual practice, draft Conventions adopted during the Fourteenth Session being made available for signature by States immediately after the Closing Session. Four States signed the Convention then (Canada, France, Greece and Switzerland), which thus bears the date 25 October 1980.

2   As regards the starting point of the proceedings which resulted in the adoption of the Convention, as well as the matter of existing conventions on the subject or those directly related to it, we shall refer to the introduction to the Report of the Special Commission.[2]

3   The Fourteenth Session of the Conference, which took place between 6 and 25 October 1980, entrusted the task of preparing the Convention to its First Commission, the Chairman of which was Professor A. E. Anton (United Kingdom) and the Vice-Chairman Dean Leal (Canada), who had already been Chairman and Vice-Chairman respectively of the Special Commission. Professor Elisa Pérez-Vera was confirmed in her position as Reporter. Mr Adair Dyer, First Secretary of the Permanent Bureau, who had prepared important documents for the Conference proceedings, was in charge of the scientific work of the secretariat.

4   In the course of thirteen sittings, the First Commission gave a first reading to the Preliminary Draft drawn up by the Special Commission. At the same time, it named the members of a Drafting Committee which drafted the text

---

[1] Allemagne, Australie, Autriche, Belgique, Canada, Danemark, Espagne, Etats-Unis, Finlande, France, Grèce, Irlande, Japon, Luxembourg, Norvège, Pays-Bas, Portugal, Royaume-Uni, Suède, Suisse, Tchécoslovaquie, Venezuela et Yougoslavie. Les Représentants de la République Arabe d'Egypte, d'Israël et de l'Italie, quoique ayant pris une part active aux travaux de la Première commission, n'ont pas participé au vote. Le Maroc, le Saint-Siège et l'Union des Républiques Socialistes Soviétiques ont envoyé des observateurs. Au cours des travaux, la Première commission a également disposé du concours précieux des observateurs du Conseil de l'Europe, du Commonwealth Secretariat et du Service Social International.

[2] Rapport de la Commission spéciale, Nos 3 et 7 à 15.

[1] Australia, Austria, Belgium, Canada, Czechoslovakia, Denmark, Finland, France, Germany, Greece, Ireland, Japan, Luxembourg, Netherlands, Norway, Portugal, Spain, Sweden, Switzerland, United Kingdom, United States, Venezuela and Yugoslavia.
Representatives of the Arab Republic of Egypt, Israel and Italy did not participate in the vote, despite having played an active part in the proceedings of the First Commission. Morocco, the Holy See and the Union of the Soviet Socialist Republics sent observers. In the course of the proceedings, the First Commission also had at its disposal the invaluable assistance of observers from the Council of Europe, the Commonwealth Secretariat and International Social Service.

[2] Report of the Special Commission, Nos 3 and 7 to 15.

A144

gression des travaux, a mis les textes au point.[3] Sept autres séances ont été consacrées à la discussion du texte préparé par le Comité de rédaction,[4] ainsi qu'à celle des clauses visant l'application de la Convention au regard des Etats à systèmes juridiques non unifiés («*Application Clauses*») et de la formule modèle[5] rédigées par des Comités *ad hoc*.[6] Les clauses finales, suggérées par le Bureau Permanent, ont été incorporées dans l'avant-projet établi par le Comité de rédaction.

## II   *Objet et plan du présent Rapport*

5   Le Rapport explicatif d'un texte destiné à devenir du droit positif, c'est-à-dire d'un texte qui devra être invoqué et appliqué, doit remplir au moins deux objectifs essentiels. D'une part, le Rapport doit mettre en relief aussi fidèlement que possible les principes qui sont à la base de la Convention et, quand cela s'avère nécessaire, l'évolution des idées qui ont conduit à consacrer de tels principes parmi les options existantes. Il ne s'agit certes pas de faire état d'une manière exhaustive des positions adoptées tout au long du processus d'élaboration de la Convention, mais le point de vue retenu par celle-ci sera parfois plus facile à comprendre s'il est confronté à d'autres idées avancées.

Or, étant donné que l'avant-projet de Convention préparé par la Commission spéciale a obtenu un large appui[7] et que, par conséquent, le texte définitif maintient l'essentiel de la structure et des principes fondamentaux de l'avant-projet, le présent Rapport final reprendra, surtout dans sa première partie, certains passages du Rapport de la Commission spéciale préparé en avril 1980 à l'intention de la Quatorzième session.[8]

6   Ce Rapport final doit remplir aussi un autre objectif: fournir à ceux qui auront à appliquer la Convention un commentaire détaillé de ses dispositions. Ce commentaire étant en principe destiné à éclairer la teneur littérale des dispositions conventionnelles, nous nous préoccuperons beaucoup moins d'en retracer la genèse que d'en préciser le contenu.

7   Des considérations précédentes nous pouvons conclure que les deux objectifs envisagés sont nettement différenciés et que les méthodes mêmes d'analyse utilisées pour atteindre l'un et l'autre ne peuvent pas être identiques. Toutefois, la référence dans les deux cas à un texte unique, celui de la Convention, impliquera certaines redites, qui nous semblent inévitables. En dépit de ce risque et étant donné le double objectif souligné, nous avons divisé le Rapport en deux parties: la première est consacrée à l'étude des principes généraux qui inspirent la Convention; la seconde est destinée à l'examen du texte article par article.

8   Finalement, comme le soulignait en 1977 le professeur von Overbeck,[9] il semble opportun de rappeler que ce Rapport a été établi, à l'issue de la Quatorzième session, à partir des procès-verbaux et des notes du Rapporteur. Il n'a

concurrently with the progress of the main proceedings.[3] Seven other sittings were devoted to a discussion of the text prepared by the Drafting Committee,[4] as well as of clauses relating to the application of the Convention to States with non-unified legal systems ('Application Clauses') and of the model form[5] drafted by *ad hoc* Committees.[6] The final clauses had been suggested by the Permanent Bureau and were incorporated into the preliminary draft Convention drawn up by the Drafting Committee.

## II   *Aim and structure of this Report*

5   The Explanatory Report on a text which is destined to become positive law, that is to say a text which will require to be cited and applied, must fulfil at least two essential aims. On the one hand, it must throw into relief, as accurately as possible, the principles which form the basis of the Convention and, wherever necessary, the development of those ideas which led to such principles being chosen from amongst existing options. It is certainly not necessary to take exhaustive account of the various attitudes adopted throughout the period during which the Convention was being drawn up, but the point of view reflected in the Convention will sometimes be more easily grasped by being set opposite other ideas which were put forward.

Now, given the fact that the preliminary draft Convention prepared by the Special Commission enjoyed widespread support[7] and that the final text essentially preserves the structure and fundamental principles of the Preliminary Draft, this final Report and in particular its first part, repeats certain passages in the Report of the Special Commission prepared in April 1980, for the Fourteenth Session.[8]

6   This final Report must also fulfil another purpose, *viz.* to supply those who have to apply the Convention with a detailed commentary on its provisions. Since this commentary is designed in principle to throw light upon the literal terms of these provisions, it will be concerned much less with tracing their origins than with stating their content accurately.

7   We can conclude from the foregoing considerations that these two objectives must be clearly distinguished and that even the methods of analysis used cannot be the same for each of them. Nevertheless, the need to refer in both cases to the one text, that of the Convention, implies that a certain amount of repetition will be necessary and indeed inevitable. Despite this risk and in view of the emphasis which is placed on a double objective, the Report has been divided into two parts, the first being devoted to a study of the general principles underlying the Convention, the second containing an examination of the text, article by article.

8   Finally, as Professor von Overbeck emphasized in 1977,[9] it would be as well to remember that this Report was prepared at the end of the Fourteenth Session, from the *procès-verbaux* and the Reporter's notes. Thus it has not

---

[3] Le Comité de rédaction, sous la présidence de M. Leal en tant que Vice-président de la Première commission, comprenait MM. Savolainen (Finlande), Chatin (France), Jones (Royaume-Uni) et le Rapporteur, M. Dyer et plusieurs des secrétaires rédacteurs lui ont fourni un concours extrêmement précieux.
[4] Doc. trav. Nos 45, 66, 75, 78, 79 et 83.
[5] Doc. trav. No 59, complété par la proposition du Secrétariat contenue dans le Doc. trav. No. 71. Le Sous-comité «*Application Clauses*» a décidé de ne pas changer la teneur des articles élaborés à ce sujet par la Commission spéciale (P.-v. No 12).
[6] Le Sous-comité «Formule-modèle», sous la présidence du professeur Müller-Freienfels (République fédérale d'Allemagne), comprenait MM. Deschenaux (Suisse), Hergen (Etats-Unis), Barbosa (Portugal), Minami (Japon) et Mlle Pripp (Suède). Le Sous-comité «*Application Clauses*», présidé par M. van Boeschoten (Pays-Bas), était formé par MM. Hétu (Canada), Hjorth (Danemark), Creswell (Australie), Salem (Egypte) et Mlle Selby (Etats-Unis).
[7] Voir notamment les *Observations des Gouvernements*, Doc. prél. No. 7.
[8] Doc. prél. No. 6.
[9] Rapport explicatif de la Convention sur la loi applicable aux régimes matrimoniaux, *Actes et documents de la Treizième session*, tome II, p. 329.

[3] The Drafting Committee, under the chairmanship of Mr Leal as Vice-Chairman of the First Commission, included Messrs Savolainen (Finland), Chatin (France), Jones (United Kingdom) and the Reporter. Mr Dyer and several recording secretaries provided the Committee with extremely valuable assistance.
[4] Working Documents Nos 45, 66, 75, 78, 79 and 83.
[5] Working Document No 59, supplemented by the proposal of the Secretariat in Working Document No. 71. The Subcommittee on 'Application Clauses' decided against changing the terms of the articles on this topic which had been prepared by the Special Commission (*Procès-verbal* No 12).
[6] The 'Model Forms' Subcommittee, under the chairmanship of Professor Müller-Freienfels (Federal Republic of Germany) comprised Messrs Deschenaux (Switzerland), Hergen (United States), Barbosa (Portugal), Minami (Japan) and Miss Pripp (Sweden). The Subcommittee on 'Application Clauses', chaired by Mr van Boeschoten (Netherlands), was made up of Messrs Hétu (Canada), Hjorth (Denmark), Creswell (Australia), Salem (Egypt) and Miss Selby (United States).
[7] See in particular the *Observations of Governments*, Prel. Doc. No 7.
[8] Prel. Doc. No 6.
[9] Explanatory Report on the Convention on the Law Applicable to Matrimonial Property Regimes, *Acts and Documents of the Thirteenth Session*, Book II, p. 329.

---

*Rapport Pérez-Vera*

*Pérez-Vera Report*   427

[15]

donc pas été approuvé par la Conférence et il est possible que, malgré les efforts faits par le Rapporteur pour rester objectif, certains passages répondent à une appréciation partiellement subjective.

been approved by the Conference, and it is possible that, despite the Rapporteur's efforts to remain objective, certain passages reflect a viewpoint which is in part subjective.

## Première partie – Caractères généraux de la Convention

9   La Convention reflète, dans son ensemble, un compromis entre deux conceptions, partiellement différentes, du but à atteindre. On perçoit, en effet, dans les travaux préparatoires, la tension existant entre le désir de protéger les situations de fait altérées par le déplacement ou le non-retour illicites d'un enfant et le souci de garantir surtout le respect des rapports juridiques pouvant se trouver à la base de telles situations. A cet égard, l'équilibre consacré par la Convention est assez fragile. D'une part, il est clair que la Convention ne vise pas le fond du droit de garde (article 19); mais d'autre part il est également évident que le fait de qualifier d'illicite le déplacement ou le non-retour d'un enfant est conditionné par l'existence d'un droit de garde qui donne un contenu juridique à la situation modifiée par les actions que l'on se propose d'éviter.

## First Part – General characteristics of the Convention

9   The Convention reflects on the whole a compromise between two concepts, different in part, concerning the end to be achieved. In fact one can see in the preliminary proceedings a potential conflict between the desire to protect factual situations altered by the wrongful removal or retention of a child, and that of guaranteeing, in particular, respect for the legal relationships which may underlie such situations. The Convention has struck a rather delicate balance in this regard. On the one hand, it is clear that the Convention is not essentially concerned with the merits of custody rights (article 19), but on the other hand it is equally clear that the characterization of the removal or retention of a child as wrongful is made conditional upon the existence of a right of custody which gives legal content to a situation which was modified by those very actions which it is intended to prevent.

### I   OBJET DE LA CONVENTION

10   Le titre de ce chapitre fait allusion tant au problème auquel répond la Convention, qu'aux objectifs qu'elle a adoptés pour lutter contre le développement des enlèvements. Après avoir abordé ces deux points, nous traiterons d'autres questions connexes qui nuancent sensiblement la portée des objectifs visés; il s'agit en particulier de l'importance accordée à l'intérêt de l'enfant et des exceptions possibles au retour immédiat des enfants déplacés ou retenus illicitement.

### I   OBJECT OF THE CONVENTION

10   The title of this chapter alludes as much to the problem addressed by the Convention as to the objectives by which it seeks to counter the increase in abductions. After tackling both of these points, we shall deal with other connected questions which appreciably affect the scope of the Convention's objectives, and in particular the importance which has been placed on the interest of the child and on the possible exceptions to the rule requiring the prompt return of children who have been wrongfully removed or retained.

### A   Délimitation du sujet

11   En ce qui concerne la délimitation du sujet,[10] nous nous limiterons à rappeler très brièvement que les situations envisagées découlent de l'utilisation de voies de fait pour créer des liens artificiels de compétence judiciaire internationale, en vue d'obtenir la garde d'un enfant. La diversité des circonstances qui peuvent concourir dans un cas d'espèce fait échouer toute tentative d'établir une définition plus précise d'un point de vue juridique. Cependant, deux éléments se font jour de façon inéluctable dans toutes les situations examinées et confirment la caractérisation approximative que l'on vient d'ébaucher.

12   En premier lieu, dans toutes les hypothèses nous nous trouvons confrontés au déplacement d'un enfant hors de son milieu habituel, où il se trouvait confié à une personne physique ou morale qui exerçait sur lui un droit légitime de garde. Bien entendu, il faut assimiler à une telle situation le refus de réintégrer l'enfant dans son milieu, après un séjour à l'étranger consenti par la personne qui exerçait la garde. Dans les deux cas, la conséquence est en effet la même: l'enfant a été soustrait à l'environnement familial et social dans lequel sa vie se déroulait. D'ailleurs, dans ce contexte, peu importe la nature du titre juridique qui était à la base de

### A   Definition of the Convention's subject-matter

11   With regard to the definition of the Convention's subject-matter,[10] we need only remind ourselves very briefly that the situations envisaged are those which derive from the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child. The variety of different circumstances which can combine in a particular case makes it impossible to arrive at a more precise definition in legal terms. However, two elements are invariably present in all cases which have been examined and confirm the approximate nature of the foregoing characterization.

Firstly, we are confronted in each case with the removal from its habitual environment of a child whose custody had been entrusted to and lawfully exercised by a natural or legal person. Naturally, a refusal to restore a child to its own environment after a stay abroad to which the person exercising the right of custody had consented must be put in the same category. In both cases, the outcome is in fact the same: the child is taken out of the family and social environment in which its life has developed. What is more, in this context the type of legal title which underlies the exercise of custody rights over the child matters little, since

---

[10] Voir notamment *Questionnaire et Rapport sur l'enlèvement international d'un enfant par un de ses parents*, établi par M. Adair Dyer, Doc. prél. No 1, août 1977, *supra*, p. 18-25 (cité par la suite, «Rapport Dyer»), et Rapport sur l'avant-projet de Convention adopté par la Commission spéciale, Doc. prél. No 6, mai 1980, *supra*, p. 172-173.

[10] See in particular the *Questionnaire and Report on international child abduction by one parent*, prepared by Mr Adair Dyer, Prel. Doc. No 1, August 1977, *supra*, pp. 18-25 (hereafter referred to as the 'Dyer Report'), and the Report on the preliminary draft Convention, adopted by the Special Commission, Prel. Doc. No 6, May 1980, *supra*, pp. 172-173.

---

*Rapport Pérez-Vera*

*Pérez-Vera Report*

l'exercice du droit de garde sur la personne de l'enfant: de ce point de vue, l'existence ou l'absence d'une décision relative à la garde ne change en rien les données sociologiques du problème.

13   En second lieu, la personne qui déplace l'enfant (ou qui est responsable du déplacement, quand l'action matérielle est exécutée par un tiers) l'espoir d'obtenir des autorités du pays où l'enfant a été emmené le droit de garde sur celui-ci. Il s'agit donc de quelqu'un qui appartient au cercle familial de l'enfant, au sens large du terme; en fait, dans la plupart des cas, la personne en question est le père ou la mère.

14   Il est fréquent que la personne qui retient l'enfant essaie d'obtenir qu'une décision judiciaire ou administrative de l'Etat de refuge légalise la situation de fait qu'elle vient de créer; mais si elle n'est pas sûre du sens de la décision, il est aussi possible qu'elle opte pour l'inactivité, laissant ainsi l'initiative à la personne dépossédée. Or, même si cette dernière agit rapidement, c'est-à-dire même si elle évite la consolidation dans le temps de la situation provoquée par le déplacement de l'enfant, l'enleveur se trouvera dans une position avantageuse, car c'est lui qui aura choisi le for qui va juger de l'affaire, un for que, par principe, il considère comme le plus favorable à ses prétentions.

15   En conclusion, nous pouvons affirmer que le problème dont s'occupe la Convention – avec tout ce qu'implique de dramatique le fait qu'il concerne directement la protection de l'enfance dans les relations internationales – prend toute son acuité juridique par la possibilité qu'ont les particuliers d'établir des liens plus ou moins artificiels de compétence judiciaire. En effet, par ce biais, le particulier peut altérer la loi applicable et obtenir une décision judiciaire qui lui soit favorable. Certes, une telle décision, surtout quand elle coexiste avec d'autres décisions de contenu contradictoire rendues par d'autres fors, aura une validité géographiquement restreinte, mais en tout état de cause elle apportera un titre juridique suffisant pour «légaliser» une situation de fait qu'aucun des systèmes juridiques en présence ne souhaitait.

### B   Les objectifs de la Convention

16   Les objectifs de la Convention, qui apparaissent dans l'article premier, pourraient être résumés comme suit: étant donné qu'un facteur caractéristique des situations considérées réside dans le fait que l'enleveur prétend que son action soit légalisée par les autorités compétentes de l'Etat de refuge, un moyen efficace de le dissuader est que ses actions se voient privées de toute conséquence pratique et juridique. Pour y parvenir, la Convention consacre en tout premier lieu, parmi ses objectifs, le rétablissement du *statu quo*, moyennant le «retour immédiat des enfants déplacés ou retenus illicitement dans tout Etat contractant». Les difficultés insurmontables rencontrées pour fixer conventionnellement des critères de compétence directe en la matière[11] ont en effet conduit au choix de cette voie qui, bien que détournée, va, dans la plupart des cas, permettre que la décision finale sur la garde soit prise par les autorités de la résidence habituelle de l'enfant, avant son déplacement.

17   D'ailleurs, bien que l'objectif exprimé au point *b*, «faire respecter effectivement dans les autres Etats contractants les

whether or not a decision on custody exists in no way alters the sociological realities of the problem.

Secondly, the person who removes the child (or who is responsible for its removal, where the act of removal is undertaken by a third party) hopes to obtain a right of custody from the authorities of the country to which the child has been taken. The problem therefore concerns a person who, broadly speaking, belongs to the family circle of the child; indeed, in the majority of cases, the person concerned is the father or mother.

14   It frequently happens that the person retaining the child tries to obtain a judicial or administrative decision in the State of refuge, which would legalize the factual situation which he has just brought about. However, if he is uncertain about the way in which the decision will go, he is just as likely to opt for inaction, leaving it up to the dispossessed party to take the initiative. Now, even if the latter acts quickly, that is to say manages to avoid the consolidation through lapse of time of the situation brought about by the removal of the child, the abductor will hold the advantage, since it is he who has chosen the forum in which the case is to be decided, a forum which, in principle, he regards as more favourable to his own claims.

15   To conclude, it can firmly be stated that the problem with which the Convention deals – together with all the drama implicit in the fact that it is concerned with the protection of children in international relations – derives all of its legal importance from the possibility of individuals establishing legal and jurisdictional links which are more or less artificial. In fact, resorting to this expedient, an individual can change the applicable law and obtain a judicial decision favourable to him. Admittedly, such a decision, especially one coexisting with others to the opposite effect issued by the other forum, will enjoy only a limited geographical validity, but in any event it bears a legal title sufficient to 'legalize' a factual situation which none of the legal systems involved wished to see brought about.

### B   The objectives of the Convention

16   The Convention's objects, which appear in article 1, can be summarized as follows: since one factor characteristic of the situations under consideration consists in the fact that the abductor claims that his action has been rendered lawful by the competent authorities of the State of refuge, one effective way of deterring him would be to deprive his actions of any practical or juridical consequences. The Convention, in order to bring this about, places at the head of its objectives the restoration of the *status quo*, by means of 'the prompt return of children wrongfully removed to or retained in any Contracting State'. The insurmountable difficulties encountered in establishing, within the framework of the Convention, directly applicable jurisdictional rules[11] indeed resulted in this route being followed which, although an indirect one, will tend in most cases to allow a final decision on custody to be taken by the authorities of the child's habitual residence prior to its removal.

17   Besides, although the object stated in sub-paragraph *b*, 'to ensure that rights of custody and of access under the law

---

[11] Une telle option a été rejetée au cours de la première réunion de la Commission spéciale. *Cf. Conclusions des discussions de la Commission spéciale de mars 1979 sur le kidnapping légal*, établies par le Bureau Permanent, Doc. prél. No 5, juin 1979, *supra*, p. 163-164.

[11] Such an option was rejected in the course of the first meeting of the Special Commission. *Cf. Conclusions drawn from the discussions of the Special Commission of March 1979 on legal kidnapping*, prepared by the Permanent Bureau, Prel. Doc. No 5, June 1979, *supra*, pp. 163-164.

---

*Rapport Pérez-Vera*

*Pérez-Vera Report*                                                                    429

[17]

A147

droits de garde et de visite existant dans un Etat contractant», présente un caractère autonome, sa connexion téléologique avec l'objectif «retour de l'enfant» n'en est pas moins évidente. En réalité, on pourrait estimer qu'il ne s'agit que d'un seul objectif considéré à deux moments différents: tandis que le retour immédiat de l'enfant répond au désir de rétablir une situation que l'enleveur a modifiée unilatéralement par une voie de fait, le respect effectif des droits de garde et de visite se place sur un plan préventif, dans la mesure où ce respect doit faire disparaître l'une des causes les plus fréquentes de déplacements d'enfants.

Or, puisque la Convention ne précise pas les moyens que chaque Etat doit employer pour faire respecter le droit de garde existant dans un autre Etat contractant, il faut conclure qu'exception faite de la protection indirecte, qui implique l'obligation de retourner l'enfant à celui qui en avait la garde, le respect du droit de garde échappe presque entièrement au domaine conventionnel. Par contre, le droit de visite fait l'objet d'une régulation incomplète certes, mais indicative de l'intérêt accordé aux contacts réguliers entre parents et enfants, même quand la garde a été confiée à un seul des parents ou à un tiers.

18  Si on admet le bien-fondé des considérations précédentes, il faut en conclure que toute tentative de hiérarchisation des objectifs de la Convention ne peut avoir qu'une signification symbolique. En effet, il semble presque impossible d'établir une hiérarchisation entre deux objectifs qui prennent leurs racines dans une même préoccupation. Car, en définitive, il revient à peu près au même de faciliter le retour d'un enfant déplacé ou de prendre les mesures nécessaires pour éviter un tel déplacement.

Or, comme nous le verrons par la suite, l'aspect que la Convention a essayé de régler en profondeur est celui du retour des enfants déplacés ou retenus illicitement. La raison nous semble évidente: c'est après la rétenue illicite d'un enfant que se produisent les situations les plus douloureuses, celles qui, tout en exigeant des solutions particulièrement urgentes, ne peuvent pas être résolues de façon unilatérale par chaque système juridique concerné. Prises dans leur ensemble, toutes ces circonstances justifient à notre avis le développement que la réglementation du retour de l'enfant reçoit dans la Convention et en même temps accordent, sur le plan des principes, une certaine priorité à l'objectif visé. Ainsi donc, bien qu'en théorie les deux objectifs mentionnés doivent être placés sur un même plan, dans la pratique c'est le désir de garantir le rétablissement de la situation altérée par l'action de l'enleveur qui a prévalu dans la Convention.

19  Dans un dernier effort de clarification des objectifs de la Convention, il convient de souligner qu'ainsi qu'il résulte en particulier des dispositions de son article premier, elle ne cherche pas à régler le problème de l'attribution du droit de garde. Sur ce point, le principe non explicite sur lequel repose la Convention est que la discussion sur le fond de l'affaire, c'est-à-dire sur le droit de garde contesté, si elle se produit, devra être engagée devant les autorités compétentes de l'Etat où l'enfant avait sa résidence habituelle avant son déplacement; et cela aussi bien si le déplacement a eu lieu avant qu'une décision sur la garde ait été rendue — situation dans laquelle le droit de garde violé s'exerçait *ex lege* — que si un tel déplacement s'est produit en violation d'une décision préexistante.

C   *Importance accordée à l'intérêt de l'enfant*

20  Avant tout, il est nécessaire de justifier les raisons qui nous amènent à insérer l'examen de ce point dans le contexte des considérations sur l'objet de la Convention. Elles apparaissent clairement si l'on considère, d'une part que

of one Contracting State are effectively respected in the other Contracting States' appears to stand by itself, its teleological connection with the 'return of the child' object is no less evident. In reality, it can be regarded as one single object considered at two different times; whilst the prompt return of the child answers to the desire to re-establish a situation unilaterally and forcibly altered by the abductor, effective respect for rights of custody and of access belongs on the preventive level, in so far as it must lead to the disappearance of one of the most frequent causes of child abductions.

Now, since the Convention does not specify the means to be employed by each State in bringing about respect for rights of custody which exist in another Contracting State, one must conclude that, with the exception of the indirect means of protecting custody rights which is implied by the obligation to return the child to the holder of the right of custody, respect for custody rights falls almost entirely outwith the scope of the Convention. On the other hand, rights of access form the subject of a rule which, although undoubtedly incomplete, is nevertheless indicative of the interest shown in ensuring regular contact between parents and children, even when custody has been entrusted to one of the parents or to a third party.

18  If the preceding considerations are well-founded, it must be concluded that any attempt to establish a hierarchy of objects of the Convention could have only a symbolic significance. In fact, it would seem almost impossible to create a hierarchy as between two objects which spring from the same concern. For at the end of the day, promoting the return of the child or taking the measures necessary to avoid such removal amount to almost the same thing.

Now, as will be seen below, the one matter which the Convention has tried to regulate in any depth is that of the return of children wrongfully removed or retained. The reason for this seems clear: the most distressing situations arise only after the unlawful retention of a child and they are situations which, while requiring particularly urgent solutions, cannot be resolved unilaterally by any one of the legal systems concerned. Taken as a whole, all these circumstances justify, in our opinion, the Convention's development of rules for regulating the return of the child, whilst at the same time they give in principle a certain priority to that object. Thus, although theoretically the two above-mentioned objects have to be placed on the same level, in practice the desire to guarantee the re-establishment of the *status quo* disturbed by the actions of the abductor has prevailed in the Convention.

19  In a final attempt to clarify the objects of the Convention, it would be advisable to underline the fact that, as is shown particularly in the provisions of article 1, the Convention does not seek to regulate the problem of the award of custody rights. On this matter, the Convention rests implicitly upon the principle that any debate on the merits of the question, *i.e.* of custody rights, should take place before the competent authorities in the State where the child had its habitual residence prior to its removal; this applies as much to a removal which occurred prior to any decision on custody being taken — in which case the violated custody rights were exercised *ex lege* — as to a removal in breach of a pre-existing custody decision.

C   *Importance attached to the interest of the child*

20  Above all, one has to justify the reasons for including an examination of this matter within the context of a consideration of the Convention's objects. These reasons will appear clearly if one considers, on the one hand, that the

[18]

A148

l'intérêt de l'enfant est souvent invoqué à ce sujet, et d'autre part que l'on pourrait argumenter que l'objectif conventionnel touchant au retour de l'enfant devrait toujours être subordonné à la prise en considération de son intérêt.

21   A cet égard, il a été à juste titre mis en relief que «la norme juridique reposant sur «l'intérêt supérieur de l'enfant» est, à première vue, d'une telle imprécision qu'elle ressemble davantage à un paradigme social qu'à une norme juridique concrète. Comment étoffer cette notion pour décider quel est l'intérêt *final* de l'enfant sans faire des suppositions qui ne prennent leur source que dans le contexte moral d'une culture déterminée? En introduisant le mot «final» dans l'équation, on fait aussitôt naître de sérieux problèmes, puisque l'énoncé général de la norme ne permet pas de savoir clairement si «l'intérêt» de l'enfant qu'il faut protéger est celui qui suit immédiatement la décision, ou celui de son adolescence, de son existence de jeune adulte, de son âge mûr ou de sa vieillesse».[12]

22   D'autre part, on ne doit pas oublier que c'est en invoquant «l'intérêt supérieur de l'enfant» que souvent, dans le passé, les juridictions internes ont accordé finalement la garde en litige à la personne qui l'avait déplacé ou retenu illicitement. Il a pu se trouver que cette décision soit la plus juste; nous ne pouvons cependant pas ignorer le fait que le recours, par des autorités internes, à une telle notion implique le risque de traduire des manifestations du particularisme culturel, social, etc., d'une communauté nationale donnée et donc, au fond, de porter des jugements de valeur subjectifs sur l'autre communauté nationale d'où l'enfant vient d'être arraché.

23   Pour les motifs invoqués, parmi d'autres, la partie dispositive de la Convention ne contient aucune allusion explicite à l'intérêt de l'enfant en tant que critère correcteur de l'objectif conventionnel qui vise à assurer le retour immédiat des enfants déplacés ou retenus illicitement. Cependant, il ne faudrait pas déduire de ce silence que la Convention ignore le paradigme social qui proclame la nécessité de prendre en considération l'intérêt des enfants pour régler tous les problèmes les concernant. Bien au contraire, dès le préambule, les Etats signataires déclarent être «profondément convaincus que l'intérêt de l'enfant est d'une importance primordiale pour toute question relative à sa garde»; c'est précisément dans cette conviction qu'ils ont élaboré la Convention, «désirant protéger l'enfant, sur le plan international, contre les effets nuisibles d'un déplacement ou d'un non-retour illicites».

24   Ces deux paragraphes du préambule reflètent assez clairement quelle a été la philosophie de la Convention à cet égard, philosophie que l'on pourrait définir comme suit: la lutte contre la multiplication des enlèvements internationaux d'enfants doit toujours être inspirée par le désir de protéger les enfants, en se faisant l'interprète de leur véritable intérêt. Or, parmi les manifestations les plus objectives de ce qui constitue l'intérêt de l'enfant figure le droit de ne pas être déplacé ou retenu au nom de droits plus ou moins discutables sur sa personne. En ce sens, il est souhaitable de rappeler la Recommandation 874 (1979) de l'Assemblée parlementaire du Conseil de l'Europe dont le premier principe général dit que «les enfants ne doivent plus être considérés comme la propriété de leurs parents, mais être reconnus comme des individus avec leurs droits et leurs besoins propres».[13]

interests of the child are often invoked in this regard, and on the other hand, that it might be argued that the Convention's object in securing the return of the child ought always to be subordinated to a consideration of the child's interests.

21   In this regard, one fact has rightly been highlighted, *viz.* that 'the legal standard 'the best interests of the child' is at first view of such vagueness that it seems to resemble more closely a sociological paradigm than a concrete juridical standard. How can one put flesh on its bare bones without delving into the assumptions concerning the *ultimate* interests of a child which are derived from the moral framework of a particular culture? The word 'ultimate' gives rise to immediate problems when  it is inserted into the equation since the general statement of the standard does not make it clear whether the 'interests' of the child to be served are those of the immediate aftermath of the decision, of the adolescence of the child, of young adulthood, maturity, senescence or old age'.[12]

22   On the other hand, it must not be forgotten that it is by invoking 'the best interests of the child' that internal jurisdictions have in the past often finally awarded the custody in question to the person who wrongfully removed or retained the child. It can happen that such a decision is the most just, but we cannot ignore the fact that recourse by internal authorities to such a notion involves the risk of their expressing particular cultural, social etc. attitudes which themselves derive from a given national community and thus basically imposing their own subjective value judgments upon the national community from which the child has recently been snatched.

23   For these reasons, among others, the dispositive part of the Convention contains no explicit reference to the interests of the child to the extent of their qualifying the Convention's stated object, which is to secure the prompt return of children who have been wrongfully removed or retained. However, its silence on this point ought not to lead one to the conclusion that the Convention ignores the social paradigm which declares the necessity of considering the interests of children in regulating all the problems which concern them. On the contrary, right from the start the signatory States declare themselves to be 'firmly convinced that the interests of children are of paramount importance in matters relating to their custody'; it is precisely because of this conviction that they drew up the Convention, 'desiring to protect children internationally from the harmful effects of their wrongful removal or retention'.

24   These two paragraphs in the preamble reflect quite clearly the philosophy of the Convention in this regard. It can be defined as follows: the struggle against the great increase in international child abductions must always be inspired by the desire to protect children and should be based upon an interpretation of their true interests. Now, the right not to be removed or retained in the name of more or less arguable rights concerning its person is one of the most objective examples of what constitutes the interests of the child. In this regard it would be as well to refer to Recommendation 874(1979) of the Parliamentary Assembly of the Council of Europe, the first general principle of which states that 'children must no longer be regarded as parents' property, but must be recognised as individuals with their own rights and needs'.[13]

---

[12] Rapport Dyer, *supra*, p. 22-23.
[13] Assemblée parlementaire du Conseil de l'Europe. 31ème Session ordinaire, *Recommandation relative à une Charte européenne des droits de l'enfant*. Texte adopté le 4 octobre 1979.

[12] Dyer Report, *supra*, pp. 22-23.
[13] Parliamentary Assembly of the Council of Europe, 31st Ordinary Session, *Recommendation on a European Charter on the Rights of the Child*. Text adopted on 4 October 1979.

*Rapport Pérez-Vera*

En effet, comme l'a souligné M. Dyer, dans la littérature consacrée à l'étude de ce problème, «l'opinion qu'on y trouve le plus souvent exprimée est que la véritable victime d'un «enlèvement d'enfant» est l'enfant lui-même. C'est lui qui pâtit de perdre brusquement son équilibre, c'est lui qui subit le traumatisme d'être séparé du parent qu'il avait toujours vu à ses côtés, c'est lui qui ressent les incertitudes et les frustrations qui découlent de la nécessité de s'adapter à une langue étrangère, à des conditions culturelles qui ne lui sont pas familières, à de nouveaux professeurs et à une famille inconnues».[14]

25    Il est donc légitime de soutenir que les deux objectifs de la Convention — l'un préventif, l'autre visant la réinté-gration immédiate de l'enfant dans son milieu de vie habituel – répondent dans leur ensemble à une conception déterminée de l'intérêt supérieur de l'enfant. Cependant, même dans l'optique choisie, il fallait admettre que le déplacement d'un enfant peut parfois être justifié par des raisons objectives touchant soit à sa personne, soit à l'en-vironnement qui lui était le plus proche. De sorte que la Convention reconnaît certaines exceptions à l'obligation générale assumée par les Etats d'assurer le retour immédiat des enfants déplacés ou retenus illicitement. Pour la plupart, ces exceptions ne sont que des manifestations concrètes du principe trop imprécis qui proclame que l'intérêt de l'enfant est le critère vecteur en la matière.

26    D'ailleurs, la réglementation du droit de visite répond aussi au souci de fournir aux enfants des rapports familiaux aussi complets que possible, afin de favoriser un développement équilibré de leur personnalité. Pourtant, ici encore les avis ne sont pas unanimes, ce qui met une fois de plus en relief le caractère ambigu du principe de l'intérêt de l'enfant. En effet, à l'encontre du critère admis par la Con-vention, certaines tendances soutiennent qu'il est préférable pour l'enfant de ne pas avoir de contacts avec ses deux parents quand le couple est séparé *de jure* ou *de facto*. A cet égard, la Conférence a été consciente du fait qu'une telle solution peut parfois s'avérer la plus souhaitable. Tout en sauvegardant la marge d'appréciation des circonstances concrètes inhérente à la fonction judiciaire, la Conférence a néanmoins préféré l'autre option et la Convention fait pré-valoir sans équivoque l'idée que le droit de visite est la contrepartie naturelle du droit de garde; contrepartie qui, par conséquent, doit en principe être reconnue à celui des parents qui n'a pas la garde de l'enfant.

D    *Exceptions à l'obligation d'assurer le retour immédiat des enfants*

27    Etant donné que le retour de l'enfant est en quelque sorte l'idée de base de la Convention, les exceptions à l'obligation générale de l'assurer constituent un aspect important pour en comprendre avec exactitude la portée. Il ne s'agit évidemment pas d'examiner ici en détail les dis-positions qui établissent ces exceptions, mais d'en esquisser le rôle, en insistant particulièrement sur les raisons qui ont déterminé leur inclusion dans la Convention. De ce point de vue, nous pouvons distinguer des exceptions basées sur trois justifications différentes.

28    D'une part, l'article 13a reconnaît que les autorités judiciaires ou administratives de l'Etat requis ne sont pas

In fact, as Mr Dyer has emphasized, in the literature devoted to a study of this problem, 'the presumption generally stated is that the true victim of the 'childnapping' is the child himself, who suffers from the sudden upsetting of his stability, the traumatic loss of contact with the parent who has been in charge of his upbringing, the uncertainty and frustration which come with the necessity to adapt to a strange language, unfamiliar cultural conditions and un-known teachers and relatives'.[14]

25    It is thus legitimate to assert that the two objects of the Convention — the one preventive, the other designed to secure the immediate reintegration of the child into its familiar environment — both correspond to a specific idea of what constitutes the 'best interests of the child'. However, even when viewing from this perspective, it has to be admitted that the removal of the child can sometimes be justified by objective reasons which have to do either with its person, or with the environment with which it is most closely connected. Therefore the Convention recognizes the need for certain exceptions to the general obligations assumed by States to secure the prompt return of children who have been unlawfully removed or retained. For the most part, these exceptions are only concrete illustrations of the overly vague principle whereby the interests of the child are stated to be the guiding criterion in this area.

26    What is more, the rule concerning access rights also reflects the concern to provide children with family relationships which are as comprehensive as possible, so as to encourage the development of a stable personality. However, opinions differ on this, a fact which once again throws into relief the ambiguous nature of this principle of the interests of the child. In fact, there exists a school of thought opposed to the test which has been accepted by the Convention, which maintains that it is better for the child not to have contact with both parents where the couple are separated in law or in fact. As to this, the Conference was aware of the fact that such a solution could sometimes prove to be the most appropriate. Whilst safeguarding the element of judicial discretion in individual cases, the Conference nevertheless chose the other alternative, and the Convention upholds unequivocally the idea that access rights are the natural counterpart of custody rights, a counterpart which must in principle be acknowledged as belonging to the parent who does not have custody of the child.

D    *Exceptions to the duty to secure the prompt return of children*

27    Since the return of the child is to some extent the basic principle of the Convention, the exceptions to the general duty to secure it form an important element in understand-ing the exact extent of this duty. It is not of course necessary to examine in detail the provisions which constitute these exceptions, but merely to sketch their role in outline, while at the same time stressing in particular the reasons for their inclusion in the Convention. From this vantage point can be seen those exceptions which derive their justification from three different principles.

28    On the one hand, article 13a accepts that the judicial or administrative authorities of the requested State are not

---

[14] Rapport Dyer, *supra*, p. 21.

[14] Dyer Report, *supra*, p. 21.

A150

tenues d'ordonner le retour de l'enfant lorsque le demandeur n'exerçait pas de façon effective, avant le déplacement prétendument illicite, la garde qu'il invoque maintenant, ou lorsqu'il a donné son accord postérieur à l'action qu'il attaque désormais. Il s'agit par conséquent des situations dans lesquelles, ou bien les conditions préalables au déplacement ne comportaient pas l'un des éléments essentiels des relations que la Convention entend protéger (celui de l'exercice effectif de la garde), ou bien le comportement postérieur du parent dépossédé montre une acceptation de la nouvelle situation ainsi créée, ce qui la rend plus difficilement contestable.

29  D'autre part, les alinéas 1b et 2 du même article 13 retiennent des exceptions s'inspirant clairement de la prise en considération de l'intérêt de l'enfant. Or, comme nous l'avons signalé auparavant, la Convention a donné un contenu précis à cette notion. Ainsi, l'intérêt de l'enfant de ne pas être déplacé de sa résidence habituelle, sans garanties suffisantes de stabilité de la nouvelle situation, cède le pas devant l'intérêt primaire de toute personne de ne pas être exposée à un danger physique ou psychique, ou placée dans une situation intolérable.

30  De surcroît, la Convention admet aussi que l'avis de l'enfant sur le point essentiel de son retour ou de son non-retour puisse être décisif, si d'après les autorités compétentes il a atteint un âge et une maturité suffisante. Par ce biais, la Convention donne aux enfants la possibilité de se faire l'interprète de leur propre intérêt. Evidemment, cette disposition peut devenir dangereuse si son application se traduit par des interrogatoires directs de jeunes qui peuvent, certes, avoir une conscience claire de la situation, mais qui peuvent aussi subir des dommages psychiques sérieux s'ils pensent qu'on les a obligés à choisir entre leurs deux parents. Pourtant, une disposition de ce genre était indispensable étant donné que le domaine d'application de la Convention *ratione personae* s'étend aux enfants jusqu'à leur seizième anniversaire; il faut avouer que serait difficilement acceptable le retour d'un enfant, par exemple de quinze ans, contre sa volonté. D'ailleurs, sur ce point précis, les efforts faits pour se mettre d'accord sur un âge minimum à partir duquel l'opinion de l'enfant pourrait être prise en considération ont échoué, vu les chiffres ayant un caractère artificiel, voire arbitraire; il est apparu préférable de laisser l'application de cette clause à la sagesse des autorités compétentes.

31  En troisième lieu, il n'existe pas d'obligation de faire revenir l'enfant quand, aux termes de l'article 20, ceci ne serait pas permis par les principes fondamentaux de l'Etat requis sur la sauvegarde des droits de l'homme et des libertés fondamentales». Nous nous trouvons ici devant une disposition peu habituelle dans les conventions concernant le droit international privé et dont la portée exacte est difficile à établir. En renvoyant au commentaire de l'article 20 pour tenter d'y parvenir, il nous paraît surtout intéressant ici d'en considérer l'origine. Or cette règle est le produit d'un compromis entre délégations favorables et délégations contraires à l'inclusion dans la Convention d'une clause d'ordre public.

Une telle possibilité a été largement débatue au sein de la Première commission, sous des formules différentes. Finalement, après quatre scrutins négatifs et par une seule voix de différence, la Commission a admis la possibilité de rejeter la demande en retour de l'enfant, avec mention d'une réserve faisant état de l'exception d'ordre public sous une formule restreinte en relation avec le droit de la famille et de l'enfance de l'Etat requis. La réserve prévue était formulée littéralement comme suit: «*Contracting States may reserve the right not to return the child when such return would be manifestly incompatible with the fundamental principles of the*

bound to order the return of the child if the person requesting its return was not actually exercising, prior to the allegedly unlawful removal, the rights of custody which he now seeks to invoke, or if he had subsequently consented to the act which he now seeks to attack. Consequently, the situations envisaged are those in which either the conditions prevailing prior to the removal of the child do not contain one of the elements essential to those relationships which the Convention seeks to protect (that of the actual exercise of custody rights), or else the subsequent behaviour of the dispossessed parent shows his acceptance of the new situation thus brought about, which makes it more difficult for him to challenge.

29  On the other hand, paragraphs 1b and 2 of the said article 13 contain exceptions which clearly derive from a consideration of the interests of the child. Now, as we pointed out above, the Convention invests this notion with definite content. Thus, the interest of the child in not being removed from its habitual residence without sufficient guarantees of its stability in its new environment, gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.

30  In addition, the Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests. Of course, this provision could prove dangerous if it were applied by means of direct questioning of young people who may admittedly have a clear grasp of the situation but who may also suffer serious psychological harm if they think they are being forced to choose between two parents. However, such a provision is absolutely necessary given the fact that the Convention applies, *ratione personae*, to all children under the age of sixteen; the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will. Moreover, as regards this particular point, all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary. It seemed best to leave the application of this clause to the discretion of the competent authorities.

31  Thirdly, there is no obligation to return a child when, in terms of article 20, its return 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms'. Here, we are concerned with a provision which is rather unusual in conventions involving private international law, and the exact scope of which is difficult to define. Although we shall refer to the commentary on article 20 for the purpose of defining such scope, it is particularly interesting to consider its origins here. This rule was the result of a compromise between those delegations which favoured, and those which were opposed to, the inclusion in the Convention of a 'public policy' clause.

The inclusion of such a clause was debated at length by the First Commission, under different formulations. Finally, after four votes against inclusion, the Commission accepted, by a majority of only one, that an application for the return of a child could be refused, by reference to a reservation which took into account the public policy exception by way of a restrictive formula concerning the laws governing the family and children in the requested State. The reservation provided for was formulated exactly as follows: 'Contracting States may reserve the right not to return the child when such return would be manifestly incompatible with the

---

A151

*law relating to the family and children in the State addressed*».[15] En adoptant ce texte, on ouvrait une brèche grave dans le *consensus* qui avait présidé fondamentalement jusqu'alors aux travaux de la Conférence; c'est pourquoi, conscientes de ce qu'il fallait trouver une solution largement acceptable, toutes les délégations se sont engagées dans cette voie qui constituait le chemin le plus sûr pour garantir la réussite de la Convention.

32   Le point débattu était particulièrement important, car il reflétait en partie deux conceptions partiellement différentes de l'objectif de la Convention en matière de retour de l'enfant. En effet, jusqu'ici le texte élaboré par la Première commission (en accord avec l'avant-projet préparé par la Commission spéciale) avait limité les exceptions possibles au retour de l'enfant à la considération des situations de fait et de la conduite des parties ou à une appréciation spécifique de l'intérêt de l'enfant. Par contre, la réserve qu'on venait d'accepter impliquait qu'on admettait la possibilité de refuser le retour d'un enfant sur la base d'arguments purement juridiques, tirés du droit interne de l'Etat requis. Droit interne qui aurait pu jouer dans le contexte de la disposition transcrite, soit pour «évaluer» le titre invoqué par le parent dépossédé, soit pour apprécier le bien-fondé juridique de l'action de l'enleveur. Or, de telles conséquences altéraient considérablement un édifice conventionnel construit sur l'idée qu'il fallait éviter le détournement, par voies de fait, de la compétence normale des autorités de la résidence habituelle de l'enfant.

33   Dans cette situation, l'adoption par une majorité[16] rassurante de la formule qui figure à l'article 20 de la Convention représente un louable effort de compromis entre les différentes positions, le rôle accordé à la loi interne de l'Etat de refuge ayant considérablement diminué. D'une part, la référence aux principes fondamentaux concernant la sauvegarde des droits de l'homme et des libertés fondamentales porte sur un secteur du droit où il existe de nombreux compromis internationaux. D'autre part, la règle de l'article 20 va également plus loin que les formules traditionnelles de la clause d'ordre public en ce qui concerne le degré d'incompatibilité existant entre le droit invoqué et l'action envisagée; en effet, pour pouvoir refuser le retour de l'enfant en invoquant le motif qui figure dans cette disposition, l'autorité en question doit constater non seulement l'existence d'une contradiction, mais aussi le fait que les principes protecteurs des droits de l'homme interdisent le retour demandé.

34   Pour clore les considérations sur les problèmes traités à cet alinéa, il semble nécessaire de souligner que les exceptions de trois types au retour de l'enfant doivent être appliquées en tant que telles. Cela implique avant tout qu'elles doivent être interprétées restrictivement si l'on veut éviter que la Convention devienne lettre morte. En effet, la Convention repose dans sa totalité sur le rejet unanime du phénomène des déplacements illicites d'enfants et sur la conviction que la meilleure méthode pour les combattre, au niveau international, est de ne pas leur reconnaître des conséquences juridiques. La mise en pratique de cette méthode exige que les Etats signataires de la Convention soient convaincus de ce qu'ils appartiennent, malgré leurs différences, à une même communauté juridique au sein de laquelle les autorités de chaque Etat reconnaissent que les autorités de l'un d'entre eux — celles de la résidence

fundamental principles of the law relating to the family and children in the State addressed'.[15] The adoption of this text caused a serious breach in the consensus which basically had prevailed up to this point in the Conference proceedings. That is why all the delegations, aware of the fact that a solution commanding wide acceptance had to be found, embarked upon this road which provided the surest guarantee of the success of the Convention.

32   The matter under debate was particularly important since to some extent it reflected two partly different concepts concerning the Convention's objects as regards the return of the child. Actually, up to now the text drawn up by the First Commission (like the Preliminary Draft drawn up by the Special Commission) had limited the possible exceptions to the rule concerning the return of the child to a consideration of factual situations and of the conduct of the parties or to a specific evaluation of the interests of the child. On the other hand, the reservation just accepted implicitly permitted the possibility of the return of a child being refused on the basis of purely legal arguments drawn from the internal law of the requested State. an internal law which could come into play in the context of the quoted provision either to 'evaluate' the right claimed by the dispossessed parent or to assess whether the action of the abductor was well-founded in law. Now, such consequences would alter considerably the structure of the Convention which is based on the idea that the forcible denial of jurisdiction ordinarily possessed by the authorities of the child's habitual residence should be avoided.

33   In this situation, the adoption by a comforting majority[16] of the formula which appears in article 20 of the Convention represents a laudable attempt to compromise between opposing points of view, the role given to the internal law of the State of refuge having been considerably diminished. On the one hand, the reference to the fundamental principles concerning the protection of human rights and fundamental freedoms relates to an area of law in which there are numerous international agreements. On the other hand, the rule in article 20 goes further than the traditional formulation of 'public policy' clauses as regards the extent of incompatibility between the right claimed and the action envisaged. In fact, the authority concerned, in order to be able to refuse to order the return of the child by invoking the grounds which appear in this provision, must show not only that such a contradiction exists, but also that the protective principles of human rights prohibit the return requested.

34   To conclude our consideration of the problems with which this paragraph deals, it would seem necessary to underline the fact that the three types of exception to the rule concerning the return of the child must be applied only so far as they go and no further. This implies above all that they are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter. In fact, the Convention as a whole rests upon the unanimous rejection of this phenomenon of illegal child removals and upon the conviction that the best way to combat them at an international level is to refuse to grant them legal recognition. The practical application of this principle requires that the signatory States be convinced that they belong, despite their differences, to the same legal community within which the authorities of each State acknowledge that the authorities of one of them — those of the child's habitual residence — are in

---

[15] Voir P.-v. No 9 et Doc. trav. connexes.
[16] Le texte a été adopté par 14 suffrages positifs, 6 négatifs et 4 abstentions, voir P.-v. No 13.

[15] See P.-v. No 9 and associated Working Documents.
[16] The text was adopted with 14 votes in favour, 6 against and 4 abstentions, see P.-v. No 13.

---

A152

habituelle de l'enfant – sont en principe les mieux placées pour statuer en toute justice sur les droits de garde et de visite. De sorte qu'une invocation systématique des exceptions mentionnées, substituant ainsi au for de la résidence de l'enfant le for choisi par l'enleveur, fera s'écrouler tout l'édifice conventionnel, en le vidant de l'esprit de confiance mutuelle qui l'a inspiré.

principle best placed to decide upon questions of custody and access. As a result, a systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration.

## II   NATURE DE LA CONVENTION

### A   *Une convention de coopération entre autorités*

35   En délimitant les buts poursuivis par les Etats contractants, les objectifs d'une convention en déterminent en dernier ressort la nature. Ainsi, la Convention sur les aspects civils de l'enlèvement international d'enfants est avant tout une convention qui cherche à éviter les déplacements internationaux d'enfants en instituant une coopération étroite entre les autorités judiciaires et administratives des Etats contractants. Une telle collaboration porte sur les deux objectifs que nous venons d'examiner, d'une part l'obtention du retour immédiat de l'enfant dans le milieu d'où il a été éloigné, d'autre part le respect effectif des droits de garde et de visite existant dans un des Etats contractants.

36   Cette caractérisation de la Convention peut aussi être effectuée à travers une approche négative. Ainsi, nous pouvons constater avant tout qu'il ne s'agit pas d'une convention sur la loi applicable à la garde des enfants. En effet, les références faites au droit de l'Etat de la résidence habituelle de l'enfant ont une portée restreinte, puisque le droit en question n'est pris en considération que pour établir le caractère illicite du déplacement (par exemple, à l'article 3). En second lieu, la Convention n'est pas non plus un traité sur la reconnaissance et l'exécution des décisions en matière de garde. On a sciemment évité cette option, qui a pourtant suscité de longs débats au sein de la première réunion de la Commission spéciale. Etant donné les conséquences sur le fond de la reconnaissance d'une décision étrangère, cette institution est normalement entourée de garanties et d'exceptions qui peuvent prolonger la procédure. Or, en cas de déplacement d'un enfant, le facteur temps prend une importance décisive. En effet, les troubles psychologiques que l'enfant peut subir du fait d'un tel déplacement pourraient se reproduire si la décision sur son retour n'était adoptée qu'après un certain délai.

37   Une fois acquis que nous nous trouvons devant une convention axée sur l'idée de coopération entre autorités, il faut préciser qu'elle n'essaie de régler que les situations entrant dans son domaine d'application et touchant deux ou plusieurs Etats parties. En effet, l'idée d'une convention «universaliste» (c'est-à-dire dont le domaine s'applique à toute espèce internationale) est difficile à soutenir en dehors des conventions en matière de loi applicable. En ce sens, nous devons rappeler que les systèmes prévus, qu'il s'agisse du retour des enfants ou d'assurer l'exercice effectif du droit de visite, s'appuient largement sur une coopération entre les Autorités centrales reposant sur des droits et des devoirs réciproques. De même, quand des particuliers s'adressent directement aux autorités judiciaires ou administratives d'un Etat contractant en invoquant la Convention, l'application des bénéfices conventionnels répond aussi à une idée de réciprocité qui exclut en principe son extension aux ressortissants des Etats tiers.

Par ailleurs, bien que la Convention n'atteigne la plénitude de ses objectifs qu'entre les Etats contractants, les autorités de chacun de ces Etats ont parfaitement le droit de s'inspirer

## II   NATURE OF THE CONVENTION

### A   *A convention of co-operation among authorities*

35   By defining the ends pursued by the Contracting States, a convention's objects in the final analysis determine its nature. Thus, the Convention on the Civil Aspects of International Child Abduction is above all a convention which seeks to prevent the international removal of children by creating a system of close co-operation among the judicial and administrative authorities of the Contracting States. Such collaboration has a bearing on the two objects just examined, *viz.* on the one hand, obtaining the prompt return of the child to the environment from which it was removed, and on the other hand the effective respect for rights of custody and access which exist in one of the Contracting States.

36   This description of the Convention can also be drawn in a negative way. Thus, it can be said at the outset that the Convention is not concerned with the law applicable to the custody of children. In fact, the references to the law of the State of the child's habitual residence are of limited significance, since the law in question is taken into consideration only so as to establish the wrongful nature of the removal (see, for example, article 3). Secondly, the Convention is certainly not a treaty on the recognition and enforcement of decisions on custody. This option, which gave rise to lengthy debates during the first meeting of the Special Commission, was deliberately rejected. Due to the substantive consequences which flow from the recognition of a foreign judgment, such a treaty is ordinarily hedged around by guarantees and exceptions which can prolong the proceedings. Now, where the removal of a child is concerned, the time factor is of decisive importance. In fact, the psychological problems which a child may suffer as a result of its removal could reappear if a decision on its return were to be taken only after some delay.

37   Once it is accepted that we are dealing with a convention which is centred upon the idea of co-operation amongst authorities, it must also be made clear that it is designed to regulate only those situations that come within its scope and which involve two or more Contracting States. Indeed, the idea of a 'universalist' convention (*i.e.* a convention which applies in every international case) is difficult to sustain outwith the realm of conventions on applicable law. In this regard, we must remember that the systems which have been designed either to return children or to secure the actual exercise of access rights, depend largely on co-operation among the Central Authorities, a co-operation which itself rests upon the notion of reciprocal rights and duties. In the same way, when individuals, by invoking the provisions of the Convention, apply directly to the judicial or administrative authorities of a Contracting State, the applicability of the Convention's benefits will itself depend on the concept of reciprocity which in principle excludes its being extended to nationals of third countries.

What is more, although the Convention attains its objectives in full only as among the Contracting States, the authorities in each of those States have the absolute right to be guided

---

A153

des dispositions conventionnelles pour traiter d'autres situations similaires.

### B Caractère autonome de la Convention

38 Axée comme elle l'est sur la notion de coopération entre autorités, en vue d'atteindre des objectifs précis, la Convention est autonome par rapport aux conventions existantes en matière de protection des mineurs ou relatives au droit de garde. Ainsi, l'une des premières décisions prises par la Commission spéciale a été d'orienter ses travaux dans le sens d'une convention indépendante, plutôt que d'élaborer un protocole à la *Convention de La Haye du 5 octobre 1961 concernant la compétence des autorités et la loi applicable en matière de protection des mineurs*. Dans cette même optique, elle ne pouvait pas non plus s'en tenir aux modèles proposés par les conventions sur la reconnaissance et l'exécution des décisions en matière de garde, y compris celui de la Convention du Conseil de l'Europe.[17]

39 Cette autonomie ne signifie pas que les dispositions prétendent régler tous les problèmes posés par les enlèvements internationaux d'enfants. Bien au contraire, dans la mesure où les objectifs de la Convention, quoique ambitieux, ont une portée très concrète, le problème de fond du droit de garde se situe hors du domaine d'application de la Convention. Elle est donc appelée à coexister inévitablement avec les règles sur la loi applicable et sur la reconnaissance et l'exécution des décisions étrangères de chaque Etat contractant, indépendamment du fait que leur source soit interne ou conventionnelle.

D'autre part, même dans son domaine propre, la Convention ne prétend pas être appliquée de façon exclusive; elle désire, avant tout, la réalisation des objectifs conventionnels et reconnaît donc explicitement la possibilité d'invoquer, simultanément à la Convention, toute autre règle juridique qui permette d'obtenir le retour d'un enfant déplacé ou retenu illicitement, ou l'organisation d'un droit de visite (article 34).

### C Rapports avec d'autres conventions

40 La Convention se présente comme un instrument devant apporter une solution d'urgence, en vue d'éviter la consolidation juridique des situations, initialement illicites, provoquées par le déplacement ou le non-retour d'un enfant. Dans la mesure où elle n'essaie pas de trancher sur le fond des droits des parties, sa compatibilité avec d'autres conventions s'impose. Néanmoins, une telle compatibilité ne pouvait être obtenue qu'en assurant l'application prioritaire des dispositions susceptibles de fournir une solution d'urgence et, dans une certaine mesure, provisoire. C'est en effet après le retour de l'enfant à sa résidence habituelle que devront être soulevées, devant les tribunaux compétents, les questions relatives au droit de garde. A ce sujet, l'article 34 déclare que «dans les matières auxquelles elle s'applique, la Convention prévaut sur la *Convention du 5 octobre 1961 concernant la compétence des autorités et la loi applicable en matière de protection des mineurs*, entre les Etats parties aux deux Conventions». D'ailleurs, étant donné qu'on a essayé d'éviter que l'on puisse ajourner l'application des dispositions conventionnelles en invoquant des dispositions qui touchent le fond du droit de garde, le principe incorporé à l'article 34 devrait s'étendre à toute

by the provisions of the Convention when dealing with other, similar situations.

### B The autonomous nature of the Convention

38 The Convention, centred as it is upon the notion of co-operation among authorities with a view to attaining its stated objects, is autonomous as regards existing conventions concerning the protection of minors or custody rights. Thus, one of the first decisions taken by the Special Commission was to direct its proceedings towards the drawing up of an independent Convention, rather than the preparation of a protocol to the *Hague Convention of 5 October 1961 concerning the powers of authorities and the law applicable to the protection of minors*. Seen from this perspective, the Convention could not possibly be confined within the framework provided by the conventions on the recognition and enforcement of custody decisions, including that of the Council of Europe Convention.[17]

39 This autonomous character does not mean that the provisions purport to regulate all the problems arising out of international child abductions. On the contrary, to the extent that the Convention's aims, albeit ambitious, are given concrete expression, the basic problem of custody rights is not to be found within the scope of the Convention. The Convention must necessarily coexist with the rules of each Contracting State on applicable law and on the recognition and enforcement of foreign decrees, quite apart from the fact that such rules are derived from internal law or from treaty provisions.

On the other hand, even within its own sphere of application, the Convention does not purport to be applied in an exclusive way. It seeks, above all, to carry into effect the aims of the Convention and so explicitly recognizes the possibility of a party invoking, along with the provisions of the Convention, any other legal rule which may allow him to obtain the return of a child wrongfully removed or retained, or to organize access rights (article 34).

### C Relations with other conventions

40 The Convention is designed as a means for bringing about speedy solutions so as to prevent the consolidation in law of initially unlawful factual situations, brought about by the removal or retention of a child. In as much as it does not seek to decide upon the merits of the rights of parties, its compatibility with other conventions must be considered. Nonetheless, such compatibility can be achieved only by ensuring that priority is given to those provisions which are likely to bring about a speedy and, to some extent, temporary solution. In fact it is only after the return of the child to its habitual residence that questions of custody rights will arise before the competent tribunals. On this point, article 34 states that 'This Convention shall take priority in matters within its scope over the *Convention of 5 October 1961 concerning the powers of authorities and the law applicable in respect of the protection of minors*, as between Parties to both Conventions.' Moreover, since one is trying to avoid delays in the application of the Convention's provisions caused by claims concerning the merits of custody rights, the principle in article 34 ought to be extended to any provision which has a bearing upon custody rights, whatever the reason. On the other hand, as has just been emphasized in the preceding

---

[17] Il s'agit de la *Convention européenne sur la reconnaissance et l'exécution des décisions en matière de garde des enfants et sur le rétablissement de la garde des enfants*, adoptée par le Comité des Ministres du Conseil de l'Europe le 30 novembre 1979 et ouverte à la signature des Etats membres, au Luxembourg, le 20 mai 1980.

[17] The *European Convention on Recognition and Enforcement of Decisions Concerning Custody of Children and on Restoration of Custody of Children*, adopted by the Committee of Ministers of the Council of Europe on 30 November 1979 and opened for signing by the Member States at Luxemburg on 20 May 1980.

---

A154

disposition portant sur le droit de garde, quelle qu'en soit la source. Par contre, comme nous venons de le souligner au paragraphe précédent, les parties peuvent faire appel à toute règle qui facilite la réalisation des objectifs conventionnels.

### D   Ouverture de la Convention aux Etats non-membres de la Conférence de La Haye

41   Sur ce point aussi, la Convention s'est manifestée en tant que Convention de coopération, en déterminant son caractère semi-ouvert. En principe, tout Etat pourra adhérer à la Convention, mais son adhésion «n'aura d'effet que dans les rapports entre l'Etat adhérant et les Etats contractants qui auront déclaré accepter cette adhésion» (article 38). En agissant de la sorte, les Etats contractants ont cherché à maintenir l'équilibre nécessaire entre le désir d'universalisme et la conviction qu'un système de coopération n'est efficace que lorsqu'il existe entre les Parties un degré de confiance mutuelle suffisant.

Plus encore, le choix du système de l'acceptation explicite de l'adhésion par chaque Etat membre, afin que celle-ci devienne effective à leur égard,[18] de préférence au système, plus ouvert, qui entend que l'adhésion produit ses effets sauf dans les rapports avec l'Etat membre qui s'y oppose dans un délai fixé,[19] montre l'importance accordée par les Etats à la sélection de ses cocontractants dans la matière qui fait l'objet de la Convention.

### III   INSTRUMENTS D'APPLICATION DE LA CONVENTION

#### A   Les Autorités centrales

42   Une convention de coopération comme celle qui nous occupe peut en principe s'orienter dans deux directions différentes: imposer la coopération directe entre les autorités internes compétentes dans le domaine d'application de la Convention, ou baser son action sur la création d'Autorités centrales dans chaque Etat contractant, en vue de coordonner et de canaliser la coopération souhaitée. L'avant-projet mis au point par la Commission spéciale consacrait assez nettement le choix fait en faveur de la deuxième option et la Convention elle-même continue à être bâtie, dans une large mesure, sur l'intervention et les compétences des Autorités centrales.

43   Néanmoins, l'admission sans équivoque de la possibilité reconnue aux particuliers de s'adresser directement aux autorités judiciaires ou administratives compétentes dans l'application de la Convention (article 29), accroît l'importance du devoir qui est fait à celles-ci de coopérer, à tel point qu'on pourra qualifier de «système mixte» le système suivi par la Convention du fait qu'en marge des obligations des Autorités centrales, il en introduit d'autres qui sont propres aux autorités judiciaires ou administratives.

44   D'ailleurs, ce serait une erreur de prétendre construire une convention pour lutter contre les enlèvements internationaux d'enfants sans tenir compte du rôle important joué par les autorités judiciaires ou administratives internes dans toutes les questions concernant la protection des mineurs.

paragraph, the parties may have recourse to any rule which promotes the realization of the Convention's aims.

### D   Opening of the Convention to States not Members of the Hague Conference

41   On this point also, by virtue of the decision that it be of a 'semi-open' type, the Convention is shown to be one of co-operation. In principle, any State can accede to the Convention, but its accession 'will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession' (article 38). The Contracting States, by this means, sought to maintain the requisite balance between a desire for universality and the belief that a system based on co-operation could work only if there existed amongst the Contracting Parties a  sufficient degree of mutual confidence.

What is more, the choice of a system based on the express acceptance of accession by each Member State, by which such acceptance becomes effective as a amongst themselves,[18] in preference to a more open system by which accession has effect except as regards Member States which raise objections thereto within a certain period of time,[19] demonstrates the importance which the States attached to the selection of their co-signatories in those questions which form the subject-matter of the Convention.

### III   INSTRUMENTS FOR APPLYING THE CONVENTION

#### A   The Central Authorities

42   A convention based on co-operation such as the one which concerns us here can in theory point in two different directions; it can impose direct co-operation among competent internal authorities, in the sphere of the Convention's application, or it can act through the creation of Central Authorities in each Contracting State, so as to co-ordinate and 'channel' the desired co-operation. The Preliminary Draft drawn up by the Special Commission expressed  quite clearly the choice made in favour of the second option, and the Convention itself was also built in large measure upon the intervention and powers of Central Authorities.

43   Nevertheless, the unequivocal acceptance of the possibility for individuals to apply directly to the judicial or administrative authorities which have power to apply the provisions of the Convention (article 29), increases the importance of the duty of co-operation laid upon them, so much so that the system adopted by the Convention could be characterized as a 'mixed system', due to the fact that, aside from the duties imposed upon the Central Authorities, it creates other obligations which are peculiar to judicial or administrative authorities.

44   What is more, it would be a mistake to claim to have constructed a convention to counter international child abduction without taking account of the important role played by the internal judicial or administrative authorities in all matters concerning the protection of minors. In this context,

---

[18] A l'instar de l'article 39 de la *Convention sur l'obtention des preuves à l'étranger en matière civile ou commerciale, du 18 mars 1970*, voir P.-v. No 13.
[19] Système consacré, parmi d'autres, dans la *Convention tendant à faciliter l'accès international à la justice*, adopté également au cours de la Quatorzième session de la Conference.

[18] As in article 39 of the *Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters*, see P.- v. No 13.
[19] The system adopted, among others, by the *Convention on International Access to Justice*, also adopted during the Fourteenth Session of the Conference.

---

A155

Dans ce contexte, la référence aux autorités administratives doit être comprise comme le simple reflet du fait que, dans certains Etats membres de la Conférence, cette tâche est confiée à de telles autorités d'une telle nature, tandis que dans la plupart des systèmes juridiques la compétence en la matière appartient aux autorités judiciaires. Somme toute, c'est aux autorités chargées à l'intérieur de chaque Etat de statuer sur la garde et la protection des enfants que la Convention confie le soin de trancher les problèmes posés, qu'il s'agisse du retour d'un enfant déplacé ou retenu illicitement, ou de l'organisation de l'exercice du droit de visite. Ainsi, la Convention fait sienne l'exigence de sécurité juridique qui inspire dans ce domaine tous les droits internes. En effet, quoique les décisions sur le retour des enfants ne préjugent pas du fond du droit de garde (voir article 19), elles vont largement influencer la vie des enfants; l'adoption de telles décisions, la prise d'une semblable responsabilité doivent obligatoirement revenir aux autorités qui sont normalement compétentes selon le droit interne.

45   Cependant, dans ses grandes lignes et dans une large majorité des cas, l'application de la Convention dépendra du fonctionnement des instruments qu'elle-même instituera à cette fin, c'est-à-dire des Autorités centrales. En ce qui concerne leur réglementation par la Convention, la première remarque à faire est que la Conférence a eu conscience des différences profondes existant dans l'organisation interne des Etats membres; c'est la raison pour laquelle la Convention ne précise point quelles doivent être la structure et la capacité d'action des Autorités centrales, deux aspects qui seront nécessairement régis par la loi interne de chaque Etat contractant. L'acceptation de cette prémisse se traduit dans la Convention par la reconnaissance du fait que les tâches assignées en particulier aux Autorités centrales pourront être accomplies soit directement par elles-mêmes, soit avec le concours d'un intermédiaire (article 7). Il est évident, par exemple, que la localisation d'un enfant peut requérir l'intervention de la police; de même, l'adoption de mesures provisoires ou l'introduction de procédures judiciaires sur des rapports privés peuvent tomber hors des compétences susceptibles d'être dévolues aux autorités administratives par certaines lois internes. Néanmoins, dans tous les cas, l'Autorité centrale reste le destinataire des obligations que la Convention lui impose, en tant que «monteur» de la coopération voulue pour lutter contre les déplacements illicites d'enfants. D'autre part, c'est encore pour tenir compte des particularités des différents systèmes juridiques que la Convention admet que l'Autorité centrale pourra exiger que la demande qui lui est adressée soit accompagnée d'une autorisation «par écrit lui donnant le pouvoir d'agir pour le compte du demandeur, ou de désigner un représentant habilité à agir en son nom» (article 28).

46   Par ailleurs, la Convention, suivant une tradition bien établie de la Conférence de La Haye,[20] dispose que tant les Etats fédéraux que les Etats plurilégislatifs ou ayant des organisations territoriales autonomes sont libres de désigner plus d'une Autorité centrale. Pourtant, les problèmes constatés dans l'application pratique des conventions qui prévoient l'existence de plusieurs Autorités centrales sur le territoire d'un seul Etat, ainsi que, tout particulièrement, les caractéristiques spéciales de la matière qui fait l'objet de la présente Convention, ont amené la Conférence, suivant le critère déjà établi par la Commission spéciale, à faire un pas

references to administrative authorities must be understood as a simple reflection of the fact that, in certain Member States, the task in question is entrusted to such authorities, while in the majority of legal systems jurisdiction belongs to the judicial authorities. In fine, it is for the appropriate authorities within each State to decide questions of custody and protection of minors; it is to them that the Convention has entrusted the responsibility of solving the problems which arise, whether they involve the return of a child wrongfully removed or retained or organizing the exercise of access rights. Thus, the Convention adopts the demand for legal certainty which inspires all internal laws in this regard. In fact, although decisions concerning the return of children in no way prejudge the merits of any custody issue (see article 19), they will in large measure influence children's lives; such decisions and such responsibilities necessarily belong ultimately to the authorities which ordinarily have jurisdiction according to internal law.

45   However, the application of the Convention, both in its broad outline and in the great majority of cases, will depend on the working of the instruments which were brought into being for this purpose, i.e. the Central Authorities. So far as their regulation by the Convention is concerned, the first point to be made is that the Conference was aware of the profound differences which existed as regards the internal organization of the Contracting States. That is why the Convention does not define the structure and capacity to act of the Central Authorities, both of which are necessarily governed by the internal law of each Contracting State. Acceptance of this premise is shown in the Convention by its recognition of the fact that the tasks specifically assigned to Central Authorities can be performed either by themselves, or with the assistance of intermediaries (article 7). For example, it is clear that discovering a child's whereabouts may require the intervention of the police; similarly, the adoption of provisional measures or the institution of legal proceedings concerning private relationships may fall outwith the scope of those powers which can be devolved upon administrative authorities in terms of some internal laws. Nonetheless, the Central Authority in every case remains the repository of those duties which the Convention imposes upon it, to the extent of its being the 'engine' for the desired co-operation which is designed to counter the wrongful removal of children. On the other hand, it is so as to take account of the peculiarities of different legal systems that the Convention allows a Central Authority to require that applications addressed to it be accompanied by a 'written authorization empowering it to act on behalf of the applicant, or to designate a representative so to act' (article 28).

46   In other respects, the Convention follows a long-established tradition of the Hague Conference,[20] by providing that States with more than one system of law or which have autonomous territorial organizations, as well as Federal States, are free to appoint more than one Central Authority. However, the problems encountered in the practical application of those Conventions which provide for several Central Authorities within the territory of a single State, as well as, in particular, the special characteristics of the subject-matter of this Convention, led the Conference to adopt the text previously established by the Special Commission and

---

[20] Par exemple, cf. l'article 18, troisième alinéa de la *Convention relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale, du 15 novembre 1965. Id.* les articles 24 et 25 de la *Convention sur l'obtention des preuves à l'étranger en matière civile ou commerciale, du 18 mars 1970.*

[20] Compare, for example, article 18(3) of the *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.* Also, articles 24 and 25 of the *Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters.*

---

A156

en avant vers une sorte de «hiérarchisation» des Autorités centrales dans ces Etats. En effet, en nous limitant au deuxième aspect mentionné, si la personne qui a déplacé ou retenu un enfant se sert de l'extrême facilité des communications à l'intérieur d'un Etat, le demandeur ou l'Autorité centrale de l'Etat requérant pourraient être contraints de répéter plusieurs fois leur demande en vue d'obtenir le retour de l'enfant; de surcroît, il existe la possibilité que, même en ayant des raisons sérieuses de croire que l'enfant se trouve dans un Etat contractant, on ignore quelle est l'unité territoriale de sa résidence.

47   Pour fournir une solution à ces situations et à d'autres similaires, la Convention prévoit que les Etats qui établissent plus d'une Autorité centrale, désigneront simultanément «l'Autorité centrale à laquelle les demandes peuvent être adressées en vue de leur transmission à l'Autorité centrale compétente au sein de cet Etat» (article 6). La question est importante, du fait que la Convention limite, dans le temps, l'obligation imposée aux autorités judiciaires ou administratives de l'Etat requis, en ce qui concerne le retour immédiat de l'enfant;[21] une erreur dans le choix de l'Autorité centrale requise peut donc avoir des conséquences décisives pour les prétentions des parties. Or, pour éviter qu'un facteur non prévu par la Convention en modifie l'application normale, il faudra que cette sorte de «super Autorité centrale», envisagée à l'article 6, adopte une attitude active. En effet, puisqu'elle devra servir de pont entre l'Autorité centrale de son propre Etat qui est compétente dans chaque cas d'espèce d'une part, et les Autorités centrales des autres Etats contractants d'autre part, elle se verra contrainte de choisir entre procéder à la localisation de l'enfant pour pouvoir transmettre l'affaire à l'Autorité centrale adéquate, ou transmettre une copie de la demande à toutes les Autorités centrales de l'Etat, ce qui provoquera inévitablement une multiplication des services bureaucratiques. Mais il est hors de doute qu'une telle Autorité centrale jouera un rôle fondamental dans l'application de la Convention quant aux rapports qui affectent les Etats susmentionnés.

B   *La formule modèle*

48   Suivant en cela la décision prise par la Commission spéciale lors de sa seconde réunion, la Quatorzième session de la Conférence a adopté, en même temps que la Convention, une Recommandation qui incorpore une formule modèle pour les demandes en vue du retour des enfants déplacés ou retenus illicitement. A son sujet, il convient de faire deux remarques. La première concerne la valeur juridique de la Recommandation en question: pour l'établir, il semble souhaitable de recourir au droit général des organisations internationales. Or, dans cette optique, une recommandation est en substance une invitation non contraignante adressée par une organisation internationale à un, plusieurs ou tous les Etats membres. Par conséquent, les Etats ne sont pas tenus *stricto sensu* d'utiliser la formule modèle contenue dans cette Recommandation; on a même soigneusement évité de la présenter comme une annexe à la Convention.

Les motifs en sont évidents. Avant tout, étant donné l'absence d'expérience internationale préalable dans le domaine couvert par la Convention, on peut penser qu'après quelques années l'application pratique des dispositions

take a step towards creating a sort of 'hierarchy' of Central Authorities in those States. In fact, by confining our discussion to the latter point, we can see that if the person responsible for the removal or retention of a child avails himself of the excellent means of communication within a particular State, the applicant or Central Authority of the requesting State could be forced to re-apply several times in order to obtain the return of the child. Moreover, it is still possible that, even  if there are valid reasons for believing that the child is in a Contracting State, the territorial unit of the child's residence will be ignored.

47   The Convention supplies a solution to these and other situations by providing that States which establish more than one Central Authority should at the same time designate 'the Central Authority to which applications may be addressed for transmission to the appropriate Central Authority within that State' (article 6). The matter is important, because the Convention imposes a time-limit upon the duty of judicial or administrative authorities in the requested State for the prompt return of the child;[21] a mistaken choice as to the requested Central Authority could therefore have decisive consequences for the claims of the parties. Now, so as to prevent a factor which was not provided for in the Convention modifying the Convention's normal application, this type of 'super-Central Authority' envisaged in article 6 will have to adopt a positive approach. As a matter of fact, if it is to act as a bridge between on the one hand the Central Authority of its own State which has jurisdiction in each particular case, and on the other hand the Central Authorities of the other Contracting States, it will find itself obliged to choose between proceeding to locate a child in order to transmit the matter to the appropriate Central Authority, and transmitting a copy of the application to all the Central Authorities of the State concerned, which would inevitably cause a great increase in administrative duties. However it is undoubtedly the case that such a Central Authority will play a fundamental role in the application of the Convention in regard to relations affecting the aforementioned States.

B   *The model form*

48   Following the decision taken by the Special Commission at its second meeting, the Fourteenth Session of the Conference adopted simultaneously with adoption of the Convention, a Recommendation containing a model form for applications for the return of children wrongfully removed or retained. Two comments are appropriate here. The first concerns the legal force of this Recommendation. In drawing it up, it seemed advisable to have recourse to the general law governing international organizations. Now, viewed from this perspective, a recommendation is in substance a non-obligatory invitation addressed by one international organization to one, several or all Member States. Consequently, States are not strictly required to make use of the model form contained in the Recommendation; indeed, the Commission took care to avoid presenting the form as an annex to the Convention.

The reasons for this are clear. Most importantly, given the lack of prior international experience in this field, it can well be imagined that, after a number of years, the practical application of the Convention's provisions will result in

---

[21]  *Cf. infra*, commentaire de l'article 12 de la Convention.

[21]  *Cf. infra*, the commentary on article 12 of the Convention.

---

A157

conventionnelles amène à conseiller l'introduction de certaines modifications dans la formule adoptée. Or, il semble préférable de ne pas soumettre une éventuelle révision du texte aux formalités qu'exigerait le droit international public en matière de révision des traités internationaux. On peut d'ailleurs soutenir qu'en marge d'une future action concertée de la Conférence sur ce point, l'adaptation de la formule recommandée aux Etats pourra aussi être l'œuvre des contacts bilatéraux entrepris par les Autorités centrales, en exécution de l'obligation générale visée à l'article 7, alinéa 2, lettre *i*.

D'autre part, une conséquence directe de la décision de ne pas rendre obligatoire l'emploi de la formule modèle est que la Convention contient une énumération des données que doit nécessairement inclure toute demande adressée à une Autorité centrale (article 8).

49   La deuxième remarque porte sur le domaine d'application et sur la teneur de la formule recommandée. En effet, bien que la Convention règle aussi des aspects importants concernant le droit de visite, la formule proposée se limite à offrir une requête modèle en vue du retour de l'enfant. Ceci montre la polarisation de l'intérêt de la Conférence sur la solution des problèmes posés après le déplacement de l'enfant, tout en mettant en relief l'originalité de la voie choisie pour y parvenir. C'est justement parce que cette voie est nouvelle qu'on a cru souhaitable d'insérer une indication concernant son mode d'utilisation.

50   Quant à la teneur de la formule, elle développe très justement les éléments exigés par la Convention; pourtant, nous voudrions attirer l'attention sur deux points mineurs. D'abord, sur la mention «date et lieu du mariage» des parents de l'enfant concerné: dans la mesure où elle n'est pas suivie, entre parenthèses, de l'expression «s'il y a lieu», il semble qu'on donne un traitement exceptionnel et discriminatoire à la situation des enfants naturels. D'ailleurs, l'absence de cette même expression à côté de la référence à la date et au lieu de naissance de l'enfant s'accorde mal avec la précision dont fait preuve sur ce point l'article 8 de la Convention, quand il ajoute en se référant à la date de naissance, «s'il est possible de se la procurer».

51   D'autre part, on constate un manque de concordance entre le texte français et le texte anglais, du point de vue des «renseignements concernant la personne dont il est allégué qu'elle a enlevé ou retenu l'enfant». A cet égard, il semble préférable de suivre le texte anglais, plus complet, surtout en ce qui concerne la mention de la nationalité du prétendu enleveur, un élément qui sera parfois décisif dans la localisation de l'enfant.

certain modifications to the present form being thought advisable. Now, it seems better not to subject future revisions of the text to the formalities required by public international law for the revision of international treaties. Besides, it could be said, in connection with any future concerted action by the Conference in this regard, that adaptation of the form which was recommended to States should also be a matter for bilateral negotiations between Central Authorities, in implementation of their general obligation contained in article 7(2)(*i*).

On the other hand, a direct consequence of the decision not to make the use of the model form obligatory is the catalogue of details which every application to a Central Authority must contain (article 8).

49   The second comment bears upon the sphere of application and the terms of the recommended form. Although the Convention also governs important matters concerning access rights, the model form proposed is merely a model application for the return of the child. This demonstrates the concentration of interest within the Conference on the resolution of problems arising out of the removal of a child, whilst at the same time throwing into relief the novelty of the means chosen to resolve them. It is precisely because the means are new that it was thought advisable to include some indication of the way in which they should be used.

50   The actual terms of the form narrate precisely those points required by the Convention itself. We should however like to draw attention to two minor points. Firstly, the phrase 'date and place of marriage' of the parents of the child in question: in as much as it is not followed, in parentheses, by the words 'if any', it would seem to treat natural children in an exceptional and discriminatory fashion. Moreover, the absence of the same phrase alongside the reference to the date and place of birth of the child compares badly with the precision shown by article 8 of the Convention which adds, referring to the date of birth, the words 'where available'.

51   Secondly, there is an inconsistency between the French and English texts regarding the 'information concerning the person alleged to have removed or retained the child'. It would be advisable to follow the English text here, since it is more comprehensive, especially as regards its reference to the nationality of the alleged 'abductor', a fact which will sometimes prove decisive in efforts to locate the child.

IV   STRUCTURE ET TERMINOLOGIE

A   *La structure de la Convention*

52   Les articles 1, 2, 3 et 5 définissent le domaine d'application matériel de la Convention, en précisant ses objectifs et les conditions requises pour pouvoir considérer que le déplacement ou le non-retour d'un enfant sont illicites. L'article 4 s'attache au domaine d'application personnel de la Convention, tandis que l'article 35 détermine son application dans le temps. Les articles 6 et 7 sont consacrés à la création des Autorités centrales et à leurs obligations. Les articles 8, 27 et 28 se réfèrent à la saisine des Autorités centrales et aux documents qui peuvent accompagner ou compléter une demande qui leur aurait été présentée. Les articles 9 à 12 et 14 à 19 établissent les différentes voies instaurées pour obtenir le retour d'un enfant, ainsi que de la portée juridique d'une décision à cet effet. Les articles 13 et 20 s'occupent des exceptions à l'obligation générale de renvoyer l'enfant. L'article 21 établit les devoirs spécifiques

IV   STRUCTURE AND TERMINOLOGY

A   *The structure of the Convention*

52   Articles 1, 2, 3 and 5 define the Convention's scope with regard to its subject-matter, by specifying its aims and the criteria by which the removal or retention of a child can be regarded as wrongful. Article 4 concerns the persons to whom the Convention applies, while article 35 determines its temporal application. Articles 6 and 7 are devoted to the creation of the Central Authorities and their duties. Articles 8, 27 and 28 are concerned with applications to Central Authorities and the documents which may accompany or supplement an application to them. Articles 9 to 12, and 14 to 19, deal with the various means established for bringing about the return of a child, as well as the legal significance of a decree to that effect. Articles 13 and 20 concern the exceptions to the general rule for the return of the child. Article 21 lays down the specific duties which the States have taken upon themselves with regard to access rights.

A158

assumés par les Etats à l'égard du droit de visite. Les articles 22 à 26 et 30 (ainsi que les articles 27 et 28 susmentionnés) s'occupent de certains aspects techniques concernant la procédure et les frais qui peuvent découler des demandes introduites par l'application de la Convention. Les articles 29 et 36 reflètent le point de vue non exclusif qui a présidé à l'élaboration de la Convention en précisant, d'une part l'action directe possible des particuliers devant les autorités judiciaires ou administratives des Etats contractants, hors du cadre des dispositions conventionnelles, et d'autre part la faculté reconnue aux Etats contractants de déroger conventionnellement aux restrictions auxquelles le retour de l'enfant peut être soumis d'après la présente Convention. Les articles 31 à 34 ont trait aux Etats plurilégislatifs et aux rapports avec d'autres conventions. Finalement, les articles 37 à 45 contiennent les clauses finales.

## B   Terminologie utilisée par la Convention

53   Selon une tradition bien établie de la Conférence de La Haye, la Convention a évité de définir les termes utilisés, sauf ceux contenus à l'article 5 sur les notions de droit de garde et de droit de visite, indispensables pour établir le domaine d'application matériel de la Convention. Ceci sera examiné dans son contexte. Nous voulons simplement considérer ici un aspect qui concerne la terminologie et qui mérite, à notre avis, un bref commentaire. Il s'agit du manque de concordance entre le titre de la Convention et la terminologie utilisée dans son texte. En effet, tandis que le premier emploie l'expression «enlèvement international d'enfants», les dispositions conventionnelles ont recours à des périphrases ou, en tous cas, à des tournures moins évocatrices, telles que «déplacement» ou «non-retour». L'explication est directement en rapport avec la délimitation du domaine de la Convention. Sur ce point, comme nous l'avons souligné ci-dessus (voir Nos 12 à 16), une étude du sujet dont s'occupe la Convention met en relief qu'en ce qui concerne aussi bien les rapports normalement existants entre «enleveur» et «enfant» que les intentions du premier, nous sommes fort loin des délits visés sous les dénominations d'«enlèvement», «kidnapping» ou «secuestro». Comme on est fort éloignés des problèmes propres au droit pénal, on a donc évité d'utiliser dans le texte de la Convention des appellations pouvant avoir une signification équivoque. Par contre, on a cru souhaitable de retenir le terme d'«enlèvement» dans le titre de la Convention, étant donné son emploi habituel par les «mass-media» et son retentissement dans l'opinion publique. Néanmoins, pour éviter toute équivoque, ce même titre précise, comme le faisait déjà le titre de l'avant-projet, que la Convention n'a pour objet que de régler les «aspects civils» du phénomène visé. Si tout au long de ce Rapport nous employons de temps en temps des expressions telles qu'«enlèvement» ou «enleveur», comme on les trouve d'ailleurs dans la formule modèle, c'est parce qu'elles permettent parfois une rédaction plus aisée; mais il faudra en tout état de cause les entendre avec les nuances que comporte leur application au problème spécifique dont la Convention s'occupe.

## Deuxième partie — Commentaire des articles de la Convention

CHAPITRE PREMIER — CHAMP D'APPLICATION DE LA CONVENTION

54   Le chapitre premier définit le domaine d'application de la Convention quant à la matière et aux personnes concernées (domaine d'application *ratione materiae* et *ratione*

Articles 22 to 26 and 30 (like the aforementioned articles 27 and 28) deal with certain technical matters regarding proceedings and the costs which can result from applications submitted pursuant to the provisions of the Convention. Articles 29 and 36 reflect the 'non-exclusive' view which prevailed during the preparation of the Convention in stating, on the one hand, that applications may be submitted directly by individuals to the judicial or administrative authorities of the Contracting States, outwith the framework of the provisions of the Convention, and on the other hand that Contracting States have the acknowledged right to derogate by agreement from the restrictions which the present Convention allows to be imposed upon the return of the child. Articles 31 to 34 refer to States with more than one system of law and to the Convention's relations with other conventions. Lastly, articles 37 to 45 contain the Final Clauses.

## B   Terminology used in the Convention

53   Following a long-established tradition of the Hague Conference, the Convention avoided defining its terms, with the exception of those in article 5 concerning custody and access rights, where it was absolutely necessary to establish the scope of the Convention's subject-matter. These will be examined in their context. At this point we wish merely to consider one aspect of the terminology used which in our opinion merits a brief comment. It has to do with lack of correspondence between the title of the Convention and the terms used in the text. Whilst the former uses the phrase 'international child abduction', the provisions of the Convention avail themselves of circumlocutions or at any event of less evocative turns of phrase, such as 'removal' or 'retention'. The reason for this is quite in keeping with the Convention's limited scope. As was stressed above (see Nos 12 to 16), studies of the topic with which the Convention deals show clearly that, with regard both to the relationship which normally exists between 'abductor' and 'child' and to the intentions of the former, we are far removed from the offences associated with the terms 'kidnapping', *'enlèvement'* or *'secuestro'*. Since one is far removed from problems peculiar to the criminal law, the use in the text of the Convention of possibly ambiguous terms was avoided.

On the other hand, it was felt desirable to keep the term 'abduction' in the title of the Convention, owing to its habitual use by the 'mass media' and its resonance in the public mind. Nonetheless, so as to avoid any ambiguity, the same title, as in the Preliminary Draft, states clearly that the Convention only aims to regulate the 'civil aspects' of this particular phenomenon. If, in the course of this Report, expressions such as 'abduction' or 'abductor' are used from time to time, and one will find them also in the model form, that is because they sometimes permit of easier drafting; but at all events, they will have to be understood to contain nuances which their application to the specific problem with which the Convention deals may call for.

## Second Part — Commentary on the specific articles of the Convention

CHAPTER ONE — SCOPE OF THE CONVENTION

54   The first chapter defines the scope of the Convention as regards its subject-matter and the persons concerned (its scope *ratione materiae* and *ratione personae*). However, so as

A159

*personae*). Cependant, pour avoir une perspective globale du domaine conventionnel, il faut considérer aussi l'article 34 sur les relations avec d'autres conventions, l'article 35 concernant son domaine d'application dans le temps et les articles 31 à 33 qui ont trait à l'application de la Convention dans les Etats plurilégislatifs.

to have an overall picture of the Convention's scope, one must consider also article 34 which deals with the Convention's relationship with other conventions, article 35 which concerns the Convention's temporal application, and articles 31 to 33 which relate to the application of the Convention in States with more than one legal system.

*Article premier — Les objectifs de la Convention*

*a   Observations générales*

55   Cet article expose en deux paragraphes les objectifs conventionnels que nous avons traités assez largement dans la première partie de ce Rapport. Il est donc évident que l'absence de parallélisme entre le titre et le contenu de la Convention va plus loin que la question purement terminologique.[22] De toute façon, il faut reconnaître que les termes employés dans le titre, malgré leur manque de rigueur juridique, ont un pouvoir évocateur et une force qui attirent l'attention, ce qui est l'essentiel.

56   En ce qui concerne la nature des espèces réglées, une remarque de portée générale s'impose. Quoique la Convention n'inclue aucune disposition proclamant le caractère international des situations envisagées, une telle conclusion découle aussi bien du titre que des divers articles. Or, dans le cas présent, le caractère international provient d'une situation de fait, à savoir de la dispersion des membres d'une famille entre différents pays. Une situation purement interne lors de sa naissance peut donc tomber dans le domaine d'application de la Convention par le fait, par exemple, qu'un des membres de la famille se soit déplacé à l'étranger avec l'enfant, ou du désir d'exercer un droit de visite dans un autre pays où réside la personne qui prétend avoir ce droit. Par contre, la différence de nationalité des personnes concernées n'implique pas nécessairement que nous soyons devant un cas d'espèce international auquel la Convention doive s'appliquer, bien qu'il s'agisse d'un indice clair d'une internationalisation possible, au sens où nous l'avons décrit.

*Article 1 — The aims of the Convention*

*a   General observations*

55   This article sets out in two paragraphs the objects of the Convention which were discussed in broad terms in the first part of this Report. It is therefore clear that the lack of correspondence between the title and the specific provisions of the Convention is more than merely a matter of terminology.[22] In any event, it must be realized that the terms used in the title, while lacking legal exactitude, possess an evocative power and force which attract attention, and this is essential.

56   As for the nature of the matters regulated by the Convention, one general remark is required. Although the Convention does not contain any provision which expressly states the international nature of the situations envisaged, such a conclusion derives as much from its title as from its various articles. Now, in the present case, the international nature of the Convention arises out of a factual situation, that is to say the dispersal of members of a family among different countries. A situation which was purely internal to start with can therefore come within the scope of the Convention through, for example, one of the members of the family going abroad with the child, or through a desire to exercise access rights in a country other than that in which the person who claims those rights lives. On the other hand, the fact that the persons concerned hold different nationality does not necessarily mean that the international type of case to which the Convention applies automatically will arise, although it would clearly indicate the possibility of its becoming 'international' in the sense described.

*b   Lettre a*

57   L'objectif d'assurer le retour immédiat des enfants déplacés ou retenus illicitement a été déjà longuement présenté. D'ailleurs, la Quatorzième session n'a changé en rien la teneur littérale de la formule élaborée par la Commission spéciale. Nous ne ferons donc ici que deux brèves considérations d'éclaircissement relatives à son libellé. La première concerne la caractérisation des comportements que l'on voudrait éviter par la réalisation de cet objectif. En résumé comme nous le savons déjà, il s'agit de toute conduite qui altère les rapports familiaux existant avant ou après toute décision judiciaire, en utilisant un enfant, transformé par ce fait en instrument et principale victime de la situation. Dans ce contexte, la référence aux enfants «retenus illicitement» entend couvrir les cas où l'enfant qui se trouvait dans un lieu autre que celui de sa résidence habituelle — avec le consentement de la personne qui exerçait normalement sa garde — n'est pas renvoyé par la personne avec laquelle il séjournait. C'est la situation type qui se produit quand le déplacement de l'enfant est la conséquence d'un exercice abusif du droit de visite.

*b   Sub-paragraph a*

57   The aim of ensuring the prompt return of children wrongfully removed or retained has already been dealt with at length. Besides, the Fourteenth Session in no way altered the literal meaning of the wording devised by the Special Commission. Thus only two brief points by way of explanation will be put forward here. The first concerns the characterization of the behaviour which the realization of this objective seeks to prevent. To sum up, as we know, the conduct concerned is that which changes the family relationships which existed before or after any judicial decision, by using a child and thus turning it into an instrument and principal victim of the situation. In this context, the reference to children 'wrongfully retained' is meant to cover those cases where the child, with the consent of the person who normally has custody, is in a place other than its place of habitual residence and is not returned by the person with whom it was staying. This is the typical situation which comes about when the removal of the child results from the wrongful exercise of access rights.

[22] Voir sur ce point Rapport de la Commission spéciale. No 52.

[22] See the Report of the Special Commission. No 52.

58  En second lieu, le texte commenté précise que les enfants dont on essaie d'assurer le retour sont ceux qui ont été déplacés ou retenus «dans tout Etat contractant». Une telle précision a une double signification. D'une part, en ce qui concerne la disposition contenue à l'article 4, elle délimite le domaine d'application *ratione personae* de la Convention aux enfants qui, ayant leur résidence habituelle dans un des Etats contractants, sont déplacés ou retenus sur le territoire d'un autre Etat contractant.

59  Mais ces quelques mots ont aussi une signification toute différente. En effet, par ce biais, l'objectif de la Convention examinée, considéré en soi ou par rapport à la disposition de l'article 2, devient général, c'est-à-dire applicable à tous les enfants qui, dans les conditions décrites, se trouvent dans un Etat contractant. Pourtant, il y aura toujours une différence dans la situation juridique entre les enfants qui avaient leur résidence habituelle, avant le déplacement, dans un autre Etat contractant et les autres enfants. Ainsi, la situation des premiers devra être résolue par application directe des dispositions conventionnelles. Par contre, l'obligation des Etats envers les autres sera plus nuancée, dans la mesure où elle découlerait (abstraction faite de la législation interne) du devoir consacré par l'article 2, qui pourrait être décrit comme celui de prendre les mesures appropriées pour éviter que leurs territoires ne se convertissent en lieux de refuge d'éventuels «enleveurs».

*c   Lettre b*

60  L'objectif conventionnel visé à ce sous-alinéa a été clarifié dans la rédaction qu'il a reçue lors de la Quatorzième session.[23] En ce qui concerne son domaine, il est maintenant manifeste que les situations considérées sont les mêmes que celles auxquelles s'applique la Convention, c'est-à-dire les situations internationales qui mettent en relation deux ou plusieurs Etats contractants. La précision n'est pas superflue, surtout si l'on tient compte du fait que le texte de l'avant-projet permettait d'autres interprétations, notamment la référence à des situations internes.

61  Quant à savoir quelle est la portée qu'on a voulu donner à l'objectif qui y est consacré, il s'impose de faire une distinction entre droit de garde et droit de visite. En ce qui concerne le droit de garde, on peut dire que la Convention n'a pas essayé de le développer de manière autonome. C'est donc dans l'obligation générale exprimée dans l'article 2, ainsi que dans la régulation du retour de l'enfant – basée, comme nous le verrons dans le cadre du commentaire à l'article 3, sur le respect d'un droit de garde effectivement exercé et attribué par le droit de l'Etat de la résidence habituelle – qu'on doit trouver la suite de la disposition qui nous occupe à cet égard. Par contre, le droit de visite a eu un sort plus favorable et les bases sur lesquelles doit se construire son respect effectif apparaissent fixées, au moins dans leurs grandes lignes, dans le contexte de l'article 21.

*Article 2 – Obligation générale des Etats contractants*

62  En étroite relation avec les objectifs vastes et souples de l'article 1b, cet article consacre une obligation générale de comportement des Etats contractants; il s'agit donc d'une obligation qui, à l'encontre des obligations de résultat, normalement inclus dans une convention, n'exige pas de

---

58  Secondly, the text states clearly that the children whose return it is sought to secure are those who have been removed to, or retained in, 'any Contracting State'. This wording is doubly significant. On the one hand, the provision in article 4 limits the scope of the Convention *ratione personae* to those children who, while being habitually resident in one of the Contracting States, are removed to or retained in, the territory of another Contracting State.

59  But these same words also have a quite different meaning. In fact, through this formulation this particular object of the Convention, whether considered in its own right or in relation to article 2, becomes indirectly a general one, applicable to all children who, in the circumstances set forth, are in any Contracting State. However, there will always be a difference between the legal position of those children who, prior to their removal, were habitually resident in another Contracting State, and that of other children. The position of the former will have to be resolved by the direct application of the provisions of the Convention. On the other hand, the duty of States towards the other children is less clear (leaving aside provisions of internal law) in so far as it derives from the obligation stated in article 2, which could be described as a duty to take appropriate measures to prevent their territory being turned into a place of refuge for potential 'abductors'.

*c   Sub-paragraph b*

60  The aim of the Convention contained in this sub-paragraph was clarified in the course of drafting at the Fourteenth Session.[23] So far as its scope is concerned, it is now clear that the situations under consideration are the same as those to which the Convention applies, that is to say international situations which involve two or more Contracting States. It should not be thought that precision in this matter is unnecessary, especially when one considers that the text of the Preliminary Draft allowed of other interpretations, and in particular a reference to internal situations.

61  As for knowing the desired meaning of the aim stated therein, it is necessary to draw a distinction between custody rights and access rights. With regard to custody rights, it can be said that the Convention has not attempted to deal with them separately. It is thus within the general obligation stated in article 2, and the regulation governing the return of the child – which is based, as we shall see in the commentary on article 3, upon respect for custody rights actually exercised and attributed under the law of the child's habitual residence – that one must look in order to find the consequences of the provision which concerns us here. On the other hand, access rights are treated more favourably, and the foundations upon which respect for their effective exercise seem fixed, at least in broad outline, within the context of article 21.

*Article 2 – General obligation of Contracting States*

62  Closely related to the objects stated in broad and flexible fashion in article 1b is the fact that this article sets forth a general duty incumbent upon Contracting States. It is thus a duty which, unlike obligations to achieve a result which are normally to be found in conventions, does not require

---

[23] *Cf.* Doc. trav. No 2 (*Proposal of the United Kingdom delegation*) et P.-v. No 2.

[23] *Cf.* Working Document No 2 (*Proposal of the United Kingdom delegation*) and P.-v. No 2.

A161

réalisations concrètes, mais plus simplement l'adoption d'une attitude déterminée en vue d'aboutir à de telles réalisations. Dans le cas présent, l'attitude, le comportement demandé aux Etats se traduit par le fait de prendre «toutes les mesures appropriées pour assurer, dans les limites de leur territoire, la réalisation des objectifs de la Convention». La Convention essaie ainsi, tout en sauvegardant le caractère *self-executing* de ses autres articles, d'encourager les Etats contractants à s'inspirer de ces normes pour résoudre les situations similaires à celles dont elle s'occupe, mais ne rentrant pas dans son domaine d'application *ratione personae* ou *ratione temporis*. D'une part, cela doit conduire à une considération attentive des normes conventionnelles quand l'Etat envisagera une modification de sa législation interne en matière de droits de garde ou de visite; d'autre part, l'extension des objectifs de la Convention à des cas non couverts par ses dispositions devrait influencer l'action des tribunaux et se traduire par une diminution du jeu de l'exception d'ordre public au moment de se prononcer sur des relations internationales tombant hors du domaine d'application de la Convention.

63   De plus, dans sa dernière phrase, l'article précise une des mesures envisagées, en soulignant l'importance accordée par la Conférence à l'utilisation de procédures rapides dans les affaires concernant les droits de garde ou de visite. Pourtant, cette disposition n'impose pas aux Etats l'obligation d'adopter dans leur loi interne de nouvelles procédures; la concordance établie entre le texte français et le texte anglais cherche justement à éviter une telle interprétation, que le texte français original rendait possible. Elle se limite donc à demander aux Etats contractants d'utiliser, dans toute question concernant la matière objet de la Convention, les procédures les plus urgentes figurant dans leur propre droit.

*Article 3 — Le caractère illicite d'un déplacement ou d'un non-retour*

a   *Observations générales*

64   L'ensemble de l'article 3 constitue une disposition clé de la Convention, puisque de son application dépend le déclenchement des mécanismes conventionnels en vue du retour de l'enfant; en effet, la Convention n'impose l'obligation de retourner l'enfant que lorsqu'il y a eu un déplacement ou un non-retour considérés par elle comme illicites. Or, en précisant les conditions que doit réunir une situation pour que son altération unilatérale puisse être qualifiée d'illicite, cet article met indirectement en relief les rapports que la Convention entend protéger; ces rapports sont basés sur un double élément: *primo*, l'existence d'un droit de garde attribué par l'Etat de la résidence habituelle de l'enfant; *secundo*, l'exercice effectif de cette garde, avant le déplacement. Examinons de plus près la teneur des conditions mentionnées.

b   *L'élément juridique*

65   En ce qui concerne l'élément des situations visées qu'on pourrait appeler juridique, ce que la Convention se propose de défendre ce sont les relations qui se trouvent déjà protégées, au moins par l'apparence d'un titre valable sur le droit de garde, dans l'Etat de la résidence habituelle de l'enfant; c'est-à-dire par le droit de l'Etat où ces relations se déroulaient avant le déplacement. L'affirmation antérieure exige certaines précisions sur deux points. Le premier aspect que nous devons considérer a trait au droit dont la violation détermine l'existence d'un déplacement ou d'un non-retour illicites, au sens de la Convention. Il s'agit, comme nous venons de le dire, du droit de garde; en effet, bien qu'au

that actual results be achieved but merely the adoption of an attitude designed to lead to such results. In the present case, the attitude and behaviour required of States is expressed in the requirement to 'take all appropriate measures to secure within their territories the implementation of the objects of the Convention'. The Convention also seeks, while safeguarding the 'self-executing' character of its other articles, to encourage Contracting States to draw inspiration from these rules in resolving problems similar to those with which the Convention deals, but which do not fall within its scope *ratione personae* or *ratione temporis*. On the one hand, this should lead to careful examination of the Convention's rules whenever a State contemplates changing its own internal laws on rights of custody or access; on the other hand, extending the Convention's objects to cases which are not covered by its own provisions should influence courts and be shown in a decreasing use of the public policy exception when questions concerning international relations which are outwith the scope of the Convention fall to be decided.

63   Moreover, the last sentence of the article specified one of the particular means envisaged, while stressing also the importance placed by the Convention on the use of speedy procedures in matters of custody or access rights. However, this provision does not impose an obligation upon States to bring new procedures into their internal law, and the correspondence now existing between the French and English texts rightly seeks to avoid such an interpretation, which the original French text made possible. It is therefore limited to requesting Contracting States, in any question concerning the subject-matter of the Convention, to use the most expeditious procedures available in their own law.

*Article 3 — The unlawful nature of a removal or retention*

a   *General observations*

64   Article 3 as a whole constitutes one of the key provisions of the Convention, since the setting in motion of the Convention's machinery for the return of the child depends upon its application. In fact, the duty to return a child arises only if its removal or retention is considered wrongful in terms of the Convention. Now, in laying down the conditions which have to be met for any unilateral change in the *status quo* to be regarded as wrongful, this article indirectly brings into clear focus those relationships which the Convention seeks to protect. Those relationships are based upon the existence of two facts, firstly, the existence of rights of custody attributed by the State of the child's habitual residence and, secondly, the actual exercise of such custody prior to the child's removal. Let us examine more closely the import of these conditions.

b   *The juridical element*

65   As for what could be termed the juridical element present in these situations, the Convention is intended to defend those relationships which are already protected, at any rate by virtue of an apparent right to custody in the State of the child's habitual residence, i.e. by virtue of the law of the State where the child's relationships developed prior to its removal. The foregoing remark requires further explanation in two respects. The first point to be considered concerns the law, a breach of which determines whether a removal or retention is wrongful, in the Convention sense. As we have just said, this is a matter of custody rights. Although the problems which can arise from a breach of

A162

cours de la Quatorzième session les problèmes pouvant dériver de la violation d'un droit de visite, surtout quand le titulaire de la garde déplace l'enfant à l'étranger, aient été soulevés, l'opinion majoritaire a été qu'on ne peut pas assimiler une telle situation aux déplacements illicites qu'on essaie de prévenir.[24]

Cet exemple, et d'autres similaires où la violation du droit de visite altère profondément l'équilibre de la situation établie par une décision, sont certes la preuve de ce que les décisions sur la garde des enfants devraient toujours être susceptibles de révision. Mais ce problème échappe à l'effort de coordination entrepris par la Conférence de La Haye; on aurait abouti à des résultats contestables si, à travers une égale protection accordée aux droits de garde et de visite, l'application de la Convention avait conduit, au fond, à la substitution des titulaires de l'un par ceux de l'autre.

66   La deuxième question à examiner se réfère au droit choisi pour évaluer la validité initiale du titre invoqué. Nous ne nous arrêterons pas ici sur le concept de la résidence habituelle; il s'agit en effet d'une notion familière à la Conférence de La Haye, où elle est comprise comme une notion de pur fait, qui diffère notamment de celle de domicile. D'ailleurs, le choix du droit de la résidence habituelle en tant que critère déterminant de la légalité de la situation violée par l'enlèvement est logique. En fait, aux arguments qui ont agi en faveur de lui accorder un rôle prééminent en matière de protection des mineurs, comme dans la Convention de La Haye de 1961, vient s'ajouter la propre nature même de la Convention, c'est-à-dire sa portée limitée. En ce sens, il faut faire deux considérations: d'une part, la Convention n'essaie pas de régler définitivement la garde des enfants, ce qui affaiblit considérablement les arguments favorables à la loi nationale; d'autre part, les normes conventionnelles reposent, dans une large mesure, sur l'idée sous-jacente qu'il existe une sorte de compétence naturelle des tribunaux de la résidence habituelle de l'enfant dans un litige relatif à sa garde.

Dans une perspective différente, nous devons aussi attirer l'attention sur le fait que la Convention parle du «droit» de l'Etat de la résidence habituelle, s'écartant ainsi de la tradition bien établie par les Conventions de La Haye sur la loi applicable, élaborées à partir de 1955, qui soumettent la réglementation du sujet dont elles s'occupent à une loi interne déterminée. Certes, dans ces cas, le terme de «loi» doit être compris dans son sens le plus large, celui qui recouvre aussi bien les règles écrites et coutumières – quel qu'en soit le rang – que les précisions apportées par leur interprétation jurisprudentielle. Cependant, l'adjectif «interne» implique l'exclusion de toute référence aux règles de conflit de la loi désignée. Donc, si la Convention a abandonné la formule traditionnelle pour parler du «droit de la résidence habituelle», la différence ne saurait être purement terminologique. En effet, comme le montrent les travaux préparatoires,[25] dès le début, l'intention a été d'élargir davantage l'éventail des dispositions qui doivent être prises en considération dans ce contexte. En fait, il y a même eu, au cours de la Quatorzième session, une proposition tendant à expliciter dans cet article que la référence au droit de la résidence habituelle s'étend à ces normes de droit international privé; si la proposition a été rejetée, c'est parce que la Conférence était convaincue qu'une telle inclusion était superflue et s'avérait implicite du moment que le texte

access rights, especially where the child is taken abroad by its custodian, were raised during the Fourteenth Session, the majority view was that such situations could not be put in the same category as the wrongful removals which it is sought to prevent.[24]

This example, and others like it  where breach of access rights profoundly upsets the equilibrium established by a judicial or administrative decision, certainly demonstrate that decisions concerning the custody of children should always be open to review. This problem however defied all efforts of the Hague Conference to co-ordinate views thereon. A questionable result would have been attained had the application of the Convention, by granting the same degree of protection to custody and access rights, led ultimately to the substitution of the holders of one type of right by those who held the other.

66   The second question which should be examined concerns the law which is chosen to govern the initial validity of the claim. We shall not dwell at this point upon the notion of habitual residence, a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile. Moreover, the choice of the law of habitual residence as the factor which is to determine the lawfulness of the situation flouted by the abduction is logical. In actual fact, to the arguments in favour of its being accorded a pre-eminent role in the protection of minors, as in the Hague Convention of 1961, must be added the very nature of the Convention itself, *viz.* its limited scope. In this regard, two points must be made: on the one hand, the Convention does not seek to govern definitively questions concerning the custody of children, a fact which weakens considerably those arguments favouring the application of national law; on the other hand, the rules of the Convention rest largely upon the underlying idea that there exists a type of jurisdiction which by its nature belongs to the courts of a child's habitual residence in cases involving its custody.

From a different viewpoint, our attention should also be drawn to the fact that the Convention speaks of the 'law' of the State of habitual residence, thus breaking with a long-established tradition of Hague Conventions on applicable law since 1955, which refer to a particular internal law to govern the matters with which they deal. Of course, in such cases, the word 'law' has to be understood in its widest sense, as embracing both written and customary rules of law – whatever their relative importance might be – and the interpretations placed upon them by case-law. However, the adjective 'internal' implies the exclusion of all reference to the conflict of law rules of the particular legal system. Therefore, since the Convention has abandoned its traditional formulation by speaking of 'the law of the habitual residence', this difference cannot be regarded as just a matter of terminology. In fact, as the preliminary proceedings of the Commission demonstrate,[25] it was intended right from the start to expand considerably the range of provisions which have to be considered in this context. Actually, a proposal was made during the Fourteenth Session that this article should make it clear that the reference to the law of the habitual residence extends also to the rules of private international law. The fact that this proposal was rejected was due to the Conference's view that its inclusion was unnecessary and became implicit anyway

---

[24] *Cf.* Doc. trav. No 5 (Proposition de la délégation canadienne) et P.-v. No 3.

[25] *Cf.* le Rapport de la Commission spéciale, No 62, *supra*, p. 90.

[24] *Cf.* Working Document No 5 (Proposal of the Canadian delegation) and *P.-v.* No 3.

[25] *Cf.* the Special Commission Report, No 62, *supra*, p. 90.

---

*Rapport Pérez-Vera*

n'exclut ni directement ni indirectement les règles en question.[26]

67   Les considérations antérieures nous montrent que l'invocation du droit de la résidence habituelle de l'enfant est aussi large que possible. De même, les sources dont peut découler le droit de garde qu'on essaie de protéger sont toutes celles qui peuvent fonder une réclamation dans le cadre du système juridique en question. A cet égard, l'alinéa 2 de l'article 3 considère certaines — les plus importantes sans doute — de ces sources, mais en soulignant la nature non exhaustive de l'énumération; cet alinéa dispose en effet que «le droit de garde visé en a peut notamment résulter ...», en soulignant de la sorte l'existence possible d'autres titres non considérés dans le texte. Or, comme nous le verrons dans les paragraphes suivants, les sources retenues couvrent un vaste éventail juridique; la précision de leur caractère partiel doit donc être surtout comprise comme favorisant une interprétation souple des concepts employés, qui permette d'appréhender le maximum d'hypothèses possibles.

68   La première des sources à laquelle l'article 3 fait allusion est la loi, quand il dit que la garde peut «résulter d'une attribution de plein droit». Cela nous amène à insister sur l'un des traits caractéristiques de cette Convention, nommément son applicabilité à la protection des droits de garde exercés avant toute décision en la matière. Le point est important, car on ne peut pas ignorer que, dans une perspective statistique, les cas où l'enfant est déplacé avant qu'une décision concernant sa garde n'ait été prononcée sont assez fréquents. D'ailleurs, dans de telles situations, les possibilités existantes, en marge de la Convention, pour le parent dépossédé de récupérer l'enfant sont presque nulles, sauf s'il recourt à son tour à des voies de fait toujours pernicieuses pour l'enfant. A cet égard, en introduisant ces cas dans son domaine d'application, la Convention a progressé de manière significative dans la solution des problèmes réels qui échappaient auparavant, dans une large mesure, aux mécanismes traditionnels du droit international privé.

Quant à savoir quel est, selon la Convention, le système juridique qui peut attribuer le droit de garde qu'on désire protéger, il nous faut en revenir aux considérations développées au paragraphe précédent. Ainsi donc, la garde *ex lege* pourra se baser soit sur la loi interne de l'Etat de la résidence habituelle de l'enfant, soit sur la loi désignée par les règles de conflit de cet Etat. Le jeu de la première option est parfaitement clair; en ce qui concerne la seconde, elle impliquerait, par exemple, que le déplacement par son père français d'un enfant naturel ayant sa résidence habituelle en Espagne où il habitait avec sa mère, tous les deux étant aussi de nationalité française, devrait être considéré comme illicite au sens de la Convention, par application de la loi française désignée comme compétente par la règle de conflit espagnole en matière de garde et indépendamment du fait que l'application de la loi interne espagnole aurait vraisemblablement conduit à une autre solution.

69   La deuxième source du droit de garde, retenue à l'article 3, est l'existence d'une décision judiciaire ou administrative. Etant donné que la Convention n'ajoute aucune précision sur ce point, il faut considérer, d'une part que le mot «décision» est utilisé dans son sens le plus large, de manière à embrasser toute décision ou élément de décision (judiciaire ou administrative) concernant la garde d'un

once the text neither directly nor indirectly excluded the rules in question.[26]

67   The foregoing considerations show that the law of the child's habitual residence is invoked in the widest possible sense. Likewise, the sources from which the custody rights which it is sought to protect derive, are all those upon which a claim can be based within the context of the legal system concerned. In this regard, paragraph 2 of article 3 takes into consideration some — no doubt the most important — of those sources, while emphasizing that the list is not exhaustive. This paragraph provides that 'the rights of custody mentioned in sub-paragraph *a* above may arise in particular', thus underlining the fact that other sorts of rights may exist which are not contained within the text itself. Now, as we shall see in the following paragraphs, these sources cover a vast juridical area, and the fact that they are not exhaustively set out must be understood as favouring a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.

68   The first source referred to in article 3 is law, where it is stated that custody 'may arise . . . by operation of law'. That leads us to stress one of the characteristics of this Convention, namely its application to the protection of custody rights which were exercised prior to any decision thereon. This is important, since one cannot forget that, in terms of statistics, the number of cases in which a child is removed prior to a decision on its custody are quite frequent. Moreover, the possibility of the dispossessed parent being able to recover the child in such circumstances, except within the Convention's framework, is practically non-existent, unless he in his turn resorts to force, a course of action which is always harmful to the child. In this respect, by including such cases within its scope, the Convention has taken a significant step towards resolving the real problems which in the past largely escaped the control of the traditional mechanisms of private international law.

As for knowing the legal system which, according to the Convention, is to attribute the custody rights, which it is desired to protect, it is necessary to go back to the considerations developed in the previous paragraph. Thus, custody *ex lege* can be based either on the internal law of the State of the child's habitual residence, or on the law designated by the conflict rules of that State. The scope of the first option is quite clear; the second implies, for example, that the removal by its French father of a child born out of wedlock which had its habitual residence in Spain where it lived with its mother, both mother and child being of French nationality, should be considered wrongful in the Convention sense, by means of the application of French law designated as applicable by the Spanish conflict rule on questions of custody, quite independently of the fact that application of internal Spanish law would probably have led to a different result.

69   The second source of custody rights contained in article 3 is a judicial or administrative decision. Since the Convention does not expand upon this, it must be deemed, on the one hand, that the word 'decision' is used in its widest sense, and embraces any decision or part of a decision (judicial or administrative) on a child's custody and, on the other hand, that these decisions may have been issued by the courts of

---

[26]   *Cf.* Doc. trav. No 2 (*Proposal of the United Kingdom delegation*) et P.-v. No 2.

[26]   *Cf.* Working Document No 2 (Proposal of the United Kingdom delegation), and P.-v. No 2.

A164

enfant; d'autre part que les décisions visées peuvent avoir été rendues aussi bien par les tribunaux de l'Etat de la résidence habituelle de l'enfant que par ceux d'un Etat tiers.[27] Or, dans cette dernière hypothèse, c'est-à-dire lorsque le droit de garde s'exerçait dans l'Etat de la résidence habituelle de l'enfant sur la base d'une décision étrangère, la Convention n'exige pas qu'elle ait été formellement reconnue. En conséquence, il doit suffire aux effets considérés que la décision soit telle au regard du droit de l'Etat de la résidence habituelle, c'est-à-dire, en principe, qu'elle présente les caractéristiques *minima* pour pouvoir déclencher une procédure en vue de son homologation ou de sa reconnaissance;[28] interprétation large qui se trouve d'ailleurs confirmée par la teneur de l'article 14 de la Convention.

70   Finalement, le droit de garde peut découler, d'après l'article 3, «d'un accord en vigueur selon le droit de cet Etat». En principe, les accords envisagés peuvent être de simples transactions privées entre les parties, au sujet de la garde des enfants. La condition d'être «en vigueur» selon le droit de l'Etat de la résidence habituelle, a été introduite au cours de la Quatorzième session en substitution de l'exigence d'avoir «force de loi», qui figurait dans l'avant-projet. La modification répond à un désir de clarification, mais aussi d'assouplissement, autant que possible, des conditions posées à l'acceptation d'un accord en tant que source de la garde protégée par la Convention. Sur ce point précis de savoir ce qu'est un accord «en vigueur» selon un droit déterminé, il nous semble que l'on doive inclure sous cette appellation tout accord qui ne soit pas interdit par un tel droit et qui puisse servir de base à une prétention juridique devant les autorités compétentes. Or, pour en revenir au sens large que la notion «droit de l'Etat de la résidence habituelle de l'enfant» a reçu dans cet article 3, le droit en question peut être aussi bien la loi interne de cet Etat que la loi désignée par ses règles de conflit; le choix entre les deux branches de l'option appartient aux autorités de l'Etat concerné, quoique l'esprit de la Convention semble incliner pour celle qui, dans chaque cas d'espèce, légitime la garde effectivement exercée. D'autre part, la Convention ne précise point les conditions de fond ou de forme que ces accords doivent remplir; elles changeront donc selon la teneur du droit impliqué.

71   Tout en ajournant l'étude de la personne qui peut être titulaire d'un droit de garde au commentaire de l'article 4 sur le domaine d'application *ratione personae* de la Convention, il convient d'insister ici sur le fait qu'on s'est proposé de protéger toutes les modalités d'exercice de la garde d'enfants. En effet, aux termes de l'article 3, le droit de garde peut avoir été attribué, seul ou conjointement, à la personne qui demande qu'on en respecte l'exercice. Il ne pouvait en être autrement à une époque où les législations internes introduisent progressivement la modalité de la garde conjointe, considérée comme la mieux adaptée au principe général de la non-discrimination à raison du sexe. D'ailleurs, la garde conjointe n'est pas toujours une garde *ex lege*, dans la mesure où les tribunaux se montrent de plus en plus favorables, si les circonstances le permettent, à partager entre les deux parents les responsabilités inhérentes au droit de garde. Or, dans l'optique adoptée par la Convention, le déplacement d'un enfant par l'un des titulaires de la garde

the State of the child's habitual residence as well as by the courts of a third country.[27] Now, in the latter case, that is to say when custody rights were exercised in the State of the child's habitual residence on the basis of a foreign decree, the Convention does not require that the decree had been formally recognized. Consequently, in order to have the effect described, it is sufficient that the decision be regarded as such by the State of habitual residence, *i.e.* that it contain in principle certain minimum characteristics which are necessary for setting in motion the means by which it may be confirmed or recognized.[28] This wide interpretation is moreover confirmed by the whole tenor of article 14.

70   Lastly, custody rights may arise according to article 3, 'by reason of an agreement having legal effect under the law of that State'. In principle, the agreements in question may be simple private transactions between the parties concerning the custody of their children. The condition that they have 'legal effect' according to the law of the State of habitual residence was inserted during the Fourteenth Session in place of a requirement that it have the 'force of law', as stated in the Preliminary Draft. The change was made in response to a desire that the conditions imposed upon the acceptance of agreements governing matters of custody which the Convention seeks to protect should be made as clear and as flexible as possible. As regards the definition of an agreement which has 'legal effect' in terms of a particular law, it seems that there must be included within it any sort of agreement which is not prohibited by such a law and which may provide a basis for presenting a legal claim to the competent authorities. Now, to go back to the wide interpretation given by article 3 to the notion of 'the law of the State of the child's habitual residence', the law concerned can equally as well be the internal law of that State as the law which is indicated as applicable by its conflict rules. It is for the authorities of the State concerned to choose between the two alternatives, although the spirit of the Convention appears to point to the choice of the one which, in each particular case, would recognize that custody had actually been exercised. On the other hand, the Convention does not state, in substance or form, the conditions which these agreements must fulfil, since these will change according to the terms of the law concerned.

71   Leaving aside a consideration of those persons who can hold rights of custody, until the commentary on article 4 which concerns the scope of the Convention *ratione personae*, it should be stressed now that the intention is to protect *all* the ways in which custody of children can be exercised. Actually, in terms of article 3, custody rights may have been awarded to the person who demands that their exercise be respected, and to that person in his own right or jointly. It cannot be otherwise in an era when types of joint custody, regarded as best suited to the general principle of sexual non-discrimination, are gradually being introduced into internal law. Joint custody is, moreover, not always custody *ex lege*, in as much as courts are increasingly showing themselves to be in favour, where circumstances permit, of dividing the responsibilities inherent in custody rights between both parents. Now, from the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is equally wrongful, and

---

[27] Cette interprétation s'appuie sur les travaux qui ont conduit à l'adoption d'un texte, similaire à l'actuel, au sein de la Commission spéciale. Voir Rapport de la Commission spéciale, No 64, *supra*, p. 191-192.
[28] Sur l'intérêt de ce que la Convention indue un tel cas, voir le Doc. trav. No 58, «Document de clarification présenté par la délégation italienne».

[27] This interpretation is based upon the deliberations of the Special Commission which led to its adopting a similar text to the current one. See Report of the Special Commission, No 64, *supra*, pp. 191-192.
[28] See Working Document No 58, '*Document de clarification présenté par la délégation italienne*', for the desirability of including such a case in the Convention.

A165

conjointe, sans le consentement de l'autre titulaire, est également illicite; ce caractère illicite proviendrait, dans ce cas précis, non pas d'une action contraire à la loi, mais du fait qu'une telle action aurait ignoré les droits de l'autre parent, également protégé par la loi, et interrompu leur exercice normal. La véritable nature de la Convention apparaît plus clairement dans ces situations: elle ne cherche pas à établir à qui appartiendra dans l'avenir la garde de l'enfant, ni s'il s'avérera nécessaire de modifier une décision de garde conjointe rendue sur la base de données qui ont été altérées par la suite; elle essaie plus simplement d'éviter qu'une décision ultérieure à cet égard puisse être influencée par un changement des circonstances introduit unilatéralement par l'une des parties.

this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention's true nature is revealed most clearly in these situations: it is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding joint custody on the basis of facts which have subsequently changed. It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.

*c  L'élément de fait*

72  Le deuxième élément qui caractérise les rapports protégés par la Convention est que le droit de garde, qu'on prétend violé par le déplacement, ait été exercé de façon effective par son titulaire. En effet, du moment qu'on a choisi une approche du sujet conventionnel s'écartant de la pure et simple reconnaissance internationale des droits de garde attribués aux parents, la Convention a mis l'accent sur la protection du droit des enfants au respect de leur équilibre vital: c'est-à-dire du droit des enfants à ne pas voir altérées les conditions affectives, sociales, etc., qui entourent leur vie, à moins qu'il n'existe des arguments juridiques garantissant la stabilité d'une nouvelle situation. Cette approche est reflétée dans la limite du domaine d'application de la Convention aux droits de garde effectivement exercés. De plus, une telle conception se trouve justifiée dans le cadre des relations internationales par un argument complémentaire, touchant au fait que, dans ce contexte, il est relativement fréquent qu'il existe des décisions contradictoires peu à même de servir de base à la protection de la stabilité de la vie d'un enfant.

*c  The factual element*

72  The second element characterizing those relationships protected by the Convention is that the custody rights which it is claimed have been breached by the child's removal were actually exercised by the holder. In fact, as soon as an approach to the subject-matter of the Convention was adopted which deviated from the pure and simple international recognition of custody rights attributed to parents, the Convention put its emphasis on protecting the right of children to have the stability which is so vital to them respected. In other words, the Convention protects the right of children not to have the emotional, social etc. aspects of their lives altered, unless legal arguments exist which would guarantee their stability in a new situation. This approach is reflected in the scope of the Convention, which is limited to custody rights actually exercised. What is more, such a notion is justified within the framework of international relations by a complementary argument which concerns the fact that contradictory decisions arise quite frequently in this particular context, decisions which are basically of little use in protecting the stability of a child's life.

73  En réalité, cette conception a été à peine contestée. Pourtant, plusieurs propositions[29] ont été présentées en vue de supprimer de l'article 3 toute référence à l'exercice effectif de la garde; la raison en était que, par ce biais, on imposait au demandeur le fardeau d'une preuve sur un point qui serait parfois difficile à établir. La situation semblait encore plus compliquée si on tenait compte du fait que l'article 13 consacre aux exceptions possibles à l'obligation de faire retourner l'enfant exige, de «l'enleveur» cette fois, la preuve que la personne dépossédée n'exerçait pas effectivement la garde qu'elle réclame maintenant. Or, c'est justement en rapprochant les deux dispositions que l'on fait apparaître nettement la véritable nature de la condition prévue à l'article 3. En effet, cette condition, en délimitant le domaine d'application de la Convention, n'exige du demandeur qu'une première évidence du fait qu'il exerçait réellement les soins sur la personne de l'enfant; cette circonstance doit être, en général, assez facile à établir. D'ailleurs, le caractère non formel de cette exigence est mis en relief à l'article 8 lorsque, parmi les données que doit contenir la demande introduite auprès des Autorités centrales, il indique simplement sous *c* «les motifs sur lesquels se base le demandeur pour réclamer le retour de l'enfant». Par contre, l'article 13 de la Convention (12 de l'avant-projet) nous place devant un véritable fardeau de la preuve à la charge de «l'enleveur»; c'est en effet lui qui doit établir,

73  Actually, this idea was not opposed to any extent. However, several proposals[29] were put forward for the deletion from article 3 of any reference to the actual exercise of custody rights. The reason for this was that its retention could place on the applicant the burden of proving a point which would sometimes be difficult to establish. The situation became even more complicated when account was taken of the fact that article 13, which concerns the possible exceptions to the obligation to order the return of the child, requires the 'abductor' this time to prove that the dispossessed party had not actually exercised the custody rights he now claims. Now, it is indeed by considering both provisions together that the true nature of the condition set forth in article 3 can be seen clearly. This condition, by defining the scope of the Convention, requires that the applicant provide only some preliminary evidence that he actually took physical care of the child, a fact which normally will be relatively easy to demonstrate. Besides, the informal nature of this requirement is highlighted in article 8 which simply includes, in sub-paragraph *c*, 'the grounds on which the applicant's claim for return of the child is based', amongst the facts which it requires to be contained in applications to the Central Authorities.
On the other hand, article 13 of the Convention (12 in the Preliminary Draft) shows us the real extent of the burden of proof placed upon the 'abductor'; it is for him to show, if he

---

[29] Cf. Doc. trav. No 1 (*Proposal of the United States delegation*) et No 10 (*Proposal of the Finnish delegation*), ainsi que le P.-v. No 3.

[29] Cf. Working Documents Nos 1 (Proposal of the United States delegation) and 10 (Proposal of the Finnish delegation), and also P.-v. No 3.

---

A166

pour éviter le retour de l'enfant, que le gardien n'exerçait pas effectivement le droit de garde. Donc, nous pouvons en arriver à la conclusion que l'ensemble de la Convention est construit sur la présomption non explicite que celui qui a le soin de la personne de l'enfant en exerce effectivement la garde; cette idée devra être détruite en vertu de l'inversion du fardeau de la preuve qui est le propre de toute présomption, (par «l'enleveur» s'il veut éviter que l'enfant ne soit renvoyé).

74   Cependant, la Convention inclut expressément dans le domaine qu'elle entend protéger la situation qui se pose quand la garde n'a pas pu devenir effective à cause précisément du déplacement de l'enfant; c'est en ce sens que se prononce le dernier membre de phrase de la lettre b de l'article 3. En théorie, l'idée sous-jacente s'accorde parfaitement avec l'esprit qui inspire la Convention; c'est donc d'un point de vue pratique qu'on peut se demander si un tel ajout était nécessaire.[30] Dans cette optique, les hypothèses que cette précision essaie de protéger visent deux situations type possibles, dont l'une rentrerait clairement dans le domaine d'application de la Convention, tandis que l'autre, à défaut de cette norme, exigerait vraisemblablement une interprétation trop forcée de ses dispositions. Il s'agit, d'une part, des cas soulevés lorsqu'une première décision sur la garde est mise en échec par le déplacement de l'enfant; or, dans la mesure où une telle décision suit, dans un délai raisonnable, la rupture de la vie familiale commune, on peut considérer que le titulaire de la garde l'avait exercée au préalable et qu'en conséquence la situation décrite remplit toutes les conditions que fixe le domaine d'application conventionnel. Pourtant, si nous nous plaçons devant une décision sur la garde, rendue par les tribunaux de la résidence habituelle de l'enfant, qui modifie une décision précédente et dont l'exécution est rendue impossible par l'action du ravisseur, il peut se trouver que le nouveau titulaire de la garde ne l'ait pas exercée dans un délai étendu; les difficultés qu'on rencontrerait dans de telles situations, et peut-être dans d'autres non visées dans ces lignes, pour invoquer la Convention sont évidentes. En conclusion, et quoiqu'il faille s'attendre à ce que le jeu de cette disposition ne soit pas fréquent, nous devons conclure que son inclusion dans la Convention peut s'avérer utile.

*Article 4 - Domaine d'application* ratione personae

75   Cet article ne concerne que le domaine d'application *ratione personae* de la Convention par rapport aux enfants protégés. Pourtant dans un souci de systématisation, nous traiterons aussi dans son contexte les autres aspects du problème, c'est-à-dire les titulaires possibles des droits de garde et de visite et les personnes qui pourraient être considérées comme «enleveurs», aux termes de la Convention.

*a   Les enfants protégés*

76   La Convention s'applique aux enfants âgés de moins de seize ans qui avaient «leur résidence habituelle dans un Etat contractant immédiatement avant l'atteinte aux droits de garde ou de visite». En relation avec l'exigence concernant la résidence habituelle, il faut revenir aux considérations émises sur la nature de la Convention, qui aboutissent à la conclusion qu'une convention de coopération entre

wishes to prevent the return of the child, that the guardian had not actually exercised his rights of custody. Thus, we may conclude that the Convention, taken as a whole, is built upon the tacit presumption that the person who has care of the child actually exercises custody over it. This idea has to be overcome by discharging the burden of proof which has shifted, as is normal with any presumption (*i.e.* discharged by the 'abductor' if he wishes to prevent the return of the child).

74   However, there is expressly included amongst the matters which the Convention is intended to protect the situation which arises when actual custody cannot be exercised precisely because of the removal of the child; that is the situation envisaged in the last alternative set out in article 3b. Theoretically, the underlying idea is perfectly in keeping with the spirit of the Convention, and it is therefore from a practical point of view that it may be wondered whether such a provision needed to be added.[30] From this viewpoint, the hypothetical situations which this provision is designed to protect are of two types, one of which falls clearly within the scope of the Convention, while the other, failing this rule, would probably require too strained an interpretation of its provisions. On the one hand, there are cases where an initial decision on custody is rendered worthless by the removal of the child. In so far as such a decision follows the disruption of normal family life after a reasonable lapse of time, the holder of the rights could be regarded as having exercised them from the outset, so that the situation described fulfils all the conditions laid down within the scope of the Convention. However, if a decision on custody by the courts of the child's habitual residence is considered, which modifies a prior decision and cannot be enforced because of the action of the abductor, it could be that the new holder of the right to custody has not exercised it within the extended time-limit. The difficulties which would be encountered in seeking to apply the Convention to such situations and perhaps to others not herein mentioned, are obvious. To conclude, although this provision must not be expected to come into play very often, it has to be said finally that its inclusion in the Convention might prove to be useful.

*Article 4 - Convention's scope* ratione personae

75   This article concerns only the Convention's scope *ratione personae* as regards the children who are to be protected. However, for the sake of completeness, we shall also deal with the other aspects of the problem in their proper context, that is to say those potential holders of custody and access rights and those who could be regarded as 'abductors', within the terms of the Convention.

*a   The children protected*

76   The Convention applies to children of less than sixteen years of age, who were 'habitually resident in a Contracting State immediately before any breach of custody or access rights'. As regards the requirement that they be habitually resident, reference must again be made to those considerations previously expressed about the nature of the Convention, which lead to the conclusion that a convention

---

[30] *Cf.* Doc. trav. No 2 (*Proposal of the United Kingdom delegation*) et les débats sur ce point aux P.-v. Nos 3 et 13.

[30] *Cf.* Working Document No 2 (Proposal of the United Kingdom delegation) and the debate on this point in *P.-v.* Nos 3 and 13.

---

autorités ne peut atteindre toute son efficacité que si les rapports visés se produisent entre Etats contractants.

77  L'âge limite pour l'application de la Convention soulève deux questions importantes. La première, la question de l'âge *stricto sensu*, a été à peine débattue. La Convention retient l'âge de seize ans, consacrant ainsi une notion d'enfant plus restrictive que celle admise par d'autres Conventions de La Haye.[31] La raison découle des objectifs conventionnels eux-mêmes; en effet, une personne de plus de seize ans a en général une volonté propre qui pourra difficilement être ignorée, soit par l'un ou l'autre de ses parents, soit par une autorité judiciaire ou administrative.

Quant à la détermination du moment où cet âge interdit l'application de la Convention, celle-ci, parmi les diverses options possibles, retient la plus limitative; en conséquence, aucune action ou décision basée sur les dispositions conventionnelles ne peut être adoptée à l'égard d'un enfant après son seizième anniversaire.

78  Le deuxième problème a trait à la situation des enfants âgés de moins de seize ans qui ont le droit de fixer leur lieu de résidence. Compte tenu que ce droit fait en général partie du droit de garde, une proposition a été faite dans le sens de la non-application de la Convention dans de tels cas.[32] Cependant, cette proposition a été rejetée sur la base de divers arguments, parmi lesquels on peut citer: 1) la difficulté de choisir le système juridique qui devrait consacrer l'existence d'une telle possibilité, étant donné qu'il existe au moins trois possibilités qui sont, respectivement, la loi nationale, la loi de la résidence habituelle avant le déplacement et la loi de l'Etat de refuge; 2) la limitation excessive que cette proposition apporterait au domaine d'application de la Convention, par rapport notamment au droit de visite; 3) le fait que la faculté de décider du lieu de résidence d'un enfant n'est qu'un élément possible du droit de garde qui n'en épuise pas le contenu.

D'autre part, la décision prise à cet égard ne peut pas être isolée de la disposition de l'article 13, alinéa 2, qui donne la possibilité aux autorités compétentes de tenir compte de l'opinion de l'enfant sur son retour, dès qu'il atteint l'âge et une maturité suffisants; en effet, cette norme permettra aux autorités judiciaires ou administratives, quand il sera question du retour d'un mineur ayant capacité de décider sur son lieu de résidence, de considérer que l'opinion de l'enfant est toujours déterminante. On peut arriver ainsi à l'application automatique d'une disposition facultative de la Convention, mais une telle conséquence semble préférable à la réduction globale du domaine d'application de la Convention.

*b   Les titulaires des droits de garde et de visite*

79  Les problèmes soulevés à cet égard par l'un et l'autre des droits visés sont nettement différents. D'abord, en ce qui concerne le droit de visite, il est évident que par la nature même des choses, ses titulaires seront toujours des personnes physiques, dont la détermination dépendra de la loi appliquée à l'organisation de ce droit. En principe, ces personnes appartiendront à la proche famille de l'enfant, et il s'agira normalement soit du père, soit de la mère.

based on co-operation among authorities can only become fully operational after the relationships envisaged come into existence as among Contracting States.

77  The age limit for application of the Convention raises two important questions. Firstly, the matter of age in the strict sense gave rise to virtually no dispute. The Convention kept the age at sixteen, and therefore held to a concept of 'the child' which is more restrictive than that accepted by other Hague Conventions.[31] The reason for this derives from the objects of the Convention themselves; indeed, a person of more than sixteen years of age generally has a mind of his own which cannot easily be ignored either by one or both of his parents, or by a judicial or administrative authority.

As for deciding upon the point at which this age should exclude the Convention's application, the most restrictive of the various options available was retained by the Convention. Consequently, no action or decision based upon the Convention's provisions can be taken with regard to a child after its sixteenth birthday.

78  The second problem deals with the situation of children under sixteen years of age who have the right to choose their own place of residence. Considering that this right to choose one's residence generally forms part of the right to custody, a proposal was put forward to the effect that the Convention should not apply in such cases.[32] However, this proposal was rejected on various grounds, *inter alia* the following: (1) the difficulty of choosing the legal system which should determine whether such a possibility exists, since there are at least three different laws which could be applicable, namely, national law, the law of habitual residence prior to the child's removal, and the law of the State of refuge; (2) the excessive restriction which this proposal would place upon the scope of the Convention, particularly with regard to access rights; (3) the fact that the right to decide a child's place of residence is only one possible element of the right to custody which does not itself deprive it of all content.

On the other hand, the decision taken in this regard cannot be isolated from the provision in article 13, second paragraph, which allows the competent authorities to have regard to the opinion of the child as to its return, once it has reached an appropriate age and degree of maturity. Indeed, this rule leaves it open to judicial or administrative authorities, whenever they are faced with the possibility of returning a minor legally entitled to decide on his place of residence, to take the view that the opinion of the child should always be the decisive factor. The point could therefore be reached where an optional provision of the Convention becomes automatically applicable, but such a result seems preferable to an overall reduction in the Convention's scope.

*b   The holders of custody and access rights*

79  The problems raised by both of these rights in this regard are quite different. Firstly, as regards access rights, it is obvious, by the very nature of things, that they will be held by individuals, whose identity will depend on the law which applies to the organizing of these rights. These persons will as a rule be close relatives of the child, and normally will be either its father or mother.

---

[31] Par exemple: *Convention sur la loi applicable aux obligations alimentaires envers les enfants, du 24 octobre 1956* (article premier); *Convention concernant la reconnaissance et l'exécution des décisions en matière d'obligations alimentaires envers les enfants, du 15 avril 1958* (article premier); *Convention concernant la compétence des autorités et la loi applicable en matière de protection des mineurs, du 5 octobre 1961* (article 12); *Convention concernant la compétence des autorités, la loi applicable et la reconnaissance des décisions en matière d'adoption, du 15 novembre 1965* (article premier).
[32] *Cf.* Doc. trav. No 4 (Proposition de la délégation belge) et P.-v. No 4.

[31] For example: *Convention of 24 October 1956 on the Law Applicable to Maintenance Obligations in Respect of Children* (article 1); *Convention of 15 April 1958 on the Recognition and Enforcement of Decisions Relating to Maintenance Obligations in Respect of Children* (article 1); *Convention of 5 October 1961 Concerning the Powers of Authorities and the Law Applicable in Respect of the Protection of Minors* (article 12); *Convention of 15 November 1965 on Jurisdiction, Applicable Law and Recognition of Decisions Relating to Adoptions* (article 1).
[32] *Cf.* Working Document No 4 (*Proposition de la délégation belge*) and P.-v. No 4.

---

A168

80   Par contre, des personnes morales peuvent aussi être titulaires d'un droit de garde, au sens de la Convention. A cet égard, l'article 3 considère la possibilité de l'attribution du droit de garde à «une institution ou tout autre organisme», en utilisant sciemment une expression vague et large. En effet, au cours de la Quatorzième session, l'inclusion dans le domaine conventionnel des hypothèses où la personne de l'enfant est confiée à une institution a été acceptée sans débats. Or, étant donné qu'il y a des organismes autres que les institutions qui ont à leur charge les soins de certains enfants, on a élargi l'expression utilisée pour y faire rentrer aussi bien les organismes ayant une personnalité juridique que ceux qui sont liés à l'organisation étatique et dépourvus d'une personnalité indépendante.

80   On the other hand, legal persons can also, in terms of the Convention, hold rights of custody. Article 3 envisages the possibility of custody rights being attributed to 'an institution or any other body', and is expressed in deliberately vague and wide terms. In fact, during the Fourteenth Session, the inclusion within the scope of the Convention of situations in which the child is entrusted to an institution was not challenged. Now, since there are bodies other than institutions which have children in their care, the term used was extended so as to apply equally to those bodies with legal personality and to those which, as an arm of the State, lack separate personality.

*c   Les éventuels «enleveurs»*

*c   The potential 'abductors'*

81   La Convention ne contient aucune disposition expresse à ce propos. Néanmoins, de l'ensemble du texte, nous pouvons déduire deux remarques qui éclairent cet aspect relatif au domaine d'application *ratione personae* de la Convention. La première concerne les personnes physiques qui peuvent être responsables du déplacement ou du non-retour d'un enfant. Sur ce sujet, la Convention maintient le point de vue adopté par la Commission spéciale de ne pas attribuer de telles actions exclusivement à des parents.[33] L'idée de famille étant plus ou moins large selon les différentes conceptions culturelles, il est préférable de s'en tenir à une vue large qui permette, par exemple, de qualifier d'enlèvement d'enfant, au sens de la Convention, les déplacements faits par un grand-père ou un père adoptif.

81   The Convention contains no express provision on this matter. Nevertheless, two comments may be drawn from the text as a whole, which shed light upon this question in relation to the Convention's scope *ratione personae*. The first concerns the physical persons who may be responsible for the removal or retention of a child. On this, the Convention upholds the point of view adopted by the Special Commission by not attributing such acts exclusively to one of the parents.[33] Since the idea of 'family' was more or less wide, depending on the different cultural conceptions which surround it, it was felt better to hold a wide view which would, for example, allow removals by a grandfather or adoptive parent to be characterized as child abduction, in accordance with the Convention's use of that term.

82   La deuxième remarque a trait à la possibilité de ce qu'une «institution ou tout autre organisme» agisse comme «enleveurs». A cet égard, il est difficilement imaginable qu'un organisme quelconque puisse déplacer, par la force ou par la ruse, un enfant d'un pays étranger vers son propre pays. D'autre part, si un enfant a été confié, par une décision judiciaire ou administrative (c'est-à-dire, au cas d'un placement forcé de l'enfant), à un tel organisme dans le pays de sa résidence habituelle, le parent qui prétend obtenir la jouissance effective d'un droit de garde sur celui-ci aura peu de chance de pouvoir invoquer la Convention. En effet, du fait que les organismes visés exercent en principe leurs compétences, abstraction faite de l'éventuelle reconnaissance de l'autorité parentale,[34] une telle prétention ne rentrerait pas dans le domaine conventionnel, puisque la garde au sens de la Convention appartiendrait à l'organisme en question.

82   The second comment relates to the possibility of an 'institution or any other body' acting as an 'abductor'. In this regard, it is difficult to imagine how any body whatever could remove, either by force or by deception, a child from a foreign country to its own land. On the other hand, if a child were entrusted, by virtue of a judicial or administrative decision (*i.e.* compulsory placement of the child) to such a body in the country of its habitual residence, the parent who sought to obtain the actual enjoyment of custody rights would stand little chance of being able to invoke the provisions of the Convention. In fact, by virtue of the fact that such bodies would as a rule exercise jurisdiction, except as regards the possible recognition of parental authority,[34] such a claim would not come within the scope of the Convention, since custody, in the sense understood by the Convention, would belong to the body in question.

*Article 5 – De certaines expressions utilisées dans la Convention*

*Article 5 – Certain terms used in the Convention*

83   Suivant une tradition bien établie de la Conférence de La Haye, la Convention ne définit pas les concepts juridiques dont elle se sert. Pourtant, dans cet article, elle précise le sens dans lequel sont utilisées les notions de droit de garde et de droit de visite, étant donné qu'une interprétation incorrecte de leur portée risquerait de compromettre les objectifs conventionnels.

83   The Convention, following a long-established tradition of the Hague Conference, does not define the legal concepts used by it. However, in this article, it does make clear the sense in which the notions of custody and access rights are used, since an incorrect interpretation of their meaning would risk compromising the Convention's objects.

84   En ce qui concerne le droit de garde, la Convention se limite à souligner qu'il comprend «le droit portant sur les soins de la personne de l'enfant», en marge des mécanismes

84   As regards custody rights, the Convention merely emphasizes the fact that it includes in the term 'rights relating to the care of the person of the child', leaving aside the

---

[33] Une approche plus restrictive se trouvait initialement dans le Rapport Dyer, cité supra, intitulé *Rapport sur l'enlèvement international d'un enfant par un de ses parents*.
[34] Voir sur ce point, Cour internationale de Justice, Arrêt du 28 novembre 1958, Affaire relative à l'application de la Convention de 1902 pour régler la tutelle des mineurs, *Recueil des arrêts* 1958, p. 55 et suiv.

[33] A more restrictive approach was to be found initially in the Dyer Report, referred to above, entitled *Report on international child abduction by one parent*.
[34] See the Judgment of the International Court of Justice, dated 28 November 1958, on the case concerning the application of the Convention of 1902 for regulating the guardianship of minors, *ICJ Reports* 1958, p. 55 *et seq.*

---

possibles de protection de ses biens. Il s'agit donc d'une notion plus restrictive que celle de «protection des mineurs»,[35] malgré les tentatives faites au cours de la Quatorzième session pour introduire l'idée de «protection», en vue surtout de couvrir les cas des enfants confiés à des institutions ou organismes. Mais, tous les efforts faits pour préciser la notion de droit de garde par rapport à ces situations ayant échoué, il faut s'en tenir au concept générique mentionné ci-dessus. La Convention essaie de le préciser en mettant en relief, comme indice des «soins» dont il s'agit, le droit de décider du lieu de résidence de l'enfant. Cependant, lorsque l'enfant, quoique mineur du point de vue juridique, a la faculté de fixer lui-même son lieu de résidence, le contenu du droit de garde sera déterminé en fonction des autres droits portant sur sa personne.

D'autre part, bien que dans cet article rien ne soit dit sur la possibilité que la garde soit exercée par son titulaire seul ou conjointement, il est évident que cette possibilité est envisagée. En effet, une règle classique du droit des traités exige que l'interprétation de ses termes soit effectuée dans son contexte et en tenant compte de l'objet et du but du traité;[36] or, la teneur de l'article 3 ne laisse pas de doute sur l'inclusion de la garde conjointe parmi les situations que la Convention entend protéger. Quant à savoir quand existe une garde conjointe, c'est une question qui doit être déterminée dans chaque cas d'espèce à la lumière du droit de la résidence habituelle de l'enfant.

85   Quant au droit de garde, la lettre b de cet article se limite à signaler qu'il comprend «le droit d'emmener l'enfant pour une période limitée dans un lieu autre que celui de sa résidence habituelle». L'intention de la Convention n'est évidemment pas d'exclure toutes les autres modalités du droit de visite; plus simplement, elle a voulu souligner que cette notion s'étend aussi au droit dit d'hébergement, manifestation du droit de visite que la personne qui a la garde de l'enfant redoute spécialement. De plus, étant donné que cette norme explicative ne qualifie point ce «lieu autre» où l'enfant peut être emmené, il faut conclure que le droit de visite, selon la Convention, inclut également le droit de visite transfrontière.

86   Une proposition a été faite en vue d'inclure dans cet article une définition des autorités judiciaires ou administratives visées tout au long des normes conventionnelles.[37] Les difficultés rencontrées tant pour la localisation d'un point de vue systématique que pour trouver une rédaction large qui englobe toutes les hypothèses possibles ont conseillé sa non-inclusion. Or il est clair qu'il s'agit, comme nous l'avons déjà souligné,[38] des autorités compétentes pour décider soit de la garde, soit de la protection des enfants, d'après la loi interne de chaque Etat contractant. D'ailleurs, c'est justement en raison des différences entre ces lois que l'on parle toujours des autorités «judiciaires ou administratives», en vue de recouvrir toutes les autorités ayant compétence en la matière, sans égard à la qualification juridique qu'elles reçoivent dans chaque Etat.

possible ways of protecting the child's property. It is therefore a more limited concept than that of 'protection of minors',[35] despite attempts made during the Fourteenth Session to introduce the idea of 'protection' so as to include in particular those cases where children are entrusted to institutions or bodies. But since all efforts to define custody rights in regard to those particular situations failed, one has to rest content with the general description given above. The Convention seeks to be more precise by emphasizing, as an example of the 'care' referred to, the right to determine the child's place of residence. However, if the child, although still a minor at law, has the right itself to determine its own place of residence, the substance of the custody rights will have to be determined in the context of other rights concerning the person of the child.

On the other hand, although nothing is said in this article about the possibility of custody rights being exercised singly or jointly, such a possibility is clearly envisaged. In fact, a classic rule of treaty law requires that a treaty's terms be interpreted in their context and by taking into account the objective and end sought by the treaty,[36] and the whole tenor of article 3 leaves no room for doubt that the Convention seeks to protect joint custody as well. As for knowing when joint custody exists, that is a question which must be decided in each particular case, and in the light of the law of the child's habitual residence.

85   As regards access rights, sub-paragraph b of this article merely points out that they include 'the right to take a child for a limited period of time to a place other than the child's habitual residence'. Clearly, therefore, it is not intended that the Convention exclude all other ways of exercising access rights. Quite simply, it seeks to emphasize that access rights extend also to what is called 'residential access', that aspect of access rights about which the person who has custody of the child is particularly apprehensive. Moreover, since this explanatory provision in no way qualifies this 'other place' to which the child may be taken, one must conclude that access rights, in terms of the Convention, also include the right of access across national frontiers.

86   A proposal was made to include in this article a definition of the judicial or administrative authorities mentioned throughout the Convention's rules.[37] The difficulties encountered as much in reaching a systematic viewpoint on this as in devising a definition wide enough to encompass all possible contingencies made for its exclusion. Now, as was mentioned earlier,[38] it is clear that these are the authorities who have the power, according to the internal law of each Contracting State, to determine questions concerning a child's custody or protection. Besides, it is precisely because of differences amongst these laws that reference is always made to 'judicial or administrative' authorities, so as to embrace all authorities which have jurisdiction in the matter, without regard to their legal characterization in each State.

CHAPITRE II — AUTORITÉS CENTRALES

*Article 6 — Création des Autorités centrales*

87   Le rôle joué par les Autorités centrales, pièces clés dans

CHAPTER II — CENTRAL AUTHORITIES

*Article 6 — Creation of Central Authorities*

87   The role played by the Central Authorities, crucial

---

[35] Voir par exemple la *Convention concernant la compétence des autorités et la loi applicable en matière de protection des mineurs, du 5 octobre 1961*.
[36] En ce sens, l'article 31, alinéa premier, de la Convention de Vienne sur le droit des traités du 23 mai 1969.
[37] Voir Doc. trav. No 7 (*Proposal of the United States delegation*) et P.-v. Nos 4 et 14.

[38] Voir *supra*, No 45.

[35] See, for example, the *Convention of 5 October 1961 concerning the powers of authorities and the applicable law in respect of the protection of minors*.
[36] See article 31(1) of the Vienna Convention of 23 May 1969 on the law of treaties.

[37] See Working Document No 7 (Proposal of the United States delegation) and *P.-v.* Nos 4 and 14.
[38] See *supra*, No 45.

A170

l'application de la Convention, a déjà été longuement présenté[39]
En ce qui concerne les Etats susceptibles de désigner plus d'une Autorité centrale, c'est l'idée que le critère déterminant à cet effet devait être l'existence de plusieurs organisations territoriales en matière de protection des mineurs qui a prévalu. En conséquence, on a ajouté aux hypothèses des Etats fédéraux et plurilégislatifs le cas des Etats «ayant des organisations territoriales autonomes», expression qui doit être interprétée dans un sens large.

*Article 7 — Obligations des Autorités centrales*

88   Cet article résume le rôle des Autorités centrales dans la mise en œuvre du système instauré par la Convention. L'article est structuré en deux alinéas, dont le premier, rédigé en termes généraux, établit une obligation globale de coopération, tandis que le second énumère, de la lettre *a* à la lettre *i*, quelques-unes des principales fonctions que les Autorités centrales doivent remplir. Tous deux sont le résultat du compromis entre, d'une part les délégations qui désiraient des Autorités centrales fortes avec des compétences d'action et d'initiative amples et d'autre part les délégations qui envisageaient lesdites Autorités comme de simples mécanismes administratifs pour faciliter l'action des parties. Or, puisque ces diverses attitudes reflétaient la plupart des profondes différences existant entre les systèmes représentés à la Conférence, la solution à retenir devait être souple, de manière à permettre à chaque Autorité centrale d'agir selon le droit dans lequel elle est appelée à s'insérer. Donc, bien que la Convention précise les principales obligations confiées à la charge des Autorités centrales, elle laisse à chaque Etat contractant la détermination des mesures appropriées pour les exécuter. D'ailleurs, c'est dans ce sens qu'il faut interpréter la phrase qui introduit le second alinéa, et qui spécifie que les Autorités centrales doivent remplir les fonctions énumérées «soit directement, soit avec le concours de tout intermédiaire»; c'est à chaque Autorité centrale de choisir entre l'une ou l'autre option en fonction de son propre droit interne et dans l'esprit du devoir général de coopération que lui impose le premier alinéa.

89   Comme nous venons de le dire, la norme insérée dans le *premier alinéa* énonce l'obligation générale de coopérer des Autorités centrales, en vue d'assurer l'accomplissement des objectifs de la Convention. Une telle coopération doit se développer à deux niveaux: les Autorités centrales doivent d'abord coopérer entre elles; mais, de surcroît, elles doivent promouvoir la collaboration entre les autorités compétentes pour les matières visées dans leurs Etats respectifs. La réalisation effective de cette promotion dépendra dans une large mesure de la capacité d'action que chaque droit interne accorde aux Autorités centrales.

90   Les fonctions détaillées au *deuxième alinéa* essaient de suivre, dans leurs grandes lignes, les différents stades de l'intervention des Autorités centrales dans un cas type de déplacements d'enfants. Néanmoins, il est évident que cette énumération n'est pas exhaustive; par exemple, puisque l'intervention des Autorités centrales exige qu'elles aient été saisies au préalable, soit directement par le demandeur, soit par l'Autorité centrale, d'un autre Etat contractant, dans la seconde hypothèse, l'Autorité centrale initialement saisie de

*Article 7 — Obligations of Central Authorities*

88   This article summarizes the role played by Central Authorities in bringing into play the system established by the Convention. The article is structured in two paragraphs, the first of which, drafted in general terms, sets out an overall duty of co-operation, while the second lists, from sub-paragraphs *a* to *i*, some of the principal functions which the Central Authorities have to discharge. Both result from a compromise between, on the one hand, those delegations which wanted strong Central Authorities with wide-ranging powers of action and initiative, and on the other hand those which saw these Authorities as straightforward administrative mechanisms for promoting action by the parties. Now, since these diverse attitudes reflected most of the deep differences which existed amongst the systems represented at the Conference, the ultimate solution had to be flexible, and such as would allow each Central Authority to act according to the law within which it has to operate. Therefore, although the Convention clearly sets out the principal obligations laid upon the Central Authorities, it lets each Contracting State decide upon the appropriate means for discharging them. And it is in this sense that the sentence occurring at the beginning of the second paragraph must be understood, which states that the Central Authorities are to discharge their listed functions 'either directly, or through any intermediary'. It is for each Central Authority to choose one or the other options, while working within the context of its own internal law and within the spirit of the general duty of co-operation imposed upon it by the first paragraph.

89   As we have just said, the rule in the *first paragraph* sets out the general duty of Central Authorities to co-operate, so as to ensure the Convention's objects are achieved. Such co-operation has to develop on two levels: the Central Authorities must firstly co-operate with each other; however, in addition, they must promote co-operation among the authorities competent for the matters dealt with within their respective States. Whether this co-operation is promoted effectively will depend to a large extent on the freedom of action which each internal law confers upon the Central Authorities.

90   The functions listed in the *second paragraph* seek to trace, in broad outline, the different stages of intervention by Central Authorities in the typical case of child removal. Nonetheless, it is clear that this list is not exhaustive. For example, since the intervention of Central Authorities necessarily depends on their having been initially seized of the matter, either directly by the applicant or by the Central Authority of a Contracting State, then in the latter case the Central Authority initially seized will have to send the

---

[39] Voir *supra* Nos 43 à 48.

[39] See *supra*, Nos 43 to 48.

A171

l'affaire devra transmettre la demande à l'Autorité centrale de l'Etat où l'on suppose que l'enfant se trouve. Or, cette obligation n'est pas précisée à l'article 7, mais plus tard, dans le contexte de l'article 9. D'autre part, il est évident aussi que les Autorités centrales ne sont pas tenues de remplir, dans chaque cas d'espèce, toutes les obligations énumérées dans cet article; en effet, ce sont les circonstances du cas précis qui vont déterminer les démarches à faire par les Autorités centrales: par exemple, on ne peut pas soutenir qu'une Autorité centrale quelconque soit tenue de «localiser» l'enfant quand le demandeur sait avec exactitude où se trouve celui-ci.

91   En plus de la localisation de l'enfant, chaque fois que cela s'avère nécessaire (lettre a), l'Autorité centrale doit prendre ou faire prendre toute mesure provisoire qui semble utile pour prévenir de «nouveaux dangers pour l'enfant ou des préjudices pour les parties concernées» (lettre b). La rédaction de ce sous-alinéa met à nouveau en relief un fait souligné auparavant: la capacité d'agir des Autorités centrales peut varier d'un Etat à un autre. Quant au fond, les mesures provisoires qui ont été envisagées se centrent tout particulièrement sur l'idée d'éviter un nouveau déplacement de l'enfant.

92   La lettre c consacre le devoir des Autorités centrales d'essayer de trouver une solution extrajudiciaire à l'affaire. En effet, d'après l'expérience évoquée par certains délégués, le nombre de cas qu'il est possible de résoudre sans avoir besoin de recourir aux tribunaux est considérable. Mais, encore une fois, c'est l'Autorité centrale qui, dans les étapes précédant une éventuelle procédure judiciaire ou administrative, dirige l'évolution du problème; donc c'est à elle de décider à quel moment les tentatives faites, soit pour assurer la «remise volontaire» de l'enfant, soit pour faciliter une «solution amiable», ont échouées.

93   La lettre d porte sur les échanges d'informations relatives à la situation sociale de l'enfant. L'obligation à cet effet est subordonnée au critère des Autorités centrales impliquées dans chaque cas d'espèce. En effet, l'introduction du membre de phrase «si cela s'avère utile» montre que l'on n'a pas voulu imposer une obligation rigide sur ce point: la possibilité qu'il n'existe pas d'informations à fournir, ainsi que la peur qu'elles puissent être employées dans le cadre d'une tactique dilatoire des parties, sont quelques-uns des arguments qui ont conseillé cette attitude. D'autre part, on a rejeté une proposition rendant possible que certaines informations soient transmises à condition qu'elles restent confidentielles.[40]

94   L'obligation faite aux Autorités centrales de fournir des informations sur le contenu du droit dans leur Etat pour l'application de la Convention apparaît à la lettre e. Ce devoir couvre notamment deux aspects: d'une part dans le cas où le déplacement s'est produit avant qu'il n'y ait eu une décision sur la garde de l'enfant, l'Autorité centrale de l'Etat de la résidence habituelle de l'enfant pourra produire une attestation sur le contenu du droit de cet Etat, en vue de l'application de la Convention; d'autre part, l'Autorité centrale devra renseigner les particuliers sur le fonctionnement de la Convention et des Autorités centrales, ainsi que sur les procédures possibles à suivre. Par contre, la possibilité d'aller plus loin, c'est-à-dire d'obliger les Autorités centrales à donner des conseils juridiques sur des cas concrets, n'est pas envisagée dans cette norme.

application to the Central Authority of the State in which the child is thought to be. Now, this obligation is not spelled out in article 7, but later, in the context of article 9. On the other hand, it is also clear that the Central Authorities are not obliged to fulfil, in every specific case, all the duties listed in this article. In fact, the circumstances of each particular case will dictate the steps which are to be taken by the Central Authorities; for example, it cannot be maintained that every Central Authority must discover the whereabouts of a child when the applicant knows full well where it is.

91   In addition to finding the whereabouts of the child, where necessary (sub-paragraph a), the Central Authority must take or cause to be taken any provisional measures which could help prevent 'further harm to the child or prejudice to interested parties' (sub-paragraph b). The drafting of this sub-paragraph clearly brings out once again a fact which was emphasized above, namely, that the ability of Central Authorities to act will vary from one State to another. Basically, the provisional measures envisaged are designed in particular to avoid another removal of the child.

92   Sub-paragraph c sets out the duty of Central Authorities to try to find an extrajudicial solution. In actual fact, in the light of experience as spoken to by some delegates, a considerable number of cases can be settled without any need to have recourse to the courts. But, once again, it is the Central Authorities which, in those stages preceding the possible judicial or administrative proceedings, will direct the development of the problem; it is therefore for them to decide when the attempts to secure the 'voluntary return' of the child or to bring about an 'amicable resolution', have failed.

93   Sub-paragraph d relates to the exchange of information about the social background of the child. This duty is made subject to the criteria adopted by the Central Authorities involved in a particular case. Indeed, the insertion of the phrase 'where desirable' demonstrates that there is no wish to impose an inflexible obligation here: the possibility of there being no information to provide, as well as the fear that reference to this provision might be used by the parties as a delaying tactic, are some of the arguments which prompted this approach. On the other hand, a proposal which would have made the transmission of certain information conditional upon its remaining confidential, was rejected.[40]

94   The obligation laid upon Central Authorities to provide information on the content of the law in their own States for the application of the Convention appears in sub-paragraph e. This duty applies in particular to two situations. Firstly, where the removal occurs prior to any decision as to the custody of the child, the Central Authority of the State of the child's habitual residence is to produce, for the purposes of the Convention's application, a certificate on the relevant law of that State. Secondly, the Central Authority must inform the individuals about how the Convention works and about the Central Authorities, as well as about the procedures available. On the other hand, the possibility of going further, by obliging the Central Authorities to give legal advice in individual cases, is not envisaged by this rule.

---

[40] Voir Doc. trav. No 9 (*Proposal of the United Kingdom delegation*) et P.-v. No 5.

[40] See Working Document No 9 (*Proposal of the United Kingdom delegation*) and *P.-v. No 5.*

A172

95  Quand il est nécessaire, pour obtenir le retour de l'enfant, de faire intervenir les autorités judiciaires ou administratives de l'Etat où il se trouve, l'Autorité centrale doit introduire elle-même — si cela est possible selon son droit interne — ou favoriser l'ouverture d'une procédure; obligation qui s'étend aussi aux procédures qui s'avèrent nécessaires pour permettre l'organisation ou l'exercice effectif du droit de visite (lettre f).

96  Dans les cas où l'Autorité centrale ne peut pas saisir directement les autorités compétentes dans son propre Etat, elle doit accorder ou faciliter au demandeur l'obtention de l'assistance judiciaire, aux termes de l'article 25 (lettre g). Il convient de préciser très brièvement que l'expression «le cas échéant» dans ce sous-alinéa fait référence à la carence de ressources économiques du demandeur, sur la base des critères établis par la loi de l'Etat où cette assistance est sollicitée; elle ne fait donc pas allusion à des considérations abstraites sur la convenance ou non de l'octroyer.

97  Au terme du processus suivi par ce paragraphe, la lettre h inclut, parmi les obligations des Autorités centrales la mise en oeuvre des mesures administratives nécessaires et opportunes dans chaque cas d'espèce, pour assurer le retour sans danger de l'enfant.

98  En dernier lieu, la lettre i énonce une obligation des Autorités centrales qui ne concerne pas directement les particuliers mais la Convention elle-même: il s'agit du devoir de «se tenir mutuellement informées sur le fonctionnement de la Convention et, autant que possible, de lever les obstacles éventuellement rencontrés lors de son application». Cette obligation devra jouer à deux niveaux complémentaires: d'une part, sur le plan des relations bilatérales entre Etats parties à la Convention; d'autre part, au niveau multilatéral, en participant le cas échéant aux commissions réunies à cet effet par le Bureau Permanent de la Conférence de La Haye.

CHAPITRE III — RETOUR DE L'ENFANT

*Article 8 – La saisine des Autorités centrales*

99  D'après le *premier alinéa*, une demande en vue d'obtenir le retour d'un enfant peut être adressée à toute Autorité centrale qui, dès lors, sera tenue par toutes les obligations conventionnelles. Cela signifie que le demandeur est libre de saisir l'Autorité centrale qu'il estime la plus adéquate; néanmoins, pour des raisons d'efficacité, une mention expresse de l'Autorité centrale de la résidence habituelle de l'enfant est faite dans le texte — mention qui ne doit pourtant pas être interprétée comme signifiant que les demandes adressées aux autres Autorités centrales devraient être exceptionnelles.

100  Etant donné que l'utilisation de la formule modèle est simplement recommandée, il était indispensable d'inclure dans le texte de la Convention les éléments que doit contenir une demande introduite devant une Autorité centrale pour être recevable, ainsi que les documents facultatifs qui peuvent accompagner ou compléter une telle demande. Les éléments que doit contenir toute demande adressée à une Autorité centrale, dans ce contexte, sont énumérés au *deuxième alinéa* de l'article 8. Il s'agit notamment des données qui permettent l'identification de l'enfant et des parties concernées, ainsi que de celles qui peuvent aider à localiser l'enfant (lettres *a*, *b* et *d*). En ce qui concerne l'information sur la date de naissance de l'enfant, la Convention signale qu'elle sera apportée seulement «s'il est possible de se la procurer». Par cette précision, on a entendu favoriser l'action du demandeur qui ignore une telle circonstance; il

95  When it is necessary, in order to obtain the child's return, for the judicial or administrative authorities of the State in which it is located to intervene, the Central Authority must itself initiate proceedings (if that can be done under its internal law) or facilitate the institution of proceedings. This duty also extends to proceedings which prove to be necessary for organizing or securing the effective exercise of rights of access (sub-paragraph f).

96  Where the Central Authority is not able to apply directly to the competent authorities in its own State, it must provide or facilitate the provision of legal aid and advice for the applicant, in terms of article 25 (sub-paragraph g). It is appropriate to point out here very briefly that the phrase 'where the circumstances so require' in this sub-paragraph refers to the applicant's lack of economic resources, as determined by the criteria laid down by the law of the State in which such assistance is sought, and that it does not therefore refer to abstract considerations as to the convenience or otherwise of granting legal aid.

97  Following the method adopted by this paragraph, sub-paragraph h includes among the Central Authorities' obligations the bringing into play in each case of such administrative arrangements as may be necessary and appropriate to secure the safe return of the child.

98  Finally, sub-paragraph i sets forth an obligation on the part of Central Authorities which does not directly concern individuals but only the Convention itself. It is the duty 'to keep each other informed with respect to the operation of the Convention, and, as far as possible, to eliminate any obstacles to its application'. This obligation is to operate on two complementary levels, firstly at the level of bilateral relations between States which are Party to the Convention, and secondly on a multilateral level, through participating when required in commissions called for this purpose by the Permanent Bureau of the Hague Conference.

CHAPTER III — RETURN OF THE CHILD

*Article 8 – Applications to Central Authorities*

99  In terms of the *first paragraph*, an application for the return of a child can be addressed to any Central Authority which, from that point, will be bound by all the obligations laid down by the Convention. This demonstrates that the applicant is free to apply to the Central Authority which in his opinion is the most appropriate. However, for reasons of efficiency, the Central Authority of the child's habitual residence is expressly mentioned in the text, but this must not be understood as signifying that applications directed to other Central Authorities are to be regarded as exceptional.

100  Since use of the model form is merely recommended, it was necessary to include in the text of the Convention the elements which any application submitted to a Central Authority must contain in order to be admissible, as well as the optional documents which may accompany or supplement such an application. The elements which every application to a Central Authority must contain, in this context, are those listed in the *second paragraph* of article 8. In particular, they are facts which allow the child and interested parties to be identified, such as those which may be able to help in locating the child (sub-paragraphs *a*, *b*, and *d*). As regards information on the child's date of birth, the Convention makes it clear that this should be supplied only 'where available'. This provision is intended to favour action by an applicant who is ignorant of such a fact but who will, however, always have to supply precise information on the

A173

devra pourtant toujours fournir des indices exacts sur l'âge de l'enfant, étant donné que le contenu de l'article 4 de la Convention peut déterminer le rejet de sa demande aux termes de l'article 27.

De plus, il faut que la demande contienne «les motifs sur lesquels se base le demandeur pour réclamer le retour de l'enfant» (lettre c). Ceci est une exigence logique, qui permettra d'ailleurs l'application de l'article 27 concernant la faculté qu'ont les Autorités centrales de rejeter les demandes manifestement non fondées. Les motifs invoqués doivent, en principe, se référer aux deux éléments, juridique et de fait, retenus à l'article 3. Or, puisque l'élément juridique peut notamment s'appuyer sur le contenu du droit de la résidence habituelle de l'enfant, sur une décision ou sur un accord, on aurait pu songer à exiger un soutien documentaire à ce stade initial. Pourtant, la Convention a choisi une voie différente et place cette preuve parmi les documents qui, d'une manière facultative, peuvent accompagner ou compléter la demande. La raison en est que l'obtention des documents en question sera parfois difficile; de plus, elle peut exiger un temps précieux pour une localisation rapide de l'enfant. D'ailleurs, chaque fois que l'Autorité centrale réussit à obtenir la remise volontaire de l'enfant ou une solution amiable de l'affaire, ils peuvent apparaître comme accessoires.

101  En ce sens, les deux premières lettres du *troisième alinéa* concernant la documentation facultative qui peut accompagner, ou compléter à un moment ultérieur, la demande, se réfèrent aux documents qui sont à la base de la réclamation en retour de l'enfant. A cet effet, il faut souligner d'abord que l'exigence que les copies de tout décision ou tout accord soient authentifiées ne s'oppose pas à la disposition de l'article 23, d'après laquelle «aucune légalisation ni formalité similaire ne sera requise dans le contexte de la Convention». Il s'agit simplement de vérifier des copies ou des documents privés à l'origine pour en garantir la concordance avec les originaux et en assurer, par ce biais, la libre circulation.

En second lieu, la preuve du contenu du droit de l'Etat de la résidence habituelle de l'enfant peut être établie soit par une attestation, soit par une déclaration avec affirmation, c'est-à-dire moyennant des documents incorporant des déclarations solennelles qui engagent la responsabilité de leurs auteurs. Quant à savoir qui peut produire lesdites déclarations, la Convention a choisi une formule large, qui doit faciliter la tâche du demandeur (lettre f). Ainsi, en plus des Autorités centrales et des autres autorités compétentes de l'Etat de la résidence habituelle de l'enfant, elles peuvent émaner de toute personne qualifiée — par exemple, d'un notaire, d'un avocat ou d'institutions scientifiques.

D'autre part, il convient de souligner que dans une phase ultérieure, c'est-à-dire quand les autorités judiciaires ou administratives de l'Etat de refuge sont appelées à intervenir, celles-ci peuvent demander, selon l'article 15, la production de certains des documents considérés comme facultatifs au moment de la saisine des Autorités centrales.

Finalement, la Convention admet la possibilité que la demande soit accompagnée ou complétée par «tout autre document utile» (lettre g). En principe, étant donné que la demande est introduite par le gardien dépossédé, c'est lui qui pourra apporter ces documents complémentaires. Ce qui n'empêche pas que, si la demande est transmise à une autre Autorité centrale, l'Autorité centrale initialement saisie puisse accompagner la demande notamment des informations relatives à la situation sociale de l'enfant — si elle en dispose et les considère utiles —, en vertu de la fonction que lui attribue l'article 7, alinéa 2d.

age of the child, since the provisions of article 4 may result in his application being rejected, in terms of article 27.

Moreover, the application must contain 'the grounds on which the applicant's claim for return of the child is based' (sub-paragraph c). This requirement is logical, in that it allows the application of article 27 concerning the right of Central Authorities to reject applications which are clearly not well-founded. The grounds must in principle refer to the two elements, legal and factual, contained in article 3. Now, since the legal element in particular may depend on the provisions of the law of the child's habitual residence, or upon a decision or agreement, it might have been expected that documentary support would be required at this initial stage. However, the Convention chose to follow a different route and placed this evidence amongst those documents which may, optionally, accompany or supplement the application. The reason for this is that obtaining the documents in question is sometimes difficult and, what is more, could take up precious time better spent in speedily discovering the whereabouts of the child. Moreover, whenever a Central Authority succeeds in bringing about the voluntary return of the child or an amicable resolution of the affair, such requirements may seem merely accessory.

101  Understood thus, the first two sub-paragraphs of the *third paragraph*, dealing with the optional provision of documents which may accompany or supplement applications, are seen to refer to documents which are fundamental to a claim for the return of the child. It must be emphasized firstly that the requirement that copies of any decision or agreement be authenticated in no way contradicts the provision in article 23 that 'no legalization or similar formality may be required in the context of this Convention'. It is simply a matter of verifying what were originally copies or private documents so as to guarantee that they correspond to the originals and thus to secure their free circulation.

Secondly, proof of the substantive law of the State of the child's habitual residence may be established by either certificates or affidavits, that is to say documents which include solemn statements for which those who make them assume responsibility. As regards those persons who may adduce such statements, the Convention chose to define them widely, a fact which must make the task of the applicant easier (sub-paragraph f). Thus, they may emanate from any qualified person — for example, an attorney, solicitor, or barrister or research institution — as well as from the Central Authorities and the other competent authorities of the State of the child's habitual residence.

On the other hand, it should be stressed that at a later stage, when the judicial or administrative authorities of the State of refuge have been called upon to intervene, they may, in terms of article 15, request the production of certain documents which were considered to be optional at the time of application to the Central Authorities.

Lastly, the Convention acknowledges that the application may be accompanied or supplemented by 'any other relevant document' (sub-paragraph g). In theory, since it is the dispossessed guardian of the child who brings the application, it is for him to provide these supplementary documents. This does not preclude the Central Authority to which the application was originally made, where the application is sent to another Central Authority, from accompanying the application by, *inter alia*, information concerning the social background of the child (if it has such information at its disposal and considers it to be useful), by virtue of the task laid upon it by article 7, paragraph 2d.

A174

*Article 9 – Transmission de la demande à l'Autorité centrale de l'Etat où se trouve l'enfant*

102   Une conséquence directe de la liberté dont jouit le demandeur de s'adresser à l'Autorité centrale de son choix est l'obligation qui pèse sur celle-ci de transmettre la demande à l'Autorité centrale de l'Etat où elle a des raisons de penser que l'enfant se trouve; obligation qui va aussi se présenter quand l'Autorité centrale qui connaît d'une affaire par une autre Autorité centrale arrivera à la conclusion que l'enfant se trouve dans un pays différent. Il s'agit là d'une fonction qui vient compléter le cadre esquissé à l'article 7, puisqu'elle est en rapport direct avec l'obligation de coopérer entre Autorités centrales qu'établit le premier alinéa dudit article.

Or, si le sens de l'article 9 est clair, sa rédaction n'en est pas très heureuse. «L'Autorité centrale requérante» à laquelle cet article se réfère existe seulement lorsque la demande introduite conformément à l'article 8 a été transmise à une *autre* Autorité centrale aux termes de l'article 9 lui-même. En conséquence, l'obligation d'informer une «Autorité centrale requérante» n'existe que lorsque la demande a été transmise à une troisième Autorité centrale, l'enfant ne se trouvant pas dans l'Etat de la deuxième Autorité centrale saisie. Par contre, l'obligation de transmettre une demande en vertu de cet article incombe à *toute* Autorité centrale, indépendamment du fait qu'elle soit première saisie ou saisie par l'intermédiaire d'une autre Autorité centrale, en raison du fait que cette disposition doit être interprétée comme s'appliquant aux deux hypothèses qu'elle a l'intention de couvrir.

*Article 10 – La remise volontaire de l'enfant*

103   La fonction des Autorités centrales visée à l'article 7, alinéa 2c «prendre toutes les mesures appropriées pour assurer la remise volontaire de l'enfant», trouve à cet article un traitement préférentiel qui met en relief l'intérêt accordé au recours à cette voie. Dans le texte de la Convention, on a supprimé le membre de phrase qui introduisait, dans l'avant-projet, cette disposition et qui situait dans le temps («avant l'ouverture de toute procédure judiciaire ou administrative») l'obligation qu'elle incorpore. La raison en était la difficulté éprouvée par certains systèmes juridiques pour accepter qu'une autorité publique, telle que l'Autorité centrale, puisse agir avant l'introduction d'une demande auprès des autorités compétentes; la teneur de la disposition conventionnelle n'empêche pas que les Autorités centrales des autres Etats agissent de la sorte. D'autre part, il ne sera jamais question d'une obligation rigide, dans un double sens: d'une part, les efforts pour la remise volontaire de l'enfant peuvent se poursuivre après la saisine des autorités judiciaires ou administratives s'ils ont commencé avant; d'autre part, dans la mesure où l'initiative en vue du retour de l'enfant ne se transfert pas à ces autorités, c'est l'Autorité centrale qui doit décider si les tentatives en vue de tel objectif ont échoué.

D'ailleurs, il est entendu que les démarches visées dans cet article ne doivent pas préjuger de l'action des Autorités centrales pour empêcher un nouveau déplacement de l'enfant, selon l'article 7, alinéa 2b.

*Article 11 – L'utilisation des procédures d'urgence par les autorités judiciaires ou administratives*

104   L'importance du facteur temps dans toute la matière apparaît de nouveau dans cet article. Si l'article 2 de la Convention impose aux Etats contractants l'obligation d'utiliser des procédures d'urgence le *premier alinéa* de cet article reproduit cette obligation à l'égard des autorités de

*Article 9 – Transmission of the application to the Central Authority of the State where the child is located*

102   A direct consequence of the applicant's right to apply to the Central Authority of his choice is the duty imposed on the latter to transmit the application to the Central Authority of the State in which it has reason to believe the child is located; this duty arises also when the Central Authority which is informed of a case by another Central Authority reaches the conclusion that the child is in fact located in a different country. This is a task which supplements the framework of duties outlined in article 7, since it relates directly to the duty of co-operation amongst Central Authorities established by the first paragraph of that article.

Now, although the meaning of article 9 may be clear, it has not been very artfully drafted. The 'requesting Central Authority' to which this article refers exists only where the application submitted in accordance with article 8 has been transmitted to *another* Central Authority in terms of article 9 itself. Consequently, the duty to inform a 'requesting Central Authority' exists only when the application has been transmitted to a third Central Authority, the child not being located in the State of the second Central Authority to which the application was sent. But on the other hand, the duty to transmit an application in terms of this article devolves upon *any* Central Authority, independently of the fact that it was seized of the matter either directly or through the intervention of another Central Authority, since this provision must be understood as applying to both of the cases it is meant to cover.

*Article 10 – Voluntary return of the child*

103   The duty of Central Authorities, stated in article 7(2)(c), to 'take all appropriate measures to secure the voluntary return of the child', is given preferential treatment in this article, which highlights the interest of the Convention in seeing parties have recourse to this way of proceeding. The phrase 'before the institution of any legal or administrative proceedings' which preceded this provision in the Preliminary Draft, and restricted the duty included within it to a particular point in time, was deleted from the text of the Convention. The reason for this deletion is the difficulty experienced by some legal systems in accepting that a public authority, such as a Central Authority, could act before an application had been brought before the competent authorities; however, the whole tenor of the provision shows that the Central Authorities of other States are not precluded from acting in that way. On the other hand, it is in no way an inflexible obligation, for two reasons: firstly, efforts to secure the voluntary return of the child which were begun prior to the referral of the matter to the judicial or administrative authorities may be pursued thereafter, and secondly, in so far as the initiative for the return of the child has not been transferred to those authorities, it is for the Central Authority to decide whether the attempts to achieve this objective have failed.

Moreover, the measures envisaged in this article are not intended to prejudice the efforts of Central Authorities to prevent further removals of the child, pursuant to article 7(2)(b).

*Article 11 – The use of expeditious procedures by judicial or administrative authorities*

104   The importance throughout the Convention of the time factor appears again in this article. Whereas article 2 of the Convention imposes upon Contracting States the duty to use expeditious procedures, the *first paragraph* of this article restates the obligation, this time with regard to the authori-

---

*Rapport Pérez-Vera*

A175

l'Etat où l'enfant a été emmené et qui doivent statuer sur la remise de celui-ci. L'obligation considérée a un double aspect: d'une part, l'utilisation des procédures les plus rapides connues par leur système juridique; d'autre part le traitement prioritaire, dans toute la mesure du possible, des demandes visées.

105   Dans son désir de pousser les autorités internes à accorder une priorité maximum aux problèmes soulevés par les déplacements internationaux d'enfants, le *deuxième alinéa* établit un délai non contraignant de six semaines, après lequel le demandeur ou l'Autorité centrale de l'Etat requis peuvent solliciter une déclaration sur les motifs du retard. De plus quand l'Autorité centrale de l'Etat requis aura reçu la réponse, elle aura à nouveau une obligation de renseignement, soit envers l'Autorité centrale de l'Etat requérant, soit envers le demandeur, si c'est lui qui l'a directement saisie. En somme, l'importance de cette disposition ne peut pas être mesurée par rapport à l'exigibilité des obligations qu'elle consacre, mais par le fait même qu'elle attire l'attention des autorités compétentes sur le caractère décisif du facteur temps dans les situations concernées et qu'elle fixe le délai maximum que devrait prendre l'adoption d'une décision à cet égard.

*Articles 12 et 18 – Obligation de retourner l'enfant*

106   Ces deux articles peuvent être examinés ensemble car, malgré leur nature différente, ils présentent un certain caractère complémentaire.
*L'article 12* constitue une pièce essentielle de la Convention, étant donné que c'est lui qui précise les situations dans lesquelles les autorités judiciaires ou administratives de l'Etat où se trouve l'enfant sont tenues d'ordonner son retour. C'est pourquoi il convient de souligner, une fois encore, que la remise non volontaire d'un enfant s'appuie, d'après la Convention, sur une décision adoptée par les autorités compétentes à cet égard dans l'Etat requis; en conséquence, l'obligation de retour dont traite cet article s'impose auxdites autorités. A cet effet, l'article distingue deux hypothèses: la première concerne le devoir des autorités lorsqu'elles ont été saisies dans le délai d'un an après le déplacement ou le non-retour illicites d'un enfant; la seconde a trait aux conditions qui entourent ce devoir quand l'introduction de la demande est postérieure au délai susmentionné.

107   Dans le premier alinéa, l'article apporte une solution unique au problème soulevé par la détermination de la période pendant laquelle les autorités en question doivent ordonner le retour immédiat de l'enfant. Le problème est important car, dans la mesure où le retour de l'enfant est envisagé dans son intérêt, il est certain que lorsque l'enfant est intégré dans un nouveau milieu, son retour ne devrait se produire qu'après un examen du fond du droit de garde – ce qui nous situe en dehors de l'objectif conventionnel. Or, les difficultés que rencontre toute tentative de traduire le critère de l'intégration de l'enfant sous forme d'une norme objective ont conduit à la fixation d'un délai, qui est peut-être arbitraire, mais qui constitue la «moins mauvaise» réponse aux soucis exprimés sur ce point.

108   Dans l'approche adoptée, il a fallu affronter une pluralité de questions: *primo*, le moment à partir duquel commence le délai; *secundo*, l'extension du délai; *tertio*, le moment d'expiration du délai. En ce qui concerne le premier point, c'est-à-dire la détermination du moment où commence à courir le délai, l'article se réfère au déplacement ou non-retour illicites; la concrétisation de la date décisive en cas de non-retour devant être entendue comme celle à laquelle l'enfant aurait dû être remis au gardien, ou à laquelle le titulaire de la garde a refusé son consentement à

ties of the State to which the child has been taken and which are to decide upon its return. There is a double duty to this duty: firstly, the use of the most speedy procedures known to their legal system; secondly, that applications are, so far as possible, to be granted priority treatment.

105   The *second paragraph*, so as to prompt internal authorities to accord maximum priority to dealing with the problems arising out of the international removal of children, lays down a non-obligatory time-limit of six weeks, after which the applicant or Central Authority of the requested State may request a statement of reasons for the delay. Moreover, after the Central Authority of the requested State receives the reply, it is once more under a duty to inform, a duty owed either to the Central Authority of the requesting State or to the applicant who has applied to it directly. In short, the provision's importance cannot be measured in terms of the requirements of the obligations imposed by it, but by the very fact that it draws the attention of the competent authorities to the decisive nature of the time factor in such situations and that it determines the maximum period of time within which a decision on this matter should be taken.

*Articles 12 and 18 – Duty to return the child*

106   These two articles can be examined together since they complement each other to a certain extent, despite their different character.
*Article 12* forms an essential part of the Convention, specifying as it does those situations in which the judicial or administrative authorities of the State where the child is located are obliged to order its return. That is why it is appropriate to emphasize once again the fact that the compulsory return of the child depends, in terms of the Convention, on a decision having been taken by the competent authorities of the requested State. Consequently, the obligation to return a child with which this article deals is laid upon these authorities. To this end, the article highlights two cases; firstly, the duty of authorities where proceedings have begun within one year of the wrongful removal or retention of a child and, secondly, the conditions which attach to this duty where an application is submitted after the aforementioned time-limit.

107   In the first paragraph, the article brings a unique solution to bear upon the problem of determining the period during which the authorities concerned must order the return of the child forthwith. The problem is an important one since, in so far as the return of the child is regarded as being in its interests, it is clear that after a child has become settled in its new environment, its return should take place only after an examination of the merits of the custody rights exercised over it – something which is outside the scope of the Convention. Now, the difficulties encountered in any attempt to state this test of 'integration of the child' as an objective rule resulted in a time-limit being fixed which, although perhaps arbitrary, nevertheless proved to be the 'least bad' answer to the concerns which were voiced in this regard.

108   Several questions had to be faced as a result of this approach: firstly, the date from which the time-limit was to begin to run; secondly, extension of the time-limit; thirdly, the date of expiry of the time-limit. As regards the first point, *i.e.* how to determine the date on which the time-limit should begin to run, the article refers to the wrongful removal or retention. The fixing of the decisive date in cases of wrongful retention should be understood as that on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to

A176

un prolongement du séjour de l'enfant dans un autre lieu que celui de sa résidence habituelle. En second lieu, la consécration d'un délai unique d'un an, abstraction faite des difficultés rencontrées dans la localisation de l'enfant, constitue une amélioration substantielle du système prévu dans l'article 11 de l'avant-projet élaboré par la Commission spéciale. En effet, par ce biais on a clarifié l'application de la Convention, en éliminant les difficultés inhérentes à la preuve des éventuels problèmes suscités par la localisation de l'enfant. Troisièmement, en ce qui concerne le *terminus ad quem*, l'article retient le moment de l'introduction de la demande, au lieu de la date de la décision; le retard possible dans l'action des autorités compétentes ne devant pas nuire aux intérêts des parties protégées par la Convention.

En résumé, chaque fois que les circonstances que nous venons d'examiner se trouvent réunies dans un cas d'espèce, les autorités judiciaires ou administratives doivent ordonner le retour immédiat de l'enfant, sauf si elles constatent l'existence d'une des exceptions prévues par la Convention elle-même.

109   Le deuxième alinéa répond à la nécessité, ressentie tout au long des travaux préparatoires,[41] d'assouplir les conséquences de l'adoption d'un délai rigide passé lequel la Convention ne pourrait pas être invoquée. La solution finalement retenue[42] étend nettement le domaine d'application de la Convention en consacrant, pour une période indéfinie, une véritable obligation de retourner l'enfant. De toute façon, on ne peut pas ignorer qu'une telle obligation disparaît à son arrivée à établir que «l'enfant s'est intégré dans son nouveau milieu». La disposition ne précise point qui doit prouver cette circonstance; pourtant, il semble logique de penser qu'une telle tâche incombe à l'enleveur ou à la personne qui s'oppose au retour de l'enfant, tout en sauvegardant l'éventuel pouvoir d'appréciation des autorités internes à cet égard. En tout cas, la preuve ou la constatation du nouvel enracinement de l'enfant ouvre la porte à la possibilité d'une procédure plus longue que celle visée au premier alinéa. En définitive, tant pour ces raisons que du fait que le retour se produira toujours, par la nature même des choses, beaucoup plus tard qu'un an après l'enlèvement, la Convention ne parle pas dans ce contexte de retour «immédiat», mais simplement de retour.

110   Un problème commun aux deux situations examinées est la détermination du *lieu* où il faut retourner l'enfant. A cet égard, la Convention n'a pas retenu une proposition tendant à préciser que le retour se ferait toujours vers l'Etat de la résidence habituelle de l'enfant avant son déplacement. Certes, une des raisons sous-jacentes à l'idée de retourner l'enfant est le souci d'éviter que la compétence «naturelle» des tribunaux de l'Etat de sa résidence ne soit bafouée par une voie de fait; néanmoins, l'inclusion d'une telle précision dans le texte de la Convention en aurait rendu l'application inutilement rigide. En effet, nous ne devons pas ignorer que ce qu'on entend protéger en luttant contre les enlèvements internationaux d'enfants, c'est le droit de ceux-ci à ne pas être écartés d'un certain milieu qui, parfois, sera fondamentalement familial. Or, si le demandeur n'habite plus l'Etat de la résidence habituelle antérieure au déplacement, le retour de l'enfant dans cet Etat poserait des problèmes pratiques difficiles à résoudre. Le silence de la Convention sur ce point doit donc être interprété comme permettant aux autorités de l'Etat de refuge de renvoyer

an extension of the child's stay in a place other than that of its habitual residence. Secondly, the establishment of a single time-limit of one year (putting on one side the difficulties encountered in establishing the child's whereabouts) is a substantial improvement on the system envisaged in article 11 of the Preliminary Draft drawn up by the Special Commission. In fact, the application of the Convention was thus clarified, since the inherent difficulty in having to prove the existence of those problems which can surround the locating of the child was eliminated. Thirdly, as regards the *terminus ad quem*, the article has retained the date on which proceedings were commenced, instead of the date of decree, so that potential delays in acting on the part of the competent authorities will not harm the interests of parties protected by the Convention.

To sum up, whenever the circumstances just examined are found to be present in a specific case, the judicial or administrative authorities must order the return of the child forthwith, unless they aver the existence of one of the exceptions provided for in the Convention itself.

109   The second paragraph answered to the need, felt strongly throughout the preliminary proceedings,[41] to lessen the consequences which would flow from the adoption of an inflexible time-limit beyond which the provisions of the Convention could not be invoked. The solution finally adopted[42] plainly extends the Convention's scope by maintaining indefinitely a real obligation to return the child. In any event, it cannot be denied that such an obligation disappears whenever it can be shown that 'the child is now settled in its new environment'. The provision does not state how this fact is to be proved, but it would seem logical to regard such a task as falling upon the abductor or upon the person who opposes the return of the child, whilst at the same time preserving the contingent discretionary power of internal authorities in this regard. In any case, the proof or verification of a child's establishment in a new environment opens up the possibility of longer proceedings than those envisaged in the first paragraph. Finally, and as much for these reasons as for the fact that the return will, in the very nature of things, always occur much later than one year after the abduction, the Convention does not speak in this context of return 'forthwith' but merely of return.

110   One problem common to both of these situations was determining the *place* to which the child had to be returned. The Convention did not accept a proposal to the effect that the return of the child should always be to the State of its habitual residence before its removal. Admittedly, one of the underlying reasons for requiring the return of the child was the desire to prevent the 'natural' jurisdiction of the courts of the State of the child's residence being evaded with impunity, by force. However, including such a provision in the Convention would have made its application so inflexible as to be useless. In fact, we must not forget that it is the right of children not to be removed from a particular environment which sometimes is a basically family one, which the fight against international child abductions seeks to protect. Now, when the applicant no longer lives in what was the State of the child's habitual residence prior to its removal, the return of the child to that State might cause practical problems which would be difficult to resolve. The Convention's silence on this matter must therefore be understood as allowing the authorities of the State of refuge

---

41 Voir Rapport de la Commission spéciale No 92.
42 Voir Doc. trav. No 25 (Proposition de la délégation de la République fédérale d'Allemagne), et P.-v. Nos 7 et 10.

41 See Report of the Special Commission, No 92.
42 See Working Document No 25 (Proposal of the delegation of the Federal Republic of Germany) and P.-v. Nos 7 and 10.

---

*Rapport Pérez-Vera*

*Pérez-Vera Report*                                   459

[47]

A177

l'enfant directement au demandeur, sans égard au lieu de la résidence actuelle de celui-ci.

111   Le troisième alinéa de l'article 12 introduit une idée tout à fait logique, inspirée par des soucis d'économie procédurale, en vertu de laquelle les autorités qui connaissent d'une affaire peuvent suspendre la procédure ou rejeter la demande, lorsqu'elles ont des raisons de croire que l'enfant a été emmené dans un autre Etat. Les moyens par lesquels elles peuvent arriver à une telle conviction ne sont pas envisagés dans l'article; ils dépendront par conséquent du droit interne de l'Etat concerné.

112   Finalement, l'article 18 signale que rien dans ce chapitre ne limite le pouvoir de l'autorité judiciaire ou administrative saisie d'ordonner le retour de l'enfant à tout moment. Rédigée sur la base de l'article 15 de l'avant-projet, cette disposition, qui n'impose aucune obligation, souligne la nature non exhaustive, complémentaire, de la Convention. En effet, elle autorise les autorités compétentes à ordonner le retour de l'enfant en invoquant d'autres dispositions plus favorables à ce but. Ceci peut surtout se produire dans les situations envisagées au deuxième alinéa de l'article 12, c'est-à-dire quand, du fait que l'autorité a été saisie après que se soit écoulé plus d'un an depuis le déplacement, le retour peut être refusé si l'enfant s'est intégré dans son nouveau milieu social et familial.

*Articles 13 et 20 — Exceptions possibles au retour de l'enfant*

113   Dans la première partie de ce Rapport nous avons commenté longuement la justification, l'origine et la portée des exceptions consacrées dans les articles examinés.[43] Nous nous limiterons ici à faire quelques considérations sur sa teneur littérale. En termes généraux, il convient d'insister sur le fait que les exceptions visées dans les deux articles en question ne sont pas d'application automatique, en ce sens qu'elles ne déterminent pas inévitablement le non-retour de l'enfant; par contre, la nature même de ces exceptions est de donner aux juges la possibilité – non pas de leur imposer l'obligation – de refuser le retour dans certaines circonstances.

114   En ce qui concerne l'article 13, le paragraphe introductif du premier alinéa met en relief que le fardeau de la preuve des circonstances énoncées aux sous-alinéas a et b est à la charge de celui qui s'oppose au retour de l'enfant, c'est-à-dire à une personne, institution ou organisme qui peut parfois ne pas coïncider avec l'enleveur. La solution retenue se limite certes à préciser une maxime générale de droit, selon laquelle celui qui invoque un fait (ou un droit) doit le prouver; mais en adoptant cette optique, la Convention a entendu équilibrer la position de la personne dépossédée par rapport à l'enleveur qui, en principe, a pu choisir le for de sa convenance.

115   Les exceptions retenues à la lettre a sont établies en raison du fait que la conduite du prétendu gardien permet de douter de l'existence d'un déplacement ou d'un non-retour illicites, au sens de la Convention. D'une part, il s'agit des situations où celui qui avait le soin de la personne de l'enfant n'exerçait pas effectivement le droit de garde à l'époque du déplacement ou du non-retour. La Convention

to return the child directly to the applicant, regardless of the latter's present place of residence.

111   The third paragraph of article 12 introduces a perfectly logical provision, inspired by considerations of procedural economy, by virtue of which the authorities which are acquainted with a case can stay the proceedings or dismiss the application, where they have reason to believe that the child has been taken to another State. The reasons by which they may come to such a conclusion are not stated in the article, and will therefore depend on the internal law of the State in question.

112   Finally, article 18 indicates that nothing in this chapter limits the power of a judicial or administrative authority to order the return of the child at any time. This provision, which was drafted on the basis of article 15 of the Preliminary Draft, and which imposes no duty, underlines the non-exhaustive and complementary nature of the Convention. In fact, it authorizes the competent authorities to order the return of the child by invoking other provisions more favourable to the attainment of this end. This may happen particularly in the situations envisaged in the second paragraph of article 12, i.e. where, as a result of an application being made to the authority after more than one year has elapsed since the removal, the return of the child may be refused if it has become settled in its new social and family environment.

*Articles 13 and 20 — Possible exceptions to the return of the child*

113   In the first part of this Report we commented at length upon the reasons for, the origins and scope of, the exceptions contained in the articles concerned.[43] We shall restrict ourselves at this point to making some observations on their literal meaning. In general, it is appropriate to emphasize that the exceptions in these two articles do not apply automatically, in that they do not invariably result in the child's retention; nevertheless, the very nature of these exceptions gives judges a discretion — and does not impose upon them a duty — to refuse to return a child in certain circumstances.

114   With regard to article 13, the introductory part of the first paragraph highlights the fact that the burden of proving the facts stated in sub-paragraphs a and b is imposed on the person who opposes the return of the child, be he a physical person, an institution or an organization, that person not necessarily being the abductor. The solution adopted is indeed limited to stating the general legal maxim that he who avers a fact (or a right) must prove it, but in making this choice, the Convention intended to put the dispossessed person in as good a position as the abductor who in theory has chosen what is for him the most convenient forum.

115   The exceptions contained in a arise out of the fact that the conduct of the person claiming to be the guardian of the child raises doubts as to whether a wrongful removal or retention, in terms of the Convention, has taken place. On the one hand, there are situations in which the person who had the care of the child did not actually exercise custody rights at the time of the removal or retention. The Conven-

---

43   Voir *supra* Nos 28 à 35.

43   See *supra*, Nos 28 to 35.

*Rapport Pérez-Vera*

*Pérez-Vera Report*

A178

n'inclut pas une définition de ce qu'il faut entendre par «exercice effectif» de la garde, mais cette disposition se réfère de façon expresse au soin de la personne de l'enfant; donc, si l'on en compare le texte avec celui de la définition du droit de garde contenue à l'article 5, on peut conclure qu'il y a garde effective quand le gardien s'occupe des soins de la personne de l'enfant, même si, pour des raisons plausibles (maladie, séjour d'études, etc.), dans chaque cas concret, enfant et gardien n'habitent pas ensemble. Il s'en-suit que la détermination du caractère effectif ou non d'une garde doit être établi par le juge d'après les circonstances qui entourent chaque cas d'espèce.

D'ailleurs en mettant en relation ce paragraphe avec la définition du déplacement ou du non-retour illicites de l'article 3, il faut conclure que la preuve que la garde n'était pas effective ne constitue pas une exception à l'obligation de retourner l'enfant lorsque le gardien dépossédé n'exerçait pas de façon effective son droit à cause précisément de l'action de l'enleveur. En effet, la délimitation des situations protégées, contenue à l'article 3, préside toute la Convention et on ne peut interpréter aucun de ses articles en con-tradiction avec cette délimitation.

D'autre part, la conduite du gardien peut aussi altérer la qualification de l'action du ravisseur, au cas où il aurait consenti ou acquiescé postérieurement au déplacement qu'il combat maintenant. Cette précision a donné lieu à la possibilité de supprimer toute référence à l'exercice de «bonne foi» du droit de garde, en évitant simultanément que la Convention puisse être utilisée comme instrument d'un «marchandage» possible entre les parties.

116   Les exceptions consacrées à la lettre *b* concernent des situations dans lesquelles l'enlèvement international d'un enfant s'est vraiment produit, mais où le retour de l'enfant serait contraire à son intérêt, tel qu'il est apprécié dans ce sous-alinéa. Chacun des termes employés dans cette dis-position reflète un délicat compromis atteint au cours des travaux de la Commission spéciale et qui s'est maintenu inchangé; en conséquence, on ne peut pas déduire, *a con-trario*, des interprétations extensives du rejet, au cours de la Quatorzième session, des propositions tendant à inclure une allusion expresse à l'impossibilité d'invoquer cette exception lorsque le retour de l'enfant pourrait nuire à ses perspectives économiques ou éducatives.[44]

117   Il n'y a rien à ajouter aux commentaires déjà faits sur le deuxième alinéa de cet article (notamment, *supra* No 31).

Quant au troisième alinéa, il contient une disposition de nature très différente; il s'agit, en effet, d'une disposition procédurale qui vise, d'une part, à équilibrer la charge de la preuve imposée à la personne qui s'oppose au retour de l'enfant et d'autre part, à renforcer l'utilité des informations fournies par les autorités de l'Etat de la résidence habituelle de l'enfant. De telles informations, qui peuvent émaner soit de l'Autorité centrale, soit de toute autre autorité compétente, peuvent en particulier être précieuses pour permettre aux autorités requises de constater l'existence des circonstances à la base des exceptions visées aux deux premiers alinéas de cet article.

118   La possibilité reconnue à *l'article 20* de ne pas retourner un enfant quand ce retour «ne serait pas permis par les principes fondamentaux de l'Etat requis sur la sauvegarde des droits de l'homme et des libertés fon-damentales», a été placée significativement dans le dernier

tion includes no definition of 'actual exercise' of custody, but this provision expressly refers to the care of the child. Thus, if the text of this provision is compared with that of article 5 which contains a definition of custody rights, it can be seen that custody is exercised effectively when the cus-todian is concerned with the care of the child's person, even if, for perfectly valid reasons (illness, education, etc.) in a particular case, the child and its guardian do not live together. It follows from this that the question of whether custody is actually exercised or not must be determined by the individual judge, according to the circumstances of each particular case.

Moreover, by relating this paragraph to the definition of wrongful removal or retention in article 3, one must con-clude that proof that custody was not actually exercised does not form an exception to the duty to return the child if the dispossessed guardian was unable actually to exercise his rights precisely because of the action of the abductor. In fact, the categorization of protected situations, contained in article 3, governs the whole Convention, and cannot be contradicted by a contrary interpretation of any of the other articles.

On the other hand, the guardian's conduct can also alter the characterization of the abductor's action, in cases where he has agreed to, or thereafter acquiesced in, the removal which he now seeks to challenge. This fact allowed the deletion of any reference to the exercise of custody rights 'in good faith', and at the same time prevented the Convention from being used as a vehicle for possible 'bargaining' be-tween the parties.

116   The exceptions contained in *b* deal with situations where international child abduction has indeed occurred, but where the return of the child would be contrary to its interests, as that phrase is understood in this sub-paragraph. Each of the terms used in this provision is the result of a fragile compromise reached during the deliberations of the Special Commission and has been kept unaltered. Thus it cannot be inferred, *a contrario*, from the rejection during the Fourteenth Session of proposals favouring the inclusion of an express provision stating that this exception could not be invoked if the return of the child might harm its economic or educational prospects,[44] that the exceptions are to receive a wide interpretation.

117   Nothing requires to be added to the preceding commentary on the second paragraph of this article (notably in No 31, *supra*.

The third paragraph contains a very different provision which is in fact procedural in nature and seeks on the one hand to compensate for the burden of proof placed on the person who opposes the return of the child, and on the other hand to increase the usefulness of information supplied by the authorities of the State of the child's habitual residence. Such information, emanating from either the Central Authority or any other competent authority, may be parti-cularly valuable in allowing the requested authorities to determine the existence of those circumstances which underlie the exceptions contained in the first two para-graphs of this article.

118   It is significant that the possibility, acknowledged in *article 20*, that the child may not be returned when its return 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms' has been placed in the

---

[44]   Voir Doc. trav. No 12 (*Proposal of the United States delegation*) et No 42 (Propo-sition de la délégation hellénique), ainsi que le P.-v. No 8.

[44]   See Working Documents Nos 12 (Proposal of the United States delegation) and 42 (*Proposition de la délégation hellénique*), and also *P.-v.* No 8.

---

*Rapport Pérez-Vera*

*Pérez-Vera Report*                461

[49]

article du chapitre; on a voulu souligner de la sorte le caractère nettement exceptionnel que doit toujours revêtir son application. Quant à savoir quel est le contenu de cette disposition, nous nous limiterons à faire deux remarques: en premier lieu, même si sa teneur littérale rappelle fortement la terminologie des textes internationaux en matière de protection des droits de l'homme, cette norme ne vise pas les développements atteints sur le plan international; par contre, elle ne concerne que les principes admis dans le droit de l'Etat requis, soit par voie de droit international général ou conventionnel, soit par voie législative interne. En conséquence, pour pouvoir refuser un retour sur la base de cet article, il sera nécessaire que les principes fondamentaux en la matière acceptés par l'Etat requis ne le permettent pas; il ne suffit pas que le retour soit incompatible, ou même manifestement incompatible avec ces principes. En second lieu, l'invocation de tels principes ne devra en aucun cas être plus fréquente ni plus facilement admise qu'elle ne le serait pour régler des situations purement internes. Le contraire serait discriminatoire en soi, c'est-à-dire opposé à l'un des principes fondamentaux les plus généralement reconnus dans les droits internes. Or, l'étude de la jurisprudence des différents pays montre que l'application par le juge ordinaire de la législation concernant les droits de l'homme et les libertés fondamentales se fait avec une prudence qu'il faut s'attendre à voir maintenue à l'égard des situations internationales que vise la Convention.

last article of the chapter: it was thus intended to emphasize the always clearly exceptional nature of this provision's application. As for the substance of this provision, two comments only are required. Firstly, even if its literal meaning is strongly reminiscent of the terminology used in international texts concerning the protection of human rights, this particular rule is not directed at developments which have occurred on the international level, but is concerned only with the principles accepted by the law of the requested State, either through general international law and treaty law, or through internal legislation. Consequently, so as to be able to refuse to return a child on the basis of this article, it will be necessary to show that the fundamental principles of the requested State concerning the subject-matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles. Secondly, such principles must not be invoked any more frequently, nor must their invocation be more readily admissible than they would be in their application to purely internal matters. Otherwise, the provision would be discriminatory in itself, and opposed to one of the most widely recognized fundamental principles in internal laws. A study of the case law of different countries shows that the application by ordinary judges of the laws on human rights and fundamental freedoms is undertaken with a care which one must expect to see maintained in the international situations which the Convention has in view.

### Article 14 — Assouplissement de la preuve du droit étranger

### Article 14 — Relaxation of the requirements of proof of foreign law

119 Du moment que la Convention fait dépendre le caractère illicite d'un déplacement d'enfants du fait qu'il se soit produit en violation de l'exercice effectif d'un droit de garde attribué par le droit de la résidence habituelle de l'enfant, il est évident que les autorités de l'Etat requis devront prendre ce droit en considération pour décider du retour de l'enfant. En ce sens, la disposition incluse dans l'article 13 de l'avant-projet,[45] d'après laquelle ces autorités «tiendront compte» du droit de la résidence habituelle de l'enfant pouvait être considérée comme superflue. Cependant, une telle disposition, d'une part, soulignait bien qu'il ne s'agissait pas d'appliquer un droit, mais de l'utiliser comme instrument dans l'appréciation de la conduite des parties; d'autre part, dans la mesure où elle était applicable aux décisions qui pouvaient être à la base du droit de garde violé, elle faisait apparaître la Convention comme une sorte de lex specialis, d'après laquelle les décisions visées auraient eu dans l'Etat requis un effet indirect qui ne pouvait pas être conditionné par l'obtention d'un exequatur ou de toute autre modalité de reconnaissance des décisions étrangères.

119 Since the wrongful nature of a child's removal is made to depend, in terms of the Convention, on its having occurred as the result of a breach of the actual exercise of custody rights conferred by the law of the child's habitual residence, it is clear that the authorities of the requested State will have to take this law into consideration when deciding whether the child should be returned. In this sense, the provision in article 13 of the preliminary draft Convention,[45] that the authorities 'shall have regard to' the law of the child's habitual residence, could be regarded as superfluous. However, such a provision would on the one hand underline the fact that there is no question of applying that law, but merely of using it as a means of evaluating the conduct of the parties, while on the other hand, in so far as it applied to decisions which could underlie the custody rights that had been breached, it would make the Convention appear to be a sort of lex specialis, according to which those decisions would receive effect indirectly in the requested State, an effect which would not be made conditional on the obtaining of an exequatur or any other method of recognition of foreign judgments.

Puisque le premier aspect découlait nécessairement d'autres dispositions conventionnelles, la teneur actuelle de l'article 14 s'occupe seulement du second. L'article se présente donc comme une disposition facultative concernant la preuve du droit de la résidence habituelle de l'enfant, en vertu de laquelle l'autorité saisie «peut tenir compte directement du droit et des décisions judiciaires ou administratives reconnues formellement ou non dans l'Etat de la résidence habituelle de l'enfant, sans avoir recours aux procédures

Since the first aspect of article 14 necessarily derives from other provisions of the Convention, the actual purport of article 14 is concerned only with the second. The article therefore appears as an optional provision for proving the law of the child's residence and according to which the authority concerned 'may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of habitual residence of the child, without recourse to the specific procedures for the

---

[45] Voir Rapport de la Commission spéciale, Nos 102-103.

[45] See Report of the Special Commission, Nos 102-103.

A180

spécifiques sur la preuve de ce droit ou pour la reconnaissance des décisions étrangères qui seraient autrement applicables». Il n'est pas nécessaire d'insister sur l'importance pratique que cette norme peut avoir pour aboutir aux décisions rapides qui sont à la base du mécanisme conventionnel.

proof of that law or for the recognition of foreign decisions which would otherwise be applicable'. There is no need to stress the practical importance this rule may have in leading to the speedy decisions which are fundamental to the working of the Convention.

*Article 15 — Possibilité de demander une décision ou une attestation des autorités de la résidence habituelle de l'enfant*

120  Cet article répond aux difficultés que les autorités compétentes de l'Etat requis peuvent éprouver à statuer sur la demande en retour de l'enfant sans être certaines de l'application au cas d'espèce du droit de la résidence habituelle de celui-ci. Si tel est le cas, les autorités en question peuvent demander «la production par le demandeur d'une décision ou d'une attestation émanant des autorités de l'Etat de la résidence habituelle de l'enfant». A ce propos, nous ferons seulement deux remarques. La première concerne la nature non contraignante de la pétition, en ce sens que le retour de l'enfant ne peut pas être conditionné par son accomplissement; une telle conclusion s'impose en effet au vu tant de la teneur littérale de l'article (qui parle de «demander» et non pas d'«exiger») que de la possibilité, reconnue par la même disposition, du fait que l'obtention des documents sollicités ne soit pas possible dans l'Etat de la résidence de l'enfant. Or, sur ce dernier point, l'obligation que l'article impose aux Autorités centrales d'assister le demandeur pour obtenir la décision ou attestation doit faciliter sa tâche, étant donné que l'Autorité centrale peut produire une attestation concernant son droit en matière de garde, selon l'article 8*f.* En second lieu, le contenu de la décision ou attestation doit porter sur le caractère illicite, au sens de la Convention, du déplacement ou du non-retour; cela signifie, à notre avis, que l'une ou l'autre devra se prononcer sur les deux éléments retenus à l'article 3, et donc constater que le déplacement a interrompu une garde effective et légitime *prima facie*, d'après le droit de la résidence habituelle de l'enfant.

*Article 15 — The possibility of requesting a decision or other determination from the authorities of the child's habitual residence*

120  This article answers to the difficulties which the competent authorities of the requested State might experience in reaching a decision on an application for the return of a child through being uncertain of how the law of the child's habitual residence will apply in a particular case. Where this is so, the authorities concerned can request 'that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination'. Only two comments will be made here. The first concerns the voluntary nature of the request, in the sense that the return of the child cannot be made conditional upon such decision or other determination being provided. This conclusion arises in fact as much from the actual terms of the article (which speaks of 'requesting' and not 'requiring') as from the fact acknowledged in the same provision, that it may be impossible to obtain the requested documents in the State of the child's residence. Now, with regard to this last point, the duty which the article places upon Central Authorities to help the applicant obtain the decision or determination must make his task easier, since the Central Authority can provide a certificate concerning its relevant law in terms of article 8(3)(*f*). Secondly, the contents of the decision or certificate must have a bearing upon the wrongful nature, in the Convention sense, of the removal or retention. This means, in our opinion, that one or the other will have to contain a decision on the two elements in article 3, and thus establish that the removal was in breach of custody rights which, *prima facie*, were being exercised legitimately and in actual fact, in terms of the law of the child's habitual residence.

*Article 16 — Prohibition de statuer sur le fond du droit de garde*

121  En vue de faciliter la réalisation de l'objectif conventionnel relatif au retour de l'enfant, cet article essaie d'éviter qu'une décision sur le fond du droit de garde ne soit prise dans l'Etat de refuge. Dans ce but, il interdit aux autorités compétentes de cet Etat de statuer sur ce point, si elles sont informées que l'enfant concerné a été déplacé ou retenu illicitement, selon la Convention. Cette prohibition disparaîtra: lorsqu'il sera établi qu'il n'y a pas lieu de renvoyer l'enfant, d'après la Convention; ou lorsqu'une période raisonnable ne se sera pas écoulée sans qu'une demande en application de la Convention ait été introduite. Les deux circonstances qui peuvent mettre fin au devoir consacré dans cet article sont très différentes, tant par leur justification que par leurs conséquences. En effet, il est absolument logique de prévoir que l'obligation cesse dès qu'on constate que les conditions pour un retour de l'enfant ne sont pas réunies, soit parce que les parties sont arrivées à une solution amiable, soit parce qu'il y a lieu d'apprécier une des exceptions prévues aux articles 13 et 20; de surcroît, dans de tels cas, la décision sur le fond du droit de garde réglera l'affaire de façon définitive.

Par contre, étant donné que «l'information» sur laquelle on peut justifier une prohibition de statuer doit procéder, soit de l'introduction d'une demande en retour de l'enfant,

*Article 16 — Prohibition against deciding upon the merits of custody rights*

121  This article, so as to promote the realization of the Convention's objects regarding the return of the child, seeks to prevent a decision on the merits of the right to custody being taken in the State of refuge. To this end, the competent authorities in this State are forbidden to adjudicate on the matter when they have been informed that the child in question has been, in terms of the Convention, wrongfully removed or retained. This prohibition will disappear when it is shown that, according to the Convention, it is not appropriate to return the child, or where a reasonable period of time has elapsed without an application under the Convention having been lodged. The two sets of circumstances which can put an end to the duty contained in the article are very different, both in the reasons behind them and in their consequences. In fact, it is perfectly logical to provide that this obligation will cease as soon as it is established that the conditions for a child's return have not been met, either because the parties have come to an amicable arrangement or because it is appropriate to consider on the exceptions provided for in articles 13 and 20. Moreover, in such cases, the decision on the merits of the custody rights will finally dispose of the case.

On the other hand, since the 'notice' which may justify the prohibition against deciding upon the merits of the case must derive either from an application for the return of the

---

A181

directement par le demandeur, soit d'une communication officielle de l'Autorité centrale du même Etat, il est difficile d'imaginer que les cas où l'information n'est pas suivie d'une demande ne seraient pas compris dans la première hypothèse. D'ailleurs, si de telles situations existent, l'ambiguïté de l'expression «période raisonnable» peut conduire à l'adoption d'une décision avant l'expiration de la période d'un an, retenue à l'article 12, alinéa premier; or, dans un tel cas, la décision adoptée coexisterait avec l'obligation de retourner l'enfant, d'après la Convention, posant ainsi un problème dont traite l'article 17.

*Article 17 — Existence d'une décision relative à la garde dans l'Etat requis*

122  La genèse de cet article montre clairement l'objectif qu'il poursuit: la Première commission a initialement adopté une disposition qui donnait priorité absolue à l'application de la Convention, en faisant prévaloir l'obligation de retourner l'enfant sur toute autre décision relative à la garde, rendue ou susceptible d'être reconnue dans l'Etat requis. En même temps, elle a accepté la possibilité d'une réserve qui aurait permis de refuser ce retour, quand il se serait avéré incompatible avec une décision existant dans l'Etat de refuge, antérieure à «l'enlèvement».[46] Le texte actuel est donc le produit d'un compromis en vue d'éliminer une réserve dans la Convention, sans en diminuer le degré d'acceptabilité par les Etats.[47] En ce sens, on a remanié la disposition originale en soulignant que ne fera pas obstacle au retour de l'enfant la *seule* existence d'une décision, et en donnant la possibilité au juge de prendre en considération les motifs de cette décision pour décider sur la demande de retour.

123  La solution incorporée dans l'article s'accorde parfaitement au but conventionnel de décourager les éventuels enleveurs qui ne pourront protéger leur action ni par une décision «morte», antérieure au déplacement, mais jamais exécutée, ni par une décision obtenue postérieurement et qui sera, dans la plupart des cas, entachée de fraude. Par conséquent, l'autorité compétente de l'Etat requis devra considérer la demande de retour comme la preuve de ce qu'un élément nouveau est intervenu, qui l'oblige à remettre en question une décision non effective, ou adoptée sur la base de critères abusifs de compétence, ou encore ne respectant pas les droits de défense de toutes les parties concernées. D'ailleurs, étant donné que la décision sur le retour de l'enfant ne concerne pas le fond du droit de garde, les motifs de la décision qui pourront être pris en considération se limitent à ce qui concerne «l'application de la Convention». Quant à la situation provoquée par une décision rendue par les autorités de l'Etat de la résidence habituelle de l'enfant avant son «enlèvement», accordant la garde à l'«enleveur», elle serait normalement résolue par l'application de l'article 3 de la Convention, puisque l'existence du droit de garde réclamé doit être apprécié selon le droit dudit Etat.

*Article 19 — Portée des décisions sur le retour de l'enfant*

124  Cette disposition exprime l'idée qui se trouve à la base même de toute la Convention; en fait, nous nous en sommes

child which is submitted directly by the applicant, or from an official communication from the Central Authority of the same State, it is difficult to see how cases in which the notice is not followed by an application would not be contained within the first hypothesis. Moreover, if such situations do exist, the ambiguity in the phrase 'reasonable time' could lead to decisions being taken before the period of one year, contained in article 12, first paragraph, has expired; in such a case, this decision would coexist alongside the duty to return the child, in accordance with the Convention, thus giving rise to a problem which is dealt with in article 17.

*Article 17 — The existence of a decision on custody in the requested State*

122  The origins of this article clearly demonstrate the end pursued. The First Commission initially adopted a provision which gave absolute priority to the application of the Convention, by making the duty to return the child prevail over any other decision on custody, which had been issued or was likely to be issued in the requested State. At the same time, it accepted the possibility of a reservation allowing the return of the child to be refused, when its return was shown to be incompatible with a decision existing in the State of refuge, prior to the 'abduction'.[46] The current text is therefore the result of a compromise which was reached in order to eliminate a reservation in the Convention, without at the same time reducing the extent of its acceptability to the States.[47] In this way, the original provision was recast by emphasizing that the sole fact that a decision existed would not of itself prevent the return of the child, and by allowing judges to take into consideration the reasons for this decision in coming to a decision themselves on the application for the child's return.

123  The solution contained in this article accords perfectly with the object of the Convention, which is to discourage potential abductors, who will not be able to defend their action by means either of a 'dead' decision taken prior to the removal but never put into effect, or of a decision obtained subsequently, which will, in the majority of cases, be vitiated by fraud. Consequently, the competent authority of the requested State will have to regard the application for the child's return as proof of the fact that a new factor has been introduced which obliges it to reconsider a decision which has not been put into effect, or which was taken on the basis of exorbitant grounds of jurisdiction, or else failed to have regard to the right of all the parties concerned to state their case. Moreover, since the decision on the return of the child is not concerned with the merits of custody rights, the reasons for the decision which may be taken into consideration are limited to those which concern 'the application of the Convention'. A situation brought about by a decision issued by the authorities of the State of a child's habitual residence prior to its 'abduction' and which granted custody to the 'abductor', would normally be resolved by applying article 3 of the Convention, since the existence of a claimed right to custody must be understood in accordance with the law of that State.

*Article 19 — Scope of the decisions on the return of the child*

124  This provision expresses an idea which underlies the whole of the Convention; as a matter of fact, in this Report

---

[46] Doc. trav. No 53, paragraphe 2 (*Proposal of the United Kingdom delegation*), No 32, article XG (*Proposal of the Netherlands delegation*) et No 19 (*Proposal of the Japanese delegation*), ainsi que P.-v. No 12.
[47] Voir Doc. trav. No 77 (Proposition du Président, appuyée par le Rapporteur et les délégations de la République fédérale d'Allemagne, de l'Australie, du Canada, de l'Espagne, de la Finlande, de la France, de l'Irlande, du Royaume-Uni et de la Suisse) et le P.-v. No 17.

[46] Working Documents Nos 53, paragraph 2 (Proposal of the United Kingdom delegation), 32, article XG (Proposal of the Netherlands delegation), and 19 (Proposal of the Japanese delegation), as well as P.-v. No 12.
[47] See Working Document No 77 (Proposal of the Chairman, supported by the Rapporteur and the delegations of Australia, Canada, Finland, France, the Federal Republic of Germany, Ireland, Spain, Switzerland and the United Kingdom) and P.-v. No 17.

---

A182

déjà occupé à plusieurs reprises dans ce Rapport, en ce qui concerne tant sa justification que son commentaire. Cet article se limite à préciser la portée du retour de l'enfant que la Convention essaie de garantir; un retour qui, pour pouvoir être «immédiat» ou «rapide», ne doit pas préjuger du fond du droit de garde et qui cherche précisément à éviter qu'une décision ultérieure sur ce droit puisse être influencée par un changement des circonstances, introduit unilatéralement par une des parties.

we have already been concerned on several occasions as much with the reasons for it as with commenting upon it. This article is restricted to stating the scope of decisions taken regarding the return of the child which the Convention seeks to guarantee, a return which, so as to be 'forthwith' or 'speedy', must not prejudge the merits of custody rights; this provision seeks to prevent a later decision on these rights being influenced by a change of circumstances brought about by the unilateral action of one of the parties.

CHAPITRE IV — DROIT DE VISITE

CHAPTER IV — RIGHTS OF ACCESS

### Article 21

125   Avant tout, il s'impose de reconnaître que la Convention n'essaie pas d'établir une réglementation exhaustive du droit de visite, ce qui aurait sans doute débordé les objectifs conventionnels. En effet, même si l'attention prêtée au droit de visite répond à la conviction qu'il doit être le corollaire normal du droit de garde, au niveau des buts de la Convention il suffisait d'assurer la coopération des Autorités centrales en ce qui concerne, soit son organisation, soit la protection de son exercice effectif. Par ailleurs le temps particulièrement court que lui a consacré la Première commission est peut-être le meilleur indicatif du haut degré de consensus atteint à son égard.

126   Comme nous venons de l'indiquer, l'article repose dans son ensemble sur la coopération entre Autorités centrales. Une proposition visant à introduire, dans un nouvel alinéa, la seule compétence en matière de droit de visite tant des autorités que de la loi de l'État de la résidence habituelle de l'enfant a été rejetée à une large majorité.[48] L'organisation et la protection de l'exercice effectif du droit de visite sont donc toujours envisagées par la Convention comme une fonction essentielle des Autorités centrales. En ce sens, le premier alinéa consacre deux points importants: d'un côté la liberté des particuliers pour saisir l'Autorité centrale de leur choix; de l'autre côté, l'objet de la demande adressée à l'Autorité centrale peut être, soit l'organisation d'un droit de visite, c'est-à-dire son établissement, soit la protection de l'exercice d'un droit de visite déjà déterminé. Or, surtout quand la demande vise l'organisation du droit prétendu, ou lorsque son exercice se heurte à l'opposition du titulaire de la garde, le recours à des procédures légales s'imposera très fréquemment; à cet effet, le troisième alinéa de l'article envisage la possibilité pour les Autorités centrales d'entamer ou de favoriser de telles procédures, soit directement, soit par des intermédiaires.

127   Les problèmes abordés au deuxième alinéa sont de nature très différente. Il s'agit d'assurer l'exercice paisible du droit de visite sans qu'il mette en danger le droit de garde. Dans ce sens, cette disposition contient des éléments importants pour atteindre ce but. Au centre même de la solution esquissée, il faut situer, une fois encore, la coopération entre Autorités centrales, une coopération qui vise tant à faciliter l'exercice du droit de visite qu'à garantir l'accomplissement de toute condition à laquelle un tel exercice serait soumis.

### Article 21

125   Above all, it must be recognized that the Convention does not seek to regulate access rights in an exhaustive manner; this would undoubtedly go beyond the scope of the Convention's objectives. Indeed, even if the attention which has been paid to access rights results from the belief that they are the normal corollary of custody rights, it sufficed at the Convention level merely to secure co-operation among Central Authorities as regards either their organization or the protection of their actual exercise. In other respects, the best indication of the high level of agreement reached regarding access rights is the particularly short amount of time devoted to them by the First Commission.

126   As we have just pointed out, the article as a whole rests upon co-operation among Central Authorities. A proposal which sought to insert a provision in a new paragraph that both the authorities and the law of the State of the child's habitual residence should have exclusive jurisdiction in questions of access rights, was rejected by a large majority.[48] The organizing and securing of the actual exercise of access rights was thus always seen by the Convention as an essential function of the Central Authorities. Understood thus, the first paragraph contains two important points: in the first place, the freedom of individuals to apply to the Central Authority of their choice, and secondly the fact that the purpose of the application to the Central Authority can be either the organization of access rights, i.e. their establishment, or the protection of the exercise of previously determined access rights. Now, recourse to legal proceedings will arise very frequently, especially when the application seeks to organize rights which are merely claimed or when their exercise runs up against opposition from the holder of the rights of custody. With this in view, the article's third paragraph envisages the possibility of Central Authorities initiating or assisting in such proceedings, either directly, or through intermediaries.

127   The nature of the problems tackled in the second paragraph is very different. Here it is a question of securing the peaceful enjoyment of access rights without endangering custody rights. This provision therefore contains important elements for the attainment of this end. Once again, co-operation among Central Authorities is placed, of necessity, in the very centre of the picture, and it is a co-operation designed as much to promote the exercise of access rights as to guarantee the fulfilment of any conditions to which their exercise may be subject.

---

[48] Voir Doc. trav. No 31 (*Proposal of the Danish delegation*) et P.-v. No 13.

[48] See Working Document No 31 (Proposal of the Danish delegation) and *P.-v.* No 13.

---

A183

Parmi les moyens concrets d'assurer l'exercice du droit de visite, l'article 21 en retient seulement un, lorsqu'il signale que l'Autorité centrale doit essayer que «soient levés, dans toute la mesure du possible, les obstacles de nature à s'y opposer»; obstacles qui, notamment, peuvent être légaux ou dérivés d'éventuelles responsabilités de type pénal. Le reste est laissé à la coopération entre Autorités centrales, considérée comme la meilleure méthode pour obtenir que les conditions imposées à l'exercice du droit de visite soient respectées. En effet, ce respect constitue, pour le titulaire de la garde, la seule garantie qu'un tel exercice ne serait pas nuisible à ses propres droits.

128   Sur la question de savoir comment les Autorités centrales vont organiser cette coopération en vue d'assurer le caractère «innocent» de l'exercice d'un droit de visite, la Convention ne donne pas d'exemples, car ils auraient pu être interprétés restrictivement. On peut donc mentionner, à titre purement indicatif, comme le faisait le Rapport de l'avant-projet,[49] qu'il convient d'éviter que l'enfant figure sur le passeport du titulaire du droit de visite et, en cas de visite «transfrontière», qu'il serait judicieux que celui-ci prenne l'engagement, devant l'Autorité centrale de l'Etat de la résidence habituelle de l'enfant, de le renvoyer à une date précise en indiquant le ou les endroits où il a l'intention d'habiter avec l'enfant. Une copie d'un tel compromis serait, par la suite, transmise tant à l'Autorité centrale de la résidence habituelle du titulaire du droit de visite, qu'à celle de l'Etat où il a déclaré qu'il séjournerait avec l'enfant. Cela permettrait de connaître à tout moment la localisation de l'enfant et de déclencher la procédure pour assurer son retour, dès l'expiration du délai fixé. Evidemment, aucune des mesures avancées ne peut, à elle seule, assurer l'exercice correct du droit de visite; de toute façon nous ne croyons pas que ce Rapport puisse aller plus loin: les mesures concrètes que pourront prendre les Autorités centrales impliquées dépendront des circonstances de chaque cas d'espèce et de la capacité d'agir reconnue à chaque Autorité centrale.

CHAPITRE V — DISPOSITIONS GÉNÉRALES

129   Ce chapitre contient une série de dispositions hétérogènes en raison de la matière dont elles s'occupent, mais qu'il fallait traiter en dehors des chapitres précédents. Il s'agit, d'une part de certaines dispositions procédurales communes aux procès visant tant le retour de l'enfant que l'organisation du droit de visite; d'autre part de la réglementation des problèmes posés par l'application de la Convention dans les Etats plurilégislatifs, ainsi que de ses relations avec d'autres conventions et de son domaine d'application ratione temporis.

Article 22 — «Cautio judicatum solvi»

130   Suivant une tendance marquée en faveur de la suppression conventionnelle des mesures procédurales discriminatoires envers les étrangers, cet article déclare qu'aucune caution, qu'aucun dépôt, sous quelque dénomination que ce soit, ne peut être imposé dans le contexte de la

Of all the specific ways of securing the exercise of access rights, article 21 contains only one, where it points out that the Central Authority must try to remove, as far as possible, all obstacles to the exercise of such rights', obstacles which may be legal ones or may originate in possible criminal liability. The rest is left up to the co-operation among Central Authorities, which is regarded as the best means of ensuring respect for the conditions imposed upon the exercise of access rights. In fact, such respect is the only means of guaranteeing to the custodian that their exercise will not harm his own rights.

128   The Convention gives no examples of how Central Authorities are to organize this co-operation so as to secure the 'innocent' exercise of access rights, since such examples could have been interpreted restrictively. Mention could however be made purely indicatively as in the Report of the preliminary draft Convention,[49] of the fact that it would be advisable that the child's name not appear on the passport of the holder of the right of access, whilst in 'transfrontier' access cases it would be sensible for the holder of the access rights to give an undertaking to the Central Authority of the child's habitual residence to return the child on a particular date and to indicate also the places where he intends to stay with the child. A copy of such an undertaking would then be sent to the Central Authority of the habitual residence of the holder of the access rights, as well as to the Central Authority of the State in which he has stated his intention of staying with the child. This would enable the authorities to know the whereabouts of the child at any time and to set in motion proceedings for bringing about its return, as soon as the stated time-limit has expired. Of course, none of the measures could by itself ensure that access rights are exercised properly, but in any event we believe that this Report can go no further: the specific measures which the Central Authorities concerned are able to take will depend on the circumstances of each case and on the capacity to act enjoyed by each Central Authority.

CHAPTER V — GENERAL PROVISIONS

129   This chapter contains a series of provisions which differ according to the topics with which they deal, and which had to be dealt with outside the framework of the foregoing chapters. On the one hand, there are certain procedural provisions common both to the proceedings for the return of the child and to the organization of access rights, and on the other hand there are provisions for regulating the problems arising out of the Convention's application in States with more than one system of law, as well as those which concern its relationship with other conventions and its scope ratione temporis.

Article 22 — 'Cautio judicatum solvi'

130   Following a marked tendency to favour the deletion from the Convention of procedural measures which discriminated against foreigners, this article declares that no security, bond or deposit, however described, shall be required within the context of the Convention. Two short

---

[49] Voir Rapport de la Commission spéciale, No 110.

[49] See Report of the Special Commission, No 110.

---

A184

Convention. Le texte mérite deux brefs commentaires. Le premier concerne le domaine d'application *ratione personae* de la prohibition consacrée: sur ce point, la solution retenue est largement généreuse, comme l'exigeait une convention construite sur l'idée sous-jacente de la protection des enfant.[50] En second lieu, la caution ou dépôt dont sont exonérés les étrangers sont ceux qui, dans chaque système juridique et sous différentes dénominations, visent à garantir qu'ils respecteront le contenu des décisions en ce qui concerne le paiement des frais et dépens découlant d'un procès. Dans un souci de cohérence, l'article précise que la règle joue seulement par rapport aux «procédures judiciaires ou administratives visées par la Convention», en évitant une formule plus large qui aurait pu être interprétée comme s'appliquant, par exemple aux procès visant directement la détermination du fond du droit de garde. D'autre part, il se déduit clairement de ce qui précède qu'elle n'interdit pas d'autres cautions ou dépôts possibles exigés, notamment les cautions imposées en vue de garantir l'exercice correct d'un droit de visite.

comments are in order here. The first concerns the scope of the stated prohibition *ratione personae*; on this point, an extremely liberal solution was arrived at, such as was required by a convention built upon the basic idea of protecting children.[50] Secondly, the security, bond or deposit from which foreigners are exempt are those which, in any legal system and howsoever described, are meant to guarantee respect for decisions on the payment of costs and expenses arising out of legal proceedings. The article, in its concern for coherence, states that the rule will apply only to those 'judicial or administrative proceedings falling within the scope of the Convention', and avoids a wider formulation which could have been interpreted as applicable, for example, to proceedings raised directly for a decision on the merits of custody rights. On the other hand, it can clearly be inferred from the preceding observations that it does not prevent other types of security, bond or deposit being required, particularly those which are imposed so as to guarantee the proper exercise of access rights.

*Article 23 – Exemption de légalisation*

131  Cet article reproduit à la lettre le texte de l'article parallèle de l'avant-projet, qui se limitait à exprimer dans une disposition séparée une idée contenue dans toutes les Conventions de La Haye, impliquant la transmission de documents entre Etats contractants. Il se déduit de sa rédaction ouverte qu'il n'interdit pas seulement les «légalisations diplomatiques», mais toute autre exigence de ce genre; cependant, reste en dehors de cette disposition l'exigence possible d'authentification des copies ou documents privés, selon la loi interne des autorités concernées.

*Article 23 – Exemption from legalization*

131  This article repeats word for word the text of the equivalent article in the preliminary draft Convention, which merely set forth in a separate provision an idea which is to be found in all Hague Conventions, involving the transmission of documents among Contracting States. The fact that it has been drafted in wide terms means that not only 'diplomatic legalization', but also any other similar sort of requirement, is forbidden. However, any requirement of the internal law of the authorities in question that copies or private documents be authenticated remains outside the scope of this provision.

*Article 24 – Traduction des documents*

132  En ce qui concerne les langues à utiliser dans les relations entre Autorités centrales, la Convention a maintenu la solution retenue dans l'avant-projet, en vertu de laquelle les documents seront envoyés dans leur langue d'origine et accompagnés d'une traduction dans une des langues officielles de l'Etat requis ou, lorsque cette traduction s'avère difficilement réalisable, d'une traduction en français ou en anglais.[51] Sur ce point, d'ailleurs, la Convention admet la possibilité de formuler une réserve aux termes de l'article 42, en vertu de laquelle un Etat contractant pourra s'opposer à l'utilisation d'une des langues de substitution; la réserve ne pourra évidemment pas exclure l'utilisation des deux langues. Finalement, il faut souligner, d'une part que le système établi prétend être un système de facilité *minimum*, qui peut être amélioré par d'autres conventions excluant entre les Etats parties toute exigence de traduction; d'autre part qu'il n'a trait qu'aux communications entre Autorités centrales. En conséquence de quoi, les demandes et autres documents adressés aux autorités judiciaires ou administratives internes devront respecter les règles imposées par la loi de chaque Etat en matière de traduction.

*Article 24 – Translation of documents*

132  As regards the languages which are to be used as among Central Authorities, the Convention upheld the approach in the Preliminary Draft, by which documents are to be sent in their original language, accompanied by a translation into one of the official languages of the requested State or, where that is not feasible, a translation into French or English.[51] In this matter, the Convention also allows a reservation to be made in terms of article 42, under which a Contracting State can object to the use of one or other of the substitute languages, but this reservation cannot of course exclude the use of both. Finally, it must be emphasized firstly that the scheme which has been chosen offers only a *minimal* facility and may be improved upon by other conventions which exclude any requirement of translation as among States which are Party to them, and secondly that it governs only communications among Central Authorities. Consequently, applications and other documents sent to internal judicial or administrative authorities will have to conform to the rules regarding translation laid down by the law of each State.

---

[50] Voir la construction plus restrictive incorporée à l'article 14 de la *Convention tendant à faciliter l'accès international à la justice*, Convention adoptée aussi au cours de la Quatorzième session de la Conférence.
[51] Une solution partiellement différente est consacrée à l'article 7 de la *Convention tendant à faciliter l'accès international à la justice*, citée supra.

[50] See the more restrictive construction which was incorporated in article 14 of the *Convention on International Access to Justice*, also adopted during the Fourteenth Session of the Conference.
[51] A somewhat different approach is found in article 7 of the *Convention on International Access to Justice*, referred to supra.

---

A185

*Article 25 -- Assistance judiciaire et juridique*

133   La disposition sur ce point élargit le domaine de l'assistance judiciaire dans une double perspective: d'un côté, par l'inclusion parmi les éventuels bénéficiaires, en plus des nationaux des Etats parties, des personnes qui auraient dans ces Etats leur résidence habituelle; de l'autre, par l'extension de l'assistance visée à la consultation juridique, un aspect qui n'est pas toujours couvert par les divers systèmes étatiques d'assistance judiciaire.[52]

*Article 26 — Frais découlant de l'application de la Convention*

134   Le principe exprimé au premier alinéa, d'après lequel chaque Autorité centrale assumera ses propres frais en appliquant la Convention, n'a pas rencontré d'opposition. Il implique avant tout qu'une Autorité centrale ne peut pas réclamer ces frais à une autre Autorité centrale. Quant à savoir quels sont les frais visés, il faut convenir qu'ils dépendront des services réels offerts par chaque Autorité centrale, en accord avec les possibilités d'action que lui reconnaît la loi interne de l'Etat concerné.

135   Par contre, le second alinéa a trait à l'un des points les plus controversés au cours de la Quatorzième session et qui a finalement été résolu par l'acceptation de la réserve figurant au troisième alinéa de ce même article. En effet, on n'a pu mettre fin à la controverse entre les délégations qui voulaient assurer au demandeur la gratuité totale dans l'application de la Convention (en incluant l'exonération des frais et dépens non couverts par le système d'assistance judiciaire et juridique, qui pourraient découler d'un procès ou éventuellement, des frais entraînés par la participation d'un avocat), et les délégations favorables à la solution contraire retenue par l'avant-projet,[53] que par l'inclusion d'une réserve en faveur des secondes. La raison en est que, étant donné que les différents critères prenaient leurs racines dans la structure des systèmes juridiques impliqués, toute tentative de faire prévaloir, en termes absolus, une position sur l'autre, aurait conduit à l'exclusion *a priori* de la Convention d'un certain nombre d'Etats; or, personne ne souhaitait un tel résultat.[54] Par contre, l'accord a été total en ce qui concerne la norme incluse dans la dernière phrase du deuxième alinéa, qui autorise les Autorités centrales à «demander le paiement des dépenses causées ou qui seraient causées par les opérations liées au retour de l'enfant».

136   Le quatrième alinéa incorpore une disposition de nature tout à fait différente, en vertu de laquelle les autorités compétentes internes peuvent mettre à la charge de «l'enleveur» ou de celui qui empêche l'exercice du droit de visite, le paiement de certains frais engagés par le demandeur ou en son nom, notamment «des frais de voyage, des frais de représentation judiciaire du demandeur et de retour de l'enfant, ainsi que tous les coûts et dépenses faits pour localiser l'enfant». Mais étant donné qu'il s'agit d'une norme simplement facultative, qui respecte le pouvoir d'appréciation concrète des tribunaux dans chaque cas d'espèce, sa portée semble être surtout symbolique, celle d'un éventuel élément de dissuasion d'une conduite contraire aux objectifs conventionnels.

*Article 25 — Legal aid and advice*

133   The relevant provision here enlarges the scope of legal aid in two respects. Firstly, it includes among the possible beneficiaries persons habitually resident in a Contracting State as well as that State's own nationals. Secondly, the legal aid available is extended to cover legal advice as well, which is not invariably included in the various systems of legal aid operated by States.[52]

*Article 26 — Costs arising out of the Convention's application*

134   The principle enunciated in the first paragraph, under which each Central Authority bears its own costs in applying the Convention, met no opposition. Quite simply, it means that a Central Authority cannot claim costs from another Central Authority. It must however be admitted that the costs envisaged will depend on the actual services provided by each Central Authority, according to the freedom of action conferred upon it by the internal law of the State concerned.

135   On the other hand, the second paragraph refers to one of the most controversial matters dealt with by the Fourteenth Session, a matter which in the end had to be resolved by accepting the reservation in the third paragraph of the same article. In fact, the argument between those delegations which wanted the applicant to be exempt from all costs arising out of the application of the Convention (including exemption from all costs and expenses not covered by the legal aid and advice system such as those which arise out of legal proceedings or, where applicable, the participation of counsel or legal advisers), and those which favoured the opposite solution adopted by the preliminary draft Convention,[53] was resolved only by including a reservation favouring the latter's point of view. The reason for this was that, since different criteria for the granting of legal aid were rooted in the very structure of the legal systems concerned, any attempt to make one approach prevail absolutely over the others would have led to the automatic exclusion of certain States from the Convention, a result which no one wanted.[54] However, there was total agreement as regards the rule contained in the last sentence of the second paragraph, authorizing the Central Authorities to 'require the payment of the expenses incurred or to be incurred in implementing the return of the child'.

136   The fourth paragraph contains a quite different type of provision, by which the competent internal authorities may direct the 'abductor' or the person who prevented the exercise of access rights, to pay necessary expenses incurred by or on behalf of the applicant, including 'travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child'. But since this rule is only an optional provision, which recognizes the discretion which may be exercised by the courts in each case, its scope would seem to be particularly symbolic, a possible deterrent to behaviour which is contrary to the objects of the Convention.

---

[52] Voir, dans un sens similaire, les articles 1 et 2 de la *Convention tendant à faciliter l'accès international à la justice*, cité supra.
[53] Article 22, alinéa 2a de l'avant-projet élaboré par la Commission spéciale.
[54] Voir Doc. trav. Nos 51 et 61 (Propositions de la délégation belge) et Nos 57 et 67 (Propositions des délégations des Etats-Unis, du Canada et des Pays-Bas), ainsi que les P.-v. Nos 11 et 14.

[52] See, in similar vein, articles 1 and 2 of the *Convention on International Access to Justice*, referred to supra.
[53] Article 22(2)(a) of the Preliminary Draft prepared by the Special Commission.
[54] See Working Documents Nos 51 and 61 (*Propositions de la délégation belge*) and Nos 57 and 67 (Proposals of the Canadian, Netherlands and United States delegations) and also *P.-v.* Nos 11 and 14.

---

A186

*Article 27 – Possibilité de rejeter une demande*

137   Le bon sens indique qu'on ne peut pas obliger les Autorités centrales à accepter les demandes qui se situent hors du domaine d'application de la Convention ou qui sont manifestement sans fondement. Dans ces cas-là, la seule obligation des Autorités centrales est d'informer «immédiatement de leurs motifs le demandeur ou, le cas échéant, l'Autorité centrale qui leur a transmis la demande». Cela signifie que le rejet d'une demande peut être fait tant de l'Autorité centrale directement saisie par le demandeur que d'une Autorité centrale saisie originairement par une autre Autorité centrale.

*Article 28 – Procuration exigée par l'Autorité centrale*

138   La disposition contenue dans cet article n'est qu'une autre manifestation du point de vue adopté par la Convention en ce qui concerne l'organisation et les compétences des Autorités centrales. Puisqu'on veut éviter que les Etats aient à changer leur droit pour pouvoir l'accepter, la Convention prend en considération le fait que, selon le droit des divers Etats membres de la Conférence, l'Autorité centrale pourra avoir besoin d'une autorisation du demandeur. De fait, la «formule modèle» introduit, comme exemple des pièces produites éventuellement (note au No IX), une référence à la «procuration conférée à l'Autorité centrale», procuration qui devra donc être jointe, chaque fois qu'une Autorité centrale l'exigera, aux éléments envisagés à l'article 8 et aux demandes introduites en application de l'article 21.

*Article 29 – Saisine directe des autorités internes compétentes*

139   La Convention n'essaie pas d'établir un système exclusif entre les Etats contractants pour obtenir le retour des enfants. Elle se présente au contraire comme un instrument complémentaire se proposant d'aider les personnes dont le droit de garde ou de visite a été violé. Par conséquent, ces personnes ont le choix entre recourir aux Autorités centrales – c'est-à-dire utiliser les mécanismes propres à la Convention – ou bien choisir la voie d'une action directe devant les autorités compétentes en matière de garde et de visite de l'Etat où se trouve l'enfant. Dans la seconde hypothèse, donc quand les personnes concernées optent pour saisir directement les autorités en question, elles peuvent encore faire un deuxième choix et introduire leur demande «par application ou non des dispositions de la Convention». Dans le dernier cas, évidemment, les autorités ne seront pas tenues d'appliquer les dispositions conventionnelles, à moins que l'Etat ne les ait converties en règles internes, suivant en cela l'article 2 de la Convention.

*Article 30 – Recevabilité des documents*

140   Par cette disposition, la Convention a entendu résoudre le problème existant dans certains Etats membres de la Conférence en ce qui concerne la recevabilité des documents. Il s'agit donc simplement de faciliter l'admission par les autorités judiciaires ou administratives des Etats contractants des demandes introduites directement ou par l'intermédiaire d'une Autorité centrale, ainsi que des documents pouvant être annexés ou fournis par les Autorités centrales. En effet, on ne doit pas interpréter cet article comme incorporant une règle sur la valeur de preuve qu'il faut accorder à ces documents; ce problème tombe absolument hors du domaine conventionnel.[55]

*Article 27 – Possible rejection of an application*

137   Common sense would indicate that Central Authorities cannot be obliged to accept applications which belong outside the scope of the Convention or are manifestly without foundation. In such cases, the only duty of Central Authorities is to 'inform forthwith the applicant or the Central Authority through which the application was submitted, as the case may be, of its reasons'. This means that an application may be rejected by the Central Authority to which the applicant applied directly as well as by a Central Authority which was initially brought into the case by another Central Authority.

*Article 28 – Authorization required by the Central Authority*

138   The provision in this article is merely another example of the Convention's attitude to the organization and powers of Central Authorities. Since the aim is to avoid requiring States to change their own law in order to be able to accept the Convention, the Convention takes into consideration the fact that, in terms of the law of various Member States of the Conference the Central Authority would have the power to require some authorization from the applicant. As a matter of fact, the 'model form', as an example of the documents which might be attached to an application (see note to No IX), brings in a reference to 'the authorization empowering the Central Authority to act on behalf of the applicant', an authorization which, every time it is required by a Central Authority, will have to accompany those matters listed in article 8 and the applications submitted under article 21.

*Article 29 – Direct application to competent internal authorities*

139   The Convention does not seek to establish a system for the return of children which is exclusively for the benefit of the Contracting States. It is put forward rather as an additional means for helping persons whose custody or access rights have been breached. Consequently, those persons can either have recourse to the Central Authorities – in other words, use the means provided in the Convention – or else pursue a direct action before the competent authorities in matters of custody and access in the State where the child is located. In the latter case, whenever the persons concerned opt to apply directly to the relevant authorities, a second choice is open to them in that they can submit their application 'whether or not under the provisions of this Convention'. In the latter case the authorities are not of course obliged to apply the provisions of the Convention, unless the State has incorporated them into its internal law, in terms of article 2 of the Convention.

*Article 30 – Admissibility of documents*

140   This provision was intended to resolve the problem which existed in some Member States regarding the admissibility of documents. It merely seeks to facilitate admission before the judicial or administrative authorities of Contracting States of applications submitted either directly or through the intervention of a Central Authority, as well as documents which may be attached or supplied by the Central Authorities. In fact, this article must not be understood to contain a rule on the evidential value which is to be placed on these documents, since that problem falls quite outwith the scope of the Convention.[55]

---

[55]  Voir article 26 de l'avant-projet, Doc. trav. No 49 (*Proposal of the United States delegation*) et P.-v. No 11.

[55]  See article 26 of the preliminary draft Convention, Working Document No 49 (Proposal of the United States delegation) and P.-v. No 11.

A187

*Articles 31 à 33 – Application de la Convention en ce qui concerne les Etats plurilégislatifs*

141 Ces trois articles règlent l'application de la Convention en ce qui concerne les Etats à systèmes juridiques non unifiés. A l'instar des dernières conventions élaborées par la Conférence de La Haye, une distinction est faite entre les Etats ayant plusieurs systèmes de droit d'application territoriale, et les Etats ayant plusieurs systèmes de droit applicables à des catégories différentes de personnes. Plus précisément, les solutions retenues s'inspirent de celles adoptées dans les conventions élaborées au cours de la Treizième session de la Conférence.[56]

En ce qui concerne le premier groupe d'Etats, l'article 31 précise comment il faut comprendre, d'une part la référence à la résidence habituelle de l'enfant, et d'autre part la référence au droit de l'Etat d'une telle résidence.

En ce qui concerne le deuxième groupe d'Etats, l'article 32 confie la détermination du droit dont il faut tenir compte aux règles en vigueur dans chaque Etat.

Finalement, sur le contenu de ces deux articles, il faut souligner que leur intérêt ne se limite pas aux Etats directement envisagés; en effet, les normes en question devront être prises en considération par tout Etat contractant dans ses relations avec eux, par exemple chaque fois qu'un enfant sera déplacé d'un de ses Etats vers un autre Etat ayant un système de droit unifié ou non.

142 D'autre part, l'article 33 délimite les cas dans lesquels les Etats plurilégislatifs sont tenus d'appliquer la Convention, en excluant les situations où un Etat ayant un système de droit unifié ne serait pas tenu de le faire. En somme, cet article se limite à déclarer que la Convention n'est applicable qu'aux relations internationales, en même temps qu'il qualifie de relations internes toutes celles qui se passent à l'intérieur d'un Etat, plurilégislatif ou non.

*Article 34 – Relations avec d'autres conventions*

143 Cet article a été commenté dans la première partie de ce Rapport (Nos 39 et 40).

*Article 35 – Domaine d'application* ratione temporis *de la Convention*

144 La question de déterminer si la Convention devait s'appliquer aux enlèvements qui se seraient produits entre deux Etats contractants antérieurement à son entrée en vigueur, ou seulement à ceux qui auraient eu lieu après cette date, s'est vue proposer différentes solutions au cours de la Quatorzième session. La première était sans doute la plus généreuse, puisqu'elle prévoyait l'application de la Convention à tout «enlèvement», indépendamment du moment de sa réalisation.[57] Cependant, cette décision a été suivie plus tard par l'acceptation de la possibilité pour tout Etat contractant de faire une déclaration en vue de limiter l'application de la Convention aux «enlèvements» intervenus après son entrée en vigueur dans cet Etat.[58] La situation restait ainsi largement ouverte, tout en reconnaissant néanmoins à chaque Etat la possibilité de restreindre l'application de la Convention, s'il le jugeait nécessaire. Il est clair

*Articles 31 to 33 – Application of the Convention in relation to States with more than one system of law*

141 These three articles govern the Convention's application to States with non-unitary legal systems. As in recent conventions of the Hague Conference, a distinction has been drawn between States which have several systems of law applicable in different territorial units, and those with several systems of law applicable to different categories of persons. To be more precise, the solution adopted received its inspiration from that reached by the conventions drawn up during the Thirteenth Session of the Conference.[56]

As regards the first group of States, article 31 explains how references to the child's habitual residence and to the law of the State of its habitual residence are to be understood.

As regards the second type, article 32 leaves the determination of the applicable law to the rules in force in each State.

Finally, it must be emphasized that the substantive provisions of these two articles are not restricted to the States directly concerned. In actual fact, the relevant rules are to be taken into consideration by all Contracting States in their relations with each other, for example whenever a child is removed from one of those States to another State with a unified or non-unified legal system.

142 On the other hand, article 33 limits the occasions where States with more than one system of law are obliged to apply the Convention, by excluding those in which a State with a unified system of law would not be bound to do so. Put shortly, this article merely states that the Convention applies only at the international level and at the same time characterizes as internal all those relationships which arise within a State, whether or not that State has more than one system of law.

*Article 34 – Relationship to other conventions*

143 This article was commented upon in the first part of the Report (Nos 39 and 40).

*Article 35 – Scope of the Convention* ratione temporis

144 The question as to whether the Convention should apply to abductions involving two States and which occurred prior to its entry into force or only to those occurring thereafter, was met with different proposed solutions during the Fourteenth Session. The first proposal was undoubtedly the most liberal, since it envisaged the Convention's applying to all 'abductions', irrespective of when it came into effect.[57] However, this decision was followed by acceptance of the idea that any Contracting State could declare that the Convention would apply only to 'abductions' which occurred after its entry into force in that State.[58] The situation therefore remained largely unresolved, with each State, where it deemed this necessary, being able to limit the Convention's application. It was clear that the operation of such declarations within a convention which is clearly bilateral in its application would create some technical problems, to

---

[56] Voir notamment le Rapport de M. von Overbeck sur la Convention sur la loi applicable aux régimes matrimoniaux. *Actes et documents de la Treizième session,* tome II, p. 374 et s.
[57] Voir Doc. trav. No 53 (*Proposal of the United Kingdom delegation*) et P.-v. No 13.

[58] Voir Doc. trav. No 68 (Proposition de la délégation du Canada) et P.-v. No 15.

[56] See in particular Mr von Overbeck's Report on the Convention on the Law Applicable to Matrimonial Property Regimes, in *Acts and Documents of the Thirteenth Session,* Book II, p. 374 et seq.
[57] See Working Document No 53 (Proposal of the United Kingdom delegation) and *P.-v.* No 13.
[58] See Working Document No 68 (Proposal of the Canadian delegation) and *P.-v.* No 15.

---

A188

que le jeu de telles déclarations dans le contexte d'une convention d'application nettement bilatérale posait quelques problèmes techniques. Pour y pallier, la Première commission s'est finalement prononcée en faveur de la solution contraire à la première, c'est-à-dire pour la plus restrictive. C'est donc celle qui apparaît à l'article 35, d'après lequel la Convention ne s'applique entre les Etats contractants, «qu'aux enlèvements ou aux non-retours illicites qui se sont produits après son entrée en vigueur dans ces Etats».[59] D'autre part, de l'ensemble des dispositions conventionnelles (et notamment de l'article 12, alinéa 2) on doit déduire qu'il n'existe pas de limite pour introduire l'action, dès lors que l'enfant n'a pas atteint l'âge de seize ans, selon l'article 4. En effet, l'introduction de l'action après l'expiration de la période d'un an, envisagée au premier alinéa de l'article 12, ne fait que nuancer l'obligation de faire retourner l'enfant, en admettant qu'elle ne s'impose pas lorsqu'il est établi que l'enfant s'est intégré dans son nouveau milieu.

145   La disposition a sans doute le mérite d'être claire. On ne peut cependant pas ignorer que son application est destinée à frustrer les expectatives légitimes des particuliers concernés. Mais étant donné qu'il s'agit en définitive d'une restriction à l'obligation de retourner l'enfant, rien ne s'oppose à ce que deux ou plusieurs Etats conviennent entre eux d'y déroger conformément à l'article 36, c'est-à-dire qu'ils se mettent d'accord pour appliquer rétroactivement la Convention. D'ailleurs, la disposition ne concerne que les dispositions conventionnelles visant le retour de l'enfant. En effet, la réglementation conventionnelle du droit de visite ne peut être invoquée, par la nature même des choses, qu'à propos du refus de son exercice s'étant produit ou continuant à se produire après l'entrée en vigueur de la Convention.

*Article 36 — Possibilité de limiter conventionnellement les restrictions au retour de l'enfant*

146   En concordance avec les principes généraux qui inspirent la Convention et sur la base de l'expérience d'autres Conventions de la Conférence de La Haye,[60] cet article admet la possibilité que deux ou plusieurs Etats contractants conviennent de déroger entre eux aux dispositions de la Convention pouvant impliquer des restrictions au retour des enfants, notamment celles visées aux articles 13 et 20. Cela montre d'une part le caractère de compromis de certaines dispositions conventionnelles et la possibilité d'adopter des critères plus favorables à l'objectif principal de la Convention dans les relations entre Etats de conceptions juridiques très homogènes, et d'autre part que, comme nous l'avons souligné à plusieurs reprises au cours de ce Rapport, la Convention n'est inspirée par aucune idée d'exclusivité dans son domaine d'application. Or, si de telles conventions complémentaires voient le jour, il faudrait éviter un effet négatif, redouté par certaines délégations: le fait qu'en dehors du domaine d'application géographiquement restreint de tels accords, les Etats parties soient tentés de donner une interprétation large aux restrictions incluses dans cette Convention, de manière à affaiblir sa portée.[61]

alleviate which the First Commission finally pronounced itself in favour of the opposite solution to that first adopted, *i.e.* the more restrictive. It is seen therefore in article 35, by which the Convention is to apply as among Contracting States 'only to wrongful removals or retentions occurring after its entry into force in those States'.[59] On the other hand, the inference must be drawn from the Convention's provisions as a whole (and in particular article 12, second paragraph) that no time-limit is imposed on the submission of applications, provided the child has not reached sixteen years of age, in terms of article 4. In fact, the commencement of an action after the expiry of the one year period stated in the first paragraph of article 12, merely lessens the obligation to cause the child to be returned, whilst it is recognized that the obligation will not arise if the child is shown to have become settled in its new environment.

145   The provision certainly has the merit of being clear. However, it cannot be denied that its application is fated to frustrate the legitimate expectations of the individuals concerned. But since in the last resort it is a limitation on the duty to return the child, it in no way prevents two or more States agreeing amongst themselves to derogate from it in terms of article 36, by agreeing to apply the Convention retroactively.

Moreover, the provision concerns only those provisions in the Convention regarding the return of the child. In actual fact, the provision of the Convention governing access rights can, in the nature of things, only be invoked where their exercise is refused or continues to be refused after the Convention has come into force.

*Article 36 — Possibility of limiting by agreement the restrictions on the return of the child*

146   This article, conform to the general principles underlying the Convention, which are based on the experience derived from other Hague Conventions,[60] allows two or more Contracting States to agree to derogate as amongst themselves from any of the Convention's provisions which may involve restrictions on the return of the child, in particular those contained in articles 13 and 20. This demonstrates, on the one hand, the compromise character of some of the Convention's provisions and the possibility that criteria more favourable to the principal object of the Convention may be adopted to govern relationships among States which share very similar legal concepts, while on the other hand, as we have emphasized on several occasions throughout this Report, the Convention is not to be regarded as in any way exclusive in its scope. Now, if such supplementary conventions see the light of day, one negative consequence, feared by some delegations, will have to be avoided, namely that beyond the geographical limits of such agreements, the States concerned will be tempted to interpret the limitations contained in the Convention in a wide sense, thus weakening its scope.[61]

---

[59] Voir Doc. trav. No 81 (*Proposition du Président avec l'accord des délégations de l'Autriche, de la République fédérale d'Allemagne, de la Suisse et du Royaume-Uni*) et *P.-v.* No 18. Une proposition orale du Rapporteur tendant à étendre la Convention aux situations créées au cours de l'année antérieure à son entrée en vigueur n'a pas été retenue.
[60] Par exemple la *Convention relative à la procédure civile, du premier mars 1954*.
[61] Voir sur cet article, les Doc. trav. No 70 (*Proposition des délégations belge, française et luxembourgeoise*) et No 80 (*Proposal of the United States delegation*), ainsi que les *P.-v.* Nos 15 et 18.

[59] See Working Document No 81 (*Proposal of the Chairman with the consent of the delegations of Austria, the Federal Republic of Germany, Switzerland and the United Kingdom*) and *P.-v.* No 18. An oral proposal of the Reporter that the Convention be extended to cover situations which occurred during the year prior to its entry into force was not accepted.
[60] See, for example, the *Convention of 1 March 1954 on civil procedure.*
[61] See Working Documents Nos 70 (*Proposition des délégations belge, française et luxembourgeoise*) and 80 (Proposal of the United States delegation) as well as *P.-v.* Nos 16 and 18.

A189

CHAPITRE VI — CLAUSES FINALES

CHAPTER VI — FINAL CLAUSES

147   Les clauses finales contenues aux articles 37 à 45 de la Convention sont rédigées conformément aux dispositions adoptées à cet effet par les dernières sessions de la Conférence de La Haye. Il n'est donc pas nécessaire d'en faire le commentaire détaillé et nous nous limiterons à quelques brèves remarques à leur propos.

La première concerne l'adaptation des clauses finales à la décision adoptée en ce qui concerne l'ouverture sous condition de la Convention à des Etats non-membres de la Conférence. Ce point ayant été déjà abordé auparavant,[62] il suffit de souligner ici que la nature semi-fermée de la Convention provient du mécanisme de la déclaration d'acceptation par les Etats parties et non pas de l'existence d'une restriction quelconque relative aux Etats pouvant y adhérer (article 38).

148   Quant au «degré» de l'acceptation de la Convention par les Etats qui comprennent deux ou plusieurs unités territoriales dans lesquelles des systèmes de droit différents s'appliquent aux matières régies par la Convention, l'article 40 prévoit qu'ils pourront déclarer — au moment de la signature, de la ratification, de l'acceptation, de l'approbation ou de l'adhésion — que la Convention s'applique à toutes ou seulement à certaines des unités territoriales en question. Cette déclaration pourra être modifiée à tout moment par une autre déclaration plus extensive. En effet, une modification de la déclaration tendant à restreindre l'application de la Convention devrait être considérée comme une dénonciation partielle selon l'article 44, alinéa 3.

D'après l'article 39, la même solution s'applique pour les territoires représentés sur le plan international par certains Etats; en effet, bien que de telles situations soient appelées à disparaître comme une conséquence logique de l'application progressive du principe qui proclame le droit des peuples à disposer d'eux-mêmes, la Conférence a considéré souhaitable de maintenir une clause qui peut encore s'avérer utile.

149   Il convient enfin de dire un mot sur l'article 41, la disposition étant tout à fait nouvelle dans une Convention de La Haye; elle fut introduite, de même d'ailleurs que dans l'autre Convention adoptée lors de la Quatorzième session, à savoir la *Convention tendant à faciliter l'accès international à la justice*, à la demande expresse de la délégation australienne.

Le but de cet article est de préciser que la ratification de la Convention par un Etat n'entraîne aucune conséquence quant à la répartition interne des autorités de cet Etat dans le partage des pouvoirs exécutif, judiciaire et législatif.

La chose semble aller de soi, et c'est bien dans ce sens qu'il faut comprendre l'intervention du chef de la délégation canadienne lors des débats de la Quatrième commission où fut décidée l'introduction de cette disposition dans les deux Conventions (voir P.-v. No 4 de la Séance plénière); la délégation canadienne, exprimant ouvertement l'opinion d'un grand nombre de délégations, estimait l'introduction de cet article dans les deux Conventions comme inutile. L'article 41 fut néanmoins adopté, en grande partie pour donner satisfaction à la délégation australienne, pour qui l'absence d'une telle disposition semblait poser une difficulté constitutionnelle insurmontable.

150   En ce qui concerne le problème des réserves, la Con-

147   The final clauses in articles 37 to 45 of the Convention have been drafted in accordance with similar provisions adopted by the most recent sessions of the Hague Conference. No detailed commentary is therefore necessary and we shall make only a few brief comments on them.

Firstly, the adaptation of the final clauses to the decision which was taken on the conditional opening of the Convention to non-Member States. This point has been dealt with earlier,[62] and it is sufficient merely to emphasize here that the 'semi-closed' character of the Convention derives from the means by which States Parties may declare their acceptance and not from any restriction placed on the States which may accede to it (article 38).

148   With regard to the 'degree' of acceptance of the Convention by States which contain two or more territorial units in which different systems of law are applicable to matters dealt with in this Convention, article 40 provides that they may declare — at the time of signature, ratification, acceptance, approval or accession — that the Convention shall extend to all its territorial units or only to one or more of them. Such a declaration can be modified at any time by another more extensive declaration. Actually, any modification of a declaration which tends to limit the applicability of the Convention ought to be regarded as a partial denunciation in terms of article 44, third paragraph.

Under article 39, the same result will occur with regard to States which are responsible for the international relations of other territories. Although such situations are meant to disappear as a logical consequence of the progressive application of the principle which proclaims the right of peoples to self-determination, the Conference felt it advisable to keep a clause which might yet prove to be useful.

149   Finally, a word should be said on article 41, since it contains a wholly novel provision in Hague Conventions. It also appears in the other Convention adopted at the Fourteenth Session, *i.e.* the *Convention on International Access to Justice*, at the express request of the Australian delegation.

This article seeks to make it clear that ratification of the Convention by a State will carry no implication as to the internal distribution of executive, judicial and legislative powers in that State.

This may seem self-evident, and this is the point which the head of the Canadian delegation made during the debates of the Fourth Commission where it was decided to insert such a provision in both Conventions (see *P.-v*. No 4 of the Plenary Session). The Canadian delegation, openly expressing the opinion of a large number of delegations, regarded the insertion of this article in the two Conventions as unnecessary. Nevertheless, article 41 was adopted, largely to satisfy the Australian delegation, for which the absence of such a provision would apparently have created insuperable constitutional difficulties.

150   On the question of reservations, the Convention

---

[62] Voir *supra* No 42.

[62] See *supra*, No 42.

A190

vention ne permet que celles prévues aux articles 24 et 26. Aucune autre réserve ne sera admise. D'autre part, l'article 42 précise, comme il est habituel, qu'un Etat pourra «à tout moment, retirer une réserve qu'il aura faite».

151   Finalement, il convient de souligner l'importance accrue de l'obligation de notification assumée par le Ministère des Affaires Etrangères du Royaume des Pays-Bas (article 45), dans le contexte d'une convention comme celle-ci, en raison notamment du jeu des déclarations d'acceptation des adhésions éventuelles.

Madrid, avril 1981

ELISA PÉREZ-VERA

allows only those provided for in articles 24 and 26. No other reservation is permitted. Moreover, article 42 sets forth the customary provision whereby a State can 'at any time withdraw a reservation it has made'.

151   Finally, the importance placed on the duty which was assumed by the Ministry of Foreign Affairs of the Kingdom of the Netherlands (article 45) to notify Member States and Contracting States should be emphasized, particularly in view of the role played by declarations of acceptance of future accessions in a convention such as this.

Madrid, April 1981

ELISA PÉREZ-VERA

---

A191

| Table des matières | Contents of the Report |
|---|---|

| | page |
|---|---|
| **Introduction** (Nos 1-8) | 426 |
| I Conclusions des travaux de la Conférence de La Haye de droit international privé (Nos 1-4) | 426 |
| II Objet et plan du présent Rapport (Nos 5-8) | 427 |
| **Première partie – Caractères généraux de la Convention** (Nos 9-53) | 428 |
| I OBJET DE LA CONVENTION (Nos 10-34) | 428 |
| A Délimitation du sujet (Nos 11-15) | 428 |
| B Les objectifs de la Convention (Nos 16-19) | 429 |
| C Importance accordée à l'intérêt de l'enfant (Nos 20-26) | 430 |
| D Exceptions à l'obligation d'assurer le retour immédiat des enfants (Nos 27-34) | 432 |
| II NATURE DE LA CONVENTION (Nos 35-41) | 435 |
| A Une convention de coopération entre autorités (Nos 35-37) | 435 |
| B Caractère autonome de la Convention (Nos 38-39) | 436 |
| C Rapports avec d'autres conventions (No 40) | 436 |
| D Ouverture de la Convention aux Etats non-membres de la Conférence de La Haye (No 41) | 437 |
| III INSTRUMENTS D'APPLICATION DE LA CONVENTION (Nos 42-51) | 437 |
| A Les Autorités centrales (Nos 42-47) | 437 |
| B La formule modèle (Nos 48-51) | 439 |
| IV STRUCTURE ET TERMINOLOGIE (Nos 52-53) | 440 |
| A La structure de la Convention (No 52) | 440 |
| B Terminologie utilisée par la Convention (No 53) | 441 |
| **Deuxième partie – Commentaire des articles de la Convention** (Nos 54-151) | 441 |
| CHAPITRE PREMIER — CHAMP D'APPLICATION DE LA CONVENTION (Nos 54-86) | 441 |
| Article premier – Les objectifs de la Convention (Nos 55-61) | 442 |
| a Observations générales (Nos 55-56) | 442 |
| b Lettre a (Nos 57-59) | 442 |
| c Lettre b (Nos 60-61) | 443 |

| | page |
|---|---|
| **Introduction** (Nos 1-8) | 426 |
| I Results of the work of the Hague Conference on private international law (Nos 1-4) | 426 |
| II Aim and structure of this Report (Nos 5-8) | 427 |
| **First Part – General characteristics of the Convention** (Nos 9-53) | 428 |
| I OBJECT OF THE CONVENTION (Nos 10-34) | 428 |
| A Definition of the Convention's subject-matter (Nos 11-15) | 428 |
| B The objectives of the Convention (Nos 16-19) | 429 |
| C Importance attached to the interest of the child (Nos 20-26) | 430 |
| D Exceptions to the duty to secure the prompt return of children (Nos 27-34) | 432 |
| II NATURE OF THE CONVENTION (Nos 35-41) | 435 |
| A A convention of co-operation among authorities (Nos 35-37) | 435 |
| B The autonomous nature of the Convention (Nos 38-39) | 436 |
| C Relations with other conventions (No 40) | 436 |
| D Opening of the Convention to States not Members of the Hague Conference (No 41) | 437 |
| III INSTRUMENTS FOR APPLYING THE CONVENTION (Nos 42-51) | 437 |
| A The Central Authorities (Nos 42-47) | 437 |
| B The model form (Nos 48-51) | 439 |
| IV STRUCTURE AND TERMINOLOGY (Nos 52-53) | 440 |
| A The structure of the Convention (No 52) | 440 |
| B Terminology used in the Convention (No 53) | 441 |
| **Second Part – Commentary on the specific articles of the Convention** (Nos 54-151) | 441 |
| CHAPTER ONE — SCOPE OF THE CONVENTION (Nos 54-86) | 441 |
| Article 1 – The aims of the Convention (Nos 55-61) | 442 |
| a General observations (Nos 55-56) | 442 |
| b Sub-paragraph a (Nos 57-59) | 442 |
| c Sub-paragraph b (Nos 60-61) | 443 |

A192

*Article 2 – Obligation générale des Etats contractants*
(Nos 62-63)                                                                  443

*Article 3 – Le caractère illicite d'un déplacement*
*ou d'un non-retour* (Nos 64-74)                                            444

a    *Observations générales* (No 64)                                       444
b    *L'élément juridique* (Nos 65-71)                                      444
c    *L'élément de fait* (Nos 72-74)                                        448

*Article 4 – Domaine d'application* ratione personae
(Nos 75-82)                                                                  449

a    *Les enfants protégés* (Nos 76-78)                                     449
b    *Les titulaires des droits de garde et de visite*
     (Nos 79-80)                                                            450
c    *Les éventuels «enleveurs»* (Nos 81-82)                                451

*Article 5 – De certaines expressions utilisées dans*
*la Convention* (Nos 83-86)                                                 451

CHAPITRE II – AUTORITÉS CENTRALES
(Nos 87-98)                                                                  452

*Article 6 – Création des Autorités centrales*
(No 87)                                                                      452

*Article 7 – Obligations des Autorités centrales*
(Nos 88-98)                                                                  453

CHAPITRE III – RETOUR DE L'ENFANT
(Nos 99-124)                                                                 455

*Article 8 – La saisine des Autorités centrales*
(Nos 99-101)                                                                 455

*Article 9 – Transmission de la demande à l'Autorité*
*centrale de l'Etat où se trouve l'enfant* (No 102)                         457

*Article 10 – La remise volontaire de l'enfant*
(No 103)                                                                     457

*Article 11 – L'utilisation des procédures d'urgence*
*par les autorités judiciaires ou administratives*
(Nos 104-105)                                                                457

*Articles 12 et 18 – Obligation de retourner l'enfant*
(Nos 106-112)                                                                458

*Articles 13 et 20 – Exceptions possibles au retour*
*de l'enfant* (Nos 113-118)                                                 460

*Article 14 – Assouplissement de la preuve du*
*droit étranger* (No 119)                                                   462

*Article 15 – Possibilité de demander une décision*
*ou une attestation des autorités de la résidence*
*habituelle de l'enfant* (No 120)                                          463

*Article 16 – Prohibition de statuer sur le fond du*
*droit de garde* (No 121)                                                  463

*Article 17 – Existence d'une décision relative*
*à la garde dans l'Etat requis* (Nos 122-123)                              464

*Article 19 – Portée des décisions sur le retour de*
*l'enfant* (No 124)                                                        464

CHAPITRE IV – DROIT DE VISITE
(Nos 125-128)                                                                465

*Article 21 –* (Nos 125-128)                                                465

CHAPITRE V – DISPOSITIONS GÉNÉRALES
(Nos 129-146)                                                                466

*Article 22 – «Cautio judicatum solvi»* (No 130)                           466

*Article 23 – Exemption de légalisation* (No 131)                          467

*Article 2 – General obligation of Contracting States*
(Nos 62-63)                                                                  443

*Article 3 – The unlawful nature of a removal*
*or retention* (Nos 64-74)                                                  444

a    *General observations* (No 64)                                         444
b    *The juridical element* (Nos 65-71)                                    444
c    *The factual element* (Nos 72-74)                                      448

*Article 4 – Convention's scope* ratione personae
(Nos 75-82)                                                                  449

a    *The children protected* (Nos 76-78)                                   449
b    *The holders of custody and access rights*
     (Nos 79-80)                                                            450
c    *The potential 'abductors'* (Nos 81-82)                               451

*Article 5 – Certain terms used in the Convention*
(Nos 83-86)                                                                  451

CHAPTER II – CENTRAL AUTHORITIES
(Nos 87-89)                                                                  452

*Article 6 – Creation of Central Authorities*
(No 87)                                                                      452

*Article 7 – Obligations of Central Authorities*
(Nos 88-98)                                                                  453

CHAPTER III – RETURN OF THE CHILD
(Nos 99-124)                                                                 455

*Article 8 – Applications to Central Authorities*
(Nos 99-101)                                                                 455

*Article 9 – Transmission of the application to the*
*Central Authority of the State where the child is*
*located* (No 102)                                                         457

*Article 10 – Voluntary return of the child*
(No 103)                                                                     457

*Article 11 – The use of expeditious procedures*
*by judicial or administrative authorities*
(Nos 104-105)                                                                457

*Articles 12 and 18 – Duty to return the child*
(Nos 106-112)                                                                458

*Articles 13 and 20 – Possible exceptions to the*
*return of the child* (Nos 113-118)                                        460

*Article 14 – Relaxation of the requirements of proof*
*of foreign law* (No 119)                                                  462

*Article 15 – The possibility of requesting a decision*
*or other determination from the authorities of the*
*child's habitual residence* (No 120)                                      463

*Article 16 – Prohibition against deciding upon*
*the merits of custody rights* (No 121)                                    463

*Article 17 – The existence of a decision on custody*
*in the requested State* (Nos 122-123)                                     464

*Article 19 – Scope of the decisions on the return of*
*the child* (No 124)                                                       464

CHAPTER IV – RIGHTS OF ACCESS
(Nos 125-128)                                                                465

*Article 21 –* (Nos 125-128)                                                465

CHAPTER V – GENERAL PROVISIONS
(Nos 129-146)                                                                466

*Article 22 – 'Cautio judicatum solvi'* (No 130)                          466

*Article 23 – Exemption from legalization* (No 131)                        467

*Table du Rapport*

*Contents of the Report*                                                    475

[63]

A193

| | |
|---|---|
| *Article 24 — Traduction des documents* (No 132) | 467 |
| *Article 25 — Assistance judiciaire et juridique* (No 133) | 468 |
| *Article 26 — Frais découlant de l'application de la Convention* (Nos 134-136) | 468 |
| *Article 27 — Possibilité de rejeter une demande* (No 137) | 469 |
| *Article 28 — Procuration exigée par l'Autorité centrale* (No 138) | 469 |
| *Article 29 — Saisine directe des autorités internes compétentes* (No 139) | 469 |
| *Article 30 — Recevabilité des documents* (No 140) | 469 |
| *Articles 31 à 33 — Application de la Convention en ce qui concerne les Etats plurilégislatifs* (Nos 141-142) | 470 |
| *Article 34 — Relations avec d'autres conventions* (No 143) | 470 |
| *Article 35 — Domaine d'application* ratione temporis *de la Convention* (Nos 144-145) | 470 |
| *Article 36 — Possibilité de limiter conventionnellement les restrictions au retour de l'enfant* (No 146) | 471 |
| CHAPITRE VI — CLAUSES FINALES (Nos 147-151) | 472 |

| | |
|---|---|
| *Article 24 — Translation of documents* (No 132) | 467 |
| *Article 25 — Legal aid and advice* (No 133) | 468 |
| *Article 26 — Costs arising out of the Convention's application* (Nos 134-136) | 468 |
| *Article 27 — Possible rejection of an application* (No 137) | 469 |
| *Article 28 — Authorization required by the Central Authority* (No 138) | 469 |
| *Article 29 — Direct application to competent internal authorities* (No 139) | 469 |
| *Article 30 — Admissibility of documents* (No 140) | 469 |
| *Articles 31 to 33 — Application of the Convention in relation to States with more than one system of law* (Nos 141-142) | 470 |
| *Article 34 — Relationship to other conventions* (No 143) | 470 |
| *Article 35 — Scope of the Convention* ratione temporis (Nos 144-145) | 470 |
| *Article 36 — Possibility of limiting by agreement the restrictions on the return of the child* (No 146) | 471 |
| CHAPTER VI — FINAL CLAUSES (Nos 147-151) | 472 |

*Table du Rapport*                    *Contents of the Report*

# EXHIBIT U



INSTITUTO NACIONAL DO SEGURO SOCIAL

COMUNICAÇÃO DE DECISÃO

**Página 1 de 1**

**NIT:** 129.06538.13-4

**Número do Benefício:** 639.834.241-4 **Espécie:** 31

**Número do Requerimento:** 215547458

**Ao Sr. (a):** EDERVALDO RODRIGUES DA SILVA

**Endereço:** R PARIS, 69 CASA, JARDIM LEBLON

**CEP:** 31550-150 **Município:** BELO HORIZONTE **UF:** MG

**Assunto:** Pedido de Auxílio - Doença

**Decisão:** Deferimento do Pedido

**Motivo:** Constatação de Incapacidade Laborativa

**Fundamentação Legal:** Art. 59 da Lei Nº8.213, de 24/07/1991; Artigos 71, 77 e 78 do Decreto Nº3.048, de 06/05/1999; Portaria Ministerial 359 de 31/08/2006, Artigo 207, da IN 20 INSS/PRES. de 10/10/2007.

Em atenção ao seu pedido de Auxílio por Incapacidade Temporária, apresentado no dia 09/07/2022, informamos que foi reconhecido o direito ao benefício, tendo em vista que foi constatada incapacidade para o trabalho. O benefício foi concedido até 31/08/2022. Se nos 15(quinze) dias finais até a Data da Cessação do benefício (31/08/2022), V.Sa. ainda se considerar incapacitado para o trabalho, poderá requerer novo exame médico-pericial, mediante formalização de Solicitação de Prorrogação. A partir de 31/08/2022 (data da cessação do benefício) e pelo prazo de 30 (trinta) dias, V. Sa. poderá interpor Recurso à Junta de Recursos da Previdência Social. O requerimento de Solicitação de Prorrogação poderá ser feito ligando para o número 135 da Central de Atendimento do INSS; ou pela Internet no endereço meu.inss.gov.br ou uma Agência da Previdência Social - APS. A Previdência Social informa que o(a) segurado(a) em Auxílio por Incapacidade Temporária que retornar voluntariamente à mesma atividade, poderá ter seu Auxílio cancelado a partir da data do retorno, de acordo com os §§ 6º e 7º do art. 60 da Lei nº 8213/91, com redação dada pela Lei nº Data: terça-feira, 1 de outubro de 2024.

**Alessandro Antonio Stefanutto**

Presidente do INSS

**Agência da Previdência Social:** BELO HORIZONTE OESTE

**Endereço:** RUA ESPIRITO SANTO 54 , CENTRO

**CEP:** 30160-030 **Município:** BELO HORIZONTE **UF:** MG

**Termo de Responsabilidade:** Responsabilizo-me, sob as penas do Artigo 171 do Código Penal, pela veracidade da documentação apresentada para a solicitação do benefício acima descrito. Ciente, em 2 de Agosto de 2022.



Você pode conferir a autenticidade do documento em
https://meu.inss.gov.br/#/aberto/autenticidade
com o código 241001UA24SE0UHVO5PY06

A196



**NATIONAL SOCIAL SECURITY INSTITUTE**
DECISION COMMUNICATION

**NIT:** 129.06538.13-4

**Benefit Number:** 639.834.241-4 **Type:** 31

**Application Number:** 215547458

**To Mr./Mrs.:** EDERVALDO RODRIGUES DA SILVA

**Address:** R PARIS, 69 CASA, JARDIM LEBLON

**CEP:** 31550-150 **Municipality:** BELO HORIZONTE **UF:** MG

**Subject:** Request for Assistance - Illness

**Decision:** Approval of the Order

**Reason:** Finding of Work Disability

**Legal Rationale:** Art. 59 of Law Number 8.213, of 07/24/1991; Articles 71, 77 and 78 of Decree Number 3.048, of 05/06/1999; Ministerial Ordinance 359 of 08/31/2006, Article 207, of IN 20 INSS/PRES. of 10/10/2007.

In response to your request for Temporary Disability Assistance, submitted on 07/09/2022, we hereby inform you that the right to the benefit has been recognized, considering that inability to work was found. The benefit was granted until 08/31/2022. If in the final 15 (fifteen) days up to the Benefit Termination Date (08/31/2022), you still consider yourself unable to work, you may request a new medical-expert examination, by formalizing an Extension Request. From 08/31/2022 (date of termination of the benefit) and for a period of 30 (thirty) days, you may file an Appeal with the Social Security Resource Board. The Extension Request application may be made by calling the INSS Service Center at 135; or by accessing the Internet at meu.inss.gov.br or by visiting a Social Security Agency - APS. The Social Security states that the insured person(s) in Temporary Disability Assistance who voluntarily returns to the same activity may have his/her Assistance cancelled from the date of return, in accordance with §§ 6 and 7 of Art. 60 of Law Number 8213/91, as amended by Law No.

Date: Tuesday, October 1, 2024.

[signature]

**Alessandro Antonio Stefanutto**

President of INSS

**Social Security Agency:** BELO HORIZONTE WEST

**Address:** RUA ESPIRITO SANTO 54 , CENTRO

**CEP:** 30160-030 **Municipality:** BELO HORIZONTE **UF:** MG

**Disclaimer:** I am responsible, under the penalties of Article 171 of the Criminal Code, for the truthfulness of the documentation presented for the request for the benefit described above. Advised, on August 2, 2022.



You can verify the authenticity of the document at https://meu.inss.gov.br/#/aberto/autenticidade with the code 241001UA24SE0UHVO5PY06

CONFIDENTIAL DASILVA0000260

A197



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**resultado-de-pericia (7)**" is, to the best of my knowledge and belief, a true and accurate translation from Portuguese into English.

_____
Jacqueline Yorke

Sworn to before me this
October 7, 2024

_____
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____
Stamp, Notary Public

CONFIDENTIAL

DASILVA0000261

A198

# EXHIBIT V

Frederic T. Greenhalge Elementary School
Serie: 03                                         Professor(a): S. HOEY

| Frequencia | Presente | Ausente | Atrasado |
|---|---|---|---|
| Outono | 56 | 4 | 0 |
| Inverno | 52 | 5 | 0 |
| Primavera | 52 | 10 | 0 |
| Total Anual | 160 | 19 | 0 |

## Responsabilidades & Expectativas – Sistema de Avaliação

C - Consistentemente       S - As vezes
B - Começando a            N – Precisa Melhorar
M – Nota modificada de acordo com Plano de

| Responsabilidades & Expectativas | Outono | Inverno | Primaver |
|---|---|---|---|
| Aceita a responsabilidade por seu aprendizado e comportamento |  | S | C |
| Segue os procedimentos escolares | S | S | S |
| Segue orientações | S | S | S |
| Trata outras pessoas com respeito | S | S | C |
| Trabalha cooperativamente com grupos e parceiros | C | S | C |
| Demonstra esforço e perseverança | S | S | S |
| Aceita e utiliza sugestões recebidas | S | S | S |
| Completa e devolve trabalho de casa | N | S | S |
| Devolve trabalhos organizados e legíveis | C | S | S |
| Organiza o local de trabalho e os materiais | S | S | S |

## Decisao de Promocao:

Promovido para a Serie 4 Greenhalge Elementary School

| Specialty Subjects | Outono | Inverno | Primavera |
|---|---|---|---|
| Art - Grade 3 | 1 | 2 | 2 |
| Music - Grade 3 | 3 | 3 | 3 |
| Physical Education - Grade 3 | 2 | 2 | 2 |

---



# Escolas Publicas de Lowell

Frederic T. Greenhalge Elementary School

149 ENNELL STREET
978-937-7670
JENNIFER SCARPATI, Direto(a)

# Boletim Escolar

2023-2024 Ano Escolar

Serie: 03     Sala: 303
Professor(a): S. HOEY
@lowell.k12.ma.us

A excelencia nos processos de ensino e aprendizagem e o elemento essencial e necessario para garantir resultados academicos que viabilizem a obtencao dos futuros objetivos academicos das criancas, preparando-os para o ensino universitario em seus diferentes niveis, para a competicao no mercado de trabalho globalizado e a conquista de seus sonhos de uma vida plena. O progresso maximo e desenvolvimento academico potencial ocorrem quando educadores e familias trabalham juntos, colaborativamente, visando garantir a obtencao dos melhores

Este Boletim Escolar e um documento importante do trabalho diario de sua crianca. A comunicacao entre escola e familia e essencial. Caso os senhores tenham quaisquer questoes ou precisem de algum esclarecimento, por gentileza nao hesitem em contactar o (a) professor (a) de sua crianca ou a direcao da escola.



Liam Skinner
Superintendente

CONFIDENTIAL

DASILVA0000174

A200

DASILVA0000175

**Padroes Academicos – Sistema de Classificacao**

5 - Excede o Padrão
4 - Atinge o Padrão
3 - Progredindo para atingir o Padrão
2 - Iniciando o entendimento do Padrão, mas precisa de apoio
1 - Ainda não compreende o Padrão, precisa de apoio contínuo
M - Nota modificada de acordo com Plano de Educação Individual
Áreas de conhecimento não avaliadas durante o período de avaliação são deixadas em branco intencionalmente. .

| Números & Operações | Outono | Inverno | Primaver |
|---|---|---|---|
| Arredonda números para o próximo 10 ou 100 | 1 | 2 | 2 |
| Adiciona & subtrai fluentemente até 1.000 | 1 | 2 | 2 |
| Multiplique números de 1 dígito por múltiplos de 10 | 1 | 2 | 2 |
| Compreende frações como números | | | 2 |

| Operações & Pensamento Algébrico | Outono | Inverno | Primaver |
|---|---|---|---|
| Interpreta produtos & quocientes até 100 | 2 | 2 | 2 |
| Resolve problemas matemáticos de uma etapa (x ÷) | 2 | 2 | 2 |
| Determina fator desconhecido em multiplicação e divisão ( x ÷ ) | 2 | 2 | 2 |
| Compreende e aplica propriedades de multiplicação | 2 | 2 | 2 |
| Resolve problemas matemáticos de duas etapas(+ - x ÷) | 1 | 2 | 2 |
| Identifica & explica padrões aritméticos | 1 | 2 | 2 |
| Conhece fluentemente multiplicação e divisão x ÷ até 100 | 1 | 2 | 2 |

| Geometria, Medidas & Dados | Outono | Inverno | Primaver |
|---|---|---|---|
| Descreve & analisa formas de duas dimensões 2-D | | | 2 |
| Divide formas em tamanhos iguais e as representa como frações | | | 2 |
| Conhece a hora e resolve problemas com tempo transcorrido | | | 2 |
| Resolve problemas com medidas ( volume & massa) | 1 | 2 | 2 |
| Coleta, compara , faz gráficos e analisa dados | | | 2 |
| Conta unidades quadradas, relaciona a área com multiplicação | | 2 | 2 |

| Ciências | Outono | Inverno | Primaver |
|---|---|---|---|
| Utiliza instrumentos de medição de tempo para coletar e escrever dados | 3 | 3 | |
| Compreende as propriedades da água | 3 | 3 | |
| Compreende e modela o ciclo da água | | 3 | |
| Aplica os princípios dos processos de engenharia e design | 3 | 3 | |
| Descreve as estruturas e ciclo de vida de uma planta | | | 3 |
| Descreve estruturas animais: sobrevivência, crescimento, & comportamento | | | 3 |
| Modela relações entre organismos: cadeia alimentar | | | 3 |

CONFIDENTIAL

A201

Frederic T. Greenhalge Elementary School
Serie: 03    Sala: 303    Professor(a): S. HOEY

## Padroes Academicos -- Sistema de Classificacao

5 - Excede o Padrão
4 - Atinge o Padrão
3 - Progredindo para atingir o Padrão
2 - Iniciando o entendimento do Padrão, mas precisa de apoio
1 - Ainda não compreende o Padrão, precisa de apoio contínuo
M - Nota modificada de acordo com Plano de Educação Individual
Areas de conhecimento não avaliadas durante o período de avaliacao são intencionalmente deixadas em branco.

### Comentarios do(a) Professor(a) - Outono:

Foi maravilhoso conhecer o ▬▬. Acho que ele é um aluno maravilhoso e gentil. Ele adora compartilhar suas ideias com os colegas. Às vezes, ele pode sair da tarefa e adora passear e conversar com seus amigos. No entanto, quando preço para ele voltar à tarefa, ele segue as instruções imediatamente e sempre respeita muito os professores. Gostaria que o ▬▬ tivesse mais interesse e responsabilidade sobre seu aprendizado. Ele é um aluno curioso e capaz e mal posso esperar para ver seu crescimento este ano. Continue sendo você, ▬▬

### Comentarios do(a) Professor(a) - Inverno:

▬▬ tem um coração bondoso e é doce. Ele é cheio de vida e tem um sorriso contagiante! O ▬▬ tem se esforçado muito para se manter na tarefa e evitar comportamentos que possam distrair a si mesmo ou a seus colegas de classe. Quando está envolvido em seu aprendizado, ▬▬ gosta de compartilhar suas ideias com a classe. Ele está se esforçando para desenvolver suas habilidades de leitura e escrita. Em matemática, ele gosta de experimentar novas estratégias e aprender jogos matemáticos. ▬▬ deve continuar a praticar os fatos da multiplicação em casa todas as noites. Continue assim, ▬▬

### Comentarios do(a) Professor(a) - Primavera:

Meu querido ▬▬ adorei ser sua professora este ano. O ▬▬ cresceu em muitos aspectos durante o ano letivo. Ele se esforçou muito para manter a consistência a seguir as expectativas, tanto social quanto academicamente. Estou muito orgulhoso de suas realizações. Ele se esforça muito todos os dias. Continue sendo você, ▬▬ Você é uma luz positiva! Tenha um verão seguro e saudável.

| Leitura | Outono | Inverno | Primaver |
|---|---|---|---|
| Lê & compreende textos no nível de leitura da série escolar da forma independente | 1 | 2 | 2 |
| Lê textos da série escolar de forma precisa e fluente | 1 | 2 | 2 |
| Determina as ideias principais ou temas | 1 | 2 | 2 |
| Descreve o desenvolvimento do personagem | | 2 | 2 |
| Compara & contrasta dois textos | | | 2 |
| Identifica estruturas dos textos de ficção, textos informativos e poesia | 1 | 2 | 2 |
| Determina o significado das palavras & frases | 1 | 2 | 2 |

| Escrita & Linguagem Escrita | Outono | Inverno | Primaver |
|---|---|---|---|
| Escreve efetivamente com objetivos e audiências diferentes | 2 | 2 | 2 |
| Estrutura detalhes para apoiar a escrita | 2 | 2 | 2 |
| Faz a revisão gráfica para clarificar & melhorar o texto | 1 | 2 | 2 |
| Coleta informações para apresentar o conhecimento | 1 | 2 | 2 |
| Utiliza letras maiúsculas, pontuação e soletração | | 2 | 2 |

| Linguagem Oral | Outono | Inverno | Primaver |
|---|---|---|---|
| Engaja efetivamente em discussões colaborativas | 3 | 3 | 3 |
| Escuta criticamente | 2 | 3 | 3 |
| Expressa ideias claramente | 2 | 3 | 3 |

| Estudos Sociais | Outono | Inverno | Primaver |
|---|---|---|---|
| Trabalho escrito e conhecimento | 3 | 3 | 3 |

CONFIDENTIAL

DASILVA0000176

A202

DASILVA0000177

**Dezembro & Marco:**
Por gentileza assine e devolva esta pagina de comentarios

Comentarios dos pais/responsaveis:

☐ Por gentileza entre em contato comigo para discutir o desenvolvimento da minha crianca

Assinatura dos pais/responsaveis

Date

CONFIDENTIAL



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Child's Report Card 2023-2024**" is, to the best of my knowledge and belief, a true and accurate translation from Portuguese into English.

_____
Jacqueline Yorke

Sworn to before me this
September 17, 2024

_____
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.400.8840  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

CONFIDENTIAL                                                                                    DASILVA0000227

A204

Frederic T. Greenhalge Elementary School
**Series: 03**       **Classroom: 303**       **Teacher: S. HOEY**

| Frequency | Present | Absent | Late |
|---|---|---|---|
| Fall | 56 | 4 | 0 |
| Winter | 53 | 5 | 0 |
| Spring | 52 | 10 | 0 |
| Total Annual | 109 | 19 | 0 |

### Responsibilities & Expectations - Evaluation System

**C - Consistently**          **S - Sometimes**
**B - Beginning to**          **N - Needs improvement**
**M - Grade modified according to [an Education] Plan**

| Responsibilities & Expectations | Fall | Winter | Spring |
|---|---|---|---|
| Accepts responsibility for their learning and behavior | S | S | C |
| Follows the school procedures | S | C | S |
| Follows the guidelines | S | S | C |
| Treats other people with respect | S | C | C |
| Works cooperatively with groups and partners | C | S | C |
| Shows effort and perseverance | S | S | S |
| Accepts and uses the suggestions received | S | S | S |
| Completes and returns homework | N | | |
| Returns work organized and legible | C | S | S |
| Organizes the workspace and materials | S | S | S |

| Specialty Subjects | Fall | Winter | Spring |
|---|---|---|---|
| Art - Grade 3 | 1 | 2 | 2 |
| Music - Grade 3 | 3 | 3 | 3 |
| Physical Education - Grade 3 | 2 | 2 | 2 |

[logo] LOWELL PUBLIC SCHOOLS MASSACHUSETTS

# Lowell Public Schools

Frederic T. Greenhalge Elementary School

149 ENNELL STREET
978-937-7670
JENNIFER SCARPATI, Director

# School Report Card

2023-2024 School Year

Series: 03     Classroom: 303
Teacher: S. HOEY
@lowell.k12.ma.us

**Excellence in the teaching and learning process is the essential and necessary element in order to guarantee academic results that will enable children to achieve their future academic goals, preparing them for university education at all levels, to compete in the globalized job market and to achieve their dreams of a fulfilling life. Maximum progress and potential academic development occur when educators and families work together collaboratively to ensure the best [end results.]**

**This School Report Card is an important document of your child's daily work. Communication between the school and the family is essential. Should you have any queries or need any clarification, please do not hesitate to contact your child's teacher or the school management.**

**Liam Skinner**
**Superintendent**

[logo]

CONFIDENTIAL

DASILVA0000223

A205

**Academic Standards - Grading System**
5 - Exceeds the Standard
4 - Achieves the Standard
3 - Making progress towards the Standard
2 - Beginning to understand the Standard, but needs support
1 - Does not yet understand the Standard, needs continuous support
M - Grade modified according to an Individual Education Plan
Knowledge areas not assessed during the assessment period are intentionally left blank.

| Numbers & Operations | Fall | Winter | Spring |
|---|---|---|---|
| Rounds numbers up to the nearest 10 or 100 | 1 | 2 | 2 |
| Adds & subtracts fluently up to 1,000 | 1 | 2 | 2 |
| Multiplies 1-digit numbers by multiples of 10 | 1 | 2 | 2 |
| Understands fractions as numbers | | | 2 |

| Operations & Algebraic Thinking | Fall | Winter | Spring |
|---|---|---|---|
| Interprets products & quotients up to 100 | 2 | 2 | 2 |
| Solves one-step math problems (x ÷) | 2 | 2 | 2 |
| Determines unknown factor in multiplication and division (x ÷) | 2 | 2 | 2 |
| Understands and applies multiplication properties | 2 | 2 | 2 |
| Solves two-step math problems (+ - x ÷) | 1 | 2 | 2 |
| Identifies & explains arithmetic patterns | 1 | 2 | 2 |
| Fluent in multiplication and division (x ÷) up to 100 | 1 | 2 | 2 |

| Geometry, Measurements & Data | Fall | Winter | Spring |
|---|---|---|---|
| Describes & analyzes two-dimensional (2-D) shapes | | | 2 |
| Divides shapes into equal sizes and represents them as fractions | | | 2 |
| Knows the time and solves problems with elapsed time | | | 2 |
| Solves problems with measurements (volume & mass) | 1 | 2 | 2 |
| Collects, compares, graphs and analyzes data | | | 2 |
| Counts square units, relates area to multiplication | | 2 | 2 |

| Sciences | Fall | Winter | Spring |
|---|---|---|---|
| Uses time measuring instruments to collect and write down data | 3 | 3 | |
| Understands the properties of water | 3 | 3 | |
| Understands and models the water cycle | | 3 | |
| Applies the principles of engineering and design processes | | 3 | |
| Describes the structures and life cycle of a plant | | | 3 |
| Describes animal structures: survival, growth, & behavior | | | 3 |
| Models relationships between organisms: food chain | | | 3 |

CONFIDENTIAL

DASILVA0000224

A206

Frederic T. Greenhalge Elementary School
Series: 03          Classroom: 303          Teacher: S. HOEY

**Academic Standards - Grading System**

**5 - Exceeds the Standard**
**4 - Achieves the Standard**
3 - Making progress towards the Standard
2 - Beginning to understand the Standard, but needs support
1 - Does not yet understand the Standard, needs continuous support
M - Grade modified according to an Individual Education Plan
Knowledge areas not assessed during the assessment period are intentionally left blank.

**Teacher's comments - Fall:**

It was wonderful to meet ■ I think he's a wonderful and kind student. He loves sharing his ideas with his peers. Sometimes, he can get off task and loves going for a walk and chatting with his friends. However, when I ask him to go back to the task, he follows the instructions immediately and is always very respectful of his teachers. I would like ■ to take more interest in and responsibility for his learning. He is an inquisitive and capable student, and I can't wait to see his growth this year. Carry on being you, ■

**Teacher's comments - Winter:**

■ has a kind heart and is sweet. He is full of life and has a contagious smile! ■ has been trying very hard to stay on task and avoid behavior that might distract him or his classmates. When he's involved in his learning, ■ likes to share his ideas with the class. He is working hard to develop his reading and writing skills. In math, he likes to try out new strategies and learn mathematical games. ■ should continue practicing the multiplication [tables] at home every night. Keep it up, ■

**Teacher's comments - Spring:**

My dear ■ I have loved being your teacher this year. ■ has grown in many ways during the school year. He has worked hard to maintain consistency and meet expectations, both socially and academically. I am very proud of his achievements. He works very hard every day. Keep being you, ■ You are a positive light! Have a safe and healthy summer!

| Reading | Fall | Winter | Spring |
|---|---|---|---|
| Independently reads & understands texts at the reading level of the school grade | 1 | 2 | 2 |
| Reads school texts accurately and fluently | 1 | 2 | 2 |
| Determines key ideas or themes | 1 | 2 | 2 |
| Describes character development | | 2 | 2 |
| Compares & contrasts two texts | | | 2 |
| Identifies the structures of fictional texts, informative texts and poetry | 1 | 2 | 2 |
| Determines the meaning of words & phrases | 1 | 2 | 2 |

| Writing & Written Language | Fall | Winter | Spring |
|---|---|---|---|
| Writes effectively for different purposes and audiences | 2 | 2 | 2 |
| Structures details to support the writing | 2 | 2 | 2 |
| Proofreads to clarify & improve the text | 1 | 2 | 2 |
| Collects information to present the knowledge | 1 | 2 | 2 |
| Uses capital letters, punctuation and spelling | 1 | 2 | 2 |

| Oral Language | Fall | Winter | Spring |
|---|---|---|---|
| Engages effectively in collaborative discussions | 3 | 3 | 3 |
| Critical listening | 2 | 3 | 3 |
| Expresses ideas clearly | 2 | 3 | 3 |

| Social Studies | Fall | Winter | Spring |
|---|---|---|---|
| Written work and knowledge | 3 | 3 | 3 |

CONFIDENTIAL

DASILVA0000225

A207

**December & March:**
Please sign and return this comment page

Comments from parents/guardians:

☐  Please contact me to discuss my child's development

[logo]

Signature of parents/guardians
_____

Date
_____

CONFIDENTIAL

DASILVA0000226

# EXHIBIT W



**INSTITUTO NACIONAL DO SEGURO SOCIAL**
COMUNICAÇÃO DE DECISÃO

**NIT:**  129.06538.13-4

**Número do Benefício:**  640.941.788-1                              **Espécie:** 31

**Número do Requerimento:**  217060121

**Ao Sr. (a):**  EDERVALDO RODRIGUES DA SILVA

**Endereço:**  R PARIS, 69 CASA, JARDIM LEBLON

**CEP:**  31550-150           **Município:**  BELO HORIZONTE           **UF:**  MG

**Assunto:**  Pedido de Auxílio - Doença

**Decisão:**  Indeferimento do Pedido

**Motivo:**  Não Constatação de Incapacidade Laborativa

**Fundamentação Legal:**  Art. 59 da Lei Nº 8.213, de 24/07/1991. Art. 71 do Decreto Nº 3.048, de 06/05/1999; Portaria Ministerial 359 de 31/08/2006.

Em atenção ao seu pedido de Auxílio por Incapacidade Temporária, apresentado no dia 05/10/2022, informamos que não foi reconhecido o direito ao benefício, tendo em vista que não foi constatada, em exame realizado pela perícia médica do INSS, a incapacidade para o seu trabalho ou para a sua atividade habitual. Desta decisão poderá ser interposto Recurso à Junta de Recursos da Previdência Social, dentro do prazo de 30 (trinta) dias respectivamente, contados da data do recebimento desta comunicação.

Data: terça-feira, 1 de outubro de 2024.



_____

**Alessandro Antonio Stefanutto**

Presidente do INSS

**Agência da Previdência Social:**  BELO HORIZONTE OESTE

**Endereço:**  RUA ESPIRITO SANTO 54 , CENTRO

**CEP:**  30160-030           **Município:**  BELO HORIZONTE           **UF:**  MG

**Termo de Responsabilidade:** Responsabilizo-me, sob as penas do Artigo 171 do Código Penal, pela veracidade da documentação apresentada para a solicitação do benefício acima descrito. Ciente, em 10 de Novembro de 2022.

Você pode conferir a autenticidade do documento em
https://meu.inss.gov.br/#/aberto/autenticidade
com o código 241001S96LB8026MQ7F856

A210



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**resultado-de-pericia (10)**" is, to the best of my knowledge and belief, a true and accurate translation from Portuguese into English.

_____
Jacqueline Yorke

Sworn to before me this
October 7, 2024

_____
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____
Stamp, Notary Public

CONFIDENTIAL                                                    DASILVA0000267

A211



**NATIONAL SOCIAL SECURITY INSTITUTE**
DECISION COMMUNICATION

**NIT:** 129.06538.13-4

**Benefit Number:** 640.941.788-1        **Type:** 31

**Application Number:** 217060121

**To Mr./Mrs.:** EDERVALDO RODRIGUES DA SILVA

**Address:** R PARIS, 69 CASA, JARDIM LEBLON

**CEP:** 31550-150     **Municipality:** BELO HORIZONTE     **UF:** MG

**Subject:** Request for Assistance - Illness

**Decision:** Rejection of the Request

**Reason:** Non-Detection of Work Incapacity

**Legal Rationale:** Art. 59 of Law No. 8.213, dated 07/24/1991. Art. 71 of Decree No. 3.048, of 05/06/1999; Ministerial Ordinance 359 of 08/31/2006.

In response to your request for Temporary Incapacity Assistance, submitted on 10/05/2022, we hereby inform you that the right to the benefit was not recognized, considering that incapacity for your work or usual activity was not detected, in a test performed by the INSS medical expert. An appeal may be filed against this decision with the Social Security Appeals Board within 30 (thirty) days respectively from the date of receipt of this communication. Date: Tuesday, October 1, 2024.

[signature]

**Alessandro Antonio Stefanutto**

President of INSS

**Social Security Agency:** BELO HORIZONTE WEST

**Address:** RUA ESPIRITO SANTO 54 , CENTRO

**CEP:** 30160-030     **Municipality:** BELO HORIZONTE     **UF:** MG

**Disclaimer:** I am responsible, under the penalties of Article 171 of the Criminal Code, for the truthfulness of the documentation presented for the request for the benefit described above. Advised, on November 10, 2022.



You can verify the authenticity of the document at https://meu.inss.gov.br/#/aberto/autenticidade with the code 241001S96LB8026MQ7F856

A212

# EXHIBIT X



**INSTITUTO NACIONAL DO SEGURO SOCIAL**

COMUNICAÇÃO DE DECISÃO

**NIT:**  129.06538.13-4

**Número do Benefício:**  641.947.037-8                    **Espécie:** 31

**Número do Requerimento:**      218467892

**Ao Sr. (a):**   EDERVALDO RODRIGUES DA SILVA

**Endereço:**   R PARIS, 69 CASA, JARDIM LEBLON

**CEP:**  31550-150           **Município:**   BELO HORIZONTE                    **UF:**  MG

**Assunto:**   Pedido de Auxílio - Doença

**Decisão:**   Indeferimento do Pedido

**Motivo:**   Não Constatação de Incapacidade Laborativa

**Fundamentação Legal:**      Art. 59 da Lei Nº 8.213, de 24/07/1991. Art. 71 do Decreto Nº 3.048, de 06/05/1999; Portaria Ministerial 359 de 31/08/2006.

Em atenção ao seu pedido de Auxílio por Incapacidade Temporária, apresentado no dia 13/12/2022, informamos que não foi reconhecido o direito ao benefício, tendo em vista que não foi constatada, em exame realizado pela perícia médica do INSS, a incapacidade para o seu trabalho ou para a sua atividade habitual. Desta decisão poderá ser interposto Recurso à Junta de Recursos da Previdência Social, dentro do prazo de 30 (trinta) dias respectivamente, contados da data do recebimento desta comunicação.

Data: terça-feira, 1 de outubro de 2024.

_____

**Alessandro Antonio Stefanutto**

Presidente do INSS

**Agência da Previdência Social:**      BELO HORIZONTE BARREIRO

**Endereço:**   AVENIDA TITO FULGENCIO 104 , BARREIRO

**CEP:**  30640-010           **Município:**   BELO HORIZONTE                    **UF:**  MG

**Termo de Responsabilidade:** Responsabilizo-me, sob as penas do Artigo 171 do Código Penal, pela veracidade da documentação apresentada para a solicitação do benefício acima descrito. Ciente, em 19 de Janeiro de 2023.



Você pode conferir a autenticidade do documento em
https://meu.inss.gov.br/#/aberto/autenticidade
com o código 241001AW-D03HCDFZ8GH67

A214



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**resultado-de-pericia (11)**" is, to the best of my knowledge and belief, a true and accurate translation from Portuguese into English.

_____
Jacqueline Yorke

Sworn to before me this
October 7, 2024

_____
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____
Stamp, Notary Public

CONFIDENTIAL                                    DASILVA0000269

A215



**NATIONAL SOCIAL SECURITY INSTITUTE**
DECISION COMMUNICATION

**NIT:** 129.06538.13-4

**Benefit Number:** 641.947.037-8 **Type:** 31

**Application Number:** 218467892

**To Mr./Mrs.:** EDERVALDO RODRIGUES DA SILVA

**Address:** R PARIS, 69 CASA, JARDIM LEBLON

**CEP:** 31550-150 **Municipality:** BELO HORIZONTE **UF:** MG

**Subject:** Request for Assistance - Illness

**Decision:** Rejection of the Request

**Reason:** Non-Detection of Work Incapacity

**Legal Rationale:** Art. 59 of Law No. 8.213, dated 07/24/1991. Art. 71 of Decree No. 3.048, of 05/06/1999; Ministerial Ordinance 359 of 08/31/2006.

In response to your request for Temporary Incapacity Assistance, submitted on 12/13/2022, we hereby inform you that the right to the benefit was not recognized, considering that incapacity for your work or usual activity was not detected, in a test performed by the INSS medical expert. An appeal may be filed against this decision with the Social Security Appeals Board within 30 (thirty) days respectively from the date of receipt of this communication. Date: Tuesday, October 1, 2024.

[signature]

**Alessandro Antonio Stefanutto**

President of INSS

**Social Security Agency:** BELO HORIZONTE BARREIRO

**Address:** AVENIDA TITO FULGENCIO 104 , BARREIRO

**CEP:** 30640-010 **Municipality:** BELO HORIZONTE **UF:** MG

**Disclaimer:** I am responsible, under the penalties of Article 171 of the Criminal Code, for the truthfulness of the documentation presented for the request for the benefit described above. Advised, on January 19, 2023.



You can verify the authenticity of the document at https://meu.inss.gov.br/#/aberto/autenticidade with the code 241001AW-D03HCDFZ8GH67

A216

# EXHIBIT Y



**INSTITUTO NACIONAL DO SEGURO SOCIAL**
COMUNICAÇÃO DE DECISÃO

**NIT:** 129.06538.13-4

**Número do Benefício:** 642.644.955-9      **Espécie:** 31

**Número do Requerimento:** 219421058

**Ao Sr. (a):** EDERVALDO RODRIGUES DA SILVA

**Endereço:** R PARIS, 69 CASA, JARDIM LEBLON

**CEP:** 31550-150      **Município:** BELO HORIZONTE      **UF:** MG

**Assunto:** Pedido de Auxílio - Doença

**Decisão:** Deferimento do Pedido

**Motivo:** Constatação de Incapacidade Laborativa

**Fundamentação Legal:** Art. 59 da Lei Nº8.213, de 24/07/1991; Artigos 71, 77 e 78 do Decreto Nº3.048, de 06/05/1999; Portaria Ministerial 359 de 31/08/2006, Artigo 207, da IN 20 INSS/PRES. de 10/10/2007.

Em atenção ao seu pedido de Auxílio por Incapacidade Temporária, apresentado no dia 23/02/2023, informamos que foi reconhecido o direito ao benefício, tendo em vista que ficou comprovada que houve incapacidade para o trabalho. O benefício foi concedido até 06/03/2023. Desta decisão poderá ser interposto Recurso à Junta de Recursos da Previdência Social, dentro do prazo de 30(trinta) dias, contados da data do recebimento desta comunicação. A Previdência Social informa que o(a) segurado(a) em Auxílio por Incapacidade Temporária que retornar voluntariamente à mesma atividade, poderá ter seu Auxílio cancelado a partir da data do retorno, de acordo com os §§ 6º e 7º do art. 60 da Lei nº 8213/91, com redação dada pela Lei nº 13135/15.

Data: terça-feira, 1 de outubro de 2024.



**Alessandro Antonio Stefanutto**
Presidente do INSS

**Agência da Previdência Social:** BELO HORIZONTE CALAFATE

**Endereço:** RUA PADRE EUSTAQUIO 1831 TERREO, PADRE EUSTAQUIO

**CEP:** 30720-100      **Município:** BELO HORIZONTE      **UF:** MG

**Termo de Responsabilidade:** Responsabilizo-me, sob as penas do Artigo 171 do Código Penal, pela veracidade da documentação apresentada para a solicitação do benefício acima descrito. Ciente, em 6 de Março de 2023.

Você pode conferir a autenticidade do documento em
https://meu.inss.gov.br/#/aberto/autenticidade
com o código 241001HZ0YABBF6U5HFT05

A218


**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**resultado-de-pericia (8)**" is, to the best of my knowledge and belief, a true and accurate translation from Portuguese into English.

_____
Jacqueline Yorke

Sworn to before me this
October 7, 2024

_____
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____
Stamp, Notary Public

CONFIDENTIAL



**NATIONAL SOCIAL SECURITY INSTITUTE**
DECISION COMMUNICATION

**NIT:**     129.06538.13-4

**Benefit Number:** 642.644.955-9                                             **Type:** 31

**Application Number:**     219421058

**To Mr./Mrs.:**     EDERVALDO RODRIGUES DA SILVA

**Address:**     R PARIS, 69 CASA, JARDIM LEBLON

**CEP:** 31550-150             **Municipality:** BELO HORIZONTE             **UF:** MG

**Subject:**     Request for Assistance - Illness

**Decision:**     Approval of the Order

**Reason:**     Finding of Work Disability

**Legal Rationale:**     Art. 59 of Law Number 8.213, of 07/24/1991; Articles 71, 77 and 78 of Decree Number 3.048, of 05/06/1999; Ministerial Ordinance 359 of 08/31/2006, Article 207, of IN 20 INSS/PRES. of 10/10/2007.

In response to your request for Temporary Disability Assistance, submitted on 02/23/2023, we hereby inform you that the right to the benefit has been recognized, given that it was proven that there was an incapacity for work. The benefit was granted until 03/06/2023. An appeal may be filed against this decision with the Social Security Appeals Board within 30 (thirty) days from the date of receipt of this communication. The Social Security states that the insured person(s) in Temporary Disability Assistance who voluntarily returns to the same activity may have his/her Assistance cancelled from the date of return, in accordance with §§ 6 and 7 of Art. 60 of Law Number 8213/91, as amended by Law Number 13135/15.

Date: Tuesday, October 1, 2024.

[signature]

**Alessandro Antonio Stefanutto**

President of INSS

**Social Security Agency:**     BELO HORIZONTE CALAFATE
**Address:** RUA PADRE EUSTAQUIO 1831 TERREO, PADRE EUSTAQUIO

**CEP:** 30720-100     **Municipality:** BELO HORIZONTE             **UF:** MG

**Disclaimer:** I am responsible, under the penalties of Article 171 of the Criminal Code, for the truthfulness of the documentation presented for the request for the benefit described above. Advised, on March 6, 2023.



You can check the authenticity of the document at https://meu.inss.gov.br/#/aberto/autenticidade with the code 241001HZ0YABBF6U5HFT05

A220

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                             )
EDERVALDO RODRIGUES DA SILVA,   )   Civil Action:  24-11280-ADB
                             )
        Plaintiff/Petitioner,   )
                             )
v.                           )
                             )
JESSICA SILVEIRA DA SILVA and   )
GILBERTO LUCAS,              )
                             )
        Defendants/Respondents. )
                             )
```


BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE


BENCH TRIAL DAY ONE


October 15, 2024
9:34 a.m.


John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1   APPEARANCES:

 2   Counsel on behalf of Petitioner:

 3   Elizabeth G. Crowley, Esq.
     Charles R. Hunsinger, Esq.
 4   Bowditch & Dewey LLP
     101 Federal Street #1405
 5   Boston, MA 02110
     (617) 757-6500
 6   ecrowley@bowditch.com
     chunsinger@bowditch.com

 7

 8   Counsel on behalf of Respondents:

 9   James Matthews, Esq.
     Ruben J. Rodrigues, Esq.
10   Lea Gulotta James, Esq.
     Olivia Rae King Benjamin, Esq.
11   Jamie Steven, Esq.
     Amani Kmeid, Esq.
12   Foley & Lardner LLP
     111 Huntington Avenue, Suite 2500
13   (617) 342-4000
     rrodrigues@foley.com
14   ljames@foley.com
     obenjamin@foley.com
15   jsteven@foley.com
     akmeid@foley.com

16

17

18

19

20

21

22

23

24

25
```

1

2                              CONTENTS

3

4    WITNESS                                              PAGE

5

     EDERVALDO DA SILVA
6
         Direct Examination By Ms. Crowley               25
7        Cross-Examination By Ms. Benjamin               68

8    JESSICA SILVEIRA DA SILVA

9        Direct Examination By Mr. Hunsinger             87

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3       before the Honorable Allison D. Burroughs, United States
 4       District Judge, United States District Court, District of
 5       Massachusetts, at the John J. Moakley United States Courthouse,
 6       One Courthouse Way, Courtroom 17, Boston, Massachusetts, on
 7       October 15, 2024.)
 8       (Case called to order.)
 9              COURTROOM CLERK:  Will counsel identify themselves for
09:34 10       the record.
11              MR. HUNSINGER:  Charles Hunsinger for Edervaldo da
12       Silva.
13              MS. CROWLEY:  Good morning, Your Honor.  Attorney
14       Elizabeth Crowley, also representing Edervaldo da Silva.  Thank
15       you.
16              MS. JAMES:  Good morning, Your Honor.  Lea James on
17       behalf of respondents, Jessica Silveira da Silva and Gilberto
18       Lucas.
19              MS. BENJAMIN:  Olivia Benjamin, also on behalf of
09:34 20       respondents.
21              MS. KMEID:  Amani Kmeid, also for Jessica Silveira da
22       Silva.
23              MS. STEVEN:  Jamie Steven, also for Jessica Silveira
24       da Silva.
25              MR. MATTHEWS:  Good morning, Your Honor.  James
```

1    Matthews for the respondent.

2            THE COURT:  We'll go right to openings, unless there's

3    anything else first.  I think you all know the drill.  You can

4    open from anywhere you want.  The podium is there, whatever is

5    comfortable.

6            Are they interpreting for the openings?

7            MS. CROWLEY:  So we were speaking collectively before,

8    Your Honor, and I think it's our joint expectation and

9    agreement that we won't translate openings, just cognizant of

09:35 10  how choppy that may be.

11            MS. JAMES:  Yes, we're in agreement with that.

12            THE COURT:  So you have to say a sentence and have it

13    translated --

14            MS. CROWLEY:  Correct, correct.  And I know I can only

15    speak for myself, but my opening is going to be fairly brief.

16            THE COURT:  That's fine, as long as it's all right on

17    behalf of your clients.

18            MS. JAMES:  Fine with us.

19            MS. CROWLEY:  May we proceed, Your Honor?

09:36 20          THE COURT:  Sure.

21            MS. CROWLEY:  Good morning again, Your Honor.  My name

22    is Elizabeth Crowley.  Together with my colleague, Charles

23    Hunsinger, we represent the petitioner, father, Edervaldo

24    Rodrigues da Silva in the instant Hague matter.

25            Your Honor, the father first filed the Hague

1   application seeking a return of his minor child who was eight

2   at the time, Arthur, in Brazil in March of 2022,

3   contemporaneous, Your Honor, with his grave concern that mother

4   was in the process of wrongfully removing their son, Arthur,

5   from Brazil.  Father subsequently filed the instant Hague

6   petition here in Federal Court through his predecessor counsel

7   on May 14, 2024.  That counsel was solely retained just to

8   prepare the initial petition for him.

9           You will hear father testify that it was with some

09:37 10   difficulty that he was able to find counsel to represent him to

11   prepare the petition that was ultimately filed by predecessor

12   pro bono counsel.  You will then hear and I'll represent to

13   you, Your Honor, that we subsequently took over his

14   representation this summer when we first became involved in the

15   case.

16           Your Honor, the objects of the Hague Convention are to

17   secure the prompt return of children wrongfully removed to or

18   retained in any contracting state and to ensure that the rights

19   of custody and of access under the laws of one contracting

09:37 20   state are effectively respected in the other contracting

21   states.  Brazil and the United States obviously being two of

22   many contracting states to the Hague Convention.

23           Your Honor, pursuant to the Hague Convention, the

24   removal or the retention of a child is to be considered

25   wrongful where it is in breach of rights of custody attributed

1    to a person, an institution or other body, either jointly or

2    alone, under the law of that state in which the child was

3    habitually resident immediately before the removal or

4    retention, and, at the time of removal or retention, those

5    rights, those custodial rights were actually exercised either

6    jointly or alone or would have been so exercised but for the

7    removal or retention.

8           Your Honor, as part of our case-in-chief you're going

9    to hear first from the petitioner father, Edervaldo.  He, as

09:38 10    you can see, Your Honor, is on the Zoom screen.  He is in

11    Brazil, and he will be testifying via videoconference.  He will

12    share some basic background information, Your Honor, on

13    himself, his son, Arthur, who he loves very much, and his

14    ex-wife, the child's mother who he's known for a long time.

15    You will hear him testify, Your Honor, when the parties to this

16    litigation met, when they were married, when they had their son

17    Arthur, their roles in his care as a baby, as a toddler and

18    thereafter up until the time that he left Brazil.

19           You'll also hear from our client of his love for his

09:39 20    child.  You will hear from him the very effects that this

21    removal has had on him, not only the distance but not being

22    able to interact with him in the way that he was able to when

23    he was exercising his custodial rights prior to his removal.

24           You're going to hear our client testify as to the

25    breakdown in the relationship between the mother and father,

1    their divorce, the terms of their agreement.  That agreement,

2    Your Honor, and the terms of their custodial rights and

3    visitation rights is an uncontested exhibit.  You will see that

4    exhibit, Your Honor, and you'll also hear from our client with

5    respect to his exercising his custodial and visitation rights.

6    You will hear of his relationship with his son Arthur as he

7    continued to grow, as he continued to be involved with his

8    life.

9              You will then hear, Your Honor, from our client about

09:40  10    a period in time where mother started to demand that he sign a

11    passport application.  You're going to hear from our client

12    that he was repeatedly asked to sign a passport application,

13    and you'll hear from his own testimony of the assurances that

14    he sought from mother, that if he were to sign this passport

15    application that she wouldn't leave the country with the minor

16    child, that it would be for identification purposes only.  You

17    will hear that he ultimately did sign a passport application

18    for this child to get a passport, and then you will hear from

19    him in his own words what transpired soon thereafter.

09:41  20              You will hear from him and you will see in evidence

21    the actual Hague application that was filed in March of 2022,

22    as I mentioned, and why it was that our client filed that Hague

23    application, what his concerns were, what led to his concerns

24    and what ultimately happened soon thereafter.  You'll hear from

25    our client and it's also in the uncontested exhibit binders

1    regarding a passport termination, basically the steps that he

2    took to terminate that passport.

3          You will hear of his efforts within Brazil and

4    otherwise to locate his child thereafter.  You will hear when

5    he learned that his son Arthur was no longer in Brazil as had

6    been represented to him even after the child and mother had

7    left Brazil.  And you will hear from him what representations

8    were made by the respondent to him with respect to where they

9    were.

09:42 10          And, Your Honor, as with any trial but certainly with

11   a case like this, credibility is of utmost importance.  And I

12   would ask you to focus on the timing, focus on what happened

13   leading up to this departure as well as the representations

14   that were made soon thereafter, when analyzing credibility in

15   determining who's telling the truth and who is not.

16          Your Honor, ultimately, the child did end up here in

17   the United States, is currently residing in Lowell and has been

18   upon information and belief since they arrived here and came

19   over the border, Your Honor.  You will hear from our client

09:42 20   that he went to the police in Brazil and that he exhausted his

21   efforts in Brazil to be able to secure the return of the minor

22   child.

23          You will then hear from him, Your Honor, all of the

24   steps that he took to be able to avail himself of pro bono

25   representation here in the United States to be able to advance

1    the instant Hague proceedings.

2        Your Honor, you will hear from our client that at no

3    point did he consent to his son being removed from Brazil.  I

4    think that will be really important testimony.  You will also,

5    Your Honor, hear from the mother, from Jessica.  I won't opine

6    on what she may or may not testify to but, again, would ask

7    that Your Honor focus carefully on the timeline leading

8    immediately up to the child's departure and what happened

9    thereafter and what representations were made.

09:43 10        Your Honor, under the Hague Convention, in

11    ascertaining whether there has been a wrongful removal or

12    retention within the meaning of Article III, the judicial or

13    administrative authorities of the requested state, this

14    honorable court, may take notice directly of the law and of

15    judicial or administrative decisions formally recognized or not

16    in the state of habitual residence, Brazil, of the child,

17    without recourse to the specific procedures for the proof of

18    that law or for the recognition of foreign decisions which

19    would otherwise be applicable.

09:44 20        And, Your Honor, as I mentioned before, and all

21    pursuant to Brazilian law and the Brazilian civil code, the

22    parties entered into an agreement with respect to the custody

23    and the care of this child and with respect to prescribed

24    visitation, and you'll hear our client testify that he was

25    continuously exercising that visitation.

1          Your Honor, under the law, as we know, there's a

2     strong presumption to return a wrongfully removed child to

3     their country of habitual residence and to restore the status

4     quo for a host of reasons, not only the parent/child

5     relationship, which is obviously of utmost importance, but also

6     to avoid international forum-shopping and parents engaging in

7     self-help.

8          Once it's been determined, Your Honor, that a child

9     has been wrongfully removed under the Hague Convention, the

09:45 10     presumption is that they will be returned and they will be

11     returned promptly unless and until any affirmative defense or

12     exception applies.  There are two that have been presented to

13     Your Honor by mother.  One is a well-settled defense.  The

14     second is a grave risk of harm.

15          Your Honor, the minor child has been here with his

16     mother for approximately two years since the removal from

17     Brazil.  There are school records that are in evidence that you

18     will see that speak to a host of things, the child's

19     significant absences from school and significant difficulties

09:46 20     acclimating here not only initially but subsequently.  There

21     will be a teacher that testifies that you will hear testimony

22     from, and those records will be important, Your Honor, from the

23     actual educators that are seeing this child when he does attend

24     school.

25          Your Honor, it's our understanding that mother's

1    immigration status remains uncertain, as does the child's.  And

2    you will hear testimony from our client who has been availing

3    himself of the opportunity to have videoconferences with his

4    minor child.  He will tell you about his observations of the

5    child during those calls and his belief and understanding how

6    much the child misses him and misses his country where he was

7    born, where he lived prior to coming here, Your Honor.

8         With respect to the well-settled defense, Your Honor,

9    under the law, obviously it is not just about the timing that a

09:47 10   child has been here but all of the various facets that go into

11   a well-settled defense.  We'll explore that on

12   cross-examination of mother and otherwise throughout this

13   trial, Your Honor.

14        And then with respect to the grave risk of harm, you

15   will hear our client testify of his relationship with his son,

16   a loving relationship.  You will hear him testify about his

17   relationship with mother.  You'll also hear from mother who has

18   been deposed testify about their relationship both prior to the

19   removal as well as the long history of the parties prior.  And,

09:47 20   Your Honor, we don't believe that there's any grounds for

21   either of those affirmative defenses, but in closing and after

22   the presentation of the evidence, I will make those arguments.

23        Your Honor, at the conclusion of this case, we will be

24   asking Your Honor to return Arthur, who is now ten years old,

25   to Brazil, to his home country where he has always lived so

1    that his father can have access to him and isn't prevented from

2    being able to see his son.  Again, the stakes are obviously

3    high.  I don't need to tell you that.  But we fully believe

4    that the evidence will support the return of this minor child

5    to Brazil and support the allegations that we've raised that

6    the removal was wrong and that a return to Brazil is the

7    appropriate relief here.  Thank you very much, Your Honor.

8              THE COURT:  Can I ask you one question?

9              MS. CROWLEY:  Certainly.

09:48 10              THE COURT:  Is it your position that the filing in

11    March of 2022 precludes a well-settled child defense?

12              MS. CROWLEY:  So this has come up before in other

13    cases, and the jurisdictions have been mixed on this in my

14    reading up all the case law, whether or not the actual filing

15    of the Hague application sets off the one-year clock or whether

16    it is the subsequent filing of the petition in the jurisdiction

17    where the child actually is.

18              And I would say this, Your Honor.  We are confident

19    with respect to the well-settled defense, even if Your Honor

09:49 20    allows it to be presented, that they're not going to meet their

21    burden to be able to have that burden sustained on the

22    well-settled defense.  But certainly you'll hear from our

23    client all of the efforts that he took within days of believing

24    that this child was leaving, I think even before the child even

25    went over the border in Brazil.  And so I would ask Your Honor

1    to keep that in mind because we have cases where parents delay,

2    where they don't do anything, and then we have parents, as in

3    this case, that do absolutely everything almost immediately and

4    without the means, without the financial means to be able to do

5    so.

6              THE COURT:  Okay.

7              MS. CROWLEY:  Thank you very much.

8              MS. JAMES:  Good morning, Your Honor.  We're here

9    today to discuss Arthur Rodrigues da Silva, a happy, thriving

09:50 10   ten-year-old boy who lives with his mother Jessica Silveira da

11   Silva and his stepfather Gilberto Lucas in Lowell,

12   Massachusetts where they have lived for over two and a half

13   years.  We're here to discuss whether Arthur should stay in the

14   United States, where he has built a home, a family and a

15   community.

16              Over the next days you will hear from Arthur's family

17   members and one of his teachers here in the United States.

18   Their testimony and the evidence provided will show three

19   things:  First, Petitioner Edervaldo Rodrigues da Silva's

09:51 20   mental health, history of illegal actions and demonstrated

21   violence against Jessica show that Arthur would face a grave

22   risk of harm if required to live in Brazil.  Second, Edervaldo

23   consented to Arthur's a removal to the United States.  And

24   third, Arthur is well settled in the United States.

25              Edervaldo and Jessica were married in 2011, and Arthur

A234

1    was born three years later in 2014.  You will hear that the

2    parties did not have a healthy marriage.  Edervaldo was often

3    disrespectful to Jessica and would both sexually and verbally

4    harass her.  He had a pattern of illegal activity and mental

5    instability.  Edervaldo would break into neighbors' homes and

6    steal items.  On at least one occasion he had outbursts in the

7    night, including breaking a bedroom window and jumping out.  He

8    could not consistently hold a job, and the family struggled to

9    make ends meet.

09:52 10         By 2016, Jessica and Edervaldo had separated.  For

11   years the parties did not have an official custody agreement,

12   but Edervaldo agreed that Arthur would live with his mother

13   after the separation.  Edervaldo visited his son inconsistently

14   during this time, sometimes missing visits and disappointing

15   Arthur.

16        Jessica was Arthur's primary caretaker and provider.

17   Even after they separated, Edervaldo continued to mistreat

18   Jessica.  On at least one occasion when Jessica asked for money

19   to provide for their son, Edervaldo responded with violence,

09:52 20   grabbing and twisting her arm while Arthur was in the house.

21   When Jessica called the police, Edervaldo fled with Arthur

22   without telling Jessica where he had taken her son.

23        Edervaldo's mental health also continued to decline.

24   After the parties separated, Edervaldo told Jessica that he was

25   hearing voices that were telling him to kill himself.  Jessica

1    was left to be fearful for her son's safety while in his

2    father's care.

3            Arthur's parents officially divorced in 2021, five

4    years after they separated.  In connection with their divorce,

5    they agreed to a custody arrangement under which Arthur lived

6    primarily with his mother.  In contrast, his father was only

7    permitted to have Arthur on alternate weekends, half of school

8    breaks and certain holidays.  Edervaldo continued with this

9    pattern of inconsistently exercising his parental rights and

09:53 10  did not take Arthur on all the weekends and holidays he was

11   allowed.  Although he was directed to pay child support,

12   because of his inconsistent employment, Edervaldo was often

13   able to contribute very little to his son, sometimes as little

14   as 45 dollars a month.

15           For her part, Jessica struggled to find consistent

16   work in Brazil while also caring for her child who has always

17   been primarily in her care.  Edervaldo's history of violence

18   towards Arthur's mother, his carelessness with his child's

19   safety, his penchant for illegal activity, his inability to

09:54 20  consistently keep a job and his unstable mental health that has

21   led him to threaten to kill himself would put Arthur at risk if

22   he were to return to his father's care.  You will also hear

23   evidence that Edervaldo agreed that Arthur could move to the

24   United States with his mother.

25           In 2021, Jessica and respondent Gilberto Lucas met in

1    Brazil, started dating, and began to discuss moving to the

2    United States to build a new life.  Gilberto had family in

3    Massachusetts and knew that he would be able to find steady

4    employment there.  Jessica saw an opportunity to provide a

5    better life for her son and to escape her mentally unstable

6    ex-husband.

7         Gilberto moved to Massachusetts in mid-2021 and was

8    able to find a well-paying job and comfortable housing.  Soon

9    after, Jessica started to make plans to follow him with Arthur.

09:55 10   Jessica openly discussed with her ex-husband that she planned

11   to move to the United States and that she intended to bring

12   Arthur with her.  In connection with the move, Edervaldo came

13   to an appointment to sign for a passport for Arthur that

14   specifically had travel authorization.  You will see the

15   paperwork that Edervaldo signed, stating explicitly that the

16   passport would authorize Arthur to travel unaccompanied or with

17   only one parent.  The passport Arthur was issued contains the

18   same statement.

19        Jessica and her son began their travel to the United

09:55 20   States in March 2022.  On the day that they left, Edervaldo

21   failed to come to the agreed upon location to say goodbye to

22   his son.  Instead, over text message that day, he stated for

23   the first time that he had attempted to cancel Arthur's

24   passport.  Jessica was able to travel with Arthur from Brazil

25   using the passport and for that reason did not believe that

1    Edervaldo had actually made any attempt to cancel the passport.

2         Petitioner will attempt to undermine that he consented

3    to Arthur's removal from Brazil by arguing that he did not

4    understand the passport he applied for would be used for

5    travel.  This is not credible.  The evidence will show that

6    after he was told of Jessica's intent to move to the United

7    States with Arthur, he willingly signed a passport application

8    that expressly included travel authorization, which would

9    unilaterally allow Jessica to travel with the child.

09:56 10        You will also hear that the child is well settled in

11   Massachusetts.  Under the Hague Convention, a child is settled

12   where they have significant emotional and physical connections

13   to their new home demonstrating security and stability there.

14   The evidence will establish that two and a half years after his

15   arrival in the United States, Arthur is well settled in

16   Massachusetts.

17        Jessica and Arthur joined Gilberto in Lowell in early

18   April 2022 where Arthur has lived ever since.  Jessica has

19   applied for asylum for herself and Arthur.  She has work

09:57 20   authorization and is on a pathway to potentially receive

21   permanent residency in the United States.  Her master calendar

22   hearing is not presently scheduled until November 2025.  Both

23   Jessica and Gilberto have found more consistent work in Lowell.

24   Gilberto has worked in construction since his arrival to the

25   United States in 2021, and he alone earns enough money to

1   support himself, Arthur and Jessica.

2        Jessica has worked as a housecleaner, including at the

3   local airforce base.  She is also planning for her family's

4   future by attending school to become an aesthetician.  She's

5   completed 500 of the 600 hours required.  And when she has

6   enough hours, she will sit for the state licensing exam and

7   will seek work in her chosen field.

8        Arthur is part of a close-knit and supportive family

9   in Massachusetts.  Jessica and Gilberto recently married,

09:57 10   officially making Gilberto a part of Arthur's family.  He is

11   loved and well-cared for by both his mother and stepfather.

12   Arthur also has a close relationship with Gilberto's brother,

13   Gilmar, and his wife, Bruna, Arthur's aunt and uncle.  Arthur,

14   Gilberto and Jessica lived with Bruna and Gilmar for

15   approximately a year.  Bruna and Gilmar would help care for

16   Arthur and spend time with him.  Although Bruna and Gilmar have

17   since moved about 45 minutes away, they spend time together, at

18   least two weekends a month.  They celebrate holidays and

19   special events together, and they are important people in

09:58 20   Arthur's life.

21        Arthur also has other family nearby.  Gilberto has

22   several cousins living in Massachusetts, including some with

23   children around Arthur's age.  Arthur has become particularly

24   close with his younger cousin, Sophia.  Lowell has a vibrant

25   and supportive community of immigrants, including many

1    immigrants from Brazil.  Arthur and his family have lived in

2    Lowell since their arrival in the United States.  He has only

3    moved once and currently lives in a two-bedroom apartment with

4    a patio near downtown Lowell.  Arthur even has a pet cat that

5    he effectively calls "Little Cookie."

6          They have integrated in the local community, and

7    Arthur has made friends with other Brazilian children in his

8    neighborhood.  He takes soccer lessons and has made friends

9    there.  He also regularly attends church in his community and

09:59 10   spends service in a room with children his own age studying the

11   Bible.  Arthur is currently enrolled in fourth in Greenhalge

12   Elementary School, and this is his third year of school there.

13         Petitioner will try to distract from the fact that

14   Arthur is well settled by claiming that Arthur is not

15   succeeding in school.  This ignores that in Brazil Arthur began

16   school during COVID and suffered from home learning like so

17   many students did.  You'll hear that when he came to the United

18   States, Arthur was seven years old but was unable to read or

19   write in his native language of Portuguese.  Despite these

09:59 20   challenges, Arthur has made remarkable strides while in school

21   here in the United States.  He's learning English rapidly and

22   he's able to take his lessons in English.

23         Thanks to the large immigrant community in Lowell,

24   Arthur has support in Portuguese at school, including

25   Portuguese-speaking staff who can communicate with Arthur's

A240

1    mother.  He's learning to read, and he's advanced to the next

2    grade every year.  You'll hear from his former teacher,

3    Ms. Sarah Hoey, that Arthur is well-liked by his peers and his

4    teachers and that he tries hard in school.  Consistency in his

5    education will ensure Arthur continues to learn and advance.

6          The grasping arguments petitioner will present in this

7    trial should not be allowed to distract from the most important

8    facts that you'll hear.  Petitioner consented to Arthur's

9    removal from Brazil.  Two and a half years later, Arthur is now

10:00 10   well settled here in the United States.  He's happy and healthy

11    here, and removing him to the petitioner in Brazil would expose

12    him to a significant risk of harm.

13          We ask that this court consider the overwhelming

14    evidence in favor of keeping Arthur in his home in the United

15    States and deny the petition for return accordingly.  Thank

16    you.

17          THE COURT:  One question for you.

18          MS. JAMES:  Yes.

19          THE COURT:  Step-dad is here illegally?

10:01 20        MS. JAMES:  He is not.  He is not here legally.  I'm

21    sorry, I'm not sure I heard your question.

22          THE COURT:  That's fine.  That's not an asylum

23    situation?

24          MS. JAMES:  He does not have an asylum application,

25    Your Honor.

```
 1              THE COURT:  What's going on there?

 2              MS. JAMES:  He is in removal proceedings.  He, as far

 3      as we're aware, does not currently have any immigration court

 4      hearing date set, and he regularly complies with what we

 5      understand to be his requirements to periodically send emails

 6      with his location to check in, but that's the only obligation

 7      on him at this point of which we are aware.

 8              THE COURT:  Okay.  First witness, please.

 9              MS. CROWLEY:  Yes, thank you, Your Honor.  Petitioner

10:01 10    calls our first witness, father, Edervaldo da Silva.  And Your

11      Honor, may I do my examination from here?

12              THE COURT:  Sure.

13              MS. CROWLEY:  Where is the camera?  Where should I be

14      looking so he can hopefully engage with me best?

15              THE COURT:  Straight ahead.

16              MS. CROWLEY:  Straight ahead, okay.

17              THE COURT:  My screen is over here.  I'm not trying to

18      turn my back to you, but to watch him, I have to turn.

19              MS. CROWLEY:  Absolutely more than fine.

10:02 20        MS. JAMES:  Before you start, Elizabeth, I just want

21      to note we do have copies of exhibits here for the court and

22      for the clerk, if we'd like to handle that now.

23              THE COURT:  Yes.

24              MS. CROWLEY:  Great idea.

25              MS. JAMES:  Your Honor, not to preempt Ms. Crowley's
```

examination, but you have in front of you a joint exhibit

binder, and we've handed up to you a copy of Respondents'

Contested Exhibits, and I believe my colleague just gave you a

copy of Petitioner's Contested Exhibits.  I did just want to

raise with you, and I don't think we need to address it now,

that pursuant to our conversation at the pretrial conference,

there is one particular school document that is included in the

joint exhibit binder to which we still have an objection.  I'm

happy to deal with that at the time, but I just wanted to make

10:03 10    sure that that was clear.

MS. CROWLEY:  If I could just be heard briefly on

that, Your Honor.  And apologies that I was not at the pretrial

conference.  My colleague --

THE COURT:  No worries.

MS. CROWLEY:  -- was able to debrief.  I was at the

Horizons For Homeless Children breakfast that I'm on the board

for.  But in any event, how I look at these records and frankly

any of the records that we've agreed that in the joint binder,

many of them are hearsay.  All of them would come in under a

10:04 20    business record exception to the hearsay rule if we had keepers

of the records, whether trial subpoenas and productions

pursuant to keepers of the records or the actual keeper of the

record here to testify.

The last thing I want to do is have school

professionals from the Lowell School District have to come in,

whether administrators, teachers, and have to certify what we

all know to be school records that mother actually produced to

us.  And so, you know, what's good for the goose is good for

the gander.  It's our position they all come in.  And even

though there might be two or three you might not like because

they don't help your case doesn't mean they don't come in

purely for a hearsay objection where we've waived that for

everything else in the interest of judicial economy and in

order to get the information and evidence in to the court most

10:04  efficiently.  There's no challenge as to the authenticity of

the documents.

    MS. JAMES:  Would you like me to respond or would you

like to address it later?

    THE COURT:  Why don't we address it later.  I feel

like I need to take a look at what we're talking about to see

the nature of what the hearsay is, right?  There are some

things that are not so reliable hearsay, right?  So it depends

who it's coming from.  If it's on a transcript, that seems more

reliable than something that might have come in a text message

10:05  where somebody is trying to appease somebody, just as an

example.  So I just want to take a look at what we're talking

about, but it feels like we should move on with this and then

get to that.

    MS. JAMES:  Understood.  I just wanted to make sure I

raised that while we gave you the exhibits.

```
 1              THE COURT:  That's fine.

 2              MS. JAMES:  No problem.

 3              THE COURT:  That's fine.  I'm hold go hold off until I

 4      can look at it.

 5              MS. CROWLEY:  May I proceed, Your Honor?

 6              THE COURT:  Absolutely.  Karen wants to know how the

 7      interpreters are going to work.

 8              MS. CROWLEY:  So we have two interpreters here, after

 9      a lot of work between both offices to find two skilled

10      professionals to assist us, which we're grateful for.  I'm

11      happy to defer to them as to what makes the best sense.  We

12      have two so they can take breaks, they can take sips of water

13      and not have the whole day just on their shoulders, so however

14      it works best.

15              THE COURT:  I'm willing to do whatever.  Karen can

16      swear them both in now.  He needs to be able to hear them

17      there, so maybe it makes sense for them to be on the witness

18      stand by a microphone or the back table, wherever you guys

19      prefer.

20              (Interpreters duly sworn.)

21              EDERVALDO da Silva, Sworn

22              MS. CROWLEY:  May I proceed?

23              THE COURT:  Yes.

24      DIRECT EXAMINATION BY MS. CROWLEY:

25      Q.   Good morning, Edervaldo.
```

A245

       1    A.    Good morning.

       2    Q.    I'm going to ask you some questions, and I will make sure

       3    to go slowly and to pause to allow the interpreters to be able

       4    to interpret my questions for you and to give you time to

       5    answer.

       6    A.    Okay.

       7    Q.    If an objection is made at any point, please just wait for

       8    that to be resolved before you answer.

       9    A.    Okay.

10:08 10    Q.    Please tell the court your name.

      11    A.    Edervaldo Rodrigues da Silva.

      12    Q.    How old are you?

      13    A.    39.

      14    Q.    Where do you reside?

      15    A.    In Belo Horizonte - Minas Gerais.

      16    Q.    Is that in Brazil?

      17    A.    Yes.

      18    Q.    Which is the largest city in Brazil that is nearby to

      19    where you reside?

10:09 20    A.    Rio de Janeiro, Sao Paulo.

      21    Q.    Are you currently married?

      22    A.    Yes.

      23    Q.    When did you get married?

      24    A.    2022.

      25    Q.    To whom are you married?

```
 1    A.   Flavia.

 2    Q.   What is Flavia's last name?

 3    A.   Flavia Aparecida da Silva.

 4    Q.   Do you have any children?

 5    A.   No.

 6    Q.   Were you previously married?

 7    A.   Yes.

 8    Q.   To whom were you previously married?

 9    A.   Jessica Silveira da Silva.

10    Q.   Do you have any children with Jessica?

11    A.   Yes.

12    Q.   How many children do you have with Jessica?

13    A.   Only one.

14    Q.   What is that child's name?

15    A.   Arthur Rodrigues Silveira da Silva.

16    Q.   How old is Arthur?

17    A.   Ten.

18    Q.   When was Arthur born?

19    A.   May 4, 2014.

20    Q.   When did you marry Jessica?

21         MS. BENJAMIN:  Objection, Your Honor.  Is Mr. da Silva

22    looking at his notes?

23         MS. CROWLEY:  I can't tell if he needs to hear my

24    question again or not.

25         THE COURT:  Let's have the interpreter ask him what
```

```
 1    he's looking at.

 2            MR. RODRIGUES:  Ruben Rodrigues for the team on this

 3    side.  She's not asking what you asked her to ask.

 4            THE COURT:  Can you please ask him what he's looking

 5    at.

 6            THE WITNESS:  The certification.

 7            THE COURT:  Is that an exhibit?

 8            MS. CROWLEY:  I can ask a different question.  I think

 9    he's looking -- he has a folder.  He has a full set of all the

10:14 10 exhibits in front of him printed out by both sides.

11            THE WITNESS:  That's what I was looking for here.

12            THE COURT:  Do you have any objection to him looking

13    at exhibits while he's testifying?

14    A.   He was born on the day of 13th of May 2005.

15            THE COURT:  Wait.  Hold on, hold on.  That's the day

16    they were married.

17            THE WITNESS:  Exactly.

18            THE COURT:  Okay.  Let's hold up for a minute.  Do you

19    have any objection to him looking at the exhibits during the

10:15 20 course of his testimony?

21            MS. BENJAMIN:  I would expect that he would not look

22    at an exhibit unless directed by counsel.

23            MS. CROWLEY:  I'm happy to do it this way.  If he

24    doesn't know the answer to my question, I will refresh his

25    recollection and direct him to something so that way you know
```

1    what he's looking at or not looking at.

2        THE COURT:  Can you please tell him not to look any

3    documents or any of the papers in front of him unless he is

4    asked to.

5        THE WITNESS:  Okay.

6        MS. BENJAMIN:  Thank you, Your Honor.

7    BY MS. CROWLEY:

8    Q.    Edervaldo, do you recall when you were married to Jessica?

9    A.    Yes.

10:16 10    Q.    When were you married to Jessica?

11   A.    On the 11th, May 11, 2011.

12   Q.    When did you first meet Jessica?

13   A.    The first time?

14   Q.    Yes.

15   A.    I can't recollect.

16   Q.    Please describe for the court your early relationship with

17   Jessica when you first married.  Please tell the court how your

18   relationship was.

19   A.    At the beginning the wedding was excellent, and I have

10:17 20    nothing to complain.  Our relation was very good as a couple

21   with no problem.  It was very good and comfortable.

22   Q.    You testified already as to when Arthur was born.

23   A.    He was born May 4, 2014.

24   Q.    Please describe for the court your role in Arthur's care

25   when he was first born.

A.    I was a father, very close, and present daily with him.
And as a father I was giving him a bath when he was a baby.  I
was also putting him to sleep.  I was feeding him.  I was
bringing him to the school, and I was playing with him.

Q.    When you, Jessica, and Arthur lived together, where did
you all live?

A.    We lived in a different neighborhood, Berrero.

Q.    For how long did you live at that residence?

A.    For about eight years.

Q.    When did you cease residing in that residence?

       THE COURT:  Ms. Crowley, she needs the question
repeated.

Q.    When did you cease residing in that residence?

A.    When we separated.

Q.    When did you separate from Jessica?

A.    It was about 2016.

Q.    Do you recall how old Arthur was approximately at that
time in 2016?

A.    He was about two years old.

Q.    Why in your opinion did you and Jessica separate?

A.    The truth is that at the beginning we have a perfect
marriage, but unfortunately because of her infidelity the
marriage broke up.

Q.    At some point in time did either one of you seek a
divorce?

A250

```
 1   A.    I filed the divorce.

 2   Q.    When did you do that?

 3   A.    At the moment that I separated, I ask for the divorce.

 4   Q.    When you and Jessica separated and you left the residence

 5   you were living in at the time, where did you go?

 6   A.    I went to live with my mother.

 7   Q.    Is your mother still alive?

 8   A.    Yes.

 9   Q.    Where does she reside?

10   A.    She lives in the region called Verrado.

11   Q.    What is the proximity between where your mother resides

12   and where you had been living with Jessica and Arthur at the

13   time?

14   A.    About, it was in the same street.

15   Q.    After you left the residence -- strike that.  After you

16   and Jessica separated, what if any visitation did you have with

17   Arthur immediately after the separation?

18   A.    Every weekend.

19   Q.    If I could please direct your and everyone else's

20   attention to uncontested Exhibit 35, please, which is a

21   picture.  I don't know if it would be helpful for me to show

22   the witness so he can easily find it.

23         THE COURT:  Maybe tell him to get the exhibit book,

24   turn to tab 35.

25         MS. CROWLEY:  Absolutely.
```

A251

```
 1   Q.   Edervaldo, the joint exhibits that we sent to you are

 2   numbered.  Can you find number 35, which is a picture of you,

 3   Arthur and another person.

 4   A.   Let me see.  Okay.

 5   Q.   Do you recognize this photograph?

 6   A.   Yes.

 7   Q.   Is that your son Arthur?

 8   A.   Exactly.

 9   Q.   And is that you next to him?

10   A.   Yes.

11   Q.   And who is that third person in the picture?

12   A.   My wife.

13   Q.   Do you recall when that photograph was taken?

14   A.   Yes.  It was in the shopping mall in Berrero.

15   Q.   I notice that it appears that you and Arthur may have

16   black masks on underneath your chin.

17   A.   Yes.

18   Q.   Was this picture taken during the COVID-19 global

19   pandemic?

20   A.   After the lockdown.

21   Q.   And was this picture taken during your visitation with

22   Arthur?

23   A.   Yes.

24   Q.   You indicated that the other person in this photo is your

25   current wife.
```

A252

1    A.    Yes.

2    Q.    How often or how many times did your current wife get to

3    be in your son Arthur's physical presence?

4    A.    Every single visitation she had contact with him.

5    Q.    What types of things would you do with Arthur during your

6    visitation with him?

7    A.    We have basically the whole day that I have with him to do

8    things that I wanted with him.  I brought him to the shopping

9    mall, to the park, play with him at home, brought him to the

10:31 10    court, food court also.  We have the whole full day with him.

11    Q.    Can you please find the next photograph numbered 36.

12    A.    Yes.

13    Q.    Do you have before you a picture of Arthur eating some

14    food?

15    A.    He was eating bread, cheese.

16    Q.    Do you recall when this photograph of you and Arthur was

17    taken?

18    A.    Yes.

19    Q.    When was it taken?

10:32 20    A.    I was bringing him back home.  It was before the pandemic.

21    Q.    When you say "bringing him back home," was this following

22    your exercising of your visitation with Arthur?

23    A.    Yes.

24    Q.    Please turn to the next exhibit and picture, 37.

25    A.    Okay.

```
 1   Q.   Do you have before you a picture of you and Arthur on your
 2   shoulders?
 3   A.   Yes.
 4   Q.   Do you recall when this picture was taken?
 5   A.   Yes.
 6   Q.   When was it taken?
 7   A.   I was going to pick him up at school.
 8   Q.   Where at the time did he go to school?
 9        INTERPRETER:  The interpreter couldn't hear.
10   A.   He was going to school in Mangarez.
11        INTERPRETER:  And the interpreter couldn't hear the
12   name of the school.  The neighborhood is called Mangarez, the
13   neighborhood.  The interpreter couldn't hear whatever he said
14   at the end.  I'm going to ask him to repeat.
15   A.   Okay.  So the school he was studying was town school
16   called Ilmay.
17   Q.   Do you recall what grade Arthur was in at the time?
18   A.   Preschool.
19   Q.   Based on your observations, do you believe that Arthur
20   enjoyed school at the time?
21   A.   It was happiness, he was very happy to go to school, and I
22   was picking him up at the school.  He loved to go to school a
23   lot, and every day there I was picking him up.  He was happy,
24   he like me picking him up at school.
25   Q.   If we could turn to the final of the four pictures,
```

          1    please, Exhibit 38.

          2    A.   Okay.

          3    Q.   Do you have before you a picture of Arthur kissing your

          4    forehead?

          5         INTERPRETER:  The interpreter couldn't hear.

          6    Q.   Do you have before you a picture of Arthur kissing your

          7    forehead?

          8         INTERPRETER:  Thank you.

          9    A.   Yes.

10:38   10    Q.   Do you recall when that photograph was taken?

         11    A.   In 2021 at home.

         12    Q.   Do you recall what month that picture was taken?

         13    A.   The month, I can't remember.

         14    Q.   Was this photograph taken during one of your visitations?

         15    A.   Yes.

         16    Q.   Other than these four photographs, do you have other

         17    photographs of your son Arthur and you during his childhood?

         18    A.   Yes.

         19    Q.   You mentioned before of your separation from Jessica and

10:39   20    subsequent divorce.  Do you recall the year in which you were

         21    formally divorced from Jessica?

         22         INTERPRETER:  Could you repeat.

         23         THE COURT:  She needs the question repeated.

         24    Q.   Do you recall when you were divorced formally from

         25    Jessica?

| | | |
|---|---|---|
| | 1 | A.   Are you talking about the judicial one? |
| | 2 | Q.   Yes.  If I could please direct your attention and everyone |
| | 3 | else's to uncontested Exhibit 11. |
| | 4 | A.   Okay. |
| | 5 | Q.   This is the court's decision on your divorce, correct? |
| | 6 | A.   Correct. |
| | 7 | Q.   Please turn to Bates JX11.0008.  If you look at the bottom |
| | 8 | right of the page of this exhibit. |
| | 9 | A.   0008? |
| 10:41 | 10 | Q.   Yes. |
| | 11 | A.   Yes. |
| | 12 | Q.   And if you could read silently with me while I read aloud. |
| | 13 | A.   Okay. |
| | 14 | Q.   On the top of the next page, page 9, it says, "The custody |
| | 15 | of the minor, Arthur Rodrigues Silveira da Silva, will be |
| | 16 | shared and he will reside with his mother."  Do you see that? |
| | 17 | A.   Yes. |
| | 18 | Q.   Would it be easier for you as I ask some brief questions |
| | 19 | on this document to direct you to the Portuguese version of it |
| 10:43 | 20 | that precedes the English version? |
| | 21 | A.   Portuguese is much better, right. |
| | 22 | Q.   If you could please turn to page 3 of this exhibit. |
| | 23 | A.   Okay, page 3. |
| | 24 | Q.   Paragraph 2 says, "The father will live with the child and |
| | 25 | have him in his company on alternate weekends," and goes on to |

1    provide some details.  Do you see that in paragraph 2?

2    A.    Exactly, yes.

3    Q.    Did you exercise your weekend visitation time with Arthur?

4    A.    I didn't understand.

5    Q.    This court decision says that the father will live with

6    the child and have him in his company on alternate weekends,

7    picking him up on Friday at the mother's residence at 5:00 p.m.

8    and returning him on Monday at mother's residence at 9:00 a.m.

9    Did you do this?

10:45 10    A.    Yes.

11    Q.    Now, this court decision is dated December 10, 2021.

12    A.    Yes.

13    Q.    What month and year did Arthur leave Brazil?

14    A.    March 28, 2022.

15    Q.    From the time that this court decision was made on

16    December 10, 2021 until Arthur left Brazil on or about March

17    28, 2022, did you get to see Arthur for any holidays?

18    A.    Yes.

19    Q.    What holidays do you say you were able --

10:47 20    A.    Saturday and Sunday, Christmas, and New Year's Eve also.

21    Q.    Was that in 2021?

22    A.    2022.

23    Q.    Now, you said that Arthur left Brazil on or about March

24    28, 2022.

25    A.    Yes.

1    Q.    And so did you see him for Christmas 2022 or 2021?

2    A.    2021, 2022.

3    Q.    At some point in time did Jessica ask you to sign a

4    passport application for your son Arthur?

5    A.    Just a passport.

6    Q.    When do you say that Jessica asked you to do this?

7    A.    She told me that he needed a document so I authorized her

8    to have the passport for him.

9    Q.    When did she first ask you to sign the passport

10:50 10    application for Arthur?

11    A.    It was the end of the year of 2021.

12    Q.    What if any concerns did you have when Jessica asked you

13    to sign a passport application for Arthur?

14    A.    So I trust her.  The truth is that she asked me to sign

15    for the application so Arthur would have a documentation.  So I

16    trust her and sign.

17    Q.    How many times did Jessica ask you to sign this passport

18    application?

19    A.    So many times, and also she was at the owner of my job,

10:52 20    asking me to sign the documents so he will have documentation,

21    so she was insisting on many times.

22    Q.    What if anything did Jessica say to you as the reason or

23    reasons why she wanted you to sign the passport application?

24    A.    So things happened as it did because I trusted her.  She

25    was telling me, asking me to sign just for Arthur to have

```
        1   documentation.

        2   Q.   What was your understanding as to how the passport would

        3   be used for Arthur if a passport was issued?

        4   A.   So in none of the moments she mention about moving or

        5   going to a different country, and now I have this, all this

        6   lost.  And actually it was just, she asked just for

        7   documentation, nothing more.

        8   Q.   What do you mean by "just for documentation, nothing

        9   more"?

10:54  10   A.   So she was asking for documentation for identification for

       11   ID, so if he had a passport, he would have documentation.  So

       12   that's why I authorized.

       13   Q.   You testified before that Jessica first began to ask you

       14   to sign a passport application in December of 2021.  If I could

       15   ask that you turn and others turn to Uncontested Exhibit 6,

       16   please.

       17   A.   Okay.

       18   Q.   Do you recognize this handwritten, partially handwritten

       19   document?

10:56  20   A.   Yes.

       21   Q.   Is this the passport application that you signed?

       22   A.   Yes.

       23   Q.   Where did you sign this document?

       24   A.   At the police, federal police, at the federal police.

       25   Q.   Oh, I understand.  And is the federal police a local
```

     1   police station?

     2   A.   Immigration.

     3   Q.   Immigration.  And when you say you signed this document at

     4   the federal police, was Jessica present?

     5   A.   Yes.

     6   Q.   And where it says "Locale," did some type of agent sign

     7   and witness this document for you both that day?

     8   A.   No.

     9   Q.   Do you know who locale Belo Horizonte is?

10:58 10   A.   It's a city.

    11   Q.   That's a city, I understand.

    12        Looking at this passport application, the last sentence of

    13   the section in the middle, starting with "I/we authorize," it

    14   says, "We are aware that the express revocation of this travel

    15   authorization by either parent will result in the immediate and

    16   irreversible cancellation of the minor's passport."

    17        Do you see that?

    18   A.   Yes.

    19   Q.   And if I could please ask everyone to turn to the next

11:00 20   exhibit, Arthur's passport, Exhibit 7.

    21   A.   Okay.

    22   Q.   And do you see that this passport issued for your son on

    23   February 3, 2022?

    24           INTERPRETER:  Interpreter couldn't hear.  It froze.

    25   No.  Let me repeat.

1    A.    Yes.

2    Q.    The document we were looking at before the travel

3    authorization, do you know when you signed that travel

4    authorization, what date?

5    A.    March 2022.

6    Q.    After the issuance of your son's passport in February of

7    2022?

8    A.    No.

9    Q.    When do you believe you signed the travel authorization,

11:02 10    what month?

11    A.    March.

12    Q.    Of 2022?

13    A.    Yes.

14    Q.    When did you learn that a passport had issued for your son

15    Arthur?

16         INTERPRETER:    Interpreter couldn't understand.  I will

17    repeat.

18    A.    Exactly on the day that I went there to cancel the

19    passport.

11:03 20    Q.    Why did you cancel the passport?

21    A.    Because I acknowledge and was suspicious that she was

22    going to another country.

23    Q.    When did you first have these concerns that Jessica may go

24    to another country?

25    A.    When I went to pick up my son, he told me he was going to

1    travel, so I was suspect.

2    Q.    You said that you learned from your son Arthur that he was

3    possibly going to travel.  When did you first become aware of

4    this information?

5    A.    The person who lived nearby her mother mentioned this, and

6    I was very suspect about it because we couldn't see him in the

7    street anymore.

8    Q.    What month was this?

9    A.    April.

11:05 10    Q.    Now, when you say you couldn't see him on the street

11    anymore, what do you mean by that?

12    A.    Yeah.  I was suspect because I didn't see him playing on

13    the street anymore.  He was not bike-riding.  He was not

14    playing with the ball.  He was not at the court nearby his

15    grandmother.

16    Q.    Now, you mentioned your son Arthur said something to you

17    about possibly traveling.  What month in 2022 do you say that

18    he shared that information with you?

19    A.    The month was March.

11:07 20    Q.    If I could please direct your and other's attention to

21    Exhibit 32, please.

22           INTERPRETER:  Interpreter couldn't hear the number of

23    the exhibit.

24           MS. CROWLEY:  32.

25           THE COURT:  Ms. Crowley, I'm a little confused.  Was

```
  1   the testimony that he, Arthur, told him in March and then he
  2   didn't see him in April?
  3              MS. CROWLEY:  Yes.
  4              THE COURT:  Okay.
  5   A.   Yes.
  6              THE COURT:  Okay.
  7   Q.   Have you found Exhibit 32?
  8   A.   Okay.
  9   Q.   This is your request for cancellation of a travel
 10   authorization included in a minor's passport, correct?
 11   A.   Correct.
 12   Q.   And the date of this document is the 17th of March 2022?
 13   A.   Yes.
 14   Q.   Please explain to the court the steps that you took
 15   leading up to filing this request for cancellation of a travel
 16   authorization included in a minor's passport.
 17   A.   I thought that the -- I thought that our divorce we would
 18   have the custody, shared custody, and that nobody could travel.
 19   So she was not doing it in good faith when I authorized her to
 20   get the passport for only a documentation, but she use it in a
 21   different way of using it.  And that's why, when I saw what was
 22   happening, I went there to cancel because we never talked about
 23   any trip even to different country.
 24   Q.   What if any steps did you take to address your concerns
 25   with Jessica?
```

11:08 10

11:10 20

A263

1    A.    I went to the immigration department to have the issues

2    resolved concerning the passport.

3    Q.    What if any discussions or communications did you have

4    with Jessica about your concerns?

5    A.    So she had request a passport for something different from

6    what we had talked about.  So regarding our son traveling, we

7    talked about it that if there would be any travel, we was going

8    to sit down together and talk about it.  So I never thought,

9    she never say anything about another country.  So we're very

11:13 10    clear regarding this and that we should talk about it before.

11    Q.    And what if anything this time did she indicate to you was

12    her intentions with Arthur and the passport that was different

13    than what you had talked about before?

14    A.    So I noticed that at that moment I noticed that she wanted

15    a passport with a different intention to use it, not with the

16    object that was just for documentation that we had talked

17    about.

18    Q.    What was this different intention that you say she shared

19    with you that was different than using it just for

11:14 20    documentation?

21    A.    Yeah.  At that moment her husband was already in the U.S.,

22    so that's why I was able to notice that she wanted it for this.

23    Q.    Did you agree that Arthur could travel to the United

24    States?

25    A.    No.

```
 1    Q.    Did you agree that Arthur could leave Brazil permanently?

 2    A.    No.

 3    Q.    Have you ever agreed that Arthur could leave Brazil

 4    permanently?

 5    A.    No.

 6    Q.    In March of 2022, what if any representations did Jessica

 7    make to you with respect to her intentions for any upcoming

 8    travel with Arthur or without?

 9    A.    At the beginning she said that she was going to Vitoria

10    Espirito Santo, and I believe from there she went to the U.S.

11    Q.    Where is Vitoria?

12    A.    Vitoria Espirito Santo, it's the state of the Espirito

13    Santo, on the southeast.

14    Q.    When did Jessica tell you that she intended to go to

15    Vitoria?

16    A.    It was also in March.

17    Q.    When did Jessica indicate to you that she planned to

18    possibly travel to Vitoria with Arthur?

19    A.    She told me that she had a plan to go to Vitoria Espirito

20    Santo, but then when I called her, she was already here.

21          INTERPRETER:  Sorry.  The interpreter needs to

22    correct.

23    A.    She was already there.

24    Q.    When you say, "She was already there," she was already

25    here in the United States when she told you that?
```

11:16 (line 10)
11:18 (line 20)

1    A.    Yes, yes.

2    Q.    If I could please have you turn the page from the Request

3    For Cancellation of a Travel Authorization Included in a

4    Minor's Passport to the next page, Certification of Migration

5    Movement.

6    A.    Okay.

7    Q.    Do you see three-quarters of the way down the page where

8    it says "Movement Date, Time, March 26, 2022, 4:11 p.m.  Normal

9    movement exit ordinary passport."  Do you see that information?

11:20 10          MS. BENJAMIN:  Objection.

11                THE COURT:  Hold on.

12                What's the objection?

13                MS. BENJAMIN:  I believe there is a mistake in the

14    interpretation of the document.  The Portuguese version

15    indicates that the date is 3/28, and the English version

16    indicates 3/26.  I assume this is just a typographical error,

17    but I'd like to make it clear for the record.

18                MS. CROWLEY:  I think all of our collective

19    understanding is that it was the 28th.

11:20 20          THE COURT:  Okay.

21    Q.    Do you see this information, Edervaldo?

22    A.    Okay.

23    Q.    Where did you believe Arthur was on or about March 28,

24    2022?

25    A.    I didn't understand.

1    Q.    As of March 28, 2022, which country did you believe Arthur

2    was in?

3    A.    In Brazil.

4    Q.    When is the first time that you learned that Arthur was no

5    longer in Brazil?

6    A.    April 11.

7    Q.    How did you learn that Arthur was no longer in Brazil?

8    A.    My nephew mention it to me.

9    Q.    When is the last time in March of 2022 that you saw your

11:23 10    son Arthur for visitation?

11    A.    It was on the second week of March.

12    Q.    Was that for your regularly scheduled alternating weekend

13    visitation with Arthur?

14    A.    Yes.

15    Q.    What if any steps did you take to inform Jessica that

16    Arthur's passport had been canceled by you?

17    A.    Through WhatsApp.

18    Q.    When, when did you inform her of this fact through

19    WhatsApp?

11:24 20    A.    Also in March.

21    Q.    What if anything did Jessica respond to you when you sent

22    that message?

23    A.    Yes.

24    Q.    What was her response?

25    A.    She told me that I needed to pay the fee to cancel the

1    passport that I did -- had done.  Sorry.

2    Q.    Could you repeat his answer, please.

3    A.    She told me that I needed to pay the fees to cancel the

4    passport as I had done.

5    Q.    Did you pay the fees to cancel the passport?

6    A.    No.

7    Q.    Were you aware that there was a fee to cancel a passport?

8    A.    No.  At any moment she talked about to pay any fees, just

9    mention about the passport.

11:26 10    Q.    Did Jessica acknowledge to you that she was aware you had

11    canceled his passport?

12    A.    No.

13    Q.    Before I ask you some brief questions with respect to your

14    Hague application in the instant Hague proceedings, could I

15    please draw everyone's attention to Uncontested Exhibit 33.

16    A.    Okay.

17    Q.    And would you agree with me this is a certificate issued

18    on September 11, 2024 that shows at the time you have no

19    criminal record?

11:27 20    A.    Okay.

21    Q.    Are you aware, Edervaldo, that Jessica has made claims

22    that you have been abusive towards her?

23    A.    No.

24    Q.    Have you ever been abusive towards Jessica?

25    A.    No.

 1    Q.    Have you ever been abusive towards your son Arthur?

 2    A.    No.

 3    Q.    Have you ever heard Jessica allege that she believes you

 4    would be a grave danger to your son Arthur if he were returned

 5    to your care in Brazil?

 6    A.    No.

 7    Q.    Do you believe that Arthur would be safe and well cared

 8    for in your care if he were returned to Brazil by this court?

 9    A.    Of course, of course.

11:29 10    Q.    If I could please draw everyone's attention --

 11          THE COURT:  Hold on for a minute.  Okay.

 12    A.    If I could please draw everyone's attention to

 13    Petitioner's Contested Exhibit 14, which is the Brazilian Hague

 14    application.

 15          MS. BENJAMIN:  Objection, Your Honor.

 16          THE COURT:  Basis?

 17          MS. BENJAMIN:  We would object to this document on the

 18    basis of relevance.  The only petition of import here is a

 19    petition filed in the U.S. and not the petition filed in

11:30 20    Brazil.

 21          MS. CROWLEY:  Your Honor, it's highly relevant.

 22          THE COURT:  The objection is overruled.  I don't

 23    actually know the answer to that question.  You may well be

 24    right, and if the legal research turns out that you are right,

 25    we won't consider it, but I'm going to have it admitted anyway

```
 1   as part of --
 2            MS. BENJAMIN:  Yes, Your Honor.
 3   A.    I'm searching for it.
 4   Q.    That is the Hague application from March.  Please let me
 5   know once you've found the document.
 6            INTERPRETER:  Interpreter couldn't hear.  Could you
 7   repeat, please.
 8   A.    You mention an article of the civic law in Brazil, of
 9   Brazil?
11:32 10          MS. CROWLEY:  I think he might be in the wrong
11   grouping of documents.
12   Q.    If he could turn one back, from 15 to 14, please,
13   Brazilian Hague application.
14   A.    Okay, okay.
15   Q.    When did you prepare this application?
16   A.    March 20, 2022.
17   Q.    If you could please turn to page 4 of 7 of this document
18   and let me know when you're there.
19   A.    Okay.
11:34 20   Q.    In your application it says, "Mother Jessica and my son
21   Arthur left Brazil on March 28, 2022 at 4:11 from the
22   Governador Andre Franco International Airport bound for
23   Colombia and that the federal police passport verification
24   believe was an offline service that is off-air and that's why
25   the child traveled.  Yes."  Do you see that?
```

1    A.    Okay, okay.

2    Q.    And it says, "My son was taken from his country by a

3    technical failure of the police federal since the passport was

4    canceled dated March 17, 2022 and he could not travel."

5         Do you see that?

6    A.    Okay, correct.

7    Q.    And the document, your application goes on to say that,

8    "According to documents filed here on Jessica's social

9    networks, the, herself is residing with my son in Lowell, a

11:36 10    town in the North American country from Middlesex,

11    Massachusetts with the address I don't have knowledge."

12         Is that correct?

13         INTERPRETER:  Could you repeat, please.

14         MS. CROWLEY:  Sure.

15    Q.    It goes on to say, "According to documents filed here on

16    Jessica's social networks, she is residing with my son in

17    Lowell."

18    A.    Okay.

19    Q.    How did you learn that certain information was shared on

11:37 20    Jessica's social media profiles that would indicate that she

21    and your son Arthur were residing in Lowell?

22    A.    Through her Instagram.

23    Q.    Were you connected at the time with Jessica on her

24    Instagram social media profile?

25    A.    No.

```
 1   Q.   How did you learn that Jessica had shared information on
 2   her social media profile indicating that she may be here in the
 3   United States?
 4   A.   I search for it.
 5   Q.   And when you searched for it, what if anything did you
 6   find?
 7   A.   So everything that she was doing in U.S. she was posting
 8   on Instagram, so I saw the pictures of her, and then she was
 9   saying that she was in the U.S.
11:39 10       MS. CROWLEY:  Your Honor, I'm mindful that the
11   objection was overruled with respect to the Hague application
12   that I just examined my client on, but I haven't moved that
13   into evidence yet.  So at this time with the objection
14   overruled, what had been Contested Exhibit 14, petitioner would
15   move into evidence as the next uncontested exhibit.
16       THE COURT:  That would be 42.
17       MS. CROWLEY:  Yes, Your Honor.
18       THE COURT:  Submitted as Exhibit 42.
19       (Exhibit 42 admitted.)
11:40 20   Q.   Edervaldo, if I could draw your attention to Contested
21   Exhibit 12, please.
22       MS. BENJAMIN:  Objection, Your Honor.
23       THE COURT:  Basis?
24       MS. BENJAMIN:  The basis of my objection is that we
25   never were given by petitioner the original versions of these
```

1    documents.  We were only given the translated versions.  We

2    have not been made able to compare any translation to the

3    original document, and we believe that this prejudices us from

4    being able to prepare for using this document or responding to

5    this document's use.

6            THE COURT:  Do you have a copy of the Portuguese

7    document?

8            MS. CROWLEY:  Let me check with my colleague.

9            So, Your Honor, my understanding is that we don't, nor

11:41 10  have we ever had a copy of the Portuguese version of this

11   document.  This document is appended to the actual Hague

12   petition, which is a pleading in this court and part of the

13   record.  Mindful that pleadings are not evidence, but mindful

14   that you can take notice of them, I'm happy to see if we can

15   find a copy of the underlying Portuguese document, but we've

16   never been provided it and we didn't prepare the petition.

17           THE COURT:  All right.  This was attached to the

18   original petition or the second petition?

19           MS. CROWLEY:  To the second one, the one that's before

11:42 20  this court is my understanding.  Yes, that's correct.

21           THE COURT:  All right.  I'm going to provisionally

22   admit it.  We can see if we can find a copy of the original,

23   but I'll let him testify to this.  And it seems like one of

24   your attorneys was Portuguese-speaking.

25           MS. BENJAMIN:  Yes.  He, unfortunately, had to leave.

A273

54

```
  1           THE COURT:  That's fine.  Maybe he can, if we get the
  2      original, he can take a quick look at it and see if there's any
  3      fodder for cross-examination.
  4           MS. BENJAMIN:  If petitioner can provide us with the
  5      original, we'd be able to prepare for that.
  6           MS. CROWLEY:  What we could perhaps do at a break at
  7      the lunch is contact the other attorney who prepared the
  8      petition.
  9           THE COURT:  I'll provisionally admit it.  I don't have
11:42 10      any reason to think that there's any issues with the
 11      translation, but just in case there are and in case we can
 12      track it down, we'll provisionally admit it.
 13           MS. KMEID:  Your Honor, if I could add to that, we
 14      have produced a Portuguese version of this document as well as
 15      a certified English copy of this to opposing counsel, so I'm
 16      not sure why this is the version that's being used, as we've
 17      already provided the Portuguese and certified English version.
 18           MS. CROWLEY:  That solves it then.  I didn't know that
 19      existed.
11:43 20           THE COURT:  So, two ideas.  Either you compare the
 21      translation that's here in the exhibit to what you have, or you
 22      can go back and find it, or they can reproduce it to you and
 23      you can do the comparison or substitute it for this.
 24           MS. CROWLEY:  That's fine.
 25           THE COURT:  I'm just going to go on the assumption
```

          1    that this is okay.  It's the beauty of a bench trial.  We can

          2    always get rid of it later.

          3             MS. BENJAMIN:  We can confer at the break, thanks.

          4             THE COURT:  This will be 43.

          5             (Exhibit 43 admitted.)

          6    Q.   Edervaldo, taking a look at this police report --

          7    A.   Okay.

          8    Q.   -- when did you first go to the police with respect to

          9    concerns regarding your son Arthur leaving Brazil?

11:45    10    A.   Just a moment.  I'm searching for the date.  On the 30th.

         11    Q.   Within this document, under "History of the Occurrence

         12    Activity," it says the author, you, of the facts said -- or

         13    strike that.

         14         Under "History of the Occurrence Activity," it says that

         15    you said that Jessica would not deliver him, Arthur, because he

         16    was going on a trip with the child.  When did Jessica tell you

         17    that?

         18             INTERPRETER:  The interpreter couldn't hear the last

         19    sentence.

11:46    20    Q.   Under "History of the Occurrence Activity," it says that

         21    you said that Jessica would not deliver Arthur because they

         22    were going on a trip with the child.

         23         My question to you is, when did Jessica say that to you?

         24    A.   On the 25th.

         25    Q.   It also says that you said that Jessica told you she would

1    move to the United States and that she would take the child.

2    When did she say that to you?

3    A.   On the 25th.

4    Q.   And finally, it says, as you said, you would not authorize

5    your son to move abroad, she said that she would ask the judge

6    for this authorization.  When did she tell you that?

7    A.   On the 25th.

8    Q.   You filed this on the 30th of March 2022.  Did you believe

9    at the time that Arthur and Jessica were still in Brazil or

11:49 10    that they had left?

11   A.   I believe that they were still in Brazil.

12        MS. CROWLEY:  Your Honor, at this time petitioner

13   would move this police report dated the 30th of March 2022 into

14   evidence as the next exhibit.

15        THE COURT:  Well, it's 43.  We already numbered it.

16   And it's again provisionally admitted unless we can ascertain

17   that it's an accurate translation.

18        MS. CROWLEY:  If I could have a moment, Your Honor.

19        THE COURT:  Yes.

11:50 20   A.   Okay.

21   Q.   Edervaldo, you mentioned about allegations of infidelity

22   against Jessica.

23   A.   Yes.

24   Q.   What is the basis of the allegations that you have against

25   Jessica regarding infidelity?

1    A.    No.  I witness it myself, I saw.  So that's the basis that

2    I have.

3    Q.    What did you see?

4    A.    There was an occasion, a certain occasion that I saw her

5    with another person at the shopping mall.

6    Q.    And at the time did you have reason to believe that she

7    was being unfaithful to you?

8         MS. BENJAMIN:  Objection, Your Honor.  I don't

9    understand the relevance of this line of questioning.

11:52 10        THE COURT:  I take it as true about her allegations

11    against him.

12        MS. CROWLEY:  Correct, Your Honor.  I wouldn't bring

13    it up other than the fact that there are allegations by mother

14    as to why the relationship broke down that differ from his

15    representations as to why the relationship broke down.

16        THE COURT:  So I'm going to let her have it because I

17    don't want him to need to be recalled.  Okay?  So overruled.

18        INTERPRETER:  For the interpreter, can you please

19    repeat that question.

11:53 20        MS. CROWLEY:  Certainly.

21    Q.    I believe the question was, and did you have reason to

22    believe that she was being unfaithful to you?

23        THE COURT:  No.  Hold on.  The question was, so he

24    said -- you asked what he saw.  He said he saw a person at the

25    mall.  Then you said at that time did you have reason to

A277

 1  believe she was being unfaithful to you.  So I guess that --

 2  sorry.

 3          MS. CROWLEY:  That's okay.  Thank you.

 4  A.   Yes.

 5  Q.   What if any steps did you take to address your belief that

 6  Jessica was possibly being unfaithful to you with her?

 7          INTERPRETER:  I'm going to ask for a repetition.  I'm

 8  sorry.

 9  A.   I ask for the divorce.

11:55 10  Q.   What if any other reasons did you have to believe that

11  that Jessica was being unfaithful to you?

12  A.   No.  In reality I witness conversations through WhatsApp,

13  and I saw other things, but apart from that, we had a child and

14  we had a perfect marriage and all of that.  And then after I

15  saw all of that, I decided to file for divorce.

16          THE COURT:  I'm sorry, what did he see at the mall

17  exactly?

18  A.   No.  What happened was we went to the shopping center

19  myself, with me, her and our son.  And then I was downstairs

11:56 20  waiting for her, and I thought she was taking too long, so then

21  I went back to check on her, and I saw that she was talking

22  with another guy.

23  Q.   Did you recognize who this individual was?

24  A.   Yes.

25  Q.   Did you ask Jessica what if anything she was doing with

1    this other individual at the mall?

2    A.    No.  Honestly she told me that the guy was a friend.

3    Q.    Did you recognize who he was?

4    A.    No, I didn't recognize him.  That was the first time I saw

5    him and I didn't see him afterwards.

6    Q.    You mentioned that you saw material on WhatsApp that led

7    you to believe that Jessica was possibly being unfaithful to

8    you.  What if any steps did you take to address these concerns

9    further with her?

11:58 10    A.    No.  What happened was I tried to have a conversation, and

11    I tried to have that resolved, but we couldn't, and then I

12    ended up unfortunately filing the divorce.

13    Q.    At the time you filed for divorce, and the divorce was

14    granted in December of 2021, how long had you and Jessica been

15    together as a couple?

16          INTERPRETER:  I will repeat the question back to him.

17          THE COURT:  Well, what was his answer?

18    A.    No more.

19          THE COURT:  Okay.

12:00 20    A.    Is the question after the divorce?  We separate in 2016.

21    Q.    What year -- I'll withdraw that prior question.

22          What year did you and Jessica first begin a romantic

23    relationship, if you can recall.

24    A.    Well, it's been a while.  I'm not remembering exactly.

25    Q.    Since Arthur and Jessica have been here in the United

1    States, have you been able to communicate with Arthur?

2    A.    I'm able to talk to him through a video call now.

3    Q.    What platform do you use to have video calls with Arthur?

4    A.    WhatsApp.

5    Q.    How often do you have video calls with Arthur?

6    A.    From June up until now it's been happening three times a

7    week.

8    Q.    And that's from June 2024 until now?

9    A.    Yes.

12:02 10    Q.    Between April of 2022 when Arthur and Jessica arrived here

11    in the United States until June of 2024, what if any access to

12    Arthur via video calls did you have?

13    A.    Well, I had some serious difficulties to get in touch with

14    him.

15    Q.    Please describe for the court what if any steps you took

16    to be able to get in touch with Jessica so that you could have

17    resumed contact with your son Arthur after April of 2022?

18    A.    Well, I had to go through the judicial decision in order

19    to get in touch with her.

12:03 20    Q.    After Jessica left Brazil in March of 2022, when was the

21    next time you were in communication with Jessica?

22    A.    It was on the 11th that I find out and she called me.

23    Q.    When was the next time that you were able to speak or

24    videoconference with Arthur?

25    A.    Last time was Friday now.

1          MS. BENJAMIN:  Objection, Your Honor.  I believe I

2    heard another voice talking to Edervaldo through the camera.

3    I'd like to confirm that he's not conferring with anyone in his

4    testimony.

5          MS. CROWLEY:  Do you want me to ask him?

6          THE COURT:  Yes, please.

7    Q.   Edervaldo, are you conferring with anyone regarding your

8    testimony?

9    A.   No.

12:05 10          MS. BENJAMIN:  Is there anyone else in the room with

11   Edervaldo?

12   A.   No.  I'm in the kitchen.

13   Q.   Edervaldo, you mentioned that from June of 2024 through

14   now you've been having three-times-per-week videoconferences

15   with Arthur, correct?

16   A.   Correct.

17   Q.   How have those video conferences been going?

18   A.   Well, he has improved a lot.  We do spend a good amount of

19   time talking.  We talk about different things, so many, many

12:06 20   different things, so it's going well.

21   Q.   What sorts of things do you talk to Arthur about during

22   these videoconferences?

23   A.   Well, I talk about how he's going in school.  He mentioned

24   to me that he has joined a soccer team and he likes soccer and

25   we talk about the team.  We also talk about his health and how

A281

1    he's doing in school and what he's been learning.

2    Q.    Do you observe your son Arthur to be happy to participate

3    in these videoconferences with you?

4    A.    Sometimes he looks happy and sometimes he looks kind of

5    different.  It's kind of really hard to determine whether he's

6    really happy or not.  But at times I notice that he looks kind

7    of sad.

8    Q.    And how long do you typically spend on a videoconference

9    with him?

12:08 10    A.    Well, sometimes he lasts about 40 minutes and sometimes

11    about one hour.  We do spend a good amount of time talking.  We

12    don't have a specific, like, time to be on the video calls.

13    Q.    Do you tell him that you love him?

14    A.    Every day during the video calls I tell him that I miss

15    him and I am anxious to see him and be with him.

16    Q.    Now, you mentioned that you've been doing the

17    three-times-per-week videoconferences since June of 2024.

18    Prior to June of 2024, what if any frequency was there to any

19    videoconferencing or telephone calls with your son since he

12:10 20    arrived here in April of 2022?

21         INTERPRETER:  Interpreter needs clarification, if you

22    can, I'm sorry --

23         MS. CROWLEY:  That's okay.  I can make it a little

24    simpler.

25    Q.    Prior to June of 2024, how often, if at all, would you

    1    communicate with Arthur by telephone or videoconference?

    2    A.    Prior to June of 2024, I couldn't understand.

    3    Q.    Prior to June 2024, did you ever have a video call with

    4    Arthur since he has been here in the United States?

    5    A.    No.  The conversation was not so often.  There was a lot

    6    of blockage from her side.

    7    Q.    And you had mentioned difficulties before earlier in your

    8    testimony.  What if anything changed to result in the

    9    three-times-per-week videoconferences?

12:12 10  A.    No.  It had to be through a judicial process because it

   11    was so difficult and I was not able to get in touch with her.

   12    Q.    If I could please direct you and everyone else's attention

   13    to Uncontested Exhibit 12.  It's the hearing transcript in

   14    Brazilian family court.  Do you see that document?

   15    A.    Just one second.  I'm going to search for it.  What page

   16    is this?

   17    Q.    Exhibit 12, hearing transcript, August 13, 2024.

   18          THE COURT:  He might be in the wrong book.

   19    Q.    Edervaldo, in the Joint Uncontested Exhibits, Exhibit 12.

12:14 20  A.    Okay.

   21    Q.    Hearing transcript, Fifth Family Court Judgment.

   22    A.    Yes.

   23    Q.    Did you file a request in the Brazilian court to be able

   24    to have video contact with your son Arthur at some point?

   25          MS. CROWLEY:  Does he understand the question before

```
 1   him?
 2   A.   I couldn't understand.  Can you please repeat.
 3   Q.   Do you recognize this document before you?
 4   A.   Yes.
 5   Q.   For this hearing on June 5, 2024, you were represented by
 6   an attorney?
 7   A.   Yes.
 8   Q.   And this document indicates that you will maintain contact
 9   with the child through video calls made to telephone number, on
12:17 10   Mondays, Wednesdays and Fridays between 7:00 and 8:00 Brazil
11   time.  Did I read that correctly?
12   A.   Correct.
13   Q.   Prior to June of 2024, were you able to have video calls
14   with Arthur while he has been here in the United States?
15   A.   Yes.
16   Q.   Approximately how many times were you able to have video
17   calls or conferences with Arthur prior to June of 2024 while
18   he's been here in the United States?
19   A.   Like I said, there was contact, it was very difficult.  It
12:18 20   was not something that was happening like consistently.  It was
21   so difficult.  But now they have that resolved, and now we are
22   able to maintain the contact.
23   Q.   How is your physical health?
24   A.   I'm doing well, thank God.
25   Q.   How is your mental health?
```

```
  1   A.    Good, thank God.

  2   Q.    Are you currently employed?

  3   A.    Not currently.

  4   Q.    Are you currently looking for employment?

  5   A.    Of course, of course.

  6   Q.    What type of work have you done in the past?

  7         INTERPRETER:  I'm going to ask for the name of the

  8   company.

  9   A.    Villa Alimentos.  It's like a food company.  They do

 10   biscuits and spaghetti and macaroni.

 11   Q.    Is your spouse employed?

 12   A.    Yes.

 13   Q.    Do you rent or own your home?

 14   A.    Own a house.

 15   Q.    How long have you owned the house that you reside in?

 16   A.    In reality the house is not mine.  It's my

 17   father-in-law's, but he allows us to stay.  We don't have to

 18   pay rent here.

 19   Q.    Are you able to pay for your bills?

 20   A.    Yes.

 21   Q.    Have you ever been here to the United States?

 22   A.    No.

 23   Q.    Do you have a passport?

 24   A.    No.

 25   Q.    Have you ever had a passport?
```

A285

1    A.    No.

2    Q.    Please describe the home that you live in for the judge.

3    A.    It's two bathrooms, it has a living room, it has a kitchen

4    and a bathroom.  There is also a porch.

5    Q.    If your son Arthur was to return to Brazil, where would he

6    sleep in your home?

7    A.    He will have his own room.  We have two rooms.

8    Q.    Where would Arthur go to school if he was returned to

9    Brazil?

12:22 10   A.    There are two high schools near the house here.

11   Q.    And at ten years old, do you know what grade of school

12   Arthur would likely be in in Brazil?

13   A.    You mean in Brazil or in U.S.?

14   Q.    In Brazil.

15   A.    I couldn't fully understand.

16   Q.    That's okay.  Just one or two more questions.

17         Can you please explain to the court how Arthur leaving

18   Brazil has affected you?

19   A.    Well, the fact that he's far away from me is making life

12:24 20   very difficult for me.  He is my only child, and I don't have

21   another child.  I do care so much about him, and we have a very

22   tight relationship.  So his absence has really, really been a

23   burden on me, and it's messing with me a lot, the fact, because

24   I do miss him a lot and the contact and everything.  So this is

25   really difficult.

        1    Q.   And the final question for the time being, Edervaldo, what

        2    are you asking this court to do in response to the Hague

        3    petition that you've filed here?

        4    A.   Well, I would like the court to be faithful.  I would like

        5    the court to be fair.  Because I know I have my own rights and

        6    she has her rights.  I don't have contact with my son besides

        7    the video calls.  He's away from me.  And I would like that the

        8    court takes a decision that's fair.

        9    Q.   Are you looking for your son to be returned to Brazil?

12:26  10    A.   Yes.

       11        MS. CROWLEY:  No further questions at this time, Your

       12    Honor.

       13        MS. BENJAMIN:  Your Honor, I would just like to make

       14    one point with regards to the objection I made with regards to

       15    Exhibit 14, just to let you know that we did brief the

       16    relevance of the Hague application that was filed in Brazil in

       17    our pretrial memo of law at page 23, for your purposes.

       18        THE COURT:  Okay.  Is this a good time for a lunch

       19    break?  How long do you want for lunch?

12:27  20        MS. CROWLEY:  Whatever works best for you and your

       21    staff works well for us.

       22        (Discussion off the record.)

       23        THE COURT:  1:00.

       24        (Recess, 12:26 p.m. - 1:11 p.m.)

       25        MS. BENJAMIN:  I do have some questions on cross of

```
 1    Mr. da Silva, Your Honor.

 2         THE COURT:  Shocked to hear it.

 3    CROSS-EXAMINATION BY MS. BENJAMIN:

 4    Q.   Mr. da Silva, nice to see you again.  We met a few weeks

 5    ago on your deposition in this case.

 6         You testified today that Jessica, Ms. da Silva, asked you

 7    to authorize a passport for Arthur only for the purpose of

 8    getting that document.  Is that right?

 9    A.   Yes.

10    Q.   And it's your testimony that you made earlier today that

11    Jessica told you she only wanted that passport to be used as a

12    document.  Is that right?

13    A.   Yes.

14    Q.   I believe you testified earlier, Mr. da Silva, that

15    Jessica never mentioned moving or going to a different country

16    with the passport.  Is that right?

17    A.   Correct.

18    Q.   You testified earlier that it's your understanding that

19    the passport authorization document you signed did not

20    authorize Arthur to travel with Jessica.  Is that correct?

21    A.   Correct.

22    Q.   I'd like to look at the document that you signed, that's

23    Exhibit Number 6 in the Uncontested Exhibits binder, and Mr. da

24    Silva, that's in the folder of documents your counsel sent you,

25    Exhibit Number 6.  Please let me know when you have that open.
```

        1        This is Arthur's passport and travel authorization

        2    document, correct?

        3    A.   Signature for the passport.

        4    Q.   This is your signature on the passport application.  Is

        5    that right?

        6    A.   Yes.

        7    Q.   And you testified earlier you traveled to the federal

        8    police in person to sign this document.  Is that right?

        9    A.   Yes.

01:14  10    Q.   And is it your understanding that this is an official

       11    government document?

       12    A.   Yes.

       13    Q.   And did you read this document before you signed it?

       14    A.   No.

       15    Q.   You did not read this document before signing it?

       16    A.   No.

       17    Q.   So I just want to be clear.  You traveled to the passport

       18    -- or the federal police and you were given this document and

       19    you did not read it, but you did sign it.  Is that accurate?

01:15  20    A.   Well, she told me that this was an application for

       21    passport.  She didn't mention anything about traveling.

       22    Q.   Mr. da Silva, that was not my question.  My question was,

       23    you did not sign this document when you read it, or you did not

       24    read this document when you signed it.  Is that right?

       25    A.   Correct.

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | Q.    Is this an important document?                               |
|        | 2  | A.    Can you please repeat.                                        |
|        | 3  | Q.    Is this document an important document?                       |
|        | 4  | A.    Yes.                                                          |
|        | 5  | Q.    And you did not read this important document but you did      |
|        | 6  | sign it?                                                            |
|        | 7  | A.    Honestly, I didn't because she was coming to the place       |
|        | 8  | where I work 24/7, 24/7, and asking me to sign it and sign it      |
|        | 9  | so many times, so I did.                                           |
| 01:17  | 10 | MS. BENJAMIN:  I would move to strike everything after        |
|        | 11 | the first response as nonresponsive to my question.                |
|        | 12 | THE COURT:  Denied.  He already testified to it.  It's       |
|        | 13 | cumulative.  It's already in the record.                           |
|        | 14 | Q.    Okay.  Mr. da Silva, please go to page marked JX6.001 and    |
|        | 15 | tell me when you're there, please.                                 |
|        | 16 | A.    What is the name again?                                      |
|        | 17 | Q.    The page is JX6.001.                                         |
|        | 18 | A.    Just one moment.  I'm looking right here.                    |
|        | 19 | Q.    It starts with the words "Standard Form."                    |
| 01:19  | 20 | A.    I found it.                                                   |
|        | 21 | Q.    Okay.  Mr. da Silva, please read aloud the top section of    |
|        | 22 | this form, starting with "Standard Form."                          |
|        | 23 | INTERPRETER:  Interpreter will need to have that            |
|        | 24 | broken down.  Maybe ask him to read one or two sentences at a      |
|        | 25 | time.  Can I please ask you to do that instead of the whole        |

A290

1    thing?

2         MS. BENJAMIN:  That's okay.  Why don't I read and

3    break it up and then you can interpret.

4         INTERPRETER:  That's fine.

5    Q.   Mr. da Silva, is it correct that this form reads "Standard

6    Form For Authorizing the Issuance of a Minor's Passport With

7    the Inclusion of an International Travel Authorization"?

8    A.   No.  In fact, we never had any conversation about

9    traveling.  We never discuss any traveling, and it was mainly

01:21 10   to have the application for passport to use that as a document.

11   Q.   Mr. da Silva, that was not my question.  My question was

12   whether this document says "Standard Form For Authorizing the

13   Issuance of a Passport With the Inclusion of an International

14   Travel Authorization."  Are those words on this document?

15   A.   Yes.

16   Q.   Please look at the second paragraph midway through the

17   page.  Your counsel earlier this morning pointed you to part of

18   this statement.  Is it correct that this statement starts with,

19   "I/we authorize the issuance of a passport for my minor son or

01:22 20   daughter whose details are given below and the inclusion of a

21   travel authorization"?

22   A.   Yes.

23   Q.   So this document says not once but twice that it is a

24   passport authorization with the inclusion of a travel

25   authorization.  Is that right?

```
 1              MS. CROWLEY:  Objection.  The document speaks for
 2    itself.  It's in evidence.
 3              THE COURT:  Overruled.
 4              INTERPRETER:  The interpreter needs a clarification.
 5    A.   I just find out about this authorization on the day that I
 6    went to cancel it.
 7    Q.   That was not my question, Mr. da Silva, but I'll move on.
 8         You testified earlier today with your counsel that you
 9    never discussed with Jessica her wanting to travel with Arthur.
01:24 10    Is that correct?
11    A.   Correct.
12    Q.   And I just want to be perfectly clear.  Is it correct that
13    Jessica asked you to authorize the passport in order for Arthur
14    to travel to the United States?
15    A.   No.  Issuance of a passport is just for document.
16    Q.   Mr. da Silva, do you remember being deposed in this case?
17              INTERPRETER:  The interpreter needs repetition.
18    Q.   Do you remember being deposed in this case?
19    A.   What do you mean?
01:25 20    Q.   Say again.
21    A.   What do you mean?
22    Q.   Do you remember sitting for a deposition on Zoom where we
23    asked you questions and your attorney was present?
24    A.   Yes.
25    Q.   Do you remember taking an oath at the start of that
```

A292

 1    deposition, stating that you would testify truthfully and

 2    accurately?

 3    A.    Yes.

 4    Q.    During your deposition I asked you, and this, for counsel,

 5    is at 11:19.  "Mr. da Silva, is it correct that Ms. da Silva

 6    asked you to authorize the passport in order for Arthur to

 7    travel to the United States at some point?"

 8          INTERPRETER:  Interpreter needs a repetition.

 9    Q.    Okay.  I'll break it up.

01:26 10      In your deposition I asked you, quote, "Mr. da Silva, is

11    it correct that Ms. da Silva asked you to authorize" --

12          INTERPRETER:  Go ahead.

13    Q.    -- "the passport order for Arthur to travel to the United

14    States at some point?"

15    A.    Certainly.

16    Q.    Your reply during your deposition was, and I quote, "Only

17    to travel, not to live," end quote.

18          INTERPRETER:  "Only to travel, not to live," right?

19          MS. BENJAMIN:  Say again.

01:27 20      INTERPRETER:  "Only to travel and not to live"?

21          MS. BENJAMIN:  Yes, end quote.

22    Q.    So, Mr. da Silva, today is it true that Jessica asked you

23    to authorize a passport for Arthur in order to travel?

24    A.    Yes.

25          INTERPRETER:  Interpreter needs a repetition.  Sorry.

```
 1              MS. BENJAMIN:  From me?
 2              INTERPRETER:  Yes.
 3    Q.   Is it true that Jessica asked you to authorize a passport
 4    for Arthur to travel?
 5    A.   I couldn't understand.
 6    Q.   I just repeated for you your deposition testimony.  I'm
 7    asking you now, is it true, as you testified in your
 8    deposition, that Jessica asked you to authorize the passport
 9    for Arthur to travel?
01:28 10  A.   Certainly, yes.
11    Q.   And you signed the passport application and travel
12    authorization, correct?
13    A.   Correct.
14    Q.   I'd like to direct you to Joint Exhibit 32 in the folder
15    that your counsel provided you.
16    A.   Okay.
17    Q.   What is this document?
18    A.   It's a passport canceled.
19    Q.   And this is your signature on the document, yes?
01:30 20  A.   Yes.
21    Q.   Did you read this document before signing it?
22    A.   Yes.
23    Q.   Do you see how the first word of this document says
24    "Request"?
25    A.   It's a request to cancel the travel document for minor.
```

A294

```
 1    Q.   Is it correct that the document states "Request for

 2    Cancellation of a Travel Authorization Included in a Minor's

 3    Passport"?

 4    A.   Correct.

 5    Q.   So, Mr. da Silva, you believe that you had authorized

 6    Arthur's ability to travel because you felt the need to revoke

 7    that authorization.  Is that right?

 8    A.   How?

 9    Q.   How?

01:32 10      INTERPRETER:  Can you repeat.

11    A.   I request the cancellation of the passport because I had a

12    suspicion that he was going to travel.  I was not aware of that

13    though.

14    Q.   What were you not aware of?

15    A.   About his authorization to travel.

16    Q.   Is it your testimony that you are not aware Jessica

17    intended to travel with Arthur?

18    A.   In the future, not now.

19    Q.   So it's your testimony that you learned that Jessica was

01:33 20    going to be traveling with Arthur?

21      INTERPRETER:  Interpreter needs a repetition, sorry.

22    Q.   It is your testimony that you learned Jessica was going to

23    travel with Arthur?

24    A.   In the future, not now.

25    Q.   Mr. da Silva, after you and Jessica separated, Arthur and
```

```
 1    Jessica stayed in the marital home.  Is that right?

 2    A.   Correct.

 3    Q.   You moved out of the marital home at that time?

 4    A.   Yes.

 5    Q.   After you separated from Jessica but before you divorced,

 6    you and Jessica did not have a formal agreement as to custody

 7    of Arthur.  Is that right?

 8    A.   (No response.)

 9    Q.   After you separated from Jessica but before you divorced,

10    you and Jessica did not have a formal agreement as to custody

11    of Arthur?

12    A.   No.

13    Q.   During the period when you and Jessica were separated but

14    before you divorced, Arthur primarily lived with Jessica,

15    correct?

16    A.   Correct.

17    Q.   And you and Jessica eventually divorced and reached a

18    formal agreement as to custody of Arthur at that time, correct?

19    A.   Correct.

20    Q.   Pursuant to that agreement, Arthur would live with you on

21    alternate weekends, right?

22    A.   Correct.

23    Q.   And alternate holidays and school vacations?

24    A.   Correct.

25    Q.   At all other times Arthur lived with Jessica.  Is that
```

01:35 (line 10)
01:36 (line 20)

A296

 1   right?

 2   A.   Correct.

 3   Q.   So despite the terms of your agreement of custody, which

 4   we just discussed, you missed some of your allotted vacations

 5   with Arthur, correct?

 6            INTERPRETER:  The last two words?

 7   Q.   Some of your agreed upon vacations with Arthur, correct --

 8        Let me repeat.  Despite the terms of your agreement as to

 9   custody, you missed some of the vacations you were allowed with

01:37 10   Arthur?

11   A.   Can you please repeat that question.

12   Q.   Did you miss any of the vacations you were allowed to have

13   with Arthur after you reached your custody agreement?

14   A.   Vacation of 2022.

15   Q.   So you did miss one vacation in 2022 with Arthur, right?

16   A.   2022, yes.

17   Q.   When you saw Arthur, you relied on your mother to pick him

18   up and drop him off, right?

19   A.   Correct.

01:39 20   Q.   And during this time you worked until noon on Saturdays,

21   right?

22   A.   I work from Mondays to Saturdays.

23   Q.   And you worked part of the day on Saturday, correct?

24   A.   Correct, correct.

25   Q.   So on your weekend visits with Arthur, you would only see

```
 1   him for one and a half days, right?
 2   A.   Correct.
 3   Q.   Other than the January 2022 vacation that you just
 4   referenced, did you miss any other visits you were allowed to
 5   have with Arthur?
 6   A.   No.
 7   Q.   Was there an instance in which you missed a visit with him
 8   in October of 2022?
 9   A.   Not in October of 2022.
01:41 10   Q.   I apologize, that was a misstatement.  Did you miss a
11   visit with Arthur in October of 2021?
12   A.   Can you repeat?
13        No, I pick him up.
14   Q.   Mr. da Silva, you submitted sworn responses to
15   interrogatories in this case, correct?
16        INTERPRETER:  Interpreter needs a repetition, sorry.
17   Q.   You submitted sworn responses to interrogatories in this
18   case, correct?
19   A.   Correct.
01:42 20   Q.   In Interrogatory Number 8 it was asked that you identify
21   any instances in which you exercised your alleged custodial
22   rights.
23   A.   That's correct.
24   Q.   You said in your response to that interrogatory that you
25   missed a visit with your son when you were diagnosed with COVID
```

on 2/10/2022, which I assume to be the wrong year, given that

that's after Jessica left.

A.    I don't recall that.

Q.    We can move on.  Let me wrap up by asking one more time,

Mr. da Silva, other than the January vacation in 2022 that you

missed, did you miss any other visits with Arthur?

A.    That was the COVID, that was the COVID.  I was tested

positive and I couldn't pick him up.  But it was not in

October, though.

01:44  Q.    Was it in February?

A.    It was February.

Q.    So there are at least two times that you missed visits

with Arthur, when you had COVID and when you missed his January

2022 vacation, right?

A.    Yes.

Q.    Mr. da Silva, you believe that Arthur and Jessica have a

good relationship.  Is that right?

A.    As far as I know, yes.

Q.    And do you believe that Jessica is a good mother to

01:45  Arthur?

A.    Yes.

Q.    And Arthur has never complained about his relationship

with his mother to you, correct?

A.    Not to me.

Q.    When you speak with Arthur on the phone, what do you

1    typically discuss?

2    A.   We talk about his entire life, how he's doing in school,

3    his health, and we talk about sports, the soccer team that he

4    has joined and how everything is going for him.

5    Q.   Do you know the name of Arthur's school?

6    A.   No.

7    Q.   Do you know the name of his current teacher?

8    A.   No.

9    Q.   Do you know the name of his teacher from last year?

01:47 10   A.   No.

11   Q.   Do you know the name of any of his friends in the United

12   States?

13   A.   No.

14   Q.   Do you know where Arthur attends church?

15   A.   No.

16   Q.   Do you know the name of Arthur's doctor in the United

17   States?

18   A.   No.

19   Q.   So you testified that you talk about Arthur's life when

01:48 20   you're on the phone with him.  But do you talk mostly about

21   soccer on those phone calls?

22   A.   Soccer, his health, how he's doing in school, how

23   everything is going for him.

24   Q.   Earlier today your counsel asked you whether you were

25   aware that Jessica alleged you had been violent towards her.

A300

1    Do you remember that?

2    A.    Yes.

3    Q.    After you and Jessica separated, would you from time to

4    time provide her with money to use to buy Arthur food?

5    A.    I used to pay pension, like child support.

6    Q.    Before you reached your divorce agreement, did you provide

7    Jessica with money, when able, to buy Arthur food?

8    A.    Well, the child support, yes.

9    Q.    Mr. da Silva, do you recall an instance in which you

01:50 10    received a Visa gift card from your employer to buy groceries?

11    A.    I don't remember.

12    Q.    You don't remember discussing this Visa gift card with

13    Jessica at her home?

14    A.    I do not remember.

15    Q.    You don't remember that Jessica asked you if she could use

16    the gift card to buy Arthur food?

17    A.    I don't recall that.

18    Q.    You don't remember that you refused to allow Jessica to

19    use that gift card to buy food for Arthur?

01:51 20    A.    I don't remember.

21    Q.    Did you forcefully twist Jessica's arm when she attempted

22    to take that gift card from you?

23    A.    No.

24    Q.    And did you forcefully take Arthur from Jessica's house?

25    A.    No.

A301

```
 1    Q.    Is it your position that Jessica was untruthful when she

 2    stated in her sworn interrogatories in this case that you

 3    violently twisted her arm during this encounter?

 4    A.    Yes.

 5          MS. BENJAMIN:  Could I have one minute, Your Honor?

 6          THE COURT:  Yes.

 7    Q.    Mr. da Silva, have you ever applied for government

 8    benefits through the National Social Security Institute?

 9    A.    I couldn't understand.

01:54 10          INTERPRETER:  He asked for repetition.

11    Q.    Okay.  Have you ever applied for benefits through the

12    National Social Security Institute?

13    A.    Yes.

14    Q.    And you applied for these benefits because you lost your

15    job?

16    A.    I couldn't understand.

17    Q.    Did you apply for INSS benefits because you lost your job?

18    A.    No.

19    Q.    Why did you apply for INSS benefits?

01:55 20    A.    I lost my benefit because I was not able to work.

21    Q.    Why did you apply for the benefits?

22    A.    I was not able to work because of my son.

23    Q.    Why were you not able to work because of your son?

24    A.    Because I was having anxiety crisis.

25    Q.    So is it your testimony that you lost your job because of
```

A302

```
 1    your anxiety as a result of Arthur leaving?

 2    A.   Yes.

 3    Q.   Did you have anxiety prior to Arthur's departure from

 4    Brazil?

 5    A.   No.

 6    Q.   I'd like to direct you to Joint Exhibit 8 in the folder

 7    your counsel sent you.

 8    A.   Okay.

 9    Q.   Have you seen this document before?

10    A.   Yes.

11    Q.   What is this document?

12    A.   It's INSS.

13    Q.   Is this the INSS response to your application for

14    benefits?

15    A.   Yes.

16    Q.   The first sentence in the paragraph on page 8.0001, the

17    English version is at .0005 for counsel and the judge, that

18    sentence states that you applied for benefits on March 2, 2022,

19    correct?

20    A.   Correct.

21    Q.   The subject line in sort of middle of the top part of the

22    page says that the request for assistance was due to illness,

23    correct?

24    A.   Correct.

25    Q.   Was the illness your anxiety?
```

A303

```
 1    A.    Yes.
 2    Q.    Just a few minutes ago you testified that you only
 3    developed anxiety after Arthur left Brazil.  Is that right?
 4    A.    It was during, during the period that Arthur left.
 5    Q.    Arthur left after March 2, 2022, correct?
 6    A.    Correct.
 7    Q.    And you testified earlier today that you learned Arthur
 8    was no longer in Brazil in April of 2022.  Is that right?
 9    A.    Correct.
02:00 10   Q.    So it's correct that you applied for INSS benefits on the
11    basis of your anxiety before you knew Arthur was leaving
12    Brazil?
13    A.    It was because of his mother insisting that I signed the
14    document in order for him to acquire the passport, and
15    throughout the process, then I started with this anxiety thing.
16    Q.    Mr. da Silva, you testified earlier that you did not
17    believe that the passport was to be used for travel.  It was
18    only to be used for a document, correct?
19    A.    Correct.
02:01 20   Q.    Why did this give you anxiety if you did not believe the
21    passport was to be used for travel?
22    A.    I was afraid of losing my child because they already had
23    the passport.
24    Q.    So if you were afraid of losing your child, is that
25    because you believed that Jessica intended to travel with
```

A304

```
  1   Arthur when you authorized the passport?

  2   A.   Correct.

  3   Q.   Your anxiety was severe, right?

  4   A.   No.

  5   Q.   If your anxiety was not severe, why do you believe that

  6   you needed to have benefits because you couldn't work?

  7   A.   I didn't understand.

  8   Q.   If your anxiety was not severe, why did you believe you

  9   could not work and needed to get benefits?

02:03 10   A.   Because I was still having crisis.

 11   Q.   Your anxiety was sufficiently severe such that you heard

 12   voices in your head telling you to kill yourself.  Is that

 13   right?

 14   A.   No, no.

 15   Q.   So you never heard voices telling you to harm yourself?

 16   A.   No.

 17   Q.   You never told Jessica about hearing voices telling you to

 18   harm yourself?

 19   A.   No.

02:04 20   Q.   Is it your position that Jessica is being untruthful when

 21   she stated in her sworn interrogatories that you told her you

 22   heard voices to harm yourself?

 23        INTERPRETER:  Would you mind repeating, please.

 24   Q.   Is it your position that Jessica was being untruthful when

 25   she stated in her sworn interrogatories that you told her you
```

A305

```
 1   heard voices telling you to harm yourself?

 2   A.   I didn't understand exactly.

 3   Q.   Do you believe Jessica is being untruthful when she stated

 4   that you told her you heard voices telling you to harm

 5   yourself?

 6   A.   Yes.

 7   Q.   Do you still have anxiety today?

 8   A.   No.

 9   Q.   Do you currently receive INSS benefits?

10   A.   No.

11   Q.   You do not currently have a job.  Is that right?

12   A.   Not yet.

13   Q.   You last had a job in April of 2023.  Is that right?

14   A.   Correct.

15   Q.   In your last job, you were only making slightly more than

16   minimum salary.  Is that right?

17   A.   Somewhat that.

18        MS. BENJAMIN:  Can I have just a minute, Your Honor?

19        THE COURT:  Sure.

20   Q.   Mr. da Silva, earlier today you testified that it was

21   difficult to contact Arthur prior to June 2024.  Is that right?

22   A.   Correct.

23   Q.   Jessica never prevented you from speaking with Arthur

24   though, did she?

25   A.   Could you repeat, please.  I didn't understand the
```

The times noted in the left margin are: 02:06 (line 10), 02:07 (line 20).

 1   question.

 2   Q.   Jessica never prevented you from speaking with Arthur, did

 3   she?

 4   A.   No.  She's had some difficulties.

 5   Q.   In fact, when you needed to reach Arthur, Jessica allowed

 6   you to reschedule if she couldn't accommodate the time.  Is

 7   that right?

 8   A.   Correct.

 9   Q.   So it's your testimony that Jessica did not prevent you

02:10 10   from speaking with Arthur prior to June 2024.  Is that right?

 11   A.   She was making it difficult.  Not impairing me to talk to

 12   him.

 13   Q.   So Jessica did not impair your ability to speak with

 14   Arthur, correct?

 15   A.   Correct.

 16        MS. BENJAMIN:  No further questions, Your Honor.

 17        THE COURT:  Redirect?

 18        MS. CROWLEY:  No redirect, Your Honor.

 19        THE COURT:  Okay.  Next witness, please.

02:11 20        MR. HUNSINGER:  We call Jessica Silveira da Silva.

 21        JESSICA SILVEIRA da Silva, Sworn

 22   DIRECT EXAMINATION BY MR. HUNSINGER:

 23   Q.   Ms. da Silva, please state your name for the record.

 24   A.   Jessica Silveira da Silva.

 25   Q.   Do I call you Ms. da Silva or Ms. Silveira or Ms. Silveira

A307

```
 1   da Silva?
 2          COURT REPORTER:  I'm sorry.
 3          MS. JAMES:  I don't think that microphone is working.
 4          (Discussion off the record.)
 5   Q.   Ms. da Silva, with whom do you live?
 6   A.   I live with my husband Gilberto, and Arthur, my son.
 7   Q.   Ms. da Silva, you were married to Edervaldo da Silva,
 8   correct?
 9   A.   Yes.
10   Q.   And you were married on May 13, 2011, correct?
11   A.   Yes, correct.
12   Q.   And during your marriage to Mr. da Silva, you had one
13   child, correct?
14   A.   Yes, correct.
15   Q.   And that child was born May 4, 2014, correct?
16   A.   Correct.
17   Q.   And that child, Arthur, is the subject of this proceeding,
18   correct?
19   A.   Yes.
20   Q.   Ms. da Silva, why did you and Mr. da Silva divorce?
21   A.   So for me the only way to resolve the things, many things
22   that was not doing well was to separate.
23   Q.   And you separated in 2018, correct?
24   A.   Yes.
25   Q.   And you divorced December 10, 2021, correct?
```

     1    A.    Yes.

     2    Q.    And your divorce document provides that you and Mr. da

     3    Silva would have joint custody of Arthur, correct?

     4    A.    Yes.

     5    Q.    After you and Mr. da Silva divorced, Arthur spent time

     6    with Mr. da Silva, correct?

     7              INTERPRETER:   Could you repeat, please.

     8    Q.    After you and Mr. da Silva divorced, Mr. da Silva spent

     9    time with Arthur, correct?

02:17 10    A.    Yes.

    11    Q.    And the time Mr. da Silva spent with Arthur included

    12    overnights, correct?

    13    A.    Yes, yes.

    14    Q.    And Mr. da Silva saw Arthur approximately every other

    15    weekend, correct?

    16    A.    Yes.

    17    Q.    And Mr. da Silva paid child support for Arthur, correct?

    18    A.    Not always he paid this child support.

    19    Q.    But he did pay child support, correct?

02:18 20    A.    Officially, after the divorce when everything was

    21    resolved, he paid 240 reals, but before the divorce, he was

    22    paying 180 dollars but just at the beginning when we separated.

    23    He was just buying things that Arthur wanted to eat.

    24    Q.    You sought Mr. da Silva's authorization on Arthur's

    25    passport in early 2022, correct?

```
 1    A.    Yes, correct.
 2    Q.    Could Arthur leave the country without Mr. da Silva's
 3    permission?
 4    A.    No.  That's why he signed the passport.
 5    Q.    Mr. da Silva ultimately canceled that passport, correct?
 6    A.    He said yes, but he's not a trustworthy man.  So when he
 7    said that he had canceled the passport, I didn't believe that
 8    he did.
 9    Q.    When did Mr. da Silva tell you that he canceled the
02:20 10    passport?
11    A.    So on the same day that I traveled, so he is supposed to
12    say goodbye to Arthur because he knew we were going to travel.
13    He knew the whole time because we had talked about it many,
14    many times.  And on this day, he didn't go there to say goodbye
15    to him.
16          MR. HUNSINGER:  Move to strike everything after "the
17    day we traveled" as nonresponsive.
18          THE COURT:  Overruled.
19    Q.    Ms. da Silva, what was the date you learned that Mr. da
02:22 20    Silva had canceled the child's passport?
21    A.    I am not sure exactly the about the date, but in this
22    document it was said that he had asked, he had made the
23    request, but I don't remember exactly when, but I know it was
24    after I arrived here in the U.S.
25    Q.    Ms. da Silva, I'm going to show you a document.
```

A310

A.    Okay.

          MR. HUNSINGER:  May I approach?

          THE COURT:  Yes.

          MS. JAMES:  Counsel, is this a document that's in
evidence?

          MR. HUNSINGER:  Ms. da Silva testified that she
couldn't remember what date she told my client the passport was
canceled.  I'm refreshing her recollection.

          MS. JAMES:  I'm going to object to this.  This was not
disclosed to us.

          THE COURT:  He can refresh with anything he wants.

          MR. HUNSINGER:  Your Honor, would you like to see this
or no?

          THE COURT:  No.

Q.    Please read for me the date at the top.

A.    March 25, 2027.

Q.    And Ms. da Silva, please read for me the second from the
bottom in the green text.

A.    Okay.  "Arthur passport is canceled, okay."

Q.    And so on March 25, 2022, Edervaldo texted you that
Arthur's passport had been canceled.  Is that correct?

A.    Yes, I didn't deny it.

Q.    And March 25, 2022 was before you left Brazil, correct?

A.    This conversation was the same day that I traveled to
Vitoria.

```
 1   Q.   Vitoria is in Brazil, correct?

 2   A.   Yes, yes.

 3   Q.   So you knew that the child's passport had been canceled

 4   before you left Brazil, correct?

 5   A.   This is what he said.  I didn't believe in his words

 6   because on the same day, he had the schedule to see the son and

 7   say goodbye.

 8   Q.   Was March 25, 2022 Mr. da Silva's regularly scheduled

 9   parenting time?

02:27 10   A.   Yes, this conversation started just because I was asking

11   him to see Arthur because he hadn't been there to say goodbye.

12   So I knew about the trip, and he knew about the trip, and this

13   moment was scheduled for him to say goodbye to Arthur.

14   Q.   Ms. da Silva, isn't it true that you entered the United

15   States on April 3, 2022?

16   A.   I believe it was April 7.

17   Q.   Directing your attention to Joint Exhibit 2, page 0003.

18        MS. JAMES:  Does the witness have the exhibits in

19   front of her?

02:29 20   A.   What's the number?

21   Q.   Joint Exhibit 2, page 3, item 19C, it says you entered the

22   United States on April 3, 2022, correct?

23   A.   Correct.

24   Q.   Did you tell Edervaldo that you and Arthur were in the

25   United States at this time?
```

A312

1    A.   I don't recall which moment I told him, but it was not on

2    this date.

3    Q.   Ms. da Silva, I'm going to show you another document.

4         MS. JAMES:  Your Honor, I also want to object for the

5    record on the lack of any translation of these documents,

6    understanding they're being use refresh the witness's

7    recollection.

8         THE COURT:  The rule says he can refresh recollection

9    with anything.  I'm not sure it requires that you translate it

02:31 10   or you be able to understand or that you can see it, as long as

11   it refreshes her recollection.

12        MR. HUNSINGER:  Thank you, Your Honor.

13   Q.   Please read for me the date at the top of this document.

14   A.   April 6, 2022.

15   Q.   And in the middle of this page, in the black, it says,

16   "Villajo and Vitoria."

17   A.   Yes.

18   Q.   Is this your text message with Edervaldo in which you told

19   him on April 6, 2022 that you took Arthur to Vitoria?

02:32 20   A.   Yes.  It is written.

21   Q.   I'm sorry?

22   A.   Yes, this is written here, yes.

23   Q.   Isn't it true that you were already in the U.S. as of

24   April 6, 2022?

25   A.   Yes.

```
 1  Q.    When you and Arthur left Brazil, you flew to Colombia,

 2  correct?

 3  A.    Yes.

 4  Q.    How did you get from Colombia to the United States?

 5  A.    We went to Mexico.

 6  Q.    How did you get from Colombia to Mexico?

 7  A.    From, we went on a plane to Mexico, and then we went to

 8  the frontier.

 9  Q.    Where in Mexico did you fly to?

10  A.    I believe it was, but I'm not sure about, I can't recall,

11  it was Tijuana.

12  Q.    Did you pay anyone to help you get to the United States

13  from Brazil?

14  A.    Yes.

15  Q.    And isn't it true that you walked across the border from

16  Mexico to the U.S.?

17  A.    Yes, this is true.

18  Q.    And when you crossed the border, were you detained by

19  federal immigration officials?

20  A.    Yes, exactly.

21  Q.    And were you electronically monitored for a period of time

22  by those immigration officials?

23  A.    Yes, we went to a -- so we went to a place that they sat

24  the people there and I spent two days there with Arthur.

25  Q.    And after you were released from there were you
```

02:33 at line 10
02:34 at line 20

A314

1    electronically monitored?

2    A.    Yes, I received a cell phone so the immigration will have

3    a kind of control to know where I would be.

4    Q.    Ms. da Silva, when did you find out that Mr. da Silva was

5    seeking to have Arthur returned to Brazil?

6            INTERPRETER:  Would you mind asking the question

7    again, please.

8            MR. HUNSINGER:  I'm sorry.

9            INTERPRETER:  Would you repeat the question, please.

02:36 10   Q.    When did you find out that Mr. da Silva was seeking to

11   have Arthur returned to Brazil?

12   A.    When he filed a request that he had done in Brazil.

13   Q.    Ms. da Silva, isn't it true that you have no other family

14   in the United States?

15   A.    No.

16   Q.    It's not true?

17   A.    I don't have relatives.  Only relatives from my husband's

18   side.

19   Q.    So both of your parents are in Brazil?

02:37 20   A.    Yes.

21   Q.    And both of Arthur's paternal grandparents are in Brazil?

22   A.    Yes.

23   Q.    You enrolled Arthur in school in 2022, correct?

24   A.    Yes, correct.

25   Q.    And isn't it true that Arthur was originally placed in

1    third grade?

2    A.    Yes.

3    Q.    And he was then moved into second grade, correct?

4    A.    Yes.

5    Q.    Why was he moved into second grade?

6    A.    I believe that everything was new for him, and I think

7    that the correct thing to do was to move him to the second year

8    so he would start his learning from there.

9    Q.    Ms. da Silva, do you remember I took your deposition in

02:38 10    this case?

11    A.    Yes.

12    Q.    And I asked you why Arthur was moved from third grade to

13    second grade?

14    A.    Yes.

15         MR. HUNSINGER:  And do you have Respondent's Contested

16    Exhibits, or do I need to give you another copy?

17         INTERPRETER:  What's the number?  I think she couldn't

18    hear the number of the page.

19         MR. HUNSINGER:  Respondent's Contested Exhibits.  Do

02:39 20    you have that binder?

21    Q.    Please turn to Exhibit 9, page 29.

22         THE COURT:  Sorry, what exhibit?

23         MR. HUNSINGER:  Respondents' Contested Exhibit 9.  I'm

24    actually going to start on the bottom of page 28.

25         MS. JAMES:  Your Honor, we're going to ask whether

1    counsel is intending to move this into evidence as an exhibit.

2    I understand it's in the binder.

3          MR. HUNSINGER:  I'm impeaching her with her prior

4    deposition testimony.

5          THE COURT:  That would generally not be an exhibit.

6          MS. JAMES:  That was my clarification, since it's in

7    the exhibit binder.  That's all.  Go ahead.

8    A.   Page 28?

9    Q.   Yes, page 28, line 23.

02:41 10        Page 28, line 23.  "Q. Why did they move him from third

11    grade to second grade?

12        Turn the page, top of page 29.  "I don't know exactly.  I

13    don't know if it was because he didn't know much when he

14    started.  He didn't know enough to go into the third grade."

15        Did I read that correctly?

16    A.   Okay, correct.

17    Q.   Isn't it true, Ms. da Silva, that in the 2022/2023 school

18    year Arthur missed 13 days of school?

19          INTERPRETER:  13 days?

02:42 20        MR. HUNSINGER:  13, yes.

21    A.   Yes.

22    Q.   Isn't it true that Arthur attended summer school in the

23    summer of 2023?

24    A.   No.

25    Q.   Turn to --

A317

1  A.    I don't recall.

2  Q.    Turn to Joint Exhibit 39, page 0005.  Are you on that

3  page?

4  A.    Yes.

5  Q.    Do you see down at the bottom, "Summer school K through 8,

6  date 7/28/2023, Code A"?

7  A.    Okay.

8  Q.    And so there's 7/28 A, 7/27 A, 7/26 A, 7/25 A, and then

9  turning the page to number 7, 7/24 and a number of other dates

02:44 10  there.  I'll represent to you that there are 15 days of summer

11  school with that code A.  Is it your understanding that Arthur

12  missed 15 days of summer school in the summer of 2023?

13        MS. JAMES:  Objection.  It's not clear from the

14  document what "A" represents.

15        THE COURT:  I assume he's going to get to it.

16  A.    Yes, but I don't recall.

17  Q.    How many days of school did Arthur miss in the 2023/2024

18  school year?

19  A.    I don't know.  I cannot tell you clearly.

02:46 20  Q.    Is it your understanding that in this Joint Exhibit 39

21  that Code A means absent?

22  A.    So in this case, it is showing the days that he missed.

23  Q.    Can you please count for me the number of days that he

24  missed between 9/12/2023 and 6/17/2024?

25        You don't need to turn the page.  It's all right there.

| | |
|---|---|
| 1 | 9/12/2023, do you agree with me that he was absent that day? |
| 2 | It's all on page 5. |
| 3 | A.   Are you talking about summer school? |
| 4 | Q.   No.  I'm talking about September 12, 2023, to June 17, |
| 5 | 2024, the 2023/2024 school year. |
| 6 | A.   Yes, he missed some classes, but I can't remember which |
| 7 | days he missed. |
| 8 | Q.   How many days of school has Arthur missed so far this |
| 9 | school year? |
| 02:49 10 | A.   So he missed three days of school because of a sore |
| 11 | throat, but it was justified.  So also because of the |
| 12 | deposition here, he came with me.  He also missed one more day |
| 13 | of school.  So total would be four. |
| 14 | Q.   And when I took your deposition, you told me you had |
| 15 | already gotten a warning this year from Arthur's school.  Is |
| 16 | that correct? |
| 17 | A.   Yes. |
| 18 | Q.   And that warning was for getting into a fight with another |
| 19 | student, correct? |
| 02:50 20 | A.   Yes.  There was a moment, yes, that the school told me |
| 21 | that the kids had a little fight between themselves. |
| 22 | Q.   And isn't it true that you told me at your deposition that |
| 23 | the school said that Arthur started the fight? |
| 24 | A.   I don't remember saying it was Arthur who started the |
| 25 | fight. |

A319

```
 1  Q.   Turn back to Respondents' Exhibit 9, page 32.

 2  A.   Okay.

 3  Q.   Read along with me line three.  "Q. Did the school say

 4  that Arthur started the fight?"  There's an objection.  "A.

 5  Yes, they did."

 6       Did I read that correctly?

 7  A.   Okay.

 8  Q.   Yes, I read that correctly?

 9  A.   The school called all the parents of the children that

02:54 10  were related to the fight, and they had that kind of

11  responsibility, so all the mothers were called.

12  Q.   Please turn to Petitioner's Contested Exhibit 5.  You may

13  not have that.

14            INTERPRETER:  5?

15            MR. HUNSINGER:  Sorry.  Permission to approach?

16            MS. JAMES:  Your Honor, before he begins asking

17  questions, we're going to have an objection to this exhibit.

18  This is one of the exhibits that we would object to on hearsay

19  grounds.

02:55 20            THE COURT:  Exhibit 5, the whole exhibit?

21            MR. HUNSINGER:  In the Petitioner's Contested.

22            THE COURT:  Petitioner's Contested, right?

23            MR. HUNSINGER:  Yes.

24            THE COURT:  And the objection is on hearsay grounds?

25            MS. JAMES:  So we would object both on hearsay and on
```

```
  1    authentication grounds, understanding that there are certain
  2    documents that we received from the school but that have no
  3    indicia of authenticity or that bring them under an exception
  4    to the hearsay rule, like the public records exception or the
  5    business records exception.  And specifically with respect to
  6    hearsay, it appears that with this particular message, the
  7    majority of the statement is made by somebody who is not in
  8    court who can't attest to the truth.
  9             THE COURT:  Well, so until we hear from one of the
02:56 10    teachers -- is Mr. Casey expected to testify?
 11             MR. HUNSINGER:  No, he's not, Your Honor.
 12             THE COURT:  So I'm going to keep it out for the truth
 13    of the matter asserted, but it can come in for not the truth.
 14    It can come in that she received this, if he wants to elicit
 15    what she did in response.
 16             MR. HUNSINGER:  Thank you, Your Honor.  If I may be
 17    heard previously on the other point, on the authentication
 18    point, just to put it on the record once because I think we're
 19    going to have this issue --
02:57 20             THE COURT:  Hold on.  I'm not -- it came with the
 21    school records, right, it's part of the school records?
 22             MR. HUNSINGER:  Yes.
 23             THE COURT:  So I'm not ruling on authenticity, but
 24    there are some things that seem like -- there's a lot of
 25    subjective sorts of things in here, and it seems like he should
```

A321

1    be cross-examined before it comes in for the truth of the

2    matter, but I'm not actually ruling on the lack of authenticity

3    or authentication.

4            MR. HUNSINGER:  Thank you.  I haven't yet moved it

5    into evidence.  I intend to lay the foundation, but thank you.

6    I'm cognizant also what time it is.

7            THE COURT:  Yes.  So the emergency motion I was

8    supposed to hear at 3:00 was with withdrawn.  The emergency is

9    not an emergency.  So I still have something else I need to do

02:57 10    later this afternoon.  How much longer do you have on her

11    direct?  I see many pages being turned there.

12            Do you think you could finish it by 3:30 or no?

13            MR. HUNSINGER:  I think so.

14            THE COURT:  Why don't we forge forward.  If anybody

15    ends up needing a break, this is like bonus time now, so I'd

16    like to keep going, but if anyone needs to stop, let me know,

17    or when we get to a good stopping place.

18            MS. JAMES:  Do you mind, Your Honor, if we could just

19    confirm with the witness?  I believe we had advised her that we

02:58 20    thought we were going to end at 3:00.  I think she'll be okay

21    but I just ask that we --

22            THE COURT:  Yes, that's fine.

23            MS. JAMES:  Jessica, are you okay to keep going for a

24    little bit today?

25            THE WITNESS:  Yes, yes.

A322

```
 1              MS. JAMES:  Thank you.
 2   BY MR. HUNSINGTON:
 3   Q.   Ms. da Silva, you have a means of texting with school
 4   officials, correct?
 5   A.   Yes.
 6   Q.   In this Exhibit 5 before you, did you receive this message
 7   from Mr. Casey in the spring of 2023?
 8   A.   Yes.
 9   Q.   And did you talk to Arthur about the consequences of
02:59 10   hitting other people in response to this message?
11   A.   Yes, I always talk to him.
12   Q.   Did you talk to Arthur about the importance of not being
13   disruptive at school in response to this message?
14   A.   Yes.
15   Q.   Did you do anything else after receiving this message?
16   A.   Yes.  I get the message from school, because I like to
17   understand what is going on, so I go to school when I need to
18   be there so I would be able to know and understand what is
19   going on, so I'm always present there.  Also at home, I talk to
03:01 20   Arthur, too, because I like to hear from him what he wants to
21   say about everything, including the origin of incident.
22   Q.   Turn to Petitioner's Contested Exhibit 6.
23              MS. JAMES:  Your Honor, I'll have the same objections
24   here.
25              THE COURT:  Yes.
```

A323

1    Q.    Ms. da Silva, did you receive this message in November of

2    2022?

3    A.    Yes.

4    Q.    What did you do in response to this message?

5    A.    So I have a nice conversation with Arthur.  We sit

6    together and I hear both sides of the situation, his side of

7    the story, and I talk to him about the consequence of his

8    attitude and what should be changed for the better.

9          MR. HUNSINGER:  Your Honor, I'm sorry, just on the

03:03 10   housekeeping front, I'd move to enter Petitioner's Contested

11   Exhibits 5 and 6 into evidence.

12         THE COURT:  They're admitted but not for the truth of

13   the matter asserted.

14         MR. HUNSINGER:  Understood.  Thank you.

15         COURTROOM CLERK:  So 44 and 45.

16         MR. HUNSINGER:  Yes.

17         (Exhibits 44, 45 admitted.)

18   Q.    Ms. da Silva, please turn to Petitioner's Contested

19   Exhibit 7 -- sorry, Petitioner's Contested Exhibit 8.

03:04 20        MS. JAMES:  Same objection, Your Honor.

21         THE COURT:  So we're skipping 7 and going right to 8?

22         MR. HUNSINGER:  Correct.

23         THE COURT:  Yes, same, unless we get a teacher to talk

24   about these.

25   Q.    Ms. da Silva, in November of 2022, did you receive this

A324

1    message?

2    A.    Yes.

3    Q.    And this was the second time in the fall of 2022 that

4    somebody had reached out to you about Arthur's behavior in

5    class, correct?

6    A.    Yes.

7    Q.    What did you do in response to this text message?

8    A.    Exactly what I told, what I said before.

9              MR. HUNSINGER:  Move to have that one admitted as

03:05 10    Exhibit 46, again with the stipulation that it won't be for the

11    truth of the matter asserted.

12              THE COURT:  Yes.

13              MR. MATTHEWS:  Sorry.  James Matthews, Your Honor.

14    Can we be clear on the record that this is also admitted not

15    for the truth of the matter.

16              THE COURT:  Yes.

17              MR. MATTHEWS:  Thank you.

18              (Exhibit 46 admitted.)

19    Q.    Turn to Petitioner's Contested Exhibit 9.

03:06 20              THE COURT:  Karen, that was admitted as 47?

21              COURTROOM CLERK:  46.

22              THE COURT:  What was 5 admitted as?

23              COURTROOM CLERK:  44.

24              MR. HUNSINGER:  Eight was 46.  That's what I have.

25              THE COURT:  Sorry.  I was one off.

1   Q.    Petitioner's Contested Exhibit 9, please.

2         MS. JAMES:  We have the same objection, Your Honor.

3   Q.    Ms. da Silva, did you receive this text message in

4   December of 2022?

5   A.    Yes, but I cannot read it because it's in English.

6   Q.    Ms. da Silva, in response to this message, what did you

7   do?

8         MS. JAMES:  Objection, Your Honor.  She just said she

9   can't understand it.

03:07 10        THE COURT:  Hold on.  Translate it.

11  Q.    Ms. da Silva, this message says, "Arthur had made fun of

12  another student's work and tried to take his paper.  The other

13  student put his foot out to keep Arthur away from him.  I

14  reviewed expectations of using respectful language."

15  A.    Okay.

16  Q.    What did you do in response to this message?

17  A.    All the complaints about Arthur from the school I did

18  exactly what I said, and I'm repeating.  I tried to listen to

19  both sides.  So I go to school and I try to understand the

03:10 20  facts, how it happened.  And as I said, we also talked to

21  Arthur, and I try to teach him about what is wrong and what is

22  right.

23        MR. HUNSINGER:  Your Honor, I would ask that Exhibit 9

24  be entered into evidence as number 47.

25        THE COURT:  Yes.

A326

           1          MR. HUNSINGER:  With the stipulation that it's not for

           2    the truth of the matter asserted.

           3          THE COURT:  Yes, same understanding.

           4          (Exhibit 47 admitted.)

           5    Q.   Ms. da Silva, please turn to Petitioner's Contested

           6    Exhibit 10.

           7          MS. JAMES:  Same objection, Your Honor.

           8          THE COURT:  Sustained on the same basis.

           9          MR. HUNSINGER:  Would you be willing to stipulate that

    03:11 10    Contested Exhibit 10 and Contested Exhibit 11, to the extent

          11    that we intend to introduce them, would also both be introduced

          12    not for the truth of the matter asserted, just to save a little

          13    bit of time?

          14          THE COURT:  Yes, assuming they're the same.

          15          MR. HUNSINGER:  Yes, they're the same, the text

          16    messages between Ms. da Silva and school employees.

          17          THE COURT:  Yes.

          18    Q.   Contested Exhibit 10, I'm sorry, did you receive this

          19    message in December of 2022?

    03:11 20    A.   Yes.

          21    Q.   This text message says, "Hi Jessica.  I wanted to let you

          22    know that I met with Arthur today because he was not listening

          23    to the teacher.  He was crawling on the floor, shouting and not

          24    completing work."

          25    A.   Okay.

1    Q.    Ms. da Silva, what did you do in response to this text

2    message?

3    A.    Same thing as I answered before of the other questions.  I

4    sat down, talked to him.

5    Q.    Ms. da Silva, at any point did you take any other approach

6    with Arthur when his behavior didn't improve?

7    A.    So I believe that conversation is the best way to fix

8    this.  Because, as I said, I had the same approach.  My way of

9    correcting this is to talk to Arthur and tell him what is wrong

03:14 10   and what is right to do.  But sometimes I take away some

11   amusement things, like video games from him.  But for me the

12   best punishment -- I'm sorry.  Strike that.  So I take away the

13   video games from him as a punishment, but my best, for me, my

14   best, the ideal in the situation is conversation.

15   Q.    Ms. da Silva, please turn to Petitioner's Contested

16   Exhibit 11.  Ms. da Silva, did you receive this text message in

17   February of 2024?

18         INTERPRETER:  For the record, the mother wants the

19   interpreter to translate the message.

03:15 20   MR. HUNSINGER:  I'm getting there.  I'm getting there.

21   Q.    Did you receive this message in February of 2024?

22   A.    Yes, it is here, right.

23   Q.    Beginning in the middle, starting with, "Unfortunately,"

24   "Unfortunately, today he was having trouble keeping his body in

25   those spaces today and needed many reminders.  I spoke with him

A328

     1    about this behavior and let him know I would be telling you as

     2    well."

     3         Ms. da Silva, what did you do in response to this text

     4    message?

     5    A.   The same thing as I answered before.

     6    Q.   So between November of 2022 and February of 2024, you

     7    received multiple text messages from the school about Arthur's

     8    inability to behave in class, and the only thing you ever did

     9    was talk to him?

03:17 10              MS. JAMES:  Objection, misrepresents the testimony.

    11              THE COURT:  Overruled.  She can respond.

    12    A.   Yes.

    13              MR. HUNSINGER:  Just as a housekeeping matter,

    14    Petitioner's Contested Exhibit 10 and Petitioner's Exhibit 11,

    15    with the stipulation about it not being for the truth of the

    16    matter asserted, I'd move those into evidence as 48 and 49.

    17              THE COURT:  Yes.

    18              (Exhibits 48, 49 admitted.)

    19    Q.   Ms. da Silva, isn't it true that you signed up Arthur for

03:17 20    soccer only in August of 2024?

    21    A.   Yes, I can't recall the date, but I believe, yes.

    22    Q.   The date is in Joint Exhibit 5.  This is August 2024

    23    Monthly Fee For Practice, correct?

    24    A.   Yes.

    25    Q.   Is Arthur still participating in this soccer program?

```
 1   A.   Yes, he is.

 2   Q.   But he only began in August of 2024, correct?

 3   A.   Yes.

 4   Q.   So between March of 2022 and August of 2024, Arthur was

 5   not participating in any extracurricular activities.  Is that

 6   correct?

 7   A.   No, no.

 8   Q.   It's not correct.  So what activities was he participating

 9   in between March of 2022 and August 2024?

03:19 10          INTERPRETER:  For the record, it's a double no.

11          MR. HUNSINGER:  I'm sorry?

12          INTERPRETER:  For the record, the Portuguese form in

13   Brazil would say no as a question like that, it's a double no.

14   Q.   So the answer is yes?

15   A.   Yes, yes.

16   Q.   So he was not participating in any extracurricular

17   activities between March of 2024 and August of 2024 -- March of

18   2022.  Sorry.

19   A.   Yes, before he was registered for soccer, no.

03:20 20   Q.   Isn't it true that Arthur does not attend church with you

21   currently?

22          INTERPRETER:  Could you repeat.

23   Q.   Isn't it true that Arthur does not attend church with you

24   currently?

25   A.   We don't go every Sunday, it's regularly, but sometimes
```

A330

1    two Sundays a month we go.

2    Q.    When you go to church is it in Portuguese or is it in

3    English?

4    A.    Portuguese.

5    Q.    When was the last time Arthur spent any time with any of

6    his friends outside of school and soccer?

7    A.    Can you ask the question again, please.

8    Q.    When was the last time Arthur spent any time with friends

9    outside of school and soccer?

03:22 10    A.    We went to a party on a weekend where he met some friends.

11    Q.    When, what date?

12    A.    Last Saturday.  I don't know the date.

13    Q.    So other than soccer, school and church, Arthur

14    participates in no activities, correct?

15    A.    Correct.

16    Q.    When you arrived in Massachusetts in 2022, did Arthur go

17    to school the first day of that school year?

18    A.    When I arrive, the school is supposed to start at the end

19    of August to the beginning of September, and that's when he

03:24 20    started.

21    Q.    What date did he start in 2022?

22    A.    I'm not sure at the end of August or beginning of

23    September.  It's somewhere in between both.  But I believe it

24    was September.

25    Q.    Did Arthur attend the first day of school in 2022?

A331

1   A.    Yes.

2   Q.    Please turn to Joint Exhibit 39.  On the first page

3   9/19/22, it says, "Original U.S. entry."  Is it your testimony

4   that September 19 was the first day of school in 2022?

5   A.    I didn't understand the question.

6   Q.    Was September 19, 2022 the first day of school for the

7   2022/2023 school year?

8   A.    I believe so.  I don't recall the date.

9           MR. HUNSINGER:  Your Honor, I have very little left,

03:26 10   but I'm hesitant to start a new topic.

11          THE COURT:  That's fine.  We can recess for the day

12   and you can pick up tomorrow morning.

13          MR. HUNSINGER:  I have very little.

14          THE COURT:  That's fine.  I'm not rushing anybody.

15   That's fine.  9:30 tomorrow.

16          MS. CROWLEY:  That works well.

17          THE COURT:  Looking at my calendar, 9:30 to 3:00?

18          MS. CROWLEY:  That works great, Your Honor.

19          THE COURT:  All right.  I have another matter at 9:00

03:27 20   on the bench, but I'll stay on the bench when that is over, and

21   if there's anything anyone wants to talk about before we get

22   started, I'll be here.

23          Does someone want to explain to the petitioner that

24   we're done and what time we're resuming tomorrow.

25          MS. JAMES:  If we can have the interpreter, we'll talk

A332

1    with her after.

2         MS. CROWLEY:  Before we sign off of the Zoom, would

3    you be able to just let the petitioner know 9:30 tomorrow

4    morning, same link.  We're going to conclude for today and he

5    can sign off.  Thank you so much.

6         (Recessed, 3:27 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Kelly Mortellite, Registered Professional

4    Reporter, Registered Merit Reporter and Certified Realtime

5    Reporter, in and for the United States District Court for the

6    District of Massachusetts, do hereby certify that the foregoing

7    transcript is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter to the best of my skill and ability.

10                    Dated this  4th day of November, 2024.

11

12               /s/ Kelly Mortellite

13               _____

14               Kelly Mortellite, RPR, RMR, CRR

15               Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


                                    )
EDERVALDO RODRIGUES DA SILVA,       )    Civil Action:  24-11280-ADB
                                    )
         Plaintiff/Petitioner,      )
                                    )
v.                                  )
                                    )
JESSICA SILVEIRA DA SILVA and       )
GILBERTO LUCAS,                     )
                                    )
         Defendants/Respondents.    )
                                    )


BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE


BENCH TRIAL DAY TWO


October 16, 2024
9:52 a.m.


John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

A335

1    APPEARANCES:

2    Counsel on behalf of Petitioner:

3    Elizabeth G. Crowley, Esq.
     Charles R. Hunsinger, Esq.
4    Bowditch & Dewey LLP
     101 Federal Street #1405
5    Boston, MA 02110
     (617) 757-6500
6    ecrowley@bowditch.com
     chunsinger@bowditch.com

7

8    Counsel on behalf of Respondents:

9    James Matthews, Esq.
     Ruben J. Rodrigues, Esq.
10   Lea Gulotta James, Esq.
     Olivia Rae King Benjamin, Esq.
11   Jamie Steven, Esq.
     Amani Kmeid, Esq.
12   Foley & Lardner LLP
     111 Huntington Avenue, Suite 2500
13   (617) 342-4000
     rrodrigues@foley.com
14   ljames@foley.com
     obenjamin@foley.com
15   jsteven@foley.com
     akmeid@foley.com

16

17

18

19

20

21

22

23

24

25

A336

1

2                              <u>CONTENTS</u>

3

4   <u>WITNESS</u>                                                    <u>PAGE</u>

5

    JESSICA SILVEIRA DA SILVA
6
       Continued Direct Examination By Mr. Hunsinger          6
7      Cross-Examination By Ms. James                     11, 76

8   BRUNA COUTINHO

9      Direct Examination By Ms. Benjamin                    44
       Cross-Examination By Ms. Crowley                      54
10
    JALMAR DOS SANTOS
11
       Direct Examination By Ms. Steven                      68
12     Cross-Examination By Mr. Hunsinger                    74

13

14

15

16

17

18

19

20

21

22

23

24

25

A337

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3      before the Honorable Allison D. Burroughs, United States
 4      District Judge, United States District Court, District of
 5      Massachusetts, at the John J. Moakley United States Courthouse,
 6      One Courthouse Way, Courtroom 17, Boston, Massachusetts, on
 7      October 16, 2024.)
 8                    THE COURT:  When you're ready.
 9                    INTERPRETER:  The interpreter needs to be sworn in.
09:53 10              THE COURT:  Only once.  You're still sworn in from
11      yesterday.
12                    INTERPRETER:  Thank you.
13                    THE COURT:  Where is the petitioner?
14                    MR. HUNSINGER:  He should be on the Zoom.  I thought
15      he was.
16                    COURTROOM CLERK:  He's connected.  He just doesn't
17      have his camera on.  You have to tell him to put it on.
18      There's no prompt to have him put his camera on.  Does he need
19      his camera on?
09:55 20              THE COURT:  Doesn't matter.  It's up to you whether
21      you need the video on.
22                    MS. CROWLEY:  I don't.  If the court would like to be
23      able to see him or the other side.  Doesn't matter.
24                    MS. JAMES:  I'd like to be able to see him, but I
25      don't want to delay, so if he can figure it out, that's great,
```

A338

|   |   |
|---|---|
| 1 | but I think we're okay to get going. |
| 2 | THE COURT:  Do you want to try to have him reboot? |
| 3 | MR. HUNSINGER:  Sure. |
| 4 | (Discussion off the record.) |
| 5 | THE COURT:  Are we hearing someone? |
| 6 | MS. CROWLEY:  I think his wife is there.  If we want |
| 7 | her to step to the other side, that's fine. |
| 8 | THE COURT:  But why? |
| 9 | MS. CROWLEY:  I think she's helping him with the |
| 10:02 10 | connection right now.  I saw her profile trying to help him. |
| 11 | (Discussion off the record.) |
| 12 | MS. CROWLEY:  Is it good now? |
| 13 | COURTROOM CLERK:  Yes, but I'm going to mute him. |
| 14 | MS. CROWLEY:  Okay. |
| 15 | MS. JAMES:  Your Honor, I wanted to raise one |
| 16 | housekeeping thing before we get started.  We have other |
| 17 | witnesses here.  I'm not aware that at this point we have a |
| 18 | witness sequestration order, but I just wanted to check with |
| 19 | you and with counsel to see if we had preferences about them |
| 10:03 20 | not listening to other witnesses' testimony. |
| 21 | MS. CROWLEY:  I would prefer that they be sequestered. |
| 22 | THE COURT:  Let's have them sequestered. |
| 23 | MS. JAMES:  Okay.  Can we ask that the interpreters |
| 24 | ask our witnesses to stay outside.  Just so you're aware, this |
| 25 | is Gilberto, the other respondent in this matter, so we intend |

```
 1    to have him stay here.
 2            MR. HUNSINGER:  May I proceed?
 3            THE COURT:  Of course, yes.
 4    CONTINUED CROSS-EXAMINATION BY MR. HUNSINGER:
 5    Q.   Ms. da Silva, good morning.
 6    A.   Good morning.
 7    Q.   May I just remind you that you remain under oath.
 8    A.   Okay.
 9    Q.   You presently work as a housecleaner, correct?  You
10    presently work as a housecleaner, correct?
11            THE COURT:  Put the microphone on their table so
12    you're talking towards it.  Use their microphone.
13    Q.   All right.  You presently work as a housecleaner, correct?
14    A.   Yes.
15    Q.   And you testified at your deposition that you work four
16    days in a week at most, correct?
17    A.   Yes.
18    Q.   And you testified also at your deposition that two days is
19    the fewest number of days you work in a week, correct?
20    A.   During the week?
21    Q.   Each week, you work between two and four days.  Is that
22    correct?
23    A.   Yes, yes.
24    Q.   And you further testified that you earn approximately $150
25    a day.  Is that correct?
```

A340

```
 1    A.    Correct.

 2    Q.    Is it accurate then to say that four days a week at $150

 3    each day is the most you earn in a week?

 4    A.    Exactly.

 5    Q.    You testified at your deposition that your husband

 6    Gilberto earns $2,150 a week.  Is that correct?

 7    A.    Yes.

 8    Q.    Is it your testimony then that Gilberto makes over

 9    $100,000 a year?

10    A.    I don't recall I had said that.

11    Q.    Would you agree with me that $2,000 a week times 52 weeks

12    a year is over $100,000?

13    A.    Yes, making the math, yes.

14    Q.    And you further testified that Gilberto works at a

15    carpentry company, correct?

16    A.    Yes, yes, carpentry.

17    Q.    What type of carpentry does Gilberto do?

18    A.    What do you mean which kind of carpentry?

19    Q.    Exactly.  What kind of carpentry?  Does he build kitchen

20    cabinets?

21    A.    I don't understand very well.

22    Q.    Does Gilberto build houses?

23    A.    Yes, it's related to it.

24    Q.    I'm sorry?

25    A.    It is related to it.
```

10:07 appears at line 10
10:08 appears at line 20

|    |    |    |
|----|----|----|
| 1  | Q. | How much is your rent each month, Ms. da Silva? |
| 2  | A. | 2,150. |
| 3  | Q. | Have you ever been late on your rent payments? |
| 4  | A. | No. |
| 5  | Q. | Do you have any debt, Ms. da Silva? |
| 6  | A. | No. |
| 7  | Q. | Do you have any credit cards? |
| 8  | A. | Yes. |
| 9  | Q. | Do you carry a balance on those credit cards? |
| 10:09 10 | A. | Yes. |
| 11 | Q. | How much? |
| 12 | A. | 300. |
| 13 | Q. | Do you have a driver's license, Ms. da Silva? |
| 14 | A. | No. |
| 15 | Q. | Do you have a learner's permit? |
| 16 | A. | Yes. |
| 17 | Q. | Ms. da Silva, how many friends does Arthur have?  How many |
| 18 |    | friends does Arthur have? |
| 19 | A. | I may say four or five. |
| 10:10 20 | Q. | How many of those friends speak Portuguese as their first |
| 21 |    | language? |
| 22 | A. | All of them. |
| 23 | Q. | How many immigrated from Brazil? |
| 24 | A. | I don't know.  I cannot -- I don't know what to say. |
| 25 | Q. | How many of them have parents who immigrated from Brazil? |

```
  1   A.    I don't know.  They are immigrants, but I don't know.
  2   Q.    Ms. da Silva, you testified at your deposition that Arthur
  3   missed Brazil and missed his family members, isn't that
  4   correct?
  5   A.    Yes.
  6   Q.    Would you say that's still true today?
  7   A.    I believe that all of us who are here far away from the
  8   family, we miss the family.  It's a normal feeling, common.
  9   Q.    And Ms. da Silva, you testified at your deposition that in
10:13 10   August of 2024 you took a trip to New York.  Is that correct?
 11   A.    Yes.
 12   Q.    And that Arthur was on this trip.  Is that correct?
 13   A.    Correct.
 14   Q.    And you're aware, Ms. da Silva, that this court entered an
 15   order prohibiting you from removing the minor child from
 16   Massachusetts, correct?
 17         INTERPRETER:  I couldn't hear.
 18   Q.    Are you aware that the court entered an order prohibiting
 19   you from removing the minor child from Massachusetts?
10:13 20   A.    No, when we traveled, I didn't know.
 21   Q.    Are you aware of that order now?
 22         THE COURT:  I think the interpreter needs to -- I
 23   think you need to speak more into the microphone to make sure
 24   the petitioner can hear you.
 25         Actually, Karen, he can understand the witness
```

A343

```
 1    testimony.
 2              COURTROOM CLERK:  Yeah, but not --
 3              THE COURT:  You have to make sure the petitioner can
 4    understand the questions.  He can get the answers from her.
 5    Thank you.
 6    A.    I didn't know at that time.
 7    Q.    Are you aware now?
 8    A.    Yes, I acknowledge after.
 9              MR. HUNSINGER:  One moment, please.  I'm all set.
10:15 10         MS. JAMES:  So Your Honor, understanding that we're
11    calling the witness once, I have no questions on cross but
12    would like to begin my direct examination of the witness as
13    part of my case-in-chief, so I'd ask whether petitioner intends
14    to present any other witnesses and, if not, I would ask that
15    they rest.
16              MR. HUNSINGER:  We have no other witnesses in our
17    case-in-chief, Your Honor.
18              THE COURT:  Okay.
19              MR. HUNSINGER:  We reserve our right to recross this
10:16 20    witness or redirect.
21              THE COURT:  Yes.
22              MS. JAMES:  Yes.  So, Your Honor, before I begin my
23    examination of Ms. da Silva, I would like to put a motion forth
24    for resolution.  And that would be a motion for a judgment on
25    partial findings pursuant to Federal Rule of Civil Procedure 52
```

1    with regards to respondent Gilberto Lucas.  If you'll allow me

2    to present, I'll briefly --

3              THE COURT:  Well, the motion is preserved.  Is there

4    any need, is there any reason why we have to resolve it right

5    now rather than getting to the testimony and then doing it

6    during the break or after court or in the morning?

7              MS. JAMES:  I'm fine with doing it at the break.

8              THE COURT:  It's preserved.

9              MS. JAMES:  Thank you.  I'm going to turn this a

10:17 10   little bit this way.  Do you mind moving the exhibits a little

11   closer.

12   CROSS-EXAMINATION BY MS. JAMES:

13   Q.   Good morning, Jessica.

14   A.   Good morning.

15   Q.   Could you please just state your full name again for the

16   record.

17   A.   Jessica Silveira da Silva.

18   Q.   When were you born?

19   A.   In Brazil.

10:17 20   Q.   What date were you born?

21   A.   September 23 of 1992.

22   Q.   And where do you live now, Ms. da Silva?

23   A.   Here in United States, Massachusetts.

24   Q.   How long have you lived in Massachusetts?

25   A.   It's been about three years.

1    Q.    And you know the petitioner, Edervaldo Rodrigues da Silva,

2    correct?

3    A.    Yes.

4    Q.    When did you first meet him?

5    A.    The date?

6    Q.    Yes, approximately.

7    A.    It was in 2011.

8    Q.    How old were you when you met?

9    A.    I believe I was 16 to 17 years old.

10:19 10    Q.    How old was he when you met?

11    A.    As I recall, I believe he was 23 years old.

12    Q.    How did you meet Mr. Rodrigues da Silva?

13    A.    He moved to the same street I used to live.

14    Q.    And I believe you testified earlier that you married on

15    May 13, 2011.  Is that right?

16    A.    Yes.

17    Q.    Where did you get married?

18    A.    I believe it was in Belo Horizonte, the city we used to

19    live.

10:20 20    Q.    Did you work while you were married to Mr. Rodrigues da

21    Silva?

22    A.    No.

23    Q.    Did Mr. Rodrigues da Silva work while you were married?

24    A.    There were periods he wasn't working and others that he

25    was working.

```
  1   Q.   When he was employed, what did he do for work?

  2   A.   I don't remember his first job.

  3   Q.   Do you know why he was not consistently employed while you

  4   were married?

  5   A.   As I remember, he was not employed for long time in any

  6   place.  He started working, then he worked for a few months and

  7   then he was fired again.

  8   Q.   Do you ever, do you remember any of the reasons that he

  9   lost his job?

10:22 10   A.   I believe it's because he was not going to work.

 11   Q.   You testified that you and petitioner have a son, correct?

 12   A.   Yes.

 13   Q.   And what's your son's name?

 14   A.   Arthur.

 15   Q.   When was Arthur born?  Was he born in Brazil?

 16   A.   May 4.

 17   Q.   I'm sorry?

 18   A.   2014, yes.

 19   Q.   And was he born in Brazil?

10:23 20   A.   In Belo Horizonte.

 21   Q.   Did you live with Mr. Rodrigues da Silva when Arthur was

 22   born?

 23   A.   Yes.

 24   Q.   And where did you live?

 25   A.   We lived in a house nearby Belo Horizonte.
```

A347

```
 1    Q.   Do you remember whether you rented or owned that house?

 2    A.   It was rented.

 3    Q.   Did anyone else live there with you?

 4    A.   No.

 5    Q.   And can you describe what that house was like?

 6    A.   There was one bedroom, one living room, one kitchen, and

 7    the bathroom.

 8    Q.   So did Arthur stay in your bedroom?

 9    A.   Yes.

10:24 10    Q.   While you were married to Mr. Rodrigues da Silva, did you

11    ever struggle with your finances?

12    A.   Yes.

13    Q.   Did you ever struggle to provide financially for Arthur?

14    A.   While I was married to him?

15    Q.   Yes, while you were married.

16    A.   When Arthur was born, he was employed, so we didn't have

17    any financial problem, difficulties.

18    Q.   At some point did you and Mr. Rodrigues da Silva separate?

19    A.   Yes.

10:26 20    Q.   Was that in or about 2016?

21    A.   I believe so.

22    Q.   Who initiated the separation?

23    A.   It was me because our relationship was not doing well.

24    Q.   Were you ever unfaithful during your marriage to

25    Mr. Rodrigues da Silva?
```

```
 1    A.    No.

 2    Q.    So why did you separate?

 3    A.    For me the marriage was already over.  That's why I

 4    thought the best thing is to separate because our relationship

 5    was not doing well.  We are having some issues at home and he

 6    was having some attitudes that I didn't like, like pornography

 7    and others, so that's why we separated.

 8    Q.    And after you separated, I believe you testified that you

 9    stayed in your home while Mr. Rodrigues da Silva moved out.  Is

10    that right?

11    A.    Yes.

12    Q.    Did Arthur continue to primarily live with you?

13    A.    Yes, yes.

14    Q.    Where did Mr. Rodrigues da Silva move after you separated?

15    A.    He went to live with his mother.

16    Q.    About how far from the house you were living in was his

17    mother's house?

18    A.    It was very nearby.

19    Q.    And did you eventually move out of that house with Arthur?

20    A.    Yes.

21    Q.    And where did you and Arthur move then?

22    A.    After that I went to live with my mother in her house.

23    Q.    And how far away from Mr. Rodrigues da Silva was your

24    mother's house?

25    A.    It was about 20 minutes by car because his mother was
```

1    picking up Arthur using bus transportation.

2    Q.    Why did you move in with your mom?

3    A.    At that moment I wasn't employed so I moved to live with

4    my mother in her house.

5    Q.    And after you separated did you and Mr. Rodrigues da Silva

6    struggle to provide financially?

7    A.    For many other reasons.  The problem with the money, the

8    disrespect, because of the pornography.  His attitudes relate

9    to some -- he was stealing things, he was robbing.  So it was

10:32 10    all together.

11          MR. HUNSINGER:  I'm going to object to that and move

12    to strike as nonresponsive.

13          THE COURT:  It's nonresponsive, but it's a bench

14    trial.  I'm going to overrule the objection.

15    Q.    After your separation and before your divorce did you have

16    an official custody agreement with Mr. Rodrigues da Silva?

17    A.    Before the divorce?

18    Q.    Yes, after your separation but before you officially

19    divorced.

10:33 20    A.    If you had any documentation or something?

21    Q.    Sure.  Let's start with that.  Did you have a written

22    custody agreement during that time?

23    A.    No, no.  We just separated.

24    Q.    Who did Arthur primarily live with during those years?

25    A.    With me, always with me.

|      |                                                              |
| ---- | ------------------------------------------------------------ |
| 1    | Q.   How did you and Mr. Rodrigues da Silva decide who Arthur |
| 2    | would live with?                                             |
| 3    | A.   We didn't talk about it.  When we separated, Arthur just |
| 4    | stayed with me.                                              |
| 5    | Q.   Did Mr. Rodrigues da Silva ever ask to have Arthur live  |
| 6    | with him during that time?                                   |
| 7    | A.   Not that I remember.                                     |
| 8    | Q.   After you separated but before the divorce, how often did |
| 9    | Mr. Rodrigues da Silva see Arthur?                           |

10:34

10    A.   It was very difficult to see him, just coming to see
11    Arthur, it was about two times a month, and then we couldn't
12    see him anymore.
13    Q.   Did Mr. Rodrigues da Silva ever fail to pick up Arthur
14    when he said he would during this time?
15          MR. HUNSINGER:  Objection, leading.
16          MS. JAMES:  I don't think that's a leading question,
17    Your Honor.  It's an open-ended question.
18          MR. HUNSINGER:  It assumes that my client failed to
19    pick up his child.

10:35

20          THE COURT:  No, it doesn't.  It says did he ever fail
21    to pick him up.  It's not leading.  Overruled.
22    A.   Yes.
23    Q.   About how many times?
24    A.   That he failed to pick him up?
25    Q.   Correct.

```
 1   A.   He didn't say anything when he failed to pick up Arthur.
 2   Well, he was supposed to pick him up every weekend, but he was
 3   picking him up about two times, two weekends a month.  So he
 4   left Arthur crying at home, waiting for him.  He was all ready
 5   to leave with the father that was supposed to pick him up, but
 6   he never appeared.
 7   Q.   During this time did you ever deny Mr. Rodrigues da Silva
 8   a request to see Arthur?
 9   A.   No.
10   Q.   Before you officially divorced was Mr. Rodrigues da Silva
11   assisting -- strike that.  Before you officially divorced was
12   Mr. Rodrigues da Silva paying child support?
13   A.   Yeah.  At the beginning he was paying for things that
14   Arthur liked, for example, cookies, things that he liked to
15   eat.  Then after that, he started paying child support in an
16   amount of 180 reals.
17   Q.   Do you know whether Mr. Rodrigues da Silva was
18   consistently employed during this time?
19   A.   No, I don't remember.
20   Q.   After you separated was Mr. Rodrigues da Silva ever
21   physically violent to you?
22   A.   Yes, it happened one day.
23   Q.   And can you describe that incident?
24   A.   Yes.  We were at my mother's house, so we are talking
25   about a food stamp that the company was giving to him.  And I
```

10:37 (line 10)
10:39 (line 20)

```
 1    was trying for an agreement with him so he would give me the
 2    food stamp and I would be able to buy things for Arthur.
 3         Okay.  So we had that argument because he didn't want to
 4    give me the card.  So I tried to take the card from him, and he
 5    twist my arm -- my hand, sorry.  And so I called the police
 6    because of what happened.  But when the police arrive, he was
 7    not there anymore.  He had left.
 8    Q.   Where was Arthur when this incident occurred?
 9    A.   He was in the same house but in a different room.
10    Q.   You said you called the police.  Did the police come to
11    the house?
12    A.   Yes.
13    Q.   And I believe you testified that Edervaldo was not there
14    when the police came.  Is that right?
15    A.   Yes.
16    Q.   Where was he?
17    A.   I've learned that he had left.
18    Q.   And where was Arthur at that time?
19    A.   Arthur went with him.
20    Q.   Did Edervaldo tell you that he was taking Arthur?
21    A.   No.
22    Q.   And did you know where they had gone?
23    A.   For his house -- to his house.
24    Q.   Did he tell you that they went to his house?
25    A.   No, he didn't say.  I just imagined.
```

```
 1   Q.    Is there a police report of this incident?

 2   A.    Yeah.   So the police officer asked me if I would like them

 3   to go to where Edervaldo was, but because he have Arthur with

 4   him, I told them not to go because I didn't want Arthur to see

 5   anything.

 6   Q.    At what point was Arthur returned to you?

 7   A.    I don't recall.

 8   Q.    When did you and Mr. Silveira da Silva officially divorce?

 9   A.    The date?

10:44 10  Q.    The date or approximately the date.

11   A.    I don't remember.

12   Q.    Were you separated the entire time between your separation

13   and your divorce?

14   A.    We were back for a while, but then we just separated until

15   the divorce came.

16   Q.    Who filed for divorce?

17   A.    He did.

18   Q.    And why did he file for divorce, if you know?

19   A.    I believe it's because he was in another relationship and

10:46 20  he wanted us to have things resolved.

21   Q.    Were you represented by an attorney during your divorce

22   proceedings?

23   A.    No.

24   Q.    Was Mr. Rodrigues da Silva represented by an attorney

25   during your divorce proceedings?
```

1   A.   The first hearing I wasn't able to be present because I

2   couldn't leave the job at that time, so I went there to resolve

3   the situation regarding Arthur at the next hearing.

4   Q.   And do you know whether Mr. Rodrigues da Silva had a

5   lawyer at those hearings?

6   A.   Yes, I believe, yes.

7   Q.   Who drafted your divorce agreement, if you know?

8   A.   I don't know.

9   Q.   After your divorce, who did Arthur live with primarily?

10:48  10   A.   With me.

11   Q.   How often did Mr. Rodrigues da Silva see Arthur after your

12   divorce?

13   A.   The frequency was every other weekend.  It was about that.

14   Q.   After signing the divorce agreement did Mr. Rodrigues da

15   Silva pay child support?

16   A.   Yes.

17   Q.   How much?

18   A.   Went up to 240.

19   Q.   Did he pay consistently?

10:49  20   A.   After the divorce, yes.

21   Q.   Do you know whether Mr. Rodrigues da Silva was employed

22   after your divorce?

23   A.   If he was employed?

24   Q.   Yes.

25   A.   I don't know, no, I don't know.

 1    Q.    Do you know whether Mr. Rodrigues da Silva is currently

 2    employed?

 3    A.    No, not at this moment.

 4    Q.    Let me ask a clarifying question.  You don't know right

 5    now or he is not employed?

 6    A.    I know that he's not employed.

 7    Q.    To your knowledge has Mr. Rodrigues da Silva ever been

 8    officially diagnosed with any mental health conditions?

 9              THE COURT:  Can I just ask the interpreter, you need

10:50 10    to talk into the microphone.  I don't think the petitioner can

11    hear you.

12              MS. JAMES:  I'm okay if we want to ask him if he's

13    understanding the questions.

14              INTERPRETER:  Could you ask the question again,

15    please.

16              MS. JAMES:  Give me one second.  Do we want to confirm

17    that he's understanding?

18              MS. CROWLEY:  I think it's more hearing.

19              MS. JAMES:  Right, hearing the translations.  Can we

10:51 20    just confirm with the petitioner whether he's hearing and

21    understanding the translations of the questions.

22              INTERPRETER:  He's muted.

23              THE COURT:  Yes, okay.

24              EDERVALDO DA SILVA:  It was a little bit low.

25              MS. JAMES:  I will ask my question again.

1   Q.   To your knowledge has Mr. Rodrigues da Silva ever been

2   officially diagnosed with any mental health conditions?

3   A.   Yes, I learned.

4   Q.   And what mental health conditions are those?

5   A.   He said it was anxiety.

6   Q.   To your knowledge was Mr. Rodrigues da Silva diagnosed

7   with any mental health conditions while you were married?

8   A.   No.

9   Q.   Has Mr. Rodrigues da Silva ever told you that he was

10:52 10   having issues with his mental health?

11   A.   Yes.  We had a conversation and he mention that he was

12   hearing voices telling him to kill himself and he show me a

13   picture of a medicine that he was taking, and in Brazil we call

14   it black label.

15   Q.   And do you remember what year this occurred?

16   A.   No, I do not remember the year.

17   Q.   Was it after you separated?

18   A.   Yes.

19   Q.   Was it while you were still living in Brazil?

10:54 20        MR. HUNSINGER:  Objection.

21   A.   Yes.

22        THE COURT:  Hold on.  Basis?

23        MR. HUNSINGER:  Leading.

24        THE COURT:  Overruled.

25   A.   Yes.

1    Q.   How did you feel when he told you that he was hearing

2    voices?

3    A.   I didn't know what was going to happen to Arthur in this

4    situation, what kind of voices he was hearing and what these

5    voices were telling him.

6    Q.   At this time was Arthur spending time with Mr. Rodrigues

7    da Silva while you weren't there?

8    A.   Yes.

9    Q.   Were there any other incidents that made you concerned for

10:56 10  Mr. Rodrigues da Silva's mental health?

11   A.   There was some moments that I was worried while we were

12   married.  I cannot exactly say that these were mental illness

13   but there was a moment that he was sleeping, we were sleeping

14   together and he stood up, walked through the house and hit the

15   window with his foot and jumped over the window.  So this is

16   very -- it's a very worried situation.

17           MS. JAMES:  Did we lose the petitioner?

18           THE COURT:  We lost the petitioner.

19           MS. JAMES:  I think it was during this question.

10:57 20         THE COURT:  We'll repeat the answer.

21           MS. JAMES:  Yes.

22           THE COURT:  Let's get him back.

23           He's back.  I'm going to read back the answer and the

24   question, if you could interpret for the petitioner, okay?

25           (Last question and answer read back.)

```
 1              MS. JAMES:  He's gone again.
 2              MS. CROWLEY:  Ms. Folan, if you don't see him connect
 3      fairly quickly, let us know, and if we need to move forward
 4      without him, we can do that.
 5              MR. HUNSINGER:  We're happy to move forward without
 6      him just in the interest of time.
 7              THE COURT:  Do you have any reason to believe he has
 8      voluntarily disconnected himself?
 9              COURTROOM CLERK:  Hold on.  He's trying to join.
11:02 10        MS. CROWLEY:  My guess is based on the connectivity
11      issue this morning.
12              THE COURT:  He's back.
13              MS. CROWLEY:  Madam Interpreter, can we ask him if has
14      a connectivity issue.
15              INTERPRETER:  I believe he cannot hear us now.  I
16      asked if he could hear us.  He did not answer.
17              THE COURT:  Karen, is he showing connected?
18              COURTROOM CLERK:  Yes, it's showing he's connected.
19              THE COURT:  Try again, ask him if he can hear us,
11:02 20        please.  Okay.
21              (Last question and answer read back.)
22              THE COURT:  Now ask your next question, please.
23      Q.   When did this happen?
24      A.   This incident happened at the beginning of the
25      relationship.
```

        1    Q.    To your knowledge has Mr. Rodrigues da Silva ever engaged

        2    in any illegal activity?

        3    A.    He did things that for me was illegal, as I mentioned

        4    before, that he robbed.

        5    Q.    Sorry.  He robbed?

        6    A.    Robbed.

        7    Q.    Okay.  And can you describe what you're talking about when

        8    you say he robbed?

        9    A.    At that moment we were living in a rented house, and there

11:06   10    were other rented houses nearby with many neighbors.  So in the

       11    morning he said goodbye and told me that he was going to work.

       12    Then I went back to sleep.  Then he came back home.  He didn't

       13    go to work, but he jumped over the neighbor's area and came

       14    back with a cell phone.

       15    Q.    When did this occur?

       16    A.    I don't remember, but we've been in this relationship for

       17    about two years.

       18    Q.    Was it while you were married?

       19    A.    Yes.

11:07   20    Q.    How did you know he had taken the cell phone from a

       21    neighbor's house?

       22    A.    Because he arrived home and told me.

       23          THE COURT:  We lost the petitioner again.

       24          MS. CROWLEY:  I was going to ask if you wanted me to

       25    take another pause.  Madam Interpreter, if he comes back on, if

1    you could kindly ask him, as I mentioned before, if it's a

2    connectivity issue so that we know what's going on.

3        MS. JAMES:  Would you like me to wait for him?

4    Because I will.

5        MS. CROWLEY:  Give it a minute.  If not, we can

6    continue.  Please.

7        INTERPRETER:  The connection is pretty bad.

8        MR. HUNSINGER:  Will you please ask him if he's

9    willing to let us continue when he drops off?

11:10 10        MR. RODRIGUES DA SILVA:  Okay.

11        MS. JAMES:  Do we want to repeat the last answer for

12    him, or should I just move on?

13        THE COURT:  The last question was:  How did you know

14    he had taken the cell phone from a neighbor's house.  The

15    answer was:  Because he arrived home and told me.

16    Q.    Did you report this to the police?

17    A.    No.

18    Q.    Why not?

19    A.    Well, not that I didn't know what happened.  I was not

11:11 20    collaborating with that.  I told him, I was telling him that it

21    was not the right thing to do, because it happened other times

22    and I told him that this attitude was putting us at risk in

23    front of the neighbors.

24    Q.    You said it happened other times.  About how many more

25    times did these breaking-and-entering incidents occur that

1 you're aware of?

2   THE COURT:  Sustained, sustained.  Ask a different

3 question.

4   MS. JAMES:  Okay.  Would you like me to rephrase or

5 move on, Your Honor?

6   THE COURT:  You have to rephrase.  Breaking and

7 entering was a mischaracterization, a prejudicial

8 mischaracterization.

9 Q.  How many times did these types of incidents occur that

11:12 10 you're aware of?

11   MR. HUNSINGER:  Objection.

12   THE COURT:  Overruled.

13 A.  As I remember, it was three times.

14 Q.  Do you know respondent Gilberto Lucas?  Do you know

15 respondent Gilberto Lucas?

16   INTERPRETER:  I couldn't understand what you said.

17 Q.  Respondent Gilberto Lucas.

18 A.  Relating to what?

19 Q.  Are you familiar with him?

11:13 20 A.  Yes.

21 Q.  And when did you meet Mr. Lucas?

22 A.  I met him in Brazil.

23 Q.  And when was that?

24 A.  It was in 2021.

25 Q.  And did you start dating at that time?

```
 1    A.    Yes.
 2    Q.    When did you start planning to move to the United States?
 3    A.    When?
 4    Q.    Yes.
 5    A.    It was the end of 2021 to the beginning of 2022 when I
 6    started talking about it to Gilberto.
 7    Q.    At that time was Gilberto still in Brazil?
 8    A.    No.  He was already here.
 9    Q.    Did you always plan to take Arthur with you to the United
11:15 10    States?
11    A.    Yes.
12    Q.    At some point did you tell Mr. Rodrigues da Silva that you
13    planned to leave Brazil with Arthur?
14    A.    Yes, many times.
15    Q.    Did you need to get Mr. Rodrigues da Silva's authorization
16    to travel with Arthur?
17    A.    Yes.
18    Q.    And did you ask him to sign a passport and travel
19    authorization form?
11:16 20    A.    Yes, yes.
21    Q.    Did you ever go to Mr. Rodrigues da Silva's work to ask
22    him to sign a passport authorization form?
23    A.    No.
24    Q.    Did you understand that the passport would give you the
25    authority to travel with Arthur?
```

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   And did you tell Mr. Rodrigues da Silva why you wanted a |
| 3 | passport for Arthur? |
| 4 | A.   Yes. |
| 5 | Q.   And why did you want that passport? |
| 6 | A.   So we could come to U.S. |
| 7 | Q.   Did you tell Mr. Rodrigues da Silva that you planned to |
| 8 | move to the United States or to come to visit? |
| 9 | MR. HUNSINGER:  I would object to that question. |
| 11:17 10 | Needs to be rephrased. |
| 11 | THE COURT:  Well, why don't you try rephrasing it. |
| 12 | Q.   Did you tell Mr. Rodrigues da Silva that you planned to |
| 13 | use the passport to move with Arthur to the United States? |
| 14 | A.   Yes. |
| 15 | Q.   And did Mr. Rodrigues da Silva sign a passport application |
| 16 | for Arthur? |
| 17 | A.   Yes. |
| 18 | Q.   Can I ask you to turn in the Joint Exhibit binder to |
| 19 | Exhibit 6, please. |
| 11:18 20 | A.   Okay. |
| 21 | Q.   That first page is in Portuguese and page 0003 is in |
| 22 | English. |
| 23 | A.   Yeah. |
| 24 | Q.   You have it in front of you? |
| 25 | A.   Yes. |

         1   Q.   Do you recognize this document?

         2   A.   Yes.

         3   Q.   And what is it?

         4   A.   This is a document that we sign for the passport.

         5   Q.   And can you read beginning at the top of the document?

         6   A.   Yes.  Standard Form to Request the Passport to a Minor

         7   that's including the authorization to international travel in

         8   the passport -- standard passport to travel with one of the

         9   parents or none -- or an adult with him with broad power.

11:20   10   Q.   Thank you.  What did you understand this to mean?

        11   A.   If he sign it, we are authorizing the minor Arthur to

        12   travel.

        13   Q.   And can you look towards the bottom of the document and

        14   tell me what date it was signed.

        15   A.   It was February 3, 2022.

        16   Q.   And underneath that, is that your signature there?

        17   A.   Yes.

        18   Q.   And do you recognize the other signature?

        19   A.   Yes.

11:22   20   Q.   Whose signature is it?

        21   A.   Edervaldo's.

        22   Q.   Did Mr. Rodrigues da Silva need to physically come to an

        23   appointment with you to sign this form?

        24   A.   Yes.

        25   Q.   Where was that appointment?

 1    A.    When?

 2    Q.    Where?

 3    A.    At the federal police where we request a passport.

 4    Q.    Was Arthur eventually issued a passport?

 5    A.    Yes.

 6    Q.    Could you turn to the next exhibit, which is Exhibit 7 in

 7    the same binder?  Do you have it in front of you?

 8    A.    Yes.

 9    Q.    Do you recognize this document?

11:23 10    A.    Yes.

11    Q.    What is it?

12    A.    It's Arthur's passport.

13    Q.    Do you see towards the bottom of the document your name?

14    A.    Yes.

15    Q.    Can you read the sentence that is after your name on the

16    passport?

17    A.    Yes.  The minor as the owner of this passport is

18    authorized by both parents during the term of this passport to

19    travel alone or with one of the parents, one way, one or the

11:24 20    other.

21    Q.    And what did you understand that to mean?

22    A.    That the passport authorizes him to travel alone or with

23    one of the parents.

24    Q.    Did Mr. Rodrigues da Silva ever tell you that he had

25    attempted to cancel Arthur's passport?

```
 1   A.   Yes.

 2   Q.   And do you remember where you were when he told you that?

 3   A.   I was still in Brazil.

 4   Q.   Do you remember what date he told you that he had

 5   attempted to cancel the passport?

 6   A.   No, I don't remember the date.

 7   Q.   Do you -- do you know -- strike that.

 8        When you were getting ready to travel to the United

 9   States, was Mr. Rodrigues da Silva aware of when you were

 10  leaving?

 11  A.   That day we were having a conversation, because he told me

 12  that he had canceled the passport, but I didn't believe he did

 13  that, and we had this argument because he didn't show up to see

 14  Arthur to say goodbye to Arthur as it was planned.

 15  Q.   When he told you that he had attempted to cancel the

 16  passport, where in Brazil were you?

 17  A.   I was in Brazil.

 18  Q.   Were you at your home in Brazil?

 19  A.   Yes.

 20  Q.   Did you still leave for the United States?

 21  A.   Yes.

 22  Q.   Why?

 23  A.   Because I didn't believe he had canceled it.

 24  Q.   Were you able to leave Brazil with Arthur using his

 25  passport?
```

          1   A.   Yes.

          2   Q.   And when approximately did you leave Brazil for the United

          3   States?

          4   A.   I left in March.

          5   Q.   Of what year?

          6   A.   Of 2022.

          7   Q.   And when you entered the United States, where did you go?

          8   A.   To Massachusetts.

          9   Q.   Why did you go to Massachusetts?

11:29    10   A.   Because it was the locale where Gilberto was.

         11   Q.   Do you currently have an asylum application?

         12   A.   Yes.

         13   Q.   Are you also seeking asylum on behalf of Arthur?

         14   A.   Yes.

         15   Q.   Did you have a biometrics appointment in connection with

         16   your asylum application?

         17   A.   Yes.

         18   Q.   Could you turn to Joint Exhibit 3, please.  I'd like to

         19   look at the second and third pages, 3.002, 3.003, and I believe

11:31    20   the Portuguese versions of those documents are 005 and 006.  Do

         21   you have them in front of you?

         22   A.   Yes.

         23   Q.   Let's start with 002 or 005 for you, Jessica.  Do you

         24   recognize this document?

         25   A.   Yes.

    1   Q.   What is it?

    2   A.   It's the biometric document.

    3   Q.   Under "Date and Time of Appointment," do you see it says,

    4   "10/23/2023 at 11:00 a.m."?

    5   A.   It's the document 006?

    6   Q.   005, for Jessica.

    7   A.   I can see it on 006.

    8   Q.   Let's make sure we're looking at the same number, JX3.005.

    9   It may also be on 006.  We may have two of them in there.

11:33 10  A.   Yeah.

    11  Q.   Just so the record is clear, let me ask again.  It says,

    12  "Date and time of appointment, 10/23/2023, 11:00 a.m.,"

    13  correct?

    14  A.   Correct.

    15  Q.   Did you attend this appointment?

    16  A.   Yes.

    17  Q.   With apologies for making you flip around, if you look at

    18  the English version, which is 002, and look towards the bottom

    19  of that document.

11:35 20  A.   Yes.

    21  Q.   Can you tell me, do you see what looks to me to be October

    22  23, 2023, that seems like it's a stamp?

    23  A.   Yes, correct.

    24  Q.   How did this stamp end up on this document?

    25  A.   Because we had done the biometric and the pictures.

```
   1   Q.   And who put the stamp there, if you remember?

   2   A.   A person I don't know, I can't remember who, but it was

   3   the person where we went to do the biometry.

   4   Q.   Do you recall whether you were shown this document at your

   5   deposition?

   6   A.   No, I don't remember.

   7   Q.   Let me clarify, you weren't or you don't remember if you

   8   were?

   9   A.   I don't remember.

11:36 10   Q.   I'm going to direct your attention Respondents' Exhibit 9,

  11   page 4.  And do you see that it says, "Exhibit, exhibits not

  12   marked"?

  13   A.   So that means that I didn't see it.

  14   Q.   I'm not telling you what it means.  I'm just reading it.

  15   A.   Okay.

  16   Q.   Do you currently have a hearing scheduled on your asylum

  17   application?

  18   A.   Yes.

  19   Q.   Do you recall when that hearing is?

11:38 20   A.   I don't recall exactly the date, but it will be the end of

  21   next year.

  22   Q.   I direct everyone's attention to Respondents' 6.

  23        MS. JAMES:  Your Honor, I would intend to move this

  24   exhibit into evidence.  I would submit that with the government

  25   seal on the top that it's a government document.  I can go
```

<pre>
  1    through authenticating questions if you'd like, if opposing
  2    counsel plans to oppose.
  3              THE COURT:  Any objection to the exhibit?
  4              MR. HUNSINGER:  No, we have no objection.
  5              THE COURT:  It's admitted.
  6              MS. JAMES:  I believe it's 50.
  7              THE COURT:  Yes, I have it as 50 also.
  8              (Exhibit 50 admitted.)
  9    Q.   Jessica, we have this in Portuguese for you.  I'm
 10    interested in the page that ends in 308 at the bottom.
 11              INTERPRETER:  Is it this file or the other one?
 12    Q.   It should be the binder that says Respondents' Trial
 13    Exhibits, tab 6.
 14    A.   Which page?
 15    Q.   The one at the bottom that says 308 is the Portuguese
 16    version.
 17    A.   Yes.
 18    Q.   And can you read me the sentence that's in that box sort
 19    of in the middle of the page?
 20    A.   "Information regarding next hearing.  Your next hearing
 21    master will be in person in November 2025 at 8:30."
 22    Q.   Thank you.  Since you've been in the United States, how
 23    often does Mr. Rodrigues da Silva speak to Arthur?
 24    A.   He's being regularly calling Arthur since the judge in
 25    Brazil stipulate the days that he's supposed to call him.
</pre>

Lines 10 and 20 have timestamps 11:39 and 11:41 respectively in the left margin.

```
 1   Because at the beginning he was not calling him frequently, and
 2   I was asking him to call him.  But after this hearing he's been
 3   calling him frequently.
 4   Q.   And after the hearing, how often do they speak?
 5   A.   Three times a week.
 6   Q.   And how do they speak to each other?
 7   A.   Through a video call using WhatsApp.
 8   Q.   Approximately how long do these calls usually last?
 9   A.   It depends.  Some days it lasts 30 to 40 minutes.  It
11:44 10  depends.
11   Q.   Have you ever kept Arthur from speaking to Mr. Rodrigues
12   da Silva?
13   A.   No, never.
14   Q.   You testified that when you entered the United States you
15   came to Massachusetts, right?
16   A.   Yes.
17   Q.   Where in Massachusetts did you go?
18   A.   To Lowell.
19   Q.   Was Mr. Lucas already living in Lowell?
11:45 20  A.   Yes.
21   Q.   Did you and Arthur go live with him?
22   A.   Yes.
23   Q.   Do you recall the address of that apartment?
24   A.   Yes, the first home, yes.
25   Q.   And what was the address?
```

```
 1    A.    Lawrence Street, 1246.

 2    Q.    And did you rent that apartment?

 3    A.    Yes, it was rented already.

 4    Q.    Did Arthur have his own room in that apartment?

 5    A.    Yes.

 6    Q.    How long did you live there?

 7    A.    I believe it was one year I believe.

 8    Q.    And have you moved from that address?

 9    A.    Yes.

11:46 10   Q.    Where did you move next?

11    A.    To the same city, 80 Garvin Street.

12    Q.    Is that your current address?

13    A.    Yes.

14    Q.    Who lives there with you?

15    A.    Gilberto, me and Arthur.

16    Q.    Do you rent that apartment?

17    A.    Yes.

18    Q.    Does Arthur have his own room in that apartment?

19    A.    Yes.

11:46 20   Q.    Have you ever lived anywhere else in the United States?

21    A.    No.  Only this.

22    Q.    Are you authorized to work in the United States?

23    A.    Yes.

24    Q.    Can I ask everyone to turn to, in the Joint Exhibit

25    binder, Exhibit 10.  Do you have it in front of you?
```

         1    A.    Yes.

         2    Q.    Do you recognize the top card?

         3    A.    Yes.

         4    Q.    What is it?

         5    A.    It's the social and the permit to work.

         6    Q.    And do you recognize the bottom card?

         7    A.    Yes.

         8    Q.    What is it?

         9    A.    Yeah, the work permit.

11:48   10    Q.    You testified that you work as a cleaner, correct?

        11    A.    Yes.

        12    Q.    Do you also currently attend school?

        13    A.    Yes.

        14    Q.    What are you going to school for?

        15    A.    I'm taking aesthetic classes.

        16    Q.    What's the name of your school?

        17    A.    Flavia Leal Beauty School.

        18    Q.    I'd ask everyone to turn to Respondents' tab 1.  Do you

        19    have it in front of you?

11:49   20    A.    Yes.

        21    Q.    Do you recognize this document?

        22    A.    Yes.

        23    Q.    What is it?

        24    A.    Because it is in English, I'm not sure if it was the

        25    register confirmation.

|    |    |
|----|----|
| 1  | Q.   I'll read it to you.  Since there's not a translation, |
| 2  | I'll read you the first part. |
| 3  | A.   Okay. |
| 4  | Q.   It says, "For anyone interested, the Flavia Leal Academy |
| 5  | of Beauty Creators declares that Jessica Silveira da Silva," |
| 6  | student ID number, "is duly graduated from the 600 hours |
| 7  | aesthetics course which began on July 2023 and ended in June |
| 8  | 2025."  Do you recall if you obtained this document? |
| 9  | A.   Yes. |
| 11:51 10 | Q.   Where did you get it from? |
| 11 | A.   The school, they gave it to me. |
| 12 | Q.   And do you see at the bottom there's a signature? |
| 13 | A.   Yes. |
| 14 | Q.   Do you know who signed it? |
| 15 | A.   I believe that we received these papers, they were already |
| 16 | pre-signed, but it was from Flavia Leal. |
| 17 |         MS. JAMES:  Your Honor, I would move to admit this as |
| 18 | an exhibit. |
| 19 |         MR. HUNSINGER:  I would object to that, Your Honor. |
| 11:52 20 | This document has not been authenticated.  It was not produced |
| 21 | from a keeper of the records subpoena, and the document |
| 22 | actually has a couple of internal inconsistencies that make me |
| 23 | a little concerned. |
| 24 |         THE COURT:  Well, are you disputing that she goes to |
| 25 | this beauty school? |

1          MR. HUNSINGER:  It's actually, the document says that

2     she is duly graduated as of 8/2/2024, then it says that the

3     course ends in June 2025, so it's not clear to me whether she

4     is actually attending or whether she's actually graduated based

5     on this document.

6          MS. JAMES:  I will have her testify as to that.

7          THE COURT:  I mean, do you want to stipulate to the

8     fact that she has attended this beauty school?  I mean, I don't

9     think this is really a contested fact.  I understand the lack

11:54 10    of clarity about whether she's attending or she's graduated,

11    but can we agree that, hopefully she'll elicit the time, but

12    for some period of time she's attended Flavia Leal's Beauty

13    School and is making significant progress towards completing

14    the course?

15         MR. HUNSINGER:  We're willing to agree that she is

16    attending or has attended at some point, yes.

17         THE COURT:  So keep the document out, but they

18    stipulated to the basic information, which is that she's

19    attended Flavia Leal's Beauty School, that she is attending or

11:54 20    has attended the beauty school.

21         MR. HUNSINGER:  Thank you, Your Honor.

22         THE COURT:  Why don't you try to elicit the time

23    period.

24         MS. JAMES:  Yes, I will.

25         THE COURT:  And whether or not she's graduated.

```
 1              MS. JAMES:  I plan to.  Thank you, Your Honor.
 2    Q.   When did you begin taking courses at Flavia Leal Beauty
 3    School?
 4    A.   In August 2023, when it started.
 5    Q.   And when will you graduate from Flavia Leal Beauty School?
 6    A.   I didn't graduate yet.  I'm still studying.  We need to
 7    complete 600 hours, and I believe that I have completed 520
 8    hours, but I'm still studying.
 9    Q.   Once you've completed 600 hours, can you sit for the state
11:56 10  aesthetic exam?
11    A.   Yes.  When I complete the 600 hours, I will be authorized
12    to do the test for the state.
13    Q.   Is the test offered in Portuguese?
14    A.   Yes.
15    Q.   If you pass the exam, what types of jobs will you be
16    qualified for?
17    A.   I will be an aesthetist.
18    Q.   Once you pass the exam, do you intend to pursue a job in
19    the aesthetics field?
11:57 20  A.   Yes, of course.
21              MS. JAMES:  Your Honor, I want to be cognizant.  I've
22    got a little bit left to go.  Is there a time you'd like me to
23    stop so we can break for lunch?
24              THE COURT:  How much more do you have?
25              MS. JAMES:  A bit.
```

```
 1          THE COURT:  We can stop now or stop at 12:30, whatever
 2     you want to do.
 3          MS. JAMES:  Can I ask my client?
 4          THE COURT:  Sure.
 5     Q.   Jessica, are you okay to go for another half hour, or
 6     would you like to take a break now?
 7     A.   I prefer to stop now.
 8          MS. JAMES:  Okay.
 9          THE COURT:  Okay.  Half an hour?
11:58 10    MS. JAMES:  That's fine with us.
11          THE COURT:  12:30.
12          (Recess, 11:58 a.m. - 12:43 p.m.)
13          MS. JAMES:  We have discussed on the break, we have
14     two witnesses who are only here today, so if it's all right
15     with you, we plan to suspend her testimony and take them.
16          THE COURT:  That's fine, no worries.
17          MS. BENJAMIN:  Your Honor, we're going to call Bruna
18     Coutinho, who is being brought in right now.
19          BRUNA COUTINHO, Sworn
12:44 20   DIRECT EXAMINATION BY MS. BENJAMIN:
21     Q.   Hi Bruna, can you please state your name for the record.
22     A.   My name is Bruna Coutinho Suarez Dos Santos.
23     Q.   Thank you.  Do you know Ms. Jessica Silveira da Silva?
24     A.   Yes, for the past two years.
25     Q.   How do you know her?
```

A378

```
 1    A.   I learn about her when she start dating Gilberto.

 2    Q.   Who is Gilberto?

 3    A.   My brother-in-law.

 4    Q.   Is she married to your husband's brother, Gilberto Lucas?

 5    A.   So Gilberto is my husband's brother.

 6    Q.   Right.  She's married to Gilberto?

 7    A.   Yes.

 8    Q.   Do you know Arthur da Silva?

 9    A.   Yes.

12:45 10    Q.   Is he one of your family members?

11    A.   He's my nephew.

12    Q.   Where were you born?

13    A.   In Brazil.

14    Q.   And did you grow up in Brazil?

15    A.   Yes.  I came here when I was 29 years old.

16    Q.   Where do you live now?

17    A.   I live in Gloucester, Massachusetts city.

18    Q.   When did you move to Gloucester?

19    A.   April 1 of last year.

12:46 20    Q.   Have you lived anywhere else in the United States?

21    A.   After I arrive here, I did reside, I reside in two

22    different locations.  The first place was Gilberto's house

23    because he's the one who received us when we first arrive, me

24    and my husband.  His house was in Lowell.  But after that,

25    three months after that, then we went to rent an apartment
```

```
     1   nearby.  And then we went back to live with him again.  And
     2   then we stayed there until the time that we moved to
     3   Gloucester.
     4   Q.   When you lived with Gilberto in Lowell, was there anyone
     5   else who lived with you?
     6   A.   Yeah.  There was a cousin, and he was married and he had
     7   two kids.
     8   Q.   In the apartment with Gilberto, did Jessica and Arthur
     9   live with you?
12:47 10  A.   Yes.
    11   Q.   And your husband Gilberto?
    12   A.   Also.
    13   Q.   For how long did you live with Jessica and Arthur in
    14   Lowell?
    15   A.   Approximately one year, one year approximately.
    16   Q.   When you lived with Arthur and Jessica, did you spend time
    17   with Arthur?
    18   A.   Yes.  We used to eat breakfast together.  On some weekends
    19   we used to eat supper together, and sometimes we used to get
12:48 20  together, all of us.
    21   Q.   Did you do any leisure activities with Arthur?
    22   A.   Yes, like Jessica likes to take him out, going to a park,
    23   and we used to go together to a restaurant and things of that
    24   nature.
    25   Q.   Did you take Arthur to the park with Jessica?
```

A380

```
 1   A.   Yes, we always go out together.

 2   Q.   Did you ride bikes with Arthur?

 3   A.   Well, I did many times while I was living in Lowell.  Not

 4   right at this point.  Well, Gilberto give him a bicycle.  Then

 5   me and Jessica used to take him to the park to play.

 6   Q.   I'd like to direct everyone's attention to Joint Exhibit

 7   28.  It's in the binder that's marked Joint Exhibits.  That's

 8   tab 28.

 9   A.   It's a picture.

12:50  10   Q.   Are you there?

11   A.   Yes.

12   Q.   Are you in this photo?

13   A.   Yes.

14   Q.   Who else is in this photo?

15   A.   Jessica and Arthur.

16   Q.   Was this photo taken on a visit with Arthur?

17   A.   Well, I don't remember when this picture was taken.

18   Q.   Okay.  Do you still live with Jessica and Arthur?

19   A.   No.  Now I live at my own house in Gloucester.

12:50  20   Q.   Who lives with you in Gloucester?

21   A.   My husband.

22   Q.   What do you do for work?

23   A.   I have two jobs.  In the morning, Mondays, Wednesdays,

24   Fridays and Saturdays, I clean a factory.  And then after

25   finishing, around 6:30, I work for a coffee shop.
```

```
 1    Q.    Do you work year-round?

 2    A.    Yes.

 3    Q.    How far from Jessica and Arthur do you live now?

 4    A.    About 15 minutes.

 5    Q.    How often do you see Arthur?

 6    A.    About twice a month or maybe about every 15 days, I would

 7    say towards the end of the year, because of the holidays, then

 8    it happens more often.

 9    Q.    When was the last time you saw Arthur?

10    A.    27th of last month we went to celebrate his mother's

11    birthday.

12    Q.    Do you care for Arthur?

13          INTERPRETER:  Would you mind repeating?  Sorry.

14    Q.    Do you care for Arthur?

15    A.    You mean taking care of him?

16    Q.    No.

17    A.    Because I don't live any longer with him.

18    Q.    Right.  Let me rephrase.  Do you care about Arthur's

19    happiness?

20    A.    Of course, he's an awesome kid.

21    Q.    When you visit with Arthur, where do you visit him?

22    A.    Usually parents' house.  Sometimes we go out to the park

23    or sometimes restaurant or friend or relative's house.

24    Q.    Does anyone else attend these visits with Arthur?

25    A.    My husband, Jessica and Gilberto.  It's usually around
```

A382

1    lunch or some kind of party with other family, the cousins also

2    participate.

3    Q.   Did you say "cousins"?

4    A.   Yes.

5    Q.   So you spend time with extended family like cousins when

6    you're with Arthur?

7              MS. CROWLEY:  Objection, leading.

8              THE COURT:  It is leading.  Can you rephrase, please.

9    Q.   Do you spend time with extended family when you're with

12:54 10    Arthur?

11   A.   Well, it depends if we are having some kind of gathering

12   together, but most of the times me, Jessica, Gilberto, and

13   Arthur.

14   Q.   Do you attend family events with Arthur and your extended

15   family?

16   A.   Yes, yes, we do spend time, like holidays, like

17   Thanksgiving, Christmas, and we do a lot of barbecues and, you

18   know, birthdays.

19   Q.   Which extended family members come to those events?

12:55 20   A.   Well, there are the cousins of my husband and Gilberto.

21   Also his uncles and the kids of the cousins.

22   Q.   Are any of those children of those cousins near Arthur's

23   age?

24   A.   Our niece only, she's about six years old, and they play

25   together.

```
 1   Q.   I'd like to direct everyone's attention to Joint Exhibit
 2   18.  Are you in this photo?
 3   A.   Yes.
 4   Q.   Who else is in this photo?
 5   A.   Sophia, which is the daughter of the cousin of Gilberto,
 6   and my husband and Arthur are also on the picture.
 7   Q.   Where was this photo taken?
 8   A.   Canobie Lake Park.
 9   Q.   What were you doing in this photo?
12:57 10   A.   We went to spend the day at the park and play.
11   Q.   Did you do any of the attractions at the park with Arthur?
12   A.   Almost all of them.
13   Q.   Was anyone else with you at the time but not in this
14   photograph?
15   A.   Yes, Jessica and Gilberto, also my husband Jalmar.
16   Q.   Have you gone sledding in the snow with Arthur?
17        INTERPRETER:  Interpreter needs repetition.  I'm
18   sorry.
19   Q.   Have you gone sledding in the snow with Arthur?
12:58 20   A.   Oh, yes.  The winter of last year, Gilberto purchased two
21   boards, and then we went to slide on the snow.
22   Q.   Did Arthur seem to enjoy himself?
23   A.   Too much, yes.
24   Q.   Do you take Arthur to the shopping mall?
25   A.   At times, yes, but not that I took him myself.  It was
```

A384

1    usually Jessica and Gilberto would come with us.

2    Q.    Do you celebrate holidays with Arthur?

3    A.    Yes.

4    Q.    Did you celebrate last Christmas with Arthur?

5    A.    Yes.  We all went together to celebrate Christmas at my

6    husband's uncle's house.

7    Q.    Who attended that celebration?

8    A.    A lot of people.  There was Jessica, Gilberto, my husband.

9          Please translate so I can keep going.

01:00 10          And then there was Gracemar, which is Sophia's mother.

11    That's usually the child that Arthur plays with during family

12    gatherings, her husband.  There was a couple cousins of Jalmar

13    and a couple of other cousins, cousin of Jalmar also.  The

14    house was full.

15    Q.    Did you get Arthur a Christmas gift?

16    A.    Yes, I did, a pretty good one.  Have you heard about the

17    toy that you play with the target and throw something to stick?

18    It was like a magnetic thing.  It's pretty good.

19    Q.    Magnetic arrows?

01:01 20    A.    There was -- the tip of it is like a magnetic, but then it

21    gets stuck to the target.

22    Q.    Darts?

23    A.    Yes.

24    Q.    Did Arthur like the toy?

25          MS. CROWLEY:  Objection.

A385

52

```
        1           THE COURT:  The objection is sustained.
        2    Q.   Did you get Arthur a Christmas gift the year before?
        3    A.   I gave him pajamas from Spider Man, and there was also a
        4    mug from Spider Man together.
        5    Q.   Do you celebrate family birthdays with Arthur?
        6    A.   I didn't get to participate of the two because both times
        7    I was working, but we are planning to attend this year because
        8    my husband was the only one to go.
        9    Q.   Your husband attended Arthur's birthdays?
01:03  10    A.   Yes, last year.
       11    Q.   I'd like to direct your attention to Joint Exhibit 29.
       12    Are you in this photo?
       13    A.   Yes.
       14    Q.   Who else is in this photo?
       15    A.   Gilberto, Jessica's husband, my husband has a white T
       16    shirt, Jalmar, and Arthur.
       17    Q.   When was this photo taken?
       18    A.   It was last year during Gilberto's birthday.
       19    Q.   Is there anyone who is not pictured that was at the event?
01:04  20    A.   Jessica, Gilberto's wife.  And there was also a friend
       21    there, Gilberto's friend.  I don't remember his name.
       22    Q.   Were you celebrating something?
       23    A.   It was Gilberto's birthday.
       24    Q.   Do you know the petitioner in this case, Edervaldo
       25    Rodrigues da Silva?
```

1 A. No.

2 Q. Have you heard his name before?

3 A. I know that he is Arthur's father and he was the former

4 husband of Jessica.  That's all.

5 Q. Have you ever seen Arthur video-chat with Edervaldo, the

6 petitioner in this case?

7 A. Yes, many times while I used to live with them in Lowell,

8 and many times while we have gatherings he's on the phone

9 talking to his dad.

01:05 10 Q. About how long would you say these calls last that you've

11 seen?

12 A. Many hours.  They talk and talk and talk up until one of

13 the two disconnect.

14 Q. If Jessica asked you for financial assistance to help her

15 support Arthur, would you provide it?

16    INTERPRETER:  Excuse me?

17 Q. If Jessica asked you for financial assistance to support

18 Arthur, would you provide it?

19 A. Of course.

01:06 20 Q. Would you be financially able to assist Jessica in this

21 way?

22 A. Yeah, yes, both myself and my husband.

23 Q. Has Arthur ever told you that he wants to return to

24 Brazil?

25 A. No.

1   Q.   Have you ever heard Arthur complain about living in the

2   United States?

3   A.   No, he likes to live here.

4   Q.   How would you feel if Arthur was made to return to Brazil?

5          INTERPRETER:  The interpreter needs repetition.  I

6   apologize.

7   Q.   How would you feel if Arthur had to return to Brazil?

8   A.   Sad.  I think his life and his future will be much better

9   here.  Because we used to live in Brazil.  We know how life is

01:08  10   like in Brazil.  So things are not -- not so good over there.

11   Here he has everything that he needs.

12          MS. BENJAMIN:  No further questions, Your Honor.

13          MS. CROWLEY:  May I proceed, Your Honor?

14          THE COURT:  Of course.

15   CROSS-EXAMINATION BY MS. CROWLEY:

16   Q.   Good afternoon.

17   A.   Good afternoon.

18   Q.   My name is Elizabeth Crowley, and I'm going to ask you a

19   few questions, okay?

01:08  20   A.   Okay.

21   Q.   Now, you testified earlier that you've only known Jessica

22   for two years, approximately, correct?

23   A.   Yes.  I begin to know her shortly before we came here.

24   Q.   Okay.  That was approximately two years ago, you

25   testified, when you met her?

1    A.    Yes, because we arrive here about two years ago, so I met

2    her shortly thereafter we came here.

3    Q.    And the first time that you met Jessica in person was here

4    in the United States, correct?

5    A.    No.  I met her at a family gathering, lunch in Brazil.

6    Q.    Okay.

7    A.    And after that we also went out together as a couple.

8    Q.    Okay.  So, ma'am, you testified on direct examination that

9    you met Jessica for the first time approximately two years ago,

01:10 10    and so is it more accurate that you met her over two years ago

11    when you were in Brazil and prior to coming here to the United

12    States?

13    A.    Yes.  I'll be accurate.  I met her in Brazil, went out

14    together a couple of times over there.  But, like, being with

15    her and have a relationship with her, this is over the past two

16    years after we move here.

17    Q.    I think I understand.  You came here to the United States

18    from Brazil in what month and year, ma'am?

19    A.    Let me try to remember.  I got here -- sorry, I get the

01:12 20    dates confused.  So I arrive here on April 4 of 2022.  And I

21    left there -- let me clarify.  I left Brazil end of May of

22    2022.  I just don't remember exactly the date, and then I

23    arrive here on the 7th because I spend three days at a shelter.

24    Q.    Okay.  So, ma'am, you testified that you arrived here in

25    the United States on April 4, 2022, and you then testified that

```
 1    you left Brazil in May of 2022.  Did you leave Brazil in March
 2    of 2022?
 3    A.   Yes.  I arrive in Arizona, but here in Massachusetts, I
 4    got here on the 7th.
 5    Q.   And the first time you met Jessica in person was in Brazil
 6    right before you came here to the United States, correct?
 7    A.   Yes, it was a family lunch party.
 8    Q.   That family lunch party, was that in March of 2022?
 9    A.   No.
 10   Q.   What month and year was that family party?
 11   A.   I don't remember.  It was shortly prior to Gilberto coming
 12   to the U.S.
 13   Q.   Was that a going-away party for you and your husband with
 14   your family since you knew you were coming here to the United
 15   States?
 16   A.   No, no.  It was a family lunch party.
 17   Q.   But it was right before your husband came here to the
 18   United States?
 19        MS. BENJAMIN:  Objection, Your Honor.  That
 20   misrepresents the testimony.  She did not say it was right
 21   before.
 22        THE COURT:  The dates are all over the place.  I'm not
 23   exactly sure what she's saying.  I think she's trying to
 24   clarify it.  I don't think she's trying to --
 25        MS. CROWLEY:  I certainly don't want to confuse the
```

01:15 (line 10)
01:15 (line 20)

A390

1    witness, but I am trying to get the timeline accurate.

2         THE COURT:  I think she's just trying to establish a

3    chronology, which is proving challenging.

4         MS. CROWLEY:  Do we need the question repeated?

5         INTERPRETER:  Please, the interpreter needs

6    repetition.

7    Q.   And that was shortly before your husband came here to the

8    United States, correct?

9    A.   No.  It was just the family lunch together, far from the

01:16 10   time that we came here.  If I'm not mistaken, by the time that

11   Jessica arrive here, she was already dating Gilberto for about

12   a year or so.

13        MS. CROWLEY:  I'm going to move to strike as

14   nonresponsive to my question, Your Honor.

15        THE COURT:  I'm not going to strike it.  I'm not going

16   to strike it.  You might want to start over.

17        MS. CROWLEY:  Yeah, I will, I will.

18        MS. BENJAMIN:  Just to make one statement, I believe

19   the confusion may be the statement about Gilberto, not Jalmar,

01:17 20   Gilberto.  Jalmar is her husband, not Gilberto.

21   Q.   Ma'am, I'm trying to determine whether or not you recall

22   when this family party took place.  Do you know when the family

23   party that you've testified about took place, yes or no?

24   A.   You mean the date?

25   Q.   The date of the party.

A391

```
 1   A.    No.

 2   Q.    Do you recall the year?

 3   A.    Well, I'm afraid of giving you a wrong date, so I'd rather

 4   not answer that.

 5   Q.    Ma'am, on direct examination you referred to Arthur as

 6   your nephew, correct?

 7   A.    Yes.

 8   Q.    Okay.  And your brother-in-law just got married to Jessica

 9   last month, correct?

10   A.    Yes.  And prior I was already calling Arthur my nephew

11   because I'm already considering him like that.

12   Q.    When you came here to the United States in April of 2022,

13   you came with your husband, correct?

14   A.    Yes.  But as we arrive in Arizona, they separate us.

15   Q.    Who else did you travel with from Brazil to the United

16   States other than your husband?

17   A.    So Jessica, Arthur, Gracemar, Gracemar is my husband's

18   cousin, and her husband and also her daughter.

19   Q.    And when you came here from Brazil to the United States in

20   April of 2022, you did so illegally, correct, ma'am?

21          MS. BENJAMIN:  Objection, Your Honor.  It's outside

22   the scope of my direct examination.

23          THE COURT:  Overruled.

24          INTERPRETER:  Should I ask for repetition?

25   Interpreter needs a repetition, please.
```

01:18 (line 10)
01:20 (line 20)

A392

 1          MS. CROWLEY:  Of my question?

 2          THE COURT:  I can read it.  When you came here from

 3     Brazil to the United States in April of 2022, you did so

 4     illegally, correct?

 5          MS. CROWLEY:  Thank you.

 6     A.   Yes.

 7     Q.   How many months in advance of your departure from Brazil

 8     did you know that you would be leaving Brazil and moving to the

 9     United States?

01:21 10   A.   I don't remember how many months I took to decide that.

11     Q.   Did you pay money to anyone in order to travel from Brazil

12     to the United States across the border?

13     A.   Yes.

14     Q.   How much money did you pay?

15          MS. BENJAMIN:  Objection, Your Honor.  I'm not sure of

16     the relevancy of the line of questioning, the amount of money

17     she paid to travel to the United States.

18          MS. CROWLEY:  Highly relevant.  It goes to not only

19     this witness's credibility, but I will make an offer of proof

01:22 20   to the court it's going to dovetail into what mother knew in

21     advance with respect to her departure plans, timing, and it

22     goes directly to the salient issues in this case.

23          THE COURT:  Well, I understand the planning issues and

24     who she came with and all of that, but the amount of money?

25          MS. CROWLEY:  I can ask a different question.

```
 1   Q.   To whom did you pay money to come here to the United
 2   States, ma'am?
 3             MS. BENJAMIN:  Objection.
 4             THE COURT:  Overruled.
 5   A.   Well, we borrow money, both me and my husband, we went and
 6   we borrow from her aunt, and she's also here in the U.S.
 7   Q.   From whose aunt?
 8   A.   My husband's aunt.
 9   Q.   My question was a bit different.  Who did you pay money
01:23 10  to?  Can you tell me who you paid money to?
11   A.   So I had to pay her because I borrow money from her.
12   Q.   Other than your husband's aunt, who you said loaned you
13   money and you repaid her, did you pay anyone else money in
14   order to assist you with your travel from Brazil to the United
15   States?
16   A.   What does this question have to do with the whole process?
17   Q.   So, ma'am, I need you to answer my question if you know
18   the answer to it.  Do you need it repeated?
19   A.   I'm obligated to respond?
01:25 20             THE COURT:  Yes.
21   A.   Okay.  I did pay the coyote that brought us here, the
22   coyote that brought us here.
23   Q.   Understood.  Did you meet Jessica and Arthur in Brazil
24   prior to departing Brazil to come here to the United States?
25   A.   Yes.  We all travel together.
```

1  Q.   Where did you meet Jessica before your departure, and

2  Arthur?

3  A.   From the Belo Horizonte, we went to Vitoria, all of us

4  together.  So that's a state in Brazil.

5  Q.   In advance of your departure with Jessica and your husband

6  and Arthur, did you and Jessica get to talk about your plans to

7  come to the United States?

8  A.   I remember that we had a conversation about what she needs

9  to do in order for her to get Arthur's passport in order to

01:27 10  travel to the U.S. because you have to schedule it.  That is

11  not something that you just go in and request.  So you have to

12  schedule the application for passport.  And we also talk about

13  the time and the day that both herself and her husband was

14  supposed to go there in person in order to do that because they

15  are both required to come in, but if I remember, that was all.

16  Q.   Do you recall when that conversation was?

17  A.   No.  Maybe about a month, but no, no.

18  Q.   A month before you left?

19  A.   I don't remember exactly how long it took for the passport

01:28 20  to be ready in Brazil, so that kind of determine the time if it

21  was close or not.

22  Q.   And is it your testimony that other than that one

23  conversation with Jessica about the passport that you didn't

24  have any other communications with Jessica regarding your

25  planned departure from Brazil to the United States?

A395

```
 1    A.    As far as I can remember, no.

 2    Q.    Now, when you left Brazil to come to the United States,

 3    you planned to stay here, correct?

 4    A.    No.  My intention is to go back.  I don't know about

 5    Jessica and her family, but me and my husband the plan is for

 6    us to go back at some point.

 7    Q.    Now, you and your husband have been living here in the

 8    United States for approximately two and a half years, correct?

 9    A.    Yes, I believe it's been close to two and a half years.

01:30 10    Q.    And when you traveled here you didn't book any return

11    travel plans to Brazil, correct?

12    A.    Correct.

13    Q.    When you came here in April of 2022, you brought all of

14    the belongings that you wanted to have here with you in the

15    United States, correct?

16    A.    Yes, but the police took everything and throw it away.  So

17    myself, my passport was the only thing I was able to keep.

18    Q.    I'm sorry to hear that.

19          When Jessica and Arthur traveled with you to the United

01:30 20    States in 2022, they brought belongings with them as well,

21    correct?

22    A.    Yes.

23    Q.    When you arrived here in the United States --

24    A.    Also all the belongings was thrown away.

25          MS. CROWLEY:  Move to strike the latter portion, Your
```

A396

```
  1   Honor, as non-responsive.  I just asked what they brought.
  2           THE COURT:  She already testified to that, right?
  3           MS. CROWLEY:  As to what she brought, and the next
  4   question was what she observed Jessica and Arthur to have
  5   brought, which she answered and then went on to add --
  6           THE COURT:  That their belongings were thrown away as
  7   well?
  8           MS. CROWLEY:  I can keep going.
  9           THE COURT:  It's not going to move the dial.
01:32 10        MS. CROWLEY:  Understood, Your Honor.
 11   Q.   When you arrived here in April of 2022, did you know where
 12   you would live?
 13   A.   Yes.  We went straight to Gilberto's house.
 14   Q.   And Gilberto, when you say "straight to Gilberto's house,"
 15   he was already here in the United States?
 16   A.   Yes, he was already here.
 17   Q.   And how much sooner did he arrive here in the United
 18   States than you?
 19   A.   I do not remember precisely, but I would say about a year
01:33 20  to maybe a year and a half, between the two.
 21   Q.   And did you, your husband, Jessica, and Arthur then all go
 22   to live with Gilberto in Lowell?
 23   A.   Yes.
 24   Q.   And then subsequently you and your husband moved to
 25   Gloucester, correct?
```

A397

 1    A.    Yes.

 2    Q.    What is the status of your immigration here in the United

 3    States, ma'am?

 4    A.    My attorney told me that we have ongoing immigration

 5    proceedings.  I don't know.

 6    Q.    Do you speak primarily in Portuguese, ma'am?

 7    A.    Yes.

 8    Q.    Are you able to speak English?

 9    A.    Not able to speak so well, but I think I do have a good

01:34 10    understanding as to the basic language.

11    Q.    And so you speak in Portuguese to Arthur, correct?

12    A.    Yes, but I saw him speaking many times in English.

13          MS. CROWLEY:  Move to strike the latter portion of her

14    answer.

15          THE COURT:  I'm not sure what it means to strike it

16    when I've already heard it and I'm the decisionmaker.

17          MS. CROWLEY:  Understood, Your Honor.

18          THE COURT:  I mean, if you want it struck, I'll strike

19    it.

01:35 20          MS. CROWLEY:  Understood.  And I appreciate the fact

21    it's a bench trial, and I know she wants to add things to her

22    testimony.

23    Q.    Ma'am, are you aware that Arthur has had struggles in

24    school, yes or no?

25          MS. BENJAMIN:  Objection, Your Honor.  Outside the

1    scope of my direct.

2              THE COURT:  Overruled.

3    Q.    She can answer yes or no.

4    A.    Yes.  Every single child has that when they change

5    schools.

6    Q.    Ma'am, you spoke on direct testimony about extended

7    family.  The extended family you spoke about is your husband's

8    family, correct?

9    A.    Yes.

01:36 10   Q.    You testified on direct, ma'am, that you've observed

11   Arthur have videoconferences with his father on numerous

12   occasions, correct?

13   A.    Yes.

14   Q.    And it's true that you've observed them to often stay on

15   these videoconferences for extended periods of time, correct?

16   A.    Well, in terms of observing, I did witness him on the chat

17   with the father on the video but not that I would be, like,

18   monitoring the conversation between him and the father because

19   he goes to his room and he maintains the conversation

01:38 20   throughout the time.

21   Q.    You mentioned about meeting Jessica for the first time at

22   a family party, you couldn't recall when.  Was Arthur at that

23   family party in Brazil?

24             INTERPRETER:  Interpreter needs repetition.  I

25   apologize.

```
 1              MS. CROWLEY:  Certainly.
 2    Q.    You mentioned about first meeting Jessica at a family
 3    party in Brazil.  Was Arthur at that family party?
 4    A.    No.
 5    Q.    When is the first time you met Arthur?
 6    A.    When we begin the travel, traveling, the trip to the U.S.
 7    Q.    That was the first time you had ever met Arthur, correct?
 8    A.    Yes.
 9    Q.    You mentioned some things that you and your husband have
10    participated in, like going to a park and bike-riding with
11    Arthur, correct?
12    A.    I don't remember if I said that my husband would take
13    Arthur to the park to play with his bicycle, but what I said
14    was like me and Jessica would take him to the park to play with
15    his bicycle.  But as far as going out and gatherings to, you
16    know, parks, restaurants and other place, everybody goes
17    together.
18    Q.    There was testimony before that if Jessica needed help
19    financially, you would be willing to help, correct?
20    A.    Yes.
21    Q.    How much in U.S. dollars do you yourself earn annually in
22    employment income?
23    A.    I don't know.  I'm making about shortly over a thousand
24    per week.
25    Q.    Do you pay taxes on that income, ma'am?
```

```
 1   A.    Yes.

 2   Q.    Do you have any assets?

 3   A.    Here or in Brazil?

 4   Q.    Either location.

 5   A.    My house here is rent.  But in Brazil, I have a lot in my

 6   husband's name.

 7   Q.    Do you have any bank accounts here in the United States?

 8   A.    Yes.

 9   Q.    How much do you have in your bank accounts here in the

01:42 10   United States?

11   A.    Today?

12   Q.    Sure, approximately.

13   A.    Ten dollars, ten dollars.  I just paid my taxes, yes.

14         MS. CROWLEY:  No further questions, Your Honor.

15         MS. BENJAMIN:  Can I just have one minute to confer?

16         THE COURT:  Sure.  Yes.

17         MS. BENJAMIN:  We have no further questions, Your

18   Honor.

19         THE COURT:  You're excused.  Thank you.

01:43 20         THE WITNESS:  So you should I go outside and call

21   Jalmar?

22         THE COURT:  She can stay in the courtroom now if she

23   wants.

24         THE WITNESS:  Okay.

25         MS. BENJAMIN:  I'll get our next witness, Your Honor.
```

1       <u>JALMAR JUNIOR TORRES DOS SANTOS, Sworn</u>

2       COURTROOM CLERK:  Thank you.  You can be seated.

3  DIRECT EXAMINATION BY MS. STEVEN:

4  Q.  Good afternoon, Mr. dos Santos.  Could you please state

5  your name for the record.

6  A.  Jalmar Junior Torres dos Santos.

7  Q.  Did you mind if I call you Jalmar?

8  A.  Yes.

9  Q.  Do you know Ms. Jessica Silveira da Silva?

01:45 10  A.  Yes.

11  Q.  How do you know her?

12  A.  I met Jessica when she began dating my brother.

13  Q.  Who is your brother?

14  A.  Gilberto Lucas Torres dos Santos.

15  Q.  What is your brother's relationship with Jessica now?

16  A.  The two are married.

17  Q.  Do you know Arthur da Silva?

18  A.  Yes.

19  Q.  How do you know Arthur?

01:45 20  A.  I met Arthur at the time that we took the trip to come

21  here.

22  Q.  Is Arthur part of your family?

23  A.  Yes.

24  Q.  How is he part of your family?

25  A.  Well, we met each other at the time that she was dating my

  1   brother, and then we got together doing the trip to come here,

  2   and from that time he became part of our family.

  3   Q.   Is he your nephew?

  4   A.   Yes.

  5   Q.   Where were you born?

  6        INTERPRETER:   Interpreter needs --

  7   Q.   Where were you born?

  8   A.   Where I was born?

  9   Q.   Yes.

01:47 10  A.   Mantenopolis, Espirito Santos, Brazil.

 11   Q.   Where do you live now?

 12   A.   Right now I live in Gloucester here.

 13   Q.   What state is that?

 14   A.   Massachusetts.

 15   Q.   When you first moved to Massachusetts, who did you live

 16   with?

 17   A.   I used to live with Gilberto and Jessica.

 18   Q.   Did you live with anyone else at that time?

 19   A.   I used to live with Arthur and Bruna, my wife.

01:47 20  Q.   When you lived together did you ever help care for Arthur?

 21   A.   Yes.

 22   Q.   Tell me about that.

 23   A.   Well, because I used to get home from work before anyone

 24   else so then Jessica would be the one contacting me always like

 25   to make sure that I was able to make it home.   And then because

A403

```
 1   Arthur used to go to school and afterwards he would stay at the
 2   babysitter, at the day care.  And then Jessica would contact
 3   them and ask them to drop off Arthur to stay with me at home
 4   afterwards.
 5   Q.    During this -- when the babysitter would drop off Arthur
 6   after school, was it just the two of you spending time
 7   together?
 8   A.    Yes.
 9   Q.    Did you spend time together doing things?
10   A.    Yes.  Jessica give him a bicycle, and sometimes I would
11   carry the bicycle downstairs, and then I would take him outside
12   to play on his bicycle.  Other times we would stay inside and
13   we would just play video games together.
14   Q.    Did you ever have to make him dinner?
15   A.    Yes.  We used to cook and sometimes I would cook for first
16   myself, and then if he feel like eating dinner, then he would
17   eat.
18   Q.    Did you spend time with Arthur on the weekends as well?
19   A.    Yes.  None of us worked weekends, so usually we would
20   prepare like a meal together, and then we would go out all
21   together because at the time we only had one car, so it's all
22   of us together.
23   Q.    When you say "all of us," who do you mean?
24   A.    Myself, Gilberto, Jessica, Arthur, and Bruna.
25   Q.    What sorts of activities would you do on the weekends?
```

```
 1   A.    We would go out to shopping centers.

 2          INTERPRETER:  I apologize.  It was long.  I'm going to

 3   ask him to repeat.  Interpreter needs repetition.  He's going

 4   to break it down for me.  I apologize.

 5   A.    There was a time we went out to practice ski.  We also

 6   like to go out and eat some Chinese food together.  There is

 7   also a place for kids to play.  It's like a big store, and we

 8   like to -- we used to take Arthur there to play.  And we also

 9   went out once to play soccer at the soccer field.

01:53 10  Q.    Do you still live with Jessica and Arthur and Gilberto?

11   A.    No.

12   Q.    Do you still see them on the weekends to do activities?

13   A.    Yes.

14   Q.    About how often?

15   A.    About every 15 days.

16   Q.    What sorts of things do you do now together?

17   A.    Most of the times it's kind of holiday celebrations or

18   birthday parties, and we also like to go out for some kind of

19   barbecue or eat something outside, and that's pretty much it.

01:54 20  Q.    You mentioned holiday celebrations.  Can you tell me more

21   about those.

22   A.    Every time there is a birthday party of a family member,

23   we all come together.

24   Q.    And who did you celebrate most recently?

25   A.    Jessica's birthday was the latest one.
```

1    Q.    Could I direct everyone's attention to Joint Exhibit 29.

2    Should be tab 29 in the binder in front of you.

3    A.    29?

4    Q.    That's right.  It might be the one right behind that.  Are

5    you in this photo?

6    A.    Yes.

7    Q.    Who else is in that photo with you?

8    A.    Arthur, Gilberto, and Bruna.

9    Q.    Do you recall what the -- strike that.  Do you recall what

01:55 10    this is a picture of?

11    A.    It was Arthur's birthday, if I'm not mistaken.

12    Q.    Is this one of the birthday celebrations that you

13    celebrate with Jessica and Gilberto and Arthur?

14    A.    Yes.

15    Q.    Can you recall other occasions like this?

16    A.    Yes.  We just had Jessica's birthday, that was on the 27th

17    of this month.  And prior to that, that was June 21, which was

18    Bruna's birthday.  It was a surprise birthday celebration, and

19    everybody came together.  And that was mine as well on the 3rd

01:57 20    of June.  And prior to that was Gilberto's in February 1, and

21    everybody came together, and there was also an aunt of mine in

22    the celebration.

23    Q.    Do you ever see other extended family?

24          INTERPRETER:  Interpreter needs repetition.

25    Q.    Do you ever see other extended family?

```
 1              INTERPRETER:  One more time.  I apologize.
 2    Q.   I can rephrase the question.  Besides Jessica, Gilberto,
 3    your wife, and Arthur, do you spend time with other family?
 4    A.   Yes, yes, there is a cousin of mine.  She also lives in
 5    Gloucester.  We do spend time together.
 6    Q.   Do you have any other family besides your cousin in the
 7    area?
 8    A.   Yes, yes, there is an aunt of mine and also another cousin
 9    that lives here.
01:58 10  Q.   Do you get together ever?
11    A.   Yes, many times we do spend time together.  Most of the
12    celebrations are usually around Christmas that we all come to
13    my aunt's house.
14    Q.   Could you please tell me about that most recent
15    celebration.
16    A.   Yes.  Usually we make a combination between ourselves.
17    Each family member would prepare a different recipe and we
18    would cook and bring it together for the celebration and bring
19    it, for example, to my aunt's house, and then we'll get all
01:59 20  together to the party.  You were referring to something like
21    that, right, that kind of celebration?
22    Q.   Yes, that's right.  Is Arthur present when you have these
23    gatherings?
24    A.   Yes, always.
25    Q.   And does he spend time with the family?
```

1    A.    Yes.

2    Q.    Has Arthur ever told you that he wants to return to

3    Brazil?

4    A.    Not in any moment.

5    Q.    Does Arthur seem happy to you here in the United States?

6    A.    Yes, a lot.

7    Q.    How would you feel if Arthur were to be required to return

8    to Brazil?

9    A.    I would feel like we are losing a family member here.

02:01 10            MS. STEVEN:  I have no further questions, Your Honor.

11            THE COURT:  Cross.

12    CROSS-EXAMINATION BY MR. HUNSINGER:

13    Q.    Mr. dos Santos, isn't it true that you've only known

14    Arthur for two years?

15    A.    Yes.

16    Q.    Isn't it true that you've never met Edervaldo?

17    A.    Yes.

18    Q.    Mr. dos Santos, have you ever taken Arthur to a Red Sox

19    game?

02:02 20    A.    No.

21    Q.    Have you ever taken Arthur to a professional soccer game?

22    A.    No.

23    Q.    Have you ever taken Arthur to a concert?

24    A.    No.

25    Q.    Have you ever helped Arthur with his homework?

1    A.    Yes.

2    Q.    Mr. dos Santos, how far is Gloucester from Lowell?

3    A.    40 miles.

4    Q.    Mr. dos Santos, what is your immigration status?

5          MS. STEVEN:  Objection, Your Honor.

6          THE COURT:  Overruled.

7    A.    My situation here is I'm illegal -- well, not illegal

8    because we already apply for permission to work, and Social

9    Security, and everything is pending, according to our attorney.

02:04 10   Q.    So you've submitted an asylum application?

11          MS. STEVEN:  Objection, Your Honor.  That misstates

12   his testimony.

13          THE COURT:  I think it's a question.

14          MR. HUNSINGER:  It is a question.

15   A.    Can you please repeat the question, please.

16   Q.    Sir, have you submitted an asylum application?

17   A.    No, we did not submit an application for asylum process.

18   Q.    What immigration paperwork have you submitted?

19   A.    Our attorney went in and filed for work permit and Social

02:05 20   Security so both myself and Bruna, we already have the permit

21   to work and the social.

22   Q.    Mr. dos Santos, what do you do for work?

23   A.    I work as a bus in a hotel.

24   Q.    Sorry, I can't hear you.

25   A.    Cleaning tables at this hotel.

 1  Q.   How much do you earn in a year?

 2  A.   Right around $40,000.

 3        MR. HUNSINGER:  I have no further questions for this

 4  witness.

 5        THE COURT:  Redirect?

 6        MS. STEVEN:  No further questions for me, Your Honor.

 7        THE COURT:  You're excused.  Thank you.

 8        Do we want to resume with Jessica?

 9        MS. JAMES:  We can if you would like to.

02:07 10        THE COURT:  What would you prefer to do?

11        MR. HUNSINGER:  Your Honor, can we take five minutes

12  perhaps?

13        THE COURT:  Yes.  How about 2:15?

14        (Recess, 2:07 p.m. - 2:21 p.m.)

15        MS. JAMES:  Your Honor, if it's all right with you,

16  we'll keep going until 3:00 today and see if I can't wrap up.

17        THE COURT:  I think that makes sense.  When you're

18  ready.

19        MS. JAMES:  Okay.

02:21 20        JESSICA SILVEIRA DA SILVA, resumed.

21  BY MS. JAMES:

22  Q.   Hi again, Jessica.

23  A.   Hi.

24  Q.   Are you and Mr. Lucas married?

25  A.   Yes.

|     |     |                                                              |
|-----|-----|--------------------------------------------------------------|
| 1   | Q.  | When did you get engaged?                                    |
| 2   | A.  | It's been about seven to six months.                         |
| 3   | Q.  | And when did you get married?                                |
| 4   | A.  | Last month, on September 18.                                 |
| 5   | Q.  | Who was present at your wedding?                             |
| 6   | A.  | Arthur.                                                       |
| 7   | Q.  | Can I ask everyone to turn to Joint Exhibit 31.  Do you      |
| 8   |     | have it in front of you?                                      |
| 9   | A.  | Yes.                                                          |
| 10  | Q.  | Do you recognize this photo?                                 |
| 11  | A.  | Yes.                                                          |
| 12  | Q.  | Who is in this picture?                                       |
| 13  | A.  | Gilberto, me, and Arthur.                                     |
| 14  | Q.  | And when was it taken?                                        |
| 15  | A.  | The day of our marriage on the 18th.                         |
| 16  | Q.  | When did Mr. Lucas first meet Arthur?                        |
| 17  | A.  | It was in Brazil.                                             |
| 18  | Q.  | And do you know approximately when that was?                 |
| 19  | A.  | It was in 2021, and they met in a lunch at my house.         |
| 20  | Q.  | Approximately how many times did Arthur meet Mr. Lucas       |
| 21  |     | before Mr. Lucas moved here to the United States?            |
| 22  | A.  | Just a little.  We'd been dating for about one month         |
| 23  |     | before he move here.                                         |
| 24  | Q.  | After coming to the United States you went to live with      |
| 25  |     | Mr. Lucas, correct?                                           |

The timestamps 02:22 appear at line 10, 02:24 at line 20.

A411

1    A.    Yes.

2    Q.    And have you lived with Mr. Lucas since then?

3    A.    Yes.

4    Q.    How would you describe Mr. Lucas's relationship with

5    Arthur?

6    A.    I describe this relationship as healthy.  It is a good

7    relationship.

8    Q.    Does Arthur spend any time alone with Mr. Lucas?

9          INTERPRETER:  Could you repeat, please.

02:25 10    Q.    Yes.  Does Arthur spend any time alone with Mr. Lucas?

11    A.    Most of the time three of us are together, but sometimes

12    they go to the hair salon to have their hair cut.

13    Q.    What other activities do they like to do together?

14          What other activities do they like to do together?

15    A.    I believe it's to play video games because it is what

16    Arthur likes more.

17    Q.    Do they ever go to the park together?

18    A.    Together with them?

19    Q.    Either just the two of them or the three of you together,

02:27 20    do you ever go to the park?

21    A.    Oh, yes.

22    Q.    Do you ever go to the beach together, you and Arthur and

23    Mr. Lucas?

24    A.    Yes.

25    Q.    Do the three of you go to church together?

```
 1    A.    Yes.

 2    Q.    Did Mr. Lucas help Arthur learn how to ride a bike?

 3    A.    Yes.

 4    Q.    Who bought Arthur his bike?

 5    A.    Gilberto.

 6    Q.    And do the three of you celebrate events together as a

 7    family?

 8    A.    Yes.

 9    Q.    Do you spend holidays together?

02:27 10    A.    Yes.

11    Q.    Do you spend birthdays together?

12    A.    Yes.

13    Q.    And we heard testimony that you and Arthur lived with

14    Jalmar and Bruna for a time.  Is that correct?

15    A.    Yes, we lived together.

16    Q.    Has Arthur spent time with Jalmar and Bruna?

17    A.    Yes.

18    Q.    Do you spend birthdays with Jalmar and Bruna?

19    A.    Yes.

02:29 20    Q.    Do you spend holidays with Jalmar and Bruna?

21    A.    Yes.

22    Q.    About how often do you see Jalmar and Bruna since they

23    have lived in Gloucester?

24    A.    Every 15 days because it is far and we all work.

25    Q.    And is Arthur with you on these visits?
```

A413

1    A.    Yes.

2    Q.    And we heard testimony that Mr. Lucas has other extended

3    family in the United States.  Is that right?

4    A.    Yes, it's true.

5    Q.    What other family members does he have here?

6    A.    An aunt, cousins.

7    Q.    And do you see these extended family members for holidays?

8    A.    Not as frequent as we get together with Bruna and Jalmar

9    that we can see more often, but we get together sometimes

02:31 10    during lunch.  It's rare to get together with them.

11    Q.    Do any of these family members have children around

12    Arthur's age?

13    A.    Yes, Sophia.

14    Q.    And what kinds of things do Arthur and Sophia like to do

15    together?

16    A.    They play.  Yeah, she already have gone with us to the

17    park.  Yeah, they play.

18    Q.    Did Arthur attend school in Brazil?

19    A.    He went but because of the pandemic he studied at school

02:32 20    for a little time.

21    Q.    Did he start school at home during COVID, or did he start

22    school in person in Brazil?

23    A.    As I remember, all the children in Brazil, because of the

24    pandemic, they lost about one year of going to school.  So the

25    teachers were giving us some activities to do with the children

```
 1   at home while the pandemic was there.  So when he started to go
 2   to school in person, he just went there for a few months.
 3   Q.   And did he start going to school in person and then had to
 4   start learning from home because of the pandemic?
 5   A.   No.  First he had the classes at home because of the
 6   pandemic.  Then the year after is when he start going to
 7   school.
 8   Q.   You said it was about a year that he was going to school
 9   at home?
10   A.   Yes.  That's it, that's what I remember.
11   Q.   Was Arthur able to read in Portuguese when you moved to
12   the United States?
13   A.   No.  He didn't have the opportunity to be -- to learn how
14   to read and write while he was in Brazil.
15   Q.   Okay.  So is it correct that Arthur also did not know how
16   to write in Portuguese when you moved to the United States?
17   A.   Yes, correct.
18   Q.   Is Arthur currently in school?
19   A.   Yes.
20   Q.   Where does he go to school?
21   A.   Greenhalge.
22   Q.   Greenhalge Elementary, is that right, Jessica?
23   A.   Yes, elementary school, I believe, yeah.
24   Q.   When did Arthur first enroll in school in the United
25   States?
```

02:34 (line 10)
02:36 (line 20)

```
 1   A.   Could you repeat, please.

 2   Q.   When did Arthur first enroll in school in the United

 3   States?

 4   A.   Right after I arrive in 2022.

 5   Q.   And I think you testified earlier that he started in third

 6   grade but was eventually reclassified into second grade.  Is

 7   that right?

 8   A.   Yes.

 9   Q.   And you just said he started school only a few months

10   after arriving in the United States, correct?

11   A.   Yes.

12   Q.   And at the time that you came here you testified he could

13   not read or write in Portuguese, right?

14   A.   Correct.

15   Q.   Could he read or write in English when you came to the

16   United States?

17   A.   When he arrived, no.

18   Q.   Who was Arthur's second grade teacher in his first year of

19   school?

20   A.   Ms. O'Donnell.

21   Q.   Did Arthur advance from second grade to third grade?

22   A.   Yes.

23   Q.   Did Arthur start third grade in fall of 2023?

24   A.   Yes.

25   Q.   Who was Arthur's third grade teacher in his second year of
```

1   school in the United States?

2   A.   On the third grade is Ms. Hoey.

3   Q.   Did Arthur advance from third grade to fourth grade at the

4   end of that school year?

5   A.   Yes.

6   Q.   Is he currently in fourth grade?

7   A.   Yes.

8   Q.   Who is his teacher this year?

9   A.   Ms. Magnuson.  I believe that's how you say it, I

02:39 10   pronounce it.

11   Q.   That's okay.  You did a good job.  You had testified that

12   Arthur missed several days of school last year, correct?

13   A.   Yes, correct.

14   Q.   How does Arthur get to and from school right now?

15   A.   Through the school bus.

16   Q.   And how far from your apartment is the place where the bus

17   picks Arthur up?

18   A.   It's about three minutes walking.

19   Q.   Last year was Arthur able to take the bus to and from

02:41 20   school?

21   A.   Last year, no.  As I can recall, he started using the bus

22   this year.

23   Q.   You testified earlier that Arthur missed three days of

24   school so far this year because he was sick.  Is that right?

25   A.   Yes, correct.

1    Q.    Did he have a doctor's note for those absences?

2    A.    Yes.

3    Q.    You were shown messages purportedly from Arthur's school

4    about his behavior.  Is that right?

5    A.    Yes.

6    Q.    All of those messages but one were from Arthur's first

7    year in school.  How many messages did you get during his

8    second year of school?

9    A.    I would say approximately two or three.

02:43 10    Q.    You testified earlier that when Arthur has behavioral

11    issues in school, you like to talk to him about them.  Is that

12    right?

13    A.    Correct.

14    Q.    Why do you like to talk to Arthur about these issues?

15    A.    Why I talk to him?

16    Q.    Yeah.  Why do you like to talk to him about these issues?

17    A.    Because I want to show him that his attitude was not the

18    right attitude, was not positive.  Because I like to also talk

19    to him to hear the story from him the way that he sees it

02:45 20    because I like to know to hear both sides of the story.  I like

21    to talk to them about it and know what really had happened so I

22    could show him what was wrong and what is right.

23    Q.    Has Arthur's behavior improved in school from the first

24    year to the second year that he was in the United States?

25    A.    Yes.

A418

1    Q.    And you testified that Arthur did not read or write

2    English when he moved to the United States, correct?

3    A.    Correct.

4    Q.    Has Arthur been learning English in school?

5    A.    Yes.

6    Q.    Can Arthur read English now?

7    A.    He's much better now since from when he started school and

8    now.  He can read but he has a little bit of difficulty still.

9    Q.    Can Arthur speak English now?

02:47 10    A.    He doesn't communicate very well.  I cannot say it is

11    fluent English, but he knows how to communicate and to

12    understand things.

13    Q.    Has his English improved since he started school in the

14    United States?

15    A.    Yes.

16    Q.    Are there any staff members at Arthur's school who speak

17    Portuguese that you can communicate with?

18    A.    Yes.

19    Q.    Do you attend parent/teacher conferences at school?

02:48 20    A.    Yes, yes.  Yes, some of them, yeah.

21    Q.    Does Arthur have friends at school?

22    A.    Yes.

23    Q.    Does he ever see those friends outside of school?

24    A.    One of his friends, yes.

25    Q.    Are any of his friends from school from Brazil?

```
 1   A.   Yes.  He's Brazilian.

 2   Q.   Does Arthur ever speak English with his friends from

 3   school?

 4   A.   I believe so.

 5   Q.   Are there many people from Brazil living in Lowell?

 6   A.   Yes.

 7   Q.   Have you made friends in that community?

 8   A.   Yes.

 9   Q.   Has Arthur made friends in your neighborhood?

10   A.   Yes.

11   Q.   And what does Arthur like to do with his friends from the

12   neighborhood?

13   A.   There is one who lives in the apartment below us and there

14   is another friend that they play soccer and there is another

15   friend they play video game.

16   Q.   You testified earlier that Arthur is taking soccer

17   lessons, correct?

18   A.   Correct.

19   Q.   And is he still taking those lessons?

20   A.   Yes, he didn't go this week, but yes.

21   Q.   Does Arthur have any pets?

22   A.   Yes.

23   Q.   What kind of pet does he have?

24   A.   It's a female cat.

25   Q.   And what's the cat's name?
```

02:49 (line 10)
02:50 (line 20)

A.   He chose the name and it is Little Cookie.

Q.   I believe you testified earlier that you attend church about twice a week -- twice a month.  Excuse me.  Is that accurate?

         INTERPRETER:  Could you repeat that.

         MS. JAMES:  Yes.

Q.   I believe you testified earlier that you attend church about twice a month.  Is that accurate?

A.   Correct.

Q.   And you testified that Arthur and Gilberto come to church with you, correct?

A.   Yes, correct.

Q.   What's the name of your church?

A.   Gracia Batista.

Q.   Are services at this church conducted in Portuguese?

A.   Yes, in Portuguese.

Q.   Do other people from Brazil attend that church?

A.   The majority are Brazilian, the majority of people who goes to there are Brazilian.

Q.   Does Arthur participate in groups for children at church?

A.   Yes.

Q.   Does Arthur have friends at church?

A.   Are you talking about friends from the church who comes to our house or friends in general that he plays at the church?

Q.   Friends that he plays with while he's at church.

```
 1    A.    Yes.

 2    Q.    Is Arthur in good health?

 3    A.    Yes.

 4    Q.    Does he have a doctor in the United States?

 5    A.    Yes.

 6    Q.    Who is his doctor?

 7    A.    Dr. Ramadan.

 8    Q.    Where is his doctor's office?

 9    A.    I don't recall the name right now, but it's about 25

02:54 10    minutes from our house.

11    Q.    Is Arthur up to date on his vaccinations?

12    A.    Yes.

13    Q.    You have health insurance?

14    A.    Yes.

15    Q.    Is that through the State of Massachusetts?

16    A.    Yes.

17    Q.    Has Arthur ever told you that he's happy in the United

18    States?

19    A.    Yes, and also his behavior, he demonstrates that he's

02:55 20    happy.

21          MS. JAMES:  I think I'm going to wrap up just in time.

22    No further questions, Your Honor.

23          THE COURT:  Do you want to call it a day and resume

24    tomorrow?

25          MS. CROWLEY:  I think that makes good sense.
```

```
 1              THE COURT:  I've lost track.  That was direct or that
 2    was redirect?
 3              MS. JAMES:  That was our direct.
 4              THE COURT:  So you directed but you can cross, right?
 5              MS. JAMES:  Yes, we agree that's the case.
 6              MS. CROWLEY:  Yes, and I think we may have some
 7    limited re-examination briefly tomorrow morning.
 8              THE COURT:  Let's do it tomorrow.
 9              MS. CROWLEY:  Your Honor, just for planning purposes
10    tomorrow, could we maybe get estimates as far as how much more
11    time for the respondents' witnesses just so we can plan?
12              MS. JAMES:  We think we'll be able to conclude
13    tomorrow.  We have a teacher who I believe is planning to show
14    up at 10:00.
15              THE COURT:  In person or on video?
16              MS. JAMES:  On video.
17              THE COURT:  Are you planning on closing tomorrow?
18              MS. JAMES:  I think we would have time to do closings
19    tomorrow.
20              MS. CROWLEY:  Yes.
21              THE COURT:  That would be great.
22              MS. CROWLEY:  Are you expecting to need the rest of
23    tomorrow, or do you think we'd finish up by noon maybe?
24              MS. JAMES:  I think we could finish by lunch and do
25    closings after lunch.
```

```
 1            THE COURT:  We can take a longer lunch break so you
 2    can regroup to the extent you want to.
 3            MS. CROWLEY:  That sounds great, Your Honor.  Thank
 4    you.
 5            THE COURT:  So 9:30 tomorrow I have a short
 6    sentencing.  I'm cognizant that you have your witness at 10:00.
 7    We should be able to start by quarter-of-ten at the latest.
 8    Okay?
 9            MS. JAMES:  Thank you, Your Honor.
10            MS. CROWLEY:  Thank you very much.
11            (Recessed, 2:57 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Professional

4    Reporter, Registered Merit Reporter and Certified Realtime

5    Reporter, in and for the United States District Court for the

6    District of Massachusetts, do hereby certify that the foregoing

7    transcript is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter to the best of my skill and ability.

10                   Dated this 4th day of November, 2024.

11

12              /s/ Kelly Mortellite

13              _____

14              Kelly Mortellite, RPR, RMR, CRR

15              Official Court Reporter

16

17

18

19

20

21

22

23

24

25

A425

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                    )
EDERVALDO RODRIGUES DA SILVA,       )   Civil Action:  24-11280-ADB
                                    )
        Plaintiff/Petitioner,       )
                                    )
v.                                  )
                                    )
JESSICA SILVEIRA DA SILVA and       )
GILBERTO LUCAS,                     )
                                    )
        Defendants/Respondents.     )
                                    )


            BEFORE THE HONORABLE ALLISON D. BURROUGHS
                 UNITED STATES DISTRICT JUDGE


                   BENCH TRIAL DAY THREE


                     October 17, 2024
                        9:54 a.m.



          John J. Moakley United States Courthouse
                    Courtroom No. 17
                    One Courthouse Way
               Boston, Massachusetts  02210
```

```
                              Kelly Mortellite, RPR, RMR, CRR
                              Official Court Reporter
                              One Courthouse Way, Room 3200
                              Boston, Massachusetts  02210
                              mortellite@gmail.com
```

A426

```
 1    APPEARANCES:

 2    Counsel on behalf of Petitioner:

 3    Elizabeth G. Crowley, Esq.
      Charles R. Hunsinger, Esq.
 4    Bowditch & Dewey LLP
      101 Federal Street #1405
 5    Boston, MA 02110
      (617) 757-6500
 6    ecrowley@bowditch.com
      chunsinger@bowditch.com
 7

 8    Counsel on behalf of Respondents:

 9    James Matthews, Esq.
      Ruben J. Rodrigues, Esq.
10    Lea Gulotta James, Esq.
      Olivia Rae King Benjamin, Esq.
11    Jamie Steven, Esq.
      Amani Kmeid, Esq.
12    Foley & Lardner LLP
      111 Huntington Avenue, Suite 2500
13    (617) 342-4000
      rrodrigues@foley.com
14    ljames@foley.com
      obenjamin@foley.com
15    jsteven@foley.com
      akmeid@foley.com
16

17

18

19

20

21

22

23

24

25
```

A427

1

2                              <u>CONTENTS</u>

3

4    <u>WITNESS</u>                                              <u>PAGE</u>

5

     JESSICA SILVEIRA DA SILVA
6
         Continued Examination By Mr. Hunsinger          6
7

8    SARAH HOEY

9        Direct Examination By Ms. Kmeid                10
         Cross-Examination By Mr. Hunsinger             18
10       Redirect Examination By Ms. Kmeid             24

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2              (The following proceedings were held in open court

 3      before the Honorable Allison D. Burroughs, United States

 4      District Judge, United States District Court, District of

 5      Massachusetts, at the John J. Moakley United States Courthouse,

 6      One Courthouse Way, Courtroom 17, Boston, Massachusetts, on

 7      October 17, 2024.)

 8              THE COURT:  You made a motion you never followed up

 9      on.  It was going to be a partial motion.  Is that what you

09:54 10    said?

11              MS. JAMES:  Yes.  So, Your Honor, it's with respect to

12      respondent, Mr. Lucas, who is a named party in this case, and

13      our motion is that he should be dismissed as a party because

14      petitioner has presented no evidence of any involvement on his

15      part in either the wrongful removal or retention of the child.

16              MS. CROWLEY:  We don't have any problem with that.  I

17      had been surprised that request to dismiss hadn't been brought

18      before.  I didn't do the petition.  I also wasn't aware why he

19      was included, but I don't have any problem with that.

09:55 20            THE COURT:  Yes, I've never actually seen --

21              MS. CROWLEY:  I haven't either.

22              THE COURT:  -- someone in his position included as a

23      respondent, so that's granted.

24              MS. JAMES:  Thank you, Your Honor.

25              THE COURT:  That means that he should have been
```

1    sequestered and he wasn't, but so be it.

2         MS. CROWLEY:  We were told this morning they were not

3    calling him as a witness anyway, so that cures that.

4         MS. JAMES:  We do not intend to have him testify

5    today.

6         THE COURT:  Okay.

7         MR. HUNSINGER:  I believe we are on my redirect of

8    Ms. da Silva.

9         THE COURT:  Yes.

09:56 10         MR. HUNSINGER:  Ms. da Silva, if you could resume the

11   witness stand.  I sorry, I did this to myself this time.  We

12   had talked about 43, the civil police bulletin.  We provided

13   the English version without the Portuguese version.  I believe

14   you accepted it, but I do have the original Portuguese version

15   of the certification and English version.

16         THE COURT:  I don't need it but their concern was they

17   couldn't verify the accuracy of the English without seeing the

18   Portuguese.  So where are you on this now?

19         MS. JAMES:  Yes, we were provided a copy of this, Your

09:56 20   Honor, this morning, and we don't have any objection with this

21   version being admitted into evidence.

22         THE COURT:  You want to admit the Portuguese and

23   English?

24         MS. JAMES:  I would, yes.

25         THE COURT:  So that was --

         1          MR. HUNSINGER:  It came in as Exhibit 43, Your Honor.

         2    It was Petitioner's Contested Exhibit 12.

         3          COURTROOM CLERK:  43 was 12.

         4          THE COURT:  So now it's admitted as 43.

         5          (Exhibit 43 admitted into evidence.)

         6          THE COURT:  I think I admitted it before provisionally

         7    and now it's admitted.

         8          MR. HUNSINGER:  May I proceed?

         9          THE COURT:  I'm going to just remind the witness that

09:58 10    you're still under oath.

        11          MR. HUNSINGER:  She won't need my books this morning.

        12    CONTINUED EXAMINATION BY MR. HUNSINGER:

        13    Q.   Ms. da Silva, isn't it true that you only met Gilberto one

        14    month before coming to the U.S.?

        15    A.   Yes.

        16          THE COURT:  Hold on a second.  Let me interrupt you.

        17    Was the teacher going to testify at 10:00?

        18          MR. HUNSINGER:  The teacher is apparently available

        19    more than she thought she was, and I'm going to be --

09:58 20          MS. JAMES:  She got a sub, so she's available, just

        21    waiting for us to let her know when.

        22          THE COURT:  I didn't want to let it go.

        23          MR. HUNSINGER:  My apologies.  We had talked in the

        24    hallway about completing this first.

        25          THE COURT:  That's fine.  I just wanted to make sure.

```
 1              MR. HUNSINGER:  Thank you.
 2    BY MR. HUNSINGER:
 3    Q.   You moved in with Mr. Lucas immediately upon coming to the
 4    U.S., correct?
 5    A.   No, I didn't understand the question.
 6    Q.   When you came to the U.S. was the first place you lived
 7    with Mr. Lucas?
 8    A.   Exactly, yes.
 9    Q.   Isn't it true that in the U.S. you have never taken Arthur
10    to the dentist?
11    A.   Yes, it's true.
12    Q.   Isn't it true that in the U.S. you've never taken Arthur
13    to the eye doctor?
14    A.   Yes.
15    Q.   Isn't it true that Mr. Lucas is in removal proceedings?
16         Is it true that Mr. Lucas is in removal proceedings?
17    A.   I don't know.
18    Q.   Has Mr. Lucas been detained by immigration authorities?
19    A.   No.
20    Q.   Are you aware that your attorney has represented to this
21    court that Mr. Lucas is in removal proceedings?
22         Are you aware that your attorney has represented to this
23    court that Mr. Lucas is in removal proceedings?
24    A.   No, I don't know.
25    Q.   If Mr. Lucas is removed from the United States, will you
```

1    stay here or will you return to Brazil?

2    A.    At this moment I don't know the answer.

3              MR. HUNSINGER:  I have nothing further.

4              MS. JAMES:  If I could have a moment just to confer.

5              No further questions from me, Your Honor.

6              THE COURT:  Okay.  She's excused.

7              MS. JAMES:  Your Honor, we're just going to be

8    contacting the teacher now so she knows she should log on.  It

9    may be a couple of minutes.

10:02  10              THE COURT:  That's fine, no worries.

11              MS. KMEID:  Your Honor, before we start, if I could

12    ask a procedural question.  So the teacher speaks English.

13    Would you and opposing counsel prefer that it be translated

14    into Portuguese for the witnesses?

15              THE COURT:  For the parties?

16              MS. KMEID:  For the parties.

17              THE COURT:  Unless you all are going to waive it on

18    behalf of your clients, but I think they're entitled to hear

19    what's going on.

10:04  20              MR. HUNSINGER:  We're willing to waive the translation

21    just in the interest of moving this along.

22              MS. KMEID:  I think we would prefer the translation,

23    Your Honor.

24              THE COURT:  I didn't hear.  You said you --

25              MS. KMEID:  We prefer it be translated.  She's going

 1    to be on the screen.

 2              (Discussion off the record.)

 3              THE COURT:  What's the teacher's name?

 4              MS. KMEID:  Sarah Hoey.

 5              COURTROOM CLERK:  What's the other name?

 6              MS. KMEID:  Jane Mosher Canty.

 7              THE COURT:  Ms. Mosher Canty, can you hear us?  We're

 8    just waiting for your client to come on.  I didn't want to

 9    leave you in the waiting room too long.

10:08 10              Ms. MOSHER CANTY:  Thank you.  I appreciate it.  Yes,

11    I texted her the minute I got notice that we were ready.

12              MS. KMEID:  Good morning, can you hear us?  Are you

13    able to speak so we can hear you?

14              THE WITNESS:  Yes, good morning.  I'm sorry.  I'm

15    really sick, of course.  I woke up yesterday and my throat is

16    -- I'm going to do my best, I'm so sorry.

17              THE COURT:  I think we're the ones that should be

18    sorry.

19              MS. KMEID:  Before we begin, I just wanted to let

10:09 20    everyone know that I'm going to go speaking in English, then

21    we're going to take a pause so the interpreter can interpret

22    into Portuguese, and then, Ms. Hoey, if you could respond in

23    English, obviously.  Then we'll take a moment for the

24    translator to interpret into Portuguese again, so there will be

25    a bit of a pause between our conversation.  Respondents will

1    call Sarah Hoey.

2                    SARAH HOEY, sworn

3    DIRECT EXAMINATION BY MS. KMEID:

4    Q.   Hi, Ms. Hoey.  My name is Amani Kmeid.  How are you doing

5    today, aside from the fact that we know you're sick?

6    A.   Good morning.  I'm doing well.

7    Q.   Thank you for being here.  Would you please tell us where

8    you work.

9    A.   I work at the Greenhalge Elementary School in Lowell,

10:11 10   Massachusetts.

11   Q.   What is your position at Greenhalge Elementary School?

12   A.   I'm a third grade teacher.

13   Q.   How long have you taught at Greenhalge Elementary School?

14   A.   This is my sixth year at the school.

15   Q.   What grades does Greenhalge Elementary School offer?

16   A.   We have students from pre-K up to fourth grade.

17            THE COURT:  Can I just make a suggestion that, given

18   that she's not well, I would pare it down to the questions that

19   you really need.

10:12 20           MS. KMEID:  Okay.  Yeah, I can do that.

21   BY MS. KMEID:

22   Q.   Do you know Arthur Silveira da Silva?

23   A.   Yes.

24   Q.   How do you know Arthur?

25   A.   He was my student last year, last school year.

 1    Q.    When did you first meet Arthur?

 2    A.    I actually met him when he was in second grade just

 3    incidentally because our school is a community school, so I met

 4    him then.  Then I met him obviously more when he was my

 5    student.

 6    Q.    Ms. Hoey, I sent you some folders.  If you could open up

 7    JX20.

 8    A.    Sure.  Okay.  I see, I'm looking at it.

 9    Q.    Do you recognize this picture?

10:14 10    A.    Yes.  It's a picture of myself and Arthur that was taken

11    by another third grade teacher.

12    Q.    Do you remember when it was taken?

13    A.    I think that would have been probably maybe May, April,

14    May or June of 2024 of the school year.

15    Q.    How would you describe your relationship with Arthur?

16    A.    I would call it a teacher/student relationship.

17    Q.    Were there any other multilingual students in your a class

18    last year?

19    A.    Yes.

10:16 20    Q.    Do you recall what languages were spoken?

21    A.    In my class we had Portuguese speakers, Spanish speakers,

22    Swahili.  I believe those were the only three languages that I

23    had last year.

24    Q.    Were there other Brazilian students in the class aside

25    from Arthur?

1    A.    Yes.

2    Q.    What language is your class taught in?

3    A.    English.

4    Q.    Is there any support in your classroom for students who

5    are not fluent in English?

6    A.    Yes.  We have a lot of supports.  I have a ELL certified,

7    multilingual certified teacher that teaches with the third

8    grade classrooms, so she provides scaffold supports throughout

9    the school day.  And on top of that, she provides specific ELD

10:17 10    instruction, which is English language development instruction,

11    which is pull-out from the classroom for a set amount of time

12    each day.

13    Q.    Could you walk us through a typical day in your classroom

14    for Arthur.

15    A.    Okay.  So we provide breakfast in the morning for students

16    7:40 to 8:00.  Then we have a morning meeting curriculum, which

17    includes social emotional learning.  It's open circle

18    curriculum.  Then we have reading.  Sorry.  Then we go into

19    math, which we have math block, which includes direct

10:19 20    instruction for 30 minutes, and then we go into intervention

21    and supports also for math.  Then the students have different

22    allied arts every day.  They would have physical education,

23    art, music.  It varies depending on the day.  Then they would

24    have lunch and recess.

25          Following that we have like our literacy portion of the

         1   day, which is a big chunk of the day, during which time that's

         2   when Arthur would have received his ELD instruction in a

         3   separate room with other non-English speakers.  And then

         4   towards the end of the day we have writing and science.

         5   Q.   Could you explain to us a little bit about the social and

         6   emotional learning -- sorry.  How did Arthur perform

         7   academically in your classroom?

         8   A.   I would say that he was on the lower end academically and

         9   for overall for the year he didn't make expected or significant

10:22   10   academic growth, but I did see that towards the second half of

        11   the year his motivation and willingness to participate and

        12   being responsible for his learning did begin to increase.

        13   Q.   Ms. Hoey, did you say his motivations increased or

        14   decreased?  I wasn't able to catch what you said.

        15   A.   I'm sorry.  Increased, increased.

        16   Q.   Could you please open Exhibit JX41, please.

        17   A.   Did you say 21?

        18   Q.   41.

        19   A.   Okay, 41.  Okay, I have it.  It's his report card.

10:24   20   Q.   If you could turn to page JX41.0007.

        21   A.   Okay, yes.

        22   Q.   My intention was for you to read some of these comments

        23   for us, but I will do that on your behalf.

        24   A.   I know, I'm so sorry.  I mean, I can try.

        25   Q.   That's okay.  I will read them and we'll proceed from

 1     there.

 2          So I understand that Arthur was in your classroom for the

 3     fall and the winter of 2023 and then the spring of 2024.  Is

 4     that correct?

 5     A.    Yes, that's true.

 6     Q.    The teacher's comment for the fall semester, it says,

 7     quote, "I would like Arthur to take more interest and

 8     responsibility for his learning.  He is an inquisitive and

 9     capable student, and I can't wait to see his growth this year.

10:25 10     Carry on being you, Arthur," end quote.

11          Did I read that correctly?

12     A.    Yes.

13     Q.    I believe you testified previously that Arthur's

14     motivations had increased throughout the year.  Is that

15     correct?

16     A.    Yes.

17     Q.    In what ways did you see his motivations improve

18     throughout the year?

19     A.    Stay on task, seeking out teacher assistance, initiating

10:27 20     questions more or, like, looking for clarification on what the

21     expectation was to really -- you could tell he was wanting to

22     do well.  He was coming to us more, asking for something to be

23     translated or asking for more information from myself or the

24     EDL teacher.  I don't know if -- I hope that makes sense.

25     Q.    I'm going to read the teacher's comment.  "Winter.  Arthur

         1    has a kind heart, is sweet.  He is full of life and has a

         2    contagious smile.  Arthur has been trying very hard to stay on

         3    task and avoid behavior that might distract him and his

         4    classmates.  When he's involved in his learning Arthur likes to

         5    share his ideas with the class.  He's working hard to develop

         6    his reading and writing skills.  In math he likes to try out

         7    new strategies and learning mathematical games.  Arthur should

         8    continue practicing the multiplication tables at home every

         9    night.  Keep it up Arthur."

10:28   10         Did I read that correctly?

        11    A.    Yes.

        12    Q.    How could you tell Arthur was trying very hard to stay on

        13    task?

        14    A.    I would say sort of same as my last answer, I guess.  He

        15    was sort of avoiding distractions.  He would, like, be at his

        16    desk, choosing a learning spot where he could focus, seeking

        17    out teacher supports and completing his school, his class work.

        18    Q.    In what ways did you see Arthur working hard to develop

        19    his reading and writing skills?

10:31   20    A.    I would have to defer that to his EDL teacher.  She is the

        21    one who gave direct support for reading and writing

        22    specifically.  But I did notice, like, the output of that.  He

        23    would come back from his reading and writing group and want to

        24    show me what he was learning, show me his writing that he had

        25    completed.  He was, like, eager to share that.

1   Q.   How was Arthur's behavior in your classroom last year?

2   A.   I would say towards the beginning of the year he had a

3   more difficult time staying on task, not being -- I guess it

4   was more silly, just, you know, kind of distracting other kids

5   or himself.   And then again towards the middle of the year, his

6   behavior was -- he was meeting expectations of the classroom,

7   rules and responsibilities.

8   Q.   How did Arthur get along with other students in your

9   classroom?

10:33 10   A.   I would say, I mean, from looking at inner peer

11   relationships, he seemed to get along well with them.

12   Q.   Were any of those friends Brazilian?

13   A.   Yes.

14   Q.   Was Arthur able to assist any of his Brazilian friends in

15   the classroom?

16   A.   Yes.   He actually seemed to enjoy sort of being, you know,

17   an interpreter of sorts, where he felt like another student was

18   sort of struggling to understand, he would ask me, he would

19   translate.   He seemed to enjoy doing that.

10:35 20   Q.   Have you ever spoken with Ms. Silveira da Silva, Arthur's

21   mother?

22   A.   Yes.   We communicated through DOJO, which is a school

23   communication app, and also she had come into the school for

24   parent/teacher conferences where we had a translator and

25   herself and myself.

1    Q.    I'm going to turn back to JX41.0007.

2    A.    Yes.

3    Q.    I'm going to read the teacher's comments for the spring.

4    "My Dear Arthur, I have loved being your teacher this year.

5    Arthur has grown in many ways during the school year.  He has

6    worked hard to maintain consistency and meet expectations, both

7    socially and academically.  I am very proud of his

8    achievements.  He works very hard every day.  Keep being you,

9    Arthur.  You are a positive light.  Have a safe and healthy

10:36 10    summer."

11          Did I read that correctly?

12    A.    Yes.

13    Q.    Did you see an improvement in Arthur's language skills

14    from the beginning of the year to the end?

15    A.    Yes.  I mean, I don't have data to show if that is true.

16    He will take the ACCESS scores, the ACCESS testing again in

17    January.  But I will -- I can say that expressive language, his

18    willingness to participate in class, vocabulary he was using,

19    sentences that he was forming all improved throughout the year.

10:38 20    Q.    Was Arthur able to communicate in English with you and his

21    peers towards the end of the year?

22    A.    Yes.

23    Q.    And did Arthur move on from your class into fourth grade

24    this year?

25    A.    Yes.

A442

1        MS. KMEID:  I have no further questions.  Thank you.

2    CROSS-EXAMINATION BY MR. HUNSINGER:

3    Q.   Ms. Hoey, my name is Charlie Hunsinger.  I represent the

4    petitioner, Edervaldo da Silva.

5    A.   Hello, nice to meet you.

6    Q.   I would ask that you please wait until the translator has

7    finished translating my questions until you begin your

8    response.

9    A.   Sounds good.

10:40  10   Q.   I'm going to endeavor to ask you mostly yes or no

11   questions to save your voice.

12   A.   Thank you.

13   Q.   If a question calls for a yes or no, please answer only

14   yes or no.

15        Ms. Hoey, isn't it true that Arthur was originally placed

16   in third grade in September of 2022?

17   A.   I believe so.

18   Q.   And he was then moved to second grade, correct?

19   A.   Honestly I wasn't part of any of his experience at that

10:41  20   time, so I'm not sure.

21   Q.   Please return to Joint Exhibit 41, page 7.  When you noted

22   on this report card that you would like Arthur to take more

23   interest and responsibility for his learning, what did you

24   mean?

25   A.   Are you referring to the comment in the fall?

1    Q.    Yes.

2    A.    So as I would for any of my students, I wanted him to be

3    more engaged in his learning to, you know, meet the

4    expectations of a third grade student.  And that's kind of

5    common for students coming in in the fall.  The transition from

6    second grade to third grade can be a lot.  But I think that's

7    what I meant by that.

8    Q.    Ms. Hoey, would you agree with me that the gradings rubric

9    on this report card is out of 5?

10:43  10    A.    Yes.

11          INTERPRETER:  The interpreter couldn't hear.  I'm

12    sorry.

13          MR. HUNSINGER:  I asked if she would agree with me

14    that the rubric on this report card is out of 5.

15    A.    Yes.

16    Q.    Would you agree with me that in most of these categories,

17    Arthur received 1's and 2's?

18    A.    Yes.

19    Q.    Ms. Hoey, is a 2 on a scale out of 5 a passing grade?

10:44  20    A.    It's listed, as you can see the grading at the top,

21    there's a key for what we consider a 2.  It says -- oh, my

22    gosh, mine isn't -- is the one that's in Portuguese.  I think 2

23    is like not -- I'm looking for the page that says that.  Yeah,

24    so a 2 is beginning to understand the standard but needs

25    support.  So that support could include things like language

A444

1   translation or scaffolds to make it accessible to a student

2   whose first language is not English.

3   Q.   That wasn't my question.  My question is, is a 2 out of 5

4   a passing grade?

5   A.   We don't really consider -- I'm not sure -- we don't

6   consider grades passing or failing for third grade.  We go by

7   this rubric that you can see right at the top first, 1 through

8   5, or M, modified.  So a 5 would be a student who is fully

9   exceeding the Mass. curriculum framework standards.  And then

10:47 10  it goes from there.

11   Q.   Ms. Hoey, would you agree with me that 2 out of 5 is 40

12   percent?

13   A.   Well, we don't calculate the grades in the way that you're

14   saying.  I agree 2 out of 5 is 40 percent, but that's not the

15   way that we come up with the grade here that you're seeing.  We

16   base it -- so the standard that's in upper case there they're

17   talking about the Massachusetts Curriculum or Core Curriculum

18   Standards for third grade.  And then they're all listed down

19   the side.  And using whatever data we've collected on

10:48 20  assessments or classroom or class work, we determine if the

21   student is beginning to understand the standard, is making

22   progress, like they're close or if they've totally mastered the

23   standard and can move on, if that makes sense.  I don't know.

24        MR. HUNSINGER:  Your Honor, I understand at this point

25   in the trial you're not big on striking testimony, but I would

1  like the record to reflect that she said "Yes, 2 out of 5 is 40

2  percent," so we have that more clear than the long answer that

3  was not responsive to my question.

4  　　　　THE COURT:  Well --

5  A.  But I would like to say --

6  Q.  There's no question before you.

7  A.  It doesn't mean 40 percent.

8  　　　　MR. HUNSINGER:  There's no question before you.

9  　　　　THE COURT:  Hold on.  Having just had kids that

10:50 10  relatively recently passed out of the Massachusetts elementary

11  school, I understand exactly what she's saying.  You're trying

12  to force her into a letter grade, and it's just not the way the

13  elementary schools conceive of it.

14  　　　　So I see it's a 1 through 5.  I see it's a 2.  I see

15  what a 2 means.  And I think you two are just talking past each

16  other a little bit.  You want to put it into a grade, and she's

17  trying to explain that's not really how they do it.  So I

18  understand exactly where we are on that.  I'm not going to

19  strike it.

10:51 20  Q.  Ms. Hoey, please turn to Joint Exhibit 41, page 5.  Would

21  you agree with me up at the top that the total annual absences

22  that Arthur had the year he was in your class was 19?

23  A.  Yes.

24  Q.  Ms. Hoey, is there a limit to the number of days a student

25  is allowed to miss during a school year?

1   A.   I actually am not sure what that number is.  Jane might

2   know.

3           MS. MOSHER CANTY:  Am I supposed to answer?

4           THE COURT:  No.

5   Q.   It was a yes or no question.  Is there a limit to the

6   number of days students can miss?

7   A.   Sorry.  I don't know.

8   Q.   Please turn to Joint Exhibit 39, and please turn there to

9   page stamped 184.

10:54 10   A.   Did you say 39?

11   Q.   Yes.  It's da Silva 184, JX390020.

12       Ms. Hoey, are these the results of an ACCESS test to which

13   you referred on your direct examination?

14   A.   I'm still scrolling.  Which page, I'm sorry?  Sorry, I'm

15   scrolling down.  Yes.

16   Q.   And would you agree with me that Arthur scored a 1 in

17   listening, speaking, and writing on this test in second grade?

18   A.   Yes.

19   Q.   And would you agree that this test is on a 1 to 6 scale?

10:55 20   A.   I don't see the scale anywhere.  I'm not certified to give

21   the ACCESS test or know much about it.  I don't know what the

22   scale goes to, to be honest.  Is it listed here?  I see it, I'm

23   sorry, I see it, yes.  I would agree with that, yes.

24   Q.   Please turn to Joint Exhibit 39, page 22, so two pages

25   later.

1   A.   Okay.  Thanks.

2        THE COURT:  Did you say 39, 22?  Mine is blank.  Do I

3   have the right page?

4        MR. HUNSINGER:  39, 22.

5        MS. KMEID:  This was the earlier version, I think it's

6   the earlier version.

7        MS. CROWLEY:  That's the replacement one.

8        MS. KMEID:  Yeah, that's the replacement.

9        THE COURT:  Are you talking about two pages further?

10:57 10  It's 27, not 22, which is two pages earlier.

11       MR. HUNSINGER:  My apologies, I thought I had swapped

12  it.

13       THE COURT:  Do you want us to all turn to the ACCESS

14  for 2024?

15       MR. HUNSINGER:  Yes.

16       THE COURT:  That's 27.

17       MR. HUNSINGER:  Thank you.

18  BY MR. HUNSINGER:

19  Q.   Do you have before you the ACCESS test for 2024?

10:57 20  A.   I believe so.  Is it the one with the line plot here?

21  Q.   It might be.  Page 27.

22  A.   I'm sorry.  Yes.

23  Q.   My apologies.  I swapped them.

24       Would you agree with me that Arthur scored a 1 in

25  listening, speaking, reading, and writing on this test when he

1    was in third grade?

2    A.    Yes, yes.

3    Q.    Are you aware that Arthur attended summer school in the

4    summer of 2023?

5    A.    No.

6    Q.    Ms. Hoey, did you ever have to remove Arthur from your

7    classroom for any reason?

8    A.    No, not that I recall.

9    Q.    Was Arthur's behavior in your classroom ever disruptive?

10:59 10   A.    At the beginning of the year more so just as in like

11   getting off track, talking to peers, in that way, yes.

12   Q.    You testified on direct that Arthur was asking for things

13   to be translated.  Was he still asking in the spring of 2024?

14   A.    Any third grade curriculum can be difficult to assess even

15   for English speakers, so for some words here and there, yes, I

16   think he was just interested in increasing his vocabulary and

17   learning in that way, but yes.

18              MR. HUNSINGER:  I have nothing further.

19              MS. KMEID:  Redirect, Your Honor?

11:02 20       THE COURT:  Yes.

21   REDIRECT EXAMINATION BY MS. KMEID:

22   Q.    Ms. Hoey, do other non-English as a first language

23   students need translation services in your classroom?

24   A.    Yes.

25              MS. KMEID:  No further questions.

1          MR. HUNSINGER:  No recross, Your Honor.

2          THE COURT:  You're excused.  Thank you.  I hope you

3     feel better.

4          THE WITNESS:  Thank you.

5          MS. JAMES:  Your Honor, we have no further witnesses.

6          MS. CROWLEY:  We have no rebuttal or further evidence

7     to offer, Your Honor.  I would ask for a brief amount of time

8     just to be able to gather our thoughts before closing.  And my

9     colleague, Attorney Hunsinger, would like to address one just

11:03 10    administrative issue before perhaps we do that, if you're

11    willing to allow us.

12          THE COURT:  We'll get to him in a minute.  When do you

13    want to close, what time?

14          MS. CROWLEY:  I only need probably 20 minutes.

15          MS. JAMES:  That would be okay with me.

16          THE COURT:  How long do you think closings will be?

17          MS. CROWLEY:  I expect to be about 20 minutes, no more

18    than half hour.

19          MS. JAMES:  Mine is significantly less than that, Your

11:03 20    Honor.

21          THE COURT:  All right.  So just to, I like even times.

22    Do you want to come back at 11:30 for closings?

23          MS. CROWLEY:  That works well.

24          THE COURT:  And Mr. Hunsinger?

25          MR. HUNSINGER:  In our contested exhibits, number 15,

1    we have translations of articles of the Brazilian civil code

2    that we'd like to enter into evidence as an exhibit.

3            THE COURT:  Hold on.  Let me find that one.  What's

4    the number?

5            MR. HUNSINGER:  Number 15 in the Petitioner's

6    Contested book.

7            THE COURT:  And Respondents' position on that?

8            MS. JAMES:  Yes, Your Honor.  We have a few issues

9    with this exhibit.  The first is that the document, as we have

11:04 10    it, contains not only what is purportedly a reproduction of

11    law, which we think is inappropriate to be introduced into

12    evidence and you as the judge can take judicial -- not of

13    foreign law but it also contains towards the back what purports

14    to be an affidavit about the meaning of Brazilian law.  This

15    document was produced to us on October 1.  On the exhibit list,

16    that joint exhibit list that we put before you in the joint

17    pretrial memorandum, it was only identified by petitioner as

18    Brazilian Civil Code.  An actual document that they intended to

19    introduce into evidence was not given to us at that time.  The

11:05 20    full document that they planned to use was only sent to us on

21    Friday, October 11, and that was the first time that we knew

22    that this affidavit was actually included in their exhibit

23    list.

24            We don't have the original Portuguese version of that

25    affidavit, and we would submit that it is essentially improper

            1    expert testimony where no experts were disclosed in this

            2    matter.  It's also unclear to us, Your Honor, why the document

            3    was obtained.  It looks like it's dated August 4, 2022.  It's

            4    not clear whether it was obtained for the purpose of anything

            5    having to do with this particular child's removal.  It's not

            6    clear why or how it was created.  So we would ask that the

            7    exhibit be excluded in its entirety.  If the affidavit

            8    specifically is admitted, we would ask for a chance to review

            9    and potentially provide expert rebuttal after the conclusion of

    11:06  10    trial.

           11         THE COURT:  I'm going to admit the first part of it.

           12    I can take judicial notice of it.  It's much easier for me if

           13    it's on the record.  But respond on the affidavit, please.

           14         MR. HUNSINGER:  Yes, thank you.  I misspoke.  We would

           15    be asking you to take judicial notice of the Brazilian law.  We

           16    would not be necessarily asking you to introduce it as an

           17    exhibit.  Per the Hague Convention you can take judicial notice

           18    of this.  This came to us with the affidavit of apiece.  We

           19    would not necessarily insist on the affidavit if you are

    11:07  20    willing to take the translation of the civil code itself.  I

           21    thought the affidavit would be helpful to the court because

           22    there is a actually QR code that allows you to check the

           23    authenticity of the document.  It came to us directly from the

           24    State Department in connection with these proceedings.  And so

           25    that's our position on that.

1          If you would prefer to only take the code, that's

2    okay.  But I think that this document came to us all of apiece

3    and therefore it should be submitted of apiece.

4          THE COURT:  He's making the completeness of the

5    document argument, but if you don't want the affidavit, I'll

6    admit the first three pages of the exhibit, not the last two.

7          MS. JAMES:  That's fine with us, Your Honor.  Thank

8    you.

9          MR. HUNSINGER:  Thank you, Your Honor.

11:08 10          THE COURT:  The affidavit might, as far as I know,

11    have completely different meaning in Brazil, and this might be

12    actually part of the law, but I don't know that, and I don't

13    know who wrote it.  I don't know if it's still good since it

14    was drafted in 2022, so I think the safest thing is just to

15    exclude the affidavit.

16          MR. HUNSINGER:  Understood, thank you.

17          THE COURT:  So petitioner's 15, the first three pages

18    becomes Exhibit--  what are we on, Karen?

19          COURTROOM CLERK:  51.

11:09 20          THE COURT:  Okay.

21          (Exhibit 51 admitted into evidence.)

22          MS. JAMES:  Your Honor, one last housekeeping thing,

23    which is that I am not sure we ever officially moved the joint

24    exhibits into evidence, and I just want to ensure that

25    everything provided to you in the Joint Exhibit binder is moved

1  into evidence.

2          THE COURT:  I thought you had, but in any case, it's

3  moved into evidence.  And even if you hadn't, nobody can -- at

4  the very least there's a waiver argument anyone contesting any

5  those exhibits later, so you're good.  So it's now ten past

6  eleven.  Do you want another few minutes, or is 11:30 still

7  good?

8          MS. CROWLEY:  11:30 works fine for me, Your Honor.

9          THE COURT:  How about this, come back when you're all

11:09 10  ready, in the range of 11:30.  Okay.  Thanks, everyone.

11          (Recess, 11:09 a.m. - 11:36 a.m.)

12          MS. CROWLEY:  Maybe at the right time have one of the

13  interpreters just let the parties know that --

14          THE COURT:  That's where we are right now, right?

15          Do you want simultaneous translation --

16          MS. CROWLEY:  From an equity standpoint, I agree to

17  either have a translator for the parties or not.  I don't think

18  it's fair for one to have the benefit --

19          MS. JAMES:  We're okay with that, Your Honor.  We can

11:36 20  do the same and tell our client the summary after.

21          THE COURT:  I think that makes good sense.

22          MS. JAMES:  We should let them know we're not going to

23  interpret this piece.

24          INTERPRETER:  Okay.

25          MS. CROWLEY:  May I proceed, Your Honor?

1    Good morning again, Your Honor.  Attorney Elizabeth

2 Crowley for the petitioner, with my co-counsel Charles

3 Hunsinger.  Thank you to the court and to your staff for the

4 time that you've given us for this important matter over the

5 course of the past three days.

6    Your Honor, when I began my opening on the first day

7 of trial, I went through the objects of the Hague Convention.

8 I shared with the court, and as the court knows, that the

9 objects of the Hague Convention are to secure the prompt return

11:37 10 of children wrongfully removed; two, or retained in any

11 contracting state and to ensure that the rights of custody and

12 of access under the law of one contracting state are

13 effectively respected in the other contracting state.

14    That is precisely what we are looking to accomplish

15 here, Your Honor.  That is precisely what is outlined in the

16 petitioner's petition and precisely what we're looking to

17 accomplish by way of the relief that we're seeking under the

18 petition, Your Honor.

19    As I shared at the beginning of my presentation and my

11:38 20 opening, the removal or the retention of a child is to be

21 considered wrongful where it is in breach of rights of custody

22 attributed to a person, an institution, or any other body

23 either jointly or alone under the law of the state in which the

24 child was habitually resident immediately before the removal or

25 retention and at the time of removal or retention those rights

A455

1    were actually being exercised or would have been so exercised
2    but for the removal or retention.
3        You heard, Your Honor, at length from our client, the
4    father, Edervaldo, and you heard from him after the parties
5    separated, after a long-term relationship, and he testified,
6    Your Honor, as to how long they knew one another and testified
7    as to the breaking down and their ultimate separation both in
8    their relationship as well as household.
9        Our client testified as to the regular visitation he
11:39 10   was having with his son -- and this is important -- even before
11   the Brazilian judgment in December of 2021 was put into place.
12   So the parties separated, they separated households, and he
13   promptly began and continuously saw his son.  We saw pictures
14   of Edervaldo and his son.  We saw evidence of a loving
15   father-son relationship.  We heard from Edervaldo of the types
16   of things that he enjoyed doing with his son, his only son, his
17   only child.
18       We heard from Edervaldo of his exercising his rights
19   pursuant to this December 2021 Brazilian judgment.  That is in
11:40 20   evidence.  And when you look at that, Your Honor, you will see
21   the very specific rights of custody and access under that
22   December 2021 judgment that the father, our client Edervaldo,
23   had with his son Arthur.  You see not only that he had rights
24   to regular every-other-weekend parenting time with his son.  I
25   like to say "parenting time" as opposed to always visitation,

1    so it's not assumed you're visiting with your child.  And he

2    exercised and he testified that he exercised that parenting

3    time.

4           You'll recall, Your Honor, during the mother's

5    presentation, they tried to suggest to you that a missed visit

6    could somehow interrupt the continuity of that parenting time,

7    that visitation with his son.  You heard our client testify

8    that if there was a missed visit, he believed there was a

9    missed visit at a point in time during which he had COVID, in

11:41 10   which he didn't think that it was probably the responsible

11   thing to do to exercise his parenting time with his son while

12   he had COVID and expose him.

13          Your Honor, missing a visit does not equate remotely

14   to not exercising the visitation that he had under the December

15   2021 judgment.  The credible evidence in this case and as our

16   client testified to is that he continuously exercised his

17   visitation with his minor child Arthur up until the point where

18   mother took him from Brazil, and I'll get to that in a moment,

19   Your Honor.

11:41 20          I understand that the court has taken judicial notice

21   of the Brazilian civil code, and we have offered a copy for the

22   court's convenience so that you have that.  And in taking a

23   look at that Brazilian code, Your Honor, you will see that both

24   biological parents have a variety of rights which are outlined

25   in the Brazilian civil code, one of which is the right to

1    refuse the ability to travel.  And I'll get to the travel

2    authorization and the passport momentarily, Your Honor.

3            But even prior to the December 2021 judgment,

4    Edervaldo had rights of custody to his son and exercised those

5    rights.  And his testimony was credible in that regard with

6    respect to all of the times that he would spend with his son,

7    whether it was picking him up from preschool as he testified to

8    and doing any number of things that a father would do with his

9    child notwithstanding the parties' physical separation, Your

10   Honor.

11           Your Honor, you heard from our client as well as far

12   as the breakdown in the parties' relationship, it is our

13   position and I think this is the case from both parties'

14   testimony, this relationship had run its course, regardless of

15   why that was.  Mother had testified, it sounded like very few

16   problems during the course of the bulk of their relationship.

17   Father had testified about claimed infidelity.  But even if

18   that wasn't the case, father filed for divorce.  Both parties

19   agreed it was going to be better to separate and to no longer

20   be married to one another.  The parties ultimately separated.

21   I've already spoken, Your Honor, about our client's testimony

22   with respect to his exercising of his visitation rights

23   post-separation and prior to the December 2021 judgment with

24   his son.

25           And he next, Your Honor, spoke about the passport, and

1    I think this is really important in the timeline.  You heard
2    from our client's testimony that he was previously asked by
3    mother in the months leading up to their departure to sign a
4    passport application.  You heard him testify that she even came
5    to his place of employment.  We can all think about the
6    pressure that one would feel when someone is showing up at your
7    place of employment demanding that you sign paperwork.  You
8    heard from our client's testimony, even though she repeatedly
9    asked him to sign this passport application, it wasn't until he
11:44 10    actually did sign the passport application at some point in
11    March of 2022 that he signed it.
12         You heard him testify about the assurances that he
13    sought from mother.  You heard about some of what mother
14    assured him was her intention in getting that passport.  You
15    heard our client explain to the court, he said documentation,
16    but you heard him explain how he believed that this was for
17    identification purposes only.  The passport speaks for itself.
18    It is what it is, and ultimately the application was signed and
19    a passport was issued for this child.
11:44 20         I think it's curious, Your Honor, you heard mother
21    through her counsel attempt to look at some of the language in
22    the passport application to try to suggest that some of the
23    language at the very bottom of the passport application
24    speaking to the authorization to travel somehow gave her the
25    rights to come here permanently or semi-permanently or somehow

1    was a tacit acknowledgment or consent by father to do what she

2    did, which was to come here illegally and take their child here

3    illegally without -- and I think the credible evidence supports

4    this -- without telling father what she was going to do.  That

5    is not the law.

6         The travel authorization separate and apart from the

7    passport application was signed by our client.  You heard him

8    testify as to why he did that.  Beyond the pressures that he

9    spoke to, you heard him testify, and I believe credibly, Your

11:45 10    Honor, that he did not believe that she was going to come here

11    to the United States with their minor child.  And I think if

12    you look to our client Edervaldo's actions immediately after

13    their departure, I think that speaks to his intent, and I think

14    it speaks to what the truth was here, Your Honor.

15         If we believe mother who says, no, look at the

16    passport application and the travel authorization; he knew I

17    was going to come here; he consented, you know, he knew we were

18    going to come here, and then you look at what the father did

19    immediately upon realizing that he had grave concerns that what

11:46 20    he had feared was going to happen was in fact going to happen,

21    which is that she was going to leave Brazil with his minor

22    child imminently.

23         You heard his testimony as to what he did.  He texted

24    her to let her know that the passport application had been

25    withdrawn.  He actually took the steps to withdraw that

1  passport.  He alerted the authorities.  He filed a police

2  report.  Mother was on the stand and my colleague Attorney

3  Hunsinger refreshed her recollection with text messages which

4  showed, okay, even though it was inconsistent with her prior

5  testimony from her own counsel, that she was on notice that

6  that passport had been revoked.  Okay.  Even knowing that,

7  okay, she still went.  She still left from the airport and came

8  here into the United States.

9        Mother's testimony was then, if I follow it, that

11:47 10  father didn't move quick enough.  It was father's duty to try

11  to either stop that or maybe he didn't pay the passport

12  termination fee, and I'd be surprised if there even is a fee

13  for something like that, but we didn't hear any testimony on

14  that, but that he didn't move quick enough to stop her.  That

15  is not the law, Your Honor.  He did everything he could,

16  including almost contemporaneous with this removal filing an

17  application through the Hague in Brazil for the return of his

18  minor child.

19        He subsequently filed the initial petition once he was

11:48 20  able to secure pro bono counsel, which was predecessor counsel,

21  solely for purposes of filing and preparing that petition.  And

22  in between then, Your Honor, even took the added steps through

23  counsel in Brazil to be able to file an action to be able to

24  have regular contact with his child.  You heard his testimony

25  before that prior to June of 2024, which is when that judgment

1    which is also or decision is also in evidence, prior to that,
2    his ability to have contact with his minor child was not
3    regular.  You heard something different from mother, suggesting
4    there were no problems, no limitation of his access.  But I
5    think the fact that he had to go and seek judicial intervention
6    in order to get those three-times-per-week videoconferences
7    speak for itself.  You heard him testify that he has done that
8    regularly.  I think it was really important mother's new
9    sister-in-law even testified on cross-examination that she has
10   seen them speak at length on these conference calls or video
11   calls, father and son.  That shows the bond, the continuing
12   bond.
13         You heard the father say of his love for his son, the
14   fact that he tells him continuously how much he loves him and
15   how much he misses him.  And the fact that they've been able to
16   continue to maintain that bond, and you have a child staying on
17   with the father.  The child that's only ten years old, that's
18   been eight, nine and ten in the intervening time, staying on to
19   speak with his father for that long length of time I think is
20   meaningful.
21         Your Honor, there was another time where my colleague,
22   Attorney Hunsinger, was speaking with mother, and it was proven
23   again through her text messages that a time where she
24   represented to Edervaldo, to the father that she was still in
25   Brazil, I believe it was in Vitoria or Victoria, if I have it

A462

1    correctly, she was already here in the United States.  All goes

2    to credibility, Your Honor.

3         When you look at the timeline of when she came here

4    and you think collectively of the testimony of mother's new

5    sister-in-law and mother's testimony, they did not call

6    mother's new husband.  There was also mother's new

7    brother-in-law.  I think it's really interesting when you put

8    all of their testimony together.  It was very clear from the

9    testimony that all three knew that they were coming here to

11:50 10   stay.

11         There was a family party at some point in time in

12   Brazil where it appears that this was the first time that

13   mother's new sister-in-law had met Jessica.  Jessica testified

14   that she had only been dating her new husband for about a month

15   before, if her testimony is accurate, before they came here to

16   the United States.  But you also heard testimony that mother's

17   new husband was already here in the United States living in

18   Lowell for some period of time prior to the other three and

19   Arthur coming here to join him.  So it's unclear to me, were

11:51 20   they dating for a month before Jessica, her new sister-in-law

21   now and her new brother-in-law left with Arthur to come and

22   meet her new husband, or was it a month before he left?

23         Irrespective of that, this was a new relationship.

24   You heard the mother's new sister-in-law, new brother-in-law

25   indicate they hadn't even met Arthur until the day that they

1    left in order to go meet with a coyote, according to the

2    mother's new sister-in-law's testimony, to come here to the

3    United States.  You heard her testimony with respect to their

4    travels here and ultimately coming over the border in Arizona

5    and ultimately making their way up to Lowell where they all for

6    some time resided together.

7         When you think back to their testimony with respect to

8    their planned departure, it is a striking contrast to what

9    mother indicated was shared with father or, conversely, not

11:52 10   shared.  Okay.  Mother tries to convince this court that father

11   consented, father consented.  Look at the passport application.

12   Read some of the language at the bottom, and that's a tacit

13   consent for everybody to leave permanently and for the father

14   to not be able to see his son again for what could be a very,

15   very long time, possibly the child's entire childhood, maybe

16   the child's entire life.  Okay.

17        Then you hear, it's very clear from their collective

18   testimony, that they all planned to come here.  They packed

19   their belongings.  They took their belongings.  They came here.

11:53 20  It was very clear from their collective testimony, even though

21   we didn't hear from her new husband, and you heard their

22   testimony, they got married last month, and it was a very new

23   relationship by the time that they came here.  But you heard

24   with respect to their plans to come here, that it had obviously

25   been planned at least for several months.  Now, when I asked

1    mother's new sister-in-law when was the family party, she

2    couldn't remember.  It sounded like it was probably in the

3    months or weeks leading up to the departure.

4         But something that mother's sister-in-law really

5    remembered well, and I found this curious and telling was the

6    passport.  It was one of the first things that mother's new

7    sister-in-law mentioned.  Mother told her she was working on

8    the passport.  This connected the dots for me with respect to

9    the pressure that mother was putting on father in order to get

11:54 10    that passport information.  Mother's new sister-in-law

11    indicated she needed that to be able to go.  Of course they all

12    needed that to be able to fly from the Brazilian airport

13    somewhere else to be able to come here to the United States.

14    They all knew that.  Father did not.  Father did not know what

15    they were going to do until they left, until he tried in

16    desperation to reach out to mother to figure out where they

17    were.

18         Mother's sister-in-law had great difficulty with

19    respect to the timeline, when they knew, when they left.  We

11:54 20    were able to piece the majority of it together, but at the end

21    of the day, Your Honor, it was very clear that these three

22    individuals, coupled with mother's new husband, all knew what

23    the plan was, and it was very clear that our client did not,

24    Your Honor.  That is by definition a wrongful removal.

25         You heard, Your Honor, during the testimony about

1  going to barbecues, about Arthur spending time with these

2  individuals who two and a half years ago he didn't know.  These

3  are new people for this child, for this young child.  You heard

4  about the mother and her new sister-in-law going to a park.  It

5  sounds like they did some things with Arthur.  You heard about

6  them liking to go out to eat.  You heard about them

7  occasionally riding a bicycle.

8          Your Honor, when we get beyond the burden of proof

9  that is ours that we embrace and I believe that we've proven

11:55 10  with respect to whether or not this was a wrongful removal, we

11  next move to, are there any available affirmative defenses to

12  mother.  Your Honor, the available -- strike that.  The

13  defenses that mother has put forth to this court are a

14  well-settled defense and a grave risk of harm.

15          It is our position, Your Honor, that they have fallen

16  far short of proving either of these two affirmative defenses.

17  Your Honor, the well-settled defense can only be raised where

18  more than one year has elapsed between the day the wrongful

19  removal or rentention and the commencement of proceedings in

11:56 20  the contracting state where the child is located.  You asked me

21  early on in the proceedings the relativity between the

22  Brazilian Hague application being filed and the date of that

23  and then the ultimate petition being filed here in the United

24  States.

25          And, you know, even with mother being able to advance

1    the well-settled defense, the defense against we embrace as

2    well, I think when you look at all of the efforts collectively

3    that this father took from right away going to the police,

4    right away canceling the passport, filing the police report,

5    seeking judicial intervention in order to not only locate his

6    child but also to be able to speak with him and continue to

7    speak with him and maintain those contacts, filing the

8    Brazilian Hague application as quick as he did in the days

9    after and then obviously promptly filing the instant petition

11:57 10    once he was able to secure legal representation pro bono here,

11    I think all of that collectively is important.  This is not

12    somebody that sat on his hands.  This is a father that really

13    did everything he could to be able to secure the return of his

14    child.

15         Your Honor, as far as a well-settled defense, the case

16    law tells us that nothing less than substantial evidence of the

17    child's significant connections to the new country is intended

18    to suffice to meet the respondent's burden of proof.  Again,

19    Your Honor, I think they have fallen far short of being able to

11:58 20    meet that burden of proof, and there are several reasons why,

21    Your Honor.

22         For one, they have suggested that this child is

23    thriving here, is doing well in school, has a command of the

24    English language.  You heard this new sister-in-law say he will

25    be better here than in Brazil, we've lived in Brazil.  I would

1    submit to the court that is not her decision to make.  That is

2    not mother's unilateral decision to make.  This is not a

3    best-interest-of-the-child standard.  As important as his best

4    interests are, as important as his well-being is, this is a

5    jurisdictional challenge.  What jurisdiction should these

6    important child custody matters be adjudicated in?  Brazil or

7    here in the United States.

8            We know that the Hague Convention is intended to avoid

9    individuals forum-shopping, avoid individuals engaging in

11:59 10   self-help, the precise type of self-help and unilateral action

11   that the mother has taken here, which has prevented our client

12   from being able to see and be able to raise his son, Your

13   Honor.

14           The child's school records speak for themselves, okay.

15   We look at the scores from 1 to 6 or 1 to 5 in certain

16   circumstances.  This is not a child that is doing well

17   academically.  Even setting that aside, Your Honor, you look at

18   the sheer volume of the reports by administrators at the Lowell

19   Public Schools, and even cognizant of the fact that the court

11:59 20   didn't take that portion of the records in for the truth of the

21   matter asserted, what child hit whom, what child did something,

22   we don't know what happened.  But when you look at the sheer

23   volume of the reports by administrators over the short amount

24   of time that this child has been here, okay, that strikes in

25   comparison to what mother has testified that he is doing so

1    well.

2          You heard mother testify that he has a few friends,

3    and I certainly hope he does.  She didn't even name one friend.

4    There's not one community member here that mother offered, not

5    a friend's parent, not someone from a soccer team.  You have

6    mother's new sister-in-law, mother's new brother-in-law, and

7    she didn't even have her new husband who is the new stepfather

8    to this child testify, not even to offer his thoughts about

9    this child, his involvement, his connection with this child.

12:00  10    That wasn't something that they chose to do, Your Honor.

11          A child going to a barbecue, a child being

12    occasionally at a park or being able to ride a bike isn't

13    enough.  You heard her admit the child has never been to a

14    dentist.  You heard mother suggest that financially they're

15    doing well.  Mother is working.  Her new husband is working.

16    Her sister-in-law indicated that she will help them out

17    financially if she needs any help, assuming that mother would

18    need the help, okay.  She's indicating they will step in.  And

19    they offered that testimony to try to convince, I would submit,

12:01  20    Your Honor that even if you're worried about mother's financial

21    stability, mother's immigration status -- you heard her new

22    husband is in active removal proceedings.  She wasn't even able

23    to tell us, if he is removed and sent back to Brazil, are you

24    going to stay here or are you going to go there?  Nothing could

25    be less stable for this family, for these individuals, which is

1    regrettable, but it's the facts, Your Honor.

2         And when you look to financially, you now have mother,

3    her new husband and a child living in the apartment that

4    they're living.  They're not all living together.  And the

5    sister-in-law indicated she has ten dollars in her bank

6    account.  This is the individual that testified with confidence

7    on direct that she will be the one to step up to help people if

8    they need help.

9         Your Honor, you heard it suggested, and I'll move on

12:02 10   to the grave risk of harm, second affirmative defense, and

11   before I do so, as far as the well settled, again, we think

12   they have come woefully short of being able to meet that burden

13   for this child.  It's frankly the bare minimum that one would

14   expect with a child that has been here for the length of time

15   that he has been.

16        Moving on to the grave risk of harm, Your Honor, the

17   only example that mother was able to offer was one example

18   where she indicated that she was the aggressor and grabbed a

19   card, some type of a card for what I assume was some type of

12:03 20   food benefits in Brazil, out of his hand, and that there was an

21   alleged unwanted touching of I believe her wrist or her arm.

22   That was all she offered, Your Honor, okay.  That doesn't cut

23   it respectfully.

24        She has failed to show that there would be any grave

25   risk of harm to this child if this child is returned to Brazil,

1    where he was born, where he has lived, where his father and his

2    family of origin are.  Mother kept talking about their family.

3    These are new people to this child.  When they talked about

4    going to some family events with an unnamed five-year-old child

5    that they suggested that Arthur enjoys playing with, these are

6    apparently extended family members of mother's new husband from

7    last month that live here.  This is not this child's family of

8    origin.  And I mean no disrespect to second families or a new

9    stepfather, but these are new people to this child.  These are

12:04  10    not people that this child has had an intimate bonded

11    connection with, okay.

12         So when you look to grave risk of harm, mother then

13    tried to suggest, after that one isolated example, okay, she

14    didn't suggest any risk of harm to this child, other than

15    trying to convince this court that father had some type of

16    grave mental health problems that would make returning this

17    child to Brazil such a grave risk of harm that you, in your

18    exercise of judgment, Your Honor, on an affirmative defense

19    would determine that that grave risk of harm was so severe that

12:04  20    it would justify keeping a child here that should otherwise be

21    returned to Brazil.

22         She gave a vague recollection of an event she said

23    that happened early on in the relationship, and let's keep in

24    mind, this was a long-term relationship that these parties had.

25    They were together for a long time.  You heard that from our

1    client's testimony.  They were married a long time.  Ultimately

2    the relationship took its course.  She suggested that father

3    woke up in the middle of the night, something about going out a

4    window, saying something about self harm.  Your Honor, I would

5    submit to the court that it's not credible.  She's offering

6    that to this court now as a last ditch attempt to try to

7    insulate her decision to come here illegally and in violation

8    of the law.

9          You heard our client testify, when I asked him how is

12:05  10    your physical health, how is your mental health, he indicated

11    that both, I think he said thank God, are good.  You heard him

12    testify credibly that, yes, he has suffered from some anxiety.

13    And he indicated that the anxiety was contemporaneous with the

14    pressures that he was receiving constantly at his place of work

15    and otherwise to sign a passport application, his fears that

16    the child was possibly going to be taken, and his fears became

17    true.  You heard him testify that, yes, he was out of work and

18    that he was anxious but that he's doing well now.  Someone

19    being anxious when their child has been taken away from them is

12:06  20    natural, okay.  That certainly doesn't arise to any grave risk

21    of harm to this child, Your Honor.

22          If I could just have a moment.

23          I would also mention this, Your Honor.  Wife has

24    suggested to this court that she does better financially than

25    father does financially.  They've pointed to him being out of

<table>
<tbody>
<tr><td>1</td><td>work.  They've pointed to child support payments either made or</td></tr>
</tbody>
</table>

```
 1   work.  They've pointed to child support payments either made or

 2   not made.  They've pointed to the United States being better

 3   than Brazil.  Respectfully, that isn't the law, and that isn't

 4   the analysis either, Your Honor.  It is obviously not a crime

 5   to be poor.  Both of these individuals have struggled

 6   financially.  That is not a basis for Your Honor to determine

 7   whether or not this child should be returned to Brazil or to

 8   stay here in the United States.

 9         Father testified about the home that he resides in.

10   Thankfully he resides in it rent-free.  He testified how he is

11   married.  It's the father-in-law's house.  They live in it.

12   They have a room ready for Arthur.  And he testified that he is

13   prepared, if this court orders Arthur to return, to lovingly

14   take him back into his care if that is the ruling of the court.

15   Who has more money or doesn't is not the proper analysis here,

16   Your Honor, but he certainly assured the court that this child

17   will be well-cared for and loved if he is returned as we are

18   asking this court to do.

19         Your Honor, it is our position in closing that we have

20   met our burden of proof, that Arthur was wrongfully removed

21   from his country of habitual residence, Brazil, and retained

22   here improperly by the mother.  And it's our position, Your

23   Honor, that neither of the affirmative defenses that have been

24   advanced by the mother have come close to mother meeting her

25   burden of proof on that to justify anything other than having
```

12:07 (line 10)
12:08 (line 20)

1   this minor child returned to Brazil, returned to his father and

2   for proceedings to be held there.

3           The Brazilian court will determine anything related to

4   this child that needs to be done, including rights of access

5   for mother and resuming contact for mother presuming that she

6   comes back most importantly so that this child can have an

7   ongoing relationship with both of these parents in the same

8   country.  Thank you very much, Your Honor, for your time.

9           THE COURT:  When you're ready.

12:09 10         MS. JAMES:  All right.  Thank you, Your Honor.

11          Your Honor, what you saw over the last three days is a

12   connected family deeply established in their community,

13   committed to Arthur's well-being and ability to thrive here in

14   the United States.

15          We would submit the petitioner has not met his burden

16   under the Hague Convention of proving that he had rights of

17   custody and was exercising those rights while Arthur was in

18   Brazil, but even if that burden were met, Arthur should stay in

19   the United States.  Respondents have met their burden to show

12:09 20   by a preponderance of the evidence that Arthur is well settled

21   in his new home and would be exposed to a grave risk of harm if

22   returned to Brazil.

23          As petitioner admits, pursuant to the Hague

24   Convention, if a child has been in the United States for more

25   than a year at the time the petition was filed in a court

          1    authorized to exercise jurisdiction in the place where the

          2    child is located, then the court should consider whether the

          3    child is now settled in their new environment.  The evidence

          4    has shown that the petition was filed in this court on May 14,

          5    2024, more than two years after Arthur arrived in the United

          6    States.  And Arthur is well settled by any understanding of

          7    that phrase.

          8         The Department of State has interpreted "settled" to

          9    mean that the child has significant emotional and physical

12:10    10    connections, demonstrating security, stability and permanence

         11    in his new environment.  Petitioner would ask that you look

         12    backwards to the time of departure to determine whether the

         13    child is well settled.  And that's not the law.  You have heard

         14    copious evidence that proves Arthur is now, at this time, well

         15    settled under this standard.

         16         The evidence shows that Arthur is well cared for in a

         17    stable and supportive home and has been for the last two and a

         18    half years.  He has lived in Lowell with his mother and

         19    stepfather since he arrived to the United States.  He's lived

12:11    20    at only two addresses, both in Lowell, and has had his own room

         21    in both apartments, unlike in Brazil.  You've heard from

         22    Arthur's aunt and uncle, Bruna and Jalmar, about the loving and

         23    close-knit family that surrounds him.  He sees his family

         24    members, including his named cousin Sophia, multiple times a

         25    month and celebrates holidays, birthdays and special events

1    with them.

2          Petitioner makes hay about how these family members

3    are not Arthur's family by blood, but that's a limiting and

4    reductive definition of what family is.  Arthur has family in

5    Massachusetts that testified that they love him, that they

6    spend time with him and that they care about his well-being and

7    happiness.

8          The evidence has shown that Arthur's mother and

9    stepfather can provide for everything that he needs and more.

12:12 10    Jessica has testified that she has work authorization and works

11    as a housecleaner.  She's also working towards a career in the

12    aesthetician field and will graduate from that program soon.

13          Jessica testified that her husband Gilberto earns over

14    $100,000 per year as a carpenter, which petitioner somehow

15    finds inconceivable, and which is more than enough to provide

16    for their family.  In contrast, you heard Mr. Rodrigues da

17    Silva testify that he was currently unemployed and has been for

18    quite some time now.  You've heard testimony that Arthur is

19    involved in his community, which has many Brazilian immigrants.

12:12 20    He has friends in his neighborhood.  He plays soccer.  He

21    attends church multiple times a month.  And while he's there,

22    he spends time with his friends who are also mostly Brazilian

23    immigrants, as Jessica testified.

24          Although petitioner suggests that Arthur's immigration

25    status should count against his being well settled, this

 1    consideration is only relevant if there is an immediate

 2    concrete threat of deportation, and that's a case citation from

 3    Moura v. Cunha, 67 F. Supp. 3d. 493 D. Mass. 2014.  The threat

 4    of deportation immediately and concretely is not present here.

 5    Jessica has a pending asylum application that includes her son,

 6    and her master calendar hearing is more than a year away.

 7    Although Arthur's immigration status is not dependent on his

 8    stepfather's immigration status, petitioner has presented no

 9    evidence to show that Gilberto's deportation is an imminent

12:13 10    risk either.  Any argument based on speculation or fear about

11    what might happen rather than proof in this trial should be

12    rejected.

13         Petitioner suggests that Arthur should be taken away

14    from his mother because he's not the best student in his class,

15    but the testimony shows that he's a normal kid.  You heard that

16    Arthur could not read or write in his native language at the

17    time he arrived in the United States.  And the evidence has

18    shown that, while he's been here, Arthur has made great strides

19    in school.  In Arthur's report card from last year, his teacher

12:14 20    Sarah Hoey, who you heard testify today, described Arthur as a

21    positive light.  She described that he has made progress in his

22    English learning and has stated that he works very hard.

23         Petitioner further highlights behavioral issues that

24    they purport that they have shown that Arthur has.  Ms. Hoey

25    has testified that these issues were mostly speaking to other

1    kids when he shouldn't.  We've also demonstrated to you that

2    the messages from the school showing reported behavioral

3    issues, all but one of them was from his first year while he

4    was here.  And then you heard testimony from both mother and

5    from Ms. Hoey that the behavioral issues Arthur may have had

6    during his first year have significantly improved while he's

7    been here.  Ms. Hoey testified that Arthur has worked to meet

8    expectations both socially and academically, that he gets along

9    with other students, and that he does things for other students

12:15 10    like working to translate their lessons for his Brazilian

11    friends.

12          It's important to contrast Arthur's happy, healthy,

13    and loving life here in Massachusetts to the situation he would

14    face if returned to Brazil.  Jessica testified about what a

15    devoted and involved mother she is, including her attendance at

16    parent/teacher conferences, as Ms. Hoey also testified, her

17    knowledge of Arthur's health and her involvement at church.  In

18    contrast, despite speaking to his son at least three times per

19    week, Mr. Rodrigues da Silva does not know where the son goes

12:16 20    to school, the name of his son's teachers, whether his son goes

21    to church.  He could not remember his son's birthday without

22    consulting documents.  This speaks both to why Arthur is well

23    settled and why he would be exposed to harm if returned.

24          A court should not return a child where considering

25    the living situation the child would actually be facing if

1  returned there is a grave risk that the child's return would

2  expose the child to physical or psychological harm or otherwise

3  place the child in an intolerable situation.  The evidence has

4  shown here that Mr. Rodrigues da Silva has a history of illegal

5  activity, which he purportedly does not remember, violence,

6  which he purportedly does not remember, and mental instability,

7  which purportedly began after the child left for the United

8  States but for which he sought disability benefits before that

9  time, all of which would present harm if Arthur returned to his

12:17 10  care.  You, in contrast, heard Jessica testify credibly about

11  detailed encounters.  Not only does Mr. Rodrigues da Silva

12  purport to have no memory of those events, but counsel has now

13  attempted to paint my client as the aggressor in an instance of

14  domestic violence.

15          You've heard testimony demonstrating Mr. Rodrigues da

16  Silva's, at best, carelessness when he admittedly failed to

17  read a document he willingly signed which authorized his son to

18  leave the country.  Mr. Rodrigues da Silva feigns that he

19  diligently withdrew his consent for Arthur's travel, when in

12:17 20  fact the balance of the testimony makes clear, as petitioner's

21  counsel admits, that the family was planning to leave for a

22  long time, that they were working towards those plans and, as

23  my client credibly testified, that he was aware of those travel

24  plans.

25          Perhaps Arthur's life here is not perfect but, quote,

```
 1    "The child's life does not have to be perfect for him to be
 2    settled," which is In Re: Lozano 809 F. Supp. 2d. 197 SDNY
 3    2011.  The evidence presented clearly establishes that Arthur
 4    is well settled in his new home and that returning him to
 5    Brazil would expose him to harm.  Arthur should not be removed
 6    to Brazil from his mother, and we respectfully request that the
 7    court deny the petition.
 8           THE COURT:  Okay.  Thank you, all.  Obviously this is
 9    not my first Hague Convention case, as I think you all know.
10    They're all challenging.  You have two parents that want to be
11    with their kid, and it's a wrenching decision to make, and so
12    we will plow through it and get a decision out when we can.
13           But irrespective of how it comes out, I really want to
14    thank you all for stepping in and doing this.  I know no one is
15    being paid for it, and you've all really done fantastic work in
16    terms of preparation and how this has been presented.  And it's
17    been a pleasure to try, notwithstanding that the issues are not
18    pleasant ones.  So I want to thank you all for that.  And
19    obviously, there's going to be a winner and a loser, and that
20    really has nothing to do with the skill or the commitment or
21    the job that you've all done here for your client.  So I just
22    want to make that clear before we make the decision.
23           I have taken very detailed notes, and Kelly, I can get
24    anything I need from her, and it's not been a super long trial,
25    so I'm not going to request submissions from you, but if you
```

```
 1    want -- do you want to make them or do you not want to make
 2    them?  I don't really feel they're necessary.
 3            MS. CROWLEY:  I don't think they're necessary.  I
 4    pretty much said everything in my closing that I would put into
 5    a written document, and I know both sides have put in a ton of
 6    resources into this.
 7            THE COURT:  Yes.  I don't feel that I need them, I
 8    really don't.
 9            MS. JAMES:  We have no need for post-trial briefing
12:20 10   either, Your Honor.  Again, I think everything is either in the
11    record or the arguments are in our initial brief to you.
12            THE COURT:  Okay.  I would let you, if you wanted to,
13    I would let you do it.  I don't love it in a bench trial
14    because it pushes me so far down the road on making a decision
15    after the testimony is fresh in my mind.  So I really don't
16    feel that I need it, and it certainly doesn't take away from
17    the quality of the work that you've done here that you're not
18    interested in making a submission like that.  So I want to
19    thank you all, and we're on it.
12:20 20           MS. CROWLEY:  We appreciate it.
21            MS. JAMES:  Thank you, Your Honor.
22            THE COURT:  So thank you, all, and we're recessed for
23    now.
24            (Adjourned, 12:20 p.m.)
25
```

1                   CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Professional

4     Reporter, Registered Merit Reporter and Certified Realtime

5     Reporter, in and for the United States District Court for the

6     District of Massachusetts, do hereby certify that the foregoing

7     transcript is a true and correct transcript of the

8     stenographically reported proceedings held in the

9     above-entitled matter to the best of my skill and ability.

10                      Dated this 4th day of November, 2024.

11

12                   /s/ Kelly Mortellite

13                   _____

14                   Kelly Mortellite, RPR, RMR, CRR

15                   Official Court Reporter

16

17

18

19

20

21

22

23

24

25

A482

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| EDERVALDO RODRIGUES DA SILVA, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 1:24-cv-11280-ADB |
| JESSICA SILVEIRA DA SILVA | ) ) | |
| Defendant. | ) ) ) | |

## MOTION FOR A STAY OF ORDER
## FOR RETURN OF CHILD PENDING APPEAL

Defendant/Respondent Jessica Silveira da Silva ("Respondent"), by and through her attorney, hereby moves for an order staying this Court's Order for Return of A.R. (the "Child") [ECF No. 41] (the "Order") pending appeal. Respondent files this instant motion in accord with Fed. R. App. P. 8(a)(1)(A). Respondent respectfully represents that (1) she is likely to prevail on the merits of the appeal, (2) absent a stay she will suffer irreparable damage, (3) Petitioner will not suffer a substantial harm for the stay, and (4) that the public interest will be served by issuing the stay.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The facts of this underlying case are well known and documented[1], but the relevant facts are briefly presented herein. In April 2022, Respondent and the Child traveled to the United States, and were shortly reunited with Respondent's now-husband, in Lowell, Middlesex County, Commonwealth of Massachusetts. On or about April 3, 2023, through counsel, Respondent filed on behalf of herself and the Child an I-589 Application for Asylum and for Withholding of

---

[1] *See* Joint Pre-trial Memorandum [ECF No. 28] (the "Pre-Trial Memo"), Respondents' Pre-Trial Memorandum of Law [ECF No. 30], and this Court's Findings of Fact and Conclusions of Law [ECF No. 41] (as previously defined, the "Order").

Removal with the United States Department of Homeland Security, United States Citizenship and Immigration Services ("USCIS"). The master calendar hearing in Respondent's proceeding with USCIS is scheduled for November 3, 2025. The Court has not yet set a final hearing date.

On February 28, 2025, this Court granted Petitioner's Petition for Return of Child Under the Hague Convention and ordered the return of the Child to Brazil "as a reasonable date and time mutually agreed upon by the parties." *See* Order.

## II.    LEGAL STANDARD

In evaluating a motion to stay the return of a child in a Hague Convention matter, a court must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of a stay will substantially injure other parties interested in the proceeding; and (4) where the public interest lies." *Chafin v. Chafin*, 568 U.S. 165 (2013). District courts have stayed orders to return a child where just one of the four factors weighed in favor of a stay. *See, e.g.*, *Karpenko v. Leendertz*, No. Civ.A. 09–03207, 2010 WL 996465, at *1 (E.D. Penn. Mar. 15, 2010) (granting stay based only upon finding of irreparable harm).

## III.    ARGUMENT

### A.    The Child May Not Be Returned To Brazil While His Asylum Application Is Pending

A little-examined area of conflict in United States jurisprudence is the interplay between a petition for return under the Hague Convention and an application for asylum. In *G v. G*, the United Kingdom considered this issue where a child was removed from her home country and was listed as a dependent on her mother's asylum application in England. G v. G, [2021] UKSC 9. Under the European Union's Asylum Procedures Directive, to which the United Kingdom is a party, asylum applicants are entitled to the protection of the principle of *non-refoulement* during

A484

the pendency of their application, meaning that they may not be returned to a country where they could face persecution or human rights violations. *Id.* at ¶¶ 129-30. The court noted that "a child named as a dependant [*sic*] on the parent's asylum application and who has not made a separate request for international protection generally can and should be understood to be seeking such protection and therefore treated as an applicant." *See id.* at ¶ 121. The court therefore held that a child may not be returned under the Hague Convention where that child had a pending asylum application. *See id.* at ¶ 129-130.

While the United States is not party to the Asylum Procedures Directive specifically, it is party to multiple international instruments that embrace the principle of *non-refoulement*. These include, among others, the United Nations Protocol Relating to the Status of Refugees, the International Covenant on Civil and Political Rights, and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. The obligation of *non-refoulement* is also codified in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1231(b)(3) (prohibiting the Attorney General from removing someone from the United States to another country if their "life or freedom would be threatened in that country because of [their] race, religion, nationality, membership in a particular social group, or political opinion"). Therefore, the logic of the United Kingdom's decision applies equally here—where a child has a pending asylum application, whether derivative or direct, *non-refoulement* prohibits return under the Hague Convention until resolution of the asylum petition. In the instant case, the Child has a derivative asylum application in the United States, and the Court may not run afoul of international law or the INA by ordering his return while the asylum petitioner is pending. For this reason, the return order must be stayed, at a minimum, during the pendency of the appeal of the Hague Convention matter.

A485

B. <u>Respondent And The Child Will Be Irreparably Injured Absent A Stay</u>

     i.    *The Child Will Be Irreparably Harmed Under The Hague Convention If Returned While An Appeal Is Pending.*

Respondent and the Child would clearly suffer irreparable harm should the Child be sent back to Brazil during the pendency of the appeal. The purpose of the Hague Convention is to protect children "from the harmful effects of their wrongful removal or retention." Hague Convention, pmbl.; *see also Swett v. Bowe*, 733 F. Supp. 3d 225, 242 (S.D.N.Y.), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024). These "harmful effects" occur because moving the Child is in and of itself harmful to the Child's well-being. *See Chafin*, 568 U.S. at 178 ("We are also sympathetic to the concern that shuttling children back and forth between parents and across international borders may be detrimental to those children.") (emphasizing that stays should be granted where appropriate); *Didon v. Castillo*, 838 F.3d 313, 319 n.12 (3d Cir. 2016) (where the return order was overturned on appeal, appeals court noted that it was "concerned that these multiple relocations of the child have been or will be detrimental to his well-being" and suggested that district courts "should seriously consider the possibility of staying that order pending appeal"). Indeed, sending the Child back to Brazil pending Respondent's appeal presupposes that the appeal *will in fact* fail, since the harm engendered by taking the Child out of country cannot be reversed simply by sending the Child back if, in fact, Respondent's appeal is successful.

Requiring the Child to return to Brazil before this case is fully disposed would undermine the Hague Convention's objective of protecting children from harm, including the harm that arises from being "shuttled" between parents without a final resolution. This is particularly true where, as here, the Child is old enough to have formed friendships and other strong social ties to the United States which would be disrupted by shuttling the Child back and forth, yet too young

A486

to be able to emotionally process such shuttling. Accordingly, the First Circuit has historically granted motions to stay pending appeal in Hague Convention matters. *See, e.g.*, *Danaipour v. McLarey*, 286 F. 3d 1, 11 (1st Cir. 2002); *Yaman v. Yaman*, 730 F. 3d 1 (1st Cir. 2013). Further, the Child will suffer irreparable harm if he is torn from school before the school year is over. As the Court noted, the Child's education is central to his development, and his integration into the United States should Respondent's appeal be successful. The Child struggled in school in Brazil prior to coming to the United States, and could not read or write in either English or Portuguese upon arrival. While in the United States, he has worked hard to overcome these initial setbacks, and has been successful in his new environment. Removing the Child not only from his particular school but to an entirely different country in the middle of the school year would be highly detrimental to the hard-won progress he has made.

    ii.    *Respondent and The Child Will Be Irreparably Harmed If Returned While An Asylum Application Is Pending.*

As discussed, the Child's pending asylum application bars the Court from returning the Child to Brazil until adjudication of the asylum petition. Even were the Court able to remove the Child, it should not, as the Child would almost certainly be unable to return to the United States in the event of a successful appeal. Leaving the country while an asylum application is pending results in forfeiture of that asylum application. *See, e.g.*, Travel Documents, USCIS, uscis.gov/green-card/green-card-processes-and-procedures/travel-documents ("If you leave the United States without first obtaining advance parole, we will assume that you have abandoned your asylum application."). Given that the Child does not have any legal immigration status in the United States aside from the pending derivative asylum application, if that application were considered abandoned, it is unlikely he would be able to re-enter the country. This risk is further exacerbated by the volatile immigration conditions under the current Administration. With no

cognizable way for the Child to return to Respondent in the United States following a successful appeal, Respondent would suffer the irreparable harm of either being forced to abandon her own asylum application and return to Brazil, or to be denied access to the Child to which she is entitled.

C. Petitioner Would Not Be Substantially Harmed If A Stay In The Order Is Granted Pending Appeal

Conversely, Petitioner will not be substantially injured if this Court orders a stay. While Respondent is very mindful of Petitioner's desire to see the Child in person as soon as possible, the Child has been in the United States for nearly three years and the parents have worked cooperatively during that time to ensure that the Petitioner has the ability to speak to the Child. Indeed, all parties agree that the Child and Petitioner speak on the phone at least three times per week. *See* Pre-Trial Memo at ¶ 25. Given these measures, any harm to Petitioner can be ameliorated during the short period of time necessary for Respondent to pursue her appeal. Further, any harm that Petitioner might suffer from having to wait to see the Child in person is outweighed by the irreparable harm that the Respondent and Child would suffer in the event of a successful appeal that could not be effectuated because the Child cannot re-enter the United States. *See, e.g.*, *Karpenko*, 2010 WL 996465, at *3 (noting that while the petitioner may be "disappointed with having to wait for a longer period of time" to take her daughter back to the Netherlands, that disappointment was "clearly outweighed" by potential harm to the respondent).

D. A Stay of The Order Pending Appeal Would Be In The Public's Interest.

If the Child is removed from the U.S. based on this Court's order, and Respondent subsequently succeeds on appeal, the Child will have been wrongly removed from the U.S. Such wrongful removal would go against the "public interest in preventing aliens from being wrongfully removed." *M.M.M. on Behalf of J.M.A. v. Sessions,* 347 F. Supp. 3d 526, 536 (S.D.

6

A488

Cal. 2018). It would also cause a disservice to the public interest to allow the Child to be returned to Brazil while the appeal is pending, only to have the appeals court subsequently order him back to the United States and be unable to effectuate that order due to the Child's immigration status. *See, e.g.*, *Karpenko*, 2010 WL 996465, at *3. It is therefore in the public interest for a stay to be granted pending appeal.

E.   There Is A Likelihood Of Success On The Merits Of Respondent's Appeal Of The Order.

A likelihood of success of the merits of respondent's appeal of the order favors granting a motion to stay pending the outcome of an appeal. *Chafin*, 568 U.S. at 179. As discussed, sending the Child back to Brazil without actually litigating the appeal presupposes that the appeal will fail, since it is undisputed that there will be harm to the Child by needlessly shuttling him between parents. To the contrary, Respondent has a strong likelihood of succeeding on appeal on the grounds that the Child is well-settled in Massachusetts.

Factors that play into the well-settled analysis include: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability. *See* Order at 20 (citing *Moura v. Cunha*, 67 F. Supp. 3d 493, 499-500 (D. Mass. 2014)). The Court correctly concluded that the Child is "old enough to allow meaningful connections to the new environment to evolve" and that Respondent and her husband have sufficient income to offer the Child financial stability. *Id.* at 21-22, 25. However, the Court erred in its findings as to the remaining factors. This error wrongly skewed the Court's decision against a finding that the Child is well-settled in his current environment.

7

A489

As to the second factor, this Court should have found that the stability and duration of the Child's residence in the new environment favored a finding that the Child is well-settled. The Court found that the Child only moved once in two years, always lived in the same town, always lived with Respondent and her husband, and always attended the same elementary school. *See* Order at 22. This should have ended the analysis. However, the Court then erroneously went on to consider the strength of the Child's community and family ties *in the context of determining whether the Child's residence was stable*, conflating two distinct factors. *See id.*; *see also Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 492 (D.N.J. 2014) (emphasizing the perils of conflating injury and standing when analyzing a multifactor test, here, for antitrust standing).  The Court clearly found that the Child's residence in Massachusetts was stable, and that should have skewed in favor of the Child being well settled.

As to the third factor, the Court erred in considering whether the Child was succeeding academically. *See* Order at 24. The analysis of this factor is properly limited to "whether the child attends school or day care consistently," and should not extend to an analysis of the child's success at school. *See* Order at 20; *see also Moura*, 67 F. Supp. 3d 493 at 499. If the Court had only considered the Child's attendance, it would have counseled toward the Child being settled.

As to the fourth factor, the Court similarly should have limited its analysis to "whether the child has friends or relatives in the new area," but instead erred by improperly comparing the Child's ties in the United States to those in Brazil. *See* Order at 22-23. In "determining whether a child is settled" the Court "should not compare the child's current situation with her or his prior situation…." *Alcala v. Hernandez*, 826 F.3d 161, 171 (4th Cir. 2016). This makes sense, as it would almost always be the case that a child would have more ties to the country of habitual residence than in the country of removal. Were the appropriate standard comparing the

8

A490

significance of the child's connections to each country, the analysis would essentially be useless. Had the Court solely considered solely the Child's relationships in the U.S., this factor too would have weighed in support of finding the Child well-settled.

As to the fifth factor, the Court should have found that the Child sufficiently participated in community or extracurricular school activities. In finding that the Child "did not participate in any significant after-school activities," this court erroneously concluded that that the Child's bi-weekly participation in church services, activities, and soccer lessons was insufficient. *Compare* Order at 25 *with da Costa v. de Lima*, No. 22-CV-10543-ADB, 2023 WL 4049378, at *5 (D. Mass. June 6, 2023), *aff'd* 94 F.4th 174 (1st Cir. 2024) (Burroughs, J.) (finding participating in church services and activities and taking swim lessons for a few months sufficient to weigh in favor of the child being well-settled).

## IV.    CONCLUSION

WHEREFORE, Respondent respectfully requests this court GRANT this Motion to Stay the Order to return the Child pending appeal.

<div style="margin-left:40%">

JESSICA SILVEIRA DA SILVA

By her attorneys,

*/s/ Ruben J. Rodrigues*
Ruben J. Rodrigues (BBO #676573)
Lea Gulotta James (BBO #705421)
Amani Kmeid (BBO #711302)
FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199-7610
Phone: (617) 342-4000
Fax: (617) 342-4001
rrodrigues@foley.com
ljames@foley.com
akmeid@foley.com

</div>

A491

## **LOCAL RULE 7.1 CERTIFICATION**

Pursuant to Local Rule 7.1(a)(2), the undersigned hereby certifies that counsel for the

Respondent conferred with Plaintiff's counsel on March 7, 2025 regarding the issues raised in

this motion, and the parties were unable to resolve or narrow the issues.


*/s/ Lea James*
Lea Gulotta James

A492

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 11, 2025, a copy of the foregoing document was electronically filed through the CM/ECF system, which will send notification of such filing to all counsel of record.

<div align="right">

*/s/ Lea James*

Lea Gulotta James

</div>

A493

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


Edervaldo Rodrigues Da Silva
_____

                    Plaintiff(s)


                    v.                          CIVIL ACTION NO. 1:24-cv-11280-ADB


Jessica Silveira Da Silva
_____

                    Defendant(s)


JUDGMENT IN A CIVIL CASE


Burroughs, D. J.
_____


_____    **Jury Verdict.**   This action came before the court for a trial by jury.   The
         issues have been tried and the jury has rendered its verdict.


☒        **Decision by the Court**.   This action came to trial or hearing before the
         Court.   The issues have been tried or heard and a decision has been
         rendered.


    **IT IS   ORDERED AND ADJUDGED:**

Edervaldo da Silva's Petition for Return of Child Under the Hague Convention is GRANTED.

IT IS HEREBY ORDERED that A.R. shall be returned to Brazil, his country of habitual residence,
at Respondent's expense at a reasonable date and time mutually agreed upon by the parties.

IT IS FURTHER ORDERED that Respondent shall make all necessary arrangements associated
with returning A.R. to Brazil.


A494

IT IS FURTHER ORDERED that Respondent shall not, absent leave of this Court,remove A.R. from the District of Massachusetts pending his return to Brazil.

IT IS FURTHER ORDERED that counsel for Respondent shall file a notice with the Clerk of Court immediately upon A.R.'s arrival in Brazil, indicating that Respondent has fully complied with the terms of this Order.

ROBERT M. FARRELL

CLERK OF COURT

Dated: 3/13/2025 _____

*/s/ Caetlin McManus*

By: Caetlin McManus

Deputy Clerk

A495

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDERVALDO RODRIGUES DA SILVA, <br>       Plaintiff/Petitioner, <br><br> v. <br><br> JESSICA SILVEIRA DA SILVA and <br> GILBERTO LUCAS, <br>       Defendants/Respondents. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     C.A. No. 1:24-cv-11280-ADB <br> ) <br> ) <br> ) <br> ) <br> ) |

## OPPOSITION TO RESPONDENT'S MOTION FOR STAY PENDING APPEAL

NOW COMES Petitioner Edervaldo Rodrigues da Silva ("Petitioner"), who hereby opposes the Motion for A Stay of Order for Return of Child Pending Appeal filed by Respondent Jessica Silveira da Silva ("Respondent"). Respondent's Motion must be denied because (1) she has not met her burden to merit a stay, (2) her argument that the minor child's asylum petition prevents his removal is unavailing, and (3) the Respondent's motion improperly relitigates the merits of the underlying Hague Petition.

### 1.    Respondent has Not Met Her Burden to Show that She Is Entitled to a Stay Pending Appeal

A court weighing a motion to stay pending appeal must consider whether the movant has made a "strong showing" that she is likely to succeed on the merits, whether she will be irreparably injured absent a stay, whether any other party to the case will be "substantially" injured by the issuance of a stay, and "where the public interest lies." See Chafin v. Chafin, 568 U.S. 165, 179 (2013). However, Chafin explicitly notes that granting a stay pending appeal in Hague Convention cases means that "a child would lose precious months when she could have been readjusting to life in her country of habitual residence, even though the appeal had little chance of success" and that such stays "conflict with the Convention's mandate of prompt return to a child's country of habitual residence." Id. at 178.  Respondent's Motion fails primarily because she has not made a strong showing that she is likely to succeed on the merits. Nor do the other factors in this analysis weigh in Respondent's favor.

1

A496

a.        **The Merits of Respondent's Appeal**

Respondent's Motion does not set forth the standard by which her appeal will be judged. This omission is notable when Respondent contends that her appeal is likely to succeed on the merits. In fact, the Respondent's appeal will be assessed for abuse of discretion or clear error in the trial judge's factual findings. See, e.g., da Costa v. de Lima, 94 F.4th 174, 180-181 (1st Cir. 2024). These standards are deferential: the trial judge's factual findings will not be overturned unless the appellate court is "left with the definite and firm conviction that a mistake has been committed." Id. at 181. "Factual findings will be upheld so long as the District Court's account of the evidence is plausible in light of the record, even if . . . we would have weighed the evidence differently." Karpenko v. Leendertz, 619 F.3d 259, 262-263 (3rd Cir., 2010), quotation and citation omitted). See Saada v. Golan, 930 F.3d 533, 538 (2nd Cir., 2019) (district courts "vested with considerable discretion under the Hague Convention"). An appellate court "will not reverse as long as the District Court's account of the evidence is 'plausible in light of the record,' even if convinced that [it] would have weighed the evidence differently." Karkkainen v. Kovalchuk, 445 F.3d 280, 289 (3rd Cir., 2006).

The grounds alleged for appeal in Respondent's motion for stay amount to a contention that the trial judge erred in weighing the factors relevant to the well-settled defense. Indeed, Respondent goes so far as to say that the trial judge "should have found" something other than what she did. See Respondent's Motion for a Stay of Order for Return of Child Pending Appeal, Pages 8-9 ("Respondent's Motion"). Respondent's Motion sets forth a number of purported errors in weighing the evidence, however, none of these so-called errors—alone or in concert—is sufficient to raise the Respondent's likelihood of success on the merits of her appeal beyond the speculative. Respondent cannot simply contend that she is likely to succeed on the merits, she must make a "strong showing."  Chafin, supra, at 179.

Respondent contends, first, that this Court "should have found that the . . . Child is well-settled" because it "erroneously" considered "the strength of [the minor child's] community and family ties *in the context of determining whether the Child's residence was stable*," thereby improperly conflating two factors. Respondent's Motion, Page 8 (emphasis in original). The sole case Respondent cites in support of this contention is from the Federal District of New Jersey and addresses the "perils of conflating injury and standing," per the Respondent's Motion. This case is inapplicable to the case at bar. Not only is it not a case involving the Hague Convention,

but the cited proposition is inapposite to this issue. This argument also amounts to an assertion that an appellate court should weigh the factors differently than did the trial court, which, as discussed above, does not constitute grounds for a meritorious appeal. Additionally, the Court cited to a prior case for the proposition that, "[i]n assessing the stability of the child's residence, the second factor, 'courts consider the number of homes they have lived in, the permanence of their residence, and the strength of their community and family ties.'" Findings, Page 22, quoting Swett v. Bowe, 733 F.Supp.3d 225, 282-283 (S.D.N.Y. 2024). Thus, the Court properly relied on persuasive precedent from its sister district. Further, this argument improperly attempts to parse the well-settled factors into smaller and smaller sub-factors. In assessing the stability of the child's residence, the Court can consider any fact that bears on the stability of the child's residence, including community and family ties, particularly where—as here—the child has lived with various family members and has limited contacts outside his immediate family. Finally, there can be no dispute that the Court also entered findings about the minor child's residence, the persons with whom he had lived, and the different homes in which he had lived in Massachusetts. Findings, Pages 8-9. The Court thus appropriately weighed this factor and this argument cannot sustain a successful appeal.[1]

Respondent next contends that the Court should not have considered the minor child's success at school but rather should have only considered whether the minor child "attends school or day care consistently." Respondent's Motion, Page 8. Accepting, *arguendo*, that this is the case, the trial judge found that the minor child missed ten days in his first year of school and nineteen days his second year. Findings of Fact and Conclusions of Law, Page 9.  The Court explicitly found that the minor child missed a "non-trivial number of school days." Findings of Fact and Conclusions of Law, Page 23. The findings also explicitly state that "the Court cannot find that A.R.'s school attendance and life at school indicate that A.R. is well settled." Findings of Fact and Conclusions of Law, Page 24. Furthermore, numerous courts—including this Court **in the very same case Respondent cites in support of her argument**—have considered a child's school performance in weighing the well settled defense. See Moura v. Cunha, 67

---

[1] Additionally, the First Circuit does not require that a trial court consider these factors in deciding a Hague Convention case. The original case setting forth these factors is In re B. Del C.S.B., a Ninth Circuit case. In re B. Del C.S.B., 559 F.3d 999, 1009 (9th Cir. 2009). Only one First Circuit case cites to this decision and even that case does not say that trial courts are required to apply these factors, but only that these are "[o]ther relevant factors" in the "totality of the circumstances" test applied by the First Circuit. Da Costa v. de Lima, 94 F.4th 174, 180 (2024).

F.Supp.3d 493, 500 (D. Mass. 2014) ("Courts also consider the amount of time a child has spent in the country, as well as their academic performance"); Karim v. Nakato, 2022 WL 1597955, *16 (D. Mass. 2022) (same); Alcala v. Hernandez, 2015 WL 4429425, *12 (D.S.C. 2015), *aff'd* 826 F.3d 161 (4th Cir. 2016) ("The stability of the minor children's residence, . . . school attendance and acclimatization to his school, . . . school performance, . . . outweighs the immigration status of the minor children…"). See also Alcala, 826 F. 3d. at 172 ("It is not impossible for a child with an unstable home life to do quite well in school, but it is certainly more difficult. It was reasonable for the district court to infer that [the child's] strong academic development suggests a baseline stability to his life"); Lozano v. Alvarez, 697 F.3d 41, 48 (2nd Cir. 2012) ("The district court engaged in a detailed analysis of various factors . . . including that . . . the child has shown social and academic progress").

Third, Respondent contends that the Court erred by "improperly comparing" the minor child's ties to the United States to his ties to Brazil. Respondent cites no particular provision of the Court's findings in this portion of her argument nor could she, as the Court did not improperly compare the minor child's situation in the United States with his situation in Brazil. Instead, the Court discussed the minor child's situation in the United States and his situation in Brazil. Merely discussing both of those environments in the same paragraph does not constitute an improper comparison. Furthermore, the case cited for this proposition is a Fourth Circuit case, that is to say, it is not binding precedent. To the extent that Respondent's argument is that the Court cannot consider the minor child's ties to Brazil, there is no authority cited for this proposition.

Lastly, Respondent contends that this Court "should have found that [the minor child] sufficiently participated in community or extracurricular school activities." Respondent's Motion, Page 9. This argument is meritless and is not grounds for a successful appeal. It is a bare assertion that an appellate court should re-weigh evidence, which is not the function of an appellate court.

In sum, the Respondent has failed to make the requisite "strong showing" that she has a likelihood of success on appeal. The deferential standard of review and the nature of the Respondent's grounds for appeal are such that the Respondent's likelihood of prevailing is low.

A499

### b.    Injury to the Respondent

Respondent perfunctorily argues that she and the child would be irreparably harmed if the stay were not granted; however, her statements in support of this contention are conclusory and hypothetical. The sole alleged harm that Respondent alleges that she would suffer is "the irreparable harm of either being forced to abandon her own asylum application . . . or to be denied access to the [c]hild to which she is entitled." Respondent's Motion, Pages 5-6. Neither of these alleged harms is sufficient to support the issuance of the stay.

As in Schwaneberg v. Lopez, the Respondent

> "has presented no evidence to the court explaining how her potential travel outside the United States would require her to abandon her asylum application as opposed to obtaining temporary status to travel outside the United States while her asylum application is pending. Nor has Respondent explained to the court why abandonment of that application amounts to an irreparable harm—one that cannot be remedied by, for instance, reapplying for asylum at a later date or applying for a permanent immigration status based on non-asylum related factors."

Id., 2024 WL 516849, *3 (W.D. Va. 2024). Here, Respondent even quotes the USCIS directive, which states that there **is** a way for her to leave the country without abandoning her asylum application—by "first obtaining advance parole." Motion, Page 5. Respondent's Motion does not state why such an option is not available to her. Respondent's first alleged harm is therefore not sufficient for this Court to order a stay pending appeal.

Respondent's second alleged harm, to be denied access to the minor child, is entirely hypothetical and therefore not adequate grounds for the allowance of her Motion. As discussed above, the Respondent can return to Brazil if the minor child is returned. There is a court order in effect in Brazil for custody and parenting time. If the Petitioner were to refuse to comply with that court order such that the Respondent were denied access to the minor child, the Respondent would have the right to seek an order from a Brazilian court. Further, Petitioner has never denied her access to the minor child and would have no reason to do so while court actions are pending in both the United States and Brazil. This alleged harm is too speculative to form a significant risk of harm to the Respondent.[2]

---

[2] Respondent also alleges that the minor child would be harmed, however, the harm considered in the second factor of this analysis is "harm to the applicant, and not the child[]." Mendoza v. Esquivel, 2016 WL 2757551, *2 (S.D. Ohio, 2016).

A500

Finally, Respondent's argument that she would be irreparably harmed if the child is ordered returned to Brazil is bitterly ironic given that she removed the minor child from Brazil without the Petitioner's permission and that she is fighting even now to keep the minor child away from the Petitioner. If the child being returned to Brazil causes the Respondent irreparable harm, did his removal from Brazil in the first place not cause irreparable harm to the Petitioner? Indeed, at root, the harm Respondent alleges she would face from the denial of her Motion can be traced back to her own choice to remove the minor child from Brazil. As noted by the Fifth Circuit, "the harm faced by [the Respondent] if her stay application is denied is similar to what [the Petitioner] would encounter if it was granted." Hernandez v. Erazo, 2023 WL 3175471 *5 (5th Cir. 2023).

c.        **Injury to the Petitioner and the Child**

Here, issuance of a stay pending appeal in a Hague Convention proceeding would "substantially injure the other parties interested in the proceeding." Chafin, 568 U.S. at 179. First, it would result in the minor child losing precious time he could be spending in Brazil, readjusting to life there. See, e.g., Chafin, at 178; Mendoza v. Silva, 987 F. Supp.2d 883, 908-909 (N.D. Iowa 2013) ("the Convention and ICARA demonstrate a public interest in expeditious resolution of petitions for return of children, 'for the sake of the children who find themselves in such an unfortunate situation'"). Second, it would cause the Petitioner to miss even more of his son's life. The Petitioner has not seen the minor child in person for approximately three years. "Respondent fails to recognize that if the court grants a stay, Petitioner will continue to suffer the very harm that led to the instant petition—the absence of [the minor child] from Petitioner's life. That harm stems from Respondent's wrongful retention of [the minor child] in the United States for more than two years and continues to the present." Schwaneberg v. Lopez, 2024 WL 5168149, *4 (W. D. Va. 2024). "A removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted. Under the logic of the Convention, it is the *abduction* that causes the pangs of subsequent return." Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996).

The major purpose of the Hague Convention is to "secure prompt return of the child to the correct jurisdiction" and therefore stays pending appeal "should hardly be a matter of course." Friedrich, 78 F.3d at 1063 n.1 (6th Cir. 1996). See also Matter of E.Z., 2021 WL 5106637, *26 (S.D.N.Y. 2021) ("the Hague Convention requires the 'prompt' repatriation of the

6

A501

child to the country of habitual residence"); Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted* 51 Fed. Reg. 10,494 (Mar. 26, 1986), Article I ("[t]he objects of the present Convention are . . . to secure the prompt return of children wrongfully removed to or retained in any Contracting State"). Signatories to the Hague Convention are to use "the most expeditious procedures available" to implement the objects of the Convention. Hague Convention, *supra*, Article II. Thus, a stay pending appeal would violate the purposes of the Hague Convention and harm the Petitioner and the minor child, who have already been denied the opportunity to see each other in person for three years based on the Respondent's wrongful removal of the minor child from Brazil.

### d.    The Public Interest

Respondent's argument that denial of her motion for stay will lead to the minor child "having been wrongfully removed from the U.S." is unavailing and entirely contrary to the public's interest in this case. Motion, Page 6. As discussed above, the explicit purpose of the Hague Convention is to ensure that children are promptly returned to their country of habitual residence and thus the public interest "supports denial of the stay." Charalambous v. Charalambous, 744 F.Supp.2d 375, 378 (2010). See Neumann v. Neumann, 197 F.Supp.3d 977, 989 (E.D. Mich. 2016); Mendoza v. Silva, 987 F.Supp.2d 883, 909 (N.D. Iowa 2013). The public interest in Hague cases "is primarily defined by the treaty itself, the express purpose of which is 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State.'" Lukic v. Elezovic, 2021 WL 804384, *3 (E.D. N.Y., 2021). See Nicolson v. Pappalardo, 685 F.Supp.2d 142, 146 (D. Maine 2010) (entering stay pending appeal "would work against the purpose of the Convention and, therefore, against the public interest"); Wasniewski v. Grzelak-Johannsen, 2007 WL 2462643, *8 (N.D. Ohio 2007) (argument that stay pending appeal serves public interest "misconstrues the public's interest in the Hague Convention"); Hofmann v. Sender, 2012 WL 8466673, *1 (S.D.N.Y. 2012) ("three of the four factors would seem *almost always* to cut against the issuance of a stay in a Hague Convention case" including the public interest, which is "to secure the prompt return of children").

The Fifth Circuit also has expressly rejected a motion to stay pending appeal where the alleged public interest was—as the Respondent contends—in preventing a child from "being unnecessarily shuttled back and forth between two countries as a result of ongoing litigation."

Hernandez v. Erazo, 2023 WL 3175471, *5 (5th Cir. 2023). Thus, Respondent's request for a stay pending appeal entirely reverses the public interest and this factor weighs heavily against granting a stay pending appeal.

      2.      **Respondent's Asylum-Related Argument is Unavailing**

Respondent's Motion contends that she is entitled to a stay on the basis that the minor child's asylum application has not yet been adjudicated and cites to a case from the United Kingdom in support of this argument. Respondent cites no American case law in support of her argument that a pending asylum application is a factor to be considered in granting a stay pending appeal in a Hague case. Moreover, Respondent explicitly concedes that the law under which that UK case was decided, the European Union's Asylum Procedures Directive, is not the law here. For these reasons, Respondent's argument is unavailing.

There appear to be only two American cases discussing the principle of non-refoulement in the context of the Hague Convention. In the first, Jose Junior v. Ferreira de Sousa, 2023 WL 4228163 (N.D. Ohio 2023), a judge of the Northern District of Ohio found that despite the respondent's arguments, "the Court has the authority to order [the child's] return when [the] asylum application is still pending . . . [because] the district court 'has a separate and exclusive responsibility to assess the applicability of a [grave-risk] defense." Id. at *7, quoting Salame v. Tescari, 29 F.4[th] 763, 772-773 (6th Cir. 2022). That judge ordered the child in question to be returned to Brazil within thirty days and noted that the District Court's Hague analysis and the asylum application were different processes with different burdens of proof, that a judge considering a Hague case had a separate duty to assess the grave harm defense, and that—unlike an asylum application—a Hague case was an adversarial proceeding. Id. In the second case, Salame v. Tescari, *supra*, the dissent cited at length a Canadian court's decision about the principle of non-refoulement and the Hague Convention's grave risk defense. Salame, 29 F.4[th] at 774-778. However, most importantly, the majority in Salame determined that "a grant of asylum does not substitute for the district court's determination that [the Respondent] failed to establish an Article 13(b) affirmative defense based on grave risk of harm" and that the asylum process does not deprive "federal courts of authority to enforce the Hague Convention." Id. at 772-773. Thus, the Sixth Circuit upheld the District Court's order that the two minor children in that case be returned to Venezuela even though their asylum application had been granted. Id. at 773. Here, Respondent goes even further and asks that this Court stay its decision before the minor

child's derivative asylum application has even been decided. The speculation that the minor child's asylum application might be allowed cannot justify a stay.

Furthermore, the principle of non-refoulement does not obviate this Court's obligations to make its own assessment of the case before it. Whether or not the minor child is entitled to asylum is a separate question than the question presented in this case: whether Brazil or the United States is the country in which the minor child's custody is to be determined. See Sanchez v. R.G.L., 761 F.3d 495, 510 (2014) ("an asylum grant does not remove from the district court the authority to make controlling findings on the potential harm to the child"). Even if the minor child is granted asylum, "[t]he language of the INA indicates that the discretionary grant of asylum is binding on the Attorney General or Secretary of Homeland Security . . . [n]o authority has been offered to support the argument that the discretionary grant of asylum confers a right to remain in the country despite judicial orders" under the Hague Convention. Sanchez v. R.G.L., 761 F.3d 4945, 510 (5th Cir. 2014), citing Sale v. Haitian Centers Counsel, Inc., 509 U.S. 155, 173 (1993). Here, after three days of trial, the Court found that the Respondent had not met her burden to show that the minor child would be at grave risk of harm if he were ordered returned to Brazil. Findings, 27. There was no evidence presented that the Petitioner had ever behaved violently towards the minor child nor were Respondent's arguments based on Petitioner's mental health sufficient to create a grave risk of harm. Findings, 28. In short, Respondent's argument based on the pending asylum application is irrelevant to this Court's duties and findings under the Hague Convention.

Finally, as discussed in detail in Schwanenberg v. Lopez, a party applying for a stay pending appeal should present evidence to the court about how travel would affect an asylum application or why abandonment of an asylum claim "amounts to an irreparable harm—one that cannot be remedied by, for instance, reapplying for asylum at a later date or applying for a permanent immigration status based on non-asylum related factors." Id., 2024 WL 5168149, *3 (W. D. Va. 2024). Respondent's Motion states that the minor child would be "unlikely" to be able to re-enter the country if he were to be returned to Brazil but does not say why such an event would be unlikely. Nor does Respondent allege that the minor child could not reapply for asylum—if needed—in the future.

A504

### 3. Respondent's Motion Improperly Attempts to Relitigate the Merits of the Underlying Hague Action

Respondent's Motion improperly re-litigates the merits of the underlying Hague action and even attempts to introduce new factual allegations.

Respondent contends that the minor child "has been successful" in the United States. Motion, Page 5. This statement contradicts this Court's findings and indeed, the grounds for this statement are difficult to fathom where the minor child has missed significant amounts of school, has gotten into fights at school, struggles to learn, has only participated in extracurricular activities for three months of his two years in the United States, and has limited friendships and other relationships outside of his extended family.

Respondent also contends that the minor child "is old enough to have formed friendships and other strong social ties to the United States which would be disrupted by shuttling the Child back and forth, yet too young to be able to emotionally process such shuttling." Motion, Pages 4-5. There is no record evidence about the emotional consequences to the minor child of being returned to Brazil nor is there evidence that the minor child would be harmed emotionally by returning to Brazil. These bare assertions are also unsupported by any citation to case law or other evidence.

These factual allegations are not supported by the record and are not properly at issue in considering the Respondent's Motion. Harm to the child is also not a factor in considering whether to grant Respondent's Motion.

### Conclusion

In conclusion, the Respondent's Motion for Stay Pending Appeal does not meet the requisite standard for granting such a stay. Respondent has not made a "strong showing" that her appeal will be successful on the merits and has not shown that she will suffer irreparable harm in the absence of a stay. The minor child must be returned to Brazil forthwith. He has already been gone too long. Thus, the Petitioner respectfully requests that this Honorable Court DENY Respondent's Motion for Stay Pending Appeal.

Dated: March 24, 2025

Respectfully submitted,

EDERVALDO RODRIGUES DA SILVA
By his attorneys,

*/s/ Charles R. Hunsinger*
Elizabeth G. Crowley, BBO #663470
Charles R. Hunsinger, BBO #703519
BOWDITCH & DEWEY LLP
75 Federal Street #1000
Boston, MA 021110
Phone: (617) 757-6500
ecrowley@bowditch.com
chunsinger@bowditch.com

## CERTIFICATE OF SERVICE

I hereby certify that, on March 24, 2025, a copy of the foregoing document was

electronically filed through the CM/ECF system, which will send notification of such filing to all

counsel of record.

*/s/ Charles R. Hunsinger*
Charles R. Hunsinger

1

A506

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EDERVALDO RODRIGUES DA SILVA, | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 1:24-cv-11280-ADB |
| JESSICA SILVEIRA DA SILVA | ) |
| Defendant. | ) |

**JESSICA SILVEIRA DA SILVA'S MOTION FOR LEAVE TO FILE A**
**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR A STAY OF ORDER**

Pursuant to D. Mass. Local Rule 7.1(b)(3), Defendant Jessica Silveira da Silva ("Respondent") hereby respectfully moves this Court for leave to file a reply memorandum of 5 pages or fewer in further support of her Motion for a Stay of Order for Return of A.R. ("the Child") pending appeal. Respondent further respectfully request that she be allowed until **7 days after the granting of this Motion** to file such reply memorandum.

In support of this Motion, the Respondent states as follows:

1. On February 28, 2025, this Court filed the Finding of Facts and Conclusions of Law. ECF No. 41.

2. On March 11, 2025, Respondent filed a Motion for a Stay of Order For Return of Child Pending Appeal. ECF No. 44.

3. On March 24, 2025, Petitioner filed an Opposition to Respondent's Motion for Stay of Order Pending Appeal (the "Opposition"). ECF No. 46.

A507

4.     The Opposition contains erroneous statements of law that Respondent seeks to address via a short reply, including but not limited to the application of the doctrine of *non-refoulement* and the import of Respondent's likelihood of success on the merits of an appeal.

5.     Granting leave to file the requested reply memorandum comports with the interests of justice and would be of assistance to the Court in ruling on the Motion for a Stay.

6.     Moreover, allowance of this Motion does not prejudice Petitioner as such allowance does not pose any undue burden or unjust delay.

WHEREFORE, Respondent respectfully requests that this Court grant her leave to file a reply memorandum of 5 pages or fewer in further support of her Motion for a Stay of Order, to be filed within seven days after leave is granted.

Dated:  March 25, 2025                              Respectfully Submitted,

*/s/ Ruben J. Rodrigues*
Ruben J. Rodrigues (BBO 676,573)
Lea Gulotta James (BBO #705421)
Jamie A. Steven (BBO #705904)
Amani Kmeid (BBO #711302)
FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199-7610
Phone: (617) 342-4000
Fax: (617) 342-4001
rrodrigues@foley.com
ljames@foley.com
jsteven@foley.com
akmeid@foley.com

*Counsel for Jessica Silveira da Silva*

2

A508

## **<u>LOCAL RULE 7.1 CERTIFICATION</u>**

Pursuant to Local Rule 7.1(a)(2), the undersigned hereby certifies that counsel for the Respondent conferred with Plaintiff's counsel on March 25, 2025 regarding the issues raised in this motion, and the parties were unable to resolve or narrow the issues.

*/s/ Lea James*
Lea Gulotta James

A509

## CERTIFICATE OF SERVICE

I hereby certify that, on March 25, 2025, a copy of the foregoing document was electronically filed through the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Lea James
Lea Gulotta James

A510

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EDERVALDO RODRIGUES DA SILVA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 1:24-cv-11280-ADB |
| v. ) | |
| ) | |
| JESSICA SILVEIRA DA SILVA ) | |
| ) | |
| Defendant. ) | |
| ) | |

<u>**JESSICA SILVEIRA DA SILVA'S NOTICE OF APPEAL**</u>

Notice is given that Defendant/Respondent Jessica Silveira da Silva[1] hereby appeals to the

United States Court of Appeals for the First Circuit from the Findings of Fact and Conclusions of

Law entered in this matter on February 28, 2025 and the Judgment entered on March 13, 2025.

Dated:  March 31, 2025              Respectfully Submitted,

*/s/ Ruben J. Rodrigues*
Ruben J. Rodrigues (BBO #676573)
Lea Gulotta James (BBO #705421)
Jamie A. Steven (BBO #705904)
Amani Kmeid (BBO #711302)
FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199-7610
Phone: (617) 342-4000
Fax: (617) 342-4001
rrodrigues@foley.com
ljames@foley.com
jsteven@foley.com
akmeid@foley.com

*Counsel for Jessica Silveira da Silva*

---

[1] Defendant/Respondent Gilberto Lucas was dismissed from this matter during trial and therefore does not join in this appeal.

A511

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on March 31, 2025 a copy of the foregoing document was filed with the Court through the ECF system and that a copy will be electronically served on registered participants as identified on the Notice of Electronic Filing.

<div align="right">

/s/ *Lea James*
Lea Gulotta James

</div>

A512

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| EDERVALDO RODRIGUES DA SILVA, )<br><br>  Plaintiff, )<br><br>v. )<br><br>JESSICA SILVEIRA DA SILVA )<br><br>  Defendant. )<br>  ) | C.A. No. 1:24-cv-11280-ADB<br><br>**Leave to File Granted<br>on March 26, 2025** |

<u>**REPLY IN SUPPORT OF MOTION FOR A**</u>
<u>**STAY OF ORDER FOR RETURN OF CHILD PENDING APPEAL**</u>

Defendant/Respondent Jessica Silveira da Silva ("Respondent"), by and through her attorney, hereby submits this reply brief in support of her Motion for a Stay of Order for Return of Child Pending Appeal (ECF No. 44, the "Motion").

1.    **Irreparable Harm to Respondent and the Child is Certain in the Absence of a Stay.**

Petitioner attempts to downplay the harm Respondent will suffer if the Child is returned to Brazil, but entirely ignores the most fundamental harm—that Respondent's legal right to appeal will be effectively nullified. Requiring the Child to leave the United States while the appeal is pending presupposes that the appeal will fail; even in the event Respondent prevails, the Court will be powerless to enforce a return order. This entirely undermines Respondent's appeal rights and must not be allowed.

This circumstance was raised in *Bekier v. Bekier*, where the district court ordered that a minor child be returned to his habitual residence of Israel with his father. 248 F.3d 1051, 1054 (11th Cir. 2001). The mother appealed, but the appeals court dismissed the appeal, holding that it could not adjudicate the case because it was "powerless to grant the relief requested." *See id.* at 1055. Although jurisdictions differ on whether a child's return under the Hague Convention

formally moots a case so as to require dismissal, courts consistently recognize that this is the practical effect. *See, e.g.*, *Chafin v. Chafin*, 568 U.S. 165, 175-76 (2013) (acknowledging that a re-return order "may not result in the return of [the minor child] to the United States," and that "[e]nforcement of the order may be uncertain.").

The Court cannot overlook the harm to Respondent that would result if she were to endure the entire appeals process and emerge victorious, only for that effort to fail to secure the Child's return. .  This is precisely the scenario that denying a stay engenders: allowing for a pyrrhic victory that renders the appeals process meaningless.  The merits of the appeal should not be prejudged before Respondent has even had a chance to make her case, and for that reason she and the Child will be irreparably harmed in the absence of a stay.[1]  Further, despite his contentions about how much he cares for the Child, Petitioner blithely states that the Court should ignore the harm to the Child when considering the stay, and instead should only consider the harm that he will suffer himself.  But courts analyzing applications for stays of removal emphasize that they consider the harm that children inevitably suffer from shuttling them back and forth between parents and across international borders. *See* Motion at 4-5.  It is strikingly inconsistent that, in accusing Respondent of harming the Child, Petitioner simultaneously suggests that harm to the Child is irrelevant.

Petitioner also argues that Respondent will not be harmed by facing the choice of either returning to Brazil and abandoning her asylum petition or losing access to her child if she stays

---

[1] It is for this same reason that the public interest weighs in favor of issuing a stay.  The integrity of the appeals process is undermined for everyone where a court issues an order that it has no power to enforce. *See, e.g.*, *Rosie D. v. Baker*, 362 F. Supp. 3d 46, 57 (D. Mass. 2019) ("The principle that a <u>court</u> has the authority, and the responsibility, to enforce its own orders is so embedded in the law that it scarcely requires a citation.") (emphasis original). While it is true that the purpose of the Hague Convention is to secure the prompt return of children wrongfully removed from their country of habitual residence, that purpose must be balanced with other interests, including the public interest in maintaining confidence in the courts.  The public interest "lies in having the child returned . . . with the approval of [the appeals court], but not prior to its decision." *Karpenko v. Leendertz*, No. Civ. A. 09–03207, 2010 WL 996465, at *3 (E.D. Penn. Mar. 15, 2010)

A514

in the United States.  According to Petitioner, Respondent could simply obtain advance parole before returning to Brazil or could leave the country then later re-enter and reapply for asylum. It is absurd to suggest as a viable option that Respondent return to the country from which she claims a credible fear of persecution.  It is also absurd to suggest this approach would in any way be feasible under the present-day immigration landscape.  Indeed, the USCIS website states that "[a]dmission or parole into the United States is not guaranteed even if you have the appropriate documents."  *See, e.g.*, Travel Documents, USCIS, uscis.gov/green-card/green-card-processes-and-procedures/travel-documents.  Even if re-entry were feasible, returning to the country from which she is claiming persecution would undermine the merits of Respondent's asylum application, leading to a presumption that the application is abandoned.  *See, e.g.*, Services Available for Asylee and Refugee at 12, USCIS, https://www.uscis.gov/sites/default/files/document/guides/Asylees_Refugees.pdf.

## 2.    The Supposed Harm to Petitioner Does Not Outweigh the Harm to Respondent.

Petitioner attempts to downplay the harm Respondent will suffer if the Child is returned to Brazil, arguing that the harm he will experience is greater.  The basis for this argument is conclusory at best—that the Hague Convention has a goal of securing the prompt return of a child, and therefore anything else must necessarily harm the left-behind parent, requiring denial of a stay.  This ignores that considering a stay requires that the Convention's goal of securing the prompt return of a child be balanced against other relevant factors, including harm to the movant.

In support of this argument, Petitioner relies heavily on a nearly thirty-year-old case from the Sixth Circuit that has been largely rejected.  *See generally Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996).  This case runs afoul not only of the controlling case law from this

A515

jurisdiction, but it also undermines the entire concept of the well-settled defense[3], and it should not be given any credence.  Case law from the First Circuit is clear that motions to stay pending appeal may be granted in Hague Convention matters where the balancing test is satisfied.  *See, e.g.*, *Danaipour v. McLarey*, 286 F. 3d 1, 11 (1st Cir. 2002); *Yaman v. Yaman*, 730 F. 3d 1 (1st Cir. 2013); *see also Didon v. Castillo*, 838 F.3d 313, 319 n.12 (3d Cir. 2016).

3.    **Petitioner Misconstrues the Principles of *Non-Refoulement*.**

In response to the argument that the principles of *non-refoulement* prohibit the return of the Child while his asylum application is pending, Petitioner points to two cases from the Sixth Circuit, neither of which is controlling either in law or on the facts.  *See Jose Junior v. Ferreira da Sousa*, 2023 WL 4228163 (N.D. Ohio June 27, 2023); *Salame v. Tescari*, 29 F.4th 763 (6th Cir. 2022).  In both cases, the merits of the asylum petition at issue were put forth as support for the contention that there would be a grave risk of harm in returning the child.  *See Jose Junior*, 2023 WL 4228163 at *6-7; *Salame*, 29 F.4th at 771.  The courts pointed to the higher evidentiary burden in a Hague Convention case to hold that the finding of lack of a grave risk of harm was sufficient to undermine the validity of the asylum application.  *See Jose Junior*, 2023 WL 4228163 at *6-7; *Salame*, 29 F.4th at 771.  Here, the merits of the asylum application have not been put at issue, and the court did not find that the grounds for the Child's asylum application were the same as those that formed the basis for the grave risk of harm argument at trial.

More fundamentally, these two cases from the Sixth Circuit are not binding precent on this Court and indicate that this area of law is far from settled in the United States.  In the absence of such precedent, the Court should consider the guidance of other nations that are also

---

[3] *Friedrich* says that a removing parent must not be allowed to remove a child and then argue that the child has now become accustomed to their new surroundings.  *See id.* at 1068.  But this is precisely what the well-settled defense allows where, as here, the other parent failed to timely seek the return of the child.  Following this line of logic would obviate the entire well-settled defense, which is explicitly allowed in the text of the Convention.

signatories to both the Hague Convention and the international treaties that form the basis for the principle of *non-refoulement*. As Petitioner points out, where these "sister signatories" have considered the issue, they have unequivocally found that requiring the return of a child where there is a pending asylum application runs afoul of the principles of *non-refoulement*. *See* G v. G, [2021] UKSC 9; *Salame*, 29 F.4th at 773-779 (Moore, J., dissenting) (analyzing A.M.R.I. v. K.E.R. [2011] ONCA 417 (Can. Ont. C.A.))

4.    **The Appeal Has a Substantial Likelihood of Success on the Merits, Which Is Only One Factor in a Balancing Test.**

Petitioner posits that Respondent's motion for a stay must fail unless Respondent demonstrates that the District Court's findings are not plausible in light of the record. Even accepting this proposition as true for the sake of argument, Petitioner fundamentally mischaracterizes the application of the four-factor test at play in deciding whether to issue a stay. Indeed, the four prongs are "factors to be balanced and not prerequisites to be met." *See State of Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). It is for this reason that in order to "justify the granting of a stay, a movant need not always establish a high probability of success on the merits." *See Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). Because the factors are properly applied as a balancing test, "[t]he probability of success that must be shown is inversely proportional to the degree of irreparable injury the [movant] will suffer absent an injunction." *See Alabama Assoc'n of Realtors v. U.S. Dep't of Health and Human Servs.*, 539 F. Supp. 3d 211, 217 (D.D.C. 2021) (citing *Cuomo*, 772 F.2d at 974). Where, as here, there is a strong showing of irreparable harm to the Respondent, a stay must be granted even with a lower probability of success on the merits of the appeal. *See, e.g.*, *Karpenko*, 2010 WL 996465, at *1.

A517

JESSICA SILVEIRA DA SILVA

By her attorneys,

*/s/ Ruben J. Rodrigues*
Ruben J. Rodrigues (BBO #676573)
Lea Gulotta James (BBO #705421)
Amani Kmeid (BBO #711302)
FOLEY & LARDNER LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199-7610
Phone: (617) 342-4000
Fax: (617) 342-4001
rrodrigues@foley.com
ljames@foley.com
akmeid@foley.com

A518

## **CERTIFICATE OF SERVICE**

I hereby certify that, on April 2, 2025, a copy of the foregoing document was electronically filed through the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Lea James*
Lea Gulotta James

A519

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### United States District Court

### District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 4/18/2025 at 1:49 PM EDT and filed on 4/18/2025

| | |
|---|---|
| **Case Name:** | Rodrigues Da Silva v. Silveira Da Silva et al |
| **Case Number:** | 1:24-cv-11280-ADB |
| **Filer:** | |

**WARNING: CASE CLOSED on 03/13/2025**

**Document Number:** 53(No document attached)

**Docket Text:**

Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Presently before the Court is Jéssica Silveira da Silva's ("Respondent") Motion for Stay of Order for Return of the Child Pending Appeal. [ECF No. 44]]. In evaluating a motion to stay return, the Court must assess "(1) whether the stay applicant has made a strong showing that [she] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Chafin v. Chafin, 568 U.S. 165, 179 (2013) (quoting Nken v. Holder, 556 U.S. 418, 434 (2009)). The Supreme Court has cautioned against granting stays "as a matter of course," as "routine stays... would conflict with the Convention's mandate of prompt return to a child's country of habitual residence." Id. at 178. For the reasons set forth below, the motion is DENIED.

In relation to the first factor, Respondent argues that she is likely to succeed on appeal because the Court improperly considered certain factors in determining that A.R. is not well-settled in the United States. [ECF No. 44] at 7–9]. The Court, however, carefully considered the parties' evidence and engaged in a thorough analysis of the pertinent facts. See [ECF No. 41] at 20–26]. Not one factor was dispositive in the Court's ultimate conclusion, and instead, as it was required to, weighed the relevant factors, in light of the evidence presented, under a totality of the circumstances analysis. [Id.]. As to the second factor—irreparable injury to the Respondent—the Court cannot agree with Respondent's reasoning that A.R.'s return to Brazil presupposes that her appeal will fail or that any relief would be automatically rendered ineffective. [ECF No. 44] at 5–6]; [ECF No. 50] at 1]; see Chafin, 568 U.S. at 171–76 (concluding that a district court's return order and subsequent removal of a child outside of the United States does not render an appeal of that order moot); id. at 175 ("No law of physics [would] prevent[] [A.R.'s] return from [Brazil]," and Petitioner "might... decide to comply with an order against [him] and return [A.R.] to the United States."); Lukic v. Elezovic, No. 20-cv-3110, 2021 WL 804384, at \*3 (E.D.N.Y. Mar. 3, 2021) ("While respondent claims that effectuating a re-return order after a favorable appeal would be nearly impossible, she provides no evidence for this assertion." (internal quotation and citation omitted)). Nor is the Court persuaded that Respondent's apprehension about the status of her asylum application in the United States should she temporarily leave the country offers a sufficient basis for the Court to find irreparable harm, and Respondent offers no authority that it is. [ECF No. 44] at 5–6]; [ECF No. 50] at 1–3]. The second factor thus disfavors Respondent. The third factor, the balance of harms, similarly weighs against Respondent. A stay pending appeal would substantially injure Edervaldo Rodrigues da Silva ("Petitioner"), who has not seen A.R. in person for nearly three years. A.R. "would [similarly] lose precious months [he] could have [spent] readjusting to life" in Brazil. Chafin, 568 U.S. at 178. The Court acknowledges that A.R. will be returned while his asylum application is still pending, with possible implications to the international law principle of non-refoulement. Nonetheless, the Court, even understanding that the interplay between that principle and the Hague Convention has not yet been resolved, is not persuaded that this sufficiently tips the scale. Cf., Salame v. Tescari, 29 F.4th 763, 772–73 (6th Cir. 2022) ("[T]he district court has the authority to order the return of wrongfully removed children, regardless of whether the children were previously granted asylum."). The fourth factor, which considers the public interest, favors denial of the motion. Mendoza v. Silva, 987 F. Supp. 2d 883, 909 (N.D. Iowa 2013) ("[T]he Convention and [International Child Abduction Remedies Act] demonstrate a public interest in expeditious resolution of petitions for return of children, 'for the sake of the children who find themselves in such an unfortunate situation.'" (quoting Chafin, 568 U.S. at 179)). In balancing the stay factors, therefore, the Court finds that they favor denial of Respondent's motion.

That said, the Court is nonetheless mindful of A.R.'s best interests and would like to see his return conducted in a manner that is minimally disruptive to his life. Thus, in order to facilitate A.R.'s transition to Brazil, the Court hereby stays the Order of Return until July 1, 2025, which will allow him to finish the school year here.

(CAM)

A520

**1:24-cv-11280-ADB Notice has been electronically mailed to:**

James W. Matthews    jmatthews@foley.com, jrossi@sherin.com

Elizabeth G. Crowley    ecrowley@bowditch.com

Ruben J. Rodrigues    rrodrigues@foley.com, bgorman@foley.com, lshine@foley.com, ruben-rodrigues-0761@ecf.pacerpro.com

John W. Custer    jcuster@wolfgreenfield.com, john-custer-0502@ecf.pacerpro.com

Lea Gulotta James    ljames@foley.com

Amani Kmeid    akmeid@foley.com

Jamie Steven    jsteven@foley.com

**1:24-cv-11280-ADB Notice will not be electronically mailed to:**

Charles R. Hunsinger
Bowditch & Dewey
Massachusetts
101 Federal Street
Suite 1405
Boston, MA 02110

RX-6



An official website of the United States government
Here's how you know ⌄

EOIR | Automated Case Information

---

**Court Closures Today**  October 7, 2024

Please check https://www.justice.gov/eoir-operational-status for up to date closures.

[Home](#)  >  **SILVEIRA DA SILVA, JESSICA (240-603-427)**



# Automated Case Information

## Name: SILVEIRA DA SILVA, JESSICA │ A-Number: 240-603-427 │ Docket Date: 4/21/2022

📅 **Next Hearing Information**

Your upcoming **MASTER** hearing is **IN PERSON** on **November 3, 2025** at **8:30 AM**

**JUDGE**
Visiting Judge 3

**COURT ADDRESS**
JFK BLDG, 15 NEW SUDBURY, #320
BOSTON, MA 02203

RX-6.0001
DASILVA0000271



A522

 **Decision and Motion Information**



*This case is pending.*

 **BIA Case Information**

No appeal was received for this case.

 **Court Contact Information**

If you require further information regarding your case, or wish to file additional documents, please contact the immigration court.

**COURT ADDRESS**

JFK FEDERAL BLDG., ROOM 320
BOSTON, MA 02203

**PHONE NUMBER**

(617) 565-3080

Archive

Accessibility

Information Quality

Privacy Policy

A523

RX-6

Legal Policies & Disclaimers

Social Media

Budget & Performance

Office of the Inspector General

No FEAR Act

For Employees

EOIR Freedom of Information Act (FOIA)

USA.gov

Contact EOIR

EOIR Home

Justice.gov

Immigration Court Online Resource

Contact Technical Support

---

Department of Justice | Executive Office for Immigration Review

*5107 Leesburg Pike, Suite 2600, Falls Church, VA 22041*

 **EOIR**   Automated Case Information

RX-6.0003
DASILVA0000273

A524

RX-6

An official website of the United States government
Here's how you know



**EOIR** | Automated Case Information

---

**Court Closures Today**  October 7, 2024

Please check https://www.justice.gov/eoir-operational-status for up to date closures.

Home  >  **RODRIGUEZ SILVEIRA DA SILVA, ARTHUR (240-485-147)**



# Automated Case Information

## Name: RODRIGUEZ SILVEIRA DA SILVA, ▮▮▮▮▮ | A–Number: 240–485–147 | Docket Date: 4/21/2022



### Next Hearing Information

Your upcoming **MASTER** hearing is **IN PERSON** on **November 3, 2025** at **8:30 AM**

**JUDGE**

Visiting Judge 3

**COURT ADDRESS**

JFK BLDG, 15 NEW SUDBURY, #320

BOSTON, MA 02203

RX-6.0004
DASILVA0000274

A525

RX-6

 **Decision and Motion Information**



*This case is pending.*

 **BIA Case Information**

No appeal was received for this case.

 **Court Contact Information**

If you require further information regarding your case, or wish to file additional documents, please contact the immigration court.

**COURT ADDRESS**

JFK FEDERAL BLDG., ROOM 320

BOSTON, MA 02203

**PHONE NUMBER**

(617) 565-3080

Archive

Accessibility

Information Quality

Privacy Policy

RX-6.0005

DASILVA0000275

A526

RX-6

Legal Policies & Disclaimers

Social Media

Budget & Performance

Office of the Inspector General

No FEAR Act

For Employees

EOIR Freedom of Information Act (FOIA)

USA.gov

Contact EOIR

EOIR Home

Justice.gov

Immigration Court Online Resource

Contact Technical Support

---

Department of Justice | Executive Office for Immigration Review

*5107 Leesburg Pike, Suite 2600, Falls Church, VA 22041*

 EOIR    Automated Case Information

RX-6.0006
DASILVA0000276

A527


Um site oficial do governo dos Estados Unidos
Veja como você sabe


EOIR | Informações automatizadas do caso

[pequeno] | DEPARTAMENTO DE JUSTIÇA Escritório Executivo para Imigração Revisão QUI PRO DOMINA JUSTITIA SEQUITUR

**Encerramento do tribunal hoje**, 7 de outubro de 2024

Consulte https://www.justice.gov/eoir-operational-status para obter informações
atualizadas sobre fechamentos.

Página inicial > **SILVEIRA DA SILVA, JESSICA (240-603-427)**



# Informações automatizadas do caso

**Nome SILVEIRA DA SILVA, JESSICA | Número A: 240-603-427 | Data do
processo: 21/4/2022**

---

📅 **Informações sobre a próxima audiência**

Sua próxima audiência **MESTRE** será **EM PESSOA** em **novembro de 2025 às
8h30**

**JUIZ**
Juiz visitante 3

**ENDEREÇO DO TRIBUNAL**
JFK BLDG, 15 NEW SUDBURY, #320
Boston, MA 02203

---

DASILVA0000308

A528

 **Informações sobre decisão e moção**



*Este caso está pendente.*

 **Informações do caso BIA**

Nenhum recurso foi recebido para este caso.

 **Informações de contato do tribunal**

Se você precisar de mais informações sobre o seu caso ou quiser arquivar documentos adicionais, entre em contato com o tribunal de imigração.

**ENDEREÇO DO TRIBUNAL**
JFK FEDERAL BLDG., ROOM 320
Boston, MA 02203

**NÚMERO DE TELEFONE**
(617) 565-3080

Arquivamento

Acessibilidade

Qualidade da informação

Política de privacidade

Políticas legais e isenções de responsabilidade

Mídia social

Orçamento e desempenho

Escritório do Inspetor Geral

DASILVA0000309

A529

Lei Sem MEDO

Para funcionários

Lei de Liberdade de Informação EOIR (FOIA)

USA.gov

Entre em contato com o EOIR

Página inicial do EOIR

Justice.gov

Recurso on-line do Tribunal de Imigração

Entre em contato com o suporte técnico

---

Department of Justice | Executive Office for Immigration Review
*5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041*

 EOIR | Informações automatizadas do caso

[selagem.] DEPARTAMENTO DE JUSTIÇA Escritório Executivo para Imigração Revisão QUI PRO DOMINA JUSTITIA SEQUITUR

DASILVA0000310

A530

RX-6


 EOIR | Informações automatizadas do caso

[miniagem ] DEPARTAMENTO DE JUSTIÇA Escritório Executivo para imigração Revisão QUI PRO DOMINA JUSTITIA SEQUITUR

**Encerramento do tribunal hoje**, 7 de outubro de 2024

Consulte https://www.justice.gov/eoir-operational-status para obter informações
atualizadas sobre fechamentos.

Página inicial > **RODRIGUEZ SILVEIRA DA SILVA, ARTHUR (240-485-147)**



# Informações automatizadas do caso

**Nome RODRIGUEZ SILVEIRA DA SILVA, ARTHUR | Número A: 240-485-147 | Data do processo: 21/4/2022**

---

📅 **Informações sobre a próxima audiência**

Sua próxima audiência **MESTRE** será **EM PESSOA** em **novembro de 2025 às 8h30**

**JUIZ**
Juiz visitante 3

**ENDEREÇO DO TRIBUNAL**
JFK BLDG, 15 NEW SUDBURY, #320
Boston, MA 02203

---

DASILVA0000311

A531

 **Informações sobre decisão e moção**



*Este caso está pendente.*

 **Informações do caso BIA**

Nenhum recurso foi recebido para este caso.

 **Informações de contato do tribunal**

Se você precisar de mais informações sobre o seu caso ou quiser arquivar documentos adicionais, entre em contato com o tribunal de imigração.

**ENDEREÇO DO TRIBUNAL**
JFK FEDERAL BLDG., ROOM 320
Boston, MA 02203

**NÚMERO DE TELEFONE**
(617) 565-3080

Arquivamento

Acessibilidade

Qualidade da informação

Política de privacidade

Políticas legais e isenções de responsabilidade

Mídia social

Orçamento e desempenho

Escritório do Inspetor Geral

Lei Sem MEDO

Para funcionários

Lei de Liberdade de Informação EOIR (FOIA)

DASILVA0000312

A532

USA.gov

Entre em contato com o EOIR

Página inicial do EOIR

Justice.gov

Recurso on-line do Tribunal de Imigração

Entre em contato com o suporte técnico

---

Department of Justice | Executive Office for Immigration Review

*5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041*



EOIR | Informações automatizadas do caso

[imagem:] DEPARTAMENTO DE JUSTIÇA Escritório Executivo para Imigração Revisão QUI PRO DOMINA JUSTITIA SEQUITUR

DASILVA0000313

A533



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**DASILVA0000271-73- J Silveira da Silva - Master Cal Hearing Notice**" is, to the best of my knowledge and belief, a true and accurate translation from English into Portuguese (BR).

Jacqueline Yorke

Sworn to before me this
October 11, 2024

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.400.8840 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

A534



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**DASILVA0000276-76 - A Rodrigues da Silva - Master Cal Hearing Notice**" is, to the best of my knowledge and belief, a true and accurate translation from English into Portuguese (BR).

_____
Jacqueline Yorke

Sworn to before me this
October 11, 2024

_____
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____
Stamp, Notary Public

A535



## TRADUÇÃO DE ARTIGOS DO CÓDIGO CIVIL BRASILEIRO
*Translation of articles of the Brazilian Civil Code*

| Português | English |
|---|---|
| Art. 1.583. A guarda será unilateral ou compartilhada. | Art. 1.583. Custody rights may be unilateral or shared. |
| § 1o Compreende-se por guarda unilateral a atribuída a um só dos genitores ou a alguém que o substitua (art. 1.584, § 5o) e, por guarda compartilhada a responsabilização conjunta e o exercício de direitos e deveres do pai e da mãe que não vivam sob o mesmo teto, concernentes ao poder familiar dos filhos comuns. | ¶ 1 Custody rights is unilateral when it is granted to only one of the parents or to a person who substitutes him or her (art. 1584, 5º); shared custody rights means that the mother and father have joint responsibility for family authority over their common children and exercise the rights and duties of mother and father, although they do not live under the same roof. |
| § 2o Na guarda compartilhada, o tempo de convívio com os filhos deve ser dividido de forma equilibrada com a mãe e com o pai, sempre tendo em vista as condições fáticas e os interesses dos filhos. | ¶ 2 In shared custody, the parents must divide between them the time spent with their children in a balanced way, always considering the factual conditions and the children's interests. |
| § 3º Na guarda compartilhada, a cidade considerada base de moradia dos filhos será aquela que melhor atender aos interesses dos filhos. | ¶ 3 In shared custody, the city to be considered the residence of the children must be the one which better serve the children's interests. |
| § 4o (VETADO). | ¶ 4 (VETOED). |
| Art. 1.584. A guarda, unilateral ou compartilhada, poderá ser: | Art. 1.584. Custody rights, either unilateral or shared, may be: |
| I – requerida, por consenso, pelo pai e pela mãe, ou por qualquer deles, em ação autônoma de separação, de divórcio, de dissolução de união estável ou em medida cautelar; | I – requested, by consensus, by the father and mother, or by either of them, in an independent action for separation, divorce, dissolution of stable union or in an application for precautionary relief; |
| II – decretada pelo juiz, em atenção a necessidades específicas do filho, ou em razão da distribuição de tempo necessário ao convívio deste com o pai e com a mãe. | II – decreed by the judge, in function of the specific needs of the child, or by reason of the allocation of time necessary for the child to share life with his or her father and mother. |
| § 1o Na audiência de conciliação, o juiz | |

A536

informará ao pai e à mãe o significado da guarda compartilhada, a sua importância, a similitude de deveres e direitos atribuídos aos genitores e as sanções pelo descumprimento de suas cláusulas.

§ 2o Quando não houver acordo entre a mãe e o pai quanto à guarda do filho, encontrando-se ambos os genitores aptos a exercer o poder familiar, será aplicada a guarda compartilhada, salvo se um dos genitores declarar ao magistrado que não deseja a guarda do menor.

§ 3o Para estabelecer as atribuições do pai e da mãe e os períodos de convivência sob guarda compartilhada, o juiz, de ofício ou a requerimento do Ministério Público, poderá basear-se em orientação técnico-profissional ou de equipe interdisciplinar, que deverá visar à divisão equilibrada do tempo com o pai e com a mãe.

§ 4o A alteração não autorizada ou o descumprimento imotivado de cláusula de guarda unilateral ou compartilhada, poderá implicar a redução de prerrogativas atribuídas ao seu detentor.

§ 5o Se o juiz verificar que o filho não deve permanecer sob a guarda do pai ou da mãe, deferirá a guarda a pessoa que revele compatibilidade com a natureza da medida, considerados, de preferência, o grau de parentesco e as relações de afinidade e afetividade.

§ 6o Qualquer estabelecimento público ou privado é obrigado a prestar informações a qualquer dos genitores sobre os filhos destes, sob pena de multa de R$ 200,00 (duzentos reais) a R$ 500,00 (quinhentos reais) por dia pelo não atendimento da solicitação.

Art. 1.634. Compete a ambos os pais, qualquer que seja a sua situação conjugal, o pleno exercício do poder familiar, que consiste em, quanto aos filhos:

I – dirigir-lhes a criação e a educação;

II – exercer a guarda unilateral ou compartilhada nos termos do art. 1.584

III – conceder-lhes ou negar-lhes consentimento para casarem;

IV – conceder-lhes ou negar-lhes consentimento para viajarem ao exterior;

¶ 1 At the conciliation hearing, the judge shall inform the father and mother of the meaning of shared custody, its importance, the similarity of the duties and rights attributed to the parents and the sanctions for failure to comply with the terms of custody rights.

¶ 2 When there is no agreement between the mother and father about the custody rights of their child, and if both parents are able to exercise family authority, shared custody rights shall be applied, unless one of the parents demands to the judge not to have the children's custody.

¶ 3 For the purposes of establishing the attributions of the father and mother and the periods in which each shall have the company of the child in shared custody, the judge, *ex officio* or at the request of the Prosecutor's Office, may base his decision on the advice of a specialist of an interdisciplinary team, which must aim to establish a balanced division between mother and father.

¶ 4 Any unauthorized change to, or unjustified failure to comply with, the terms of custody, either unilateral or shared, may result in the reduction of the prerogatives attributed to the holder of custody.

¶ 5 If the judge determines that the child should not remain in the custody of either the mother or the father, he shall grant custody to a person who is shown to be suitable for such a measure, given its nature, preferably taking into account the degree of kinship and the bonds of affinity and affection between the person and the child.

¶ 6 Any public or private organization must provide information to any of the parents about their children, or it shall be fined R$ 200,00 (two hundred reais) to R$ 500,00 (five hundred reais) for each day of refusal.

Art. 1.634. Regardless of their relation with each other, both parents have the responsibility of exercise full family authority over their children, which consists in:

I – to direct their upbringing and education;

II – to exercise unilateral or shared custody, as defined in art. 1.584.

III – to grant or to deny them consent to marry;

IV – to grant or to deny them consent to travel abroad;

AUTORIDADE CENTRAL ADMINISTRATIVA FEDERAL
TRADUÇÃO DE ARTIGOS DO CÓDIGO CIVIL BRASILEIRO

The Brazilian Central Authority
Translation of articles of the Brazilian Civil Code

A537

V – conceder-lhes ou negar-lhes consentimento para mudarem sua residência permanente para outro Município;

VI – nomear-lhes tutor por testamento ou documento autêntico, se o outro dos pais não lhe sobreviver, ou o sobrevivo não puder exercer o poder familiar;

VII – representá-los judicial e extrajudicialmente até os 16 (dezesseis) anos, nos atos da vida civil, e assisti-los, após essa idade, nos atos em que forem partes, suprindo-lhes o consentimento

VIII - reclamá-los de quem ilegalmente os detenha;

IX - exigir que lhes prestem obediência, respeito e os serviços próprios de sua idade e condição.

Art. 1.635. Extingue-se o poder familiar:

I – pela morte dos pais ou do filho;

II – pela emancipação, nos termos do art. 5º,

paragrafo único;

III – pela maioridade;

IV – pela adoção;

V – por decisão judicial, na forma do art. 1.638.

V – to grant or to deny them consent to change their residence to a different municipality;

VI – appoint a tutor for them by testament or authentic document, if the other parent does not survive, or if the survivor cannot exercise family authority;

VII – to represent them in the acts of civil life, whether legally or extra-legally, until they attain sixteen years of age and, thereafter, to assist them in the acts to which they are party, by supplying consent

VIII – reclaim them from those who illegally detain them;

IX – require that they give obedience, respect and the services appropriate to their age and condition.

Art. 1.635. Family authority is terminated by:

I – the death of the parents or the child;

II – emancipation, within the terms of art. 5,

sole paragraph;

III – attainment of the age of majority;

IV – adoption;

V – legal decision, as provided in art. 1638.

AUTORIDADE CENTRAL ADMINISTRATIVA FEDERAL
TRADUÇÃO DE ARTIGOS DO CÓDIGO CIVIL BRASILEIRO

The Brazilian Central Authority
Translation of articles of the Brazilian Civil Code

A538

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2025, I electronically filed the foregoing

Joint Appendix Volumes 1 with the United States Court of Appeals for the First

Circuit by using the CM/ECF system, which will send notifications of such filing

to all CM/ECF counsel of record.


/s/ Beth I.Z. Boland
Beth I.Z. Boland